UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

COURTNEY BURTON,

                                              Petitioner,

v.                                                             9:21-cv-0736
                                                             (DNH/TWD)

WOLCOTT, Superintendent

                                            Respondent.

_____

APPEARANCES:                             OF COUNSEL:

COURTNEY BURTON
*Petitioner, pro se*
17-B-3514
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. LETITIA JAMES                      MARGARET A. CIEPRISZ, ESQ.
New York State Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.    INTRODUCTION

      Petitioner Courtney Burton ("Petitioner"), an inmate in the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS"), seeks federal habeas

corpus relief pursuant to 28 U.S.C. § 2254. Dkt. No. 1. Respondent filed a response and the

relevant state court records.  Dkt. Nos. 13-15.  For the reasons set forth below, the Court

recommends the petition be denied and dismissed.

## II.    RELEVANT BACKGROUND

### A.  Indictment

In an indictment dated April 13, 2017, an Onondaga County Grand Jury charged

Petitioner with: three counts of attempted murder in the second degree, in violation of N.Y.

PENAL LAW ("P.L.") § 110/125.25(1); two counts of assault in the first degree, in violation of

P.L. § 120.10(1); attempted assault in the first degree, in violation of P.L. § 110/120.10(1); and

criminal possession of a weapon in the second degree, in violation of P.L. § 265.03(3).  Dkt. No.

15-1 at 192-93.[1]  The Grand Jury found, on or about March 11, 2017, Petitioner: (1) "attempted

to intentionally cause the death of Freddie Haygood . . . by firing a loaded handgun at close

range multiple times and striking the victim in the chest and arm;" (2) "attempted to intentionally

cause the death of Antwan Turner . . . by firing a loaded handgun at close range multiple times

and striking the victim in the arm;" (3) "attempted to intentionally cause the death of Laquana

Roberts . . . by firing a loaded handgun at close range multiple times and striking the victim in

the torso;" (4) "intentionally caused serious physical injury to Freddie Haywood, by means of a

deadly weapon, . . . by firing a loaded handgun at close range multiple times and striking the

victim in the chest and arm;" (5) "intentionally caused serious physical injury to Antwan Turner,

by means of a deadly weapon, . . . by firing a loaded handgun at close range multiple times and

striking the victim in the arm;" (6) "attempted to intentionally cause serious physical injury to

---

[1] Citations to the parties' submissions will refer to the pagination generated by CM/ECF, the Court's electronic filing system.  Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Laquana Roberts, by means of a deadly weapon, . . . by firing a loaded handgun at close range

multiple times and striking the victim in the torso;" and (7) "possessed a loaded firearm at a

place other than his home or place of business, to wit: a loaded semiautomatic pistol." *Id*.[2]

### B. Pre-Trial Proceedings

#### 1. Suppression Hearing

On July 20, 2017, Onondaga County Supreme Court (hereinafter, "Onondaga County

Court" or "County Court") conducted a suppression hearing. *See generally*, Dkt. No. 15-6 at 10-

115.  Petitioner was represented at the hearing by counsel, Elise M. Voutsinas, Esq.

As relevant here, Syracuse Police Department Detective Thomas Hahn, assigned to the

Criminal Investigations Division ("CID"), reviewed video footage obtained from the "Lucky 7

Liquor store" and "Money Mansion" after hours establishment in connection with a shooting

incident. *Id*. at 17-18.  Using the footage, the Intel Unit disseminated an "Attempt-to-ID

bulletin" depicting the shooter and driver of a suspect vehicle.  *Id*. at 19.  The shooter was

identified as "Courtney Burton" by both Syracuse Police Officer Abraham and Petitioner's

parole officer, Brian Maher.  *Id*. at 19-20.  On cross-examination, Hahn clarified the parole

officer identified Petitioner as the individual depicted in the video footage *after* he told Maher

Hahn believed the suspect was Petitioner.  *Id*. at 36.

Syracuse Police Department Detective Mamoun Abraham testified he received the

attempt to identify bulletin via e-mail.  *Id*. at 79-80.  Abraham believed one of the two

individuals depicted on the still framed photograph was Petitioner, therefore, he contacted

Sergeant Ryan and requested to review the video footage.  *Id*. at 80-81.  He later reviewed the

---

[2] The Grand Jury also charged Tyron Miles with hindering prosecution in the second degree, in violation of P.L. § 205.60, finding Miles "rendered criminal assistance to [Petitioner] who had committed Class B or C felonies."  Dkt. No. 15-1 at 193.

footage at the CID office and confirmed Petitioner was, in fact, the man depicted in the still framed photograph. *Id*. at 81-82. He explained he was familiar with Petitioner due to prior interactions, including a search warrant incident, which occurred approximately one year prior, and a traffic stop, which had occurred approximately one week prior to Abraham's receipt of the bulletin. *Id*. at 83-84. Abraham identified Petitioner at the hearing. *Id*. at 84.

Syracuse Police Department Detective Matthew Arduini was instructed to interview an individual in holding at the CID, who he later learned to be Petitioner, in connection with the investigation. *Id*. at 89-91. Over the course of his interview, Arduini stepped out of the room on multiple occasions, but video recording of the room containing Petitioner continued. *Id*. at 94-96. Petitioner engaged in a number of phone conversations, potentially with multiple individuals. *Id*. at 96-98.

During one conversation, Petitioner asked an individual whether they had worked on Friday, and "[i]n response to that person's answer Mr. Burton said that, 'I'm going to tell them I was with you then.'" *Id*. at 96. He also "mentioned the fact that the police had shown him a photograph of Tyron Miles . . . . And when he said that, he said, 'They showed me a picture of Ty and me,' and quickly changed it to 'Other people' when he realized he said 'Me.'" *Id*. at 96-97. In another phone call, Petitioner "mentioned a hat with an 'A' on it and a gray-hooded sweatshirt. He instructed that person to not let them see it, referring to the police, and asked them to put it on and put an article of clothing over it and get it out of there." *Id*. at 97. At "[a]nother point, he begged a female . . . to please get that sweatshirt." *Id*. Arduini testified he discussed gunshot residue with Petitioner during the interview, and when he left the room after that exchange, Petitioner told the recipient of his call "to F everything else and get that sweatshirt and throw it in the wash and put -- he said hoodie -- and put bleach on it." *Id*.

Following the hearing, Petitioner's attorney submitted a memorandum to the Court arguing various statements, identifications, and other evidence should be suppressed. *See* Dkt. No. 15-1 at 361-63. Petitioner asserted the People failed to demonstrate probable cause for his arrest, therefore, all evidence obtained as a result thereof must be suppressed. *Id*. at 361-62. Further, Petitioner argued the photograph identification procedures used were unduly suggestive, and identifications made by various witnesses, including parole officer Maher, should not be allowed at trial. *Id*. at 363.

### 2.   Change of Counsel

At a hearing on August 31, 2017, Onondaga County Court acknowledged an issue regarding Petitioner's representation and agreed to discuss the matter with Petitioner the following week. Dkt. No. 15-6 at 120-21. Petitioner announced he wished to represent himself, and the Court stated he could return to the subject at his next appearance. *Id*. at 121.

On September 8, 2017, the Court advised Petitioner it would be willing to arrange a meeting with a different attorney for Petitioner to determine whether he would prefer to proceed with newly assigned counsel or, if Petitioner was not satisfied with the meeting, the Court would conduct a colloquy to determine whether Petitioner could represent himself. *Id*. at 126-27. Petitioner stated "I really don't want to be represented by no attorneys . . . . I will represent myself." *Id*. at 127. He further explained:

> My problem is like the caseloads are too heavy. Too many cases. Can't focus on an individual case. Because I find I am doing research and I find a lot of errors in my case and it's like it is not their fault. They are -- they aren't doing it the right way.

*Id*. at 127-28. The Court instructed Petitioner it would assign counsel and arrange for the attorney to meet with Petitioner before his next appearance. *Id*. at 129.

On September 14, 2017, attorney Paul Carey, Esq., informed the Court he had met with

Petitioner and believed Petitioner wished to proceed with Carey's representation.  *Id*. at 133.

Petitioner confirmed he wanted the Court to assign Carey.  *Id*.  Accordingly, Mr. Carey was

assigned to represent Petitioner and Ms. Voutsinas was relieved.  *Id*.

### 3. *Molineux* Ruling

The People moved, pursuant to *People v. Molineux* and *People v. Ventimiglia*,[3] to

introduce various statements made by Petitioner as evidence of identity, intent, and

consciousness of guilt.  *See generally*, Dkt. No. 15-1 at 394-400.  As relevant here, the People

sought to introduce the following phone calls:

> 3/16/2017: The Defendant engages in a phone conversation from jail
> emphasizing to the person that he called to find the people that were
> shot and talk to them about not identifying Burton as the shooter.
> Burton goes on to say if "they" don't identify him in the trial they
> can have all the lawsuit money.
> 3/17/2017: The Defendant wants his grandma to convince the
> people who were shot that he didn't do it.  Said that he was at home
> at the time of the incident.  Said that his cousin (Ty) said the person
> who actually shot the victims just jumped into his car, he didn't
> know the person.

*Id*. at 396-97.  The People argued Petitioner's statements should be allowed in their case in chief

as they were highly probative of the charged crimes.  *Id*. at 398.

By decision dated October 13, 2017, Onondaga County Court ruled the People would be

permitted to play portions of the March 16, 2017, and March 17, 2017, phone calls.  *Id*. at 213-

14.  The Court noted it would be willing to provide a limiting instruction, upon Petitioner's

---

[3] *See generally*, *People v. Ventimiglia*, 52 N.Y.2d 350 (1981); *People v. Molineux*, 168 N.Y. 264
(1901) (explaining the New York procedure for determining whether evidence of prior crimes is
probative for the purpose of showing, *e.g.*– (1) motive; (2) intent; (3) the absence of mistake or
accident; (4) a common scheme or plan; or (5) identity –and for determining whether that
probative value outweighs the prejudicial effect).

request, instructing the jury to derive no adverse inference from the fact Petitioner was in custody at the time of the calls. *Id*. at 214.  Next, parole officer Maher would be allowed to "testify as to the nature of his duties, and the frequency/number of contacts that he had with" Petitioner prior to his identification. *Id*.  The Court noted it intended to provide the following limiting instruction:

> You have heard that the defendant was previously subject to parole supervision.  This evidence was not offered, and must not be considered, for the purpose of proving that the defendant had a propensity or predisposition to commit the crimes charged in this case.  It was offered as evidence solely to establish why Officer Brian Mah[e]r is familiar with the defendant and to establish the foundation for his opinion that the defendant is depicted on the video(s) that you have seen.  If you find the evidence believable, you may consider it for that limited purpose and for no other reasons.

*Id*.  Finally, the Court stated Detective Abraham would be permitted to testify he had "viewed the video(s) in question and is able to identify the defendant as the person depicted therein" however, the probative value of testimony concerning "the nature of" Abraham's "prior interactions with the defendant . . . would be outweighed by its potential for prejudice.  It should be sufficient for the detective to testify that he has had 'interaction(s)' with the defendant, and to describe the length of the interactions and when they took place" prior to his identification. *Id*.

## C.  Jury Trial

Petitioner's jury trial before Onondaga County Court commenced on October 16, 2017. *See generally*, Dkt. No. 15-6 at 148.  The Court ruled, if Petitioner elected to testify, the People would be permitted to cross-examine him on the fact of his three prior felony convictions; a jury was selected; and the parties delivered opening statements. *See generally*, Dkt. No. 15-6 at 149-198; Dkt. No. 15-7 at 1-152; Dkt. No. 15-8 at 1-150; Dkt. No. 15-9 at 1-41.

Detective Thomas Hahn testified he was involved in the investigation of a triple shooting which occurred on March 11, 2017, in the parking lot of "Lucky 7s Liquor and Wine store located at 200 Lodi Street" which was also used by the "Flip Money Mansion after hours club . . . ." Dkt. No. 15-9 at 42-43. He explained detectives recovered surveillance footage from both establishments, and CDs containing the video footage were admitted into evidence by stipulation. *Id*. at 43-44. Hahn identified two individuals depicted in the footage, one wearing a "gray hooded sweatshirt . . . dark-colored baseball hat" with "an 'A' on it" and "big glasses," and the other wearing an "orange hooded sweatshirt" and "furry, puffy winter hat . . . ." *Id*. at 47.

Prior to the shooting, Hahn explained the three victims– Freddie Haygood, Laquana Roberts, and Antwan Turner –were depicted exiting the after hours club and walking to a Nissan vehicle parked along the side of the "Lucky 7" building. *Id*. at 49-50. The three were then approached by the men in the grey and orange sweatshirts. *Id*. at 50. Hahn testified the "intelligence department sent out an attempt-to-I.D. bulletin" in an effort to locate "the suspect shooter in the gray and the driver that was in the orange . . . ." *Id*. at 53.

An investigative report identified footage of the suspect shooter and driver entering a vehicle as they "fled the scene . . . ." *Id*. at 55. The intelligence department was able to identify distinctive features of the White Ford Taurus, including a New York Giants sticker on the back windshield, and a vertically oriented registration sticker on the front windshield. *Id*. The vehicle's license plate read "HAB 7396." *Id*. at 57.

Hahn later responded to 15 Galloway Drive in Liverpool on March 14, 2017, where the CID captain identified the vehicle. *Id*. at 56. The vehicle's registered owner, Tyron Miles, resided in Apartment 3, and allowed Hahn to speak with him in the apartment. *Id*. at 58. Hahn

observed "the orange hooded sweatshirt and the furry, puffy winter hat" were located inside of the apartment. *Id*.

DOCCS parole officer Brian Maher testified he met with Petitioner weekly for approximately 10 weeks both in Maher's office and at Petitioner's residences on Marriman and Huron Streets. *Id*. at 94-95. He stated the face-to-face meetings would typically last "5 to 10 minutes" and his final meeting with Petitioner prior to the incident occurred on March 1, 2017. *Id*. at 96. On March 13, 2017, Maher explained he spoke with Detective Hahn and reviewed surveillance video footage from a shooting incident. *Id*. at 96-97. Maher identified Petitioner in the courtroom and testified he was the individual depicted in the video footage wearing a gray sweatshirt, glasses, and ball cap. *Id*. at 97-98.

Tyron Miles identified Petitioner as his cousin, the nephew of his father. *Id*. at 119-20. Miles testified on March 11, 2017, around 2:00 or 3:00 a.m., he drove his white Taurus to the north side, where he picked up Petitioner. *Id*. at 121. Miles wore an orange sweatshirt, fuzzy hat, and black jeans while Petitioner wore a gray sweatshirt, hat, and blue jeans. *Id*. at 122. The pair arrived at the after hours club after 3:00, and later departed the establishment with a friend of Petitioner's. *Id*. at 122-23.

Miles explained he drove Petitioner's friend to Petitioner's house on Marriman Street where the friend's car was parked. *Id*. at 123. Thereafter, Petitioner and Miles returned to the club and parked outside of the front door. *Id*. at 124. When Miles and Petitioner left the club the second time, Miles approached the driver's side door of his car and Petitioner headed towards the passenger's side, but then kept walking across the lot. *Id*. at 125.

Miles recalled he followed Petitioner and told him he planned to leave, Petitioner said he was coming but remained outside another vehicle talking to the people inside. *Id*. After Miles

repeated it was time to go, Petitioner said "I'm coming right now" then Miles heard gunshots and tried to get to his car as fast as he could.  *Id*. at 126.  Petitioner entered Miles' vehicle through the passenger's side door and Miles drove him to his residence on Marriman.  *Id*. at 126.

On March 14, 2017, police spoke to Miles at his residence, then brought him downtown to the Police Department.  *Id*. at 128-29.  After Miles completed his interview, he went to the downstairs area of the building to be picked up, and received two or three phone calls from Petitioner.  *Id*. at 132-33.  Miles testified "the first couple of calls, he was trying to see what I said to the police, and another phone call, when I was finally at home, he wanted me to go and get a phone that he had turned off."  *Id*. at 133.  Petitioner continued to contact Miles which led Miles to believe Petitioner "wanted me to change my statement that I gave to the police."  *Id*. at 135.  The prosecutor played video footage and Miles identified himself and Petitioner exiting the after hours club.  *Id*. at 140-41.

Detective Abraham testified he was assigned to the department's Gang Violence Task Force and recalled he received an attempt to identify bulletin via his department email regarding an incident on March 11, 2017.  Dkt. No. 15-10 at 19-20.  Abraham believed one of the individuals contained therein was Petitioner, so he contacted Sergeant Ryan and requested to review the video footage.  *Id*. at 21.  He reported to the CID office to review the footage from different angles and determined the individual depicted therein was Petitioner.  *Id*. at 21-22.  Abraham explained he was able to identify Petitioner because he "had some prior work-related interactions with him" including a face-to-face conversation the week prior, which lasted "[w]ell over an hour."  *Id*. at 22-23.  He also identified Petitioner in the courtroom.  *Id*. at 22.

Antwan Turner testified he went to an after hours club located near Oak Street and Lodi during the early morning hours on March 11, 2017, where he met with his friend Freddie

Haygood and Haygood's girlfriend, "Quana." *Id*. at 26-27. He had no recollection of any altercations or fights occurring inside the establishment. *Id*. at 27. Turner stated he drank "[q]uite a bit" so Haygood offered him a ride home, which he accepted. *Id*. at 27-28.

Turner exited the club with "Freddie and Quana" and approached their car, a "grayish" Maxima or Altima. *Id*. at 28. He testified he entered the back seat of the vehicle on the driver's side, but was intoxicated, and did not recall what happened next. *Id*. at 28-29. Turner remembered receiving treatment for a gunshot wound in his right arm. *Id*. at 29-30. After he was released from the hospital, he received additional treatment at Upstate Orthopedics. *Id*. at 30. Despite the continued treatment, Turner testified his arm was "not the same" as he still felt pain and had a limited range of motion. *Id*. at 31.

Turner identified himself, and "Quana and Fred" on video footage from the morning of the incident leaving the establishment. *Id*. at 32-33. He explained he ran away from the vehicle after he was shot, but Haygood drove the car up to his side and he re-entered, then the vehicle drove away towards the hospital. *Id*. at 34. Turner testified he did not know Courtney Burton. *Id*. at 35.

Freddie Haygood testified on March 11, 2017, he drove his girlfriend Laquana's Nissan Altima to the "Flip Money Mansion" on Oak Street. *Id*. at 46-47. He identified himself and his girlfriend in a screenshot photograph inside of the establishment, then stated he vaguely remembered exchanging words with the man depicted in another image. *Id*. at 48-49. Haygood explained another video depicted him entering the driver's seat of his girlfriend's vehicle and being shot. *Id*. at 50-51.

Haygood testified he was shot in the chest and the arm. *Id*. at 49. After he was shot, he drove the vehicle to the hospital. *Id*. at 48. Haygood testified neither he nor anyone he spent the

morning with possessed a gun. *Id*. He did not know the individual who shot him and did not know Courtney Burton. *Id*. at 51.

Laquana Roberts testified Freddie Haygood was her fiancée and the father of one of her children. *Id*. at 70-71. On March 11, 2017, she went with Haygood to the Flip Money Mansion. *Id*. at 71. Roberts recalled Haygood exchanged words with another man at the party, but no physical altercation occurred. *Id*. at 73-74.

Later the same morning, Roberts exited the club with Haygood and one of his friends. *Id*. at 74. The three approached her silver vehicle and Roberts sat in the front passenger seat. *Id*. at 75. She began to look at her phone when the person Haygood exchanged words with inside began speaking to him through the window. *Id*. at 76. The person outside the window then pointed a gun towards the driver side window and fired approximately four gunshots into the vehicle. *Id*. at 77.

Roberts recalled she cried and yelled as she experienced pain on her side and saw blood coming from Haygood's chest. *Id*. at 78. Haygood drove to Upstate hospital, located approximately fifteen minutes away, where staff responded to the vehicle to treat the individuals. *Id*. at 78. Roberts continued to experience pain in her side for a couple of weeks. *Id*. at 80. She recalled the shooter wore a hat and glasses and his hair was styled in a ponytail. *Id*. at 80-81.

Daniel DeMartini testified he worked as a physician assistant in the Upstate Orthopedics trauma department. *Id*. at 59. He examined Antwan Turner for a gunshot wound to the right elbow, collected x-rays, examined the entrance and exit wounds, and placed the arm into a cast. *Id*. at 61. DeMartini explained Turner experienced "a comminuted fracture of the mesial epicondyle" meaning the fracture extended to multiple planes in many directions, in lay terms,

the elbow was "shattered." *Id*. at 64-65. After Turner's cast was removed, he utilized a compressive sleeve and underwent physical therapy. *Id*. at 66.

Dr. Joan Dolinak testified she worked as a trauma surgeon at Upstate University Hospital. *Id*. at 139. On March 11, 2017, she received a hospital alert concerning two or three gunshot wound patients. *Id*. at 142. Freddie Haygood was taken to a trauma resuscitation room in critical condition, where he received breathing tube and a chest tube. *Id*. Haygood was hypotensive and later hypothermic, so he was moved to an OR where the temperature was raised and additional procedures were performed. *Id*. at 143-44. Two additional chest tubes were placed and Haygood was placed on a ventilator. *Id*. at 145.

Dr. Dolinak explained Haygood sustained gunshot wounds to the front and back of the chest and the forearm. *Id*. at 146. He remained under Dolinak's care for three to four hours, and under the care the residents Dolinak supervised for the next day. *Id*. at 151. Haygood was discharged from the hospital approximately one week after his arrival, which Dr. Dolinak opined was "rather quick considering how he came in," as he was at a substantial risk of death upon his arrival. *Id*.

Syracuse Police Department Sergeant Sean Ryan testified he was assigned to the CID and was involved in the investigation of a shooting that occurred on March 11, 2017, at the corner of Oak and Lodi. *Id*. at 89. He reviewed footage from "cops' cameras" located throughout the city and saved the pertinent data. *Id*. at 90-91. Ryan explained he searched for and found video displaying a white four-door Ford Taurus with a New York Giants football sticker in the back rear window and a vertically positioned registration sticker in the front. *Id*. at 91.

Using the footage, Sergeant Ryan was able to determine the vehicle's path of travel prior to and after the shooting. *See id*. at 92-105. He explained the vehicle left and later returned to

the area of Lodi and Oak that morning, which was confirmed by the Flip Money Mansion surveillance cameras. *Id*. at 93-96. The footage captured the vehicle turn left off of Marriman Avenue onto Oswego Street shortly after 6:31. *Id*. at 98-99. At 6:41, the vehicle returned to the parking lot and a black male wearing a gray sweatshirt and hat exited the passenger's side while a black male in an orange sweatshirt exited the driver's side. *Id*. at 102. Surveillance footage from a camera located inside the Flip Money Mansion showed the two men from the white Ford Taurus enter the establishment around 6:42. *Id*. at 103. Later portions of the video footage depicted the vehicle departing the parking lot after the shooting occurred and eventually making a right turn onto Marriman at 7:11. *Id*. at 105.

Syracuse Police Department Detective Michael Malone testified he was assigned to the CID and had also trained as an evidence technician. Dkt. No. 15-11 at 19-20. On March 14, 2017, he executed a search warrant for a residence at 302 Marriman Ave., the home of Courtney Burton. *Id*. at 21. Malone collected a dark-colored baseball cap with a letter "A" on it, multiple cellphones, a light gray colored sweatshirt with a Nike logo, and a pair of white high top sneakers. *Id*. at 28-36. Photographs of the items were admitted. *See id*.

Detective Matthew Arduini was assigned to interview Petitioner, who he identified in court, on March 14, 2017. *Id*. at 102-03. The Detective first took him to the bathroom, then read Petitioner his *Miranda* rights in a video recorded interview room. *Id*. at 104. Arduini stated the interview began at 3:00 p.m. and continued until 7:35, but Petitioner was left alone in the room for multiple periods throughout. *Id*. at 107. The People admitted recordings of the interview, which were played for the jury. *Id*. at 107-12. Upon reviewing video recordings of the interview, Arduini discovered Petitioner was engaged in texting and phone calls after he had left the room. *Id*. at 117.

Following the Detective's testimony, the People rested their case. *See* Dkt. No. 15-12 at 19. Petitioner moved for a trial order of dismissal on all counts, which the trial court denied. *Id.* at 19-21. Petitioner declined to testify on his own behalf and the defense rested. *Id.* at 22, 23. After a brief recess, Petitioner's attorney delivered his closing arguments and the People followed. *See id.* at 26-75. County Court instructed the jury on the law. *Id.* at 76-134. The jurors began deliberations and reached a verdict. *See id.* at 135-39; Dkt. No. 15-13 at 1-6.

The jury returned a verdict of guilty as to count one, attempted murder in the second degree, count two, assault in the first degree, count three, attempted murder in the second degree, count four, assault in the first degree, and count seven, criminal possession of a weapon in the second degree. Dkt. No. 15-13 at 7-8. However, the jurors found Petitioner not guilty as to count five, attempted murder in the second degree, and count six, attempted assault in the first degree. *Id.* at 8.[4]

### D. Sentencing

Petitioner reappeared before County Court for sentencing on December 1, 2017. *See* Dkt. No. 15-13 at 14-30. Petitioner declined to challenge his 2011 conviction for criminal possession of a weapon in the second degree and made a statement on his own behalf. *See id.* at 17-25.

County Court sentenced Petitioner to determinate terms of 25 years' incarceration for each of his convictions for attempted murder in the second degree, to be followed by five years of post-release supervision, and ordered the sentences to run consecutively to each other. *Id.* at 27-28. With respect to his two convictions of assault in the first degree, Petitioner was sentenced to determinate terms of 25 years' incarceration, followed by five years' post release supervision,

---

[4] Petitioner was found not guilty as to the counts charging the attempted murder and attempted assault of Laquana Roberts. Dkt. No. 15-13 at 7-8.

to run concurrently with the sentences imposed on counts one and two. *Id*. at 28. Finally, County Court sentenced Petitioner to a 15 year determinate term, to be followed by five years' post-release supervision, for his conviction of criminal possession of a weapon in the second degree, to run concurrently with the sentences previously imposed. *Id*.

### E. Direct Appeal

Petitioner appealed his judgment of conviction to the Appellate Division, Fourth Department. *See generally*, *People v. Burton*, 191 A.D.3d 1311 (4th Dept. 2021), *leave denied*, 36 N.Y.3d 1095 (2021).[5] Petitioner argued: (1) his convictions for attempted murder were not supported by legally sufficient evidence and were against the weight of the evidence (Dkt. No. 15-1 at 26-33); (2) the trial court erred in denying his request to suppress the recording of his interrogation, which was the result of an unconstitutional arrest (Dkt. No. 15-1 at 33-45); (3) the trial court erred in denying Petitioner's request to suppress parole officer Maher's identification, which was based on an impermissibly suggestive identification procedure (Dkt. No. 15-1 at 45-50); (4) the trial court erred in allowing the People to present evidence indicating Petitioner was on parole at time of the incident and had recent interactions with Abraham, a member of the Gang Violence Task Force (Dkt. No. 15-1 at 50-60; *see also* Dkt. No. 15-1 at 66-67); (5) the trial court erred in allowing the People to present evidence containing various individuals' opinions that Petitioner was the shooter depicted in the video footage and elicit testimony from Miles that Petitioner also contacted Miles' father and requested he change his police statement (Dkt. No. 15-1 at 60-67); (6) he was deprived of the effective assistance of counsel due to defense counsel's failure to object to (a) opinion testimony that Petitioner was the shooter depicted in

---

[5] A copy of the Appellate Division's Memorandum and Order is also contained in the state court records. *See* Dkt. No. 15-1 at 158-61.

video footage, (b) Maher and Abraham's identifications of Petitioner, (c) evidence that Petitioner was on parole at the time of the shooting, and (d) Abraham's testimony that he was familiar with Petitioner through his work with a Gang Violence task force (Dkt. No. 15-1 at 68-70); (7) the trial court erred in ruling the grand jury proceedings were not defective (Dkt. No. 15-1 at 70-72); and (8) his sentence was excessive (Dkt. No. 15-1 at 73-75). The People responded: (1) Petitioner's conviction was supported by legally sufficient evidence and the jury's verdict was supported by the weight of the evidence (Dkt. No. 15-1 at 109-16); (2) the trial court properly denied Petitioner's motion to suppress because the police obtained probable cause for his arrest prior to the interrogation (Dkt. No. 15-1 at 116-20); (3) Maher's pre-trial identification was not the result of an unduly suggestive procedure (Dkt. No. 15-1 at 120-24); (4) Petitioner was not prejudiced by Maher and Abraham's statements concerning their familiarity with him (Dkt. No. 15-1 at 124-28); (5) defense counsel provided Petitioner with meaningful assistance (Dkt. No. 15-1 at 128-35); (6) the grand jury proceedings were not defective (Dkt. No. 15-1 at 135-38); and (7) Petitioner's sentence was appropriate (Dkt. No. 15-1 at 138-40).

On February 5, 2021, the Appellate Division affirmed Petitioner's convictions. *See Burton*, 191 A.D.3d at 1312. The Fourth Department concluded the trial court did not err in admitting Petitioner's post-arrest statements finding, prior to his "arrest by members of the Syracuse Police Department and parole units, two people who knew defendant positively identified him as the shooter depicted in the video recording, thereby providing probable cause for his arrest . . . " and, even assuming, *arguendo*, Petitioner "was arrested for a parole violation prior to the issuance of a parole warrant, defendant knowingly and voluntarily waived his *Miranda* rights before speaking with the detective, and his statements were sufficiently attenuated from the improper detention . . . ." *Id*. at 1314 (internal quotations citations omitted).

The Appellate Division also rejected Petitioner's claims that his convictions were not supported by sufficient evidence and against the weight of the evidence, explaining:

> The evidence established, inter alia, that defendant repeatedly fired a loaded handgun at the victims at close range, striking one of the victims in the chest, back, and arm and striking another victim in the arm. Video evidence also showed that prior to the shootings, defendant confronted one of the victims inside a club. After the victim left the club, defendant also left the club and approached the victims' vehicle in the parking lot, where he appeared to re-engage in a verbal altercation with the victims before shooting repeatedly into their vehicle.

*Id*. at 1312. The Fourth Department also denied his ineffective assistance claim, finding Petitioner failed to demonstrate the absence of strategic or other legitimate explanations for counsel's alleged errors. *Id*. at 1314-15.

The state court next concluded Petitioner failed to preserve his arguments related to the trial court's "*Molineux* ruling, which permitted the People to elicit testimony that defendant was on parole at the time of the shootings and that he had prior interactions with a police detective who was a member of the Gang Violence Task Force." *Id*. at 1315. Further, the court found Petitioner's sentence was "not unduly harsh or severe." *Id*.

The Fourth Department agreed with Petitioner's contention that the trial court erred in refusing to suppress parole officer Maher's "identification of him as the shooter depicted in surveillance video of the shootings on the basis that the police-arranged procedure was unduly suggestive." *Id*. at 1312. However, the Appellate Division found "the error in admitting the parole officer's in-court identification of defendant is harmless beyond a reasonable doubt . . . ." *Id*. at 1313. The court explained:

> The surveillance video establishes that the shooter wore a gray hooded sweatshirt and a black baseball cap with the letter "A" on it. Other witnesses, including a police detective who had several interactions with defendant prior to the shooting and defendant's

cousin, who was with defendant on the morning of the shootings and appeared with defendant in the surveillance video, identified defendant in court and in the video recording as the person who was wearing the gray hooded sweatshirt and black baseball cap with the letter "A" on the front.  In addition, defendant's cousin testified that he saw defendant approach the victims' car and extend his arm toward their vehicle, that he then heard the gunshots, and that he drove defendant to defendant's residence after the shootings.  The testimony of defendant's cousin was corroborated by evidence from the city's traffic camera system, which depicted the white Ford Taurus driven by defendant's cousin as it traveled from the parking lot where the victims were shot to the street where defendant lived.  The police executed a search warrant at defendant's residence, where they recovered, among other things, a gray hooded sweatshirt and a black baseball cap with the letter "A" on the front.  Furthermore, after defendant was arrested, he made phone calls from the interrogation room requesting that other people go to his residence to retrieve a gray sweatshirt and a black hat with an "A" on it or, in the alternative, wash the sweatshirt in the washing machine with bleach.  In recorded jailhouse telephone calls, defendant solicited others to contact the victims and promise them money if they did not identify him as the shooter.  Defendant also asked others to contact his cousin to convince him to change his story to police.  Under these circumstances, the proof of defendant's guilt is overwhelming and there is no reasonable possibility that the jury would have acquitted defendant were it not for the identification by defendant's parole officer . . . .

*Id.* at 1313-14.  Finally, the Appellate Division summarily rejected Petitioner's remaining contentions.  *Id.* at 1315.

Petitioner sought leave to appeal the Fourth Department's adverse decision to the Court of Appeals.  Dkt. No. 15-1 at 162-69.  The People opposed the leave application.  *Id.* at 170-73.  By Order dated March 29, 2021, the Court of Appeals denied Petitioner's application for leave.  *See People v. Burton*, 36 N.Y.3d 1095 (2021).[6]

---

[6] A Copy of the Court of Appeals' Order denying leave is also contained in the state court records.  *See* Dkt. No. 15-1 at 174.

III.    PETITION

Petitioner challenges his 2017 convictions for attempted murder in the second degree,

assault in the first degree, and criminal possession of a weapon in the second degree, following

jury trial in Onondaga County Supreme Court.  Dkt. No. 1.  Petitioner argues: (1) his arrest was

unconstitutional and resulted in him making an involuntary statement (*id*. at 5); (2) his

convictions for attempted murder are not supported by legally sufficient evidence (*id*. at 7); (3)

he was deprived of the effective assistance of counsel (*id*. at 8); and (4) Maher and Abraham's

identifications and testimony were unduly prejudicial (*id*. at 10).  Respondent contends: (1)

Petitioner's claim concerning his arrest and statements to police is barred by *Stone v. Powell*

(Dkt. No. 13 at 20-22); (2) Petitioner's legal sufficiency claim is partially unexhausted and

procedurally defaulted and entirely meritless (Dkt. No. 13 at 22-28); (3) Petitioner's ineffective

assistance claim is unexhausted and meritless (Dkt. No. 13 at 28-34); (4) the state court

reasonably concluded Maher's identification testimony was harmless (Dkt. No. 13 at 34-37); and

(5) Petitioner's claims regarding Maher and Abraham's testimony are procedurally barred on

independent and adequate state law grounds, and, in any event, are not exhausted or cognizable

on habeas review (Dkt. No. 13 at 37-43).

IV.    DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal

court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state

court only if, based upon the record before the state court, the state court's decision was (1)

"contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or" (2) "based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  28

U.S.C. § 2254(d)(1)-(2); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (citing *Renico v. Lett*, 559 U.S. 766, 773 (2010)) (quotations omitted).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

**A. Petitioner's Arrest and Post-Arrest Statements**

Petitioner first argues he is entitled to federal habeas relief due to an "unconstitutional arrest leading to involuntary statement." Dkt. No. 1 at 5.  He avers there "was no warrant for my arrest.  And it was never established how and who arrested me, resulting in an involuntary statement." *Id*.  Respondent contends this claim is barred by *Stone v. Powell*.  Dkt. No. 13 at 20-22.  The Court agrees.

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 482 (1976).  Following the Supreme Court's decision in *Stone*, habeas review of Fourth Amendment claims is permitted only "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citing *Gates v.*

*Henderson*, 568 F.2d 830, 840 (2d Cir. 1977); *McPhail v. Warden, Attica Correctional Facility*, 707 F.2d 67, 70 (2d Cir. 1983)).

Here, Petitioner has not claimed an absence of corrective procedures to redress the alleged violations. *See generally*, Dkt. No. 1. In any event, such an argument would be unpersuasive. "Indeed, the federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate." *Capellan*, 975 F.2d at 70 n. 1 (citing *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y.1989)) (internal quotations and additional citations omitted).

Furthermore, Petitioner availed himself of the aforementioned New York procedures. In a pre-trial omnibus motion, he moved "for an Order, pursuant to CPL § 710.20(1) and (4) . . . suppressing all evidence derived from" his "unlawful arrest . . . ." Dkt. No. 15-1 at 350. Onondaga County Court subsequently conducted a suppression hearing where the People called five witnesses, who were cross-examined by Petitioner's attorney, and Petitioner testified on his own behalf. *See* Dkt. No. 15-7 at 10-115. Following the hearing, defense counsel submitted a letter to County Court further arguing "all evidence, including statements . . . gained as a result of that illegal arrest must be suppressed." Dkt. No. 15-1 at 361-62. The trial court issued its findings in a written Decision/Order. *See id*. at 196-212. Finally, on direct appeal, Petitioner argued the trial court erred in refusing to suppress his interrogation as the result of an unconstitutional arrest. *See id*. at 33-45; *see also Burton*, 191 A.D.3d at 1314. Therefore, Petitioner is unable to demonstrate a lack of corrective procedures to redress the alleged fourth amendment violations.

Nor has Petitioner alleged an unconscionable breakdown in the underlying process occurred. *See generally*, Dkt. No. 1. Such a breakdown "occurs when 'the totality of state

procedures allegedly did not provide rational conditions for inquiry into federal law.'" *Jackson v. Capra*, No. 9:19-CV-1542 (DNH/CFH), 2023 WL 8375913, at *13 (N.D.N.Y. Sept. 11, 2023) (citing *Capellan*, 975 F.2d at 70) (additional citations omitted), *report and recommendation adopted*, 2023 WL 8371081 (N.D.N.Y. Dec. 4, 2023).  "[A] mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process."  *Capellan*, 975 F.2d at 72.  Rather, "situations such as the bribing of a trial judge, the government's knowing use of perjured testimony, or the use of torture to extract a guilty plea, all without opportunity to obtain state review," are circumstances demonstrating such an unconscionable breakdown justifying habeas inquiry.  *Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y.) (citing *Allah v. LeFevre*, 623 F. Supp. 987, 991 (S.D.N.Y. 1985)), *aff'd*, 852 F.2d 59 (2d Cir. 1988).

Accordingly, Petitioner's challenges to his arrest and statements to police as a result thereof are barred from federal habeas review.  *See, e.g., Evans v. Colvin*, No. 9:16-CV-1346 (JKS), 2018 WL 3069211, at *6 (N.D.N.Y. June 21, 2018) (the petitioner "claims that the trial court erred in refusing to suppress as the fruit of an unlawful arrest statements he made after he was allegedly arrested in violation of [the law] . . . . However, any challenge to his arrest and the admissibility of his resulting statements is foreclosed by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465 (1976)."); *Hill v. Conway*, No. 9:04-CV-524 (FJS/RFT), 2008 WL 8095710, at *13 (N.D.N.Y. June 2, 2008) ("*Stone* bars habeas review of claims that statements made during or after an allegedly unlawful arrest should have been suppressed as fruit of an illegal arrest.") (citing *Cardwell v. Taylor*, 461 U.S. 571, 572-73 (1983)) (additional citations omitted), *report and recommendation adopted*, 2010 WL 3718871 (N.D.N.Y. Sept. 14, 2010).

**B. Legal Sufficiency**

Petitioner next contends federal habeas relief is warranted because there was "insufficient evidence to support the convictions of attempted murder." Dkt. No. 1 at 7. He asserts "I was charged and arraigned on second degree attempted murder 3 counts assault in the first degree (3 counts) with 3 shell casings for Evidence at trial, with all three victims driving away, And video before, during, And after the incident was never Authenticated." *Id*. Respondent avers the Appellate Division reasonably rejected the portions of Petitioner's claim which were presented on direct appeal and Petitioner's new contention concerning the authentication of surveillance video is unexhausted and procedurally defaulted. Dkt. No. 13 at 22-28.

It is well established that "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995)) (additional citations and quotations omitted); *see also* 28 U.S.C. § 2254(b)(1)(B)(ii)-(iii) (an application for a writ of habeas corpus may not be granted until a petitioner has exhausted all remedies available in state court unless "there is an absence of available State corrective process; or . . . circumstances exist that render such process ineffective to protect the rights of the applicant."). A petitioner must exhaust his claims both procedurally and substantively.

Procedural exhaustion requires that a petitioner raise all claims in state court prior to raising them in a federal habeas petition. In other words, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Substantive exhaustion requires a petitioner to "'fairly present' his claim in each

24

appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29 (citing *Duncan*, 513 U.S. at 365).

"In New York, to invoke one complete round of the State's established appellate process, a criminal defendant must first appeal his or her conviction to the Appellate Division and then seek further review by applying to the Court of Appeals for leave to appeal." *Jones v. Annucci*, 124 F. Supp. 3d 103, 116 (N.D.N.Y. 2015) (citing *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005)). While Petitioner alleged the evidence supporting his convictions was insufficient on direct appeal, his briefs did not contain any arguments concerning the authentication of video evidence. *See* Dkt. No. 15-1 at 26-33, 163-64. Therefore, his legal sufficiency claim on this basis is unexhausted. *See*, *e.g.*, *Kelsey v. Lewin*, No. 9:21-CV-0348 (MAD/ATB), 2023 WL 9316847, at *8 (N.D.N.Y. Mar. 28, 2023) (explaining only the legal sufficiency claims which the petitioner asserted on direct appeal were properly exhausted for federal habeas purposes), *report and recommendation adopted*, 2024 WL 194006 (N.D.N.Y. Jan. 18, 2024).

Where a petitioner has "failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, the federal habeas court should consider the claim to be procedurally defaulted." *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991)). "Under New York law, all claims that are record-based must be raised in a direct appeal." *O'Kane v. Kirkpatrick*, No. 1:09-CV-5167, 2011 WL 3809945, at *7 (S.D.N.Y. Feb. 15, 2011) (citing *Dunham v. Travis*, 313 F.3d 724, 729 (2d Cir. 2002) ("In New York, a criminal defendant may not raise in a § 440 motion a claim that could have been raised on direct appeal."); N.Y. CRIM. PRO. LAW ("CPL") § 440.10(2)(c)),

*report and recommendation adopted*, 2011 WL 3918158 (S.D.N.Y. Aug. 25, 2011).

Accordingly, Petitioner could not return to state court so as to properly exhaust his legal

sufficiency claim on this basis. *See Jones*, 124 F. Supp. 3d at 116 (explaining the petitioner's

"unexhausted claims are procedurally barred. Because these unexhausted claims are based on

the record, he cannot bring a motion to vacate as to these claims" and the petitioner "already

filed the direct appeal and leave application to which he is entitled.") (citing CPL § 440.10(2)(c);

*Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991)); *see also*, *e.g.*, *Hughes v. Sheahan*, 312 F.

Supp. 3d 306, 344 (N.D.N.Y. 2018) (concluding the petitioner's legal sufficiency claim was

procedurally defaulted, explaining "[t]he facts supporting his legal sufficiency claim were

necessarily record-based and . . . should have been raised on direct appeal.").

 In sum, "Petitioner was entitled to one (and only one) appeal to the Appellate Division

and one request for leave to appeal to the Court of Appeals, both of which he pursued long ago."

*Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) (citations omitted). Therefore, the portion of

his legal sufficiency claim concerning the authentication of video evidence is procedurally

defaulted.

 "That procedural default can only be cured by a showing of cause for the default plus

prejudice, or a showing of actual innocence." *Aparicio*, 269 F.3d at 91 (citing *Coleman v.*

*Johnson*, 566 U.S. 650, 748-49 (2012)). Here, Petitioner has not alleged, much less established,

either some external factor caused the procedural default of his claims and prejudice resulted, or

that he is actually innocent. *See generally*, Dkt. No. 1. Accordingly, habeas relief cannot be

granted with respect to Petitioner's legal sufficiency claim insofar as it concerns the

authentication of video evidence. However, the remaining portions of Petitioner's claim which

were properly exhausted may be addressed.

Where a federal habeas petitioner claims he has been convicted in a state court on insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted, emphasis in original).  In determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, "federal courts must look to state law for the substantive elements of the criminal offense, . . . but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 566 U.S. at 655 (citing *Jackson*, 443 U.S. at 324, n. 16) (internal quotations omitted).  As the Supreme Court has explained, challenges to the sufficiency of the evidence supporting a conviction:

> [F]ace a high bar in federal habeas proceedings because they are subject to two layers of judicial deference.  First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury . . . . And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was objectively unreasonable.

*Id*. at 651 (citing *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (internal quotations and additional citation omitted)).

Under New York law, "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." P.L. § 110.00.  "A person is guilty of murder in the second degree when: With intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

27

P.L. § 125.25(1).  Here, a rational trier of fact could have found Petitioner, with the intent to cause the death of another person, engaged in conduct which tended to effect the causing of such person or a third person's death.

Viewing the evidence in the light most favorable to the prosecution, Petitioner was involved in a verbal exchange with Haygood inside the after hours club.  When Haygood, Turner, and Roberts departed the establishment later the same morning and began to enter Roberts' vehicle, Petitioner approached the three, pulled out a gun, and fired at least three gunshots in close proximity to them.  As a result, Turner sustained a wound to the arm which, in lay terms, shattered his elbow, and Haygood sustained wounds to the chest and forearm, the former of which placed him at a substantial risk of death.

In support of his legal sufficiency claim, Petitioner references "3 shell casings for Evidence" and "all three victims driving away," but has not explained how either demonstrate no rational trier of fact could have found him guilty of attempted murder in the second degree.  *See* Dkt. No. 1 at 7.[7]  To the extent he seeks to reiterate the argument he made on direct appeal, that "[h]ad the shooter intended to kill Turner, he would have fired additional shots at him to ensure his demise" and the "absence of evidence" that Haygood "manifested a wound the shooter would have understood to be fatal" contravenes evidence of the requisite intent to kill, such arguments are unpersuasive.  *See* Dkt. No. 15-1 at 28, 31.

As the Appellate Division concluded, the requisite intent to kill was sufficiently established by Petitioner's firing of a loaded handgun at the victims at close range.  *Burton*, 191 A.D.3d at 1312 (citing *People v Williams*, 154 A.D.3d 1290, 1291 (4th Dept. 2017), *leave*

---

[7] Petitioner references the "3" counts of attempted murder in the second degree and assault in the first degree, however, to be sure, Petitioner was only convicted on two counts of each crime.

*denied*, 30 N.Y.3d 1110 (2018)); *see also*, *e.g.*, *Evans v. Bennett*, No. 9:98-CV-1706 (LEK/DRH), 2001 WL 36006042, at *4 (N.D.N.Y. Nov. 20, 2001) ("there was sufficient evidence to infer intent from the close range at which [the petitioner] shot [the victim].").  Even accepting Petitioner's apparent contention that the recovery and introduction of only three shell casings suggests only three gunshots were fired, the firing of three gunshots at two individuals would be sufficient evidence to support both attempted murder charges.  *See*, *e.g.*, *Rodriguez v. Hoke*, No. 86-C-3058, 1987 WL 9679, at *2-3 (E.D.N.Y. Apr. 1, 1987) (concluding a reasonable jury could have determined the petitioner had the requisite intent to sustain one count of attempted murder, despite counsel's argument that "petitioner fired only one bullet, and later abandoned his gun while it still contained three live rounds.").  Moreover, that Haygood was able to drive to the hospital after being shot in the chest and arm does not render the conclusion that Petitioner possessed the requisite intent to kill unsupported.  As Respondent avers, Petitioner's knowledge that the victim's injuries were not fatal *after* he inflicted them is not relevant to whether he intended to cause the victim's death at the time he fired the gunshots.

In sum, Petitioner has not met the high bar of demonstrating the Appellate Division's rejection of his legal sufficiency claim was unreasonable.  Therefore, no habeas relief is warranted.

### C.  Ineffective Assistance of Counsel

Petitioner next asserts he is entitled to habeas relief due to "ineffective assistance of counsel," specifically, he avers "due to ineffectiveness of first Attorney Ellise Voutsinas, Esq. I was assigned another attorney 30 days before trial, which was not enough time for a strategy." Dkt. No. 1 at 8.  Respondent contends this claim is unexhausted and, in any event, meritless. Dkt. No. 13 at 28-34.

"Where a petitioner raises an ineffective assistance of trial counsel claim, each factual claim made in support must be fairly presented to a state court before a federal habeas court can consider it." *Williams v. Duncan*, No. 9:03-CV-0568 (LEK/RFT), 2007 WL 2177075, at *4 (N.D.N.Y. July 27, 2007) (citing *Panezo v. Portuondo*, 2003 WL 23198781, at * 10 (E.D.N.Y. Nov. 6, 2003); *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991)).  Here, Petitioner has not presented to a New York court his contention that Ms. Voutsinas did not provide effective assistance.  Instead, Petitioner's ineffective assistance claim on direct appeal solely concerned Mr. Carey's failure to make various objections.  *See* Dkt. No. 15-1 at 68-70.  Therefore, any claim based on Ms. Voutsinas' representation of Petitioner is unexhausted.  *See Williams*, 2007 WL 2177075, at *4 (explaining the petitioner's "particular theories in support of his ineffective assistance claim" which were never raised on direct appeal or in a state post-conviction motion were unexhausted).

As explained above in connection with Petitioner's unexhausted argument concerning the authentication of video evidence, New York law requires record-based claims be raised on direct appeal, therefore, a Petitioner's failure to include such a claim would render any subsequent federal habeas argument procedurally defaulted.  Yet, in the instant petition, it is not clear whether Petitioner's ineffective assistance argument concerning Voutsinas' representation is based on the trial court record.  *See Mosley v. Rich*, No. 9:18-CV-00428 (JKS), 2020 WL 3128530, at *12 (N.D.N.Y. June 12, 2020) (explaining, if the petitioner's unexhausted claims were based on the trial court record, the claims could have been raised on direct appeal, therefore, he could not bring a motion to vacate such claims; however, if the claims were based on evidence outside of the trial record, "they could still be brought in a motion to vacate judgment under CPL § 440.10 because there is no time limit or number cap on § 440.10

motions.").  Indeed, Petitioner has offered no explanation as to how his first attorney's

representation of him was deficient or how such deficient performance prejudiced his defense.

*See generally*, *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

However, this failure by Petitioner to articulate a basis for his ineffective assistance claim

renders the question of procedural default immaterial.  "It is well-settled in this Circuit that

vague and conclusory allegations that are unsupported by specific factual averments are

insufficient to state a viable claim for habeas relief."  *Shamsuddin v. Smith*, 578 F. Supp. 3d 328,

343-44 (N.D.N.Y. 2022) (citation omitted); *see also*, *e.g.*, *Gross v. Graham*, No. 9:14-CV-0768

(JKS), 2016 WL 11621787, at *7 (N.D.N.Y. Aug. 26, 2016) (same), *aff'd*, 802 F. App'x 16 (2d

Cir. 2020); *Lankford v. McCarthy*, No. 9:21-CV-0022 (BKS/DJS), 2024 WL 2053414, at *8

(N.D.N.Y. Feb. 15, 2024) (same), *report and recommendation adopted*, 2024 WL 1694018

(N.D.N.Y. Apr. 19, 2024).  "As such, a claim of ineffective assistance must contain specific

factual contentions regarding how counsel was ineffective."  *Kimbrough v. Bradt*, 949 F. Supp.

2d 341, 355 (N.D.N.Y. 2013) (collecting cases); *see also Shamsuddin*, 578 F. Supp. 3d at 344.

Where, as here, a petitioner has not provided specific allegations in support of his

ineffective assistance claim, dismissal is warranted.  *See*, *e.g.*, *Griffin v. Coveny*, No. 9:19-CV-

1495 (JKS), 2021 WL 3884217, at *12 (N.D.N.Y. Aug. 31, 2021) (dismissing the petitioner's

ineffective assistance of counsel claim, pursuant to 28 U.S.C. § 2254(b)(2), despite the potential

that the claim could be based on matters outside of the record and thus could be raised in a

*coram nobis* motion, due to the petitioner's failure to support his claim with specific factual

contentions regarding how counsel was ineffective).  Therefore, the undersigned recommends

this claim be dismissed as plainly meritless.

### D.  Maher and Abraham's Testimony

Finally, Petitioner contends habeas relief is warranted due to the "unduly suggestive identification, And prejudice testimony by parole officer and detective."  Dkt. No. 1 at 10.  He argues the "parole officer was told Courtney Burton was depicted in video and testified to what he was told.  Parole officer and detective stated I was incarcerated and on parole multiple times. I also filed a complaint and a federal 1983 against detective Abraham from a incident that occurred May 18, 2016, And he still was able to Testify."  *Id*.  Respondent avers the Appellate Division's conclusion that Maher's identification of Petitioner constituted harmless error was not unreasonable, Petitioner's claim concerning Maher and Abraham's testimony that he was incarcerated and on parole is barred from habeas review on independent and adequate state law grounds, and any claim based on Petitioner's civil lawsuit against Abraham is unexhausted, procedurally defaulted, and meritless.  Dkt. No. 13 at 34-43.

### 1.  Parole Officer Maher's Identification of Petitioner

Petitioner first argues, as he did on direct appeal, that the trial court erred in refusing to suppress parole officer Maher's identification of him as the shooter depicted in the surveillance footage.  Dkt. No. 1 at 10.  The Appellate Division agreed the identification procedure was unduly suggestive, however, it found the admission of Maher's in court identification "harmless beyond a reasonable doubt . . . ."  *Burton*, 191 A.D.3d at 1313.

Where, as here, a state court makes a harmless error determination, "a state prisoner should not receive federal habeas relief based on trial error unless he can show the error had a 'substantial and injurious effect or influence' on the verdict."  *Brown v. Davenport*, 596 U.S. 118, 133 (2022) (*citing Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)) (additional quotations omitted); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (explaining, the relevant

inquiry is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.").  Additionally, "when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original) (citing *Mitchell v. Esparza*, 540 U.S. 12 (2003)); *see also*, *e.g.*, *Swift v. Superintendent*, No. 9:18-CV-1204 (GTS/TWD), 2022 WL 814033, at *17 (N.D.N.Y. Feb. 17, 2022) ("Where, as in this case, a state court makes a harmless error determination on direct appeal, the Court 'owe[s] the harmlessness determination itself deference under the [AEDPA].'") (citing *Orlando v. Nassau Cty. Dist. Attorney's Off.*, 915 F.3d 113, 127 (2d Cir. 2019)) (additional quotations omitted), *report and recommendation adopted*, 2022 WL 813923 (N.D.N.Y. Mar. 17, 2022).[8]

Here, the People presented a myriad of evidence other than Maher's testimony supporting the conclusion that Petitioner was the shooter depicted in the surveillance video footage.  Tyron Miles, Petitioner's cousin, identified himself and Petitioner as the individuals depicted in the videos both inside and outside of the Flip Money Mansion.  *See* Dkt. No. 15-9 at 119-20, 140-41. His testimony was corroborated by other evidence, including footage of his vehicle traveling to the street where Petitioner's residence was located after the shooting.  *See* Dkt. No. 15-10 at 103-05.  Detective Abraham, who was familiar with Petitioner from prior interactions, also identified

---

[8] *See also United States v. Kaplan*, 490 F.3d 110, 123 (2d Cir. 2007) (explaining, in assessing whether an error was harmless, the Court considers "'(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence.'") (citing *Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir. 2004).

him as the individual depicted in the video. *See id.* at 19-22. Additionally, clothing items recovered from Petitioner's home and his phone communications during and after his police interview further supported the identification of him as the shooter. *See* Dkt. No. 15-11 at 21, 28-36, 117; Dkt. No. 15-9 at 132-35. Therefore, it cannot be said that Maher's testimony to the same effect provided the basis for Petitioner's conviction or that reasonable doubt would have existed on the record without it.

In sum, Maher's testimony identifying Petitioner as the shooter depicted in the surveillance video footage did not have a substantial and injurious effect on the jury's verdict and the Appellate Division's harmless error determination was not unreasonable. Accordingly, Petitioner is not entitled to habeas relief on this basis.

### 2. *Molineux* Ruling

Plaintiff next avers he is entitled to habeas relief because Parole Officer Maher and Syracuse Police Detective Abraham testified Petitioner "was incarcerated and on parole multiple times . . . ." Dkt. No. 1 at 10.[9] On direct appeal, the Fourth Department held Petitioner "failed to preserve" his challenge to the trial court's "*Molineux* ruling, which permitted the People to elicit testimony that defendant was on parole at the time of the shootings and that he had prior interactions with a police detective who was a member of the Gang Violence Task Force." *Burton*, 191 A.D.3d at 1315.

"A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and

---

[9] The Court notes, contrary to Petitioner's contention, Detective Abraham did not testify Petitioner was incarcerated or on parole. Instead, as Petitioner argued on direct appeal, the Detective testified he was familiar with Petitioner due to prior encounters with him and that he had served as a member of the police department's Gang Violence Task Force. *See* Dkt. No. 15-10 at 19-24.

adequate to support the judgment.'" *Walker v. Martin*, 562 U.S. 307, 315 (2011) (citing *Beard v. Kindler*, 558 U.S. 53, 55 (2009); *Coleman*, 501 U.S. at 729).  "This rule applies whether the state law ground is substantive or procedural."  *Coleman*, 501 U.S. at 729 (citations omitted).  Therefore, federal habeas review of Petitioner's legal sufficiency challenge will be barred if the Fourth Department's reliance on New York's preservation rule to deny his claim on direct appeal was "independent of the federal question and adequate to support the judgment."  *Kindler*, 558 U.S. at 55 (citing *Coleman*, 501 U.S. at 729) (internal quotations omitted).

The Second Circuit has held New York's preservation rule "is a state law ground . . . independent of any federal question . . . ."  *Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007).  Therefore, the Appellate Division's application of the preservation rule was independent of the federal question presented here, *i.e.*, whether Onondaga County Court's *Molineux* ruling deprived Petitioner of a fair trial.  "To qualify as an 'adequate' procedural ground, a state rule must be firmly established and regularly followed."  *Walker*, 562 U.S. at 316 (citing *Kindler*, 558 U.S. at 60-61) (additional quotations omitted).  Courts in this circuit have consistently found New York's preservation rule to be "firmly established and regularly followed."  *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) (collecting cases).

Accordingly, the Appellate Division's denial of Petitioner's claim concerning Onondaga County Court's *Molineux* ruling based on his failure to properly preserve it, as required by New York law, constitutes an independent and adequate state law ground precluding federal habeas review.  As with his procedurally defaulted claim concerning the authentication of video evidence above, Petitioner has not made the requisite showing of cause and prejudice or actual innocence so as to overcome the procedural bar.  *See, e.g.*, *Humphrey v. Fisher*, No. 9:07-CV-1200 (TJM/DRH), 2010 WL 7417094, at *4 (N.D.N.Y. July 23, 2010) (explaining, "[i]f the last-

reasoned state court opinion decided the claim on an independent and adequate state law ground, the claim would be procedurally barred, and the petitioner can only overcome the procedural bar by showing cause and prejudice, or a fundamental miscarriage of justice."), *report and recommendation adopted*, 2011 WL 4055407 (N.D.N.Y. Sept. 12, 2011).  Therefore, Petitioner's challenge to the trial court's *Molineux* ruling must be dismissed.[10]

### 3.  Petitioner's Civil Lawsuit Involving Detective Abraham

Finally, Petitioner appears to contest the fact that Abraham was allowed to testify, as Plaintiff filed a civil lawsuit which named Abraham as a defendant.  Dkt. No. 1 at 10.  Petitioner is not entitled to habeas relief on this basis.

As an initial matter, as Respondent correctly points out, *see* Dkt. No. 13 at 43, Petitioner has not raised this claim in state court.  *See generally*, Dkt. No. 15-1 at 1-76.  Therefore, as with Petitioner's claims concerning the authentication of video evidence and Ms. Voutsinas' representation of him, this claim is unexhausted.  *See* Sections (IV)(B)-(C), *supra*.

---

[10] In any event, a *Molineux* claim is not cognizable on federal habeas review.  *See*, *e.g.*, *Griffin*, 2021 WL 3884217, at *8 ("To the extent that [the petitioner] contends that the trial court's ruling was contrary to *Molineux*, such claim presents solely an issue of state law that is not cognizable on federal habeas review.") (citing *Mercedes v. McGuire*, No. 2:08-CV-0299, 2010 WL 1936227, at *8 (E.D.N.Y. May 12, 2010); *Allaway v. McGinnis*, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004)); *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 72-73 (2d Cir. 2011) (Summary Order) (explaining "[u]nder Supreme Court jurisprudence, a state court's evidentiary rulings, even if erroneous under state law, do not present constitutional issues cognizable under federal habeas review.") (citing *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006); *Crane v. Kentucky*, 476 U.S. 683, 689 (1986)).  Alternatively, to the extent Petitioner would argue the state court's evidentiary ruling deprived him of due process under the Fourteenth Amendment, he is unable to demonstrate he was deprived of a fundamentally fair trial.  Even assuming, *arguendo*, the testimony was not properly admitted in violation of New York law, the witness' testimony "viewed objectively in light of the entire record before the jury, was" not "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985).

More significantly, however, Petitioner's claim is completely meritless.  Under 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  This is particularly true where the claim is plainly meritless.  *See Rhines v. Weber*, 544 U.S. 269, 277 (2005).

Here, Petitioner's suggestion Abraham should not have been "able to testify" is plainly meritless.  The basis of Plaintiff's argument is the complaint he filed, which named Abraham as a defendant, in a federal civil action.  However, that action was commenced when Petitioner filed his complaint on February 6, 2018, *see Burton v. Abraham*, No. 5:18-CV-0150 (ATB), Dkt. No. 1, over one year *after* Petitioner's jury trial.  In any event, as Respondent further avers, a witness's potential bias is, at most, an appropriate subject for cross-examination.  Accordingly, dismissal of Plaintiff's claim is warranted.

## V.    CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED** that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety; and it is further

**RECOMMENDED** that no Certificate of Appealability ("COA") shall issue because reasonable jurists would not find it debatable that Petitioner has failed to offer a substantial showing that he was denied a constitutional right.  *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); and it is further

**ORDERED** that the Clerk shall serve a copy of this Report-Recommendation and Order on Petitioner, along with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk serve a copy of the Report-Recommendation on the parties.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file

written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

**WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated:  May 29, 2024
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[11] If you are proceeding pro se and are served with this Report-Recommendation & Order by
mail, three additional days will be added to the fourteen-day period, meaning that you have
seventeen days from the date the Report-Recommendation & Order was mailed to you to serve
and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a
Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2023 WL 8375913
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond L. JACKSON, Petitioner,

v.

Michael CAPRA, Respondent.

9:19-CV-1542 (DNH/CFH)
|
Signed September 11, 2023

**Attorneys and Law Firms**

RAYMOND L. JACKSON, Petitioner, pro se, 15-A-3740, Fishkill Correctional Facility, P.O. Box 1245, Beacon, New York 12508.

HON. LETITIA JAMES, Attorney for Respondent, MARGARET A. CIEPRISZ, ESQ., Assistantt Attorney General, New York State Attorney General, The Capitol, Albany, New York 12224.

**REPORT-RECOMMENDATION and ORDER**

CHRISTIAN F. HUMMEL, United States Magistrate Judge

**I. INTRODUCTION**

 **\*1** Petitioner Raymond L. Jackson ("Petitioner") seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Dkt. No. 1, Petition ("Pet."). On December 16, 2019, this action was administratively closed due to Petitioner's failure to properly commence it. Dkt. No. 2, Order Directing Administrative Closure. Petitioner was advised if he desired to pursue this action he must so notify the Court and, within thirty days of the Order, either (1) pay the filing fee of five dollars; or (2) submit a completed, signed, and properly certified in forma pauperis ("IFP") application. *Id.* at 2.

Petitioner filed a motion to amend his Petition and stay the instant action. Dkt. No. 3, Motion to Amend and Stay. On January 8, 2020, the Court advised Petitioner the action remained closed and sua sponte granted Petitioner an extension of time to comply with the December 16, 2019, Order. Dkt. No. 4, Text Order. Petitioner subsequently paid the filing fee and submitted a letter enclosing additional grounds for relief. Dkt. Nos. 5-6, Letters.

The case was reopened. Dkt. Entry dated January 27, 2020 (identifying receipt information for the filing fee transaction); Dkt. No. 7, Text Order (restoring case to the Court's active docket). On February 6, 2020, after completing an initial review of the petition and subsequently-filed documents, the Court denied Petitioner's request for a stay and ordered Petitioner to file an amended petition. Dkt. No. 8, Decision and Order. Petitioner filed an amended petition, and the Court directed Respondent to answer. Dkt. No. 9, Amended Petition ("Am. Pet."); Dkt. No. 10, Decision and Order (dated February 27, 2020).

Petitioner submitted a request for appointment of counsel and a renewed motion for a stay. Dkt. No. 11, Motion. Respondent opposed Petitioner's motions. Dkt. No. 13. On March 27, 2020, the Court denied Petitioner's motions and sua sponte granted Petitioner an extension of time clarify his intentions by (1) filing a complete motion to stay, a proper motion to expand discovery, or a combination thereof; or (2) indicating his preference for the case to proceed. Dkt. No. 14 at 11, Decision and Order.

Petitioner subsequently filed a motion (1) seeking additional discovery and expansion of the record, and (2) requesting reconsideration of the Court's decision denying his motions to stay and for the appointment of counsel. Dkt. No. 15, Letter Motion. Respondent opposed both motions. Dkt. No. 16. On April 21, 2020, the Court denied Petitioner's motions and directed Respondent to file an answer. Dkt. No. 17 at 7, Decision and Order.

Petitioner submitted a letter requesting permission to amend his petition. Dkt. No. 20. Petitioner also appealed the undersigned's April 21, 2020, denial of Petitioner's request for additional discovery to the District Court. Dkt. No. 22. Respondent opposed Petitioner's request to amend his petition and appeal of the undersigned's decision. Dkt. No. 25; Dkt. No. 28. On June 15, 2020, Hon. Judge David N. Hurd denied Petitioner's appeal. Dkt. No. 29, Text Order. Petitioner moved for a Certificate to appeal the District Court's denial of his request for discovery to the U.S. Court of Appeals for the Second Circuit. Dkt. No. 30. On July 7, 2020, the District Court denied Petitioner's motion to amend his petition and request for a Certificate of Appealability. Dkt. No. 31 at 9-11, Decision and Order. Petitioner submitted a renewed motion for a Certificate of Appealability, which the District Court denied. Dkt. No. 32, Renewed Motion; Dkt. No. 33, Text Order.

**\*2** Respondent successfully requested three extensions of time to file a response to the operative pleading–the Amended Petition. Dkt. Nos. 34, 36, 38, Letter Motions; Dkt. Nos. 35, 37, 39, Text Orders. On November 16, 2020, Petitioner filed a motion to stay the proceedings. Dkt. No. 40. Respondent opposed Petitioner's motion. Dkt. No. 43. The undersigned denied Petitioner's motion. Dkt. No. 44 at 5, Decision and Order.

Respondent successfully requested permission to file an oversized memorandum of law. Dkt. No. 45, Letter Motion; Dkt. No. 46, Text Order. Respondent submitted a response. Dkt. No. 47, Memorandum of Law in Opposition to Petition; Dkt. No. 48, Answer; Dkt. No. 49-1–4, State Court Records; Dkt. No. 49-5–15, State Court Transcripts.

Petitioner requested: an extension of time to file a reply, appointment of counsel, an evidentiary hearing, and expanded discovery. Dkt. No. 52, Letter Motion. On February 23, 2021, the undersigned granted Petitioner's request for an extension of time and denied his requests for appointment of counsel, an evidentiary hearing, and expanded discovery. Dkt. No. 53 at 6-7, Decision and Order. Petitioner subsequently appealed the undersigned's denial of his request for appointment of counsel and an evidentiary hearing to the Second Circuit. Dkt. No. 54, Notice of Appeal. The Second Circuit dismissed Petitioner's appeal on September 29, 2021. Dkt. No. 68, Mandate of U.S.C.A.

Petitioner successfully requested a second extension of time to file a reply. Dkt. No. 56, Letter Motion; Dkt. No. 57, Text Order. Petitioner also submitted a motion which was liberally construed as requesting reconsideration of the April 21, 2020, denial of Petitioner's request for additional discovery. Dkt. No. 58, Letter Motion. Respondent opposed the motion. Dkt. No. 61. On May 19, 2021, the undersigned denied Petitioner's motion for reconsideration. Dkt. No. 62 at 5, Decision and Order. Petitioner appealed the Magistrate Judge's decision to the District Court. Dkt. No. 63. Respondent opposed Petitioner's appeal. Dkt. No. 66. On July 8, 2021, the District Court affirmed the undersigned denial of Petitioner's motion for reconsideration. Dkt. No. 67, Text Order. Petitioner moved for reconsideration of the aforementioned Text Order. Dkt. No. 71. The District Court denied Petitioner's motion. Dkt. No. 72, Text Order.

Petitioner also advised the Court he was unable to access the law library to reply to the Respondent's opposition to his amended petition. Dkt. No. 64, Letter Motion. Accordingly, the undersigned sua sponte extended Petitioner's time to file a reply. Dkt. No. 65, Text Order. Petitioner declined to file a reply. *See* Dkt. No. 72, Text Order.

## II. RELEVANT BACKGROUND

### A. Indictment

In an indictment dated July 15, 2014, Petitioner was charged with: six counts of Criminal Possession of a Controlled Substance in the Third Degree, in violation of N.Y. Penal Law ("P.L.") § 220.16; and three counts of Criminal Sale of a Controlled Substance in the Third Degree, in violation of P.L. § 220.39. Dkt. No. 49-1 at 251-54, Indictment. A Grand Jury found that Petitioner, "on or about March 28, 2014, ... possess[ed] Cocaine, a narcotic drug, with the intent to sell it" and "sold Cocaine[;]" "on or about April 28, 2014, ... possess[ed] Heroin, a narcotic drug, with the intent to sell it" and "sold Heroin[;]" "on or about April 30, 2014, ... possess[ed] Heroin ... with the intent to sell it" and "sold Heroin[;]" and "on or about June 11, 2014, ... "possess[ed] Heroin ... with the intent to sell it[,]" "possess[ed] Cocaine ... with the intent to sell it[,]" and "possess[ed] one or more preparations, compounds, mixtures or substances containing cocaine ... with an aggregate weight of one-half ounce or more." *Id.*

### B. Pre-Trial Proceedings

**\*3** Petitioner was represented by three attorneys during the course of his pre-trial proceedings–the relevant portions of which are discussed in connection with Petitioner's claims in the instant matter–until the conclusion of a *Huntley/Wade/Mapp* hearing on April 24, 2015, [1] when Petitioner informed Clinton County Court ("trial court") that he wished to proceed pro se. Dkt. No. 49-5 at 216.

---

[1]   *See generally*, *People v. Huntley*, 15 N.Y.2d 72 (1965); *Brown v. City of Utica*, No. 6:17-CV-1190 (BKS/ATB), 2020 WL 1046022, at *1 n.2 (N.D.N.Y. Mar. 4, 2020) (explaining, "a *Huntley* hearing tests the voluntariness of a defendants post-arrest statements[.]") (quotations and citations omitted); *United States v. Wade*, 388 U.S. 218 (1967); *United States v. Gershman*, 31 F.4th 80, 92-93 (2d Cir. 2022) (explaining, "[t]he purpose of a *Wade* hearing is to determine before the

trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification." (quotation and citation omitted)), *cert. denied*, 143 S.Ct. 816 (Feb. 21, 2023); *Mapp v. Ohio*, 367 US 643 (1961); *Anderson v. Miller*, No. 9:19-CV-1123 (BKS), 2022 WL 4465294, at *1 n.5 (N.D.N.Y. Sept. 26, 2022) (explaining, "[a] *Mapp* hearing tests the constitutionality of the seizure of physical evidence.") (additional quotations and citations omitted).

### C. Jury Trial

Petitioner's jury trial before Clinton County Court commenced on June 24, 2015. *See generally*, Dkt. No. 49-5 at 269. A jury was selected and sworn in, the Assistant District Attorney ("A.D.A.") delivered the People's opening statement, and Petitioner made an opening statement thereafter. Dkt. No. 49-8 at 143-48; Dkt. No. 49-9 at 1-18.

New York State Police Investigator Timothy Connolly testified he was assigned to the narcotics enforcement unit where he worked with confidential informants ("CI"s) to conduct controlled purchase operations. Dkt. No. 49-9 at 19-29. Connolly testified on March 28, 2014, CI "K.D." advised him she could purchase cocaine from an individual known to the CI as "Jay" at 14 Cross Road in Plattsburgh. *Id.* at 39-41. The CI was provided a recording and audio transmitting device and fifty dollars to purchase "[h]alf a gram of cocaine[.]" *Id.* at 45. K.D. identified Petitioner as the individual known to her as "Jay[.]" Dkt. No. 49-10 at 122-23. K.D. testified that on March 28, 2014, she met with Petitioner at 14 Cross Road and gave him the fifty dollars; Petitioner told her he "only had hundreds so he had to go get a half" a gram of cocaine; then provided her with the requested "half a gram of cocaine" packaged "[i]n a ziplock bag." *Id.* at 128-29.

K.D. testified that she met with Investigators Connolly and Ewing and provided them the cocaine and the electronic devices. Dkt. No. 49-10 at 129-30. Connolly identified People's Exhibit 5 as the "tie-off" of "cocaine that [Petitioner] sold to" K.D. on March 28, 2014. Dkt. No. 49-9 at 55-56. Forensic scientist Kathryn Botting testified she performed tests on the substance contained in People's Exhibit 5 and concluded "the sample contained cocaine." Dkt. No. 49-13 at 103-07.

Connolly testified that a second CI, "S.V.[,]" informed him that she could purchase heroin from "Jay[.]" Dkt. No. 49-9 at 68-69. Connolly stated that S.V. was provided recording and transmitting devices and "eighty dollars" to purchase "[f]our bags of heroin" on April 28, 2014. *Id.* at 70-73. S.V. identified Petitioner as "Jay[.]" Dkt. No. 49-11 at 38-39. S.V. testified that on April 28, 2014, she met with Petitioner in front of 14 Cross Road, then the pair walked to the back of the residence and entered a "camper" where the CI "asked for the four bags" and Jay "gave [her] six bags, and [she] gave him the money and left." *Id.* at 44-47. [2]

[2]    S.V. explained "[i]t was common for [Petitioner] to do that, to give people extras." Dkt. No. 49-11 at 47.

**\*4** After obtaining the bags from Petitioner, S.V. met with the Investigators and provided them the electronic devices and six bags. Dkt. No. 49-11 at 47-48. Connolly identified People's Exhibit 9 as "the heroin that was sold to [S.V.] on April 28, 2014." Dkt. No. 49-9 at 83. Botting testified that she performed tests on People's Exhibit 9 and determined "the sample contained heroin and morphine." Dkt. No. 49-13 at 109-11.

Connolly testified that S.V. reported she could purchase an additional "two bags of heroin from" Petitioner on April 30, 2014. Dkt. No. 49-9 at 88-89. S.V. testified that she arranged to meet with Petitioner "at Dunkin' Donuts" to conduct the purchase. Dkt. No. 49-11 at 49-50. S.V. was again provided electronic devices and "forty dollars" to purchase the heroin. Dkt. No. 49-9 at 91. S.V. testified she entered Petitioner's vehicle in the "Dunkin' Donuts" parking lot and "asked for the two bags[,]" then Petitioner "pulled out a prescription bottle, took two bags out [from the] multiple bags of heroin that were in the prescription bottle, [and] gave them to [S.V.]" Dkt. No. 49-11 at 53. After receiving the bags from Petitioner, S.V. provided him the money and exited the vehicle to meet with the investigators. *Id.*

S.V. explained the heroin she purchased from Petitioner was packaged "[i]n wax baggies" on both April 28, and April 30, 2014. Dkt. No. 49-11 at 54. Connolly identified People's Exhibit 13 as the "two white wax envelopes containing heroin" that Petitioner sold to S.V. on April 30, 2014. Dkt. No. 49-10 at 9. Botting testified she performed tests on People's Exhibit 13 which revealed "the sample contained heroin and morphine." Dkt. No. 49-13 at 114.

New York State Police Investigator Joey Rice testified that, as a member of the "Adirondack Drug Task Force[,]" he was involved in an investigation, the subject of which was the Petitioner. Dkt. No. 49-13 at 25-26. Rice testified that on June 11, 2014, he "received a call from Group Supervisor Matt Bell who advised [Rice] that [Petitioner] was" driving in his vehicle "northbound heading towards the Plattsburgh area[.]" *Id.* at 27. Accordingly, Rice "called Trooper Brian Caron ... [and] asked him to keep watch out for [Petitioner's] vehicle coming northbound on I-87." *Id.* Caron testified that Rice advised him that "there was a silver vehicle [driving] northbound somewhere in the area of Exit 33 with Pennsylvania plates, and ... suspected for transporting narcotics" and instructed Caron "if [Caron] came upon that vehicle and [he] observed a traffic violation to stop the vehicle." Dkt. No. 49-12 at 76.

Caron explained that he "drove to Exit 34" and entered "the interstate northbound and continued north" in an attempt to locate the vehicle and testified it was "cloudy" and "raining" and the "roads were wet." Dkt. No. 49-12 at 78. Caron stated, under vehicle and traffic law, use of headlights is "required" when vehicles operate with "the windshield wipers [turned] on" and recalled that the windshield wipers of his own vehicle were turned on at a "steady" pace at the time he entered the interstate. *Id.* Caron testified he located the vehicle Rice described "about three or four miles north of Exit 34 on the interstate" and observed "the windshield wipers were on" but "[t]here were no taillights on the vehicle" which led Caron to believe "either the vehicle [wa]s equipped with daytime running lights or that no lights were on at all[.]" *Id.* at 79. Therefore, Caron "radioed ... Trooper Ron Arnold" and asked Arnold to determine whether the vehicle Caron was following had the headlights turned on. *Id.* at 80.

**\*5** Approximately five minutes later, as both vehicles passed Arnold, "Arnold told [Caron] ... that there were no headlights on in the vehicle at all." Dkt. No. 49-12 at 80. Based on Arnold's observation, "[w]hen it was safe to do so[, Caron] initiated a traffic stop of the vehicle" in the "[t]own of Plattsburgh." *Id.* at 80-81. Caron explained "Trooper Brett Smith" arrived on the scene and approached the passenger's side of the vehicle as Caron approached the driver's side. *Id.* at 81. Caron testified the operator of the vehicle produced a Pennsylvania driver's license bearing the name "Raymond Jackson" and identified Petitioner as the driver. *Id.* at 82.

After Caron spoke to Petitioner and Smith spoke to the other occupant, the two discussed their conversations and

"determined that two different stories were given from the two different occupants of the vehicle." Dkt. No. 49-12 at 84. Accordingly, Caron performed "DMV checks of the vehicle and the operator" and "call[ed] Investigator Rice and let him know" what had happened. *Id.* Rice instructed Caron "to detain both occupants of the vehicle" and advised Caron that a "K9" would report to the scene. *Id.* at 85.

Border patrol agent Aaron Carlson testified he worked with a K9 named "Avan" in 2014, who was "trained to detect[, *inter alia*,] concealed human beings, ... cocaine and its derivatives, [and] heroin and its derivatives[.]" Dkt. No. 49-13 at 80-81. Carlson stated on June 11, 2014, he received a phone call informing him a K9 response was requested at "a vehicle stopped on ... Interstate 87[.]" *Id.* at 83. Caron testified Carlson arrived "[w]ithin five minutes" of Caron's phone call to Rice. Dkt. No. 49-12 at 85. Carlson explained K9 Avan "performed a non-intrusive free air sniff of the vehicle" and "alerted to the vehicle[,]" indicating to Carlson "that there was ... at least one of the trained odors present." Dkt. No. 49-13 at 84. Following the K9 alert, Rice arrived on the scene and instructed Caron to "bring [Petitioner] back to the state police barracks in Plattsburgh[.]" Dkt. No. 49-12 at 85.

Plattsburgh Police Department Detective Christopher Maggy, another member of the Adirondack Drug Task Force, reported to "the DEA office in Plattsburgh" to "await the arrival of" Petitioner's vehicle. Dkt. No. 49-13 at 143-45, 151-52. After Rice informed Maggy that a "warrant had been endorsed[,] ... [Maggy], Detective Bell[,] and Agent Carlson" prepared to "perform an actual search of the vehicle[.]" Dkt. No. 49-13 at 155. Maggy testified, "a suitcase that was located in the trunk area of the vehicle" was removed and searched. *Id.* at 158. Maggy testified the contents of the suitcase were removed and he "observe[d] the actual lining to the suitcase had been unzipped" and "fe[lt] a bump underneath the lining." Dkt. No. 49-14 at 2. Maggy unzipped the lining of the suitcase and discovered "a sealed oven bag" which contained "several white wax envelopes or bundles" which Maggy recognized as "commonly used to package heroin." *Id.* at 4. Maggy also "located a second sealed oven ziplock bag ... [and] observed what appeared to [be] ... clear plastic tie-offs which are commonly used ... to package cocaine or crack cocaine." *Id.* at 5-6. Rice later clarified the large bag contained "several other baggies[,]" including one that "contained a large chunk" and other, even smaller baggies which were "wrapped into ... smaller increments." Dkt. No. 49-13 at 36-37.

Maggy explained "Investigator Rice was going to be the primary agent on th[e] case." Dkt. No. 49-14 at 8. Rice testified he "received a phone call from ... Maggy, who said that they had found a quantity of narcotics in the vehicle[;]" therefore, Rice secured the narcotics "and transported them back to SP-Plattsburgh" where field tests were conducted. Dkt. No. 49-13 at 32. Rice testified the narcotics discovered in Petitioner's vehicle included "wax envelopes wrapped in rubberbands in quantities of ten"–the contents of which "field tested positive for heroin"–and "[an]other package ... which ... field tested ... positive for cocaine." *Id.* at 33. Rice identified People's Exhibit 14 as "the heroin evidence with the bundles" and People's Exhibit 15 as "the evidence of the cocaine[.]" *Id.* at 46.

**\*6** New York State Police forensic scientist Jamie Sickinger testified that she performed "two preliminary tests and a confirmatory test" on the substances contained in People's Exhibits 14 and 15. Dkt. No. 49-13 at 130-36. Sickinger explained that testing revealed "heroin was present in [the] sample" taken from People's Exhibit 14. *Id.* at 134. Sickinger also concluded, "cocaine [wa]s present in the sample" of People's Exhibit 15. *Id.* at 136.

After the People rested their case, Petitioner delivered his summation, the A.D.A. delivered the People's summation, and Clinton County Court instructed the jury on the law. Dkt. No. 49-14 at 84-131; Dkt. No. 49-15 at 1-67. The jury returned a verdict of guilty for all nine counts. Dkt. No. 49-15 at 83-85.

### D. Sentencing

On September 9, 2015, Petitioner appeared before Clinton County Court for sentencing. Dkt. No. 49-15 at 90-104. The A.D.A. asked County Court to sentence Petitioner to a total sentence of twenty-four years' determinate, to be followed by eight years of post-release supervision. *Id.* at 91-94. Petitioner made a statement thereafter. *Id.* at 95-96.

County Court sentenced Petitioner to determinate terms of three years, to be followed by two years' post-release supervision, for his convictions on counts one and two, to run concurrently with each other. Dkt. No. 49-15 at 99. For his convictions on counts three and four, County Court sentenced Petitioner to three-year determinate sentences, to run concurrently with each other and consecutively to the sentences imposed for counts one and two, and two

years of post-release supervision. *Id.* For his convictions on counts five and six, Petitioner was sentenced to three-year determinate terms, to run concurrently with each other and consecutively to the sentences imposed for counts three and four, to be followed by two years of post-release supervision. *Id.* at 99-100. Finally, Petitioner was sentenced to four year determinate sentences for his convictions on counts seven, eight, and nine, to run concurrently with each other and consecutively to the sentences imposed for counts five and six, and two years' post-release supervision. *Id.* at 100.

### E. Direct Appeal

Petitioner appealed his judgment of conviction. *See* Dkt. No. 49-1 at 1-248, Petitioner's Counseled Appellate Division Brief and Appendix, 249-93, Record on Appeal, Dkt. No. 49-2 at 1-141, Record on Appeal, Dkt. No. 49-3 at 1-23, Record on Appeal, 24-87, Petitioner's Pro Se Supplemental Brief and Exhibits, 88-436, The People's Appellate Division Brief and Appendix. In his counseled brief, Petitioner argued: (1) County Court did not conduct a sufficient inquiry into Petitioner's waiver of the right to counsel (Dkt. No. 49-1 at 21-25); (2) County Court's admission of evidence related to an uncharged drug crime deprived Petitioner of a fair trial (Dkt. No. 49-1 at 25-29); (3) testimony concerning uncharged drug sales rendered several counts duplicitous (Dkt. No. 49-1 at 29-31); and (4) the prosecutor committed misconduct by vouching for a witness' credibility and shifting the burden of proof during the People's summation (Dkt. No. 49-1 at 31-36). In a supplemental pro se brief, Petitioner added: (1) police committed misconduct by tampering with evidence (Dkt. No. 49-3 at 36-39); (2) physical evidence collected from Petitioner's car should not have been admitted (Dkt. No. 49-3 at 39-40); (3) the trial court erred in failing to grant Petitioner's motion to suppress physical evidence collected pursuant to an invalid search warrant (Dkt. No. 49-3 at 40-43); and (4) the identification process was tainted when police forged a signature on a photograph identification form (Dkt. No. 49-3 at 43-44).

**\*7** On April 12, 2018, the Appellate Division, Third Department, affirmed Petitioner's judgment of conviction. *People v. Jackson*, 160 A.D.3d 1125 (N.Y. App. Div. 3rd Dep't 2018).[3] The Third Department held "County Court conducted a sufficient 'searching inquiry' in response to [Petitioner]'s request to proceed pro se," noting that the trial court "discussed the risks and disadvantages of self-representation with" Petitioner and "conducted a separate

2023 WL 8375913

inquiry to address the knowing and intelligent character of [Petitioner]'s request to represent himself." *Id.* at 1126-27 (citations omitted). Next, the Appellate Division found Petitioner's duplicity claim to be "unpreserved" but further explained that "[n]o modification would be warranted if this issue had been preserved" because "the challenged counts clearly reference the dates on which the charged crimes took place" and "Cis' testimony that they knew defendant from earlier drug transactions was distinct from their testimony about the charged crimes[.]" *Id.* at 1127-28.

> [3]      A copy of the Third Department's Memorandum and Order affirming Petitioner's judgment of conviction is included in the State Court Records. *See* Dkt. No. 49-3 at 437-43.

Similarly, the Third Department held that Petitioner "failed to preserve claims related to evidentiary errors and acts of prosecutorial misconduct," but, "[h]ad these alleged errors been preserved, no modification would have been required." *Jackson,* 160 A.D.3d at 1128 (citations omitted). The Appellate Division explained that the testimony concerning prior uncharged drug transactions "provided necessary background information regarding how [Petitioner] became an investigation target, was relevant to [Petitioner]'s identification and, with one exception, was not unduly prejudicial[.]" *Id.* (citations omitted). Furthermore, while "the probative value of one CI's testimony that she had engaged in sexual intercourse with [Petitioner] in exchange for drugs ... was outweighed by its potential prejudicial impact ... the properly-admitted proof against [Petitioner] was overwhelming[;]" thus rendering any errors harmless. *Id.* (citations omitted). Concerning Petitioner's prosecutorial misconduct claim, the Appellate Division observed that Petitioner failed to object to the remarks at issue during the People's summation; however, even "[i]f these claims had been preserved, [the Third Department] would have found that most of the challenged remarks, when taken in context, were fair responses to [Petitioner]'s summation or fair comments on the evidence[.]" *Id.* at 1129 (citations omitted).

The Third Department also held that the claims in Petitioner's pro se supplemental brief were "unavailing." *Jackson,* 160 A.D.3d at 1129. The Appellate Division observed that Petitioner's "challenge to the search warrant on the ground that the *Aguilar-Spinelli* test was not satisfied [wa]s without merit, as the CIs were deposed in camera before the issuing magistrate, rendering that standard inapplicable[.]" *Id.* (citations omitted). Additionally, Petitioner "did not

object to the admissibility of certain drug evidence at trial ... and his underlying arguments about gaps in the chain of custody—which he did raise during the trial— go to the weight of the evidence, not its admissibility[.]" *Id.* (internal quotations and citations omitted). Finally, the Third Department explained that Petitioner's "arguments about alleged forgeries and evidence tampering by the police presented issues of credibility for the jury that were clearly resolved against him[.]" *Id.* (citations omitted).

Petitioner sought leave to appeal the Third Department's decision affirming his judgment of conviction. *See* Dkt. No. 49-3 at 444-60, Petitioner's Pro Se Leave Application, 461-69, Counseled Application for Leave. The People opposed Petitioner's Application for Leave. *See* Dkt. No. 49-3 at 470-541, Dkt. No. 49-4 at 1-12, The People's Opposition to Petitioner's Leave Application. [4] On July 18, 2018, the Court of Appeals denied Petitioner's application for leave to appeal. *People v. Jackson,* 31 N.Y.3d 1149 (2018). [5]

> [4]      Petitioner also filed a response to the People's opposition to his leave application. *See* Dkt. No. 49-4 at 22-32.

> [5]      A copy of the Court of Appeals' Opinion denying Petitioner's leave application is included in the State Court Records. *See* Dkt. No. 49-4 at 33.

### F. Writ of Error Coram Nobis

**\*8** On May 1, 2019, Petitioner filed a Motion for a Writ of Error Coram Nobis. Dkt. No. 49-4 at 34-128, Petitioner's Motion for a Writ of Error Coram Nobis and Exhibits. Petitioner argued that he was deprived of the effective assistance of counsel because his appellate counsel failed to: (1) argue that County Court should have inquired into Petitioner's mental health history in connection with Petitioner's waiver of the right to trial counsel, and (2) challenge the sufficiency of probable cause to search Petitioner's vehicle. *See id.* at 44-62. The People opposed Petitioner's motion. *Id.* at 129-42, The People's Opposition to Petitioner's Motion.

The Appellate Division, Third Department, denied Petitioner's motion. Dkt. No. 49-4 at 143, Appellate Division Decision and Order. Petitioner applied for leave to appeal the Third Department's denial of his motion. *Id.* at 144-57, Petitioner's Leave Application. On November 13, 2019, the

Court of Appeals denied Petitioner's application for leave. *Id.* at 158, Court of Appeals Order.

### G. Motion to Vacate

On February 21, 2020, Petitioner filed a Motion to Vacate his conviction pursuant to N.Y. Criminal Procedure Law ("C.P.L.") § 440.10 in Clinton County Court.[6] Dkt. No. 49-4 at 159-219, Petitioner's Motion to Vacate and Exhibits. Petitioner asserted he was entitled to a new trial on the basis of newly-discovered evidence, specifically a contact sheet and a Disc containing photographs, and that the People's withholding of these exculpatory materials violated Petitioner's rights under *Brady v. Maryland. See id.* at 165-72. The People opposed Petitioner's motion. *Id.* at 220-349, The People's Opposition to Petitioner's Motion and Exhibits.

[6]    *See generally*, C.P.L. § 440.10(1)(g)-(h).

Clinton County Court denied Petitioner's Motion to Vacate, reasoning that Petitioner's claim that law enforcement tampered with physical evidence had been adjudicated by the Appellate Division on direct appeal. Dkt. No. 49-4 at 350-35, County Court's Decision and Order.[7] Petitioner applied for leave to appeal County Court's denial of his motion. *Id.* at 354-59.[8] On October 8, 2020, the Appellate Division, Third Department, denied Petitioner's leave application. *Id.* at 367, Third Department Decision and Order.

[7]    *See also* C.P.L. § 440.10(2)(a).

[8]    The People opposed Petitioner's leave application. *See* Dkt. No. 49-4 at 360-62. Petitioner subsequently submitted a reply to the People's opposition. *See id.* at 363-66.

### III. PETITION

Petitioner challenges his 2015 judgment of conviction in Clinton County Court on six counts of Criminal Possession of a Controlled Substance in the Third Degree and three counts of Criminal Sale of a Controlled Substance in the Third Degree. Am. Pet. at 1. Petitioner contends that he is entitled to federal habeas relief because: (1) his conviction was based on fraudulent evidence (*Id.* at 5-6); (2) law enforcement lacked probable cause to search his vehicle (*Id.* at 6-8); (3) the People failed to establish a proper chain of custody for physical evidence recovered from the aforementioned

vehicle (*Id.* at 8-9); and (4) the trial court failed to conduct a thorough inquiry into Petitioner's mental health when evaluating his request to proceed pro se (*Id.* at 9-11). Respondent argues: (1) the state courts' denial of Petitioner's fraudulent evidence claim was neither contrary to, nor did it involve an unreasonable application of, clearly-established federal law (Dkt. No. 47 at 28-31); (2) Petitioner's illegal search claim is barred from habeas review by *Stone v. Powell* (Dkt. No. 47 at 31-34); (3) Petitioner's evidentiary claim is unexhausted, procedurally barred, not cognizable on federal habeas review, and meritless (Dkt. No. 47 at 34-39); and (4) Petitioner's competency claim is unexhausted, procedurally barred, and meritless (Dkt. No. 47 at 39-48).

### IV. DISCUSSION

**\*9**  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (internal quotation marks and citation omitted). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

### A. "Fraud Drug Evidence"

Petitioner first asserts he is entitled to habeas relief because "[t]he photograph of 'People's 4' Buy #1 is fraud[ulent] evidence because the drug is the depiction of crack cocaine, and not the actual cocaine powder that was sold on March 28, 2014, (Buy #1)[.]" Am. Pet. at 5. Respondent contends the state courts' denial of this claim was neither contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent. Dkt. No. 47 at 28-31.

At trial, Timothy Connolly testified a CI informed him that she could purchase cocaine from either Petitioner or another individual on March 28, 2014. Dkt. No. 49-9 at 41. The CI was provided "fifty dollars" to purchase a "[h]alf a gram of cocaine[.]" *Id.* at 45. Connolly testified the investigators utilized an audio transmitting device to listen as the CI traveled to the location of the controlled buy and completed the transaction. *Id.* at 46-48. Following the transaction, the CI returned to the Plattsburgh State Field House and provided Connolly "the half gram baggie ... a small plastic sandwich baggie tie-off containing the white powdery substance, which was cocaine." *Id.* at 48.

At trial, Connolly identified "People's Exhibit 4" as the photograph he took of the "tie-off" the CI purchased from Petitioner on March 28, 2014. Dkt. No. 49-9 at 57-59. Connolly explained he photographed and weighed the "tie-off" after he received it from the CI, then conducted a "field test" of the substance, which he identified as cocaine, then sent it to the New York State Police Lab for additional examination and testing. *Id.* at 56. Connolly identified "People's Exhibit 5" as "the open plastic tie-off that contained the cocaine that [Petitioner] sold to [the CI]" on March 28, 2014. *Id.* at 55-56. "People's Exhibit 4" was admitted into evidence without objection. *Id.* at 59.

Connolly stated the "People's Exhibit 4" depicted the "tie-off" of cocaine on a scale, which read the item's weight as "half a gram[.]" Dkt. No. 49-9 at 61. Connolly explained the reading of "half a gram" included the weight of both the substance and the packaging; therefore, the substance alone would not weigh half a gram. *Id.* at 61-62. Connolly testified that, in his experience, "a Plattsburg gram" of cocaine or crack cocaine would contain ".7 to .8" grams of the substance, but if a buyer wished to purchase "half a gram[,]" the product would contain ".3 to .4 grams" of the substance. *Id.* at 62.

Connolly further explained substances were typically packaged in one gram increments; therefore, if a buyer wished to purchase a smaller amount, "[t]hey would have to take it out of the baggie and break it into half and re-package it into another plastic tie-off." Dkt. No. 49-9 at 62. When this occurred, Connolly explained the substance "would be kind of a crumbly substance [because t]here would be powder mixed in with it[.]" *Id.* at 63. The witness stated the texture of the substance contained in "People's Exhibit 5" appeared "consistent" with a half a gram of cocaine which had been broken off from a full gram. *Id.*

**\*10** On cross-examination, Connolly confirmed Petitioner "sold a cocaine powder substance to K.D." on March 28, 2014. Dkt. No. 49-10 at 17. Connolly described cocaine as "a white powdery substance" and stated, in his experience, "[e]very cocaine that [he had] seen[,] it is powdery, but there are clumps in it." *Id.* at 17-18. Connolly confirmed People's Exhibit 5 was "the actual cocaine" Petitioner sold to the CI on March 28, 2014. [9] *Id.* at 19. Connolly further described the item, stating "[i]t's powdery and there are some clumps, which is consistent with the cocaine we buy in Clinton County." *Id.* Petitioner displayed "People's Exhibit 4" and asked Connolly whether the item the witness was "holding in [his] hand," People's Exhibit 5, "that powdery substance ... with the little chunks ... [wa]s the same drug that was sold on March 28, this one right here," apparently referring to People's Exhibit 4. *Id.* at 19-20. Connolly answered "[y]es, it is." *Id.* at 20. Petitioner asked the following questions and the witness provided the following answers:

[Petitioner]: Is that a powdery substance, sir?

[Connolly]: Yes, it is.

[Petitioner]: It is?

[Connolly]: Yes. It's a corner of the plastic baggie that's tied off and it's packaged so tight in there, the powder, it gives that look. It's consistent with every cocaine in this area.

[Petitioner]: That's strange. You know why? Because this right here looks like a block.

[Connolly]: From the corner of the baggie.

*Id.* at 21.

[9]    "People's Exhibit 5" had not been admitted into evidence at the time Petitioner conducting his cross-examination of Connolly. Dkt. No. 49-10 at 20.

Kathryn Botting identified "People's Exhibit 26" as a "copy of the case receipt record" for New York State Police Forensic Investigation Center "Laboratory Case No. 15HL-01151" and "People's Exhibit 5" as "the evidence associated with" the aforementioned case number. Dkt. No. 49-13 at 100-03. Botting testified she performed "a color test, a chromatographic screening test[,] and a molecular confirmation test" on the evidence and concluded "the sample contained cocaine." *Id.* at 105-07. Botting explained the

results of the tests she performed would not have differed, irrespective of the "crack" or "powdered" form of the substance. *Id.* at 106-07.

On cross-examination, relying on the report generated for Case No. 15HL-01151, Botting testified she reported the weight of the item as "0.39 grams," explaining "that aggregate weight means the total weight of the powder substance that was submitted." Dkt. No. 49-13 at 116-17. Petitioner asked whether the aggregate weight measurement "[i]nclud[ed] the bag, the tie-off" and Botting clarified the weight measured "[j]ust the powder substance, no packaging ... the weight on the report is only the substance itself." *Id.* at 117. Botting testified measuring weight in said manner was procedure. *Id.* Petitioner asked about "the difference between cocaine powder and crack cocaine" and Botting explained "[i]t is a form ... crack cocaine being the base form and what is referred to as powder cocaine being the salt or hydrochloride form of cocaine." *Id.* at 120. Petitioner also referred to "People's Exhibit 4" and asked the witness to "read the scale number on that weight[.]" *Id.* at 123. Botting testified the number read "0.5 without a unit of measurement" but agreed it was "[p]ossibl[e]" that the measurement was "half a gram[.]" *Id.*

On direct appeal, Petitioner argued "the photograph that was introduce[d] as evidence, by the prosecution, [as] People's [Exhibit] 4 ... is not the same drug evidence, or the identical object[,] that is associated with People's [Exhibit] 5" because the substances in the two exhibits differed "in shape, and size, and ... physical condition." Dkt. No. 49-3 at 36. Petitioner averred the "People['s Exhibit] 4[ ] is legally insufficient evidence, because People's 4" did not "depict[ ]" and was not "identical to People's [Exhibit] 5, the cocaine powder[,]" rather, People's Exhibit 4 depicted "a 'hard solid rock' 'chunky' hard substance[,] a triangle block shape." *Id.* at 37. The Appellate Division held "[Petitioner]'s arguments about alleged forgeries and evidence tampering by the police presented issues of credibility for the jury that were clearly resolved against him[.]" *Jackson*, 160 *A.D.3d at 1129* (citations omitted). Petitioner has failed to demonstrate this conclusion was either contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

**\*11**  As an initial matter, Petitioner has not alleged Clinton County Court's admission of the photograph was improper, nor does he claim the evidence supporting his conviction on counts one and two was not legally sufficient. *See* Am. Pet. at 5. Instead, Petitioner contends federal habeas relief

is warranted because the photograph admitted as "People's Exhibit 4" did not depict the item a prosecution witness purported it did.

It is well established that reviewing courts "must defer to the jury's assessments of both the weight of the evidence and the credibility of the witnesses[.]" *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990), *cert. denied*, 498 U.S. 872 (1990) (citations omitted); *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (same); *see also, e.g., Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (explaining "28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses[.]"). Therefore, it was the jury's responsibility to determine whether "People's Exhibit 4" did, in fact, depict the tie-off of cocaine the CI purchased from Petitioner on March 28, 2014, as Connolly claimed. *See, e.g., Gonzalez-Pena v. Herbert*, 369 F. Supp. 2d 376, 387 (W.D.N.Y. 2005) ("[t]he issue of whether the packets introduced at trial and analyzed as heroin were the packets seized ... was for the jury to decide based upon all the evidence before it.") (citing *Howard v. Keane*, No. 1:91-CV-0723, 1991 WL 352488, at *2 (E.D.N.Y. Dec. 9, 1991) ("[w]hether the packets introduced at trial and analyzed as cocaine were the packets seized was for the jury to decide.")).

Following Connolly's identification of the exhibit on direct examination, Petitioner conducted a thorough cross-examination, during which he inquired about the appearance of the cocaine he was charged with selling to the CI. *See* Dkt. No. 49-10 at 17-21. The witness asserted that, based on his experience, the substance depicted in the photograph was "consistent with" cocaine and that the appearance of what Petitioner called "a block" could be attributed to the substance's location in "the corner of the baggie." *Id.* at 21. Similarly, during his cross-examination of the People's expert, Petitioner asked a series of questions concerning the apparent disparity between the tie-off's reported weight of "0.39 grams" and the "0.5" weight reading on the scale as depicted in the photograph. *See* Dkt. No. 49-13 at 116-23. Botting explained "the weight on the report is only the substance itself" and did not include the plastic bag packaging. *Id.* at 117.

The jury's decision to credit the prosecution's theory of the case–that "People's Exhibit 4" was a photograph of cocaine K.D. purchased from Petitioner–rather than the defense's presents no issue of constitutional dimension. *Campbell v. Greene*, 440 F. Supp. 2d 125, 157-58 (N.D.N.Y. 2006) (rejecting the petitioner's "claim[ ] that the testimony

2023 WL 8375913

provided by the police officers who testified on behalf of the prosecution was 'not credible[ ]' " because "it is well established that courts viewing a cold record may not properly reassess the jury's finding of credibility concerning the testimony of witnesses offered at trial."); *see also Stallings v. Woods*, No. 1:04-CV-4714, 2006 WL 842380, at *9 (E.D.N.Y. Mar. 27, 2006) ("juror[s] w[ere] certainly entitled to credit the prosecution's version of events over that of the defense. This Court may not revisit these credibility determinations.") (citations omitted); *Alvarez v. Conway*, No. 1:05-CV-3235, 2005 WL 3434634, at *5 (S.D.N.Y. Dec. 13, 2005) ("[t]he jury obviously accepted the prosecutor's argument in rendering its verdict, and it is axiomatic that a habeas court may not revisit the jury's credibility determinations.") (citing *Marshall*, 459 U.S. at 432-35; *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993)).

*12 In sum, the Appellate Division's conclusion – that Petitioner's claim that "People's Exhibit 4" was not actually a photograph of the tie-off of cocaine the CI purchased from Petitioner on March 28, 2014, was a matter for the jury to resolve – was neither contrary to, nor did it involve an unreasonable application of, clearly-established federal law. Accordingly, federal habeas relief is not warranted.

### B. "Insufficient Probable Cause, Illegal Search [and] Seizure"

Petitioner next avers he is entitled to federal habeas relief because of an "illegal search [and] seizure[.]" Am. Pet. at 6. Petitioner claims "[a]n unidentifi[ed] law enforcement source contact[ed] Det. Matt Bell about a drug transport, but it is unclear where [sic] the law enforcement source got this information of requisite knowledge" and the magistrate judge "signed a search warrant at 4:35 p.m." to allow police to search Petitioner's vehicle, but evidence demonstrates police "entered the vehicle ... at 3:18 p.m. and documented the drug evidence [collected as a result of the search of the vehicle] at 3:18 p.m." *Id.* Respondent contends habeas review of Petitioner's Fourth Amendment claim is precluded by *Stone v. Powell*. Dkt. No. 47 at 31-34.

In *Stone v. Powell*, the Supreme Court held, "where [a] State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure

was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). Following *Stone*, federal habeas review of Fourth Amendment claims is permissible only "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citations omitted).

Petitioner has not, and cannot, claim an absence of corrective procedures to redress the alleged violation here. *See generally*, Am. Pet. at 6. "[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in [C.P.L.] § 710.10 *et seq.* ... as being facially adequate.' " *Capellan*, 975 F.2d at 70 n.1 (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989); then citing *Gates v. Henderson*, 568 F.2d 830, 837 n.4 (2d Cir. 1977), *cert. denied*, 434 U.S. 1038 (1978); *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)).

Indeed, Petitioner availed himself of the aforementioned procedure by moving, pursuant to C.P.L. § 710.20, to suppress "all evidence seized or discovered as a result of [Petitioner's] traffic stop and subsequent arrest on June 11, 2014[.]" Dkt. No. 49-2 at 29-33. Clinton County Court conducted a *Mapp* hearing, during which Petitioner's attorney cross-examined the People's witnesses and asked the court to suppress the fruit of the June 11, 2014, seizure in closing remarks. Dkt. No. 49-5 at 65-222. Following the hearing, Clinton County Court issued a written order denying Petitioner's motion to suppress. Dkt. No. 49-2 at 106-07. Furthermore, on direct appeal, Petitioner averred his "motion to suppress the physical evidence [collected] on June 11, 2014, ... should have been granted[,]" an argument which the Appellate Division found to be "unavailing." Dkt. No. 49-3 at 43; *Jackson*, 160 A.D.3d at 1129. Therefore, Petitioner is unable to demonstrate a lack of corrective procedures to redress the claimed Fourth Amendment violation.

*13 Nor has Petitioner proved that "an unconscionable breakdown" in New York's corrective processes occurred. "An unconscionable breakdown in the underlying process occurs when 'the totality of state procedures allegedly did not provide rational conditions for inquiry into federal law.' " *Cepeda v. Morton*, No. 1:19-CV-2444, 2020 WL 6382052, at *5 (S.D.N.Y. Oct. 30, 2020) (quoting *Capellan*, 975 F.3d at 70), *appeal dismissed*, No. 20-3873, 2021 WL 1964767 (2d Cir. May 13, 2021). To the extent Petitioner contends the state

courts' decisions were incorrect, "a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." *Capellan*, 975 F.3d at 72. [10]

[10]    Rather, examples of "unconscionable breakdowns in the underlying procedure" justifying habeas inquiry include "situations such as the bribing of a trial judge, the government's knowing use of perjured testimony, or the use of torture to extract a guilty plea ... without opportunity to obtain state review." *Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988) (citations omitted), *affirmed*, 852 F.2d 59 (2d Cir. 1988).

In sum, Petitioner was afforded an opportunity to challenge the alleged Fourth Amendment violations in state court and there is no basis to conclude that "an unconscionable breakdown" in New York's corrective process occurred here. Therefore, federal habeas review of Petitioner's Fourth Amendment claim is barred.

### C. "Chain of Custody"

Petitioner also argues that habeas relief is warranted because of a "chain of custody" issue related to the "June 11, 2014, drug evidence." Am. Pet. at 8. Petitioner states:

> The drug evidence on June 11, 2014, is being documented at two separate location[s, which] w[ould] be physically impossible. Christopher Maggy['s] field notes show the drugs being discovered at 16:53 and 16:54 and their search concluded at 17:48[.] However, T[roo]p[e]r Bryan C[a]ron is taking photographs of the drug evidence at 5:25 p.m. and concluded at 5:45 p.m. at S[tate] P[olice station at] Plattsburg[;] however, Det. Maggy is in possession of the evidence at the DEA Garage at 5:48 p.m.

*Id.* Respondent contends this evidentiary claim is not cognizable on federal habeas review and any federal constitutional issue must be denied as procedurally barred due to Petitioner's failure to exhaust state court remedies. Dkt. No. 47 at 34-39.

In his pro se supplemental brief to the Appellate Division, Petitioner argued the "June 11, 2014, drug evidence[ ] ha[d] a gap in the chain of custody." Dkt. No. 49-3 at 39. Petitioner cited two New York cases with respect to his chain of custody argument. *See id.* at 39-40. The Third Department found Petitioner's claim to be "unavailing[,]" observing Petitioner did not object to the admissibility of the evidence at trial and, irrespective of Petitioner's failure to object, "arguments about gaps in the chain of custody ... go to the weight of the evidence, not its admissibility[.]" *Jackson*, 160 A.D.3d at 1129 (internal quotations and citations omitted).

"Federal courts in New York have held that a chain of custody argument is a matter governed by New York law and provides no basis for federal habeas relief." *Danford v. Graham*, No. 9:12-CV-0201 (JKS), 2014 WL 1412492, at *5 (N.D.N.Y. Apr. 11, 2014) (citing *Gonzalez-Pena*, 369 F.Supp. 2d at 387; *Tirado v. Senkowski*, 367 F.Supp. 2d 477, 487 (W.D.N.Y. 2005); *Estelle*, 502 U.S. at 67-68). Therefore, Petitioner's chain of custody claim is not cognizable on habeas review. *Gonzalez-Pena*, 369 F.Supp.2d at 387-88. Because Petitioner's chain of custody claim provides no basis upon which federal habeas relief could be granted, dismissal is warranted.

### D. The Trial Court's Failure to "Conduct a Thorough Inquiry"

**\*14**    Finally, Petitioner avers "County Court ... did not conduct a thorough inquiry [into] the [P]etitioner's mental health history [prior to] allowing the petitioner to proceed pro se[.]" Am. Pet. at 9. Respondent contends Petitioner's competence claim is unexhausted, procedurally defaulted, and meritless. Dkt. No. 47 at 39-48.

### 1. Petitioner's Competence Claim is Procedurally Defaulted

An application for a writ of habeas corpus may not be granted until a petitioner has exhausted all remedies available in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(A)-(B)(ii). To satisfy the exhaustion

requirement, a petitioner must do so both procedurally and substantively. Procedural exhaustion requires that a petitioner raise all claims in state court prior to raising them in a federal habeas corpus petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Substantive exhaustion requires that a petitioner "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). In other words, a habeas Petitioner is required to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.

Petitioner did not challenge the trial court's alleged failure to sufficiently inquire into his mental health history on direct appeal in either his counseled or pro se brief. *See* Dkt. No. 49-1 at 1-36, Petitioner's Counseled Appellate Division Brief; Dkt. No. 49-3 at 24-45, Petitioner's Pro Se Supplemental Appellate Division Brief. While Petitioner did assert Clinton "County Court's Searching Inquiry Regarding [Petitioner]'s request to proceed pro se was insufficient because it did not rigorously convey the dangers of waiving counsel at trial"–Dkt. No. 49-1 at 21–Petitioner's claim that the trial court failed to adequately inform him of the consequences of his decision to waive his right to trial counsel is distinct from Petitioner's claim in the instant petition. Because Petitioner did not "fairly present" the issue raised here in his direct appeal, the instant claim was not properly exhausted. *See Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 192 (2d Cir. 1982) (explaining a federal habeas petitioner has "fairly presented" a claim in state court only where he: (1) "informed the state court of both the factual and the legal premises of the claim he asserts in federal court[,]" and (2) "placed before the state court essentially the same legal doctrine he asserts in his federal petition" because "[t]he chief purposes of the exhaustion doctrine would be frustrated if [a] federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court.").

Petitioner first raised the issue of his competence to waive his right to trial counsel in his application for coram nobis relief. Petitioner argued "[a]ppellate counsel was ineffective for not raising [Petitioner]'s lengthy mental health history[,]" specifically, the fact that Petitioner "was hospitalized in a United States federal Medical Center ... for a mental defect ... [and Petitioner]'s federal indictment was dismiss[ed] because [Petitioner] was deem[ed] incompetent to stand trial, in the

[E]astern [D]istrict [of Pennsylvania]." Dkt. No. 49-4 at 38. "However, a petition for a writ of error *coram nobis* does not exhaust the underlying claims advanced to support the claim of ineffective assistance of appellate counsel." *Zimmerman v. Burge*, 492 F. Supp. 2d 170, 189 (E.D.N.Y. 2007) (citing *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001)). Therefore, Petitioner's claim concerning the trial court's alleged failure to adequately assess Petitioner's competence was not exhausted by Petitioner's application for coram nobis relief on the basis of ineffective assistance of appellate counsel. *See Miller v. Chapplus*, No. 9:16-CV-0512 (TJM/CFH), 2018 WL 2709228, at *8 (N.D.N.Y. Apr. 2, 2018) ("Petitioner's filing of the coram nobis petition[,]" wherein the Petitioner argued his appellate counsel was ineffective for failing to raise a claim on direct appeal, "did not exhaust his challenge to the underlying state trial court error.") (citation omitted), *report and recommendation adopted*, 2018 WL 2694425 (N.D.N.Y. June 5, 2018).

**\*15** "For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.' " *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (quoting *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989)) (additional citations omitted).

> When a claim has never been presented to a state court, a federal court may theoretically find that there is an "absence of available State corrective process" under § 2254(b)(1)(B)(i) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile.

*Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001). A Petitioner's unexhausted constitutional claim is procedurally barred under New York law where it was not included in the Petitioner's "completed ... direct appeal and the nature of the claim is apparent from the face of the record, meaning that [the Petitioner] would be barred from raising it in a motion to vacate the judgment." *Jackson v. Conway*, 763 F.3d 115, 143 (2d Cir. 2014) (citing N.Y. Crim. Proc. Law § 440.10(2)(c); *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003)).

Petitioner's claim concerning the trial court's allegedly insufficient inquiry into his competence is record based. *See United States v. Berger*, 188 F. Supp. 2d 307, 325 (S.D.N.Y. 2002) ("[i]n judging whether a court's decision not to order a competence hearing was in error 'only the evidence before the court at the time its decision was made is pertinent.' ") (quoting *Nicks v. United States*, 955 F.2d 161, 168 (2d

Cir. 1992)); *United States v. Gabb*, 80 F. App'x 142, 145 (2d Cir. 2003) (explaining "the question of competency and reasonable cause to doubt it must focus upon the defendant's abilities *at the time of trial*, not any conduct discovered or analyzed after the fact.") (citing *United States v. Vamos*, 797 F.2d 1146, 1150-51 (2d Cir. 1986)) (emphasis in original). As such, Petitioner was required to raise the claim on direct appeal; however, because he failed to do so, the claim is procedurally barred by state law. *See* C.P.L. § 440.10(2)(c) (New York courts "must deny a motion to vacate a judgment" where "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion" but "no such appellate review or determination occurred owing to the defendant's ... unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him[.]").

"[I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred ... there is a procedural default for purposes of federal habeas[.]" *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991) (citations omitted). [11] The Supreme Court has held where, as here, "a state prisoner has defaulted his federal" constitutional claim:

> Federal habeas review of the claim[ ] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice.

**\*16** *Coleman*, 501 U.S. at 750. To satisfy the "cause" requirement, Petitioner must show "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 127 (2d Cir. 1995).

[11]    The procedural default doctrine applies whether the default occurred at trial, on appeal or on state collateral review. *Murray v. Carrier*, 477 U.S. 478, 490-92 (1986).

### 2. Petitioner has Failed to Demonstrate Either "Cause" for The Procedural Default and Resulting "Prejudice" or "A Fundamental Miscarriage of Justice"

As explained above, Petitioner has argued his appellate counsel was ineffective for failing to challenge the sufficiency of the trial court's consideration of Petitioner's mental health history in connection with Petitioner's waiver of the right to counsel. *See* Dkt. No. 49-4 at 38. However, "attorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel." *Davila v. Davis*, 582 U.S. 521, 528 (2017) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)). Petitioner is unable to prove appellate counsel's failure to raise the instant claim on direct appeal rose to the level of constitutionally defective assistance.

To prove he was denied the effective assistance of counsel, Petitioner must demonstrate: (1) "counsel's performance was deficient" and (2) counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the first prong, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' " *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688). "To establish *Strickland* prejudice[,] a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694). Accordingly, counsel's failure to raise a meritless claim cannot amount to ineffective assistance. *See, e.g., Aparicio*, 269 F.3d at 99. [12]

[12]    *See also Hanks v. Kelly*, No. 9:14-CV-0618 (BKS), 2015 WL 6738830, at *12 (N.D.N.Y. Nov. 4, 2015)
    When challenging the effectiveness of appellate counsel, a petitioner must show that counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker" ... A petitioner must show more than counsel's failure to raise a non-frivolous argument, because counsel is required to use professional judgment when deciding to concentrate on a few key issues while eliminating weaker arguments, and is not

required to advance every argument urged by the petitioner.

(quoting *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); then citing *Evitts v. Lucey*, 469 U.S. 387, 394 (1985); *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)) (additional citation omitted).

"[T]he Sixth Amendment right to the assistance of counsel implicitly embodies a 'correlative right to dispense with a lawyer's help.' " *Faretta v. California*, 422 U.S. 806, 835 (1975) (quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942)). However, "a defendant choosing self-representation must do so 'competently and intelligently[.]' " *Godinez v. Moran*, 509 U.S. 389, 400 (1993) (quoting *Faretta*, 422 U.S. at 835). The "standard for competence to ... waive the right to the assistance of counsel" is the same as the standard for competence to stand trial, a defendant must have the " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and ... 'a rational as well as factual understanding of the proceedings against him.' " *Godinez*, 509 U.S. at 396 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)); *see also King v. Cunningham*, 442 F. Supp. 2d 171, 186 (S.D.N.Y. 2006) (explaining that "[w]hile New York law on competency determinations is different from federal law, it provides the 'procedural protections' required under federal law.") (quoting *Silverstein v. Henderson*, 706 F.2d 361, 367 (2d Cir. 1983)) (footnote omitted). [13]

[13]    *See also Godinez*, 509 U.S. at 399 (rejecting the argument "that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not ... [because] the competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself.").

**\*17** It is well established that "a competency determination is necessary *only when a court has reason to doubt the defendant's competence.*" *Godinez*, 509 U.S. at 401 n.13 (emphasis added). "There are ... no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed[.]" *Drope v. Missouri*, 420 U.S. 162, 180 (1975). However, "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required[.]" *Drope*, 420 U.S. at 180 (citing *Pate v. Robinson*, 383 U.S. 375 (1966)). Further, "the trial court is required to consider

only that evidence actually before it when deciding whether a competency hearing is required." *Nicks*, 955 F.2d at 169 (citing *Vamos*, 797 F.2d at 1150) (additional citations omitted).

Ultimately, "[t]he inquiry is whether, 'in light of what was then known, the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial.' " *Nicks*, 955 F.2d 169 (quoting *Drope*, 420 U.S. at 174-75). In his application for coram nobis relief, Petitioner argued his "extensive history [of] ... mental health illnesses[;] ... [use of] psyc[h]otic medication during his detention[; and] ... outburst[s] with [the] trial judge" demonstrated he "lack[ed] the mental capacity to represent himself in a[ ] criminal case[.]" Dkt. No. 49-4 at 46-48.

### i. Petitioner's History of Mental Health Issues

In arguing appellate counsel was ineffective for failing to raise the issue of his competence to waive the right to counsel, Petitioner stated he "ha[d] been dealing with mental health issues since [he was] a child ... and during trial proceedings[, Petitioner] did not, and could not, have exercised the right[ ] to represent himself" especially in light of the fact that he "ha[d] been dem[ed] legally incompetent and lack[ing] the mental capacity to stand trial and to aid in his defense[.]" Dkt. No. 49-4 at 47 (citing *United States v. Jackson*, No. 03-173-04, 2009 WL 691973, at *1 (E.D. Pa. Mar. 16, 2009)). [14] That Petitioner had a history of mental illnesses, however, is insufficient to prove that Clinton County Court's failure to further inquire into Petitioner's competence denied him a fair trial.

[14]    On March 16, 2009, the United States District Court for the Eastern District of Pennsylvania found Petitioner "incompetent to stand trial" and ordered that Petitioner be "commit[ted] ... to the custody of the Attorney General for release to the appropriate state official or to hospitalize [Petitioner] ... for treatment in a suitable facility." *Jackson*, 2009 WL 691973, at *3. On January 14, 2011, the Eastern District of Pennsylvania ordered Petitioner be discharged from custody. *Jackson*, No. 03-173-04, Dkt. No. 386.

As explained above, in determining whether a hearing to further inquiry into Petitioner's competency was warranted, Clinton County Court was "required to consider only

that evidence actually before it[.]" *Nicks*, 955 F.2d at 169 (emphasis added). Significantly, the record lacks any indication that evidence of Petitioner's history of mental health issues or the 2009 finding of incompetence were put before Clinton County Court. Petitioner has not alleged, either in support of his application for coram nobis relief or in the instant action, that the trial court was aware of his history of mental illness. *See* Dkt. No. 49-4 at 44-48; Am. Pet. at 9-11. Indeed, at the May 5, 2015, hearing – conducted for the purpose of confirming Petitioner's intent to proceed pro se – Petitioner informed the court, as a part of its colloquy, that he had previously appeared before courts in "New York, Downstate, ... [and] Pennsylvania" but did not explain the disposition of the Eastern District of Pennsylvania case. Dkt. No. 49-5 at 250.

**\*18** Furthermore, the Eastern District of Pennsylvania's March 16, 2009, conclusion that Petitioner was not competent to stand trial occurred more than six years before Petitioner's June 2015, jury trial. *Jackson*, 2009 WL 691973, at \*10. "The question of competency to stand trial is limited to the defendant's abilities *at the time of trial[.]*" *Vamos*, 797 F.2d at 1150 (emphasis added) (citing *United States v. Makris*, 483 F.2d 1082, 1091 (5th Cir. 1973), *cert. denied*, 415 U.S. 914 (1974)). Accordingly, the fact that Petitioner had been deemed incompetent to stand trial in 2009, without more, does not prove Clinton County Court erred in failing to conduct a formal inquiry into Petitioner's competence.

Additionally, "[i]t is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." *Vamos*, 797 F.2d at 1150-51 (2d Cir. 1986) (citing *Hall v. United States*, 410 F.2d 653, 658 (4th Cir. 1969), *cert. denied*, 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436 (1969)). "The mental illness must deprive the defendant of the ability to consult with his lawyer 'with a reasonable degree of rational understanding' and to understand the proceedings against him rationally as well as factually." *United States v. Nichols*, 56 F.3d 403, 412 (2d Cir. 1995) (quoting *Dusky*, 362 U.S. at 402); *see also e.g.*, *Davis v. Keane*, 45 F. App'x 31, 32-33 (2d Cir. 2002) (Summary Order) (holding "[n]o clearly established Federal law ... indicates that [the petitioner]'s low I.Q. and history of mental impairment alone required the trial court *sua sponte* to order a competency hearing" and petitioner's "counsel did not act unreasonably when he did not move for a competency hearing[.]"). Therefore, even if Clinton County Court had been provided evidence of Petitioner's history of mental health issues, further inquiry into Petitioner's competence may not have been warranted.

*See, e.g.*, *Alexis v. Griffin*, No. 1:11-CV-5010, 2014 WL 3545583, at \*17 (S.D.N.Y. July 18, 2014) (concluding "the mere fact that [the petitioner] suffered from a mental illness that required him to be hospitalized for a brief period did not preclude [the trial court] from determining that an additional competency hearing was unnecessary."), *report and recommendation adopted*, 2014 WL 5324320 (S.D.N.Y. Oct. 20, 2014); *Smith v. Lempke*, No. 6:08-CV-6065, 2010 WL 2629794, at \*6-7 (W.D.N.Y. June 28, 2010) (rejecting the petitioner's "claim[ ] that the state court erroneously failed to inquire into his competence prior to trial and sentencing" noting "a defendant's history of mental impairment alone does not require the trial court *sua sponte* to order a competency hearing.") (citing *People v. Tortorici*, 92 N.Y.2d 757, 765 (1999) (a "defendant's history of psychiatric illness does not in itself call into question defendant's competence to stand trial.")) (additional citations omitted).

Finally, as identified by Respondent, none of the three attorneys tasked with representing Petitioner prior to his waiver of counsel called Petitioner's competency into question or moved for a competency examination. [15] Courts in this district have concluded "[t]he fact that trial counsel never moved for a competency examination and never called petitioner's competency into question ... indicates petitioner's competence." *Mosby v. O'Meara*, No. 9:12-CV-1543 (FJS/ATB), 2015 WL 4871803, at \*8 (N.D.N.Y. Aug. 13, 2015) (citing *Pate*, 383 U.S. at 391); *see also Chicherchia v. Griffin*, No. 9:16-CV-1027 (NAM/ATB), 2017 WL 9511171, at \*8-9 n.6 (N.D.N.Y. May 22, 2017) (rejecting the argument that the trial court should have conducted a competency hearing because of the petitioner's "history of mental illness" and "multiple verbal outbursts prior to and during the trial" and explaining "[t]he fact that petitioner's legal counsel did not express any doubts about [petitioner's] competency during the proceeding is a valid factor for the court to consider."), *report and recommendation adopted*, 2017 WL 2819816 (N.D.N.Y. June 29, 2017); *Rodriguez v. Lamanna*, No. 2:18-CV-07196, 2020 WL 4926358, at \*4 (E.D.N.Y. Aug. 19, 2020) (concluding the petitioner's claim "that his guilty plea was not knowing, voluntary, and intelligent because the trial court did not inquire into his mental capacity" did not warrant federal habeas relief and observing "quite significantly, as the record memorializes, neither of the two lawyers who appeared on behalf of [the petitioner] suggested that [petitioner] was incompetent to stand trial ... nor did either of them at any time ... request that a competency hearing be ordered."). Here, that none of the attorneys who served as counsel for Petitioner raised the issue of Petitioner's competence

provides further support for the conclusion that Petitioner had a rational understanding of the proceedings during which he was represented and, accordingly, that further inquiry into the subject was not warranted.

15    At Petitioner's arraignment, Clinton County Court appointed Mr. Michaud as counsel. Dkt. No. 49-5 at 3. In a letter dated August 4, 2014, Petitioner "inform[ed] the [trial] court[ ] that [he was] firing Mr. Michaud as [his] attorney[.]" Dkt. No. 49-1 at 49. Clinton County Court relieved Mr. Michaud on August 12, 2014. Dkt. No. 49-5 at 12. Thereafter, Petitioner hired Mr. Norfolk as counsel, who first appeared on Petitioner's behalf on September 16, 2014. Dkt. No. 49-5 at 15. Mr. Norfolk asked the trial court to be relieved prior to the February 24, 2015, hearing, during which Petitioner stated he had no objection to Mr. Norfolk's request. Dkt. No. 49-5 at 26-28. Clinton County Court Ordered Mr. Norfolk be relieved as counsel on February 27, 2015, and adjourned the proceedings for Petitioner to obtain representation. Dkt. No. 49-1 at 52; Dkt. No. 49-5 at 29-31. Following Mr. Norfolk's discharge, Petitioner asked the trial court that he, being "competent with a sound mind [and] very capable of representing [himself] in this matter[,]" be allowed to proceed with a "co-counsel of [his] choosing." Dkt. No. 49-1 at 53. At a hearing on March 11, 2015, Petitioner asked the trial court to appoint new counsel. Dkt. No. 49-5 at 49. Accordingly, Clinton County Court appointed Mr. Anderson as counsel, who entered his appearance before the court on March 13, 2015. Dkt. No. 49-5 at 60. At the conclusion of the *Huntley/Wade/Mapp* hearing on April 24, 2015, Clinton County Court relieved Mr. Anderson. Dkt. No. 49-5 at 221.

### ii. Petitioner's Use of Medications

 **\*19**  Petitioner also argued appellate counsel should have raised the trial court's failure to assess Petitioner's capacity to waive the right to trial counsel because he "was taking medication during trial and after trial[ ] for Bipolar Depression" because he "ha[d] been diagnose[d] with a mental defect, which includes symptoms of: Paranoid Ideation, hallucinations, Bipolar affective disorder, and Schizophrenic disorder." Dkt. No. 49-4 at 48 (citing *Jackson, 2009 WL 691973*).

As previously stated, evidence of the Eastern District of Pennsylvania's 2009 Order finding Petitioner incompetent was not presented to Clinton County Court at the time of Petitioner's trial. Therefore, the trial court was under no obligation to consider the diagnoses in the aforementioned order, which was not before it. *See Nicks, 955 F.2d at 169*.

Prior to trial, Petitioner filed a motion requesting release on his own recognizance or bail, dated April 10, 2015, wherein Petitioner argued he should be released "due to[, *inter alia,*] the extreme ... mental stress of being incarcerated." Dkt. No. 49-2 at 61. In a subsequent letter to the trial court, dated April 15, 2015, Petitioner asked the court to "release [Petitioner] on his own recognizance" because the People and the trial court "ha[d] eroded [Petitioner's] Due Process [rights], and cause[d] significant[ ] damage to [Petitioner's] mental state[.]" *Id.* at 62. Petitioner averred he "ha[d] high blood pressure, which [he] t[ook] medication for" and took a "prescri[ption] medication (Prozac) for anxiety[ ] and deep depression." *Id.* Because Petitioner's use of "Prozac" was "actually before" Clinton County Court, the trial court was obligated to consider that fact in determining whether further inquiry into Petitioner's competence was required.

However, Petitioner's use of "Prozac[ ] for anxiety[ ] and deep depression" did not require Clinton County Court to inquire into his competence to waive the right to counsel and proceed to trial. *See, e.g., Lopez v. Walker, 239 F. Supp. 2d 368, 374-75 (S.D.N.Y. 2003)* (rejecting the petitioner's argument that the trial court "err[ed] in failing to inquire into [his] competency[,]" despite the petitioner's "prior suicide attempts, hospitalization, and use of the drug Sinequan" because "[t]his evidence alone did not require the [state] court to make a further inquiry into [the petitioner]'s competency to stand trial[.]"); *Rodriguez, 2020 WL 4926358, at \*4* ("[t]he trial court's decision to go forward without ordering a competency hearing was not inappropriate" because "[a]lthough [a] report detailed [the petitioner's] history of prior hospitalizations, mental health therapy, suicide attempts, and use of psychiatric medication, this evidence alone does not trigger a right to a competency hearing when, otherwise, there is no indication of incompetence."); *see also, e.g., Cohn v. United States, No. 1:19-CR-0279 (LEK), 2023 WL 4670839, at \*13 (N.D.N.Y. July 10, 2023)* (concluding "it was not an abuse of discretion to refrain from sua sponte ordering a competency hearing" despite evidence of the petitioner's "extensive history of mental illness" and "use of several medications to manage his mental health issues,

including 'Zoloft (an antidepressant which can also be used to treat anxiety disorders, post-traumatic stress disorder, and other conditions), Buspar (an anti-anxiety medication), Clozapine (used to treat schizophrenia), and Trazadone (an antidepressant).' ").

**\*20** Petitioner did not allege his use of "Prozac" during trial impaired his ability to understand the proceedings. *See e.g.*, *Munck v. Amoia*, No. 9:16-CV-0118 (GLS), 2016 WL 4275737, at \*4 (N.D.N.Y. Aug. 12, 2016) (petitioner claimed his entry of a "guilty plea was unknowing, involuntary and unintelligent because" at the time, the petitioner "suffer[ed] from bipolar disorder and ... was taking several medications" which "tend[ed] to impair his concentration and understanding.") (internal quotations omitted); *Roman v. Cunningham*, No. 04-CV-1093, 2005 WL 1796122, at \*2 (E.D.N.Y. July 27, 2005) (petitioner argued, in a motion to vacate his judgment of conviction, "that his plea was not knowing and voluntary because he was 'under the influence of various medications' that impaired his ability to understand the proceedings."). Instead, Petitioner appears to argue his use of medication to treat mental health issues evinces he should not have been permitted waive his right to trial counsel. Dkt. No. 49-4 at 48. Petitioner's argument is unpersuasive, however, as "some degree of mental illness cannot be equated with incompetence to stand trial." *Vamos*, 797 F.2d 1150-51. Therefore, the fact that Petitioner utilized medication to treat symptoms of a mental illness during the pre-trial and trial proceedings did not require the court to inquire into his competence to waive trial counsel. *See, e.g.*, *Lopez*, 239 F. Supp. 2d at 374-75.

### iii. Petitioner's Behavior

Finally, Petitioner argued appellate counsel's failure to raise the issue of his mental capacity constituted ineffective assistance because Petitioner "had a few outburst[s] with [the] trial judge[.]" Dkt. No. 49-4 at 46. Petitioner cited two exhibits in support of this argument: a portion of the transcript from the May 5, 2015, hearing and a portion of the transcript from the *Huntley/Wade/Mapp* hearing which took place on April 23-24, 2015. *See id.* at 73-88. [16]

[16]    *See also* Dkt. No. 49-5 at 65-222 (Transcript April 23-24, 2015), 240-59 (Transcript May 5, 2015).

In the portion of the *Huntley/Wade/Mapp* hearing cited by Petitioner, Clinton County Court first acknowledged the

appointed counsel's report that Petitioner wished to terminate counsel's representation of him then informed Petitioner that if he wished to proceed pro se, Petitioner would be required to abide by the same rules of evidence and decorum as an attorney. Dkt. No. 49-5 at 216. Petitioner requested "a Court Order for [handwriting] samples from [Investigators] TJ Connolly and Sue Ewing[, because] TJ Connolly forged those documents[.]" *Id.* at 216-17. The court asked Petitioner to elaborate and Petitioner explained his theory that "the confidential informant didn't pick [him] out" as the individual who sold the CI drugs. *Id.* at 217. The court asked how the CI's signature related to the discovery of "drugs ... in [petitioner's] suitcase" and Petitioner answered the police were "trying to base everything off of th[e traffic] stop. The reason why they stopped me on June 11th was because I made sales [to the CI] in the past [in] March and April[.]" *Id.*

The trial court stated "12 jurors" would be the ones to "make a determination as to [the] credibility" of the document and "whether that was signed properly or not, can the police/ People prove that [Petitioner] possessed drugs on the occasion that [he] was arrested? ...That's the whole issue. I don't understand how that plays." Dkt. No. 49-5 at 218. Petitioner began to respond, explaining that if the documents related to the March and April sales had been forged, but the court interjected that the documents at issue were not forged, to which Petitioner asserted, the "signatures [were] totally different[.]" *Id.* at 218-19. The trial court explained the documents were "subject to proof[,]" Petitioner stated he had hired a forensic scientist, and the following colloquy ensued:

The Court: A jury is going to have to decide whether --

[Petitioner]: Why does a jury got to decide if that's proof? A real judge would just give a sample so I don't have to go through this. This is [sic] violating my rights. You just sat here and just said it don't solve nothing if you forge those documents or somebody else signed for the confidential informant.

**\*21** I don't know which Constitution you live under, but that is not New York State or United States Constitution. That is a Fourth Amendment [violation] of the due process.

The Court: When you get your law degree, you tell me more about it.

[Petitioner]: You're right, Mr. biased Judge.

*Id.* at 219. The court announced the matter was adjourned, but Petitioner continued, requesting a "hearing for police misconduct and prosecut[orial] misconduct" and "a court order." *Id.* at 220.

Clinton County Court stated there was "absolutely no proof" of misconduct in the matter, but Petitioner argued "[t]he signatures [we]re forged" and the "forensic scientist said they were forged; they are different from one another. He clearly stated it's not signed by one person[.]" Dkt. No. 49-5 at 220. The court repeated that the matter was adjourned and Petitioner responded "[t]hat's okay, but I'm going to keep writing that Appellate Division, the Third Department[,] until I get it. I will get it." *Id.* The court explained that Petitioner could continue writing, but his request for a hearing would not be granted. *Id.* Petitioner responded "[y]eah, I will, Mr. biased Judge. I will. I will. I promise. No, Mr. McGill, you're wrong. You just said it's okay to forge a document. That's what you just said. Did I hear that right?" then exited the courtroom. *Id.* at 220-21.

The May 5, 2015, hearing began with Clinton County Court's declaration of its intent to seek assurance that Petitioner wish to proceed pro se. Dkt. No. 49-5 at 241. The court asked whether Petitioner so wished, Petitioner answered "[u]h huh[,]" and the trial court instructed Petitioner to answer verbally to assist the court reporter. *Id.* Petitioner refused to respond when the trial court asked whether he planned to speak and "what stage the[ ] proceedings [we]re at[,]" but when the trial court asked Petitioner if he "kn[e]w what the next step in the[ ] proceedings [wa]s[,]" Petitioner responded that he "sent in a motion for handwriting samples of the parties involved." *Id.* at 241-42.

Clinton County Court acknowledged receipt of Petitioner's motion and explained a hearing might be necessary to clarify what relief Petitioner had requested because, if the matter was merely one of impeachment, the proper redress would be questioning at trial; however, "[i]f it [wa]s a due process issue, then the question becomes ... whether that was so heinous ... [that the allegation amounted to] a violation of [Petitioner's] due process rights[.]" Dkt. No. 49-5 at 242-43. Petitioner responded the issue was "a due process violation," the court permitted him to continue, and Petitioner explained:

> The Police Officer, Timothy J. Connelly, forged the CIB number of

the confidential informant. That is a violation. That is a manufactured crime. He is not entitled to forge or falsify reports to get a conviction. So basically by him getting on the stand, lying under oath, he tainted the case. So counts one through nine should be dismissed on the Poisonous Tree Doctrine. Because Investigator Joey Rice took those allegations of drug buys undisposed to Judge Pattenode to get a search warrant to search my vehicle. In fact, Joey Rice testified at the Mapp Hearing that he called Investigator -- no, Trooper Brian Karen to be on the lookout for a 2007 Infinity.

**\*22** *Id.* at 243. The court began to interject, but Petitioner continued:

> Basically what I'm saying is Timothy Connelly as some human lied under oath. Timothy Connelly signed the CIB number, which is a clear violation because it clearly states witnesses must sign. And I clearly asked for it, for these samples a long time ago. I br[ought] this to your attention on March 9th. Matter of fact, your words w[ere] it would be a battle of the experts. Now the People are reluctant to -- the People are entitled to get their own experts to rebut[ ] these allegations.

*Id.* at 244.

The court interjected, instructing Petitioner that the purpose of the hearing was "to determine whether [Petitioner] ha[d] knowingly and intelligently decided to proceed pro se." Dkt. No. 49-5 at 244. Petitioner answered "Yes, I d[id]." *Id.* Clinton County Court reminded Petitioner he would be required to abide by the rules governing the presentation of evidence at trial and asked Petitioner if he had "ever represented himself

in court before?[.]" *Id.* at 245. Petitioner did not answer the question, rather, the following colloquy ensued:

[Petitioner]: Mr. Judge McGill, I just want to be clear about this: If Timothy Connelly did this heinous act, there won't be no trial and there shouldn't be no trial, because that's fruit from the poisonous tree all the way through for --

The Court: Mr. Jackson, there are cases that deal with this issue ... and if the fact pattern is as I understand it, I'm not sure it meets that criteria ... If you take the signature out of this entire mix, the issue then becomes one of whether there was any kind of basis upon which to stop and arrest you. And as I read the case law, they were entitled to stop you. If you violated a traffic infraction, they were entitled to stop you and they were also entitled to do a sniff around which forms the basis of the search warrant regardless of your prior --

[Petitioner]: Okay. What was the probable cause to do a free air sniff and --

The Court: There's no probable cause necessary.

[Petitioner]: Okay. What was the reason for him calling [Brian Caron] to be on the lookout for a 2007 Infinity? Is that racial profiling? Why?

The Court: Racial profiling?

[Petitioner]: Okay. Why is he on the lookout for a 2007 Infinity? He stated because [Petitioner was] under investigation and he ha[d] suspicion to believe that [Petitioner was] carrying drugs.

The Court: Right.

[Petitioner]: What is he basing this off from?

The Court: It doesn't make any difference. He doesn't have to have a basis to do an investigation.

[Petitioner]: Why is he on the lookout for a 2007 Infinity?

The Court: Because he was investigating the suspicion that there was a crime afoot.

[Petitioner]: How d[id] he know this?

The Court: Because he said so.

[Petitioner]: Oh, because he said so. So basically pick a nigger off the highway, be on the lookout for, right?

The Court: This does not have anything to do with --

[Petitioner]: Because they investigated me for drugs --

The Court: Mr. Jackson, Mr. Jackson --

[Petitioner]: -- April 28th, April 30th --

The Court: -- Mr. Jackson --

**\*23** [Petitioner]: -- and that's the forged documents.

The Court: -- Mr. Jackson, do you think you're the first or only person who's been stopped in this manner?

[Petitioner]: Oh, I know you all been stalking niggers like it's okay, like you think it's 1776 or something or 1950 or 1930.

The Court: You've been watching too much TV.

[Petitioner]: No, I haven't been watching nothing, Mr. McGill. If Timothy Connelly forged this signature, counts one though nine should be dismissed.

*Id.* at 246-48. The prosecutor requested to respond and the court granted the request. *Id.* at 248.

Following the People's response, the trial court–in a portion of the transcript which was excluded from Petitioner's application for coram nobis relief–ensured that Petitioner's waiver of the right to counsel was knowingly and intelligently made. Dkt. No. 49-5 at 249-53. Following a series of questions, Clinton County Court announced it was satisfied with Petitioner's responses and adjourned the proceedings. *Id.* at 253. [17]

[17]      After the trial court's declaration, the People raised the issue of its intent to use audio and video recordings at trial and an appearance was scheduled for the purpose of allowing Petitioner to view and listen to the recordings. Dkt. No. 49-5 at 253-55. Thereafter, Petitioner asked the court to lower his bail, but the request was denied. *Id.* at 255-58.

As previously stated, a defendant's "demeanor" or any evidence of "irrational behavior" are "relevant in determining whether further inquiry [into the defendant's fitness to proceed] is required[.]" *See Drope,* 420 U.S. at 180 (citation

2023 WL 8375913

omitted). However, "[a] defendant's odd or even bizarre behavior will not trigger a trial court's duty to order a competency examination or hearing as long as it does not indicate that the defendant is unable to understand the proceedings or communicate with defense counsel." *Castrillo v. Breslin*, No. 1:01-CV-1284, 2005 WL 2792399, at *8 (S.D.N.Y. Oct. 26, 2005) (citing *Kemp v. Conway*, No. 1:03-CV-5439, 2005 WL 107096, at *4 & n.9 (S.D.N.Y. Jan. 14, 2005); *Galandreo v. Perlman*, No. 1:02-CV-6799, 2003 WL 23198790, at *19-20 (E.D.N.Y. Oct. 31, 2003), *aff'd*, 115 F. App'x 514 (2d Cir. 2004)).

Here, neither of the colloquies which Petitioner cites as evidence of his incompetence suggest he was unable to understand the proceedings. On the contrary, Petitioner's statements at both hearings demonstrated a detailed knowledge of the facts of the case and were responsive to questions asked by the trial court. *See, e.g.*, *Hoornweg v. Smith*, 504 F. Supp. 1189, 1192 (W.D.N.Y. 1981) (explaining the state court records lacked facts which should have caused the trial court to question the petitioner's competency because, "[a]lthough curt, petitioner's replies [to the court's questions] ... were coherent, consistent and directly responsive to [the] Judge ... [and n]o hesitation or lack of comprehension by petitioner [we]re manifested in the records."); *Cohn*, 2023 WL 4670839, at *18 (explaining the petitioner's "conduct during the proceedings evinced an ability to understand the proceedings and to participate in his own defense" where "during the proceedings against him, Petitioner was able to cogently ... answer questions about his background, experience, education, and ... otherwise appropriately answer the questions directed toward him[.]") (citing *United States v. Kerr*, 752 F.3d 206, 216 (2d Cir. 2014), *as amended* (June 18, 2014); *United States v. Quintieri*, 306 F.3d 1217, 1233 (2d Cir. 2002); *Saddler v. United States*, 531 F.2d 83, 86 (2d Cir. 1976)); *Qualls v. United States*, No. 1:06-CV-5852, 2021 WL 2986707, at *6 (E.D.N.Y. July 15, 2021) (rejecting the petitioner's argument that his colloquy with the trial court indicated he was not competent to proceed noting, "[m]ost importantly, there was nothing in Petitioner's responses to the Court that indicated he was incompetent to stand trial.").

 **\*24**  While Petitioner's conduct in referring to the trial court as "Mr. biased Judge" and suggestion that law enforcement had been "stalking" him prior to his arrest evinced a lack of concern for or disregard of the decorum typical for such proceedings, Petitioner's statements did not demonstrate an *inability to understand the proceedings* requiring the trial

court to further inquire into his fitness to proceed. *See, e.g.*, *Gouvatsos v. Ercole*, No. 1:09-CV-1449, 2012 WL 3685977, at *15 (E.D.N.Y. Aug. 23, 2012) ("petitioner's occasional outbursts during trial were insufficient to give the trial court or defense counsel reasonable cause to believe that petitioner may not have been competent to stand trial."); *Hernandez v. Senkowski*, No. CV 98-5270 RR, 1999 WL 1495443, at *26 (E.D.N.Y. Dec. 29, 1999) (rejecting the petitioner's claim that "that due process required the trial court to order [a competency] examination sua sponte" as both procedurally barred and without merit because the record demonstrated the petitioner "was an active participant in his defense" and "his own testimony demonstrate[d] his clear understanding of the proceedings and the charges against him" despite the petitioner's apparent "total disrespect for the criminal justice system" and "incorrigibility[.]").

Moreover, to the extent Petitioner contends his pre-trial insistence that both the appearance of the CI's signature on an identification document and insufficient probable cause required dismissal of some or all of the charges against him was irrational, "[t]he Supreme Court has made clear that the *ability* to represent oneself, i.e., 'technical legal knowledge,' has no bearing on a defendant's competence to choose self-representation." *Rosado v. Capra*, No. 9:09-CV-0676 (JKS), 2012 WL 4062824, at *7 (N.D.N.Y. Sept. 14, 2012) (quoting *Godinez*, 509 U.S. at 399-400) (emphasis in original). Therefore, any misunderstanding of state or federal constitutional law is distinguishable from an inability to comprehend the proceedings.

In sum, Petitioner's claim that the trial court erred in failing to further inquire into his competence to waive the right to counsel is unsupported by the record. Therefore, appellate counsel's failure to raise the issue in Petitioner's direct appeal did not amount to ineffective assistance. *See United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) (explaining counsel's "failure to make a meritless argument does not rise to the level of ineffective assistance[.]") (*United States v. Javino*, 960 F.2d 1137, 1145 (2d Cir. 1992), *cert. denied*, 506 U.S. 979 (1992)). Accordingly, petitioner has failed to establish "cause" for the procedural default of this claim. [18]

18     *See Galusha v. Duncan*, No. 9:02-CV-1602 (DNH/ GJD), 2007 WL 4198272, at *14 (N.D.N.Y. Nov. 21, 2007) (explaining that, "[b]ecause Petitioner ha[d] not demonstrated cause for his procedural default, the court need not decide whether he has suffered prejudice as the result.") (citing *Stepney*

*v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Pou v. Keane*, 977 F. Supp. 577, 581 (N.D.N.Y. 1997)).

Alternatively, there is an exception to the procedural bar in cases where a petitioner can prove actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *see also House v. Bell*, 547 U.S. 518, 536-39 (2006) (explaining "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt[.]' ") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). However, Petitioner has failed to allege, much less prove, he is actually innocent. Therefore, federal habeas review of this claim is barred. *Coleman*, 501 U.S. at 750.

## V. CONCLUSION
**WHEREFORE**, it is:

**RECOMMENDED**, that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety; and it is further

**ORDERED**, that the Clerk of the Court shall provide petitioner with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**\*25 RECOMMENDED**, that no Certificate of Appealability ("COA") shall issue because petitioner has failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[19] and it is further

[19]    *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate

of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).

**RECOMMENDED**, that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (FED. R. APP. P. 22(b)); and it is further

**ORDERED**, that the Clerk shall serve a copy of this Report-Recommendation and Order upon the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [20]

[20]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. See FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. See id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2023 WL 8375913

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 8371081
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond L. JACKSON, Petitioner,

v.

Michael CAPRA, Respondent.

9:19-CV-1542
|
Signed December 4, 2023

**Attorneys and Law Firms**

RAYMOND L. JACKSON, Petitioner, Pro Se, 3475 Bivona Street, Apt. 7B, Bronx, NY 10475.

HON. LETITIA JAMES, New York State Attorney General, Attorneys for Respondent, 28 Liberty Street, New York, NY 10005.

## ORDER ON REPORT & RECOMMENDATION

DAVID N. HURD, United States District Judge

 **\*1**  On December 13, 2019, *pro se* petitioner Raymond Jackson ("petitioner") filed this action seeking habeas corpus relief. Dkt. No. 1. After a series of procedural hurdles, delays, and interlocutory appeals, respondent eventually filed an opposition to the petition. Dkt. Nos. 47–49. And after a series of additional delays, petitioner ultimately declined to file a reply. Dkt. No. 72.

On September 11, 2023, U.S. Magistrate Judge Christian F. Hummel advised by Report & Recommendation ("R&R") that the petition be denied and dismissed. Dkt. No. 73. In a thorough, fifty-three-page opinion, Judge Hummel explained why petitioner's various habeas claims failed. *Id.*

Petitioner has not filed objections despite being afforded extensions of time in which to do so. Dkt. Nos. 76, 78. Upon review for clear error, the R&R is accepted and will be adopted. *See* FED. R. CIV. P. 72(b).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED;

2. The petition is DENIED and DISMISSED;

3. No Certificate of Appealability shall be issued; and

4. Any further request for a Certificate of Appealability must be addressed to the U.S. Court of Appeals for the Second Circuit in accordance with Rule 22(b) of the Federal Rules of Appellate Procedure.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 8371081

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3069211

2018 WL 3069211
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Saquan EVANS, Petitioner,
v.
John COLVIN, Superintendent, Five
Points Correctional Facility, Respondent.

No. 9:16-cv-01346-JKS
|
Signed 06/21/2018

**Attorneys and Law Firms**

Saquan Evans, Romulus, NY, pro se.

Lisa E. Fleischmann, New York State Attorney General, New York, NY, for Respondent.

MEMORANDUM DECISION

JAMES K. SINGLETON, JR., Senior United States District Judge

**\*1** Saquan Evans, a New York state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Evans is in the custody of the New York State Department of Corrections and Community Supervision and incarcerated at Five Points Correctional Facility. Respondent has answered the Petition, and Evans has not replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On December 16, 2010, Evans was charged with second-degree murder and second-degree criminal possession of a weapon in connection with the shooting of Rashad Walker, Jr., a bystander caught in the midst of gang-related violence. [1] Prior to trial, the court held a hearing to address Evans' motion to suppress identification evidence and verbal statements he made to the police. At the conclusion of the hearing, the court denied suppression of identification evidence. The court also denied suppression of statements he made to Detectives Merola and Lenhart and reserved judgment on suppression of Evans' statements to Detectives Walsh and Vanslyke. Defense counsel subsequently argued that the remainder of Evans'

statements should be suppressed as the fruit of an illegal arrest at his home, in violation of *Payton v. New York*, 445 U.S. 573, 602-603 (1980) (holding that the Fourth Amendment generally precludes law enforcement from effectuating an arrest within a person's home in the absence of an arrest warrant). The court issued a written decision finding *Payton* inapplicable, but also determining that Evans invoked his right to remain silent when Detective Walsh interviewed him, which was not scrupulously honored. The court thus suppressed statements Evans made after that invocation. After a jury trial, Evans was convicted as charged. He was subsequently sentenced to consecutive terms of 25 years to life imprisonment for the second-degree murder conviction and 15 years' imprisonment for the second-degree criminal possession of a weapon conviction, plus five years of post-release supervision.

[1]     The indictment also included 10 other counts relating to an incident that occurred on November 7, 2010. Those 10 counts were severed from the two counts that are the subject of the instant Petition.

Through counsel, Evans appealed his conviction, arguing that: 1) the verdict was against the weight of the evidence; 2) the trial court improperly imposed consecutive rather than concurrent terms of imprisonment; 3) he was denied a fair trial due to a prosecution witness's testimony and the prosecutor's statement on summation that commented on Evans' invocation of his right to remain silent; 4) his counsel was ineffective for failing to object to those remarks; and 5) the trial court erred in denying Evans' motion to suppress statements made after he was unlawfully arrested. The Appellate Division of the New York Supreme Court unanimously affirmed the judgment against Evans in a reasoned opinion issued on October 9, 2015. *People v. Evans*, 17 N.Y.S.3d 576, 578 (N.Y. App. Div. 2015). Evans filed a counseled petition for review in the Court of Appeals, raising all claims he had unsuccessfully raised to the Appellate Division. The Court of Appeals denied leave without comment on October 29, 2015. *People v. Evans*, 44 N.E.3d 942, 942 (N.Y. 2015).

**\*2** Evans timely filed the instant *pro se* Petition for a Writ of Habeas Corpus to this Court on October 23, 2016. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

2018 WL 3069211

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Evans raises the five claims he unsuccessfully raised to the state courts on direct appeal. Namely, Evans argues that: 1) the verdict was against the weight of the evidence; 2) the trial court improperly imposed consecutive rather than concurrent terms of imprisonment; 3) he was denied a fair trial due to a prosecution witness's testimony and prosecutor's statement on summation that commented on Evans' invocation of his right to remain silent; 4) his counsel was ineffective for failing to object to those remarks; and 5) the trial court erred in denying Evans' motion to suppress statements made after he was unlawfully arrested.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues de novo on the record before it. *See Dolphy v. Mantello*, 552 F.3d 236, 239-40 (2d Cir. 2009) (citing *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006) ); *cf. Wiggins v. Smith*, 539 U.S. 510, 530-31 (2003) (applying a de novo standard to a federal claim not reached by the state court). In so doing, the Court presumes that the state court decided the claim on the merits and the decision rested on federal grounds. *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989); *see also Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (explaining the *Harris-Coleman* interplay); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810-11 (2d Cir. 2000) (same). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference); *Jimenez*, 458 F.3d at 145-46. Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

**\*3** Evans has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *United States ex rel. Catalano v. Shaughnessy*, 197 F.2d 65, 66-67 (2d Cir. 1952) (per curiam).

## IV. DISCUSSION

A. Weight of the Evidence/Sufficiency of the Evidence (Ground 1)

Evans first argues that the jury's verdict was against the weight of the evidence. As an initial matter, claims that challenge verdicts as against the weight of the evidence are

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 63 of 267

Evans v. Colvin, Not Reported in Fed. Supp. (2018)
2018 WL 3069211

not cognizable on federal habeas review. *See McKinnon v. Superintendent, Great Meadow Corr. Facility,* 422 Fed.Appx. 69, 75 (2d Cir. 2011). "Unlike a sufficiency of the evidence claim, which is based upon federal due process principles, a weight of the evidence claim is an error of state law, for which habeas review is not available." *Garrett v. Perlman,* 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (citation and internal quotation marks omitted). "A weight of the evidence argument is a pure state law claim grounded in [CPL] § 470.15(5) which empowers New York state intermediate appellate court[s] to make weight of the evidence determinations." *Id.* (citation and internal quotation marks omitted). The Court therefore denies Evans' weight of the evidence claim on that basis.

Moreover, even if Evans had properly raised before this Court a sufficiency of the evidence claim, he would not be entitled to relief.[2] As articulated by the Supreme Court in *Jackson,* the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown,* 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the New York court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson,* 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

2      Respondent urges the Court to deny as unexhausted and defaulted any construed legal insufficiency claim. But at least some federal courts in this Circuit have concluded that presenting a weight of the evidence claim without also raises a federal sufficiency of the evidence claim for purposes of habeas exhaustion. *See, e.g., Williams v. LaValley,* No. 9:12-cv-01141, 2014 WL 1572890, at *3 (N.D.N.Y. Apr. 17, 2014); *Martin v. Brown,* No. 08-CV-0316, 2010 WL 1740432, at *7-8 (E.D.N.Y. Apr. 29, 2010). Indeed, the Second Circuit has suggested in dicta that a petitioner who

raises a state law weight of the evidence claim on direct appeal has both raised and exhausted a constitutional sufficiency of the evidence claim for federal habeas purposes. *See Liberta v. Kelly,* 839 F.2d 77, 80 n.1 (2d Cir. 1988); *see also Wilson v. Heath,* 938 F. Supp. 2d 278, 290 (N.D.N.Y. 2013) (noting that "the Second Circuit [in *Liberta*] has suggested that a petitioner who raises a state law weight of the evidence claim on direct appeal has exhausted a constitutional sufficiency of the evidence claim for federal habeas purposes"). In an abundance of caution, this Court will assume that the Second Circuit will ultimately clearly hold that, for exhaustion purposes, the presentation of a weight of the evidence claim is sufficient to exhaust a federal sufficiency of the evidence claim and address the merits of the claim.

**\*4** It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac,* 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson,* 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw,* 546 U.S. at 76; *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law...."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon,* 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips,* 455 U.S. 209, 221 (1982) ) (internal quotation marks omitted).

In support of his claim, Evans attacks the value of the evidence against him by alleging that the identification testimony of the eyewitnesses was unreliable, and that the other individuals who were involved in the incident and testified for the prosecution were not credible. But this Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. *See Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir. 1996) (dismissing habeas claim because "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal" and deferring to the jury's assessments of

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 64 of 267

Evans v. Colvin, Not Reported in Fed. Supp. (2018)
2018 WL 3069211

the particular weight to be accorded to the evidence and the credibility of witnesses). Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995). The Appellate Division summarized the following evidence presented at trial:

> We note that [Evans] was identified at trial as the shooter by a fellow gang member, and that data from his GPS ankle bracelet that he wore while on parole placed him at the scene of the shooting at the approximate time of the shooting. The GPS data also showed that, after the shooting, [Evans] went to his grandfather's house, where a revolver was found by the police that was consistent with the weapon used to fire the bullet that killed the victim.

*Evans*, 17 N.Y.S.3d 576 at 577.

Although it might have been possible to draw a different inference from the evidence presented at trial based on the inconsistencies and motivations identified by Evans, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. Evans bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous. 28 U.S.C. § 2254(e)(1). He has failed to carry such burden. For the reasons discussed by the Appellate Division, the record does not compel the conclusion that no rational trier of fact could have found proof that Evans was guilty of second-degree murder and second-degree possession of a weapon, especially considering the double deference owed under *Jackson* and the AEDPA. Evans therefore cannot prevail on an insufficiency of the evidence claim either.

B. Erroneous Sentencing (Ground 2)

Evans next avers that the trial court erred in imposing consecutive, rather than concurrent, sentences for his two convictions. On direct appeal, the Fourth Department rejected on the merits Evans' claim regarding the imposition of consecutive sentences. As Respondent argues, this claim is not cognizable on federal habeas review, which is limited to

questions of constitutional and federal law. *See Estelle*, 502 U.S. at 67-68. "[T]here is no constitutionally cognizable right to concurrent, rather than consecutive, sentences." *United States v. McLean*, 287 F.3d 127, 136-37 (2d Cir. 2002) (internal quotations omitted); *see also Figueroa v. Grenier*, No. 02 Civ. 5444, 2005 WL 249001, at *15 (S.D.N.Y. Feb. 3, 2005) (holding that imposition of consecutive sentences under state law is not a ground for relief).

**\*5** Moreover, the Appellate Division explained that Evans' sentences were not erroneous as a matter of state law:

> The court sentenced [Evans] to an indeterminate term of 25 years to life for the murder, and a consecutive determinate term of 15 years, plus 5 years of postrelease supervision, for the weapon possession. [Evans] was charged with "simple" weapon possession and, when a defendant is so charged, "[s]o long as [the] defendant knowingly unlawfully possesses a loaded firearm before forming the intent to cause a crime with that weapon, the possessory crime has already been completed, and consecutive sentencing is permissible." Contrary to [Evans'] contention, the evidence was legally sufficient to establish that he possessed the murder weapon in the car on the way to the shooting, and thus "there was a completed possession, within the meaning of [section 265.03(3) ], before the shooting took place."

*Evans*, 17 N.Y.S.3d 576 at 577 (citations omitted).

Thus, there was no error of New York state law, much less an error of federal constitutional magnitude. Accordingly, Evans' sentencing error claim must fail.

C. Prosecutorial Misconduct/Ineffective Assistance of Counsel (Grounds 3, 4)

Evans additionally complains that the prosecutor and a prosecution witness commented on Evans' exercise of his right to remain silent, and that counsel was ineffective for failing to object to the improper comment and testimony. On direct appeal, the Appellate Division concluded that Evans failed to preserve his prosecutorial misconduct claim and that counsel's failure to preserve those contentions did not deprive Evans of the effective assistance of counsel. *Evans*, 17 N.Y.S.3d 576 at 577-78.

As an initial matter, Respondent correctly argues that Evans' prosecutorial misconduct claim is procedurally barred from federal habeas review as well. "[A]n adequate and

Case 9:21-cv-00736-DNH-TWD Document 35 Filed 05/29/24 Page 65 of 267

Evans v. Colvin, Not Reported in Fed. Supp. (2018)

2018 WL 3069211

independent finding of procedural default will bar federal habeas review of the federal claim." *Harris*, 489 U.S. at 262. In finding the prosecutorial conduct claim unpreserved for appellate review, the Appellate Division relied upon New York's contemporaneous objection rule, New York Criminal Procedure Law ("CPL") § 470.05(2), which has long been considered an "adequate and independent ground" that bars federal habeas review. *See Whitley v. Ercole*, 642 F.3d 278, 292 (2d Cir. 2011). New York's rule requires that an alleged error be "brought to the attention of the trial court at a time and in a way that [gives it] the opportunity to remedy the problem and thereby avert reversible error." *People v. Luperon*, 647 N.E.2d 1243, 1246-47 (N.Y. 1995). As the record supports that defense counsel did not raise this particular contention at trial, the Appellate Division properly applied New York's adequate and independent contemporaneous objection rule, and his prosecutorial misconduct claim must be denied on that basis.

Moreover, Evans is not entitled to relief on the merits of his *Doyle* claim. A suspect has a constitutional right not to speak to police after he is arrested and given his *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). As a consequence of that right, prosecutors are prohibited from commenting on a defendant's post-*Miranda* silence. *Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976); *see also United States v. Lopez*, 500 F.3d 840, 844 (9th Cir. 2007) (prosecutor's comment on defendant's post-*Miranda* silence violates *Doyle* ). The rationale for this rule "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) (citation and internal quotation marks omitted) (holding that prosecution may not use defendant's silence during case-in-chief). After the Supreme Court's decision in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), "for a defendant to invoke either the right to remain silent or the right to counsel, he must do so unambiguously," *United States v. Plugh*, 648 F.3d 118, 128 (2d Cir. 2011).

**\*6** The Supreme Court, however, has declined to extend *Doyle* to situations where the defendant did not invoke his *Miranda* rights but waived them and gave a post-arrest statement. *See Anderson v. Charles*, 447 U.S. 404, 408 (1980) (per curiam). Here, the suppression court found that Evans did not unequivocally invoke his right to remain silent. Rather, the court concluded that Evans' statements to detectives that "I wish to remain silent for now. You can go ahead and talk but

I might not answer your question" were instead "an invitation of the [petitioner] to be asked questions and then he would decide on each occasion whether or not to answer them."

The factual determination of the state courts that Evans did not invoke his right to remain silent is entitled to deference pursuant to § 2254(d)(2). *See Parsad v. Greiner*, 337 F.3d 175, 180 (2d Cir. 2003). In light of this deferential standard of review, an independent review of the record reveals that, although certain factors may weigh in favor of finding that Evans invoked his right to remain silent and thus the prosecutor committed *Doyle* error in eliciting that testimony, the Appellate Division's determination was not contrary to or an unreasonable application of federal law, and did not result in a decision that was based on an unreasonable determination of the facts. Furthermore, the Appellate Division's determination that defense counsel's failure to object to the alleged prosecutorial misconduct did not constitute ineffective assistance, *Evans*, 17 N.Y.S.3d 576 at 577-78, is both reasonable and fully supported by the record, *see Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (holding that it is not ineffective assistance where counsel fails to raise meritless claims). Evans is thus not entitled to relief on either of these grounds.

D. Erroneous Denial of Suppression Motion (Ground 5)

Finally, Evans claims that the trial court erred in refusing to suppress as the fruit of an unlawful arrest statements he made after he was allegedly arrested in violation of *Payton*, in which the Supreme Court held that the Fourth Amendment generally precludes the police from effectuating an arrest within a person's home in the absence of an arrest warrant, 445 U.S. at 576, 602–03. However, any challenge to his arrest and the admissibility of his resulting statements is foreclosed by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465 (1976). Under *Stone*, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," [ 3 ] federal habeas corpus relief will not lie for a claim that evidence recovered through an illegal search or seizure was introduced at trial. *Id.* at 482. The *Stone v. Powell* doctrine applies to all Fourth Amendment claims, including claims of illegal stops, arrests, searches, or seizures based on less than probable cause, and it applies regardless of the nature of the evidence sought to be suppressed. *Cardwell v. Taylor*, 461 U.S. 571, 572-73 (1983) (per curiam).

3       The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

The Second Circuit has made clear that all *Stone* requires is that the State provide a petitioner the opportunity to litigate his Fourth Amendment claim. *See McPhail v. Warden, Attica Corr. Facility,* 707 F.2d 67, 69-70 (2d Cir. 1983). In order to receive habeas review of a Fourth Amendment claim, a petitioner must demonstrate either that the State failed to provide any "corrective procedures" by which Fourth Amendment claims could be litigated, or that the State had such procedures in place but that the petitioner was unable to avail himself of those procedures "because of an unconscionable breakdown in the underlying process." *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir. 1992). A "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process," and thus is insufficient to give this Court authority to review Fourth Amendment claims. *Id.* at 72. That New York has in place such procedures is well-settled, and the record reflects that Evans took full advantage of his opportunity to fully adjudicate the matter in state court. *See*

*id.* at 70 & n.1. Evans is therefore not entitled to relief on this ground.

## V. CONCLUSION

**\*7** Evans is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " (quoting *Miller-El,* 537 U.S. at 327) ). Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R. APP. P. 22(b); 2D CIR. R. 22.1.

The Clerk of the Court is to enter judgment accordingly.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3069211

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3718871

2010 WL 3718871
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Teddy HILL, Petitioner,

v.

James CONWAY, Superintendent, Respondent.

No. 9:04–CV–524 (FJS/RFT).
|
Sept. 14, 2010.

**Attorneys and Law Firms**

Teddy Hill, Dannemora, NY, pro se.

Office of the New York State Attorney General, Senta B.
Siuda, AAG, of Counsel, Syracuse, NY, for Respondent.

**ORDER**

SCULLIN, Senior District Judge.

*\*1* In a Report–Recommendation and Order dated June
2, 2008, Magistrate Judge Treece recommended that the
Court deny and dismiss Petitioner's petition and that the
Court decline to issue a certificate of appealability. Petitioner

filed objections to the Report–Recommendation and Order,
essentially raising the same arguments that he presented to
Magistrate Judge Treece.

When a party files specific objections to a magistrate judge's
report-recommendation, the district court makes a *"de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." 28 U.S.C. § 636(b)(1). After such a review, "the court
may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." *Id.*

Having reviewed the record *de novo* in light of the issues
that Petitioner raised in his objections, this Court finds the
objections to be without merit.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Treece's June 2, 2008
Report–Recommendation and Order is **ACCEPTED** in its
entirety for the reasons stated therein; and the Court further

**ORDERS** that Petitioner's petition for a writ of habeas corpus
is **DENIED** and **DISMISSED;** and the Court further

**ORDERS** that no certificate of appealability will be issued
with respect to any of Petitioner's claims.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3718871

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 8095710
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Teddy HILL, Petitioner,
v.
James CONWAY, Superintendent, Respondent.

Civ. No. 9:04–CV–524 (FJS/RFT).
|
June 2, 2008.

**Attorneys and Law Firms**

Teddy Hill, Attica, N.Y., pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Maria Moran, Esq., Assistant Attorney General,
of Counsel, Syracuse, N.Y., for Respondent.

***REPORT–RECOMMENDATION AND ORDER*** [1]

[1]     This matter was referred to the undersigned for
        a report-recommendation pursuant to 28 U.S.C. §
        636(b) and N.D.N.Y.L.R. 72.3(c).

RANDOLPH F. TREECE, United States Magistrate Judge.

 **\*1** *Pro se* Petitioner Teddy Hill was convicted of aggravated
assault on a police officer, false impersonation, and resisting
arrest on June 10, 1999. Dkt. No. 1, Pet. at p. 1; Dkt. No. 12,
Resp't's Mem. of Law, at p. 1; State Ct. R. on Appeal, Ex.
G, Tr. of Trial of Teddy Hill ("Trial Tr.") at 733. Petitioner
presently seeks a Writ of *Habeas Corpus* pursuant to 28
U.S.C. § 2254 on the following grounds: (1) the evidence was
insufficient to sustain his conviction for second degree assault
because there was no proof of physical injury; (2) Petitioner
received ineffective assistance of trial counsel; (3) his motion
to suppress should have been granted; and (4) Petitioner was
denied his choice of counsel. Pet. at pp. 5–6, Attach. 1(A),
(B); Dkt. No. 27, Supp. Reply Mem. Of Law ("Supp.Mem."),
at ¶¶ 1–30. For the reasons that follow, this Court recommends
that the Petition be **denied.**

# I. BACKGROUND

According to the testimony adduced at trial, on the afternoon
of October 17, 1998, Petitioner was sitting on the steps of
a house at the intersection of West Onondaga and Putnam
Streets in Syracuse, New York. Trial Tr. at 370–71, 430–33,
& 490. Petitioner was accompanying Pamela Ratliff and a
male companion, [2] who were standing approximately fifteen
feet away under a tree. *Id.* at 372 & 396. Uniformed Police
Officers Ronald Bricco and Patrick Phelps were in a marked
police car on patrol in the area and noticed Petitioner and
his companions. *Id.* at 371–73, 430–32. The area was known
for illegal drug activity, loitering, and juvenile problems;
citizens made numerous complaints and asked police to
increase patrol. *Id.* at 370 & 431–32. Officer Phelps received
a memorandum from Officer Maureen Buckland that she
stopped several people at that location earlier in the week and
recovered crack cocaine. *Id.* at 432.

[2]     The name of the companion was not disclosed at
        trial.

Officers Bricco and Phelps parked their car and approached
Petitioner and his companions. As they approached, the
officers saw a pink, plastic glassine baggy, a lighter, a glass
crack pipe, and the push rod used to fill the pipe on the
ground directly under Ratliff and her companion. *Id.* at 372 &
433. Officer Phelps spoke to Ratliff and her male companion,
learned that the man had an outstanding warrant, and placed
him and Ratliff under arrest. *Id.* at 432–33 & 435–36.

Officer Bricco spoke to Petitioner, who appeared nervous.
*Id.* at 372–73. He asked Petitioner his name, date of birth,
and why he was there. *Id.* at 372–73 & 490. Officer Bricco
testified that Petitioner told him he was "just hanging out"
with Ratliff and the man. *Id.* at 375. Petitioner had no
identification, but told Officer Bricco his name was Oliver
L. Davis, and that his date of birth was June 7, 1966. *Id.* at
373 & 397. Petitioner answered Bricco's questions, prefacing
them with "yes sir" and "no sir," which indicated a level of
respect that was uncommon to Bricco during street encounters
and suggested that Petitioner had a military background or
had been in prison. *Id.* at 375–76. Bricco asked Petitioner if
he had been arrested before, and Petitioner told him that he
had completed parole. *Id.* at 375–76. Officer Bricco used his
portable radio to call the 911 center to check for warrants
for Oliver L. Davis. *Id.* at 374. The check revealed that
there was no police record for an Oliver L. Davis with

the date of birth given by Petitioner. *Id.* at 375 & 397–98. Officer Bricco's suspicion was aroused because, based upon Petitioner's claim that he completed parole, there should have been a record. *Id.* at 375–76. Officer Bricco warned Petitioner that if he lied about his identity, he could be arrested for false impersonation. *Id.* at 397. He asked Petitioner to accompany him to the patrol car where Bricco could run a further identification search in the computer. *Id.* at 376. Petitioner agreed. *Id.*

 **\*2** Officer Bricco directed Petitioner into the rear passenger seat of the patrol car. He was not handcuffed nor under arrest at that time. *Id.* at 376–77. Officer Bricco got into the front passenger seat and entered the information Petitioner had given him into the computer. *Id.* at 398. While he waited for a response, Bricco asked Petitioner how he could verify Petitioner's identity. Petitioner gave the name and phone number of a woman he claimed was his mother. *Id.* at 376–78. Officer Bricco called the woman, who told him that she had a son named Jimmy Davis who was thirty-eight years old, a description that did not fit the information provided by Petitioner. *Id.* at 377–78 & 408. With suspicions further aroused, Officer Bricco again warned Petitioner about the ramifications of lying about his identity, and exited the patrol car. He intended to open the rear door, speak to Petitioner further, and arrest Hill if he continued to lie about his identity. *Id.* at 378 & 398.

As Officer Bricco opened the rear door, Petitioner pushed the door into him and fled. *Id.* at 378–79, 398–99, & 436. A chase ensued with Officer Bricco in pursuit of Petitioner, yelling at him to stop, *id.;* Officer Phelps called for backup, *id.* at 437. As Officer Bricco continued to chase him, Petitioner jumped over a chain link fence. Officer Bricco grabbed Petitioner's clothing, but lost his grip as Petitioner fell over the fence. *Id.* at 379 & 399. Officer Bricco also jumped over the fence and continued to chase Petitioner, yelling at him to halt because he was under arrest. *Id.* at 379, 401, & 423–24. Petitioner ran down the length of the fence and jumped over a second chain link fence. *Id.* at 379 & 400. He picked up a clay brick and raised it over his head as Officer Bricco climbed the fence. *Id.* at 379. Bricco drew his gun and ordered Petitioner to drop the brick. *Id.* at 379–80 & 409. Officer Bricco testified that Petitioner threw the brick at him, striking him in the left temple. *Id.* at 380–81 & 409–10. Petitioner ran, and Bricco holstered his gun and followed. *Id.* at 383.

Petitioner attempted to climb a third fence, but because it was a wood stockade fence he could not do so. *Id.* at 383–84.

Bricco caught him and tried to handcuff him, but Petitioner struggled. *Id.* at 384. The two fell to the ground as Petitioner was punching and kicking Bricco who, in turn, punched Petitioner in an attempt to handcuff him. *Id.* at 384. Bricco successfully handcuffed Petitioner's left hand, but Petitioner continued to struggle. *Id.* Petitioner got on top of Bricco, and told him, "I am going to kill you. We are going to die here together." *Id.* at 385. Officer Bricco testified that Petitioner began tugging on his gun and he felt it being twisted in the holster. *Id.* at 386–87 & 418. He grabbed the gun to try to keep it in the holster as Petitioner unfastened the holster's safety strap. *Id.* at 387. Petitioner bit Bricco's hand, his top teeth digging into the fleshy part of the hand between the thumb and index finger and his bottom teeth biting into the butt of the gun. *Id.* at 388 & 415–16. Bricco managed to hit a signal button on his radio that transmitted a distress call to the 911 Center and he began to yell for help. *Id.* at 388–89.

 **\*3** Susie Files and her mother-in-law, Ann Burns, saw Petitioner get out of the patrol car and run in the direction of Files' yard. *Id .* at 466–67. Files watched Petitioner jump over the first fence, with Bricco close behind. *Id.* She went home to lock her doors. *Id.* at 467. As Files pulled her screen door closed, she heard someone say "help, please help." *Id.* at 468 & 475. She saw two people wrestling next to her driveway and told Burns to call 911. *Id.* at 468–69. Burns testified that she also heard someone calling for help and that she saw Petitioner on top of Bricco. *Id.* at 474–76.

Officer Phelps testified that he put Ratliff and her companion into the patrol car and drove around the block looking for Petitioner and Officer Bricco. *Id.* at 437–38. The police dispatcher broadcast that Bricco was emitting a distress signal from his radio. *Id.* at 438. Ann Burns flagged Officer Phelps down and told him that Petitioner and Bricco were in her daughter's back yard. *Id.* at 438–39.

Officers Robert McLaughlin, James Morris and Joseph Gianuzzi also responded to the distress call. *Id.* at 443–44, 451, & 458. As Officer McLaughlin searched area backyards, he heard groaning and saw Petitioner on top of Bricco. Petitioner was bleeding from the mouth. He had Bricco in a head lock or choke hold and was punching him. *Id.* at 445, 449, & 452. McLaughlin jumped over the fence to render assistance and tried, without success, to pull Petitioner off Bricco. *Id.* at 446 & 452. Officers Morris and Gianuzzi saw McLaughlin climbing the fence and ran in his direction. The three officers pulled Petitioner off Officer Bricco as Petitioner continued to kick and fight. *Id.* at 447–48, 453, &

460. Because Petitioner hid his hands underneath his body, his arms had to be pulled out one at a time in order to be handcuffed. *Id.* As McLaughlin pulled Petitioner's left arm free, he noticed there was already a handcuff on his left wrist. *Id.* at 447. In order to gain control of him, Officer Gianuzzi struck Petitioner with his wooden baton. *Id.* at 459. Yet, Petitioner continued to struggle. *Id.* at 448, 454, & 460–62. Eventually, the officers handcuffed Petitioner and walked him to the street. *Id.* at 461. The officers later learned that there was a parole violation warrant issued for Petitioner. *Id.* at 394–95.

Officer Bricco testified that he suffered abrasions and contusions on his head as a result of the struggle as well as an abrasion where the brick hit him. *Id.* at 390–91 & 411. He testified that the bite wound was flushed out at the hospital, that he was given antibiotics, and his hand was stiff for a week; at the time of trial, it was still stiff when it rained. There was a visible scar. *Id.* at 391. Bricco stated that he suffered a headache for a day and, if he had been scheduled to work the two days following the incident, he would have taken those days off. *Id.* at 391–92. His body was sore for a few days and he went for treatment "a couple of times." Moreover, he still had to have blood drawn to test for communicable diseases. *Id.* at 392–93.

 **\*4** Pamela Ratliff testified on behalf of Petitioner. *Id.* at 577–93. According to Ratliff, Officer Bricco escorted Petitioner to the patrol car and shoved him into the rear passenger seat. *Id.* at 578. She was not sure if Petitioner was handcuffed and did not remember telling an investigator that Bricco handcuffed Petitioner before putting him in the patrol car, or that Bricco pulled Petitioner out of the car and removed the handcuffs. *Id.* at 586–87. Ratliff testified that Officer Bricco slapped Petitioner across the face and Petitioner ran. *Id.* at 578–79, 84.

Petitioner testified on his own behalf. *Id.* at 489–558. He claimed that he was sitting on the steps waiting for his friend Vicky to return from the store. *Id.* at 490 & 513–14. He did not know Vicky's last name, but during his conversation with Officer Bricco, she returned to the house, walked past them, and went inside. *Id.* at 514–15. Although he told Bricco he was waiting for Vicky, he did not point her out to him. *Id.* Petitioner testified that Bricco did not believe his explanation and searched him by going into all of his pockets. *Id.* at 491 & 515–16. He admitted he lied about his identity because he thought there might be a parole warrant for him. *Id.* at 492, 510–13, & 516. Petitioner denied telling Bricco he had completed parole or that he had been arrested before. He

later admitted that Bricco asked if he had been arrested, but claimed he answered "no." *Id.* at 518–19.

Petitioner admitted he gave Bricco his grandmother's name, and that he told the officer she was his mother in order to conceal his identity. *Id.* at 519–20. Petitioner denied that he was nervous and testified that he was not concerned nor afraid of being arrested because he did not have much time left on parole. *Id.* at 521. Petitioner testified that when Bricco opened the rear passenger door, he slapped Petitioner across the face and asked him why he was lying. *Id.* at 494 & 523–24. Contrariwise, in a complaint filed with the Citizens Review Board, Petitioner claimed Bricco opened the back door and started punching him. *Id.* at 541–42. Petitioner admitted he ran, but claimed he had done so because he was afraid, having never before experienced "police brutality." *Id.* at 494. Petitioner explained that he had "knowledge of the Rodney King, Johnny Gammage situation, so I feared of becoming a victim like that. He hit me, so I ran." *Id.*

Petitioner testified that he never picked up a brick and was not holding one when Bricco drew his gun and told him to stop running. *Id.* at 498–99. However, in his Citizens Review Board complaint, Petitioner did not mention that Bricco drew his weapon. *Id.* at 544. He testified that Officer Bricco never told him he was under arrest. *Id.* According to Petitioner's testimony, Bricco repeatedly hit him and he pleaded with Bricco to stop. *Id.* at 499–501. He testified that he thought Bricco was not trying to arrest him, but rather, was going to beat him, so he got on top of Bricco. *Id.* at 532–33. He denied intentionally trying to take Bricco's gun, threatening to kill Bricco, or that Bricco called for help. *Id.* at 502–04 & 549–50. Petitioner further testified that he bit Bricco's hand because he saw Bricco holding the butt of the gun and was afraid he intended to shoot him. *Id.* at 502–04. Petitioner claimed that throughout the struggle, he never once hit Bricco, but instead covered his head and arms to fend off the beating. *Id.* at 529 & 534. He admitted that he continued to struggle with and kick the other officers, and claimed that the officers continued to beat him even after he was handcuffed. *Id.* at 535–36. However, he did not claim in his Citizens Review Board complaint that the officers continued to beat him once he was handcuffed. *Id.* at 556–57.

 **\*5** Petitioner claimed that he suffered a broken jaw, a cracked wrist and cracked ribs, and that he had reconstructive surgery on the side of his jaw and chin. *Id.* at 504 & 538–39. Petitioner denied injuring his ribs in a football game earlier in the week, despite a photograph showing him wearing what

2008 WL 8095710

appeared to be an ace bandage around his rib cage on the day of the incident. *Id.* at 539. In his Citizens Review Board complaint, Petitioner alleged that Bricco beat him with a night stick, breaking his jaw, but testified at trial he did not know what object, if any, Bricco used to strike him, and later admitted Bricco never struck him with a weapon or his gun. *Id.* at 545–47, 557–58, & 560.

On November 24, 1998, Petitioner was indicted by an Onondaga County grand jury. *See* Dkt. No. 12, Resp't Ans., Ex. U at A5–8. In that accusatory instrument, Petitioner was charged with attempted aggravated assault upon a police officer, second degree assault, second degree attempted criminal possession of a weapon, third degree criminal possession of a weapon, resisting arrest, and false impersonation. *Id.* at pp. A5–6.

Beginning on June 7, 1999, Petitioner was tried before a jury as to the foregoing charges, with the Honorable Joseph E. Fahey, Onondaga County Court Judge, presiding. At the conclusion of that trial, Hill was convicted of second degree assault, resisting arrest and false impersonation. Trial Tr. at 733. On August 24, 1999, Petitioner was sentenced as a persistent violent felony offender to an indeterminate term of twenty years to life in prison on the second degree assault and two concurrent terms of one year in prison for resisting arrest and false impersonation. Dkt. No. 12, Resp't Ans., Ex. H, Sentencing Tr. ("Sentencing Tr.") at 34. With the assistance of counsel, Hill filed a Notice of Appeal. Dkt. 12, Ex. U at A2.

On July 19, 2000, before his direct appeal was perfected, Hill filed a motion to vacate his conviction pursuant to New York's Criminal Procedure Law ("CPL") Section 440.10 ("July 2000 CPL Motion"). Dkt. No. 12, Ex. I. That application was opposed by the District Attorney. Dkt. No. 12, Ex. J. In a Decision and Order, dated October 3, 2000, Judge Fahey denied Hill's July 2000 CPL Motion in all respects. Dkt. No. 12, Ex. L ("October 2000 DO"). The Appellate Division, Fourth Department denied Petitioner's application for leave to appeal the October 2000 DO on March 19, 2001. Dkt. No. 12, Ex. N.

On January 3, 2002, also before his direct appeal was perfected, Hill filed a second CPL 440 motion. Dkt. No. 12, Ex. O ("January 2002 CPL Motion"). That application was also opposed by the District Attorney. Dkt No. 12, Ex. P. In a Decision and Order, dated February 25, 2002, Judge Fahey denied Hill's January 2002 CPL Motion in all respects. Dkt. No. 12, Ex. Q ("February 2002 DO"). On July 26, 2002, the Appellate Division, Fourth Department denied Petitioner's application for leave to appeal the February 2002 DO. Dkt. No. 12, Ex. T.

**\*6** On August 21, 2002, through counsel, Hill perfected the direct appeal of his convictions and sentences to the New York State Supreme Court, Appellate Division, Fourth Department. Dkt. No. 12, Exs. U, App. (7/16/02) & V, Appellate Br. (8/21/02). That court modified the judgment of conviction by reducing the sentence for false personation from one year to three months, and otherwise affirmed the convictions. *People v. Hill,* 755 N.Y.S.2d 169 (N.Y.App. Div., 4th Dep't 2002); *see also* Dkt. No. 12, Ex. X. The New York State Court of Appeals denied Petitioner leave to appeal on May 22, 2003. *People v. Hill,* 793 N.E.2d 418 (N.Y.Ct.App.2003); *see also* Dkt. No. 12, Ex. Z.

On May 11, 2004, Petitioner filed this Petition for a Writ of *Habeas Corpus.* On October 26, 2004, Respondent filed a Response to the Petition, along with a Memorandum of Law and the state court records. Dkt. No. 12. On March 31, 2005, Petitioner filed a Traverse. Dkt. No. 16. By letter dated April 19, 2005, Petitioner requested that the proceedings herein be stayed so he could return to state court to exhaust an additional claim that he was denied counsel of his choice. Dkt. No. 17. A brief stay was granted, and, on May 16, 2005, Petitioner filed a third CPL 440 motion in Onondaga County Supreme Court ("May 2005 CPL Motion"). Dkt. No. 21, Pet'r Status Rpt.; Dkt. No. 35, Ex. AA. That application was opposed by the District Attorney. Dkt. No. 35, Ex. CC. In a Decision and Order, dated July 27, 2005, Judge Fahey denied Hill's motion in all respects. Dkt. No. 35, Ex. FF ("July 2005 DO"). Permission to appeal to the Appellate Division, Fourth Department, was denied on November 15, 2006, and leave to appeal was denied by the New York Court of Appeals on February 27, 2007. Dkt. No. 27, at ¶ 5; Dkt. No. 35, Exs. KK & LL. On April 10, 2007, Petitioner filed a Supplemental Reply Memorandum of Law in this Court, in which he raised this newly exhausted claim for *habeas* relief. Dkt. No. 27.

## II. DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant *habeas* relief to a state prisoner on a claim unless the state courts

adjudicated the merits of the claim and such adjudication either

    1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Hawkins v. Costello,* 460 F.3d 238, 242 (2d Cir.2006); *DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005); *Miranda v. Bennett,* 322 F.3d 171, 177–78 (2d Cir.2003); *Boyette v. LeFevre,* 246 F.3d 76, 88 (2d Cir.2001).

The AEDPA also requires that in any such proceeding "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Boyette v. LeFevre,* 246 F.3d at 88 (quoting § 2254(e)(1)).

**\*7** A state court determines a petitioner's federal claim "on the merits" and triggers the highly-deferential AEDPA standard of review when the state court (1) disposes of the claim on the merits and (2) reduces its disposition to judgment. *See Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001). In this regard, it is not necessary for the state court to explicitly refer to the particular federal claim or to any federal case law. *See id.*

However, if a state court does not adjudicate a petitioner's federal claim "on the merits," the state court's decision is not entitled to AEDPA deference and instead, the federal *habeas* court must apply the pre-AEDPA standard of *de novo* review to the state court's disposition of the federal claim. *See Cotto v. Herbert,* 331 F.3d 217, 230 (2d Cir.2003) (citing *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001)).

**B. Sufficiency of Evidence**

In the first ground of his Petition, Hill contends, as he did on direct appeal, that the evidence was insufficient to support his conviction for second degree assault because the People failed to prove that Officer Bricco suffered "physical injury." Dkt. No. 1, Ground One; Appellate Br. at pp. 7–16. [3] Respondent argues that this claim is meritless. Dkt. No. 12, Resp't Mem.

at pp. 3–6. The Appellate Division, Fourth Department, held that the evidence of physical injury was sufficient. *People v. Hill,* 755 N.Y.S.2d at 171; Dkt. No. 12, Ex. X at p. 2. Leave to appeal this claim was rejected by the New York Court of Appeals. *People v. Hill,* 793 N.E.2d 418; Dkt. No. 12, Ex. Z.

[3]     Hill does not challenge the sufficiency of the evidence to support his convictions for resisting arrest and false impersonation.

A petitioner who challenges a conviction on the sufficiency of the evidence bears a "heavy burden." *United States v. Quattrone,* 441 F.3d 153, 169 (2d Cir.2006) (citation omitted); *Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir.2002). The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which he is charged. *See Fiore v. White,* 531 U.S. 225, 228–29 (2001); *Jackson v. Virginia,* 443 U.S. 307, 315 (1979). This inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins,* 506 U.S. 390, 402 (1993) (emphasis in original). A *habeas* petitioner claiming that there was insufficient evidence supporting the conviction is entitled to relief under 28 U.S.C. § 2254 only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. at 324; *see also Schlup v. Delo,* 513 U.S. 298, 323 n.38 (1995). The reviewing court is required to consider the evidence in the light most favorable to the prosecution and draw all inferences in its favor. *Jackson v. Virginia,* 443 U.S. at 319. [4] "When considering the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.' " *Ponnapula v. Spitzer,* 297 F.3 d at 179 (quoting *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir.1999)).

[4]     The *Jackson* standard is clearly established federal law as determined by the Supreme Court. *See Huber v. Schriver,* 140 F.Supp.2d 265, 276 n.5 (E.D.N.Y.2001) (citing *Francis S. v. Stone,* 221 F.3d 100, 114 (2d Cir.2000)) (other citation omitted); *see also Santana v. Kuhlmann,* 232 F.Supp.2d 154, 166–67 (S.D.N .Y.2002).

**\*8** To sustain Hill's conviction for second degree assault, the People had to prove that Hill intended to prevent Bricco from performing a lawful duty, and that, in the process, he caused

physical injury to Bricco. N.Y. PENAL LAW § 120.05(3); *Gary v.. Conway,* 2006 WL 3290149, at *12 (N.D.N.Y. Nov. 13, 2006) (Kahn, J); *People v. Coulanges,* 696 N.Y. S.2d 466 (2d Dep't 1999). *See also* Dkt. No. 12, Ex. U, at A5–8. Intent may be inferred from the circumstances, including the actions of the accused, and it may be proven by direct or circumstantial evidence. *Stone v. Stinson,* 121 F.Supp.2d 226, 247 (W.D.N.Y.2000); *People v. Price,* 825 N.Y.S.2d 868 (N.Y.App. Div., 4th Dep't 2006). "Physical injury" means impairment of physical condition or substantial pain. N.Y. PENAL LAW § 10.00(9).

Here, Petitioner does not challenge the sufficiency of the evidence on the "lawful duty" element of second degree assault.[5] *See* Pet. at Attach. 1(A) & (B); Dkt. No. 16, Traverse, at ¶¶ 7–13; Dkt. 27, Supp. Mem. at ¶¶ 31–39. Petitioner challenges only the sufficiency of the evidence as to physical injury. Pet. at Attach. 1(A) & (B); Dkt. No. 16, at ¶¶ 7–13; Dkt. No. 27, at ¶¶ 31–39. This argument is without merit. The testimony of both Officer Bricco and Petitioner establish that Petitioner punched and kicked Officer Bricco as he tried to arrest Petitioner, causing several abrasions and contusions on Bricco's head. *Id.* at 390–91 & 411. Photographs were admitted into evidence that showed Bricco's injuries as they appeared at the time of the incident. *Id.* at 389–92. Bricco testified that he suffered a headache for a day and that if he had not been off duty for the two days following the incident, he would have taken those days off. *Id.* at 391–92. Petitioner admitted he bit Bricco's hand. *Id.* at 503. The bite wound was flushed out at the hospital and treated with antibiotics. Bricco testified that his hand was stiff for a week and, at the time of trial, continued to be stiff if it rained. Bricco sustained a visible scar as a result of the bite. *Id.* at 388 & 391. Bricco testified that his body was sore for a few days and that he went for treatment "a couple of times," but still had to have blood drawn to test for communicable diseases. *Id.* at 392–93. The culmination of this testimony proves that Officer Bricco suffered injury "well beyond the minimal harm caused by 'petty slaps, shoves, kicks and the like.' " *Foster v. Miller,* 2007 WL 1893726, at *8 (S.D.N.Y. June 29, 2007) (quoting *Matter of Philip A.,* 400 N.E.2d 358 (N.Y.1980)). Based upon this evidence, a rational jury could have concluded Hill was guilty beyond a reasonable doubt of second degree assault since all the elements of the crime were established. *See id.* (evidence sufficient to establish "physical injury" where victim was punched twice in the head and face, suffered headaches lasting two or three days, a split lip, and pain persisting for a week which was treated with Tylenol); *Jerrel v. Keane,* 1995 WL 653369, at *3 (S.D.N.Y. Nov. 7, 1995) (evidence sufficient to establish physical injury where the victim suffered a bite, resulting in a scar, multiple bruises and cuts, and a sprain to his right hand, and the victim testified he felt a sharp pain when bitten and applied peroxide to the wound for five days).

5    Making an authorized arrest is a "lawful duty" under New York law. *See Hill v. Miller,* 2005 WL 807044, at *3 (E.D.N.Y. Apr. 8, 2005); *People v. Winchester,* 790 N.Y.S.2d 238, 239 (N.Y.App. Div., 3d Dep't 2005). The court notes that the testimony of Officers Bricco and Phelps regarding Petitioner's conduct on October 17, 1998, as well as Petitioner's own testimony, established that Petitioner intended to prevent Officer Bricco from performing a lawful duty, *i.e.,* his arrest. *See, e.g.,* Trial Tr. at 374–89, 423, 432–37, & 490–558.

**\*9** The Appellate Division's determination that the evidence was sufficient to establish physical injury was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, and the petition on this ground should be **denied.**

### C. Ineffective Assistance of Counsel

In the second ground of his Petition, Hill contends, as he did on direct appeal and in his CPL 440 motions, that his trial counsel was ineffective because he failed to adequately represent him. Pet. Ground Two, Attachs. 2(A) & (B); Dkt. No. 16, Traverse, at ¶¶ 16–17. Specifically, Petitioner claims that counsel (1) failed to present mitigating evidence in the form of Officer Bricco's medical records; (2) failed to move to set aside the verdict on the ground that the evidence was insufficient to establish that Bricco suffered physical injury; and (3) failed to prepare for a hearing to determine whether Petitioner was a persistent violent felony offender. Appellate Br. at pp. 18–21; July 2000 CPL motion. Petitioner further claims that trial counsel had a substance abuse problem which interfered with his ability to adequately represent him. Pet. Ground Two, Attachs. (2)(A) & (B); Jan.2002 CPL Motion. Respondent argues that these claims are meritless. Dkt. No. 12, Resp't Mem. at pp. 6–9.

Petitioner's July 2000 and January 2002 CPL motions were filed while his direct appeal was pending but not perfected. In the July 2000 CPL motion, Petitioner alleged counsel was ineffective for not presenting Bricco's medical records

at trial. The state court considered this claim and rejected it, explaining that Petitioner received meaningful representation. Dkt. No. 12, Ex. L. Although the state court noted in its October 2000 Decision and Order that Petitioner raised "no issue that could not be resolved on the trial record," it addressed the merits of the claims without reliance on a state procedural bar. *See* Dkt. No. 12, Ex. L, at 2. In his January 2002 CPL motion, Petitioner claimed counsel was ineffective due to an alleged substance abuse problem. The state court first found that this claim was barred under CPL § 440.10(2)(b) because it was based upon facts on the record and could therefore be raised on direct appeal. Dkt. No. 12, Ex. Q. It nonetheless addressed the merits of this claim, and rejected it. *Id.*

On direct appeal, appellate counsel raised two of Petitioner's current *habeas* claims: (1) that counsel did not understand the concept of physical injury and, as a result, failed to move the court to set aside the verdict on second degree assault based upon a lack of evidence of physical injury; and (2) that counsel failed to adequately prepare for the sentencing hearing. Appellate Br. at pp. 17–20. The Appellate Division, Fourth Department, held that Petitioner was not denied effective assistance of counsel. *People v. Hill,* 755 N.Y.S.2d at 171. Petitioner's leave to appeal these claims was rejected by the New York Court of Appeals. *People v. Hill,* 793 N.E.2d 418.

**\*10** To establish ineffective assistance of counsel, a *habeas* petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness measured by the prevailing professional norms; and (2) prejudice, *i.e.,* there is a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 688, 694 (1984) (cited in *Bell v. Cone,* 535 U.S. 685, 695 (2002)); *see also Aeid v. Bennett,* 296 F.3d 58, 62–63 (2d Cir.2002); *Brown v. Artuz,* 124 F.3d 73, 79–80 (2d Cir.1997); *White v. Herbert,* 2006 WL 3728878, at \*4 (N.D.N.Y. Dec. 15, 2006).[6] There is a strong presumption that counsel rendered adequate assistance as courts give high deference to counsel, and Petitioner "must overcome the presumption that the challenged action 'might be considered sound trial strategy.' " *Gatto v. Hoke,* 809 F.Supp. 1030, 1038 (E.D . N.Y.1992) (quoting *Strickland v. Washington,* 466 U.S. at 689), *aff'd mem.,* 986 F.2d 500 (2d Cir.1992); *see also Jackson v. Conway,* 448 F.Supp.2d 484, 492 (W.D.N.Y.2006).

[6] In *Williams v. Taylor,* the Supreme Court declared that "the rule set forth in *Strickland* qualifies as 'clearly established Federal law [.]' " 529 U.S. 362, 391 (2000); *see also Sellan v. Kuhlman,* 261 F.3d 303, 309 (2d Cir.2001).

A review of the record indicates that Hill's trial counsel properly represented him in all respects. Counsel's theory of the case was that Officer Bricco had no reason to approach Petitioner, that Bricco ceased acting as an officer of the law when he allegedly struck Petitioner, and that Petitioner ran because he was assaulted and feared for his life. Trial Tr. at 598–627. In support of that theory, counsel elicited testimony from Officer Bricco that over the years he had been the subject of citizen complaints. *Id.* at 420. Counsel called Pamela Ratliff to testify that she saw Bricco slap Petitioner. *Id.* at 577–87. He vigorously cross-examined the prosecution's witnesses, pointing out inconsistencies and establishing that Petitioner, too, had injuries. *Id.* at 396–420, 424–27, 441–42, 449, 456–57, 471–72 & 479. Counsel moved for a trial order of dismissal on two counts of the indictment (attempted aggravated assault and attempted criminal possession of a weapon) at the close of the People's case, and renewed the motion with respect to all counts of the indictment at the close of Petitioner's case. *Id.* at 483–86, 566, & 592–93. Counsel's representation resulted in an acquittal on three of the charges, including attempted aggravated assault upon a police officer and both weapons charges. *Id.* at 732–33.

Nonetheless, Petitioner claims counsel should have moved to set aside the second degree assault verdict on the ground that Bricco did not suffer a physical injury. Pet. Ground Two, Attach 2(A); Dkt. No. 16, Traverse, at p. 8. At sentencing, counsel moved to set aside the verdict on the ground that Officer Bricco was not acting in his capacity as a police officer because he slapped Petitioner, and, accordingly, Petitioner could not have assaulted a police officer within the meaning of New York Penal Law § 120.05(3). Sentencing Tr. at 3–5. Counsel likely understood, as noted above, that the evidence was sufficient to establish that Bricco suffered physical injury. *See supra* Part II.B. Counsel cannot now be deemed ineffective for failing to make a meritless argument. *United States v. Arena,* 180 F.3d 380, 396 (2d Cir.1999). Counsel instead attempted to negate the other key element of the crime for which Petitioner was convicted—that the victim was a police officer performing a lawful duty. This claim relates to trial counsel's tactical or strategic choices, which are "virtually unchallengeable." *Strickland,* 466 U.S. at 690; *Campbell v. Greene,* 440 F.Supp.2d 125, 150 (N.D.N.Y.2006) (quoting *Nieves v. Kelly,*

Hill v. Conway, Not Reported in F.Supp.2d (2008)
2008 WL 8095710
Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 75 of 267

990 F.Supp. 255, 264 (S.D.N.Y.1997)). Based on the record, counsel's strategic decision was well within the wide range of reasonable professional assistance. In any event, in spite of his speculation to the contrary, Petitioner cannot establish that but for counsel's alleged error, the outcome of the case would have been different. The Appellate Division's rejection of this claim was not contrary to nor an unreasonable application of clearly established Supreme Court precedent, and this aspect of Petitioner's ineffectiveness claim should therefore be **denied.**

**\*11** Petitioner also argues that Officer Bricco's medical records showed that his injuries were minimal and insufficient to establish that he suffered "physical injury." According to Petitioner, counsel was therefore ineffective for failing to present this mitigating evidence at trial. Pet. Ground Two, Attach. 2(A). To the contrary, the record shows that counsel cross-examined Bricco regarding the medical records in an effort to minimize the injuries. The medical records reveal that the treating physician described some of Officer Bricco's injuries as "multiple areas of shallow abrasion" and noted that there was "no open laceration." Dkt. No. 12, Ex. I. Counsel asked Bricco if he received treatment for his injuries and if he recalled "multiple areas of shallow abrasion with no open laceration"—language almost identical to that used by the treating physician—to which Officer Bricco answered, "That's correct." Trial Tr. at 412. Moreover, counsel likely understood that the medical records corroborated Bricco's testimony that he was, in fact, injured and received medical treatment for those injuries. *Id.* 390–92. By declining to move the records into evidence, opting instead to use them for cross-examination purposes only, counsel prevented the jury from reviewing this potentially damaging evidence during deliberations. This aspect of Petitioner's ineffectiveness claim should also be **dismissed.**

Petitioner next alleges that counsel was ineffective because he did not prepare for the sentencing hearing. Specifically, Petitioner points to the trial court's comment at sentencing that counsel had not done "a single thing in terms of preparing for this hearing today." Pet. Ground Two, Attach. 2(A). This comment, reviewed in context, does not support Petitioner's claim that counsel was unprepared for sentencing.

At the hearing, the People moved to have Petitioner declared a persistent violent felony offender based upon his convictions, upon guilty pleas, for first degree robbery in 1984 and second degree robbery in 1990. Sentencing Tr. at 2–3, 10–12, & 15; *see also* N .Y. PENAL LAW § 70.08. [7] Counsel

asked the court for an adjournment to obtain the transcripts from these prior convictions in order to challenge their constitutionality. Sentencing Tr. at 6–7. The prosecutor gave counsel a copy of the transcript for the 1990 conviction, but did not have the transcript for the 1984 conviction. *Id.* at 7–8. After a pause in the proceedings, counsel again moved for an adjournment to obtain the sentencing minutes for the 1984 conviction, explaining that he had not attempted to obtain the minutes because he believed the prosecutor was going to obtain them and provide counsel with a copy. *Id.* at 7 & 9–10. It was on the heels of this explanation that the court commented, "Well, you know, Mr. Falco, when you're going to argue the constitutionality, you have got to be prepared to know what you're arguing. I mean, what you're telling me, you haven't done a single thing in terms of preparing for this hearing today." *Id.* at 10. Counsel objected to this conclusion by the court, and proceeded to argue that Petitioner's prior convictions should not be used to declare him a persistent violent felony offender and, if they were declared constitutional, Petitioner should still not be so classified. *Id.* at 15–21. Petitioner has failed to demonstrate that counsel's performance was deficient, or that the outcome would have been different had counsel obtained the missing 1984 transcript—*i .e.,* that he would not have been sentenced as a persistent violent felony offender. The Appellate Division's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Accordingly, this aspect of his Petition should be **denied.**

7    Section 70.08 provides that a persistent violent felony offender is "a person who stands convicted of a violent felony offense as described in subdivision one of section 70.02 ... after having previously been subjected to two or more predicate violent felony convictions as defined in paragraph (b) of subdivision one of section 70.04." Second degree assault, for which Petitioner was convicted, is classified as a violent felony offense. N.Y. PENAL LAW § 70.02(1)(c). Petitioner's two prior convictions for first and second degree robbery are also violent felony offenses committed in New York within ten years of the present conviction, excluding the time Petitioner served in prison, thereby qualifying him for persistent violent felony offender status. *Id.* at §§ 70.02(1)(a), (b), & 70.04(1); Sentencing Tr. at 10–12,16–18, 22, & 34.

**\*12** Petitioner further claims that trial counsel suffered from a substance abuse problem that prevented him from

**Hill V. Conway, Not Reported in F.Supp.2d (2008)** Case 9:21-cv-00736-DNH-TWD Document 35 Filed 05/29/24 Page 76 of 267

2008 WL 8095710

zealously representing him. Pet. Ground 2, Attachs. 2(A) & (B). Specifically, he claims that counsel admitted himself into a rehabilitation center one and one half months after Petitioner's trial was over to recover from an addiction to crack cocaine. *Id.* Petitioner claims that this alleged drug addiction was the reason for counsel's failure to present Officer Bricco's medical records at trial. *Id.* He refers this court to his January 2002 CPL 440 motion, in which he argued that trial counsel had been arrested for driving while intoxicated, that police recovered a crack pipe in the car, that counsel had refused a blood test, and that one Aaron Gilbert tried to hire counsel one and one half months after Petitioner's sentencing but was informed counsel was in a rehabilitation facility. *Id.* at Attach 2(B); Dkt. No. 12, Ex. O.

The state court denied this claim on the ground that, pursuant to CPL § 440.10(2)(b), Petitioner's motion was barred because it was based on matters in the record and could still be raised on direct appeal. *See* Dkt. No. 12, Ex. Q. at pp. 1–2.[8] A denial of a claim under CPL § 440.10(2)(b) rests on an adequate and independent state ground and this claim is therefore procedurally barred. *Johnson v. Sabourin,* 2005 WL 2663039, at *4–6 (S.D.N.Y. Oct. 14, 2005); *Brown v. New York,* 374 F.Supp.2d 314, 318–19 (W.D.N.Y.2005); *Encarnacion v. Walker,* 1998 WL 34002608, at *4–5 (N.D.N.Y. Aug. 21, 1998) (Sharpe, M.J.), *adopted,* No. 96–329, Dkt. No. 17 (N.D.N.Y. Aug. 24, 1999) (Scullin, D.J.). That the state court also addressed the merits of the claim does not change that result. *Fama v. Comm'r of Corr. Servcs.,* 235 F.3d 804, 810 n.4 (2d Cir.2000); *Glenn v. Bartlett,* 98 F.3d 721, 724–25 (2d Cir.1996).

8      This claim was not subsequently raised on direct appeal. *See* Dkt. No. 12, Ex. V, at pp. 17–22.

This Court may review this procedurally barred claim only if Petitioner demonstrates cause for the default and resulting prejudice, or that the failure of the federal court to review the claim will result in a "fundamental miscarriage of justice" *i.e.,* that he is innocent. *Calderon v. Thompson,* 523 U.S. 538, 559 (1998); *Coleman v. United States,* 501 U.S. 722, 748–750 (1991). To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his or her ability to comply with the relevant procedural rule. *Coleman,* 501 U.S. at 753; *Restrepo v. Kelly,* 178 F.3d 634, 639 (2d Cir.1999). When a petitioner fails to establish adequate cause for his procedural default, the court need not determine whether he suffers prejudice, since federal *habeas* relief is generally unavailable as to

procedurally defaulted claims unless both cause and prejudice are demonstrated. *Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985); *Long v. Lord,* 2006 WL 1977435, at *6 (N.D.N.Y. Mar. 21, 2006).

Petitioner has not established cause for the failure to exhaust this claim, and has never argued in either the state courts or this proceeding that appellate counsel rendered ineffective assistance by failing to argue in the state courts that trial counsel was ineffective due to a substance abuse problem. Since Hill has not established cause, the court need not decide whether he suffered actual prejudice. *See Stepney,* 760 F.2d at 45; *Staley v. Greiner,* 2003 WL 470568, at *7 (S.D.N.Y. Feb. 6, 2003). Petitioner has also failed to present any new evidence to show actual innocence of the crimes for which he was convicted. *Schlup,* 513 U.S. at 327. Review of this claim is thus procedurally barred.

**\*13** Even if this claim was not procedurally barred, Petitioner would not be entitled to relief. Petitioner has provided no evidence in support of his claim that counsel had a substance abuse problem at the time of Petitioner's trial and sentencing, nor that counsel's performance was deficient. As noted above, the record establishes that counsel properly represented Petitioner in all respects. This procedurally barred claim should be **dismissed.**

### D. Suppression claim

In Ground Three of his Petition, Hill alleges that Officer Bricco approached him without reasonable cause, that his arrest was therefore unlawful, and that statements he made to Bricco should have been suppressed as fruit of the unlawful arrest. Pet. Ground Three, Attachs. 3(A) & (B). Respondent maintains that this claim is not cognizable and should be dismissed. Resp't Mem. at pp. 9–11.

This Court agrees with Respondent. In *Stone v. Powell,* 428 U .S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494–95; *see also Pina v. Kuhlmann,* 239 F.Supp.2d 285, 289 (E.D.N.Y.2003) ("It is well settled that [Fourth Amendment] claims are not cognizable for habeas corpus review where a State has provided a full and fair opportunity to litigate this

issue."). The Supreme Court has since extended *Stone* to preclude *habeas* review of a "Fourth Amendment challenge to the introduction of a confession made after an allegedly unlawful arrest ." *Glover v. Herbert,* 431 F.Supp.2d 335, 338 (W.D.N.Y.2006) (citing *Cardwell v. Taylor,* 461 U.S. 571, 572–73 (1983) (*per curiam* ) (reversing grant of *habeas corpus* where circuit court of appeals found there was an unattenuated causal link between the custodial statements made by respondent and a violation of the Fourth Amendment)). Thus, *Stone* bars *habeas* review of claims that statements made during or after an allegedly unlawful arrest should have been suppressed as fruit of an illegal arrest. *See Cardwell,* 461 U.S. at 572–73; *Glover,* 431 F.Supp.2d at 338; *see also Gantt v. Artuz,* 1999 WL 1206733, at *3 (S.D.N.Y. Dec. 16, 1999) (review of claim that arresting officers did not have probable cause to stop petitioner precluded by *Stone* ); *Joyner v. Leonardo,* 1999 WL 608774, at *3 (S.D.N.Y. Aug. 12, 1999) (no *habeas* review of search and seizure claim where probable cause to arrest was questioned). Following *Stone,* review of Fourth Amendment claims in a habeas petition is permissible only: "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992); *see also Ramdeo v. Phillips,* 2007 WL 1989469, at *27 (E.D.N.Y. July 9, 2007).

**\*14** New York has a corrective procedure for Fourth Amendment violations, which is facially adequate. *See Capellan,* 975 F.2d at 70 n.1. Indeed, Hill availed himself of that procedure by making a motion to suppress any evidence recovered from him on the ground that the officers had no reasonable suspicion or probable cause to approach him or to arrest him, which the trial court denied after a hearing, and by appealing that denial. [9] Further, having reviewed the record, the Court concludes that there was no unconscionable breakdown in the underlying process. Hill's Fourth Amendment claim is, therefore, barred by *Stone* and *Cardwell.*

[9] The Appellate Division determined that Bricco had an "objective, credible reason for initially approaching [Petitioner] and requesting information from him" because Petitioner and two others were seen loitering together in an area known for illegal drug activity. *Hill,* 755 N.Y.S.2d at 170. The court noted the officer

saw drug paraphernalia at the feet of two of the suspects. Based upon this information, Bricco was entitled to ask Petitioner his identity and other pedigree information, as well as questions about what he was doing at the location. *Id.* The court further determined that those initial observations combined with Petitioner's furtive movements, his inability to produce identification, and his attempts to conceal his identity provided Officer Bricco with a founded suspicion that criminal activity was afoot, permitting him to detain Petitioner to "gain explanatory information." Finally, the court ruled that once the dispatcher confirmed Petitioner falsely identified himself, Officer Bricco had "at a minimum a reasonable suspicion of criminal activity," and the detention was permissible. *Id.*

### D. Denial of Counsel of Choice

Petitioner contends that he was denied counsel of his choice in violation of the Sixth Amendment. Dkt. No. 27, Supp. Mem. at pp. 2–11; Dkt. No. 37, Lt. Br., at pp. 1–9. Specifically, Petitioner alleges that the attorney who represented him at trial, Mark Falco, was not the attorney retained by his father to represent him. Petitioner asserts that his father retained Andre Sobolevsky represent Petitioner on or about May 24, 1999. Dkt. No. 27 at ¶¶ 9–10; Dkt. No. 37 at p. 3. He claims that he later learned that Mark Falco shared office space with Sobolevsky, and that, although he questioned it, Sobolevsky designated Falco *ab invito* to conduct Petitioner's trial. Dkt. No. 7 at ¶¶ 11–12; Dkt. No. 37 at p. 3. In support of his claim, Petitioner attached an affidavit signed by his father, James Handford, a copy of a receipt for legal fees, and the retainer agreement. Dkt. No. 27, Exs. 1–3. He also attached a Notice of Motion, brought by Falco, which indicates that Mark Falco, of the law firm entitled "Falco & Sobolevsky," is Petitioner's attorney. Dkt. No. 27, Attach. A. Petitioner further claims that Sobolevsky was not authorized to delegate his representation to Falco, even if they were part of the same firm, without his consent. *Id.* Respondent argues that these claims are without merit. Dkt. No. 35, Resp't Lt. Br., with Attachs.

The state court rejected these claims, finding that although a criminal defendant has a right under the state and federal constitutions to counsel of his own choosing, Petitioner never objected to Falco's representation and did not move for a change in counsel after Falco entered his appearance. Dkt. No. 35, Ex. FF at pp. 2–4 (July 2005 Decision and Order). The court noted that, according to its records, Petitioner retained

Falco, who then entered his appearance on June 3, 1999, and Falco and Sobolevsky were members of the same law firm. *Id.* at 3. The court further noted that the Appellate Division determined Petitioner received meaningful representation nonetheless. *Id.* at 4. Accordingly, it denied Petitioner's motion.

The right to counsel in criminal prosecutions is guaranteed by the Sixth Amendment, applicable to the states through the Fourteenth Amendment. *United States v. Gonzalez–Lopez,* 126 S.Ct. 2557, 2561 (2006); *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624–25 (1989); *Lainfiesta v. Artuz,* 253 F.3d 151, 154 (2d Cir.2001) (quoting U.S. Const. amend. VI and *Gideon v. Wainwright,* 372 U.S. 335, 342 (1963)). The Supreme Court has held that "an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *Gonzalez–Lopez,* 126 S.Ct. at 2561 (citing *Wheat v. United States,* 486 U.S. 153, 159 (1988)). This right, though qualified, may not be denied arbitrarily. Deprivation of the right to counsel of choice is

> **\*15** 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received. To argue otherwise is to confuse the right to counsel of choice-which is the right to a particular lawyer regardless of comparative effectiveness-with the right to effective counsel-which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed."

*Gonzalez–Lopez,* 126 S.Ct. at 2563; *see also Lainfiesta,* 253 F.3d at 154 (citing *Morris v. Slappy,* 461 U.S. 1, 11–12 (1983)).

The right to counsel of choice may be overcome "when it is outweighed by competing interests in the fair administration of justice or maintaining orderly trial procedures." *Lainfiesta,* 253 F.3d at 154; *see also Caplin & Drysdale, Chartered v. United States,* 491 U.S. at 624; *Wheat v. United States,* 486 U.S. at 159.

Here, the state court correctly identified Petitioner's qualified right to counsel of his choice as the legal principle governing Petitioner's CPL motion, but denied relief for two reasons. First, the court denied relief because the Appellate Division, Fourth Department, held that Petitioner received meaningful representation. Dkt. No. 35, Ex. FF, July 2005 DO. Since the Supreme Court has ruled that deprivation of the right to counsel of choice is " 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received," the fact that Falco was ultimately effective is irrelevant to the question of whether Petitioner was denied counsel of choice. *See Gonzalez–Lopez,* 126 S.Ct. at 2563.

The state court's decision, however, was not based solely on the determination that Petitioner received meaningful representation. The court also denied relief because Petitioner never objected to Falco's "numerous appearances" and never "requested a change of counsel." Dkt. 35, Ex. FF, at pp. 2–4. The record supports that determination. Falco entered his appearance on June 3, 1999, ten days after Petitioner's father apparently retained Sobolevsky. Dkt. No. 27, Exs. 1 & 3. Falco told the court, "I've spoken to Mr. Hill. He desires to hire me to do the trial." Dkt. No. 12, Ex. E, Tr., Appearance, 6/3/99, at 2. Petitioner, whom the record indicates was present in court, did not correct Falco and did not object when the trial court permitted Falco to enter his appearance. *Id.* The record further indicates that Petitioner fully cooperated with Falco, indicating that he apparently agreed to Falco's representation. *See, e.g.,* Trial Tr. at 7–8. Since Petitioner failed to object to Falco's representation on these grounds at any stage of the proceedings, until nearly eight years after his conviction, the state court properly denied relief on that ground. *See Ante Ljubas v. United States,* 1987 WL 19951, at \*1 (S.D.N.Y. Nov. 10, 1987) (*habeas* petitioner's claim that he was denied counsel of choice was meritless where he chose attorney Lopez to represent him, but at trial Lopez was replaced by attorney Light of the same law firm, and petitioner failed to object to Light's representation: "petitioner obviously agreed to the arrangement with respect to Light's presence and representation in the trial since he made no objection to this arrangement on the trial or even on appeal but only in hindsight five years after his conviction.").

**\*16** Moreover, Petitioner's claim is not that the government or the trial court arbitrarily or erroneously prevented him from being represented by counsel of his choice. *See, e.g., Gonzalez–Lopez,* 126 S.Ct. at 2563 (court's denial of attorney's *pro hac vice* admission request was an erroneous

deprivation of the defendant's Sixth Amendment right to counsel); *Lainfiesta,* 253 F.3d at 156 (court's refusal to permit chosen counsel to conduct cross-examination was arbitrary and a denial of defendant's right to counsel); *United States v. Stein,* 495 F.Supp.2d 390, 393, 421–23 (S.D.N.Y.2007) (government's interference, by threatening to indict an accounting firm and coercing it to limit and cut off its payment of legal fees of its employees violated the employees' constitutional right to counsel of choice). In fact, the record indicates exactly the opposite: that the state court protected Petitioner's right to counsel of choice. Petitioner was represented by attorney David Savlov from February 11, 1999 until June 3, 1999, the Friday before the jury trial was scheduled to begin, when Falco entered his appearance. The trial court allowed Falco, on the eve of trial, to enter his appearance based upon Falco's representation that Petitioner wanted him to try the case. Dkt. No. 12, Ex. E, Tr., Appearance, June 3, 1999, at 2. Instead, Petitioner's claim appears to be that **retained counsel** denied him his choice of counsel when he allegedly delegated his representation to Falco. "Thus, the truism that a defendant's choice of counsel should not be unnecessarily obstructed by the court is not implicated here." *Ante Ljubas v. United States,* 1987 WL 19951, at *2 (explaining that where a petitioner claimed he was "deprived of the counsel of his choice not by his adversary, the Government, or by the Court, but by the collusion of counsel of his choice and one of his associated lawyers," cases involving interference with the right to counsel of choice do not apply).

Finally, Petitioner claims that Sobolevsky was not authorized to delegate his representation to Falco without Petitioner's consent. In support of that claim, Petitioner relies heavily on a state court decision in *People v. Betillo,* 279 N.Y.S.2d 444 (N.Y.Sup.Ct.1967). Dkt. No. 27, at ¶¶ 19 & 27–29; Dkt. No. 37, at pp. 1–3. Petitioner's reliance is misplaced. In *Betillo,* a retained attorney designated another attorney, who occupied the same suite of offices, to represent the defendant at sentencing without the defendant's consent. The court found that a "retained attorney is not authorized to hire another attorney or to delegate his authority to another **without the consent of his client,"** and vacated the defendant's sentence, remanding it for re-sentencing on the ground that the defendant's right to counsel of choice had been violated. *Id.* at 453 (citations omitted) (emphasis added).

In contrast, the record here demonstrates that not only did Petitioner consent to Falco's representation, he apparently hired Falco himself. Dkt. No. 12, Ex. E, at p. 2. Thus,

the holding in *Betillo* is inapposite. In any event, attorneys often use the services of associate attorneys during the course of their representation of clients. *See Maurer v. McCoy,* 2002 WL 975308, at *4 (N.D.N.Y. Feb. 22, 2002) (Sharpe, M.J.); *Phillips v. United States,* 2001 WL 274092, at *5 (S.D.N.Y. Mar. 19, 2001). This District has held that "[w]ithout proof that the delegation of work to another attorney was unreasonable and prejudiced [the defendant], a habeas petition based upon such a claim must fail." *Maurer,* 2002 WL 975308, at *4. Petitioner here has offered no such proof, and, as discussed above, counsel properly represented him in all respects.

**\*17** In sum, Petitioner was not deprived of his choice of counsel. The state court's rejection of this claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent, and the petition on this ground should be **denied.**

### III. CONCLUSION

**WHEREFORE,** it is hereby

**RECOMMENDED,** that Hill's Petition for a Writ of *Habeas Corpus* (Dkt. No. 1) be **denied;** and it is further

**RECOMMENDED,** that because the Court finds Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), no certificate of appealability should issue with respect to any of Petitioner's claims. *See* 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.2000); and it is further

**ORDERED,** that the Clerk serve a copy of this Report–Recommendation and Order on the parties.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .),* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a) & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 8095710

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 9316847
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael N. KELSEY, Petitioner,

v.

Donna LEWIN, Hudson Correctional
Facility Superintendent, Respondent.

9:21-CV-348 (MAD/ATB)

|

Signed March 27, 2023

|

Filed March 28, 2023

**Attorneys and Law Firms**

MICHAEL N. KELSEY, Petitioner, pro se.

PAUL B. LYONS, AAG, for Respondent.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, UNITED STATES MAGISTRATE
JUDGE

**\*1** This matter has been referred to me for Report and
Recommendation by the Honorable Mae A. D'Agostino,
United States District Judge, pursuant to 28 U.S.C. § 636(b)
and N.D.N.Y. Local Rule 72.3(c).

Petitioner, while incarcerated at Hudson Correctional
Facility, [1] filed this petition pursuant to 28 U.S.C. § 2254,
challenging a May 12, 2016 judgment of conviction after
a St. Lawrence County Court jury found him guilty of
Sexual Abuse in the First Degree, Attempted Sexual Abuse
in the First Degree, Forcible Touching, and two counts of
Endangering the Welfare of a Child. (Petition ("Pet.") at
1) (Dkt. No. 1). Petitioner was sentenced to serve seven
years imprisonment, followed by ten years of post-release
supervision.

[1]     Plaintiff was released from DOCCS confinement
        in May 2022. (Dkt. No. 39). He appears to
        maintain parole status as of the date of this report-
        recommendation, with a maximum expiration date
        for supervision of August 2031. *See* https://
        nysdoccslookup.doccs.ny.gov/. Accordingly, and

respondent does not dispute that, plaintiff continues
to satisfy the statutory requirement of "custody"
relative to federal habeas corpus jurisdiction. *See
Maleng v. Cook*, 490 U.S. 488, 491, 109 S.Ct. 1923,
104 L.Ed.2d 540 (1989); *Scanio v. United States*,
37 F.3d 858, 860 (2d Cir. 1994); *see also Plato
v. Morrissey*, 638 F. Supp. 2d 338, 343 (W.D.N.Y.
2009) (noting that "the Supreme Court and the
Second Circuit have recognized that a prisoner who
has been released from physical custody but has
been placed on parole/supervised release remains
'in custody' for habeas purposes where such status
results in restrictions on freedom and liberty").

On August 24, 2016, petitioner filed a post-trial motion to
vacate the judgment of conviction pursuant to N.Y. Crim.
Proc. Law ("CPL") § 330.30. (State Court Record ("SR")
31-107). [2] The trial court denied petitioner's motion on
October 18, 2016. (SR 108-10).

[2]     The state court record contains both sealed and
        unsealed documents (Dkt. Nos. 29, 32).

On direct appeal to the Appellate Division, Third Department
("Appellate Division"), petitioner filed a counseled brief as
well as a pro se reply brief. (SR 332-550, 840-79). The
Appellate Division unanimously affirmed the judgment of
conviction on July 3, 2019. *People v. Kelsey*, 174 A.D.3d 962
(3d Dep't 2019) (SR 884-90). Petitioner filed pro se papers
applying for leave to appeal to the Court of Appeals, which
request was denied on October 15, 2019. *People v. Kelsey*, 34
N.Y.3d 982, 137 N.E.3d 41 (2019) (SR 996-97).

Petitioner filed a pro se coram nobis motion in the Appellate
Division on August 4, 2019, which was denied on January 23,
2020. (SR 998-1005, 1011-12). Petitioner applied for leave to
appeal to the Court of Appeals (SR 1013-21), and the Court
of Appeals denied leave on December 28, 2020. *People v.
Kelsey*, 36 N.Y.3d 973, 162 N.E.3d 722 (2020) (SR1024-25).
Petitioner filed a pro se petition for a writ of certiorari with
the United States Supreme Court. (SR1026-89). The Court
denied the writ on May 3, 2021. *Kelsey v. New York*, No.
20-7308, ––– U.S. ––––, 141 S.Ct. 2607, 209 L.Ed.2d 738,
2021 WL 1725238 (U.S. May 3, 2021).

**\*2** On February 24, 2020, petitioner filed a motion to
vacate the conviction pursuant to CPL § 440.10. (SR 1090-92). Judge
Catena issued a Decision and Order on June 9, 2020, denying
the motion in its entirety. (SR 1714-17). Petitioner applied to

2023 WL 9316847

the Appellate Division for leave to appeal, and his application was denied on March 11, 2021. (SR 1719-55, 1759-60).

Petitioner filed a pro se state habeas petition pursuant to CPLR Article 70 on November 23, 2020. (SR 1761-1817). The Columbia County Supreme Court denied the petition on March 16, 2021, and petitioner appealed this decision to the Appellate Division on April 11, 2021. (SR 1820-28, 1829-33). The Appellate Division denied petitioner's appeal on March 10, 2022, *People ex rel. Kelsey v. Lewin*, 203 A.D.3d 1366 (3d Dep't 2022), and upon leave to the Court of Appeals, the Court dismissed petitioner's appeal sua sponte on June 14, 2022, "on the ground that [petitioner] has been released[.]" *People ex rel. Kelsey v. Lewin*, 38 N.Y.3d 1054, 190 N.E.3d 1172 (2022). Petitioner's motion for reconsideration was denied on September 13, 2022. *People ex rel. Kelsey v. Lewin*, 38 N.Y. 3d 1166, 195 N.E.3d 62 (2022). [3]

[3]    The decisions from the Appellate Division and the Court of Appeals concerning petitioner's state habeas petition are not included in the state record, as they were not issued until after the response in this matter was filed.

In his extensive federal habeas corpus application filed on March 24, 2021, petitioner raises a host of arguments as grounds for relief. (*See* Pet., generally). Respondent filed a response to the petition, together with the pertinent state court records and a memorandum of law. (Dkt. Nos. 27, 28, 29, 32). For the following reasons, this court agrees with respondent and will recommend denying the petition.

## DISCUSSION

### I. Relevant Facts

Respondent has included a detailed description of the facts and procedural history of this case. (Resp. MOL at 2-31) (Dkt. No. 27). This court will summarize the relevant facts as set forth in the state court record for clarity, and will discuss specific facts as necessary in the analysis of petitioner's claims.

#### A. Pre-Trial Proceedings

On June 30, 2015, petitioner was charged by a grand jury in a five-count indictment filed in St. Lawrence County. (SR 120-22). The first count was brought pursuant to New York Penal Law § 130.65(2), and charged petitioner with

committing sexual abuse in the first degree for touching DC's [4] penis while DC was asleep. (SR 120). The second count was brought pursuant to New York Penal Law § 110.00/130.65(2), and charged petitioner with attempting to commit sexual abuse in the first degree for attempting to touch JD's penis while JD was asleep. (SR 120-21). The third count was brought pursuant to New York Penal Law § 130.52, and charged petitioner with forcible touching for touching DC's penis for the purpose of degrading or abusing DC, or for gratifying petitioner's sexual desire. (SR 121). The fourth and fifth counts were brought pursuant to New York Penal Law § 260.10(1), and charged petitioner with endangering the welfare of a child by knowingly acting in a manner likely to be injurious to the physical, mental, or moral welfare of both DC and JD. (SR 121-22).

[4]    The indictment identified the complainants, whom this court will identify as DC and JD, by their dates of birth and as persons known to the grand jury. (SR 120-22).

**\*3** Petitioner was arraigned on July 16, 2015, at which time he plead not guilty to the indictment. (Dkt. No. 32-1 at CM/ECF pp. 51-65). Petitioner was released under probation supervision. (*Id.* at CM/ECF p. 60). On April 12, 2016, he appeared for a court conference with retained defense counsel, Richard Portale. [5] (Dkt. No. 32-1 at CM/ECF pp. 6-10). At the conference, petitioner waived his right to a *Huntley* hearing as it related to the suppression of a controlled call between petitioner and JD's mother, which the government sought to introduce as evidence at trial. (*Id.*). The parties also discussed whether the government had satisfied its obligation to disclose all existing *Brady* material in their possession. (*Id.*). Last, defense counsel stated his understanding that the government did not, at that time, intend to make an application to introduce evidence of any prior bad acts under *Molineux* or *Ventimiglia*. (*Id.*).

[5]    Petitioner originally retained Gary Greenwald as his defense counsel; however on October 28, 2015, petitioner substituted himself as sole attorney of record. (SR 257). Petitioner handled his own defense without assistance through March 2016, when he retained Mr. Portale. (SR 1234).

#### B. The Trial

A seven day jury trial was held in St. Lawrence County Court before the Honorable Felix J. Catena, [6] commencing on May

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 83 of 267

2, 2016. (Dkt. No. 32-1 at CM/ECF pp. 84-1439 (Trial ("T") 1-807)). Prior to jury selection, Mr. Portale informed the court that petitioner, an attorney of the New York State bar in good standing, would be acting as "co-counsel" or "second chair," and would be handling some of the witnesses. (T 10-12, 22). Petitioner then delivered his own opening statement. (T 237-75). In the middle of petitioner's opening statement, the court ruled that petitioner had "opened the door" for the prosecution to introduce, during their case-in-chief, evidence of petitioner's "prior bad acts." (T 260-61).

6     For reasons not stated in the record, St. Lawrence County Judge Jerome Richards recused himself from petitioner's case prior to the trial, and was replaced by Montgomery County Supreme Court Acting Justice Catena.

The prosecution presented the following evidence from five witnesses at trial, including JD and DC. JD and DC were fifteen years old at the time of the relevant crimes, and sixteen years old at the time of trial. They were close friends, and both members of the local Boy Scouts Troop 95. (T 278-81, 315-16, 386-87, 420-21, 471-73, 480, 501-02). JD and DC met petitioner through Troop 95, where petitioner was an Assistant Scout Master and leader of the "Venture Patrol"–a group of older and "higher skilled" scouts who went on "more advanced trips than the rest of the troop." (T 282-83, 286-87, 387, 377, 473-74, 479, 495-96). In August of 2014, JD was the "crew chief" of the Venture Patrol, and worked with petitioner to plan and lead trips. DC was the assistant crew chief. (T 285-86, 372-73, 473-74, 499-501). Prior to August 2014, JD and DC had a good relationship with the petitioner; however JD denied ever having a "romantic relationship" with petitioner. (T 284, 475, 494).

The Troop 95 Venture Patrol went on a 50-mile hike at Cranberry Lake in the Adirondacks from August 13 through August 20, 2014. The Scouts were accompanied by two adults, petitioner and Scout Master Tom Ricci. They drove to the excursion in two cars–JD, DC, and TN, another Scout, rode in petitioner's car. (T 286-89, 377-78, 478-81).

The Scouts arrived to Cranberry Lake on August 13th at approximately 11:00 p.m. Because it was raining, they decided to sleep in the cars. In petitioner's car, petitioner slept in the driver's seat; TN slept in the passenger seat; and JD slept in the back seat. (T 289-90, 378-79, 481-82). DC also slept in petitioner's car, on his back in the center console of the front seat, with his left foot in the driver's side foot compartment, his right foot in the passenger's side foot compartment, and his head lying on backpacks stacked in the rear. (T 290-91, 482-83). While they slept, petitioner's body was situated so that his legs were stretched out on the dashboard in a way that "pinned down" DC's left leg, to the extent that DC "couldn't pull [his] left leg out or move it that much." (T 291-92). DC fell asleep around midnight but was awakened by petitioner's "hand touching [DC's] penis" over DC's shorts. (T 291-93, 368). DC testified that he shifted to "act like [he] was waking up," but he did not want petitioner to know he was awake because he "didn't know what to do." (T 293-95). Petitioner continued to touch DC's penis over his shorts, and also attempted to put his hand under the waistband of DC's shorts, but stopped when DC "shifted." (*Id.*). DC testified that he tried to squirm, move, and roll away, but was unable to move at first because he was "pinned" by petitioner's legs. (T 295, 319, 369). Eventually, petitioner moved his leg a little so DC could pull his left leg out of the driver's side foot compartment. DC was then able to roll over. (T 294-96, 369). DC testified that petitioner touched his penis for "probably around 10 or 20 minutes." (T 319, 350, 368). They did not speak to each other during the incident. (T 295). In the morning, DC moved into the back seat with JD. (T 296).

**\*4**  On the night of August 17th, the Scouts, with petitioner and Tom Ricci, reached an area called "High Falls" where they all slept in a lean-to together. (T 486, 489). JD was sleeping next to petitioner. (*Id.*). During the night, JD "was awoken by [petitioner] putting his hand down [JD's] shorts and trying to touch [JD's] penis." (T 485-86). JD realized that petitioner was trying to reach down his pants, so JD "batted" petitioner's hand away. (T 487). At that point, petitioner "tried again," so JD "just moved" petitioner's hand away, zipped up his sleeping bag, and turned his back to petitioner. (T 487). JD attempted to wake up another Scout that was sleeping next to him to ask for help, but that Scout "didn't really understand what was going on." (T 488). The next morning, JD was sitting by himself when petitioner approached him and said, "I'm sorry if I made you feel uncomfortable last night, and sometimes I do stupid things." (T 489-90). Petitioner also told JD that he "made a mistake." (T 490).

Neither DC nor JD immediately disclosed these incidents to anyone, and they continued to interact with petitioner on subsequent occasions, including on various "cliff jumping" and "caving" excursions in the months that followed the Cranberry Lake trip. (T 297-98, 323, 334-39, 347-49, 364-65, 491, 498-99, 506, 509-11, 521-22, 550-52).

2023 WL 9316847

In September 2014, DC and JD attended a sleepover at a friend's house. There, they had a private conversation during which DC stated that petitioner had "touched" DC's penis during the Cranberry Lake trip. JD then disclosed to DC that petitioner had "tried to touch" JD's penis during the same trip. (T 298-300, 492). DC and JD decided to disclose petitioner's conduct to their Assistant Scout Master, Chris Marsella. (T 300-01, 333, 492-93). JD and DC confided in Marsella during a hike in late October. (T 301-02, 333, 493, 511-12, 526-27). Marsella stated that he would let JD and DC choose when to tell their parents about petitioner's abuse, though he encouraged them to do so. (T 547-48).

In December 2014, JD's mother, LD, became concerned about how petitioner was coping with his loss in the N.Y. State Assembly election. (T 389-90, 423, 431-32). On December 13, 2014, LD sent a text message to petitioner asking if he "wanted to get together to chat." (T 389-90, 447). When JD learned about LD's plans to have coffee with petitioner, JD decided to tell his mother what happened on the Cranberry Lake trip. (T 390-94, 441-43, 446-47, 530-31, 546-47). After JD spoke to LD, she contacted the police. (T 393-94, 442-49). JD and DC were separately interviewed on videotape by the state police, and they also gave written depositions. (T 308-11, 313-15, 453-58, 512-15). On December 15, 2014, LD conducted a controlled phone call with the petitioner at the request of the state police. (T 395-96, 399-400, 424, 455-60). A copy of the controlled call was admitted into evidence and played for the jury. (T 416).

With respect to petitioner's "prior bad acts," the prosecution presented evidence that petitioner had "grabbed" JD's penis while they were in an outdoor heated pool on a Troop snowshoeing trip in 2013. (T 476-77). JD and DC also testified that petitioner introduced them to a game called "padiddle," which they played on car trips. During the game, each passenger would have to hit the ceiling and say "padiddle" when they saw a car with only one headlight. The last person to do so would have to remove an article of clothing. (T 284-86, 339, 475-76). JD and DC testified that they played padiddle in petitioner's car on the trip to Cranberry Lake.

Petitioner testified in his own defense. Petitioner denied grabbing JD's penis in 2013, and also denied that anyone removed their clothing while playing "pididdle" in the car with him. (T 888-93). He further denied the allegations by DC and JD of sexual abuse during the Cranberry Lake trip. With respect to DC, petitioner testified that when they arrived

on the night of August 13 th, petitioner got his sleeping bag from the trunk, got into the driver's seat of his car, and went to sleep. (T 897). He testified that he was the only one in the car when he fell asleep, and he did not know where the others were. (T 897-98, 912). Petitioner did not attempt to touch DC, nor did he come into any physical contact with DC that night. (T 913-14). When petitioner woke up the next morning, DC was sleeping on the arm rest with a leg on either side of the console. (T 914).

**\*5** Petitioner also denied abusing JD. On the fourth night of the Cranberry Lake trip, petitioner "wrestled" in the lean-to with some of the Scouts, including JD. (T 919-20). At one point, JD "rolled over so that his groin was on [petitioner's] hand, and [petitioner] froze." (T 920). Petitioner looked at JD and said, "this is awkward." (T 920, 978-79). JD "didn't move," so petitioner "quickly" pulled his hand away, "stopped wrestling and walked away." (T 920, 979). Petitioner believed that JD was making a "pass" at him. (T 920, 974).

On the fifth night of the trip, they all slept in a lean-to. Petitioner slept between JD and DC. (T 921-23). Petitioner woke in the middle of the night, because JD's head was on petitioner's chest, and JD was "straddled next to petitioner," which "bothered" him. (T 923-24). Petitioner "pushed [JD] away." (T 924, 926-27). Petitioner was so "disturbed by this incident that he got out of his sleeping bag, grabbed a blanket from his backpack, and went down to the falls." (T 924). Petitioner denied that he reached for or made any attempt to touch JD's penis. (T 925, 977-78). Petitioner returned to the lean-to at daybreak, and everyone was still asleep. He proceeded to boil water for breakfast. (T 924-25). Later that morning, petitioner went up to JD and "apologized," saying "I don't know what happened last night. I still like you. Sorry." (T 925-27).

JD and DC had multiple communications and interactions with petitioner after the Cranberry Lake trip. (T 931-32, 934-36). On cross-examination, petitioner was impeached with incriminating statements he made in subsequent emails to Scout Master Rich Robbins in the weeks following JD and DC's accusations. (T 263, 946-47, 956-58, 962-64). In particular, petitioner wrote to Robbins on December 8, 2014, asking him to deliver a message to JD:

> I need you to know that I'm not a bad person and that I never wanted any harm to come to you. I'm sick, but I'm

> doing my best to get better. You did
> the right thing in coming forward, and
> I understand if you want to hate me.
> I'm truly sorry. Please remember me
> for the good that I tried to do for you
> and for others and forgive me for my
> faults and weaknesses.

(T 967-68). Petitioner testified that he had believed if he gave an apology, he would be allowed to re-enter the troop. (T 1016). Petitioner also testified that he was under extreme mental stress between October and December 2014. (T 937-38, 947). He was prescribed an anti-depressant in November 2014, which provided some short-term relief of his mental health symptoms. (T 947, 959-62, 994-95, 959-60, 994-95). At the time of the controlled call with LD, petitioner was "between medications" and "noticing bizarre behaviors" in himself that made him think that he was mentally ill. Accordingly, he was "not sure what to believe." (T 946). Petitioner testified to various innocent explanations for the incriminating statements he made to LD during the controlled call during his direct testimony. (T 936-56, 990-91).

In addition to petitioner, the defense called several other witnesses including two former members of the Venture Patrol, MR and DR. (T 564-72, 700-03). Both testified that they had played the "padiddle" game in petitioner's car, but had never seen anyone take off their clothes. (T 586-87, 707-08). MR also testified that he never saw any physical contact between petitioner and JD on the 2013 snowshoeing trip. (T 703-07). Furthermore, MR was on the Cranberry Lake trip and testified, among other things, that JD had not been sleeping next to petitioner on the night at issue. (T 744-45). TR, who is MR and DR's father, also testified on behalf of the defense. TR was an Assistant Scout Master in August of 2014, and among other things testified that petitioner had an "exemplary" reputation in the Scouting community. (T 835-37).

**\*6** The jury found petitioner guilty of all charges. (T 1349-50).

## II. Generally Applicable Law

### A. Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

The AEDPA provides that, when a state court has adjudicated the merits of a petitioner's constitutional claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See also, e.g., Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001); *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008). This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (citations omitted).

To determine whether a state-court decision is contrary to clearly established Supreme Court precedent, the federal court must consider whether the state court decision " 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." *Id.* at 182, 131 S.Ct. 1388 (quoting *Williams v. Taylor*, 529 U.S. 362, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)) (alterations in original). A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle, but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case. *See Williams*, 529 U.S. at 413, 120 S.Ct. 1495; *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000).

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*. *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001). Finally, the Supreme Court has held that circuit and district court decisions do not constitute "clearly established Federal Law, as determined by the Supreme Court." *Parker v. Matthews*, 567 U.S. 37, 40, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012). Instead, circuit court decisions may illustrate the "possibility" of fairminded disagreement, sufficient to justify denying the writ. *White v. Woodall*, 572 U.S. 415, 422 n.3, 134 S.Ct. 1697, 188 L.Ed.2d 698 (2014).

### B. Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, ... thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (internal quotation and other citations omitted)); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id.*; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

**\*7** "A habeas petitioner has a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.' " *Hernandez v. Conway*, 485 F. Supp.2d 266, 273 (W.D.N.Y. 2007) (quoting *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir. 1982)).

Where a petitioner has failed to exhaust his claims, but he cannot return to state court, petitioner's claims are then "deemed" exhausted, but barred by procedural default. *Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994). The merits of such a procedurally defaulted claim may not be reviewed by a federal court unless the petitioner can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that the constitutional violation has resulted in the conviction of one who is "actually innocent." *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012); *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations omitted). The actual innocence prong is referred to as the fundamental miscarriage of justice exception. *Rivas, supra*. "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the alleged constitutional violation. *Stickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

**C. Adequate and Independent State Ground Doctrine**

A federal judge may not issue a writ of habeas corpus if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim. *See Wainwright v. Sykes*, 433 U.S. 72, 81-85, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A federal habeas court generally will not consider a federal issue if the last state court decision to address the issue " 'rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)) (emphasis added). This rule applies whether the independent state law ground is substantive or procedural. *Id.* When the independent and adequate state ground supporting a habeas petitioner's custody is a state procedural default, additional concerns come into play. *Coleman v. Thompson*, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (quoting *Garcia v. Lewis*, 188 F.3d 71, 76 (2d Cir. 1999) ("[P]rocedural default in the state court will ... bar federal habeas review when the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.") (internal quotation marks omitted)).

There are certain situations in which the state law basis for decision will not be considered "adequate": (1) where failure to consider a prisoner's claims will result in a "fundamental miscarriage of justice," *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546; (2) where the state procedural rule was not " 'firmly established and regularly followed,' " *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991); *James v. Kentucky*, 466 U.S. 341, 348-349, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984); and (3) where the prisoner had "cause" for not following the state procedural rule and was "prejudice[d]" by not having done so. *Wainwright v. Sykes*, 433 U.S. at 87, 97 S.Ct. 2497. In certain limited circumstances, even firmly established and regularly followed rules will not prevent federal habeas review if the application of that rule in a particular case would be considered "exorbitant." *Garvey v. Duncan*, 485 F.3d at 713-14 (quoting *Lee v. Kemna*, 534 U.S. at 376, 122 S.Ct. 877).

**\*8** In order to find that the application of a generally sound rule is exorbitant, the court considers (1) whether the alleged procedural violation was actually relied upon by the state court and whether perfect compliance with the state rule would have changed the court's decision; (2) whether state caselaw indicated that compliance with the

2023 WL 9316847

rule was demanded in the specific circumstances presented; and (3) whether petitioner "substantially complied" with the rule given the realities of trial and whether demanding perfect compliance with the rule would serve a legitimate governmental interest. *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003).

**DISCUSSION**

### III. Legal Sufficiency

Petitioner asserts that his convictions were based on legally insufficient evidence. (Pet. MOL at 6-12) (Dkt. No. 1-1). Petitioner contends, among other things, that (1) he could not have sexually abused DC under the terms of the relevant penal statute, because DC was only pretending to be asleep during the assault, and therefore was not "physically helpless," (2) JD could not have been physically helpless if he was able to swat petitioner's hand away, (3) the victims' testimony was inconsistent, and (4) the victims had continued contact with petitioner.

At the outset, the court agrees that many of petitioner's legal sufficiency claims are either unexhausted or barred by an adequate and independent state law ground. The legal sufficiency claims asserted by petitioner in his direct appeal were limited to those concerning the victims' subsequent interactions with petitioner, as well as the purported inconsistencies in the victims' testimony. (SR 366-68). Because petitioner failed to properly exhaust his other record-based legal insufficiency claims on direct appeal, and no longer has a venue in which to raise them, they are deemed exhausted but are barred by procedural default. In order to overcome this procedural bar, the petitioner must show (1) both cause for failing properly to raise the claim in state court and prejudice resulting from the alleged constitutional error, or (2) that the failure to address the claim on habeas would result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

As the respondent correctly observes, petitioner's ineffective appellate counsel claim cannot serve as the "cause" for his failure to raise these claims in his direct appeal, because petitioner did not exhaust such a claim in state court. *See Edwards v. Carpenter*, 529 U.S. 446, 452, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) ("[A] claim of ineffective assistance ... must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural

default.") (internal quotation marks omitted). Petitioner has not otherwise established cause, and "given the absence of cause, this Court need not address the prejudice." *Gomez v. Brown*, 655 F. Supp. 2d 332, 345 (S.D.N.Y. 2009). Moreover, petitioner has not established any fundamental miscarriage of justice.

To the extent petitioner raised legal sufficiency claims on direct appeal regarding the inconsistency of the victims' testimony and their continued contact with the petitioner, the Appellate Division denied these claims as unpreserved because petitioner "did not move for a trial order of dismissal." *Kelsey*, 174 A.D.3d at 962 (citations omitted). Indeed, counsel expressly waived the motion for a trial order of dismissal, which is required in New York to preserve a legal sufficiency claim. (T 1019). *See Velez v. Cunningham*, No. 09-CV-6506, 2013 WL 5272953 (S.D.N.Y. Sept 17, 2013) (reasoning that habeas review of legal sufficiency claim was foreclosed where, "the appellate court determined that [p]etitioner procedurally defaulted this claim because he did not preserve [it] for appellate review by moving for a trial order of dismissal") (citation omitted); *see also Garvey v. Duncan*, 485 F.3d 709, 714-15 (2d Cir. 2007). Accordingly, the legal sufficiency claims raised in petitioner's direct appeal are barred from habeas review on adequate and independent state law grounds. Petitioner has failed to establish cause and prejudice, or a fundamental miscarriage of justice that would excuse this procedural default. Although petitioner argued on direct appeal that trial counsel was ineffective for failing to preserve this claim, the court agrees with the Appellate Division's ruling that such claim is meritless, as further discussed below. Accordingly, petitioner's ineffectiveness claim cannot serve as the cause to excuse his procedural default. *See Gomez v. Brown*, 655 F. Supp. 2d at 356 ("In order to use ineffective assistance of counsel as cause for procedural default, the ineffective assistance claim itself must be both exhausted and meritorious.") (citations omitted).

**\*9** Even if petitioner's legal sufficiency claims were properly exhausted and not procedurally barred, the court agrees that they are also meritless. In assessing a petitioner's request for habeas relief, "the critical inquiry on review of [a claim challenging] the sufficiency of the evidence ... [is] whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court must determine if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781 (emphasis in original); *see also McDaniel v. Brown,* 558 U.S. 120, 132-33, 130 S.Ct. 665, 175 L.Ed.2d 582 (2010) (reaffirming standard).

In so doing, the reviewing court must be mindful that, when "faced with a record of historical facts that supports conflicting inferences [it] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Cavazos v. Smith,* 565 U.S. 1, 7, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) (internal quotation marks and citations omitted); *see also Cole v. Miller,* No. 9:19-CV-01093 (JKS), 2021 WL 1267802, at *5 (N.D.N.Y. Apr. 6, 2021) ("[The reviewing court] may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inference, or considered the evidence at trial."). A habeas petitioner who claims that the evidence was insufficient to sustain a conviction bears a "very heavy burden." *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 811 (2d Cir. 2000).

Based on the record presently before this court, the testimony and other proof presented at trial provided sufficient evidence to sustain petitioner's convictions, and petitioner is not entitled to habeas relief on the basis of legal insufficiency. Turning first to petitioner's conviction for sexual abuse in the first degree,[7] DC testified that petitioner touched DC's penis in petitioner's car during a trip to Cranberry Lake, thus establishing the element of "sexual contact." It is well settled that " 'the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.' " *United States v. Frampton,* 382 F.3d 213, 222 (2d Cir. 2004) (citation omitted).

[7]    Sexual abuse in the first degree is committed when a person "subjects another person to sexual contact ... [w]hen the other person is incapable of consent by reason of being physically helpless." NY Penal Law § 130.65(2).

Moreover, petitioner's objection to the evidence establishing DC's physical helplessness–DC's testimony that he was asleep when petitioner first touched his penis-is meritless. According to New York law, "[i]t is well established that physical helplessness is defined broadly and may include a sleeping victim." *People v. Manning,* 81 A.D.3d 1181, 1181, 917 N.Y.S.2d 721 (3d Dep't 2011); *accord People v. Mesko,* 150 A.D.3d 1412, 1414 (3d Dep't 2017); *People v. Williams,* 94

A.D.3d 1555, 1555-56, 943 N.Y.S.2d 714 (4th Dep't 2012). Evidence that DC subsequently woke up and pretended to be asleep as petitioner continued to touch him does not alter his initial state of physical helplessness. *See Williams,* 94 A.D.3d at 1555-56, 943 N.Y.S.2d 714 ("the testimony of the victim that she was asleep when defendant began touching her was legally sufficient to establish the element of physical helplessness"). Nor did any purported lack of evidence that petitioner "restrained" DC affect the legitimacy of petitioner's conviction, as the elements of first-degree sexual abuse were satisfied because petitioner first began touching DC's penis while DC was asleep, i.e., "physically helpless and unable to consent to such conduct." *Kelsey,* 174 A.D.3d at 964. The statute does not require additional proof that the victim was restrained. As for the purported inconsistencies between DC's trial testimony and his prior statements, the Appellate Division correctly found that any inconsistencies in the victims' testimony were "minor," "were thoroughly explored on cross-examination[,] and presented credibility questions to be resolved by the jury." *Kelsey,* 174 A.D.3d at 964.

**\*10** The evidence also supported petitioner's conviction for attempted[8] first degree sexual abuse of JD. JD testified that he was awakened by petitioner's hand on JD's stomach, as it was moving toward JD's penis. (T 485-87, 526). Petitioner corroborated this account in his controlled call. (T 953, 990-94, 1002). Based on this evidence, the jury could have rationally concluded that petitioner came "very near to the completion of the intended crime" of touching JD's penis while he was asleep.

[8]    "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." NY Penal Law § 110.00.

Petitioner's argument that the crime of attempted sexual abuse is a "legal impossibility" falls short. In the case cited by petitioner, *People v. Cecunjanin,* 16 N.Y.3d 488, 922 N.Y.S.2d 258, 947 N.E.2d 149 (2011), the Court of Appeals found that the victim could not be deemed "physically helpless" under the statute because, although drunk, she was able to "block" the defendant from fondling her. The court thus concluded that the conviction for attempted sexual abuse must be vacated, because the victim was not physically helpless at the moment she prevented the defendant from fondling her. *Id.* at 492, 922 N.Y.S.2d 258, 947 N.E.2d 149. The *Cecunjanin* facts are readily distinguishable from

this case, wherein JD testified that he was asleep, and thus physically helpless, when petitioner first began touching him. Importantly, the *Cecunjanin* court did not hold that a conviction for attempted sexual abuse was a legally impossibility, but merely that it could not be upheld based on the underlying facts of that case.

With respect to petitioner's conviction for forcible touching, [9] the Appellate Division properly concluded that DC's testimony petitioner touched DC's penis "established the requisite contact to support the guilty verdict." *Kelsey*, 174 A.D.3d at 964. *See People v. Guaman*, 22 N.Y.3d 678, 681-85, 985 N.Y.S.2d 209, 8 N.E.3d 324 (2014) (holding that "any bodily contact involving the application of some level of pressure to the victim's sexual or intimate parts qualifies as a forcible touch," and that "rubbing" the victim's intimate parts "easily meets this test."). Although DC did not testify regarding the specific pressure that petitioner applied, the jury could have rationally inferred that petitioner applied "some level of pressure" (T 1118), based on DC's testimony that petitioner kept his hand on DC's penis for an extended period of time and continued to do so even as DC attempted to squirm away from him (T 319, 350, 368).

[9]    Forcible touching is committed when a person "intentionally, and for no legitimate purpose ... forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person, or for the purpose of gratifying the actor's sexual desire." N.Y. Penal Law § 130.52(1).

Petitioner argues that the "forcible touching conviction remains ... legally insufficient for lack of forcible compulsion[,]" emphasizing the government's failure to establish "restraint." (Pet. MOL at 7, 33-34). Petitioner appears to confuse the crime of forcible touching with the term "forcible compulsion," which is defined in the NY Penal Law as "to compel by" either (a) "use of physical force"; or (b) "a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person ...." N.Y. Penal Law § 130.00(8). Forcible compulsion is not, however, an element of forcible touching.

 *11  Finally, the evidence sufficiently supported petitioner's convictions for endangering the welfare of a child. As respondent points out, "under New York law, where the evidence is legally sufficient with respect to a conviction for sexual abuse, 'it necessarily also was legally sufficient

with respect to the conviction of endangering the welfare of a child.' " *Martinez v. Colvin*, No. 1:17-CV-757, 2018 WL 7047148, *10 (S.D.N.Y. Nov. 6, 2018), *report-recommendation adopted*, 2018 WL 6649608 (S.D.N.Y. Dec. 19, 2018). Accordingly, petitioner is not entitled to habeas relief based on his legal insufficiency claims.

### IV. Constitutionality of Sexual Abuse Statute

Petitioner also asserts that the definition of physical helplessness under Penal Law § 130.00(7) is "unconstitutionally vague" as applied to the first-degree sexual abuse statute, Penal Law § 130.65(2). Respondent contends that this claim is both unexhausted and meritless. The court agrees that petitioner's claim is unexhausted, and ultimately barred by procedural default.

Petitioner failed to raise this claim in his brief on direct appeal to the appellate division. Although he did raise the claim in his leave application to the Court of Appeals and in his state habeas petition, these filings did not properly exhaust the claim. *See Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000) ("[C]onsideration before the Court of Appeals is discretionary review.... Presenting a claim for the first time to a state court of discretionary review is insufficient to exhaust the claim unless the court considers it."); *Garcia v. Laclair*, No. 06 Civ. 10196, 2011 WL 1097414, at *13 (S.D.N.Y. Jan. 3, 2011), *report and recommendation adopted*, 2011 WL 1046058 (S.D.N.Y. Mar. 22, 2011) (finding state habeas proceeding not a proper avenue for exhaustion where there is no indication that "practicality and necessity" prevented the claims from being raised on direct appeal). This unexhausted claim is also procedurally barred, because petitioner has no state forum in which he can now raise the claim.

Petitioner cannot overcome this procedural bar because he cannot satisfy the cause-prejudice test. In particular, petitioner failed to exhaust any argument that his appellate counsel erred by not raising this claim on direct appeal; thus he cannot establish counsel's failure as the cause for his default. *See Edwards v. Carpenter*, 529 U.S. at 452, 120 S.Ct. 1587. Accordingly, petitioner's claim is barred by his procedural default, and should be dismissed.

### V. Completeness of the Trial Record

Petitioner contends that the trial record was incomplete because certain sidebar and chambers conferences were held off the record. (Pet. MOL at 3). To the extent that petitioner asserts a violation of New York Judiciary Law § 295, this

2023 WL 9316847

claim is based solely on state law and is not cognizable on federal habeas review. See *Chappelle v. Griffin*, No. 9:16-CV-1130, 2017 WL 2601885, at *6 n.2 (N.D.N.Y. June 15, 2017).

To the extent that petitioner is raising a federal constitutional claim, respondent argues this claim is barred on adequate and independent state law grounds. Petitioner failed to raise the claim that the trial record was incomplete on direct appeal. Although petitioner briefly mentioned the claim in his *pro se* reply brief to the Appellate Division relative to his ineffective counsel claim, "a claim of error first raised in a reply brief is not properly presented to the reviewing court." *Lurie*, 228 F.3d at 124.

Petitioner did, however, raise this claim in his subsequent CPL § 440 motion. (SR 1196-97). The trial court denied the claim pursuant to CPL § 440.10(2)(c), finding that petitioner should have raised the claim on direct appeal. (SR 1716). Pursuant to § 440.10(2)(c), "New York law requires a state court to deny a motion to vacate a judgment based on a constitutional violation where the defendant unjustifiably failed to argue the constitutional violation on direct appeal despite a sufficient record." *Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 2003). Respondent argues that § 440.10(2)(c) constitutes an adequate and independent state-law ground precluding federal habeas review of petitioner's claim.

**\*12**  There is "no dispute" that § 440.10(2)(c) is "firmly established and regularly followed" by New York courts. *Pierotti v. Walsh*, 834 F.3d 171, 177 (2d Cir. 2016) (collecting cases). However, "even if a procedural bar is 'firmly established and regularly followed [by the state courts],' a petitioner may still challenge the adequacy of the bar in exceptional cases where the state court's application of the rule was 'exorbitant,' 'render[ing] the state ground inadequate to stop consideration of a federal question.' " *Id.* (quoting *Lee v. Kemna*, 534 U.S. at 376, 122 S.Ct. 877).

In this case, where the court is "assessing the contours of a state court's denial of collateral review because of a petitioner's failure to raise an issue on direct appeal," the court will "focus on" "whether state caselaw indicated that compliance with [CPL § 440.10(2)(c)] was demanded in the specific circumstances presented[.]" *Id.* Petitioner argues that in this instance, § 440.10(2)(c) constituted an adequate bar to petitioner's claim at the state level, because the claim is "clearly record-based," and should have been raised on direct appeal. (Resp. MOL at 42-43). Based on a review of

the relevant state caselaw, this court agrees that petitioner's challenge is one that should have been raised on direct appeal. *See, e.g., People v. Rick*, 224 A.D.2d 790, 790, 637 N.Y.S.2d 526 (3d Dep't 1996) (rejecting, on the merits, claim that criminal defendant was prejudiced by the failure to record sidebar conference at trial); *People v. Blair*, 25 A.D.3d 1018, 1019, 808 N.Y.S.2d 500 (3d Dep't 2006) (same); *People v. Yanowitch*, 227 A.D.2d 225, 225, 642 N.Y.S.2d 261 (1st Dep't 1996) (rejecting criminal defendant's claim that he was deprived of his right to appellate review due to an inadequate record, specifically the failure to record sidebars and missing pages from two witnesses' testimony). Because petitioner has not offered any cause or prejudice to excuse his procedural default, nor has he established a miscarriage of justice, the claim is barred from habeas review.

Even if § 440.10(2)(c) was "inadequate" to foreclose federal habeas review of petitioner's challenge to the completeness of the trial record, it alternatively fails under AEDPA review. [10] Although the Supreme Court has held that the state is generally required to provide a "record of sufficient completeness" to permit adequate appellate review, *Mayer v. Chicago*, 404 U.S. 189, 194, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971), "the Supreme Court has never held that due process requires verbatim transcription of the entire proceedings of a trial," *Chappelle*, 2017 WL 2601885 at *6 n.2. Therefore, the Appellate Division's rejection of this claim was not contrary to clearly established Supreme Court precedent. *See Wright v. Van Patten*, 552 U.S. 120, 125-26, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008) (when a petitioner raises an issue that the Supreme Court has not "squarely address[ed]" or "clear[ly] answer[ed]," habeas relief is unavailable). Accordingly, petitioner is not entitled to habeas relief on this basis, and the petition should be dismissed as to this claim.

[10]   The trial court alternatively denied petitioner's claim on the merits. Accordingly, the claim is subject to the limited review available under AEDPA, i.e. whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See* 28 U.S.C. § 2254(d).

## VI. Preclusion of Evidence

Petitioner contends that the trial court violated his right to present a defense by precluding the introduction of certain evidence. (Pet. MOL at 38-40). Petitioner failed to raise this claim on direct appeal, but instead raised it in his § 440.10 motion. The trial court denied petitioner's claim as

procedurally barred under CPL § 440.10(2)(c), finding that it should have been raised on direct appeal. (SR 1716). Thus, respondent argues, petitioner's claim is barred from habeas review on adequate and independent state law grounds. (Resp. MOL at 44). To the extent petitioner's claims were based on the trial record, this court agrees.

**\*13** To the extent that petitioner's claim falls outside the scope of the record adduced at trial, the state court alternatively denied it as meritless. (SR 1716). For the following reasons, this court does not find that the state court's decision unreasonably applied clearly established Supreme Court law.

### A. Dr. Smith's Testimony

Petitioner claims that Dr. Smith's "medical report and mental health testimony were deceptively precluded from evidence." (Pet. MOL at 39-40). Specifically, he contends that Dr. Smith's testimony was precluded because the prosecutor accused defense counsel of failing to disclose Dr. Smith's written report. (*Id.*). However, this is not the case. Dr. Smith was included on the defense witness list, along with 33 other potential witnesses. (SR 1549-50). During the course of the trial, the prosecutor complained that Dr. Smith's report, which she had yet to receive in discovery, constituted *Rosario* evidence and was subject to disclosure for impeachment purposes. (T 15-16, 23, 408-13, 797, 804-06). Defense counsel argued that the report had already been disclosed, and the dispute was resolved when counsel agreed to email Dr. Smith's report to the prosecutor. (T 805-06). At no time during the trial, however, did the defense attempt to call Dr. Smith as a witness or otherwise introduce his medical report as evidence. As such, the court never had an opportunity to preclude his testimony. Thus, no reasonable interpretation of the record suggests that petitioner was in any way precluded from introducing Dr. Smith's testimony and/or report as evidence at trial.

### B. Car Photographs

Petitioner claims that the court improperly precluded certain photographs of his car because they were not timely disclosed. (Pet. MOL at 38-40). Specifically, during petitioner's case in chief, outside the presence of the jury, the prosecutor stated that she would object to counsel's proposed admission of photographs of petitioner's car as evidence, arguing that petitioner had not timely produced the photographs in response to the prosecutor's pre-trial demands. Defense counsel argued that the photographs had been timely

produced, and the court ultimately reserved decision on the issue. (T 793-802, 804). The prosecutor raised the issue again during petitioner's direct examination, when defense counsel sought to introduce a photograph of petitioner in the car with his feet on the steering wheel. (T 898-911). The parties argued over whether the photograph had been timely produced, and the court stated, "I'll figure it out," before calling a recess. (T 911).

The transcript reflects that the following representations were made immediately after the court came back on the record:

> Judge Catena: Mr. Portale, you've had a change of mind?
>
> Defense Counsel: Judge, I spoke to [the prosecutor]. We agreed I would speak to [petitioner], and on consent we'll withdraw our application.
>
> Judge Catena: Okay. Very good. Anything else at this point before we proceed?
>
> Prosecutor: No.
>
> Defense Counsel: No.

(T 911).

Based on the aforementioned, petitioner has no basis on which to assert that his right to present a defense was violated. The record establishes that defense counsel, with the consent of petitioner, expressly agreed to withdraw his application to introduce the photograph. Thus, the court never had an opportunity to rule on whether the photograph was admissible, and petitioner's claim is without merit.

### VII. Ineffective Assistance of Trial Counsel

**\*14** Petitioner has submitted an unremitting number of grounds upon which he argues he is entitled a writ of habeas corpus based on the ineffective assistance of his trial counsel. Many of these claims were raised in petitioner's § 440.10 motion, upon which the trial court concluded that they were record-based claims that should have been raised on direct appeal. To the extent these claims are procedurally barred, it is discussed in further detail below.

The Appellate Division and § 440 court also denied petitioner's claims on the merits. The relevant federal law governing ineffective assistance of counsel claims was set forth by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

To succeed, a defendant must satisfy the two-pronged test set forth in *Strickland.* First, the defendant must show that counsel's performance was deficient. "This means showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth amendment." *Hudson v. New York,* No. 07-CV-1327, 2007 WL 3231970, at *2-3 (E.D.N.Y. Oct. 30, 2007) (citing *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052). Under this prong, "[j]udicial scrutiny of counsel's performance must be highly deferential ... a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks and citations omitted).

Second, the defendant must satisfy the prejudice prong set forth in *Strickland* by showing that any deficiencies in counsel's performance actually prejudiced the defendant. *Id.* at 692-93, 104 S.Ct. 2052. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In making the determination whether the specific errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Id.* at 694, 104 S.Ct. 2052.

Upon review of an habeas petition claiming ineffective assistance of counsel, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, [the district court] were adjudicating a *Strickland* claim on direct review of a criminal conviction[.]" *Paige v. Lee,* 99 F. Supp. 3d 340, 345 (E.D.N.Y. 2015) (quoting *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)). Therefore, to the extent a habeas petitioner must show both that counsel's performance was unreasonable and that the state court's decision to the contrary was unreasonable, a "doubly deferential" standard of judicial review applies to ineffective assistance of counsel claims analyzed under 28 U.S.C. § 2254(d)(1). *Santana v. Capra,* 284 F. Supp. 3d 525, 538 (S.D.N.Y. 2018) (citing *Knowles v. Mirzayance,* 556 U.S. 111, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009)).

This court will address each of petitioner's ineffective assistance of counsel claims in turn.

### A. Failure to Move to Dismiss Forcible Touching

**\*15** Petitioner claims that defense counsel should have moved to dismiss the count of forcible touching, because DC stated in an interview prior to trial that petitioner did not "restrain" him. (Pet. MOL at 33-34). Even if petitioner's claim was not procedurally barred on adequate and independent state law grounds, as argued by the respondent, the court agrees that he is not subject to habeas relief on this basis. At the outset, the record establishes that petitioner's former defense attorney, Gary Greenwald, Esq., did move to dismiss this count. (SR 160). More to the point, petitioner's argument fails because the crime of forcible touching does not require proof of restraint, such that DC's testimony would have supported such a motion. As previously discussed, under New York law "any bodily contact involving the application of some level of pressure to the victim's sexual or intimate parts qualifies as forcible touch." *People v. Guaman,* 22 N.Y.3d at 681-85, 985 N.Y.S.2d 209, 8 N.E.3d 324. There is no requirement under the statute that the victim be "restrained," thus any motion brought by defense counsel on this basis would have been meritless. Accordingly, this is not a basis on which petitioner may seek habeas relief. *See Flowers v. Ercole,* No. 06 Civ. 6118, 2009 WL 2986738, at *20 (S.D.N.Y. Sept. 18, 2009) ("Failure to make a meritless argument does not amount to ineffective assistance.") (quoting *United States v. Arena,* 180 F.3d 380, 396 (2d Cir. 1999)).

### B. Failure to Preserve Legal Sufficiency Claim

Petitioner asserts, as he did on direct appeal, that counsel erred by not moving for a trial order of dismissal in order to preserve his legal sufficiency claim. (Pet. MOL at 6). The Appellate Division considered this argument on the merits, concluding that they did "not find that counsel was ineffective in failing to move for a trial order of dismissal." *Kelsey,* 174 A.D.3d at 966.

The Appellate Division also directly addressed the petitioner's underlying legal sufficiency claim, notwithstanding counsel's "failure" to move for a trial order of dismissal. Specifically, the Appellate Division found that, although the legal sufficiency claim was unpreserved, the court would

necessarily evaluate the legal sufficiency claim by evaluating a weight-of-the-evidence claim. *Kelsey*, 174 A.D.3d at 962-63; *see also Parker v. Ercole*, 666 F.3d 830, 833-35 (2d Cir. 2012) ("to the extent the Appellate Division decided that [petitioner's] conviction was not against the weight of the evidence, it necessarily decided that there was sufficient evidence to support the verdict."). Accordingly, even if the court found that counsel's failure to make the motion fell below *Strickland* standards, which it does not, "the petitioner suffered no prejudice as a result because the Appellate Division considered, and rejected, the merits of petitioner's claim[.]" *Sparrow v. Griffin*, No. 9:16-CV-204(TJM/ATB), 2017 WL 2912518, at *15 (N.D.N.Y. Apr. 6, 2017), *report and recommendation adopted*, 2017 WL 2912497 (N.D.N.Y. July 7, 2017); *Jackson v. Perez*, No. 9:15-CV-00688 (JKS), 2016 WL 6208552, at *5 (N.D.N.Y. Oct. 24, 2016) ("[B]ecause the Appellate Division examined the merits of Jackson's legal insufficiency claim notwithstanding the lack of preservation, Jackson cannot demonstrate that he was prejudiced by counsel's [failure to properly preserve the legal insufficiency issue for appellate review.]"). Accordingly, petitioner is not entitled to habeas relief on this basis.

### C. Failure to Object to Evidence of Prior Bad Acts/ Failure to Request Limiting Instructions

Petitioner argues that counsel was also ineffective for failing to object to the introduction of his prior bad acts. (Pet. MOL at 15-19). Specifically, on direct appeal petitioner claimed that counsel erred by failing to challenge the admission of testimony regarding the padiddle game, of petitioner "grabbing" JD's penis in 2013, and of petitioner touching JD's groin while wrestling with him on the Cranberry Lake trip. The Appellate Division addressed this argument on the merits, concluding that "such evidence was admissible to show defendant's intent and motive, provide necessary background and complete the victims' narratives[.]" *Kelsey*, 174 A.D.3d at 965. The court also recognized that the "County Court balanced the probative value of this testimony against its prejudicial effect." *Id.* Last, the court found that petitioner "failed to show that defense counsel's failure to object to certain undesirable testimony was not a purposeful choice made to avoid drawing further attention to it. *Id.* at 966. This was not an unreasonable application of clearly established federal law warranting habeas relief.

**\*16** Under New York law, the prosecution may introduce evidence regarding prior bad acts and/or uncharged crimes when it is relevant to a material issue other than a defendant's propensity to commit the act or crime, and its probative value outweighs the risks of undue prejudice. *See People v. Dorm*, 12 N.Y.3d 16, 19, 874 N.Y.S.2d 866, 903 N.E.2d 263 (2009) (citing *People v. Molineux*, 168 N.Y. 264, 264, 61 N.E. 286 (1901) ("evidence may be used to prove motive, intent, lack of mistake or accident, identity, or common scheme or plan")). "Where there is a proper nonpropensity purpose, the decision whether to admit evidence of [a] defendant's prior bad acts rests upon the trial court's discretionary balancing of probative value and unfair prejudice. In cases involving allegations of sexual abuse, evidence of uncharged crimes is admissible to 'complete the victim's narrative, describe the events leading up to the charged crime and explain the relationship between the defendant and the victim, as well as to place the events in question in a believable context and explain the victim's delay in reporting [the] defendant's conduct.' " *Martinez v. Colvin*, 2018 WL 7047148, at *15 (quoting *People v. Haidara*, 65 A.D.3d 974, 974, 885 N.Y.S.2d 415 (1st Dep't 2009) ("Although the evidence was extensive, it was not unduly inflammatory and the court's thorough limiting instruction was sufficient to minimize any possible prejudice") (citations omitted)). Petitioner does not identify any Supreme Court holding that renders New York's admission of prior bad acts unconstitutional. *Id.* at *16 ("The Supreme Court has never decided whether the admission of 'prior bad acts' or 'uncharged crimes" evidence would violate the due process clause.") (citing *Estelle v. McGuire*, 502 U.S. 62, 75 & n.5, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (expressing "no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime")); *see also Fernandez v. Ercole*, No. 14-CV-2974, 2017 WL 2364371, at *4 (S.D.N.Y. May, 31, 2017).

Notwithstanding the fact that evidence of prior bad acts and uncharged crimes are admissible under New York law, the record establishes that trial counsel objected to the admission of such evidence as early as the very first day of trial, as soon as the prosecutor indicated that she wished to cross-examine petitioner regarding the padiddle game and the 2013 incident. (T 35-37, 38-44). The court reserved decision on the issue. (*Id.*). However, the following day petitioner delivered his opening statement, in which he repeatedly advocated for his good character and law-abiding nature, and asserted that no other incidents of abuse had ever been alleged against him. (T 240-42, 246, 249, 251-53, 256-57). The court then held an off-the-record conference, after which the court asked the prosecutor to assert her position on the record, which she did in stating that petitioner had "clearly opened the door for [the] case in chief to be able to explore any prior bad acts that he's

done because he's said he has a stellar reputation, and he has never been accused by anyone." (T 260). Defense counsel responded, "I respect your ruling, Judge. We'll stand by your ruling." (*Id.*). The court ultimately agreed with the prosecutor, finding her position to be "correct." (*Id.*).

Following the remainder of petitioner's opening statement, the parties had another off-the-record conference. (T 276). The court then "put on the record" that they had "reviewed a few issues," and that defense counsel had "indicated to the court that you're not looking for any instruction, limiting instruction, from the court on potential evidence that [the prosecutor] may put in with her next witness with respect to ... [t]wo games and wrestling" between petitioner and the two victims. Defense counsel stated, "That's correct, Judge." (T 276.).

Based on the record before this court, the Appellate Division's decision as to this issue did not unreasonably apply *Strickland.* Despite defense counsel's efforts to preclude evidence of prior bad acts, petitioner's remarks during his opening statement all but cemented the admissibility of this evidence under New York law. While defense counsel apparently, eventually conceded this point to the court, his failure to pursue a meritless argument did not amount to ineffective assistance. *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995).

Likewise, petitioner has failed to overcome the "strong presumption" that defense counsel's failure to object to or request a limiting instruction "derived ... from trial strategy." *Acevedo v. Capra*, 600 F. App'x 801, 802-03 (2d Cir. 2015). "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (citing *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052). Accordingly, petitioner has failed to establish that he received ineffective assistance of counsel on this basis.

### D. Waiving the *Huntley* Hearing/Failure to Object to Controlled Call

**\*17** Petitioner argues that counsel was ineffective for waiving the *Huntley* hearing, and for not objecting to the controlled call at trial. (Pet. MOL at 19-23). The Appellate Division rejected this claim on the merits, finding that the record suggested that petitioner had " 'extensive discussions' with defense counsel regarding the controlled call, and defendant instructed counsel to waive the hearing." *Kelsey,*

174 A.D.3d at 965. The court also found no evidence to show that defense counsel's waiver was "not a strategic decision in light of his trial strategy." *Id.* With respect to petitioner's contention that counsel failed to object to his statements made during the call as involuntary, in light of his alleged mental capacity, the trial court concluded that "counsel cannot be faulted for not making an objecting that would have little chance of success." *Id.*

On the record before this court, there is no basis to find that habeas relief is warranted on this claim. At the outset, petitioner affirmatively waived the right to his *Huntley* hearing, on the record in open court, stating his understanding of the ramifications of his waiver and denying that he had any questions. (SR 436-37). *See Rosa v. Napoli*, No. 9:09-CV-00687 (TJM), 2011 WL 6103473, at \*7 (N.D.N.Y. Dec. 7, 2011) (rejecting ineffective assistance claim where record established that counsel and petitioner "agreed to waive [*Huntley*] hearing" after further discussion). Moreover, petitioner has failed to rebut the presumption that counsel had a strategic reason for waiving the hearing. *Id.* ("Alternatively rejecting the same ineffective assistance claim because this argument relates to counsel's tactical or strategic choices, which are 'virtually unchallengeable' in the context of federal habeas corpus proceedings.") (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052; *Campbell v. Greene*, 440 F. Supp. 2d 125, 150 (N.D.N.Y. 2006)).

Nor was the Appellate Division's conclusion that any objection to the voluntariness of the call would have had "little chance of success" an unreasonable one. As the respondent points out in their brief, the only support for the involuntariness claim was petitioner's own self-serving statements asserting that he was incompetent at the time of the call. Accordingly, defense counsel did not object to the controlled call as involuntary, perhaps realizing that such an objection would only serve to highlight the incriminating statements made therein. Instead, defense counsel addressed the controlled call through his direct examination of petitioner, asking petitioner to explain the context of each statement made during the call, and attempting to show how these statements were misconstrued, and misrepresented, by the prosecutor. Defense counsel's strategic decisions do not constitute ineffective assistance. *See Quinones v. Miller*, 224 F. App'x 44, 49 (2d Cir. 2007) (finding that counsel could have made a strategic decision not to object, believing that an objection would only serve to highlight the statement to the jury); *see also United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) ("Decisions such as when to object and on what

grounds are primarily matters of 'trial strategy and tactics,' and thus are 'virtually unchallengeable' absent exceptional grounds for doing so.") (internal citations omitted).

### E. Failure to Present Expert Testimony Regarding Voluntariness of the Controlled Call/Failure to Request a Jury Charge on Voluntariness

Petitioner argues that counsel erred by failing to present an expert witness at trial regarding the voluntariness of his statements reflected in the controlled call, and for failing to seek a jury charge on voluntariness. (Pet. MOL at 26-27, 31-33). Petitioner raised these claims in both his direct appeal and his § 440 motion, and both courts denied these claims on the merits. The state courts decisions did not unreasonably apply *Strickland.*

 **\*18**  As previously discussed, issues of trial strategy, such as the decision whether or not to call a particular witness, "are ill-suited to second-guess." *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) (citation omitted); *King v. Griffin*, No. 9:17-CV-321(MAD), 2018 WL 1940419, \*12 (N.D.N.Y. Apr. 23, 2018) (citing *Greiner*, 417 F.3d at 323) ("[S]econd-guessing trial counsel's decision about retaining an expert witness is exactly the type of strategic choice about which courts reviewing habeas petitions have been cautioned."). Instead of focusing on the voluntariness of petitioner's statements during the controlled call, the record makes clear that defense counsel attempted to convince the jury that petitioner's statements had been taken out of context and misconstrued by the prosecutor. It is also a reasonable interpretation of the record that defense counsel opted to distract focus from petitioner's mental illness, as it carried the risk that the jury might conclude petitioner's purported mental instability during the call was reflective of his mental status during the Cranberry Lake trip four months earlier.

Not only has petitioner failed to establish that counsel's strategy in declining to call such a witness was unreasonable, but he has not presented this court with any proof that a witness, who would have qualified as an expert, was available and willing to testify regarding petitioner's involuntariness. *See Calderon v. U.S.*, Nos. 16-CV-7536, 10-CR-392-33, 2017 WL 11473376, \*3 (S.D.N.Y. Mar. 13, 2017) ("[T]o succeed on an ineffective assistance claim [based on failure to interview and call a witness], a petitioner must produce evidence explaining what the witness would have testified about and that the witness would have actually testified.") (collecting cases).

Moreover, the Appellate Division reasonably determined that counsel had no basis to ask for a jury charge on the voluntariness of the call, as petitioner's testimony, and the call itself, did not raise issues of involuntariness. Counsel cannot be faulted for declining to make a meritless motion, and therefore petitioner is not entitled to habeas relief on this basis.

### F. Conspiring to Prematurely Rest the Case

Petitioner claims that during the trial, without his knowledge or consent, defense counsel worked out a "deal" with the court and prosecutor in which petitioner was promised a seven-year sentence in return for agreeing to prematurely rest his case without calling additional witnesses. (Pet. MOL at 36-37, 42). Petitioner raised this claim for the first time four years after the trial, in his § 440.10 motion, and the court denied it on the merits. (SR 1260-67, 1714-17).

The state court's decision denying petitioner's claim of a conspiracy was not contrary to, or an unreasonable application of, established Supreme Court law. Petitioner submitted two affidavits with his § 440.10 motion in support of his assertion. Dr. Barretto, close friend and "confidant" of the petitioner, prepared a December 2019 affirmation in which he stated:

> Following the conviction, I confronted attorney Portale. He said that the judge was planning to sentence Michael to the maximum punishment of 11 years in retaliation for Michael refusing to take a plea of 10 years' probation with no jail time that the judge wanted him to take. Regardless, Atty Portale said that he cut a deal so that the judge would only sentence Michael to 7 years, if he rested the case that day. I was standing with Michael's brother John, girlfriend Katy, and friend Lou when Portale told us ....

(SR1538).

Petitioner's brother, John Kelsey, also prepared a December 2019 affidavit, in which he claimed, in part, that the prosecutor "got a hold of compromising information about

[defense counsel] and used it to blackmail him to throw [petitioner's] case." (SR 1542). John Kelsey further asserted that:

> Following Mike's conviction [defense attorney] Portale told me personally that he cut a deal with the District Attorney, but that the District Attorney had reneged on whatever it was that they agreed to. Portale also told me, following Mike's conviction, that Mike would be sentenced to seven years, which is exactly what the judge sentenced him to five months later. I believe that Portale did work out a deal with the DA, without telling Mike, that somehow involved Portale resting the case following Mike's testimony and not calling other witnesses, and that if convicted the judge would only sentence him to seven years.

**\*19** (SR 1542). Other than these affidavits, which were not prepared until years after the fact and constitute inadmissible hearsay, petitioner has failed to substantiate his claim of conspiracy, much less explain why he did not raise this issue at any earlier opportunity. The trial court did not err by denying petitioner's claim to this effect, nor is this court obligated to grant petitioner habeas relief based on unsupported hearsay allegations. *See Covington v. Warden, Five Points Corr. Facility,* No. 11-CV-8761, 2014 WL 7234820 (S.D.N.Y. Dec. 8, 2014) (denying habeas petition and noting that the trial court did not err by denying petitioner's motion to set aside the verdict because it relied on inadmissible hearsay); *D'Ercole v. United States,* 361 F.2d 211, 212 (2d Cir. 1966) (affidavit containing hearsay statements could not support habeas petition). Accordingly, petitioner is not entitled to habeas relief on this basis.

### G. Failure to Prepare for Trial

Petitioner claims that defense counsel failed to adequately prepare for trial, including his failure to meet with and/or prepare the petitioner. Petitioner also claims that defense counsel failed to prepare and/or call certain lay witnesses at trial. Petitioner raised these claims in his § 440.10 motion, and the trial court denied them on the merits. This was not an unreasonable decision, and petitioner is not entitled to a writ of habeas corpus based on any purported failure by counsel to adequately prepare for trial.

Despite the fact that petitioner's trial attorney was retained shortly before the start of the trial, the record evidences that counsel was well versed in the nuances of the charges in the indictment, petitioner's defense, and the evidentiary issues at hand. Among other things, defense counsel engaged in an extensive cross-examination of the victims, in which he sought to impeach them with their prior inconsistent statements to law enforcement officers. Counsel also skillfully maneuvered petitioner through his direct testimony, in which petitioner attempted to offer innocent explanations for his controlled-call statements. Moreover, it is clear from both the trial transcript and the emails attached to petitioner's § 440.10 motion that defense counsel had multiple, extensive discussions and meetings with petitioner prior to and during the trial.

Furthermore, defense counsel's decision to call only three of the 34 witnesses from the witness list at trial did not constitute the ineffective assistance of counsel. The record establishes that those witnesses whom defense counsel did call were prepared and sufficiently examined at trial. Counsel also subpoenaed and prepared a handful of other witnesses on the list; however they were ultimately not called to testify. Petitioner has failed to submit any evidence that the anticipated testimony from any of the other named witnesses for the defense was admissible or noncumulative, or that there is a reasonable probability that calling these witnesses would have changed the verdict. As previously discussed, "[t]he decision to call, or not call, a witness is a classic example of trial strategy," and the decision of "whether to call a specific witness–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse in professional representation.' " *Moore v. Kirkpatrick,* No. 09-CV-0457, 2011 WL 1233124, at \*14 (W.D.N.Y. Mar. 30, 2011) (citing *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir. 1997)).

Petitioner also argues that defense counsel did not adequately prepare for the prosecutor's cross-examination of the petitioner regarding emails he sent to Rich Robbins, and that counsel failed to rehabilitate petitioner on redirect examination with respect to the emails. (Pet. MOL at 35-36). The trial court denied petitioner's claim as presented in his § 440.10 motion on the merits, and this decision did not unreasonably apply *Strickland.* Contrary to petitioner's arguments, the transcript reflects that defense counsel

was familiar with the contents of these emails, and that he rehabilitated petitioner on redirect through a series of questions that allowed petitioner to provide innocent explanations for the otherwise compromising email excerpts pointed out by the prosecutor. (T. 1013-16). There is no evidence that defense counsel's approach to addressing the emails–i.e. only focusing on certain portions of the emails–did not amount to a strategic decision attempting to avoid "highlight[ing] for the jury the argument that counsel found objectionable." *Bierenbaum v. Graham*, 607 F.3d 36, 58 (2d Cir. 2010); *accord. People v. Taylor*, 1 N.Y.3d 174, 176-77, 770 N.Y.S.2d 711, 802 N.E.2d 1109 (2003). Accordingly, the petition should be dismissed as to this claim.

### H. Denying Petitioner the Right to Represent Himself

**\*20** Petitioner claims that defense counsel denied him the right to represent himself. (Pet. MOL at 27-28). Specifically, petitioner contends that on the second day of trial, counsel gave petitioner a note that cited "case precedent against hybrid-representation," which had been provided to defense counsel by the court. (SR 1235-36). It was then "communicated" to petitioner that "he was no longer permitted to serve as co-counsel." (*Id.*). This claim was raised in petitioner's § 440.10 motion, and denied on the merits. That decision did not unreasonably apply clearly established Supreme Court precedent.

Petitioner's claim is suspicious at best, considering there is no mention of petitioner being removed from his role as co-counsel anywhere in the trial transcript, and petitioner dubiously admits that "speculation remains" as to this claim. Moreover, "a criminal defendant has no constitutional or statutory right to represent himself as co-counsel with his own attorney." *Neree v. Capra*, No. 17-CV-5434, 2020 WL 2098097, at \*6 (E.D.N.Y. May 1, 2020) (citing *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989); *People v. Rodriguez*, 95 N.Y. 2d 497, 501, 719 N.Y.S.2d 208, 741 N.E.2d 882 (2000) ("A criminal defendant has no Federal or State constitutional right to hybrid representation")). "The right to self-representation and the assistance of counsel are separate rights depicted on the opposite sides of the same Sixth Amendment coin. To choose one obviously means to forego the other." *Id.* (quoting *U.S. v. Purnett*, 910 F.2d 51, 54 (2d Cir. 1990)). Accordingly, the trial court was within its discretion to deny the petitioner right to act as co-counsel, and there is no evidence that defense counsel "denied" petitioner's request to act in this capacity in light of the court's determination.

### I. Failure to Introduce *Brady* Witness Statements

Petitioner asserts that defense counsel failed to introduce the police statements of various witnesses at trial. (Pet. MOL at 28-30). Petitioner raised this claim in his § 440.10 motion, and the trial court denied the claim both on the merits and pursuant to CPL § 440.10(2)(c).

To the extent petitioner's claim is not barred on adequate and independent state law grounds, the trial court did not unreasonably deny it on the merits. As respondent points out, petitioner has failed to explain how the police statements at issue would have been admissible at trial. Of the statements petitioner identifies, only two related to witnesses who actually testified at trial. (Pet. MOL at 30 n.3.) As to those witnesses, their own prior statements could only have been employed to impeach the witness or refresh the witness's recollection, not admitted into evidence. Moreover, none of these third-party out-of-court statements could have been employed to impeach the victims, as "a trial witness may only be impeached by his own prior statements." *Browne v. Heath*, No. 11-CV-1078, 2014 WL 8390320, at \*25 (E.D.N.Y. Aug. 25, 2014) (citing *People v. Dickerson*, 70 A.D.2d 623, 623, 416 N.Y.S.2d 622 (2d Dep't 1979)), *report-recommendation adopted*, 2015 WL 1469182 (E.D.N.Y. Mar. 30, 2015). Accordingly, petitioner has not met his burden in establishing that counsel's performance fell below *Strickland* standards in this regard, and habeas relief is not warranted.

### J. Counsel Failed to Properly Impeach the Victims

Petitioner asserts that counsel failed to subject the victims to "meaningful adversarial testing" by, among other things, questioning their motives and highlighting inconsistencies in their statements. (Pet. MOL at 28). Petitioner raised this claim for the first time in his § 440.10 motion. (SR 1139-48, 1159). The trial court denied the claim pursuant to CPL § 440.10(2)(c), as well as on the merits. Notwithstanding the trial court's alternative consideration of the merits of petitioner's argument, [11] the denial of this clearly record-based ineffective assistance of counsel claim under CPL § 440.10(2)(c) rests upon an independent and adequate state ground, and federal review of the claim is barred. *See Murden v. Artuz*, 497 F.3d 178, 196 (2d Cir 2007) ("Where the basis for a claim of ineffective assistance of counsel is well established in the trial record," as was the case here, "a state court's reliance on subsection [440.10](2)(c) provides an independent and adequate procedural bar to federal habeas review."); *Sweet v. Bennett*, 353 F.3d 135, 139-40 (2d Cir. 2003) (noting that section 440.10(2)(c) acts as an independent

2023 WL 9316847

and adequate state ground barring federal habeas review of ineffective assistance of counsel claim where the basis of a Sixth Amendment issue, regarding counsel's failure to adequately preserve an issue for appeal, involves alleged errors well established in the trial record).

[11]    The fact that a state court alternatively rules on the merits and a procedural bar does not necessarily mean that a claim is subject to federal habeas review on the merits. *See Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990)* (citation omitted).

**\*21** The court may review this procedurally barred claim only if petitioner has demonstrated cause for the default and resulting prejudice, or a "fundamental miscarriage of justice." Petitioner has established neither. Accordingly, Petitioner's record-based ineffective assistance of counsel claim is barred by procedural default, precluding habeas review.


**K. Failure to Present Testimony from Dr. Smith**
Petitioner claims that counsel erred in declining to call Dr. Smith as a witness at trial. (Pet. MOL 30-31). Dr. Smith, a forensic psychiatrist, submitted an unsworn report to petitioner's former defense attorney opining, among other things, that petitioner was not a pedophile. (SR 1552-68). Petitioner raised this claim in his § 440.10 motion, which the trial court denied on the merits.

As previously discussed, in order to succeeded on an ineffective assistance of counsel claim based on the failure to interview or call a witness, "a petitioner must produce evidence explaining what the witness would have testified about and that the witness would have actually testified." *Calderon, 2017 WL 11473376, at \*3*. There is nothing in the record to suggest to the court that Dr. Smith was willing and/or available to testify on behalf of petitioner at his trial. Moreover, petitioner has not established that counsel lacked reasonable strategic grounds for declining to call Dr. Smith to testify. "[S]trategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness," *Dunn v. Reeves, —— U.S. ——, 141 S. Ct. 2405, 2410, 210 L.Ed.2d 812 (2021)*, and reviewing courts must "affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did," *Cullen v. Pinholster, 563 U.S. 170, 196, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011)* (citation and internal quotation marks omitted). As respondent points out, defense counsel may have reasonably decided that calling Dr. Smith would subject him to cross-examination that would prove harmful to the defense,

including the fact that Dr. Smith's conclusions were, in part, based on incorrect facts. [12] Accordingly, counsel's strategic decision not to call Dr. Smith is not subject to second-guessing by this court, and habeas relief is not warranted as to this basis.

[12]    For example, Dr. Smith's conclusions were based, in part, on the incorrect premise that the victims were never interviewed by trained professionals from the state police on video. (SR 1552-55).

**L. Failure to Introduce Photograph of Petitioner's Car**
Liberally construed, petitioner's habeas petition raises the argument that counsel was ineffective for failing to seek the admission of a photograph of petitioner's car into evidence. Petitioner raised this claim in his § 440.10 motion, which the trial court denied under CPL § 440.10(2)(c). The trial court's decision constitutes an adequate and independent bar to habeas review, a procedural bar for which petitioner has not raised cause or prejudice to overcome, nor any indicia of actual innocence. Accordingly, this claim is not subject to federal habeas review. [13]

[13]    The trial court alternatively denied petitioner's claim on the merits. If the district court were to find that petitioner's claim is not barred on independent and adequate and independent state-law grounds pursuant to CPL § 440.10(2)(c), this court alternatively finds that the claim does not warrant habeas relief under AEDPA standards for the reasons set forth in respondent's memorandum of law. (Resp. MOL at 80-82).

**M. Jury Instructions**
**\*22** Petitioner argues that counsel's representation was deficient as to his failure to propose, or object to, various jury instructions. (Pet. MOL at 35). Other than the jury charge pertaining to the voluntariness of the controlled call, which this court has already discussed, petitioner failed to raise the remainder of this record-based, sub-category of his ineffective assistance of counsel claim in his direct appeal. Accordingly, the claim is unexhausted but should be deemed exhausted and procedurally defaulted. In the absence of cause and prejudice, or any evidence of actual innocence, habeas relief is not warranted on this basis.


**VIII. <u>Prosecutorial Misconduct</u>**

Petitioner argues that the prosecution engaged in misconduct by (1) violating their disclosure obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and (2) introducing evidence of petitioner's prior bad acts and the controlled phone call.

Petitioner raised the *Brady* violation in his § 440.10 motion, arguing that the government failed to produce the police statements of several witnesses prior to the trial. (Pet. MOL at 28-30). The trial court denied the claim under CPL § 440.10(2)(c) because it was not raised on direct appeal, and alternatively on the merits.

Even if CPL § 440.10(2)(c) did not act as a procedural bar to federal habeas review of this claim, the trial court did not unreasonably apply Supreme Court precedent in dismissing the claim on the merits. "It is well settled that "as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not [committed a *Brady* violation] simply because it did not produce the evidence sooner." *United States v. Campbell*, 850 F. App'x 102, 109 (2d Cir. 2021) (quoting *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001)). Here, the record establishes that there were some pre-trial disputes over whether the government had produced all of the relevant *Brady* material to the defense, and the adequacy of the disclosures. (SR 129-263). On April 19, 2016, defense counsel emailed the prosecutor admonishing her for not yet producing LD's grand jury testimony. (SR 1304). Nevertheless, on the first day of trial, the court asked whether discovery had been completed, and defense counsel did not raise any complaints about the status of the *Brady* material. (T 15). Nor did the defense complain that he did not have specific *Brady* material at any time during the trial. Accordingly, there is nothing in the record to support the premise that defense counsel was not provided all relevant *Brady* material prior to the commencement of trial.

In any event, there is no evidence that petitioner was prejudiced as a result of any purported *Brady* violation by the prosecution. A *Brady* violation consists of three factors: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Simpson v. United States*, 693 F. App'x 33, 34 (2d Cir. 2017) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). As previously discussed, the majority of out-of-court police statements would not have been admissible to impeach the government's

witnesses, and there is otherwise no indication that petitioner was prejudiced as a result of his failure to obtain any *Brady* material from the prosecution. Based on the foregoing, petitioner has failed to show that the prosecutor committed a *Brady* violation subject to habeas review.

Liberally construed, the petition also maintains that the prosecution engaged in misconduct with respect to introducing evidence of petitioner's prior bad acts, as well as the controlled phone call. (Pet. MOL at 15-19, 21-23). Petitioner raised these claims in his § 440.10 motion, and the trial court denied them pursuant to § 440.10(2)(c). Petitioner does not argue that any of the exceptions to procedural default apply, nor has this court's review of the record revealed cause for his default or evidence of his actual innocence. Accordingly, this claim is procedurally barred from habeas review on adequate and independent state law grounds.

## IX. Ineffective Assistance of Appellate Counsel

**\*23** Petitioner argues, in largely general terms, that he was deprived of competent and effective appellate counsel. To the extent petitioner argues that appellate counsel should have asserted the "gross negligence of trial counsel" and the "extensive errors and omissions that occurred ... concerning prosecutorial and judicial misconduct wherein the [petitioner'] constitutional rights are alleged to have been violated," these vague and conclusory allegations are not cognizable as a basis for ineffective assistance on habeas review. *See Cabezudo v. Fischer*, No. 05-CV-3168, 2009 WL 4723743, at \*12 & n. 5 (E.D.N.Y. Dec. 1, 2009) (denying claim of ineffective assistance of appellate counsel where petitioner did not present any evidence indicating that counsel omitted significant and obvious issues, while pursuing clearly and significantly weaker arguments; conclusory statements are not cognizable as a basis for claims of ineffective assistance).

Liberally construed, the petition contains some specific claims concerning appellate counsel's purported ineffectiveness, including counsel's (1) failure to file a CPL § 440.10 motion while his direct appeal was pending, and (2) failure to assert a *Brady* claim on appeal. (Pet. MOL 3-4, 28-30). Petitioner's writ of error coram nobis arguably raised both of these issues pertaining to appellate counsel's deficiencies. (SR 998-1005), which the Appellate Division denied in its January 23, 2020 decision and order (SR 96).

The general standard for ineffective assistance of counsel, articulated by the Supreme Court in *Strickland v. Washington*,

applies to both trial and appellate counsel. *McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999) (*Strickland* standard also applies to effectiveness of appellate counsel). While a defendant has the right to effective counsel on appeal, *Evitts v. Lucey*, 469 U.S. 387, 396-397, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), in the appellate context, counsel is not required to advance every non-frivolous argument that could be made. *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts*, 469 U.S. at 394, 105 S.Ct. 830); *see also Jones v. Barnes*, 463 U.S. 745, 75, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). "However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (citing *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)).

### A. § 440.10 Motion

Petitioner claims that appellate counsel was "deficient in failing to first file an Article 440 motion ... wherein facts and circumstances not reflected in the record ... could receive proper noticing and become part of the official record by which a proper appeal could ensue." (Pet. MOL at 4). Petitioner's claim assumes that he was entitled to counsel for a CPL § 440.10 motion in state court. However, it is well settled that petitioner does not have a constitutional right to counsel in post-conviction collateral proceedings. *See, e.g., Coleman*, 501 U.S. at 752, 111 S.Ct. 2546 ("There is no constitutional right to an attorney in state post-conviction proceedings ... Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings."); *Aviles v. Capra*, No. 13-CV-1153, 2014 WL 4805036, at *12 (E.D.N.Y. Sept. 26, 2014) ("Here, because there is no right to counsel to pursue collateral relief under § 440.10, petitioner's claim that his appellate counsel should have expanded the record through a § 440.10 motion must fail"); *Diaz v. Smith*, 04 Civ. 1337, 2007 WL 946196, at *13 (S.D.N.Y. Mar. 27, 2007) ("However, the Supreme Court has 'never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions.' ") (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)); *Lugo v. Kuhlmann*, 68 F. Supp. 2d 347, 375-76 (S.D.N.Y. 1999) ("Finally, while [petitioner] was entitled to counsel on direct appeal, he had no constitutional right to counsel for a state collateral attack.") (collecting cases); *see also Colon v. Sheahan*, 13 Civ. 6744, 2016 WL 3919643, at *12 (S.D.N.Y. Jan. 13, 2016) ("Therefore, there is still no clearly established Supreme Court precedent recognizing a constitutional right to counsel in a collateral

proceeding"), *report and recommendation adopted*, 2016 WL 3926443 (S.D.N.Y. July 14, 2016). Accordingly, petitioner had no right to counsel submitting a § 440.10 motion on his behalf, and he may not seek habeas relief on this basis.

### B. *Brady* Claim

**\*24** Petitioner also appears to argue that "appellate counsel failed to claim prosecutorial/police BRADY misconduct [sic]." (Pet. MOL at 28). Because this court has already found that petitioner's underlying *Brady* claim is meritless, appellate counsel cannot be found deficient for failing to raise it on direct appeal. *See Harden v. Fields*, No. 9:18-CV-162 (MAD/CFH), 2021 WL 2445680, at *16 (N.D.N.Y. Apr. 16, 2021), *report and recommendation adopted*, 2021 WL 2439144 (N.D.N.Y. June 15, 2021) (quoting *Kalyon v. Hood*, No. 91-CV-107, 1991 WL 159079, at *1 (E.D.N.Y. June 30, 1991)) ("Failure to raise a meritless issue on direct appeal does not constitute ineffective assistance of appellate counsel."); *Roberts v. Griffin*, No. 16-CV-5970, 2019 WL 456179, at *10 (E.D.N.Y. Feb. 5, 2019) ("Appellate counsel cannot be deemed ineffective for failing to raise a meritless argument") (internal quotations and citation omitted). Accordingly, petitioner's ineffective assistance of appellate counsel claim on this basis should be dismissed.

### X. Sentencing Claims

Petitioner asserts that his sentence was (1) unduly harsh and excessive under state law, (2) violated the Eighth Amendment because it was grossly disproportionate to the crime, (3) violated due process because it was intended to punish petitioner for insisting on a trial rather than pleading guilty, and (4) relied on an improper pre-sentence report. (Pet. MOL at 41-47). For the following reasons, petitioner is not entitled to habeas relief on these bases.

With respect to petitioner's "harsh and excessive claim," it is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *Bellavia v. Fogg*, 613 F.2d 369, 373 (2d Cir. 1979) (setting mandatory sentences is solely the province of state legislature); *Hernandez v. Conway*, 485 F. Supp. 2d 266, 284 (W.D.N.Y. 2007) (excessive sentence claim does not present a federal question cognizable on habeas review where the sentence was within the range prescribed by state law). In this instance, the statutorily authorized sentence for Sexual Abuse in the First Degree, Penal Law § 130.65(2), is a determinate prison term of from 2 to 7 years followed by

2023 WL 9316847

a term of post-release supervision. See Penal Law §§ 60.13; 70.02(1)(c); 70.02(3)(c); 70.80(1)(a)(b); 70.80(6); 70.80(9). Attempted Sexual Abuse in the First Degree, Penal Law §§ 110.05(6), 130.65(2), carries a determinate prison term of from 1-1/2 to 4 years, followed by a term of post-release supervision, Penal Law §§ 70.80(1)(a), 70.80(3), 70.80(4) (a)(iv). Accordingly, the seven year sentence imposed on petitioner was well within the statutory range prescribed for the crimes of conviction, and he is not entitled to habeas relief on this basis.

Petitioner has also failed to establish that his sentence was so disproportionate to the crimes he was convicted of, that it implicated his Eighth Amendment right against cruel and unusual punishment. As previously set forth, petitioner's sentence was well within the range prescribed by state law, and the Supreme Court has rejected similar claims involving sentences that were far lengthier and crimes that were far less serious than the crimes committed here. *See Lockyer v. Andrade*, 538 U.S. 63, 66-69, 77, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Ewing v. California*, 538 U.S. 11, 19-20, 30-31, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003); *see also Rummel v. Estelle*, 445 at 284-85, 112 S.Ct. 475 ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare."). [14] Thus, petitioner cannot prevail on his Eighth Amendment claim.

[14]    *See also United States v. Reingold*, 731 F.3d 204, 212-13 (2d Cir. 2013) ("As these cases make plain, at the same time that the Eighth Amendment prohibits grossly disproportionate sentences, it is rare that a sentence falling within a legislatively prescribed term of years will be deemed grossly disproportionate.") (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)); *accord. United States v. Polk*, 546 F.3d 74, 76 (1st Cir. 2008) (observing that "instances of gross disproportionality" are "hen's-teeth rare").

**\*25** Petitioner next asserts that he was subjected to vindictive sentencing in violation of his due process rights, based on the disparity between the prosecutor's plea offers and the sentence actually imposed, as well as a purported threat that petitioner's sentence would be severe if he did not accept a plea deal. (Pet. MOL at 41-46). At the outset, any disparity between the plea offers made to the petitioner and the ultimate sentence imposed, by itself, does not constitute proof that the sentence was vindictive. The Supreme Court

has "repeatedly held that the government 'may encourage a guilty plea by offering substantial benefits in return for the plea.' " *United States v. Mezzanatto*, 513 U.S. 196, 209-10, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995) (quoting *Corbitt v. New Jersey*, 439 U.S. 212, 219, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978)). Accordingly, it is well settled that "[a] discrepancy between an offered plea bargain and the actual sentence alone does not make out a claim of constitutionally impermissible vindictive sentencing." *Wheeler v. Phillips*, No. 05-CV-4399, 2006 WL 2357973, \*11 (E.D.N.Y. Aug. 15, 2006); *accord. Scott v. Graham*, 16 Civ. 2372, 2018 WL 5257613, \*20 (S.D.N.Y. Oct. 22, 2018).

Nor does defense counsel's purported comment that petitioner's sentence would be "severe" if he did not accept the plea offer support a claim of constitutional proportion. *See United States v. Evans*, 537 F. App'x 10, 11 (2d Cir. 2013) (in the context of plea proceedings, finding that "the only action that [petitioner] describes as a 'threat'- that his counsel 'threatened [him]' that if he withdrew his plea 'the Court could sentence [him] to an even longer sentence,' ... was not a threat but instead advice that his attorney was ethically required to provide him.").

Last, petitioner asserts that the pre-sentence investigation report was prepared "in violation of his Fourth Amendment rights," "without due process," and against the "prohibition on double jeopardy." (Pet. MOL at 45-46). Petitioner's claim is unexhausted, because he did not raise it in his direct appeal or in his § 440.10 motion. (*Id.*). [15] Notwithstanding plaintiff's failure to exhaust his state court remedies, his claim is meritless pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see Rhines v. Weber*, 544 U.S. 269, 277, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). Specifically, the laundry-list of constitutional violations set forth by petitioner relative to his pre-sentence report, without any factual application to the underlying record, is so vague and conclusory that it wholly fails to state a proper ground for habeas relief. *See Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) (A habeas petitioner "bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated."). Accordingly, and for the reasons more thoroughly set forth by the respondent in their memorandum of law, petitioner's claim is meritless and should be dismissed. (Resp. MOL at 95).

15   At the time of filing, petitioner was apparently pursuing this claim in a "suit seeking Declaratory Judgment filed in Supreme Court, Dutchess County, and ... in the sentencing court as a motion seeking suppression, redaction and issuance of a protective order. (Pet. MOL at 45).

**XI. Judicial Bias**

Petitioner claims that the sentencing judge was biased against him. (Pet. MOL at 43-45, 47-48). Petitioner raised this claim in his § 440.10 motion, and the trial court denied it on the merits. That decision did not unreasonably apply clearly established federal law. To the extent petitioner challenges the court's participation in the plea negotiations held throughout the trial, "[i]n New York State courts, a trial judge is permitted to participate in plea negotiations with criminal defendants. While participating in plea negotiations, a judge is permitted to discuss the possible sentencing repercussions of a defendant's choice to go to trial rather than plead guilty." *McMahon v. Hodges*, 382 F.3d 284, 289 n.5 (2d Cir. 2004) (citations omitted). Otherwise, petitioner's suggestions of bias and/or a conflict of interest are entirely contradicted by the record before this court, and find no basis in law. Accordingly, petitioner is not entitled to habeas relief and this claim should be dismissed.

**\*26 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**, and it is

**RECOMMENDED**, that a certificate of appealability be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**All Citations**

Slip Copy, 2023 WL 9316847

---

**End of Document**     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification
Appeal Filed by *Kelsey v. Lewin,* 2d Cir., February 28, 2024

2024 WL 194006
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael N. KELSEY, Petitioner,
v.
Donna LEWIN, Respondent.

9:21-CV-348 (MAD/ATB)
|
Signed January 18, 2024

**Attorneys and Law Firms**

MICHAEL N. KELSEY, 243 Hibernia Road, Salt Point, New York 12578, Petitioner, pro se.

PAUL B. LYONS, AAG, OFFICE OF THE NEW YORK, STATE ATTORNEY GENERAL, 28 Liberty Street, New York, New York 10005, Attorney for Respondent.

### MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, United States District Judge:

### I. INTRODUCTION

**\*1** On March 24, 2021, Petitioner Michael N. Kelsey, then an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] *See* Dkt. No. 1. In his petition, Petitioner claimed that: (1) he was denied meaningful appellate review because of incomplete records; (2) he was denied effective assistance of trial and appellate counsel; (3) his conviction was based upon legally insufficient evidence and unconstitutional statutory authority; (4) the New York State Appellate Division ignored the federal ineffective assistance of counsel standard; (5) the state court denied Petitioner a fair, full, and adequate appellate review in his post-conviction proceeding; (6) his sentence was cruel and unusual; and (7) the state court judge was biased. *See id.* at 2-4.

[1] Petitioner was released from DOCCS' custody in May 2022 and is currently on parole, with a maximum expiration date for supervision of October 2030. *See* https://nysdoccslookup.doccs.ny.gov/. Although Petitioner has been released from confinement, he is considered in state "custody" for purposes of his habeas petition because he remains under state supervision. *See Nowakowski v. New York*, 835 F.3d 210, 215-16 (2d Cir. 2016).

In a Report-Recommendation dated March 28, 2023, Magistrate Judge Andrew T. Baxter recommended that the Court deny the petition in its entirety and deny a certificate of appealability. *See* Dkt. No. 40. Specifically, Magistrate Judge Baxter found Petitioner's claims were procedurally defaulted, unexhausted, and/or meritless. *See id.* at 23, 24, 27, 29-48, 51-54, 57, 58. Petitioner objected to the Report-Recommendation, and Respondent responded. *See* Dkt. Nos. 46, 52.[2]

[2] Petitioner sought to file an oversized brief for his objections. *See* Dkt. No. 42. The Court granted the request and allowed Petitioner to file objections no longer than forty pages. *See* Dkt. No. 43. Petitioner filed objections that were sixty-four pages, which were thereafter stricken. *See* Dkt. No. 44. Petitioner refiled his objections which total forty pages. *See* Dkt. No. 46. However, Petitioner simply decreased the font of his previous objections. He stated that "[t]he 40-page version contains the same objections as the 64-page version." *Id.* at 1. As Respondent states, Petitioner "has [ ] filed revised Objections that, if properly formatted, would appear to run to well over 70 pages." Dkt. No. 52 at 5 n.3 (citing Dkt. No. 46; N.D.N.Y. L.R. 10.1(a)). The Local Rules require all motions to be in 12-point font and double spaced, with one-inch margins. *See* N.D.N.Y. L.R. 10.1. Although the Court will consider the entirety of Petitioner's objections, he is cautioned that any future filings must comply with the Local Rules, or such filings will be stricken from the record.

### II. BACKGROUND

For a complete recitation of the relevant facts, the parties are referred to Magistrate Judge Baxter's March 28, 2023, Report-Recommendation. *See* Dkt. No. 40.

## III. DISCUSSION

### A. Standard of Review

#### *1. AEDPA*

**\*2** The enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") brought about significant new limitations on the power of a federal court to grant habeas relief to a state prisoner under 28 U.S.C. § 2254. In discussing this deferential standard, the Second Circuit noted:

> a federal court may award habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication resulted in an outcome that: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Rodriguez v. Miller*, 439 F.3d 68, 73 (2d Cir. 2006), *cert. granted, judgment vacated, and case remanded on other grounds by*, 549 U.S. 1163, 127 S.Ct. 1119, 166 L.Ed.2d 888 (2007) (quoting 28 U.S.C. § 2254(d)) (footnote omitted); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005).

In providing guidance concerning the application of this test, the Second Circuit has observed that:

> [A] state court's decision is "contrary to" clearly established federal law if it contradicts Supreme Court precedent on the application of a legal rule, or addresses a set of facts "materially indistinguishable" from a Supreme Court decision but nevertheless comes to a different conclusion than the Court did. [*Williams v. Taylor*, 529 U.S. 362,] 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 [(2000)]; *Loliscio v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001).... [A] state court's decision is an "unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts" of the case before it. *Williams*, 529 U.S. at 413, 120 S.Ct. 1495.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

Significantly, a federal court engaged in habeas review is not charged with determining whether a state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2009); *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (citation omitted). Courts have interpreted "objectively unreasonable" to mean that "some increment of incorrectness beyond error" is required for the habeas court to grant the application. *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (quotation omitted).

As the Second Circuit has instructed, "[t]he necessary predicate to this deferential review is, of course, that [the] petitioner's federal claim has been 'adjudicated on the merits' by the state court." *Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) (quoting *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001)) (additional quotation marks omitted). "If a state court has not adjudicated the claim 'on the merits,' [Courts] apply the pre-AEDPA standards, and review *de novo* the state court disposition of the petitioner's federal constitutional claims." *Id.* (quotation and quotation marks omitted). "A state court 'adjudicates' a petitioner's federal constitutional claims 'on the merits' when 'it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment.' " *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)). To determine whether a state court has disposed of a claim on the merits, the Court must consider " '(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits.' " *Cotto*, 331 F.3d at 230 (quotation omitted).

#### *2. Review of a Report-Recommendation*

**\*3** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). When a party declines to file objections to a magistrate judge's report-recommendation, the district court reviews the recommendations for clear

error. *See McAllan v. Von Essen*, 517 F. Supp. 2d 672, 679 (S.D.N.Y. 2007). Also, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted); *see also John L. M. v. Kijakazi*, No. 5:21-CV-368, 2022 WL 3500187, *1 (quoting *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013)) ("A proper objection is one that identifies the specific portions of the [Report-Recommendation] that the objector asserts are erroneous and provides a basis for this assertion. Properly raised objections must be 'specific and clearly aimed at particular findings' in the report"); *Bowman v. Racette*, No. 12-CV-4153, 2015 WL 1787130, *2 (S.D.N.Y. Apr. 20, 2015), *aff'd*, 661 Fed. Appx. 56 (2d Cir. 2016) (reviewing objections for clear error where they were "couched in conclusory language and repeat [ ] earlier arguments"). After the appropriate review, "a judge of the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (additional citations omitted). The Second Circuit has instructed that courts are obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

The special solicitude due to a pro se litigant, however, depends upon that particular party's litigation experience, as "the degree of solicitude may be lessened where the particular pro se litigant is experienced in litigation and familiar with the procedural setting presented." *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010). Thus, "an attorney, even one who has been disbarred, is not entitled to the 'special solicitude' afforded to pro se litigants in construing the allegations of his pleading." *Allegrino v. Ruskin*, No. 19-CV-08900, 2021 WL 429121, *5 (S.D.N.Y. Feb. 8, 2021), *aff'd*, No. 21-CV-484, 2021 WL 5500084 (2d Cir. Nov. 24, 2021); *see also United States v. Pierce*, 649 Fed. Appx. 117, 117 n.1 (2d Cir. 2016) (holding that the defendant, who was automatically disbarred following his felony conviction, was not entitled to

the special solicitude ordinarily afforded to pro se litigants); *Mitchell v. Con Edison*, 531 Fed. Appx. 140, 141 (2d Cir. 2013) (holding that a disbarred attorney is not entitled to special solicitude); *In re Truong*, 327 Fed. Appx. 260, 262 (2d Cir. 2009) (same). Petitioner is a former attorney who was automatically disbarred following his felony convictions. *See In re Kelsey*, 148 A.D.3d 257 (2d Dep't 2017) (disbarring Petitioner based on his felony convictions). Accordingly, Petitioner is not entitled to special solicitude.

**B. Petitioner's Objections**

*1. General Objections*

As an initial matter, Petitioner objects to the Report-Recommendation, arguing that Magistrate Judge Baxter did not address certain claims raised in the Petition and Traverse. *See* Dkt. No. 46 at 3-7. First, Magistrate Judge Baxter did not ignore Petitioner's claims raised in his Petition and instead addressed each of them, in turn. Dkt. No. 40 at 37-38, 40-42, 47-48. Second, it is well settled that "a traverse or reply is not the proper pleading in which to raise additional grounds for habeas relief." *Parker v. Smith*, 858 F. Supp. 2d 229, 233 n.2 (N.D.N.Y. 2012) (citations omitted). Thus, Petitioner's claims in his Traverse were not properly before Magistrate Judge Baxter and he did not err by omitting consideration of those arguments. For example, Magistrate Judge Baxter addressed Petitioner's claim that his counsel was ineffective for failing to introduce witness statements that Petitioner refers to as "*Brady*[3] affidavits." Dkt. No. 40 at 45. Petitioner objects that the "R/R overlooks the fact that the Petitioner did in fact explain that the police statements were admissible as business records when prosecution witness State Police Detective Jeffrey Rutledge testified." Dkt. No. 46 at 15. However, as Respondent states, "Petitioner appears to have asserted this claim for the first time in his Traverse, such that the claim is now barred." Dkt. No. 52 at 14. Thus, the Court finds no error in the Report-Recommendation's lack of discussion concerning the admissibility of the witness statements as business records because Magistrate Judge Baxter was not required to discuss anything raised for the first time in Petitioner's Traverse.

[3]    *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**\*4** Further, as Respondent explains, Petitioner references documents in his objections that are not contained in the state court record. *See* Dkt. No. 52 at 4-5 (citing Dkt. No. 46 at 7-8, 10, 13, 16). "[R]eview under [28 U.S.C.] § 2254(d)(1)

is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). Therefore, to the extent Petitioner references information that is not contained in the state court record, such evidence will not be considered by the Court.

Throughout his objections Petitioner refers the Court to his Petition and Traverse. *See generally* Dkt. No. 46. Many of his objections merely restate the arguments he raised in his Petition and Traverse and the Court will review the applicable sections of the Report-Recommendation for clear error. *See John L. M.*, 2022 WL 3500187, at *1 (citation omitted) ("To the extent a party makes 'merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments' set forth in the original submission, the Court will only review for clear error"); *Taylor v. Astrue*, 32 F. Supp. 3d 253, 261 (N.D.N.Y. 2012) ("[W]hen an objection merely reiterates the same arguments made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that report-recommendation to only a clear error review").

Finally, Petitioner objects that the Report-Recommendation's "selective fact reporting is slanted to the State's case, to the prejudicial detriment of the Petitioner. The proper role of a habeas court is to advocate for the petitioner's constitutional rights, not merely defend the institutions and judgments of the states." Dkt. No. 46 at 5. Petitioner is incorrect. First, the Court finds no clear error in Magistrate Judge Baxter's recitation of the state court records and procedural history. *See* Dkt. No. 40 at 4-12. Second, the Court's role is not to advocate for Petitioner. Magistrate Judge Baxter's role was to review whether the state courts applied the law correctly or violated Petitioner's rights, and this Court's role is to review Magistrate Judge Baxter's conclusions. Thus, Petitioner's objections in this regard are rejected.

### 2. Actual Innocence

Petitioner makes claims of actual innocence in his objections. *See* Dkt. No. 46 at 3-5, 15-17, 33. In Magistrate Judge Baxter's Report-Recommendation, he noted that Petitioner can overcome a procedural bar if Petitioner is "actually innocent." Dkt. No. 40 at 15 (quotation omitted); *see also McQuiggin v. Perkins*, 569 U.S. 383, 386, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013) ("[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar"). Magistrate Judge Baxter repeatedly concluded that the record was devoid of "any

indicia of actual innocence." Dkt. No. 40 at 48-51. The Supreme Court has cautioned "that tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.' " *McQuiggin*, 569 U.S. at 386, 133 S.Ct. 1924 (alteration in original) (quoting *Schlup v. Delo*, 513 U.S. 298, 329, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)). "[T]he preexisting equitable authority of federal courts to hear barred claims if they are accompanied by a compelling showing of actual innocence survives the enactment of AEDPA and applies to claims otherwise barred by its statute of limitations, § 2244(d)(1)." *Rivas v. Fischer*, 687 F.3d 514, 551 (2d Cir. 2012).

**\*5** Here, as Respondent states, Petitioner did not clearly set forth any actual innocence claim in his petition. *See generally* Dkt. No. 1; *see also* Dkt. No. 52 at 6. In his list of the grounds he raised for habeas review, he did not allege actual innocence. *See* Dkt. No. 1 at 2-4. He appears to have attempted to raise the issue in his Traverse stating that he "maintains his claim of actual innocence" but that "the facts establish by clear and convincing evidence that but for constitutional errors described herein no reasonable jury would have found the Petitioner guilty." Dkt. No. 37 at 51. As Petitioner did not raise the claim in his Petition, Magistrate Judge Baxter did not clearly err by failing to address the more in-depth actual innocence arguments raised in Petitioner's Traverse. *See Parker*, 858 F. Supp. 2d at 233 n.2 (N.D.N.Y. 2012). Further, Magistrate Judge Baxter did not err in stating that Petitioner did not present "any indicia of actual innocence," Dkt. No. 40 at 48-49, because Petitioner "does not proffer new evidence establishing his actual innocence." *Levola v. New York State Div. of Parole*, No. 9:12-CV-1185, 2014 WL 2106294, *8 (N.D.N.Y. May 20, 2014). Nor has he persuaded the Court that "no juror, acting reasonably would have voted to find him guilty." *McQuiggin*, 569 U.S. at 386, 133 S.Ct. 1924. Petitioner states in his objections that he "may in fact be innocent as he claims" and he points the Court to his Traverse. Dkt. No. 46 at 33. This is insufficient to persuade the Court that he is actually innocent. Therefore, Petitioner's objections are rejected on this ground.

### 3. Magistrate Judge Bias

Petitioner asserts that Magistrate Judge Baxter was biased in his Report-Recommendation. *See* Dkt. No. 46 at 3-7. Evidence of bias may be shown if a judge has "a wrongful or inappropriate inclination or preconceived opinion toward a

person or matter that improperly sways judgment and renders the judge incapable of performing official duties fairly and impartially." *Teachers4Action v. Bloomberg*, 552 F. Supp. 2d 414, 415 (S.D.N.Y. 2008). Petitioner's arguments that Magistrate Judge Baxter was biased and distorted the record are "overly general, conclusive, and speculative." *Foster v. Miller*, No. 04-CV-7990, 2007 WL 1893726, *3 (S.D.N.Y. June 29, 2007) (citations omitted). Magistrate Judge Baxter's analysis was thorough and addressed all of Petitioner's claims that are in his Petition. *See* Dkt. No. 40. Nothing in the Report-Recommendation demonstrates that Magistrate Judge Baxter was biased in his analyses or findings. *See id.* As such, Petitioner's objections are rejected on this ground.

### 4. Legal Sufficiency

Petitioner objects to Magistrate Judge Baxter's Report-Recommendation insofar as it discussed Petitioner's arguments concerning insufficient evidence to support his convictions for sexual abuse and endangering the welfare of a child. *See* Dkt. No. 46 at 21. He contends "that the Magistrate's analysis was both erroneous and unreasonable." *Id.*

Magistrate Judge Baxter accurately addressed Petitioner's argument that there was legally insufficient evidence to convict him. *See* Dkt. No. 40 at 17-23. Magistrate Judge Baxter noted "that many of [P]etitioner's legal sufficiency claims are either unexhausted or barred by an adequate and independent state law ground." *Id.* at 17. He explained that Petitioner did not raise his legal sufficiency claims on direct appeal aside from his claims concerning victims' interactions with Petitioner and the victims' testimony. *See id.* Magistrate Judge Baxter concluded that all other record-based legal sufficiency challenges were exhausted because Petitioner could no longer raise them, but were procedurally defaulted. *See id.*; *see also Wilson v. Heath*, 938 F. Supp. 2d 278, 294 (N.D.N.Y. 2013) ("[I]f a petitioner has failed to exhaust his state court remedies, and no longer has remedies available to pursue his claims, then they are deemed exhausted and are also procedurally defaulted"). Magistrate Judge Baxter then correctly explained the standard for overcoming a procedural bar which requires: "(1) both cause for failing properly to raise the claim in state court and prejudice resulting from the alleged constitutional error, or (2) that the failure to address the claim on habeas would result in a 'fundamental miscarriage of justice.' " Dkt. No. 40 at 17 (quoting *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). As he stated, an ineffective assistance of counsel claim does not establish "cause" if the ineffective assistance

of counsel claim was not exhausted in state court. *Id.* at 17-18; *see also King v. Mantello*, No. 98-CV-7603, 2003 WL 1873618, *2 (E.D.N.Y. Apr. 11, 2003) ("[T]he 'cause'—that is, the ineffective assistance of counsel claim—must also be presented first to the state court").

**\*6** Petitioner contends that the insufficiency of the evidence used to convict him is demonstrated by "*Brady* police affidavits" that the Report-Recommendation did not discuss. Dkt. No. 46 at 3-4, 21. Petitioner asserts that Magistrate Judge Baxter did not "recognize that Petitioner documented that appellate counsel was cause of the prejudice of not introducing" the insufficient evidence "claim on direct appeal." *Id.* at 7. Petitioner also contends that he sent a letter to appellate counsel asking counsel to challenge "how the factual circumstances of the allegations do not correspond to the charges [he] was convicted of." *Id.*

First, Magistrate Judge Baxter repeatedly discussed Petitioner's purported *Brady* claims. *See* Dkt. No. 40 at 45, 49-50, 53-54. Magistrate Judge Baxter noted that Petitioner "has failed to explain how the police statements at issue would have been admissible at trial. Of the statements petitioner identifies, only two related to witnesses who actually testified at trial." *Id.* at 45. Magistrate Judge Baxter was also correct that "there is no evidence that petitioner was prejudiced as a result of any purported *Brady* violation by the prosecution," and "majority of out-of-court police statements would not have been admissible to impeach the government's witnesses, and there is otherwise no indication that petitioner was prejudiced as a result of his failure to obtain any *Brady* material from the prosecution." *Id.* at 50.

Petitioner argues that the "*Brady* affidavits" would have been admissible as business records. *See* Dkt. No. 46 at 15; *see also* FED. R. EVID. 803(6). However, witness affidavits are not business records, even if collected by police officers. *See Chwojdak v. Schunk*, 213 A.D.3d 1310, 1312 (4th Dep't 2023) (quotations omitted) ("Although a police report is generally admissible as a business record ... 'statements contained in the report concerning the cause of an accident constitute inadmissible hearsay unless' a relevant exception applies"). Second, Magistrate Judge Baxter did acknowledge Petitioner's contention that appellate counsel was the cause of the prejudice Petitioner suffered, but rejected the assertion because "[P]etitioner's ineffective appellate counsel claim cannot serve as the 'cause' for his failure to raise these claims in his direct appeal, because petitioner did not exhaust such a claim in state court." Dkt. No. 40 at 17-18 (citation

2024 WL 194006

omitted). Petitioner does not present any authority to the contrary. *See* Dkt. No. 46. Third, Plaintiff sending a letter to appellate counsel, which is not in the state court record, does not save Petitioner's claims from being procedurally barred. *See Garner v. Lee*, 908 F.3d 845, 860 (2d Cir. 2018). Thus, Magistrate Judge Baxter did not clearly err in his conclusion that Petitioner's legal sufficiency claims were procedurally barred.

#### *5. Constitutionality of Sexual Abuse Statute*

As to his challenge to the constitutionality of the state sexual abuse statute, Petitioner contends that "nowhere does the R/R respond or consider Petitioner's objections to" the statutory definition of "force." Dkt. No. 46 at 7. In his Traverse, "Petitioner cited PL 130.00(8)'s definition of 'forcible compulsion' as demonstrated proof, for which we note that all entries in PL 130.00 are labeled as statutory 'definitions.' There is no separate definition entry for 'forcible.' " Dkt. No. 37 at 27-28.

Contrary to Petitioner's contention, the Penal Law states that "[f]or the purposes of this section, forcible touching includes squeezing, grabbing or pinching." N.Y. Penal Law § 130.52. Magistrate Judge Baxter correctly stated that "[f]orcible compulsion is not, however, an element of forcible touching." Dkt. No. 40 at 23. Magistrate Judge Baxter also explained that

> **\*7** [a]lthough DC[4] did not testify regarding the specific pressure that petitioner applied, the jury could have rationally concluded that petitioner applied "some level of pressure," based on DC's testimony that petitioner kept his hand on DC's penis for an extended period of time and continued to do so even as DC attempted to squirm away from him.

*Id.* at 22 (citing SR at 319, 350, 368, 1118). The Court agrees that because DC testified that Petitioner "pinned [him] in such a way that [he] couldn't move" and Petitioner "stroked his penis" for "around 10 or 20 minutes," a rational jury could conclude that such stroking involved "squeezing, grabbing or pinching." SR at 320; N.Y. Penal Law § 130.52; *see also People v. Guaman*, 22 N.Y.3d 678, 684, 985 N.Y.S.2d 209, 8 N.E.3d 324 (2014) ("[W]e hold that, when done

with the relevant mens rea, any bodily contact involving the application of some level of pressure to the victim's sexual or intimate parts qualifies as a forcible touch within the meaning of Penal Law § 130.52"); *Johnson v. NYU Langone Health*, No. 22-CV-09456, 2023 WL 6393466, *3 (S.D.N.Y. Sept. 30, 2023)* (same). Thus, the Court finds no clear error in Magistrate Judge Baxter's rejection of Petitioner's legal insufficiency claims and rejects any challenge to the constitutionality of the penal code.

4    All references to the victims, DC and JD, are abbreviated as they appear in the state court records.

#### *6. Prosecutorial Misconduct*

As to Petitioner's prosecutorial misconduct claim, Petitioner "object[s] to the R/R's failures to acknowledge and discuss the police affidavits withheld from the Defense by law enforcement until the eve of trial," "that both cause and prejudice exist so that this claim is not procedurally defaulted," and he "continue[s] to argue that the prosecutor committed a *Brady* violation (i.e., is misconduct) when she took no steps to protect possible injustices." Dkt. No. 46 at 3-4, 18. However, as Magistrate Judge Baxter correctly noted, "on the first day of trial, the court asked whether discovery had been completed, and defense counsel did not raise any complaints about the status of the *Brady* material at any time during the trial." Dkt. No. 40 at 49-50 (citing SR at 15). Thus, the Court finds no clear error in Magistrate Judge Baxter's analysis or conclusion on this issue.

#### *7. Ineffective Assistance of Appellate Counsel*

As to Petitioner's ineffective assistance of appellate counsel claims, Magistrate Judge Baxter noted that Petitioner's claims were "largely general," but did include "some specific claims." Dkt. No. 40 at 51. The two specific claims concerned the failure of appellate counsel to file a section 440.10 motion and to raise a *Brady* claim on appeal. *See id.* Magistrate Judge Baxter concluded that both claims were baseless because (1) there is no right to post-conviction counsel such as for filing a post-trial motion to vacate pursuant to N.Y. C.P.L. § 440.10; and (2) as Petitioner's *Brady* claims were meritless, appellate counsel could not be ineffective for failing to raise them. *See id.* at 52-54.

Petitioner "object[s] to the R/R's ... claim that Petitioner complained 'in largely general terms that he was deprived of competent and effective appellate counsel,' " by directing

the Court to his Petition and the state court records. Dkt. No. 46 at 19. He asserts that "the R/R's page 51 labeling as 'vague and conclusory' " is "misleading and errant." *Id.* at 19. Petitioner contends that Magistrate Judge Baxter's analysis "suggests at minimum a cursory or carless review of the evidence submitted in furtherance of the [H]abeas [P]etition, and more likely a failure to actually read the Habeas Response." *Id.* More specifically, Petitioner "object[s] to the R/R ... inferences that because there is not a recognized right to counsel for post-conviction motions that appellate counsel cannot be found ineffective when he files an appeal without first expanding the record." *Id.* at 20. Petitioner argues that "while there may be no right to assistance of counsel for post-conviction motions, that the constitutional right of due process is recognized as a right in the appellate process." *Id.* Petitioner asks the Court to "reverse" Magistrate Judge Baxter's conclusion that Appellate Counsel was not ineffective concerning Petitioner's *Brady* claims. *Id.* at 21.

**\*8** Respondent correctly points out that "the Magistrate Judge was clearly familiar with all of [P]etitioner's claims and construed them liberally where necessary. Even with this liberal construction, the Magistrate Judge was unable to discern a coherent claim, and thus properly found it non-cognizable." Dkt. No. 52 at 15. Respondent argues that "the record clearly shows that [Petitioner] did not file a *coram nobis* motion asserting the relevant claims of appellate counsel ineffectiveness." *Id.*

It is well settled that "[u]nder New York law, [a defendant is] required to raise a challenge to the effectiveness of appellate counsel by writ of error *coram nobis.*" *Brooks v. Walker,* No. 9:01-CV-760, 2006 WL 1875103, \*4 (N.D.N.Y. July 3, 2006) (citations omitted). Petitioner did raise an ineffective assistance of appellate counsel claim in his writ of error *coram nobis. See* SR at 998-1003. However, Petitioner did not assert that his appellate counsel was ineffective for failing to assert an insufficient evidence claim. *See id.* Additionally, as Magistrate Judge Baxter explained, "a criminal defendant has no right to counsel beyond his first appeal in pursuing state discretionary or collateral review." *Coleman v. Thompson,* 501 U.S. 722, 756, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also* Dkt. No. 40 at 44; *Shinn v. Ramirez,* 596 U.S. 366, 383, 142 S.Ct. 1718, 212 L.Ed.2d 713 (2022) (quotations omitted) ("[B]ecause there is no constitutional right to counsel in state postconviction proceedings, a prisoner ordinarily must 'bea[r] responsibility' for all attorney errors during those proceedings. Among those errors, a state prisoner is responsible for counsel's negligent

failure to develop the state postconviction record"). Finally, because the Court finds no clear error in Magistrate Judge Baxter's conclusion concerning Petitioner's *Brady* claims, the Court finds no error in his conclusion on the ineffective assistance of appellate counsel claim. Therefore, the Court finds no clear error in Magistrate Judge Baxter's conclusion as to Petitioner's ineffective assistance of appellate counsel claims.

### *8. Incomplete Trial Record*

Petitioner also objects to the Report-Recommendation's conclusion that Petitioner's claim that the trial record was incomplete did not warrant habeas relief. *See* Dkt. No. 46 at 28; Dkt. No. 40 at 24-27. Petitioner states that "the R/R's page 26-27's AEDPA analysis defies its own p.13 rule that 'the Supreme Court has held that circuit and district court decisions do not constitute clearly established Federal Law, as determined by the Supreme Court,' " because Magistrate Judge Baxter cited to a federal district court opinion. Dkt. No. 46 at 28; *see also* Dkt. No. 40 at 24 (citing *Chappelle v. Griffin,* No. 9:16-CV-1130, 2017 WL 2601885, \*6 n.2 (N.D.N.Y. June 15, 2017)). As Respondent states, "Petitioner ... overlooks the R&R's recitation of well-settled law that lower court decisions may be employed to illustrate the 'possibility of fairminded disagreement, sufficient to justify denying the writ.' " Dkt. No. 52 at 17 (citing Dkt. No. 40 at 13-14; *White v. Woodall,* 572 U.S. 415, 422 n.3, 134 S.Ct. 1697, 188 L.Ed.2d 698 (2014)) (additional quotation marks omitted). The Court agrees with Magistrate Judge Baxter that circuit and district court decisions do not constitute clearly established federal law. *See* Dkt. No. 40 at 13; *see also* *Drake v. Portuondo,* 553 F.3d 230, 239 (2d Cir. 2009) (quotation omitted) (" 'Clearly established Federal law ... refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision' "). However, the Court does not discern any instance where Magistrate Judge Baxter applied circuit or district court decisions to conclude that the state court did not err. Rather, he appears to have cited *Chappelle* as an example where a district court came to the same conclusion as Magistrate Judge Baxter. *See Chappelle,* 2017 WL 2601885, at \*6 n.2. Petitioner presents no authority to support a conclusion that use of another district court case as an example to support a conclusion is error. Without such clear error, Petitioner's objections are rejected.

### *9. Preclusion of Evidence*

**\*9** Magistrate Judge Baxter rejected Petitioner's arguments that the trial court erred in precluding certain evidence because the claims were procedurally barred or meritless, or the state court's decisions were not the result of an unreasonable application of established federal law. *See* Dkt. No. 40 at 27-29. Specifically, Magistrate Judge Baxter concluded that Petitioner's arguments as to evidence of a medical report and a photograph of his car were not improperly precluded because there was no evidence that defense counsel attempted to call the expert as a witness and defense counsel expressly withdrew his attempt to introduce the photograph into evidence. *See id.* at 28-29.

The only construable objection Petitioner makes is in a footnote stating:

> Except that Dr. Smith's Report and the car photographs were not admitted because allegedly he did not meet discovery deadlines, and he did not challenge the control call, he did not admit the *Brady* affidavits, he did not call expert witnesses, etc. etc. This Magistrate and his Report and Recommendation has lost any credibility [they] [sic] might otherwise have had.

Dkt. No. 46 at 12 n.8. As Magistrate Judge Baxter explained, defense counsel did not call an expert witness or seek to admit an expert report and he withdrew his attempt to admit a photograph of Petitioner's car. *See* Dkt. No. 40 at 27-29. Thus, as Magistrate Judge Baxter concluded, the state court cannot be found to have erred where Petitioner did not seek to admit certain evidence or call a specific witness. The Court finds no clear error in this conclusion.

### 10. Sentencing

Petitioner objects to the Report-Recommendation's conclusion on his sentencing claim. Dkt. No. 40 at 54-57. Petitioner states that Magistrate Judge Baxter mischaracterized "that it was trial counsel who threatened a severe prison sentence if the mid-trial no-prison plea offer was not accepted." Dkt. No. 46 at 22 (emphasis omitted). Petitioner contends that "it was the trial judge who made such a threat." *Id.* (emphasis omitted). Respondent correctly

points out that the state court record corroborates Magistrate Judge Baxter's finding that defense counsel made this alleged assertion, not the trial judge. *See, e.g.*, Dkt. No. 52 at 16; Dkt. No. 40 at 56; Dkt. No. 27 at 101; SR at 1211. Magistrate Judge Baxter's conclusion on this issue is free from clear error as Petitioner does not cite a record, nor does the Court discern one, which contains a threat from the trial judge to Petitioner concerning a plea deal and his sentence.

### 11. Bias of State Court Judge

Petitioner objects to Magistrate Judge Baxter's finding that "[P]etitioner's suggestions of bias and/or a conflict of interest are entirely contradicted by the record before this court, and find no basis in law." Dkt. No. 40 at 58. He contends that Magistrate Judge Baxter's conclusion is "overly vague, broad, and does not address any of the Petition's claims with specificity so as to justify the R/R's ruling that the '[P]etitioner is not entitled to habeas relief and [that] this claim should be dismissed.' " Dkt. No. 46 at 22. However, Magistrate Judge Baxter's findings did not require him to directly recite each instance of alleged judicial bias; rather his review of the record found that all of "[P]etitioner's suggestions of bias and/or a conflict of interest" were meritless. Dkt. No. 40 at 58. Petitioner's objections do not suggest otherwise. Petitioner "direct[s]" the Court to his Petition, Traverse, and the state court records to demonstrate "the very real conflict of interest complaint about that claims it violates fairness for the same out-of-county judge to decide a post-conviction motion that complains of his own bias." Dkt. No. 46 at 23. However, none of the citations present evidence that the state court judge's decision or conduct was the result of " 'deep-seated favoritism or antagonism that would make fair judgment impossible.' " *Lane v. Graham*, No. 9:14-CV-01261, 2016 WL 154111, \*12 (N.D.N.Y. Jan. 12, 2016) (quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). Petitioner cites eight cases in his objections but does not explain how any support a conclusion of bias. *See* Dkt. No. 46 at 23 (collecting cases). After reviewing the eight cases, it is not clear how any of them support a conclusion that Magistrate Judge Baxter erred. Rather, the Court finds no clear error in the conclusion that Petitioner did not demonstrate the state court judge's bias. Petitioner's objections are rejected on this issue.

### 12. Ineffective Assistance of Trial Counsel

**\*10** Much of Magistrate Judge Baxter's Report-Recommendation focuses on Petitioner's ineffective assistance of trial counsel claims. *See* Dkt. No. 40 at

29-49. Petitioner "object[s] to the R/R's ... cause and prejudice analysis in that 'the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable,' noting also that 'this is different from asking whether defense counsel's performance fell below *Strickland*'s standards.' " Dkt. No. 46 at 8. Petitioner explains that his "main objection here is as the Petition [ ] argued that New York courts do not adhere to the *Strickland* ineffective assistance test opting instead for their own version." *Id.* (emphasis deleted).

Magistrate Judge Baxter correctly explained in his Report-Recommendation that to assert an ineffective assistance of counsel claim, Petitioner must satisfy the two-prong *Strickland* test: that counsel's performance was deficient, and that Petitioner suffered prejudice as a result of counsel's deficiencies. Dkt. No. 40 at 30 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Magistrate Judge Baxter also correctly noted that the state court's application of the *Strickland* standard must be unreasonable to warrant habeas relief. *Id.* at 30-31. He concluded that most of Petitioner's claims were barred because of adequate and independent state grounds and that alternatively, trial counsel's performance was not deficient and prejudicial. *See id.* at 31-49.

Petitioner repeatedly objects to Magistrate Judge Baxter "rubber stamping" the state courts' decisions. Dkt. No. 46 at 29. He also objects to the AEDPA and section 440.10, arguing that the statutes are unconstitutional. *See id.* at 24-26; *see also* N.Y. C.P.L. § 440.10; 28 U.S.C. § 2254. Magistrate Judge Baxter explained the correct standards under AEDPA and the deferential review that he is required to apply. *See* Dkt. No. 40 at 12-14; *see also* *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017) (footnote omitted) ("AEDPA by its terms requires substantial deference to the state court's decision in all cases governed ... by § 2254(d)"). In reviewing the state court decisions, he did not "rubber stamp" the conclusions, but considered the issues thoughtfully and thoroughly and used case law to support his determinations. *See* Dkt. No. 40. Additionally, the AEDPA has been repeatedly held to be constitutional and Petitioner's challenges to the statute are without merit. *See* Diane P. Wood, *The Enduring Challenges for Habeas Corpus*, 95 NOTRE DAME L. REV. 1809, 1818 (2020) (footnotes omitted) ("The constitutionality of these changes has been upheld by the Supreme Court").

Petitioner challenges Magistrate Judge Baxter's conclusions that Petitioner's ineffective assistance of counsel claims did

not warrant habeas relief because the state court's decision on Petitioner's section 440.10 motion was based on an adequate and independent state ground. *See* Dkt. No. 40 at 30-31. That ground rests on the procedural rule set forth in section 440.10(2)(c) that Petitioner is required to first raise his arguments on direct appeal. *See* N.Y. C.P.L. § 440.10(2)(c) ("[T]he court must deny a motion to vacate a judgment when ... [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal ... or to his or her unjustifiable failure to raise such ground or issue upon an appeal actually perfected ...").

Magistrate Judge Baxter did not discuss whether section 440.10 is constitutional. *See generally* Dkt. No. 40. However, Magistrate Judge Baxter correctly determined which claims were barred from habeas review on adequate and independent state grounds because of section 440.10's procedural requirements. *See* Dkt. No. 40 at 15-16, 30-31, 46. He also reviewed the merits of all but one of Petitioner's claims. *See id.* at 31-49. Further, Petitioner's challenge to the constitutionality of section 440.10 is meritless. In his petition, Petitioner argued that section 440.10 is "inadequat[e], unfair[ ] and incomplete[ ]." Dkt. No. 1-1 at 23. In his objections, he contends that he "objects" to the "adequate and independent state ground doctrine" "in theory as well as in practice." Dkt. No. 46 at 24. Neither statement sufficiently sets forth a constitutional challenge to section 440.10. Thus, the Court finds no error in Magistrate Judge Baxter's Report-Recommendation on this ground.

**\*11** In her response to Petitioner's objections, Respondent notes that N.Y. C.P.L.R. § 440.10(2)(c) was amended, effective October 25, 2021, to read that

> (c) Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during

the prescribed period or to his or her unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him or her *unless the issue raised upon such motion is ineffective assistance of counsel ....*

N.Y. C.P.L. § 440.10(2)(c) (emphasis added). Respondent contends that "[t]he case law is unsettled as to whether the amendment would apply to [P]etitioner's case, given that, among other things, the CPL § 440.10 order was issued and became final prior to the amendment's October 25, 2021 effective date." Dkt. No. 52 at 21. Respondent acknowledges that Magistrate Judge Baxter denied the majority of Petitioner's ineffective assistance of counsel claims both on procedural and merits-based grounds. *See id.* at 22. However, Magistrate Judge Baxter denied Petitioner's ineffective assistance of counsel claim as it relates to trial counsel impeaching victims on cross examination solely on procedural grounds. *See id.*; *see also* Dkt. No. 40 at 46-47. Thus, the Court will review all of Magistrate Judge Baxter's conclusions and consider the merits of Petitioner's ineffective assistance of counsel claim related to the impeachment of victims.

"[T]he *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 105, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quotation omitted). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009)). Therefore, "a *Strickland* claim evaluated under the § 2254(d)(1) standard" is evaluated "[u]nder [a] doubly deferential judicial review." *Knowles*, 556 U.S. at 123, 129 S.Ct. 1411 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003)).

Petitioner argues that the state court applied the wrong standard to his ineffective assistance of counsel claims. *See* Dkt. No. 46 at 8-9. Magistrate Judge Baxter applied the

appropriate federal standard: *Strickland*. *See* Dkt. No. 40 at 30. The state court did not apply *Strickland*, but, as Petitioner states, applied the New York State standard asking whether a defendant was "provided meaningful representation." SR at 888.

As explained by the Second Circuit, "New York's test for ineffective assistance of counsel under the state constitution differs from the federal *Strickland* standard. The first prong of the New York test is the same as the federal test." *Rosario v. Ercole*, 601 F.3d 118, 124 (2d Cir. 2010). However, "[t]he difference arises in the second prong of the *Strickland* test. In New York, courts need not find that counsel's inadequate efforts resulted in a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "Instead, the 'question is whether the attorney's conduct constituted egregious and prejudicial error such that defendant did not receive a fair trial.' " *Id.* (quoting *People v. Benevento*, 91 N.Y.2d 708, 713, 674 N.Y.S.2d 629, 697 N.E.2d 584 (1998)). "Thus, under New York law the focus of the inquiry is ultimately whether the error affected the 'fairness of the process as a whole.' " *Id.* (quotation omitted). The Second Circuit noted that "[t]he New York Court of Appeals clearly views the New York constitutional standard as more generous toward defendants than *Strickland*." *Id.* (quotation omitted). However, "the New York 'meaningful representation' standard is not contrary to the *Strickland* standard." *Id.* (quoting *Eze v. Senkowski*, 321 F.3d 110, 123-24 (2d Cir. 2003)).

**\*12** Thus, although Magistrate Judge Baxter did not discuss the state court's application of the New York standard, the Court agrees with Magistrate Judge Baxter and finds no error in the state court's decisions. *See* Dkt. No. 40 at 29-49.

Regarding the alleged failure of defense counsel to move to dismiss the forcible touching charge, Magistrate Judge Baxter noted that although the claim is barred on adequate and independent state grounds, trial counsel did move to dismiss the charge, and any motion would have been meritless. *See id.* at 31-32, 124 S.Ct. 1. Petitioner raises no specific objections to this section of the Report-Recommendation. *See generally* Dkt. No. 46. Magistrate Judge Baxter also concluded that the state court's decision to deny Petitioner the right to represent himself did not unreasonably apply Supreme Court precedent. *See* Dkt. No. 40 at 44-45. Petitioner has not objected to this section of the Report-Recommendation. *See generally* Dkt. No. 46. Therefore, the Court reviews these sections of the Report-Recommendation for clear error and finds none.

Magistrate Judge Baxter also concluded that Petitioner is not entitled to habeas relief for his trial counsel's alleged failure to preserve the legal insufficiency claim. Dkt. No. 40 at 32-33. This is because the failure to make a meritless motion cannot be the basis for habeas relief and even if Petitioner had shown that counsel's conduct fell below *Strickland* standards, Petitioner did not prove that he suffered prejudice as a result. *Id.* at 33, 124 S.Ct. 1. Petitioner objects that "[t]he Magistrate decline[d] to conduct [his] own assessment, even when the habeas petition complain[ed] that the state court was not applying the *Strickland* standard." Dkt. No. 46 at 29 (citing Dkt. No. 1-1 at 13-15; Dkt. No. 37 at 39-42). Although the state court did not apply *Strickland*, its decision is not contrary to established law as the standard the state court applied is more liberal than *Strickland*. *See Rosario*, 601 F.3d at 124-26. The Court finds no clear error in Magistrate Judge Baxter's conclusion.

Petitioner next objects to Magistrate Judge Baxter's conclusion that trial counsel was not ineffective for failing to object to the admission of prior bad acts. *See* Dkt. No. 46 at 31. Petitioner's objections refer the Court to his Traverse and Petition. *See id.* at 30, 124 S.Ct. 1. He also cites *Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) and *Wood v. Ercole*, 644 F.3d 83 (2d Cir. 2011) to support the contention that the state courts erred in considering the ineffective assistance of counsel claims, arguing that appellate courts are required "to apply a 'substantial and injurious effect test.' " Dkt. No. 46 at 28.

It is true that in *Fry*, the Supreme Court held "that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect.' " *Fry*, 551 U.S. at 121, 127 S.Ct. 2321; *see also Wood*, 644 F.3d at 93-94 (restating the standard set forth in *Fry*). However, Magistrate Judge Baxter concluded that the state court did not unreasonable apply *Strickland* and that trial counsel was not ineffective because trial counsel objected to their admission. *See* Dkt. No. 40 at 35-36. The Court finds no clear error in either conclusion because trial counsel initially objected to admission of the prior bad act evidence and the appellate court reasonably concluded that trial counsel did not err. *See* SR at 35-37, 38-44, 888-89. Thus, Magistrate Judge Baxter was not required to reach the substantial and injurious effect question because Petitioner did not first establish that it was error to admit the prior bad act evidence. *See Gumbs v. Stanford*, No. 22-CV-4659, 2023 WL 5928454, *3 (S.D.N.Y.

Sept. 12, 2023) (quotations omitted) ("Because the Appellate Division determined that the trial court's *error* was harmless, Petitioner is only entitled to habeas relief if he can show that the error: (1) had a 'substantial and injurious effect or influence' on the jury's verdict; and (2) that, under 28 U.S.C. § 2254(d)(1), the Appellate Division's harmless-error determination was an 'unreasonable application' of clearly established federal ..., or, under § 2254(d)(2), was based on an unreasonable determination of the facts").

**\*13** Petitioner relies on *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948) to support the proposition that "character evidence is not permitted in [a] criminal trial." Dkt. No. 46 at 30. However, that case expressly held that "[t]he inquiry as to an arrest is permissible also because the prosecution has a right to test the qualifications of the witness to bespeak the community opinion." *Id.* at 483, 69 S.Ct. 213. In fact, it instead be "note[d] that admission of prior convictions is not itself a constitutional violation." *Lopez v. Graham*, No. 11-CV-7729, 2014 WL 2940855, *12 (S.D.N.Y. June 30, 2014) (citing *Spencer v. Texas*, 385 U.S. 554, 560–561, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); *Michelson*, 335 U.S. at 482-86, 69 S.Ct. 213; *United States v. Belt*, 514 F.2d 837, 839, 849-850 (D.C. Cir. 1975)). Such an admission, subject to certain caveats, is expressly allowed. *See* FED. R. EVID. 404(b), 609(a); *People v. Molineux*, 168 N.Y. 264, 264-65, 61 N.E. 286 (1901).

Petitioner also:

> [O]bject[s] to the Magistrate[']s[ ] p.34 attempts to justify the [s]tate [c]ourt's *ex post facto* attempt to determine a non-propensity purpose for introducing the alleged prior bad acts and for falsely claiming that the trial record showed the trial judge weighed the probative value against the risk of undue prejudice when no such indication is present in the trial transcript.

Dkt. No. 46 at 29 (emphasis deleted). Contrary to Petitioner's contentions, the trial judge held a conference, on the record, in chambers with counsel regarding the admission of the prior bad acts where he heard from both the prosecution and defense regarding that admission. *See* SR at 259-60,

889. Therefore, Magistrate Judge Baxter was correct in determining that the Appellate Division's decision "was not an unreasonable application of clearly established federal law warranting habeas relief." Dkt. No. 40 at 34.

Petitioner states that "[n]o sound trial strategy would allow negative character testimony into a trial without objection. No sound trial strategy would permit a jury to go into the jury room without limiting instructions from the judge as to how not to use the negative testimony they heard." Dkt. No. 46 at 30. However, Petitioner's counsel expressly declined a limiting instruction on that evidence. *See* SR at 276. Further, in some situations, "counsel may reasonably conclude that it is strategically preferable to omit [ ] a request [for a limiting instruction,] since the instruction might have the undesired effect of highlighting the" evidence of other bad acts. *Buehl v. Vaughn*, 166 F.3d 163, 170 (3d Cir. 1999). Thus, as Magistrate Judge Baxter concluded, "[u]nder the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard, [Petitioner]'s ineffective-assistance of counsel claim fails." *Knowles*, 556 U.S. at 123, 129 S.Ct. 1411; *see also* Dkt. No. 40 at 36.

Petitioner next objects that there were expert witnesses who could have testified had it not been for counsel's deficiencies. *See* Dkt. No. 46 at 9–11. The Report-Recommendation addressed this argument and concluded that the state courts did not unreasonably apply federal law in concluding that counsel was not ineffective. Dkt. No. 40 at 38–40. As Respondent explains, "[P]etitioner failed to offer proof in state court that a qualified expert was ready, willing, and able to testify." Dkt. No. 52 at 12 (citing Dkt. No. 27 at 71, 84–86). The Court agrees that "[i]f counsel had made a timely request for the expert witness, there is no evidence it would have changed the outcome of the trial, *i.e.*, there was no prejudice to Petitioner." *Dayton v. LaValley*, No. 11-CV-1261, 2014 WL 13023993, *6 (E.D.N.Y. Jan. 15, 2014).

**\*14** In his objections, Petitioner reiterates the same statements he made in his prior filings: he has e-mails which document his desire to retain an expert for trial. *See* Dkt. No. 46 at 16; Dkt. No. 1-1 at 39–40; Dkt. No. 37 at 49–51. However, those e-mails are not in the state court record, nor do they establish that an expert was willing and available to testify. *See United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) (citations omitted) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel"); *Dunn v. Reeves*, 594 U.S. ——, 141 S. Ct. 2405, 2410,

210 L.Ed.2d 812 (2021) (quotations and quotation marks omitted) ("As to counsel, we have often explained that strategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness. Defense lawyers have limited time and resources, and so must choose from among countless strategic options. Such decisions are particularly difficult because certain tactics carry the risk of harm[ing] the defense by undermining credibility with the jury or distracting from more important issues").

In Petitioner's objections, he lists witnesses who allegedly could have testified at his trial as well as the testimony they would have given. *See* Dkt. No. 46 at 13–15. However, as Magistrate Judge Baxter correctly explained, " '[t]he decision to call, or not call, a witness is a classic example of trial strategy,' and the decision of 'whether to call a specific witness–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse in professional representation.' " Dkt. No. 40 at 43 (quoting *Moore v. Kirkpatrick*, No. 09-CV-0457, 2011 WL 1233124, *14 (W.D.N.Y. Mar. 30, 2011); citing *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)). The Court notes that there is an affidavit in the state court record which appears to corroborate Petitioner's contention that additional witnesses were prepared to testify at his trial. *See* SR at 1536-57. However, Magistrate Judge Baxter did not clearly err in concluding that the state court decisions did not unreasonably apply federal law where the decision to call witnesses is given deference and the record evidences trial counsel's intention to steer the jury away from Petitioner's mental health. *See* Dkt. No. 40 at 39–40.

Additionally, Petitioner does not object to Magistrate Judge Baxter's conclusion that the state court "reasonably determined that counsel had no basis to ask for a jury charge on the voluntariness of the call, as [P]etitioner's testimony, and the call itself, did not raise issues of involuntariness." Dkt. No. 40 at 40; *see also* Dkt. No. 46 at 9–11. The Court finds no clear error in that conclusion.

Petitioner objects to Magistrate Judge Baxter's conclusion that trial counsel was not ineffective for allegedly failing to prepare for trial. *See* Dkt. No. 46 at 11-12; *see also* Dkt. No. 40 at 42-44. Petitioner contends that Magistrate Judge Baxter "abandon[ed]" and "ignore[d]" the *Strickland* standard. Dkt. No. 46 at 11-12. In his Report-Recommendation, Magistrate Judge Baxter repeatedly noted his reliance on *Strickland*. *See* Dkt. No. 40 at 30-31, 33, 36, 39, 43, 45, 52. As to counsel's preparation for trial, the Court finds no clear error

in Magistrate Judge Baxter's conclusion that trial counsel is afforded significant deference in determining what evidence to present or witnesses to call and the state court did not unreasonably determine as such. *See id.* at 43-44, 124 S.Ct. 1; *see also* SR at 888-889, 1715-16.

Magistrate Judge Baxter then addressed Petitioner's argument that his counsel failed to introduce a photograph of Petitioner's car into evidence. Dkt. No 40 at 48. Petitioner contends that his habeas petition "amply explain[s] the prejudice that Petitioner suffered when the photographs of the crime scene were not introduced at trial" and that this was ineffective trial and appellate counsel. Dkt. No. 46 at 17. He also notes that he "explicitly directed the Court to review the CPL 440.10 motion." *Id.* Magistrate Baxter did review Petitioner's 440.10 motion and noted that Petitioner raised the issue in that motion. *See* Dkt. No. 40 at 48. Magistrate Judge Baxter also correctly concluded that Petitioner's claim is barred on adequate and independent state grounds because the section 440.10 court denied Petitioner's motion for failure to raise it on direct appeal. *See id.* Further, although section 440.10(2)(c) has been amended, the section 440.10 court and Magistrate Judge Baxter also denied Petitioner's claim on the merits. *See id.* at 48, 124 S.Ct. 1 n.13. Magistrate Judge Baxter also noted that ineffective assistance of counsel "cannot serve as the cause to excuse his procedural default." *Id.* at 48, 124 S.Ct. 1. Magistrate Judge Baxter denied the claim on the merits "under AEDPA standards for the reasons set forth in [R]espondent's memorandum of law." *Id.* (citing Dkt. No. 27 at 86-88). As explained in Respondent's memorandum, Petitioner's counsel, after conferring with Petitioner, withdrew his attempt to introduce the photograph into evidence. *See* SR at 911. Trial counsel is afforded substantial deference in determining what evidence to admit and Petitioner has not established prejudice where he was able to testify concerning his position in the car on the evening of the incident underlying his conviction. Based on the foregoing, the Court finds no clear error on this issue.

**\*15** Magistrate Judge Baxter noted that Petitioner raised his ineffective assistance of counsel concerning the impeachment of victims for the first time in his section 440.10 motion. *See* Dkt. No. 40 at 46. Magistrate Judge Baxter concluded that the state court's denial of Petitioner's claim was based "upon an independent and adequate state ground, and federal review of the claim is barred." *Id.* Magistrate Judge Baxter noted that the Court would only consider the merits of a procedurally barred claim if Petitioner established cause and prejudice or actual innocence. *See id.*

As Respondent states, section 440.10(2)(c) was amended after the state court's decision was final, *see* Dkt. No. 52 at 20, and the New York Court of Appeals has not instructed whether the amendment is retroactive. Even if the Court considers the merits of the issue, Petitioner has not established that counsel was constitutionally ineffective.

Petitioner argues that trial counsel was ineffective because "trial counsel failed to subject the Petitioner's accusers to meaningful adversarial testing that resulted in convicting an innocent man of not only the charged crimes but various acts claimed to be both prior and bad." Dkt. No. 46 at 17. The state court record reflects considerable cross examination of the victims. *See* SR at 409-17, 423-30, 909, 995, 1800-1807. It is well settled that "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim." *Dunham v. Travis,* 313 F.3d 724, 732 (2d Cir. 2002) (quoting *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir. 1987)). Petitioner has not presented evidence to rebut this presumption and the state court's decision to deny Petitioner's section 440.10 motion was not contrary to established federal law. Thus, the Court finds no error in Magistrate Judge Baxter's denial of the petition on this ground.

### *13. Evidentiary Hearings*

Petitioner notes in his objections that he attached eleven motions to his habeas petition requesting an evidentiary hearing. *See* Dkt. No. 46 at 34. In his Petition, after setting forth his argument on a particular issue, Petitioner stated that he was "entitled to a hearing on this point as required under Townsend v. Sain and/or Tamayo-Reyes." Dkt. No. 1-1 at 12, 18, 22, 26, 28, 30-31, 33-34. The Supreme Court, in *Townsend v. Sain,* concluded that "[w]here an unresolved factual dispute exists, demeanor evidence is a significant factor in adjudging credibility. And questions of credibility, of course, are basic to resolution of conflicts in testimony." 372 U.S. 293, 322, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (footnote omitted). The Supreme Court continued, stating that "[t]o be sure, the state-court record is competent evidence, and either party may choose to rely solely upon the evidence contained in that record, but the petitioner, and the State, must be given the opportunity to present other testimonial and documentary evidence relevant to the disputed issues." *Id.* (footnote omitted). *Townsend* was overruled by *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), which held that a party be afforded "an evidentiary

hearing if he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure." *Id.* at 11, 112 S.Ct. 1715. Additionally, "[a] habeas petitioner's failure to develop a claim in state-court proceedings will be excused and a hearing mandated if he can show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing." *Id.* at 12, 112 S.Ct. 1715.

**\*16** In 2022, the Supreme Court noted that "[f]ederal courts, years later, lack the competence and authority to relitigate a State's criminal case." *Shinn*, 596 U.S. at 390, 142 S.Ct. 1718. Thus, the Supreme Court declined to expand "§ 2254(e)(2)'s narrow exceptions to AEDPA's 'genera[l] ba[r on] evidentiary hearings.' " *Id.* (quoting *McQuiggin*, 569 U.S. at 395, 133 S.Ct. 1924). Section 2254(e)(2) states:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall *not* hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on--
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added). Petitioner has not established that his claims rely on a new rule of constitutional law or on facts that could not have been earlier discovered. *See id.*; *see also* Dkt. No. 46. Thus, Petitioner's objections are rejected on this issue.

## C. Certificate of Appealability

28 U.S.C. § 2253(c)(1) provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from – (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]" 28 U.S.C. § 2253(c)(1). A court may only issue a Certificate of Appealability "if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). Petitioner has failed to make such a showing with regard to any of his claims, and the Court declines to issue a Certificate of Appealability in this matter.

## IV. CONCLUSION

After carefully reviewing the Report-Recommendation, the entire record in this matter, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 40) is **ADOPTED** in its entirety for the reasons set forth herein; and the Court further

**ORDERS** that the petition for writ of habeas corpus (Dkt. No. 1) is **DENIED** and **DISMISSED**; and the Court further

**ORDERS** that no Certificate of Appealability shall be issued with respect to any of Petitioner's claims; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 194006

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

O'Kane v. Kirkpatrick, Not Reported in F.Supp.2d (2011)

2011 WL 3809945

2011 WL 3809945
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David O'KANE, Petitioner,

v.

Robert KIRKPATRICK, Respondent.

No. 09 Civ. 05167(HB)(THK).
|
Feb. 15, 2011.

**REPORT AND RECOMMENDATION**

THEODORE H. KATZ, United States Magistrate Judge.

**\*1 TO; HON. HAROLD BAER, JR., UNITED STATES DISTRICT JUDGE.**

**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Petitioner David O'Kane brings this action for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his July 8, 2004 conviction in New York State Supreme Court, New York County, upon his guilty plea, of Criminal Possession of a Controlled Substance in the Fourth Degree (N.Y. Penal Law § 220.09). Petitioner was sentenced, as a second felony offender, to an indeterminate prison term of 3 to 6 years. [1]

[1] This sentence was to run concurrently with an indeterminate prison term of from 2 ½ to 5 years arising from an *unrelated* 1999 conviction, upon his guilty plea, of Criminal Sale of a Controlled Substance in the Fifth Degree (N.Y. Penal Law § 220.31).

In a decision dated October 2, 2008, the Appellate Division, First Department affirmed Petitioner's conviction. See People v. O'Kane, 55 A.D.3d 315, 316, 865 N.Y.S.2d 61 (1st Dep't 2008), *lv. denied,* 11 N.Y.3d 928, 874 N.Y.S.2d 13, 902 N.E.2d 447 (2009). Petitioner is currently incarcerated at the Upstate Correctional Facility in Malone, New York.

In his undated *pro se* motion for habeas corpus relief, which was later clarified in an amended Petition, dated January 20, 2010, Petitioner argues that: (1) his indictment was defective because false statements were made in the felony complaint and the prosecutor knowingly presented false evidence to the grand jury; and (2) he received ineffective assistance of counsel because his attorney: (a) failed to investigate and impeach purportedly false statements in the felony complaint and pretrial proceedings; and (b) allowed Petitioner to plead guilty although the evidence against him was false. (*See* Petition for Writ of Habeas Corpus, dated Jan, 20, 2010 ("Pet."), at 1–3.) Respondent opposes the Petition, arguing that Petitioner's claim that the indictment is defective is procedurally barred and is not cognizable on federal habeas review. (*See* Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, dated May 28, 2010 ("Resp't Mem."), at 16–23.) Respondent further contends that Petitioner received meaningful assistance of counsel. (*See id.* at 23–26, 874 N.Y.S.2d 13, 902 N.E.2d 447.)

The Petition was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). Having carefully considered the parties' submissions and the state court record, for the reasons that follow the Court respectfully recommends that the Petition be denied and Petitioner's claims be dismissed with prejudice.

***BACKGROUND***

**I. Factual Background.**

A. *The Crime*
On January 7, 2004, at approximately 3:20 P.M., Detective Ephrem Deshazo ("Deshazo"), who was working undercover as part of a field team in a buy-and-bust operation, was sitting in a car on the corner of 114th Street and Lenox Avenue in Manhattan. (Pretrial Hearing, dated Apr. 29, 2004 ("H."), at 10–14.) Deshazo observed three people approach Petitioner and line up in front of him. (*See id.* at 17–21, 874 N.Y.S.2d 13, 902 N.E.2d 447.) Petitioner handed each an object. (*See id.*) Deshazo could not see what the objects were, and could not see whether the three individuals gave Petitioner anything in exchange. (*See id.* at 18–19, 874 N.Y.S.2d 13, 902 N.E.2d 447.)

**\*2** Petitioner then headed north on Lenox Avenue and entered a supermarket on 116th Street and Lenox Avenue. (*See id.* at 21–22, 24, 874 N.Y.S.2d 13, 902 N.E.2d 447.) Deshazo followed Petitioner into the store. As he entered, Deshazo removed his police shield from his vest pocket so that it was visible to Petitioner. (*See id.* at 24–25, 874 N.Y.S.2d 13, 902 N.E.2d 447.) Petitioner looked at Deshazo and said,

"[O]fficer, this is not my jacket." (*Id.* at 25, 874 N.Y.S.2d 13, 902 N.E.2d 447.) Deshazo searched the jacket and recovered 50 ziplock bags of crack cocaine from the *"right* inside jacket pocket." (*Id.* at 25–27, 874 N.Y.S.2d 13, 902 N.E.2d 447.) (emphasis added).

A short time later, Detective Glenn Puppa ("Puppa") arrived at the store. (*See id.* at 53–54, 874 N.Y.S.2d 13, 902 N.E.2d 447.) Deshazo informed Puppa that he had recovered the bags of crack cocaine from Petitioner. (*See id.*) Puppa handcuffed Petitioner, escorted him outside, and searched him, recovering from Petitioner's pockets a wallet, a key, and 71 cents. (*See id.* at 54–58, 874 N.Y.S.2d 13, 902 N.E.2d 447.) In response to Puppa's questions, Petitioner stated that the jacket that he was wearing did not belong to him, but the wallet and keys did. (*See id.* at 58, 60–63.)

#### B. *Pretrial Hearing*
At a *Mapp* /*Huntley* /*Dunaway* hearing on April 29, 2004, Petitioner introduced the jacket worn at the time of his arrest into evidence. Notably, the jacket had a left inside pocket, but no right inside pocket. Petitioner thus argued that Deshazo gave inconsistent testimony, since Deshazo testified at Petitioner's parole revocation proceeding that he recovered the drugs from the left inside jacket pocket, but had testified, both before the grand jury as well as at the instant hearing, that he recovered the drugs from the "right inside jacket pocket." (*Id.* at 78–80, 865 N.Y.S.2d 61.)

The court found that whether Deshazo recovered the drugs from the left or right inside jacket pocket was of no "particular moment," because it was clear that Deshazo recovered drugs from a pocket of the jacket that Petitioner was wearing at the time of his arrest. (*See id.* at 92, 865 N.Y.S.2d 61.)

The court denied Petitioner's motion to suppress the ziplock bags of crack cocaine and the statements made to Deshazo and Puppa. The court further held that Deshazo had probable cause to arrest Petitioner. (*See id.* at 90–92, 865 N.Y.S.2d 61.)

#### C. *Plea Proceedings*
On May 5, 2004, Petitioner appeared before the court with his attorney. After an off-the-record conference with the attorney, the court announced that Petitioner wished to plead guilty. (Plea Hearing, dated May 5, 2004 ("P."), at 105–06.) The court informed Petitioner that he would plead guilty to Criminal Possession of a Controlled Substance in the Fourth Degree in exchange for a promised sentence of 3 to

6 years. (*See* P. at 105, 108.) The court also explained the terms of a cooperation condition, reminding Petitioner that there was no guarantee of a reduced sentence, and that the ultimate determination of whether the information provided by Petitioner was of value would be in the sole discretion of the prosecutor. (*See id.* at 108–09, 865 N.Y.S.2d 61.) Petitioner then admitted to possessing over one ounce of crack cocaine on January 7, 2004. (*See id,* at 109–10, 865 N.Y.S.2d 61.) He confirmed that no one had threatened him, or otherwise compelled him to enter his guilty plea. The court accepted Petitioner's plea and adjudicated him a second felony offender. (*See id.* at 110–13, 865 N.Y.S.2d 61.)

**\*3** Petitioner also plead guilty in an *unrelated* case to Criminal Sale of a Controlled Substance in the Fifth Degree, in exchange for a promised concurrent sentence of 2 ½ to 5 years, again, with the understanding that his sentence could be reduced on the basis of information provided to the prosecutor. (*See id.* at 111, 113–14, 865 N.Y.S.2d 61 .) Petitioner then admitted that he sold cocaine on April 13, 1999, in New York County. (*See id.* at 114, 865 N.Y.S.2d 61.) The court accepted his plea and adjourned the case for sentencing. (*See id.* at 114–115, 865 N.Y.S.2d 61 .)

#### D. *Sentencing Proceedings*
Prior to the sentencing proceedings, Petitioner filed a *pro se* motion for inspection of the grand jury minutes, new counsel, and withdrawal of his guilty plea to fourth-degree criminal possession. On July 8, 2004, at the sentencing hearing, the court asked Petitioner why he should be allowed to withdraw his plea and be given a new attorney. (Sentencing Hearing, dated July 8, 2004 ("S."), at 2–5.) Petitioner argued that the officers lacked probable cause to stop and search him, and that he thought that if the court were to hear all of the evidence, it would have a "different outlook." (*See* S. at 5–6.)

The court reminded Petitioner that he "already pled guilty" and stated: "I don't have any reason to give you your plea back. You don't have an automatic right. You have to give me some reason. I don't have a reason." (*Id.* at 10, 865 N.Y.S.2d 61.) Petitioner argued, in response, that his attorney coerced him into pleading guilty, stating that;

> I got scared. I got two lawyers telling
> me, you blow your hearings, you are
> not going to win the trial, you might

as well take the three-to-six, and I got scared and I took the three-to-six.

(*Id.* at 10–11, 865 N.Y.S.2d 61.) The prosecutor objected, arguing that Petitioner wanted "three-to-six so bad," and that the plea itself was the result of "an extended negotiation" in which defense counsel convinced the prosecutor to lower his sentence offer from 4 ½ to 9 years to 3 to 6 years. Petitioner stated that he "didn't want three-to-six," and, again, pointed to the inconsistency in Deshazo's testimony, contending that the court did not make a credibility finding on that point at the pretrial hearing. (*See id.* at 12–14, 865 N.Y.S.2d 61.) The court disagreed: "I believe that was something that came up during the hearing, but I made my determination." (*Id.* at 15, 865 N.Y.S.2d 61.)

The court denied Petitioner's motion to withdraw his plea. (*See id.* at 16, 865 N.Y.S.2d 61.) Petitioner was sentenced to concurrent, indeterminate prison terms of 3 to 6 years on the fourth-degree 2004 drug possession count and 2 ½ to 5 years on the fifth-degree 1999 drug sale count.

## II. Procedural History

### A. *Motion to Vacate Judgment of Conviction*
On March 21, 2006, Petitioner filed a *pro se* motion, pursuant to New York Criminal Procedure Law ("CPL") § 440.10, to vacate the judgment of conviction, contending that: (1) the indictment on the 2004 criminal possession charge was defective because it was based on false testimony; (2) the prosecutor knowingly presented false testimony to the grand jury; (3) there was no probable cause for his arrest; and (4) he was denied the effective assistance of counsel because his attorney failed to: (a) impeach Deshazo's pretrial statements and testimony regarding from which pocket he had recovered the drugs; and (b) seek a motion to dismiss the indictment on the ground that Deshazo provided false statements in the felony complaint and testified falsely before the grand jury. (*See* CPL § 440.10 Motion, dated Mar. 21, 2006, attached as Ex. D to Resp't Mem.)

**\*4** On January 4, 2007, the New York County Supreme Court denied Petitioner's CPL § 440.10 motion. (*See* CPL § 440.10 Decision, dated Jan. 4, 2007 ("440 Decision"), attached as Ex. F to Resp't Mem.) Petitioner sought leave to appeal to the Appellate Division, First Department, raising the same claims asserted in his original CPL § 440 motion. On March 28, 2007, the Appellate Division, First Department,

denied Petitioner's leave application. (*See* Certificate Denying Leave, dated Mar. 28, 2007, attached as Ex. I to Resp't Mem.) Petitioner thereafter filed a motion for reargument in the Appellate Division, First Department. On June 6, 2007, the Appellate Division, First Department, denied Petitioner's motion. (*See* Order Denying Leave Upon Reargument, dated June 6, 2007, attached as Ex. L to Resp't Mem.)

### B. *Direct Appeal*
In his direct appeal, Petitioner argued that: (1) he was denied his counsel of choice when the court proceeded with the pretrial hearing notwithstanding Petitioner's request for an adjournment so that his family could retain a private attorney; (2) the drugs recovered from Petitioner should have been suppressed because the police lacked probable cause to arrest him; and (3) Petitioner's due process rights and right to effective assistance of counsel were violated when: (a) the court denied Petitioner's application for new counsel following his motion to withdraw his guilty plea; and (b) his counsel provided him with inadequate information concerning his case and "coerced" him into pleading guilty by insisting that the court would find him guilty at his bench trial. (*See* Petitioner's Appellate Brief, dated March, 2008, attached as Ex. M to Resp't Mem.)

On October 2, 2008, the Appellate Division, First Department, unanimously affirmed the judgment of conviction. *See People v. O'Kane,* 55 A.D.3d 315, 865 N.Y.S.2d 61 (1st Dep't 2008). Petitioner sought leave to appeal to the New York Court of Appeals, asking the court to review all of the issues raised in the appellate brief. On January 20, 2009, the New York Court of Appeals denied Petitioner's leave application. *See People v. O'Kane,* 11 N.Y.3d 928, 874 N.Y.S.2d 13, 902 N.E.2d 447 (2009).

## DISCUSSION

Petitioner asserts in the instant Petition that: (1) the indictment was defective because Deshazo made false statements in the felony complaint, and the prosecutor knowingly presented false evidence to the grand jury; and (2) he received ineffective assistance of counsel, because his attorney: (a) failed to investigate and impeach Deshazo's purportedly false statements in the felony complaint and pretrial proceedings regarding the jacket pocket from which the drugs were taken; and (b) allowed Petitioner to plead guilty, even though the evidence against him was false. (*See* Pet. at 1–3.)

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  3

## I. AEDPA Standard of Review

Under the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," Id. § 2254(d)(2).

**\*5** A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); accord Hoi Man Yuncr v. Walker, 468 F.3d 169, 176 (2d Cir.2006); Ernst J. v. Stone, 452 F.3d 186, 193 (2d Cir.2006). The phrase, "clearly established Federal law," limits the law governing a habeas Petitioner's claims "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Carey v. Musladin, 549 U.S. 70, 74, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006) (quoting Williams, 529 U.S. at 365, 120 S.Ct. at 1499); accord Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir.2006).

"The 'unreasonable application' standard is independent of the 'contrary to' standard ... [and] means more than simply an 'erroneous' or 'incorrect' application" of federal law," Henry v. Poole, 409 F.3d 48, 68 (2d Cir.2005) (citing Williams, 529 U.S. at 410, 120 S.Ct. at 1522). A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. See Williams, 529 U.S. at 413, 120 S.Ct. at 1523. The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but, rather, whether it was "objectively unreasonable." Id. at 408–10, 120 S.Ct. at 1521–22; see also Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir.2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable.").

Moreover, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.2003) ("This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller–El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003).

## II. Defective Indictment

Petitioner argues, as he did in his CPL § 440 motion, that the 2004 indictment was defective and should have been dismissed. In particular, Petitioner contends that Deshazo's statement—that he recovered the drugs from Petitioner's "right inside jacket pocket"—was false, and that the prosecutor knowingly submitted this false evidence to the grand jury. (See Pet. at 1–3.) Respondent contends, and this Court agrees, that this claim is procedurally barred by an adequate and independent state law ground and is not cognizable in a federal habeas corpus proceeding. Specifically, Petitioner failed to raise this claim in his direct appeal and can no longer do so. In addition, as Respondent argues, the claim is not cognizable on federal habeas review.

### A. Procedural Bar

#### 1. The Law

**\*6** Before a federal court may consider a state prisoner's petition for a writ of habeas corpus, all state remedies must be exhausted. See 28 U.S.C. § 2254(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275–76, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971); Jimenez v. Walker, 458 F.3d 130, 148–49 (2d Cir.2006); Jones v. Vacco, 126 F.3d 408, 413 (2d Cir.1997). To satisfy the exhaustion requirement of 28 U.S.C. § 2254, "it is not sufficient merely that the [petitioner] has been through the state courts." Picard, 404 U.S. at 275–76, 92 S.Ct. at 512–13. Rather, the claims must be "fairly presented" to the state courts so that the state has an opportunity to correct any alleged constitutional violations. See Castille v. Peoples, 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989); Picard, 404 U.S. at 276, 92 S.Ct. at 513; Aparicio, 269 F.3d at 89–90. Moreover, to satisfy this requirement, a petitioner must fairly present his federal claims to the highest state court from which a decision can be had. See Daye v.

*Attorney General,* 696 F.2d 186, 190–91 (2d Cir.1982) (en banc); *accord Morgan v. Bennett,* 204 F.3d 360, 369 (2d Cir.2000); *Pesina v. Johnson,* 913 F.2d 53, 54 (2d Cir.1990) (per curiam).

To have his claims heard by a federal habeas court, a petitioner must return to state court if he has not exhausted his state remedies. *See Engle v. Isaac,* 456 U.S. 107, 125–126 n. 28, 102 S.Ct. 1558, 1570–71 n. 28, 71 L.Ed.2d 783 (1982); *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991); *Robertson v. Artuz,* No. 97 Civ. 2561(DC), 2000 WL 10265, at *3–4 (S.D.N.Y. Jan.4, 2000).[2] However, "[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.' " *Grey,* 933 F.2d at 120 (quoting *Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 1043 n. 9, 103 L.Ed.2d 308 (1989)). If a petitioner has no available state forum in which to pursue a remedy because of a state procedural bar, his claim may be deemed exhausted, yet procedurally barred. *See Teague v. Lane,* 489 U.S. 288, 297–299, 109 S.Ct. 1060, 1068–1069, 103 L.Ed.2d 334 (1989); *Jimenez,* 458 F.3d at 149; *Grey,* 933 F.2d at 120.

[2]    Under AEDPA, however, a court may waive exhaustion if it concludes that a claim should be dismissed on its merits. *See* 28 U.S.C. § 2254(B)(2).

Federal habeas review is generally foreclosed when a petitioner's claim is barred by a state procedural rule which is "independent of [a] federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640 (1991); *accord Brown v. Miller,* 451 F.3d 54, 56 (2d Cir.2006). State procedural bars are independent and adequate when such laws are "firmly established and regularly followed" by the state in question. *James v. Kentucky,* 466 U.S. 341, 348, 104 S.Ct. 1830, 1835, 80 L.Ed.2d 346 (1984); *see also Cotto v. Herbert,* 331 F.3d 217, 239 (2d Cir.2003).

When engaging in an adequacy analysis of the procedural bar, federal courts should give deference to state court decisions and determine if there is a "fair or substantial basis" for the application of the state law to the particular case. *Garcia v. Lewis,* 188 F.3d 71, 78 (2d Cir.1999). "[T]he question is whether application of the procedural rule is 'firmly established and regularly followed' *in the specific circumstances presented in the case,* an inquiry that includes

an evaluation of the asserted state interest in applying the procedural rule in such circumstances ." *Cotto,* 331 F.3d at 240 (citing *Lee,* 534 U.S. at 386–87, 122 S.Ct. at 877) (emphasis added).

**\*7** In *Garvey v. Duncan,* 485 F.3d 709 (2d Cir.2007), the Second Circuit examined the guidelines a habeas court should use to determine the adequacy of a claimed state procedural bar:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Garvey,* 485 F.3d at 714 (quoting *Cotto,* 331 F.3d at 240). While the factors "are not a test for determining adequacy, they are nonetheless used as guides in evaluating 'the state interest in a procedural rule against the circumstances of a particular case.' " *Id.* at 714 (quoting *Lee,* 534 U.S. at 386–87, 122 S.Ct. at 891).

### 2. Application

In his CPL § 440.10 motion, Petitioner argued that the judgment of conviction should be vacated because the 2004 indictment for criminal possession was procured on the basis of false testimony and was, therefore, defective. The New York County Supreme Court rejected Petitioner's motion, holding that his claims in connection with "alleged discrepancies in the witnesses' testimony at various pretrial stages, including at the grand jury and suppression hearing," were "thoroughly explored on the record before [Petitioner] entered a guilty plea" and were, therefore, "not the proper subject of a CPL [§ ] 440 motion." (440 Decision.) The state court noted that "[t]he grand jury minutes were reviewed by

another Court who found them to be legally sufficient" and concluded that "[s]ince sufficient facts appeared on the record to permit review on direct appeal but [Petitioner] failed to make such appeal, [Petitioner's] motion with respect to this evidence is denied." (*Id.*)

Under New York law, all claims that are record-based must be raised in a direct appeal. *See Dunham v. Travis,* 313 F.3d 724, 729 (2d Cir.2002) ("In New York, a criminal defendant may not raise in a § 440 motion a claim that could have been raised on direct appeal."); CPL § 440.10(2)(c) (requiring courts to deny a motion to vacate the judgment where "sufficient facts appear on the record" for the claim to have been raised and decided on direct appeal). Indeed, the denial of a CPL § 440.10 motion for failure to raise a claim on direct appeal represents the application of a "firmly established and regularly followed" New York rule. *See Arce v. Smith,* 889 F.2d 1271, 1273 (2d Cir.1989); *accord Williams v. Goord,* 277 F.Supp.2d 309, 318–19 (S.D.N.Y.2003). It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by bringing a claim under CPL § 440.10. *See* CPL § 440.10(1); *Aparicio,* 269 F.3d at 91.

**\*8** The New York County Supreme Court invoked this adequate and independent state law ground in denying Petitioner's claim that the indictment was defective. In particular, the state court held that since all the facts relating to the claim appeared on the record, Petitioner had an obligation to raise his claims on direct appeal. Petitioner failed to do so. A defendant is entitled to only one direct appeal. *See Jimenez,* 458 F.3d at 149; *Aparicio,* 269 F.3d at 91 (citing CPL § 450.10(1); N.Y. Ct.App. R. 500.10(a)). Thus, Petitioner's claim is procedurally barred under well-established New York law.

The application of the statutory procedural bar in this case satisfies the three factors identified in *Garvey.* As to the first *Garvey* factor, Petitioner's failure to raise his claim on direct appeal was plainly relied upon by the trial court, as evidenced by its decision. As to the second *Garvey* factor, it is clear, under New York law, that where the factual basis of a claim appears on the record, a defendant can raise that claim only on direct appeal, and relief by way of a CPL § 440.10 motion is precluded. Finally, as to the third *Garvey* factor, Petitioner did not "substantially comply" with the state procedural requirement. As the New York Court of Appeals has recognized, "the purpose of the provision is to prevent CPL [§ ] 440.10 from being employed as a substitute for direct

appeal when [a] defendant [is] in a position to raise an issue on appeal (CPL [§ ] 440.10[2][b] ) or could readily have raised it on appeal but failed to do so." *People v. Cooks,* 67 N.Y.2d 100, 103, 500 N.Y.S.2d 503, 491 N.E.2d 676 (1986); *accord Sweet v. Bennett,* 353 F.3d 135, 139 (2d Cir.2003). Here, Petitioner could have, but failed to raise his claim on direct appeal. Had he done so, the Appellate Division could have reviewed his claim, which is now barred from federal habeas review.

### B. *No Cause and Prejudice or Miscarriage of Justice*

If a state court judgment is based on an independent and adequate state procedural rule, federal courts generally cannot review the state court judgment in a habeas corpus proceeding, unless the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565; *see also Jimenez,* 458 F.3d at 149; *Ramirez v. Attorney Gen. of New York,* 280 F.3d 87, 94 (2d Cir.2001); *Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993).

To demonstrate cause for his default, a petitioner must show "that 'some objective factor external to the defense impeded [his] efforts' to raise the claim in state court." *McCleskey v. Zant,* 499 U.S. 467, 493, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991) (quoting *Murray v. Carrier,* 477 U.S. 467, 488, 106 S.Ct. 2639, 2645 (1986)); *accord Bloomer v. United States,* 162 F.3d 187, 191 (2d Cir.1998); *Rolling v. Fischer,* 433 F.Supp.2d 336, 346 (S.D.N.Y.2006). Once a petitioner shows cause, the petitioner must also establish prejudice by demonstrating that there is a "reasonable probability" that, but for the constitutional violation that is the subject of the defaulted claim, the outcome of the relevant proceeding would have been different. *See Strickler v. Greene,* 527 U.S. 263, 289, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286 (1999); *McClesky,* 499 U.S. at 494, 111 S.Ct. at 1471; *accord DiSimone v. Phillips,* 461 F.3d 181, 192 (2d Cir.2006).

**\*9** Here, Petitioner has not argued or demonstrated "cause" for his procedural default; therefore, the Court need not consider the issue of prejudice. *See McCleskey,* 499 U.S. at 502, 111 S.Ct. at 1474; *Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985); *Dixon v. McGinnis,* 492 F.Supp.2d 343, 352 (S.D.N.Y.2007).

Alternatively, a claim that is barred from habeas review pursuant to independent and adequate state grounds can be considered if a petitioner demonstrates that failure to

consider it would result in a miscarriage of justice. A miscarriage of justice occurs "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496, 106 S.Ct. at 2649; *see also Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998); *James,* 996 F.2d at 1447. "Actual innocence means factual innocence, not mere legal insufficiency." *Dunham v. Travis,* 313 F.3d 724, 730 (2d Cir.2002) (quoting *Bousley,* 523 U.S. at 623, 118 S.Ct. at 1611) (internal quotation marks omitted). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence ...." *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 865, 130 L.Ed.2d 808 (1995). The doctrine of actual innocence applies only in "extraordinary case[s]" and "credible claims of actual innocence are extremely rare." *Doe v. Menefee,* 391 F.3d 147, 160–61 (2d Cir.2004) (quoting *Murray,* 477 U.S. at 479, 106 S.Ct. at 2642, and *Schlup,* 513 U.S. at 321, 115 S.Ct. at 864) (internal quotation marks omitted).

There is nothing in the record, however, to suggest that such exceptional circumstances can be demonstrated here. Specifically, without offering new evidence of his innocence, Petitioner cannot establish that a miscarriage of justice has occurred. *See Dunham,* 313 F.3d at 730 ("[Petitioner] presented no new evidence of his innocence and did not make the necessary showing required ... to bypass the procedural bars.").

Accordingly, because Petitioner's claim that the indictment was defective is procedurally barred from further state review, and Petitioner has failed to demonstrate cause and prejudice, or a miscarriage of justice, Petitioner's indictment claim should be dismissed.

C. *Claim is Not Cognizable on Federal Habeas Review*
In addition to being procedurally barred, Petitioner's claim that his indictment was defective is not, on its substance, cognizable in a federal habeas corpus petition.

There is no federal constitutional right to a grand jury in state criminal proceedings. *See, e.g., Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 1226–27, 31 L.Ed.2d 536 (1972). Consequently, errors alleged to have occurred at state grand jury hearings are not reviewable by federal habeas courts. *See Alexander,* 405 U.S. at 633, 92 S.Ct. at 1227; *Fields v. Soloff,* 920 F.2d 1114, 1118 (2d Cir.1990) (holding that Fifth Amendment right to indictment by a grand jury is

not incorporated by the Due Process Clause of the Fourteenth Amendment and does not apply to the states); *Dunn v. Sears,* 561 F.Supp.2d 444, 453 (S.D.N.Y.2008) ("Federal courts have consistently held that the right to appear before the grand jury is not reviewable by a federal habeas court."). This rule applies to claims of perjury occurring before the grand jury. *See May v. Warden,* No. 07 Civ. 2176(BSJ) (GWG), 2010 WL 1904327, at *3 (S.D.N.Y. May 10, 2010); *Brazeau v. Zon,* No. 04–CV–031 (RJA), 2007 WL 2903617, at *7 (W.D.N.Y. Oct.1, 2007) (finding petitioner's claim that prosecutor knowingly suborned perjury in the grand jury *not* cognizable on habeas review, because it asserts errors that allegedly occurred only at the grand jury proceeding). Thus, Petitioner's claim that his indictment is defective because it was procured on the basis of false testimony is a state law issue and affords no basis for federal habeas relief here.

**\*10** Moreover, "[g]enerally a knowing and voluntary guilty plea precludes federal habeas corpus review of claims relating to constitutional rights at issue prior to the entry of the plea." *Whitehead v. Senkowski,* 943 F.2d 230, 233 (2d Cir.1991) (citing *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973)). As the Supreme Court explained:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [acceptable] standards.

*Tollett,* 411 U.S. at 267; *accord United States v. Randall,* 327 Fed. App'x 255, 256 (2d Cir.2009); *see also United States v. Arango,* 966 F.2d 64, 66 (2d Cir.1992) (holding that "[b]y pleading guilty ... [the defendant] waived his right to object to the constitutionality of the search").

Petitioner's claims regarding deficiencies in the felony complaint, and the manner in which the prosecutor procured the indictment, are clearly independent claims arising out of events that occurred prior to the entry of Petitioner's guilty plea. Under well-settled Supreme Court law, these claims were thus waived when Petitioner entered his guilty plea.

Accordingly, Petitioner's claim that the 2004 indictment was defective is not cognizable in this proceeding and should be dismissed.

### III. Ineffective Assistance of Counsel

Petitioner contends that he was denied effective assistance of counsel on two grounds: (1) as Petitioner argued in his CPL § 440 motion, counsel failed to investigate and impeach Deshazo's purportedly false statements in the felony complaint and pretrial proceedings; and (2) counsel allowed Petitioner to plead guilty even though the evidence against him was false, as Petitioner argued on direct appeal. (*See* Pet, at 1–3.)

#### A. *Legal Standard*

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must establish: (1) that his attorney's performance was so deficient that it "fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2068; *accord Cox v. Donnelly,* 387 F.3d 193, 197 (2d Cir.2004).

In evaluating the reasonableness requirement, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound ... strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (internal quotation marks omitted); *accord Cox,* 387 F.3d at 198. The Second Circuit has defined a "strategic decision" as a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." *Cox,* 387 F.3d at 198 (quoting *Pavel v. Hollins,* 261 F.3d 210, 218 (2d Cir.2001)). A court must not use "perfect hindsight to criticize unsuccessful strategies." *Eze v. Senkowski,* 321 F.3d 110, 132 (2d Cir.2003); *see Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *Cox,* 387 F.3d at 198.

*\*11* The "reasonable probability" of prejudice prong of *Strickland* is defined as "a probability sufficient to undermine confidence in the outcome" of the state proceedings. *Strickland,* 44 6 U.S. at 694, 104 S.Ct. at 2068; *see also Cox,* 387 F.3d at 199 ("The level of prejudice [a petitioner] need demonstrate lies between prejudice that had 'some conceivable effect' and prejudice that more likely than not altered the outcome in the case.") (quoting *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir.2001)); *United States v. McCloud,* 303 Fed. App'x 916, 920 (2d Cir.2008) (holding that when ineffective assistance of counsel claims are without merit, they are unable to "demonstrate the prejudice required by the second prong of *Strickland"* ). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland,* 446 U.S. at 700, 104 S.Ct. at 2071.

For the purposes of AEDPA, it is well-settled that the *Strickland* standard constitutes the relevant "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Aparicio,* 269 F.3d at 95 & n. 8; *Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001). Thus, on habeas review, the question before a court is not whether, as a *de novo* matter, the court finds counsel to have been effective or ineffective; rather, the relevant question is whether the state court decision addressing the issue involved an "unreasonable application" of the *Strickland* standard to the facts of the petitioner's case. *See Sellan,* 261 F.3d at 314–15 & n. 6.

#### B. *Application*

##### 1. *Failure to Investigate or Impeach*

Petitioner contends that he was denied effective assistance of counsel because counsel failed to impeach Deshazo's purportedly false statements in the felony complaint and pretrial proceedings.

The New York County Supreme Court rejected Petitioner's ineffective assistance of counsel claim, holding that "the record bears out the fact that [Petitioner] did, in fact, receive meaningful assistance." (440 Decision.) The court found that Petitioner's attorney "filed adequate pretrial motions, represented [Petitioner] appropriately at the suppression hearing and assisted in negotiating a favorable plea bargain for [Petitioner]." (*Id.*) The Appellate Division denied Petitioner's application for leave to appeal. There is no reason to conclude that these state court decisions were contrary

to, or an unreasonable application of, clearly established Supreme Court law.

As an initial matter, any claims regarding Petitioner's attorney's performance—other than those relating to his guilty plea—relate to matters preceding his decision to plead guilty and are, therefore, rendered moot by his guilty plea. *See Tollett,* 411 U.S. at 267, 93 S.Ct. at 1608; *United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997); *Arango,* 966 F.2d at 66.

 **\*12** In any event, there is simply no merit to Petitioner's claim that his attorney was ineffective in failing to investigate and impeach Deshazo's purportedly false statements in the felony complaint and at pretrial proceedings. His attorney, for example, thoroughly investigated whether Deshazo had, in fact, proffered conflicting accounts with respect to the location of the jacket pocket from which the police obtained the crack cocaine. His attorney sent a private investigator to the jail, recovered the jacket, and then introduced it into evidence at the suppression hearing. Although Petitioner's counsel did not cross-examine Deshazo with his inconsistent statement, by introducing the jacket into evidence, his attorney established that the jacket had only a left inside pocket—proving that Deshazo could not have recovered drugs from a "right inside jacket pocket," as he had testified. In other words, by introducing the jacket into evidence and not cross-examining Deshazo, counsel was able to make the important point about Deshazo's testimony, without providing Deshazo an opportunity to explain the inconsistency. This was a legitimate strategic decision. Under *Strickland,* a losing tactic is not necessarily an ineffective one. *See* 466 U.S. at 689, 104 S.Ct. at 2065.

Moreover, even after the inconsistency was drawn to the trial court's attention, the court concluded that it was of no "particular moment to this Court," and that "[Deshazo] was clear that he recovered drugs from the pocket and somebody's left side could be somebody's right side, as far as I am concerned. I don't see the importance of that." (H. at 92.) Indeed, as the court stated on the record, Petitioner already conceded in his grand jury testimony that he did not dispute the fact that Deshazo found crack cocaine in his pocket. (*See id.* at 81.) The key issue in the state court's view was not so much the location of the jacket pocket, but whether the jacket, in fact, belonged to Petitioner. (*See id.*) Hence, even if counsel had cross-examined Deshazo with his prior inconsistent statements about the specific location of the

jacket pocket, this would not have altered the outcome of the suppression hearing.

Accordingly, Petitioner fails to satisfy either prong of the *Strickland* test with respect to this claim.

### 2. *Decision to Plead Guilty*

Petitioner further faults his attorney for allowing him to plead guilty, even though the evidence against him was false. In particular, Petitioner contends that his lawyer provided him with inadequate information concerning his case and "coerced" him to plead guilty by insisting that he would most likely be convicted at a bench trial. The Appellate Division rejected this claim, holding that Petitioner's "arguments concerning his motion to withdraw his plea, including his constitutional claims, are without merit," *O'Kane,* 55 A.D.3d at 316, 865 N.Y.S.2d at 62. The New York Court of Appeals denied Petitioner's leave application. There is no basis to conclude that either decision was contrary to, or an unreasonable application of, clearly established Supreme Court law.

 **\*13** As discussed, Petitioner "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [acceptable] standards ..." *Tollett,* 411 U.S. at 267, 93 S.Ct. at 1608; *accord Grant v. United States,* No. 03 Cr. 725(RPP), 2007 WL 2469450, \*4 (S.D.N.Y. Aug. 31, 2007); *see also United States v. Cayce,* No. 04 Cr. 506(LAP), 2010 WL 2106174, at \*7 (S.D.N.Y. May 19, 2010) (holding that a plea is involuntary "if the defendant made it without the effective assistance of counsel"). There is no indication here that the legal advice received by Petitioner with respect to the decision to plead guilty was not within acceptable standards.

To start, although Petitioner claims that his counsel did not provide him with an opportunity to review the grand jury minutes and police statements prior to trial, as the prosecutor stated on the record, copies of these documents had been provided to Petitioner's attorney, and Petitioner's attorney confirmed that Petitioner had every opportunity to view them with him, and that they "went over everything." (*See* S. at 18, 20.)

In addition, there is no merit to Petitioner's claim that he was "coerced" by his attorney into pleading guilty. Merely being advised of the likely outcome of his trial—conviction— does not constitute coercion. Moreover, given the substantial evidence against him, and the possibility of a lengthy prison

sentence, his plea constituted a fair bargain, which was the product of "extended negotiations," and it was entirely reasonable for his attorney to suggest that he plead guilty according to its terms. Indeed, as the 440 court itself noted: "In the context of a guilty plea, a defendant has been afforded meaningful representation when he or she receives an *advantageous plea* and nothing in the record casts doubt on the apparent effectiveness of counsel." (440 Decision) (citation omitted) (emphasis added).

In particular, if convicted, Petitioner—a five-time predicate felon with a 25–year criminal history—faced a sentence of from 8 1/3 to 25 years on the 2004 drug possession charge, as well as the possibility of a consecutive sentence of up to that same amount of time on his pending 1999 drug sale charge. *See* Penal Law §§ 70.00(2), 70.06(3)(b). After extensive discussions with his attorney, however, Petitioner pled guilty to the lesser charge of fourth-degree criminal possession in exchange for a promised sentence of from 3 to 6 years in prison—to be served concurrently with a sentence of from 2 ½ to 5 years upon his pleading guilty to the 1999 drug sale charge. Petitioner did not waive his right to appeal as a condition of either plea.

Thus, although Petitioner contends that he pled guilty to the 2004 drug possession charge only because his attorney informed him that he would likely be convicted at a bench trial and receive a sentence higher than from 3 to 6 years, in light of his failed suppression motion, as well as the lengthy prison sentence that he risked in proceeding to trial, his lawyer's advice that he accept the guilty plea constitutes, in this Court's view, not coercion, but rational advice.

 **\*14**  In any event, a review of the record plainly establishes that Petitioner's decision to plead guilty to Criminal Possession of a Controlled Substance in the Fourth Degree was knowing, voluntary, and intelligent, and not the result of coercion on the part of his attorney. Having been convicted of felony drug dealing and possession in the past, it is clear that Petitioner understood the charge to which he pled guilty in the instant case. Moreover, there is no doubt that the court elicited Petitioner's voluntary admission of guilt. Specifically, Petitioner assured the court that no one had threatened, or otherwise compelled him, to plead guilty, and that he was pleading guilty voluntarily, and of his own free will. (*See* P. at 110.) "These statements create a presumption that his plea was knowing and voluntary, a presumption that is not overcome by vague and unsupported assertions that his attorneys failed to properly advise him." *United States v. Tremblay,* No.

08 Civ. 7030(JFK), 2009 WL 1055007, at *7 (S.D.N.Y. Apr.20, 2009); *see also Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *United States v. Hernandez,* 242 F.3d 110, 112–13 (2d Cir.2001) (holding that petitioner's conclusory allegation that he was "misled about the consequences of his guilty plea by his attorney" did not overcome the presumption, created by his sworn statements made in open court, that his guilty plea was knowing, voluntary, and made after extensive discussions with his attorney).

Moreover, throughout the pretrial proceedings, the state court repeatedly reminded Petitioner that the decision to plead guilty was entirely "up to" him and explained to Petitioner that if he did not plead guilty, he would be "tak [ing] a chance" and "roll[ing] the dice," as his sentence could be "at least 4 ½ to 9 [years]"—if not "higher"—if he were found guilty at trial. (*See* H. at 77–81.) In other words, Petitioner's guilty plea was entered voluntarily, and with a full understanding of the "risks" associated with pleading not guilty. (*See id.* at 82.)

Accordingly, for all the reasons given, Petitioner's claim of ineffective assistance of counsel is meritless and should be dismissed.

## *CONCLUSION*

For the reasons set forth above, this Court respectfully recommends that Petitioner's request for habeas relief be denied and that this action be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of the denial of a federal right, the Court recommends that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.2000). The Court further recommends that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 920–21, 8 L.Ed.2d 21 (1962).

 **\*15**  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (d) (2008). Such objections

shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Harold Baer, Jr., United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Baer. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 145, 155, 106 S.Ct. 466, 470, 475, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3809945

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3918158
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David O'KANE, Petitioner,
v.
Robert KIRKPATRICK, Respondent.

No. 09 Civ. 05167(HB)(THK).
|
Aug. 25, 2011.

**OPINION & ORDER**

Hon. HAROLD BAER, JR., District Judge. *

*

> Ernesto Rodriguez, a law student at American University Washington College of Law and a summer 2011 intern in my Chambers, provided substantial research and writing assistance on this Opinion and Order.

**\*1** Pro se petitioner David O'Kane brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state court conviction and sentence on charges of Criminal Possession of a Controlled Substance in the Fourth Degree (N.Y. Penal Law § 220.09). Magistrate Judge Katz issued a Report and Recommendation ("R & R"), in which he recommends that the petition be denied and that the action be dismissed with prejudice. Petitioner filed timely objections to the R & R on April 15, 2011.

## I. BACKGROUND

**A. Factual and Procedural History**
On January 7, 2004, an undercover detective observed Petitioner handing objects to three individuals. The detective followed O'Kane into a store, where he searched petitioner's jacket and recovered 50 ziplock bags of crack cocaine. The detective attested that he recovered the crack cocaine from the right pocket; Petitioner has stressed throughout the proceedings that the jacket had only a left pocket, not a right pocket. On May 5, 2004, Petitioner pleaded guilty to criminal possession of a controlled substance in the fourth degree (N.Y. Penal Law § 220.09) and received a sentence of 3 to 6 years.

On March 21, 2006, O'Kane filed a pro se motion pursuant to New York Criminal Procedure Law ("CPL") § 440.10 to vacate the judgment of conviction, which the New York Country Supreme Court denied. The Appellate Division, First Department, denied Petitioner leave to appeal on March 28, 2007, and denied leave to reargue on June 6, 2007.

Petitioner appealed his conviction directly. On October 2, 2008, the Appellate Division, First Department, unanimously affirmed the judgment of conviction. *People v. O'Kane,* 55 A.D.3d 315, 865 N.Y.S.2d 61 (1st Dep't 2008). Petitioner sought leave to appeal to the New York Court of Appeals, which was denied on January 20, 2009. *People v. O'Kane,* 11 N.Y.3d 928, 874 N.Y.S.2d 13, 902 N.E.2d 447 (2009).

Petitioner commenced this *pro se* action on June 3, 2009. He amended the petition on January 29, 2010, arguing a defective indictment and ineffective assistance of counsel. The petition was referred to Magistrate Judge Katz, who issued a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C) on February 15, 2011 (the "R & R").

**B. Magistrate Judge Katz's Report & Recommendation**
After carefully evaluating the submissions, Magistrate Judge Katz recommended that Petitioner's petition for a writ of habeas corpus be denied. The R & R notes that Petitioner's claims are reiterations of previous arguments made in state court. Petitioner's allegation that false witness testimony was used to convict him was discussed at length. *See* R & R at 10–24. Judge Katz found that the claim is procedurally barred and is not cognizable in a federal habeas corpus proceeding. R & R at 13. Judge Katz also seriously considered petitioner's objection to effectiveness of appellate counsel. *See* R & R at 24–34. He concluded that petitioner's claim is "meritless" under the standard established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Judge Katz found counsel's performance met the *Strickland* standard, and noted that a strategy is not shown to be bad merely because it ultimately fails. Additionally, given the facts and allegations against Petitioner, Judge Katz noted that Petitioner received a relatively favorable plea deal. This supported his conclusion that Petitioner's counsel met at least an objective standard of reasonableness in representing Petitioner.

**C. O'Kane's Objections**

**\*2**  Petitioner submitted his Objections to Judge Katz's R & R on April 15, 2011. Petitioner reiterated the arguments that he made in his original petition, including: (A) that the police officers did not have probable cause to search him; (B) that Detective Deshazo's testimony regarding where the drugs were found was false and inadmissible; (C) that Petitioner never stated that the jacket was his; (D) that Petitioner never cooperated in the trial proceedings; and (E) that his counsel at trial was ineffective. Petitioner also included several exhibits with excerpts from proceedings in the case in support of his arguments.

## II. STANDARD OF REVIEW

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *New York Dist. Council of Carpenters Pension Fund v. Perimeter Interiors, Inc.,* 657 F.Supp.2d 410, 414 (S.D.N.Y.2009). This Court reviews *de novo* those parts of the R & R to which objections are made, and reviews the remainder for clear error. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b)(3); *Perimeter Interiors,* 657 F.Supp.2d at 414. "When a party makes only generalized or conclusory objections, or simply reiterates his original arguments, the Court reviews a magistrate judge's report and recommendation for clear error." *Perimeter Interiors,* 657 F.Supp.2d at 414. "The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections." *Dotson v. Zenon,* 549 F.Supp.2d 1291, 1299 (D.Colo.2008) (Citations omitted). Where portions of the R & R are uncontested or not subject to *de novo* review, "a district court need only satisfy itself that there is no clear error on the face of the record." *Reyes v. Mantello,* No. 00–Civ.–8936, 2003 WL 76997, at \*1 (S.D.N.Y. Jan.9, 2003).

## III. DISCUSSION

### A. Defective Indictment

Petitioner's objections A through C to the R & R are reiterations of the original arguments he made to support his defective indictment claim in this Court. I therefore review the R & R's findings on the defective indictment claim for clear error. *See Perimeter,* 657 F.Supp.2d at 414.

Petitioner argues that he was subject to a defective indictment, and that because of this his guilty plea should be dismissed. Judge Katz rejected Petitioner's claim because, in general, federal habeas courts may not review the judgment of a state court that rests on a procedural default that is "independent of [a] federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Additionally, because Petitioner failed to show a potential for prejudice or miscarriage of justice, his request for relief cannot be granted with respect to the defective indictment. *See id.* at 750.

### 1. *Procedural Bar/Independent and Adequate Support for the Judgment*

**\*3**  When reviewing state criminal proceedings, a federal habeas court must evaluate any procedural errors under the following guidelines: (1) whether the procedural violation was depended on by the trial court; (2) whether state case law demands compliance with the procedure in the instant case; and (3) whether compliance with the rule in the instant case would have served a legitimate governmental interest. *Garvey v. Duncan,* 485 F.3d 709 (2d. Cir.2007) (citing *Lee v. Kemna,* 534 U.S. 362, 381–5, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)).

Judge Katz properly applied the *Garvey* guidelines. Judge Katz concluded that, when the state 440.10 court rejected Petitioner's defective indictment argument as raised on his CPL 440.10 motion, it plainly relied on Petitioner's error in not previously raising that argument on a direct appeal. Petitioner did not include the defective indictment claim in his subsequent direct appeal, and is therefore barred from bringing it in subsequent appeals. The New York Court of Appeals ruled that the discrepancies in testimony that Petitioner alleges as the basis for his claim were adequately adjudicated by the trial court, and that any objections to the discrepancies should have been raised during the direct appeal process.

With respect to the second prong, state law is clear in New York that claims raised based on issues in the record must be brought on direct appeal. *Dunham v. Travis,* 313 F.3d 724, 729 (2d Cir.2002). Lastly, New York law requires compliance to prevent parties from subverting the appropriate appeals process. *People v. Cooks,* 67 N.Y.2d 100, 103, 500 N.Y.S.2d 503, 491 N.E.2d 676 (1986). As Judge Katz points out, the New York Court of Appeals has established this as a governmental interest, and therefore the third prong of *Garvey* is satisfied.

O'Kane v. Kirkpatrick, Not Reported in F.Supp.2d (2011)

2011 WL 3918158

### 2. Potential Prejudice

Judge Katz next evaluated whether there was "actual prejudice as a result of the alleged violation of federal law," or if the Petitioner could "demonstrate that failure to consider the claims [would] result in a fundamental miscarriage of justice" *Coleman,* 501 U.S. at 750. Judge Katz's analysis on this issue, however, demonstrates that such prejudice or potential miscarriage of justice were not evident in the Petitioner's case.

Additionally, Judge Katz reported that Petitioner's claim of a faulty indictment by grand jury is not a cognizable claim under federal habeas review. There is no federal constitutional right to a grand jury in state criminal proceedings. *See, e.g., Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 1226–1227, 31 L.Ed.2d 536 (1972). Because Petitioner's claim is based on state law, it is not reviewable in a federal habeas court. *See id.*

Lastly, Judge Katz emphasized the fact that Petitioner's guilty plea precludes him from raising constitutional defenses related to testimony before the plea was entered. Petitioner made his guilty plea in state court without coercion and with an understanding of the importance of making such a plea. A "knowing and voluntary guilty plea precludes federal habeas review of claims relating to constitutional rights at issue prior to the entry of the plea." *Whitehead v. Senkowski,* 943 F.2d 230, 233 (2d Cir.1991). I find no clear error in Judge Katz's findings on the defective indictment claim.

### B. Ineffective Assistance of Trial Counsel

 **\*4** Petitioner's arguments related to the ineffectiveness of trial counsel, asserted in objections D and E, merely reiterate what he argued in the petition for habeas corpus. Petitioner did not raise specific objections to Judge Katz's thorough analysis, so that analysis must be reviewed for clear error. *See Perimeter,* 657 F.Supp.2d at 414.

The Antiterrorism and Effective Death Penalty Act (AEDPA) does not allow federal *habeas* relief where a state court has made a decision on the merits, unless the state court's decision is "contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §§ 2254(d)(1). In order to prevail on an ineffective assistance of counsel challenge, petitioner must show that counsel's work (1) fell below an objective standard of reasonableness; and (2) there is a "reasonable probability that but for the counsel's unprofessional errors, the result of the proceeding would

have been different." *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In evaluating the reasonableness requirement, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound ... strategy." *Id.* at 689. Further, the "reasonable probability" of prejudice prong of Strickland is defined as a "probability sufficient to undermine confidence in the outcome" of the state proceedings. *Id.* at 694. For the purpose of the AEDPA, Strickland is recognized as the "clearly established federal law, as determined by the Supreme Court of the United States." *See Arparicio v. Artuz,* 269 F.3d 78, 95 (S.D.N.Y.2001).

Petitioner argues that counsel provided ineffective assistance when he failed to impeach Detective Deshazo for inconsistencies related to whether the crack cocaine was found in the right or the left pocket. However, "[f]ailure to raise a meritless claim does not amount to ineffective assistance." *United States v. Arena* 180 F.3d 380, 396 (2d Cir.1999). As Judge Katz notes, counsel's strategy to enter the jacket into evidence and deny Deshazo the ability to explain the inconsistency in his testimony was an indication of effective legal assistance. R & R at 28. In the end, the state trial court during a pretrial hearing found Deshazo's inconsistency to be of no "particular moment," as the drugs were recovered from Petitioner in the course of the arrest. *Id.* at 29. As Judge Katz notes, a strategy is not shown to be bad merely because it ultimately failed. Judge Katz's analysis is correct and is adopted.

Additionally, Petitioner argues that he received ineffective assistance because his attorney coerced him into the plea agreement. Judge Katz notes that this argument was rejected in the Appellate Division, and that in sum there is "no basis to conclude that [the Appellate Division's] decision was contrary to, or an unreasonable application of, clearly established Supreme Court law." R & R at 30. Further, Judge Katz correctly draws the inference that counsel's advice to Petitioner to take the plea deal rather than face a longer prison sentence, given the realities of the case, was a fair appraisal of the situation and resulted in a good deal for Petitioner. Petitioner has shown no clear error in the R & R.

### C. Motion to Amend Petition

 **\*5** Petitioner requested leave that he be allowed to amend his petition to include a claim of ineffective assistance of

appellate counsel. Irrespective of any procedural problems this request might face, the requested amendment has no merit. Petitioner's claim is based in the same argument he made with respect to his trial counsel: Petitioner claims that appellate counsel was ineffective because counsel failed to raise arguments regarding inconsistencies in Detective Deshazo's testimony. Appellate counsel are held to the same standard of effectiveness applicable to trial counsel. *See Aparicio,* 269 F.3d at 95 ("Although it was born in the context of ineffective assistance of trial counsel, *Strickland's* two-prong test applies equally to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right."). Accordingly, as detailed, *supra,* Petitioner's claim is without merit. Petitioner has the burden to prove that counsel's assistance was ineffective, and fails to meet this burden in either his complaints about appellate counsel or trial counsel. Petitioner's motion to amend is moot because, even if granted, the amendment would provide no grounds for relief The motion is denied.

## IV. CONCLUSION

For the foregoing reasons, Petitioner's objections to Magistrate Judge Katz's February 15, 2011 R & R are unpersuasive. The R & R is adopted in its entirety, and Petitioner's § 2254 application for writ of habeas corpus is DENIED. As the Petition makes no substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253.

The Clerk of Court is directed to close the matter and remove it from my docket.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3918158

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 132 of 267
Evans v. Bennett, Not Reported in F.Supp.2d (2001)
2001 WL 36006042

2001 WL 36006042
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond EVANS III, Petitioner,
v.
Floyd BENNETT, Superintendent,
Elmira Correctional Facility, Respondent.

No. 98CV1706 (LEK/DRH).
|
Nov. 20, 2001.

**Attorneys and Law Firms**

Raymond Evans, III, Elmira Correctional Facility, Elmira, New York, Petitioner pro se.

Hon. Eliot Spitzer, Attorney General for the State of New York, Office of Attorney General, Syracuse, New York, for Respondent.

Kathleen M. Dougherty, Assistant Attorney General, of counsel.

*DECISION AND ORDER*

KAHN, J.

 **\*1**  This matter comes before the Court following a Report-Recommendation filed on July 27, 1999, by the Honorable David R. Homer, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Petitioner, which were filed on August 5, 1999.

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id* . This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

ORDERED, that the Report-Recommendation is APPROVED and ADOPTED in its ENTIRETY; and it is further

ORDERED, that Petitioner's application for a writ of habeas corpus is DENIED; and it is further

ORDERED, that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

REPORT-RECOMMENDATION AND ORDER [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.4.

HOMER, Magistrate J.

Petitioner Raymond Evans, III ("Evans"), an inmate at Elmira Correctional Facility, was convicted of murder in the second degree and criminal possession of a weapon in the second degree following a jury trial in Onondaga County Court. He was sentenced principally to a total indeterminate term of twenty-five years to life imprisonment. Evans now contends that he was denied various constitutional protections in the state court proceedings and seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the following grounds:

 1) the evidence was insufficient to prove intent or to support the verdict;

 2) he was denied a fair trial by the prosecutor's voir dire, cross-examination and summation;

 3) he was denied the effective assistance of trial counsel; and

 4) the court sentenced him based on a derogatory presentence report. For the reasons which follow, it is recommended that the petition be denied.

I. Background

On October 17, 1994, Evans and his girlfriend, Stacy Arnold were arguing about an alleged relationship between Arnold

Evans v. Bennett, Not Reported in F.Supp.2d (2001)

2001 WL 36006042

and another woman. Doc. 10, pp. 525-26.[2] That evening Evans was carrying a loaded nine-shot, .22 caliber revolver. *Id.* at 531-32. As the argument between Evans and Arnold escalated, Evans became angrier and fired one shot into the floor of the kitchen where Evans and Arnold were talking. *Id.* at 534. Evans then walked out of the kitchen but abruptly returned. *Id.* at 536. When Evans walked back into the kitchen, he walked up to Arnold and, standing only a few feet away from her, fired a shot into Arnold's upper body. He then turned to walk out of the kitchen and, as he did, turned and said, "My God, I'm sorry." *Id.* at 541. Evans then left the scene; Arnold subsequently died as a result of the gunshot wound. *Id.* at 541 & 755.

2      "Doc." followed by a number refers to documents in the state court record as provided by respondent. Docket No. 7.

**\*2** On October 17, 1994, a grand jury returned a two-count indictment. Doc. 1. On November 2, 1994, Evans entered a plea of not guilty to each count. Doc. 2, p. 3. After a jury trial, Evans was found guilty on both counts. Doc. 10, p. 1095. Evans was sentenced on June 9, 1995 to twenty-five years to life imprisonment on the murder count and a concurrent, indeterminate sentence of five to fifteen years imprisonment on the criminal possession of the weapons count. Doc. 12, p. 12-13. Evans was also ordered to pay $5,000 in restitution. *Id.* at 13.

Evans appealed the conviction to the Appellate Division which affirmed the conviction but modified the sentence by vacating that portion awarding restitution. *People v. Evans,* 662 N.Y.S.2d 651 (4th Dep't 1997). Leave to appeal to the New York Court of Appeals was denied on November 24, 1997. 667 N.Y.S.2d 687 (1997). The instant petition followed.

II. Discussion

A. Sufficiency of the Evidence

Evans contends that the testimony from the witnesses at trial was inconsistent because their perceptions were affected by their use of drugs and alcohol when the shooting occurred. In addition, Evans argues that their testimony was inconsistent due to the mass confusion that existed when the shooting occurred.

A petitioner is entitled to habeas corpus relief if it is determined from evidence at trial that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 324 (1979). Where a federal habeas corpus court is faced with a conflicting factual record, it must be assumed that the "trier of fact resolved any such conflicts in favor of the prosecution." *Id.* at 326. It is for the jury to determine "the weight of the evidence [and] the credibility of the witnesses." *Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996). The sufficiency of the evidence must be looked at in a "light most favorable to the prosecution." *Bossett v. Walker,* 41 F.3d 825, 830 (2d Cir.1994). In addition, it must be determined if the record is lacking so much evidentiary support that a due process issue is raised. *Id.* In determining whether relief is warranted, a court must consider the jury's determination of the weight of contradictory evidence, the reliability given to the witnesses testimony and "the inferences drawn from the evidence." *Thomas v.. Scully,* 854 F.Supp. 944, 954 (E.D.N.Y.1994).

Bertalan Lakatos, a witness for the prosecution, testified that on October 17, 1994, throughout the course of the evening, Evans and Arnold were arguing over a relationship between Arnold and another woman. Doc. 10, pp. 525-26. Lakatos testified that at one point in the evening, he saw Evans with a nine-shot, .22 caliber revolver in his hand. *Id.* at 531. He testified that he saw Evans go into the kitchen where Arnold was and he heard them begin to argue about Arnold's relationship with the other woman. *Id.* at 532. Lakatos then testified that he saw Evans fire the gun into the floor of the kitchen, say "Fuck it," and walk out of the kitchen. *Id.* at 535. He testified that immediately after walking out of the kitchen, Evans walked back in. *Id.* Lakatos then testified that when Evans was back in the kitchen, he walked over to Arnold with the gun raised and pointed at Arnold's upper body. *Id.* at 537-38. Evans was only a few feet away from Arnold when he fired the gun. *Id.* at 538. Lakatos testified that after Evans had shot the gun, he said "Fuck you" and walked out of the kitchen. *Id.* at 539-40.

**\*3** Misty Ormsby the owner of the house where the shooting took place, testified that on October 17, 1994, she heard a gunshot go off in her kitchen. Doc. 10, pp. 599-600. Ormsby became alarmed at the sound of the shot and she went into the kitchen to investigate. *Id.* at 600-01. When she went into the kitchen, she saw both Evans, whom she saw with a gun in his hand, and Arnold in the kitchen. *Id.* at 601. Ormsby testified that she told Evans to "chill" and that Evans put the gun about six inches from her neck and said, "Bitch, don't even think

2001 WL 36006042

I won't shoot you." *Id.* at 606. She testified that Arnold said something to Evans, who then walked over to Arnold. *Id.* at 608. Ormsby testified that Evans then raised the gun, pointed it at Arnold and said, "I'll shoot you ." *Id.* at 611. Ormsby testified that Evans was standing only a few inches away from Arnold with the gun raised when he shot Arnold in the neck. *Id.* at 609.

Pamela Morrissette testified that earlier in the day Evans had shown her the gun, its cleaning kit and its bullets. Doc. 10, p. 680. Morrissette testified that Evans had been following Arnold around that day. *Id.* at 716-17. She also testified that she had been fearful for Arnold and tried to help Arnold leave the premises. *Id* . at 665-66. Morrissette testified that she was in the kitchen with Arnold when Evans came in. *Id.* at 667. Morrissette then testified that Ormsby then came into the kitchen. *Id.* at 669. She said that Evans and Ormsby were in the kitchen arguing, when Evans said "shut up," to Ormsby and fired the gun into the floor. *Id.* at 670. Morrissette testified that Evans then turned to Arnold and said, "Shut up bitch, I'll shoot you too," and then shot her. *Id.* at p. 675. She also testified that when Evans shot Arnold, the gun was on her neck. *Id.* at 676.

The testimony of the three witnesses all confirm that Evans fired one shot into the kitchen floor before turning the gun on Arnold. In addition, the witnesses all testified that Evans had been arguing with Arnold and was upset with her. All three witnesses confirm that Evans used language and conduct that established his intent to murder Arnold. There is no inconsistency between the statements of Lakatos, Ormsby and Morrissette regarding Evans' anger toward Arnold on October, 17, 1994, nor was there any inconsistency in the fact that it was Evans who fired the first shot into the kitchen floor and it was Evans who fired the fatal shot into Arnold's neck.

In addition, a witness testified that the particular gun used by Evans could only be shot when the trigger was released. Doc. 10, p. 794. Gary Pratt, a firearms examiner with the Syracuse Police Department, testified that after the gun had been fired, the only way it could be fired again was if the hammer was manually reset. *Id.* at 796. This meant that after Evans had fired the shot into the floor of the kitchen, the only way he could shoot again was if he reset the hammer. By resetting the hammer, Evans intentionally set off the gun. The gun could not have fired automatically as Evans claimed. Doc. 10, p. 891. Rather, viewed in the light most favorable to the prosecution, the evidence established that Evans reset the hammer prior to shooting Arnold. When Evans pulled the trigger, knowing the hammer was cocked, he intentionally shot Arnold. The Chief Medical Examiner for Onondaga County, Dr. Sigmund Menchel, testified that the cause of death to Arnold was a gunshot wound to the neck. Doc. 10, p. 755. In addition, Menchel testified that there was an area of blackened soot around the gunshot wound to the neck, which, according to Menchel, indicated that the gun was fired only inches from Arnold's neck. *Id.* at 750.

 **\*4**  Evans testified that he believed Arnold was having "romantic relationships" with other women that lived in the house with her. Doc. 10, p. 877. Evans admitted to being angry with Arnold on October 17, 1994 about Arnold's other relationships. *Id.* at 884 & 935. Evans testified that he had fired the gun he was carrying, several times throughout the day on October 17, 1994. *Id.* at 931. He testified that he went into the kitchen with Arnold and Ormsby, and that upon their arrival in the kitchen, Morrissette was there. *Id.* at 886. Evans testified to becoming upset at Arnold again in the kitchen when she would not tell him what she was discussing with Ormsby. *Id.* at 888. It was at this point, Evans testified, that he took out his gun and shot into the floor. *Id.* at 889. Evans testified that he shot the gun off into the floor to get Arnold's attention. *Id.* at 937. Evans then admitted to cocking back the hammer of the gun after the first shot and asking Arnold "again why she wasn't talking to him." *Id.* at 889. Evans then testified that Ormsby had said something to him and he told her to "Shut the Hell up." *Id.* at 890. Evans testified that the gun was close to Arnold's neck when it went off. *Id.* at 947. Evans testified that after Arnold was shot, he left the scene because the police were on their way and he did not want to get arrested. *Id.* at 893. He testified that he then disposed of the gun in bushes near his grandmother's apartment. *Id.* at 894.

Under the New York Penal Law, "a person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct." N.Y. Penal Law § 15.05 (McKinney 1999). Intent can "be inferred from conduct as well as the surrounding circumstances." *People v. Wallace,* 630 N.Y.S.2d 439, 440 (4th Dep't 1995). If comments and conduct are inconsistent with an accident defense, then intent will be inferred. *People v. Williams,* 574 N.Y.S.2d 48, 49 (1st Dep't 1991). Intent can also be inferred where evidence establishes that in order for a gun to fire, the hammer must be pulled manually. *Id.* Evidence establishing that a defendant shot at close range into the victim's head will suffice to "support an inference" that the defendant intended to kill the

victim. *People v. Lawrence,* 588 N.Y.S.2d 471, 472 (4th Dep't 1992).

Here, there was sufficient evidence for the jury to conclude that Evans consciously desired to shoot Arnold and that he intentionally did so. Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to infer intent from Evans' conduct and comments. *Bossett,* 41 F.3d at 830. In addition, there was sufficient evidence to infer intent from Evans' manual pull of the hammer. Finally, there was sufficient evidence to infer intent from the close range at which Evans shot Arnold. After the first shot into the floor, Evans left the kitchen and then reentered. Doc. 10, p. 535. There was sufficient evidence for the jury to determine that Evans consciously reentered the kitchen to shoot Arnold. Reentering with the gun raised and cocked in front of him provides ample evidence for the jury to find Evans' conscious intent to reenter the kitchen and shoot Arnold. *Id.* at 537-38.

*\*5* The evidence at trial was sufficient to prove intent and uphold the jury's verdict. For these reasons, Evans' first claim must fail.

### B. Prosecutorial Misconduct

Evans contends that the prosecutor engaged in misconduct when he (1) questioned the prospective jurors in a manner designed to diminish the burden of proof, (2) cross-examined Evans in a manner designed to diminish Evans' character, and (3) delivered a summation designed to inflame the passions of the jury against Evans, attacking the defense and vouching for the credibility of his witnesses.

For a defendant to establish a deprivation of due process, he must establish that he suffered substantial prejudice as a result of a prosecutor's misconduct. *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981). In determining whether the defendant suffered substantial prejudice, the court must look at the severity of the misconduct, the steps the trial court took to remedy the misconduct and the "certainty of conviction absent the prejudicial conduct." *Id.*

In order for misconduct to amount to a constitutional violation, the prosecutor must have made statements that tainted the trial with unfairness to such a degree that the conviction resulted in a "denial of due process." *Gonzalez v. Sullivan,* 934 F.2d 419, 424 (2d Cir.1991). The court must look at the prosecutor's statements in the context of the

"defense argument" that came before the comments. *Darden v. Wainwright,* 477 U.S. 168, 179 (1986). In determining whether a prosecutor's comments "deprived the petitioner of a fair trial," the comments must be placed in context. *Blissett v. Lefevre,* 924 F.2d 434, 440 (2d Cir.1991). Ultimately, the question becomes whether a petitioner has established "actual prejudice in light of the totality of the circumstances surrounding the trial court conviction." *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994). A conviction for a crime will not be reversed based on a "prosecutors' remarks in an otherwise fair proceeding." *Gatto v. Hoke,* 809 F.Supp. 1030, 1040 (E.D.N.Y.1992).

### A. Voir Dire

A prosecutor's statements during voir dire regarding the burden of proof may be rectified during the jury charge when the judge instructs the jury that any argument made by counsel on either side is not evidence and that the jury is not bound by such arguments. *Felker v. Turpin,* 83 F.3d 1303, 1310 (11th Cir.1996). When jury instructions clearly advise that lawyers' comments are not to be considered as evidence, improper remarks by the prosecutor during trial will generally fail to establish a denial of due process to the defendant. *Williams v. Groose,* 77 F.3d 259, 262 (8th Cir.1996).

As the Appellate Division observed, the prosecutor here only engaged in the standard trial tactic of questioning the prospective jurors on their potential reaction to certain areas of his case and then measuring their responses. *Evans,* 662 N.Y.S.2d at 652-53. The prosecutor did not suggest that the prosecution's burden of proof was diminished. Even if the prosecutor had questioned the jury in a manner designed to diminish his burden of proof, the judge rectified any such statement in his charge to the jury. Doc. 10, pp. 1036-43. As a result, Evans was not denied due process by any statements of the prosecutor.

### B. Cross-Examination and Summation

*\*6* Evans next contends that he was denied due process of law by improper comments made by the prosecutor during his cross-examination of Evans and during his summation. Three factors must be weighed in determining whether there was substantial prejudice as a result of the prosecutor's misconduct. *Modica,* 663 F.2d at 1181. The first factor is the severity of the misconduct. *Id.* Here, the prosecutor's conduct was not severe enough to rise to the level of egregiousness. During cross-examination, Doc. 10, pp. 901-50, the prosecutor questioned Evans concerning Evans'

claim that he would sometimes buy food for people in need. The prosecutor asked Evans, "You're kind of like a Meals on Wheels, aren't you?" *Id.* at p. 910. An objection to the question was sustained. *Id.* During his summation, *id.* at pp. 998-1029, the prosecutor repeatedly referred to Evans derisively as "Mr. Miami," *id.* at pp. 1004, 1011, 1014, 1016 & 1017, and as "a Fortune 500 dope dealer." *Id.* at p. 1009. Such comments may have been inappropriate, [3] but in the context of the cross-examination and summation, they did not cause substantial prejudice to Evans.

[3]     The Appellate Division found these comments improper but harmless. *Evans,* 662 N.Y.S.2d at 653 ("the prosecutor engaged in misconduct by his overzealous cross-examination of defendant in the nature of character assassination, and by his repeated extraneous sarcastic remarks during summation").

The second factor is the steps taken to repair the misconduct. *Modica,* 663 F.2d at 1181. Throughout the trial, the prosecutor's allegedly improper questioning was objected to by the defense. Doc. 10, pp. 905, 910, 915, 924, 933 & 949. The trial court promptly sustained such objections. *Id.* The court, as well as Evans' attorney, took the appropriate steps to correct the prosecutor's misconduct. *Id.*

Finally, the court must assess "the certainty of conviction absent the improper statements." *Modica,* 663 F.2d at 1181. Here, as described above in subsection A, the evidence of Evans' guilt was overwhelming. Evans' conviction, therefore, was certain even absent the prosecutor's improper statements. *Cf. Evans,* 662 N.Y.S.2d at 653 (same).

Evans has thus failed to demonstrate that the prosecutor's misconduct at trial was so egregious as to prejudice the trial and the jury against him. Accordingly, Evans' claim of prosecutorial misconduct must fail.

### C. Ineffective Assistance of Trial Counsel

Evans claims he was denied the effective assistance of trial counsel when his counsel failed to introduce evidence establishing Evans' blood alcohol level and drug content at the time of his arrest. According to Evans, this failure deprived him of the ability to prove his lack of intent to commit murder. In addition, Evans claims that his counsel's failure to object to the prosecution's summation, request curative instructions

or move for a mistrial deprived him of effective assistance of counsel.

In order to prove ineffective assistance of trial counsel, Evans must show that his counsel's errors were so serious that "counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment" and that the errors denied the petitioner his right to a fair trial. *Strickland v. Washington,* 466 U.S. 669, 687 (1984); *Nell v. James,* 811 F.2d 100, 106 (2d Cir.1987). If the petitioner fails to show either "deficient performance or sufficient prejudice," then the ineffectiveness claim will fail. *Strickland,* 466 U.S. at 700. The petitioner must show that counsel's performance fell below "an objective standard of reasonableness." *Id.* at 687-88. If the error made by counsel had no effect on the outcome of the trial, judgment should not be set aside based on that error. *Id.* at 691.

### 1. Trial Counsel's Failure to Submit Evidence

**\*7** In order to establish ineffective assistance of trial counsel based on counsel's failure to submit evidence, a petitioner must show that the failure was "constitutionally unreasonable" and, if the evidence had been submitted, that petitioner's conviction might not have resulted. *Walker v. Kernan,* No. C-95-0101 SI, 1997 U.S. Dist. LEXIS 3857, at \*20 (N.D.Cal. Mar. 25, 1997), *aff'd,* 156 F .3d 1241 (9th Cir.1998). A petitioner must meet a "but for" test between counsel's conduct and the outcome of the trial. *United States ex rel Tenner v. Gilmore,* No. 97 C 2305, 1998 U.S. Dist. LEXIS 16188, at \*75 (N.D.Ill. Oct. 8, 1998), *aff'd,* No. 98-3814, _ F.3d _ 1999 U.S.App. LEXIS 11893 (7th Cir. June 9, 1999).

Evans' counsel questioned Evans as to how much alcohol he consumed on the day of Arnold's murder. Doc. 10, pp. 873. During Evans' cross-examination, however, he testified that he had not consumed much alcohol that day. *Id.* at 902. Therefore, the amount of alcohol Evans' believed he had ingested was presented to the jury through Evans' testimony at trial. *Id.* at 873 & 902. Intent was established through the use of the gun, as well as through Evans' comments and conduct throughout the evening of Arnold's murder. That evidence was overwhelming and there is no reason to believe the result would have been different if Evans' counsel had offered this additional evidence.

### 2. Failure to Object to Statements Made During the Prosecutor's Summation

When counsel fails to object to statements made during the summation, his failure to do so often "represents a tactical decision" to avoid drawing attention to the prosecutor's statements. *Gatto,* 809 F.Supp. at 1039. "Trial advocacy is an art and the advocate must be given some latitude in deciding upon an appropriate trial strategy." *United States v. Helgesen,* 669 F.2d 69, 72 (2d Cir.1982).

The decision of Evans' counsel not to object to comments made by the prosecutor during his summation was a reasonable tactical decision which avoided highlighting the prejudicial comments to the jury. As such, counsel cannot be held to have committed an unreasonable act which caused substantial prejudice to Evans. *Strickland* 466 U.S. at 700. Counsel was simply adhering to a trial strategy he had developed for Evans' case.

3. Failure to Request Curative Instructions or Move for a Mistrial

Counsel's failure to "make a motion unwarranted in law" does not rise to the level of ineffective assistance of trial counsel. *McClesky v. Zant,* 580 F.Supp. 338, 401 (N.D.Ga.1984), *rev'd on other grounds,* 753 F.2d 877 (11th Cir.1985). If counsel offers a "well grounded, but ultimately unsuccessful defense," no claim of ineffective assistance of trial counsel will lie. *Id.* at 1039. "Habeas corpus is not a proper route for complaining about simple trial errors." *Johnson v. United States,* 805 F.2d 1284, 1287 (7th Cir.1986). Courts are generally hesitant to "second guess matters of trial strategy simply because the chosen strategy has failed." *United States v. Aulet,* 618 F.2d 182, 189 (2d Cir.1980).

**\*8** Counsel's failure to request curative instructions or move for a mistrial were purely questions of strategy. *McClesky,* 580 F.Supp. at 401. Evans' view that the tactics were unsound does not warrant habeas corpus relief here simply because they may have failed. Evans' counsel presented a "well-grounded defense that ultimately unsuccessful." *Gatto,* 809 F.Supp. at 1039.

Evans must show that his trial counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687. For the reasons stated above, counsel's performance at trial was not deficient. Evans therefore, fails the first part of the *Strickland* test. Moreover, were Evans to have met this part of the test, he would not be able to establish the second part of the test that the deficient performance prejudiced the defense. The evidence

of Evans' guilt was overwhelming. Nothing that Evans claims his counsel failed to do would have made a difference.

Thus, Evans' third claim must fail.

D. Sentence Based on a Derogatory Presentence Report

Evans contends that he was sentenced based on a derogatory presentence report in violation of his right to due process. He claims that the presentence report was written in an unfair and biased manner because it failed to list anything positive about Evans or his family.

A defendant has a right under the Due Process Clause to ensure that information presented to the sentencing court is accurate and reliably presented. *Pardo v. Leonard,* No. 88-CV-2072, 1989 U.S. Dist. LEXIS 4336, at \*2-3 (E.D.N.Y. Apr. 5, 1989). New York law also provides such an opportunity. *Id.* Once the defendant has seen the presentence report, the court may hold pre-sentence conferences "in order to resolve any discrepancies." *Id.* If a sentence is within the range provided by the New York Penal Law, the length of a sentence is not reviewable on federal habeas review. *Schuler v. Sullivan,* 644 F.Supp. 856, 858 (S.D.N.Y.1986). Where a sentence imposed by the state court is within the statutory limit, it is "not grounds for relief on federal habeas review." *Alexander v. Jones,* No. 88-CV-0229, 1988 U.S. Dist. LEXIS 6439, at \*5 (E.D.N.Y. May 24, 1988).

Evans was shown the presentence report prior to sentencing and had ample opportunity to resolve any discrepancies prior to his sentencing. Doc. 12, p. 2. Evans, however, remained silent at sentencing when given the opportunity to challenge the report. *Id.* at p. 10. Though Evans' attorney addressed the unfavorable presentence report, he never objected to any particular statements in the report. Id. at p. 9. Given these facts, Evans' due process rights regarding the presentence report were not violated.

Evans' claim regarding the severity of the sentence is precluded from review as it raises no constitutional question. In addition, the sentence Evans received was within the proscribed statutory limit of twenty-five years to life imprisonment for second degree murder. N.Y. Penal Law § 70.00 (McKinney 1998). For these reasons, Evans' final claim must fail.

2001 WL 36006042

III. Conclusion

**\*9** For the reasons stated above, it is hereby

RECOMMENDED that petitioners' application for a writ of habeas corpus be DENIED; and it is

ORDERED that the Clerk serve a copy of this Report-Recommendation on the parties hereto by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 36006042

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Rodriguez v. Hoke, Not Reported in F.Supp. (1987)

1987 WL 9679

1987 WL 9679
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Pedro RODRIGUEZ, Petitioner,

v.

Robert HOKE, Superintendent, Eastern Correctional
Facility, Elizabeth Holtzman, District Attorney,
Kings County, Robert Abrams, Attorney
General of the State of New York, Respondents.

No. 86 C 3058.
|
April 1, 1987.

**Attorneys and Law Firms**

Pedro Rodriguez, petitioner *pro se.*

Elizabeth Holtzman, District Attorney, Kings County
(Barbara D. Underwood, Rosalyn R. Richter, Patricia Leitner,
Assistant District Attorneys, of counsel), Brooklyn, New
York, for respondents.

MEMORANDUM AND ORDER

NICKERSON, District Judge.

**\*1** Petitioner seeks a writ of habeas corpus pursuant to
28 U.S.C. § 2254. Petitioner's traverse, however, moves "to
withdraw his petition" so as to allow "the lower courts to
exercise their ruling on unexhausted issues."

Petitioner was convicted on December 5, 1983, after a jury
trial in Kings County, New York, of two counts each of
attempted murder in the first degree, attempted aggravated
assault upon a police officer, attempted assault in the first
degree, and one count each of reckless endangerment in the
first degree and criminal possession of a weapon in the second
degree. He was sentenced on March 19, 1984 as a predicate
felon to concurrent terms of imprisonment of fifteen years
to life on the attempted murder counts, seven and one-half
to fifteen years on both the weapon count and the attempted
aggravated assault counts, and three and one-half to seven
years on the attempted first degree assault counts and on
the reckless endangerment count. The Appellate Division,
Second Department, affirmed on June 2, 1986 in an opinion

reported at 121 A.D.2d 409, 502 N.Y.S.2d 807, and the Court
of Appeals denied leave to appeal on August 11, 1986.

Petitioner now urges two claims of error, each of which his
then counsel raised in the brief in the Appellate Division:
(1) the prosecution failed to prove petitioner's guilt, and in
particular his requisite mental intent, beyond a reasonable
doubt, and (2) the trial court erred in a *Sandoval* ruling
that would have allowed cross-examination of petitioner with
respect to a prior conviction if he took the stand, and thereby
denied his due process right to a fair trial by preventing him
from testifying in his own behalf. Petitioner's brief in the
Appellate Division raised both of these claims in sufficiently
constitutional terms to exhaust his state remedies. *Daye v.
Attorney General,* 696 F.2d 186 (2d Cir.1982). Petitioner is
thus free to raise both claims in his current petition.

The evidence at trial showed that on the night of January
26, 1983, two uniformed police officers, Frederick Schroeder
and Angel Marrero, approached petitioner and an unidentified
companion, who were walking on a street in Brooklyn. The
officers wished to question the men because they had spotted
a leather scabbard or holster sticking out from below the
unidentified man's jacket. As the officers approached, the men
split up and ran in opposite directions. The unidentified man
dropped a knife. Both officers gave chase after petitioner,
who was running in the same direction that their patrol car
was facing. Petitioner was told to freeze, but continued to
flee. Officer Marrero spotted a small caliber, black gun in
petitioner's hand. Officer Schroeder enlisted the help of two
other officers, Robert Valentin and Ronald Rodriguez, who
were in a second patrol car in the area. Officers Valentin
and Rodriguez pursued petitioner into an abandoned three-
story building, with Officers Marrero and Schroeder closely
behind. The building was pitch-black, and the officers entered
with weapons and flashlights drawn, repeatedly identifying
themselves as police officers and warning petitioner to stop.
When Officers Valentin and Rodriguez were on the second-
floor stairs, about twenty feet away from petitioner, who was
on a third-floor landing, petitioner stopped, turned, and fired
a single shot in their direction. At the time, Officer Marrero
and Schroeder were one story below, on the first-floor stairs.

**\*2** Petitioner did not present a defense, but his counsel on
cross-examination and in summation claimed that petitioner
was merely firing a warning shot, and lacked both the intent
to kill that is necessary to convict of attempted murder and
the intent to cause serious injury that is necessary to convict
of attempted assault. Counsel pointed out that neither Officer

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 140 of 267
Rodriguez v. Hoke, Not Reported in F.Supp. (1987)
1987 WL 9679

Valentin nor Officer Rodriguez could unequivocally testify that a gun was pointed at them in the darkness. Rather they relied on their impression that the discharge flame from the gun's barrel came towards them. Counsel also stressed that despite several police searches no spent bullet was ever found in the area behind the officers where one would have expected a bullet fired in their direction to have come to rest. Finally, counsel argued that petitioner fired only one bullet, and later abandoned his gun while it still contained three live rounds. Counsel contended that such evidence was consistent with an intent to warn or to scare, but not with an intent to kill or seriously injure.

The standard for reviewing the sufficiency of evidence in a habeas corpus proceeding is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original).

The relevant testimony is that of Officer Valentin. On direct examination he testified, in pertinent part, as follows:

A: The defendant stopped on the third floor landing. I was still coming up. I had my flashlight on him. He turned around. I was looking dead in his face and all of a sudden I heard what sounded like a gunshot, and saw flames coming from about his chest area.

......

Q: Describe this flash that you saw in front of the defendant. Where was it coming from and where did it seem it was pointed towards?

A: From about his chest, like blue, red flame, and it was coming in my direction.

Q: Let me ask you this. Were you actually able to see a gun in his hand at that time?

A: No, I wasn't.

(Transcript of November 30, 1983, at 13–15.)

On cross-examination by petitioner's counsel, Officer Valentin testified as follows:

Q: You saw a flash coming from what I believe you described as the area around his chest, is that right?

A: Yes.

Q: But you didn't see the gun, is that right?

A: No, sir.

Q: If the person was holding a gun, you didn't see it and you don't know where the gun was pointed, is that right?

A: The flash light from the barrel was coming towards me and it was right from the defendant's chest.

Q: Let me put this to you, Officer. The gun was fired from basically a darkened area, a gun is fired and if a gun is fired this way or this way or that way will the flash light still come out of a barrel in a dark room?

A: Yes.

Q: To that extent you are assuming it was pointed at you, is that right?

A: Yes.

Q: It may not have been pointed at you, is that correct?

**\*3** A: True.

.......

Q: And you cannot tell me from your own knowledge that the gun was actually pointed at you?

A: All I saw was the flame coming in my direction.

(*Id.* at 46–47, 58.)

Officer Valentin's partner, Officer Rodriguez, testified similarly:

A: I was about 6, 7 steps behind my partner. The male with the blue jacket, as he approached the third floor landing, he turned around and at that time I saw the flash and I heard the shot rang [sic] out.

.......

Rodriguez v. Hoke, Not Reported in F.Supp. (1987)

1987 WL 9679

Q: Where did the flash seem to you like it was coming from?

A: It was coming from some person. This male, whoever it was at the time, and it was facing at us.

(Id. at 70–71.)

On cross-examination by petitioner's counsel the following colloquy occurred:

Q: You didn't see the gun?

A: No.

Q: You didn't see a gun pointing at you at any time?

A: No.

(Id. at 79.)

A rational jury could have found petitioner guilty beyond a reasonable doubt in this instance. Petitioner did not fire at the officers until they had closed in on him and were about twenty feet away. Moreover, the testimony shows that he stopped, turned, and then fired. The prosecution must usually show intent through circumstantial evidence, which by its very nature tends to admit of differing inferences. This court cannot say that no reasonable jury could have concluded beyond a reasonable doubt that petitioner had the requisite intent to sustain the counts of attempted murder and attempted assault.

Petitioner's second claim is that the trial court erroneously ruled, pursuant to *People v. Sandoval,* 34 N.Y.2d 371, 314 N.E.2d 413, 357 N.Y.S.2d 849 (1974), that the prosecutor could inquire into the facts and circumstances of a prior felony conviction for the purpose of impeaching petitioner's credibility if he took the stand, and that this ruling deprived him of his due process right to a fair trial by preventing him from testifying in his own behalf. Petitioner argues that since the critical factual dispute at trial was the gravity of his intent in firing the gun, his own testimony on this point was essential.

A threshold issue for the court's consideration is whether the Supreme Court's ruling in *Luce v. United States,* 469 U.S. 38 (1984), precludes petitioner from raising this claim. In *Luce* the Supreme Court held that a claim of a denial of the right

to testify stemming from improper impeachment with prior convictions pursuant to Federal Rule of Evidence 609(a) is unreviewable on appeal absent defendant having created a record by actually testifying. *Luce* did not deal with federal review of state habeas corpus petitions, however, and in the absence of Second Circuit authority on this point the court assumes that petitioner's claim is properly before it. *Cf. New Jersey v. Portash,* 440 U.S. 450 (1979).

The trial court found, in accordance with *Sandoval,* that petitioner's conviction in 1978 for robbery in the second degree, involving the use of a firearm, "clearly show[ed] that the defendant put his interest ahead of that of society" and thus was sufficiently relevant to petitioner's credibility to outweigh the prejudice to him. In affirming, the Appellate Division held that "[t]he *Sandoval* ruling permitting cross-examination as to the facts underlying the defendant's robbery conviction was not an abuse of discretion." *People v. Rodriguez,* 121 A.D.2d 409, 502 N.Y.S.2d 807 (App.Div.1986). Even if the evidentiary ruling was in fact erroneous, a writ of habeas corpus will "issue *only* where petitioner can show that the error deprived [him] of a *fundamentally fair* trial." *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.) (emphasis in original), *cert. denied,* 464 U.S. 1000 (1983).

**\*4**  The *Sandoval* ruling did not deprive petitioner of a fundamentally fair trial. "[N]ot all restrictions on a defendant's right to testify are *per se* impermissible." *United States v. Sun Myung Moon,* 718 F.2d 1210, 1231 (2d Cir.1983), *cert. denied,* 466 U.S. 971 (1984). A defendant exercising his right to testify must comply with appropriate evidentiary and procedural restrictions. *Id.; see also United States v. Bifield,* 702 F.2d 342, 350 (2d Cir.), *cert. denied,* 461 U.S. 931 (1983). The use of prior criminal convictions to impeach a witness' credibility, so that the jury may fairly assess the truthfulness of the testimony, is accepted practice in both federal and state courts. In this case, the facts which the trial court held could be adduced on cross-examination if petitioner took the stand were plainly relevant to his credibility.

Moreover, the ruling in no way prevented petitioner's counsel from presenting to the jury during cross-examination and in summation the defense theory of the case, namely, that petitioner had no intention of killing or seriously injuring the pursuing officers. Even assuming that it was only the *Sandoval* ruling that prevented petitioner from taking the witness stand, the court finds no indication that petitioner's

1987 WL 9679

testimony would have altered this theory or otherwise offered exculpatory evidence.

The petition is dismissed. So ordered.

**All Citations**

Not Reported in F.Supp., 1987 WL 9679

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2177075

2007 WL 2177075
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Randy WILLIAMS, Petitioner,
v.
George DUNCAN, Respondent.

No. 9:03-CV-568 (LEK/RFT).
|
July 27, 2007.

**Attorneys and Law Firms**

Randy Williams, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Maria Moran, Esq., Assistant Attorney General, of Counsel, Syracuse, NY, for Respondent.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

 **\*1** This matter comes before the Court following a Report-Recommendation filed on June 22, 2007 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 64). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Petitioner, which were filed on July 17, 2007. Objections (Dkt. No. 66).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 64) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Petitioner's Amended Petition (Dkt. No. 56) is **DENIED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### *REPORT-RECOMMENDATION AND ORDER* [1]

[1]     This matter was referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

RANDOLPH F. TREECE, U.S. Magistrate Judge.

*Pro se* Petitioner Randy Williams was convicted of attempted murder in the second degree, assault in the first degree, criminal possession of a weapon in the third degree, and criminal use of a firearm in the first degree on October 27, 2000. Dkt. No. 56, Am. Pet. at p. 2; Dkt. No. 61, Resp't Answer, Ex. 2, Transcript of Trial of Randy Williams (10/27/00) ("Trial Tr.") at pp. 639-40. Petitioner presently seeks a Writ of *Habeas Corpus* pursuant to 28 U.S.C. § 2254 on the following grounds: (1) Petitioner received ineffective assistance of trial counsel; (2) law enforcement authorities conspired to convict Petitioner through the use of false evidence; (3) the prosecutor engaged in misconduct during the course of his trial; (4) newly discovered evidence emerged after trial to exonerate him; (5) his rights under *Batson v. Kentucky,* 476 U.S. 79 (1986), were violated; and (6) trial counsel failed to discuss plea offers with him. [2] Dkt. No. 56, Am. Pet. [3] For the reasons that follow, this Court recommends that the Amended Petition be **denied.**

[2]     While Petitioner sets forth his grounds for relief in the above order, the Court will consider Petitioner's allegations out of succession for sake of clarity.

[3]     Petitioner originally filed this action on May 8, 2003. *See* Dkt. No. 1. However, on April 15, 2004, we stayed this matter so that Petitioner could exhaust his state court remedies. Dkt. No.

Williams v. Duncan, Not Reported in F.Supp.2d (2007)

2007 WL 2177075

21. Petitioner thereafter advised the Court he had exhausted his state court remedies, *see* Dkt. No. 38, and we lifted the stay by Order filed on December 13, 2005, *see* Dkt. No. 55. At that time, we also granted Petitioner's Motion to Amend the Petition, and advised that the Amended Petition "shall supersede and replace *in toto* the original Petition filed herein[.]" Dkt. No. 55 at p. 3 (emphasis in original). Accordingly, the Court will consider herein only those grounds raised in Williams' Amended Petition and reiterated in his subsequently-filed Traverse. *See* Dkt. Nos. 56 & 62.

## I. BACKGROUND

According to the testimony adduced at trial, on the afternoon of March 23, 2000, Petitioner was sitting on the front porch of his house located at 148 Lilac Street in Syracuse, New York, along with Rausheen Cox, Raheem Dunaway, Wayne Williams, and his sister, Nicole Williams. Trial Tr. at pp. 173-75 & 374. Nicole Williams stated these individuals, including herself and Petitioner, were members of the "Bloods" gang. *Id.* at pp. 455 & 485-86. She further testified that her boyfriend, Raheem "Jaws" Dunaway, had plans to "rejump" Petitioner into the gang. *Id.* at p. 486. [4]

[4]    Detective Steven Stonecypher testified that Petitioner admitted he was an active member of the Bloods, but he was not recognized by the gang because the person who jumped him in had lost respect. Trial Tr. at p. 357. Petitioner acknowledged that Jaws planned to rejump him into the gang. *Id.* According to Detective Stonecypher, who had attended a seminar regarding the Bloods gang, to get "jumped" into the Bloods, an individual is required to find someone on the street and to assert power over him by inflicting an injury through shooting or slicing him. *Id.* at p. 362. However, according to Wayne Williams, an individual is required to fight and be beaten up by several people in order to get "jumped" into the Bloods. *Id.* at pp. 386-87.

**\*2** That afternoon, a group of people, including fifteen-year-old Larry McCraney and his cousin Charles Johnson, walked by the house and purportedly demonstrated signs of the "Crips" gang to the group on the porch. *Id.* at pp. 176-77 & 373. Rausheen Cox testified that Petitioner was angered

and decided to go down to their block so they could "[s]ee how it feels, see how they like it ." *Id.* at pp. 315-16. Wayne Williams testified that Petitioner stated he wanted to shoot "them niggers." *Id.* at pp. 375-76. Before Petitioner left the porch to follow the alleged Crips, Jaws handed Petitioner a gun. *Id.* at pp. 376-78. Petitioner wore a black hooded sweatshirt and black jeans, while Cox wore a blue hooded sweatshirt and blue jeans. *Id.* at pp. 317 & 376-78. Petitioner also wore boots, with a blue bandana tied around one boot. *Id.* at p. 91. Shortly thereafter, Petitioner and Cox met up with McCraney and Johnson at the corner of Park and John Streets. *Id.* at pp. 91 & 316-19. Cox testified that Petitioner told him to watch himself, and then reached into his black hooded sweatshirt to pull out the gun. *Id.* at pp. 316-19. Petitioner fired two shots at McCraney as Cox ran away from the scene. *Id.* at pp. 92 & 319-20. Eyewitnesses Beth Giangiobbe and Tyrone Knight observed two black males walking on Park Street, and saw the male dressed in black pull out an object and discharge it twice at a male walking toward him. *Id.* at pp. 139-40 & 147-48. In his pre-arrest statement to police, Petitioner denied any involvement in the shooting. *Id.* at p. 356.

Following the shooting, Petitioner returned to his house on Lilac Street, where Wayne Williams observed Petitioner in possession of the gun. *Id.* at pp. 376-78. Cox testified Petitioner informed him that, upon returning home, he handed the gun to his sister, Nicole. *Id.* at p. 322. [5] About fifteen minutes after the shooting, Petitioner arrived at a friend's home, no longer wearing the black hooded sweatshirt and instead dressed in overalls and boots. *Id.* at pp. 321-23 & 379-80. Detective Eric Coe retrieved as evidence from Petitioner's house, *inter alia,* a black hooded sweatshirt, black denim jeans, a pair of boots with a blue bandana tied around the bottom, and a .22 caliber loaded revolver. *Id.* at pp. 231-32. [6]

[5]    Nicole Williams disputed this testimony by stating that Cox handed the gun to Jaws after the shooting, and Jaws gave it to Nicole to conceal. Trial Tr. at pp. 458-62. Nicole hid the weapon in her mother's house at 148 Lilac Street. *Id.* at pp. 478-81.

[6]    The Rohm .22 caliber revolver contained two spent casings, but lacked sufficient fingerprints to enable law enforcement to make a positive fingerprint identification. Trial Tr. at pp. 286-88.

2007 WL 2177075

Immediately following the shooting, McCraney informed Officer Thomas Murfitt that the shooter lived on Lilac Street, *id.* at pp. 44-45, and later told Officer William Foster that the shooter lived in the 100-block of Lilac Street, *id.* at p. 54. Officer Daniel Jones rode with McCraney to the hospital, and testified that when asked who shot him, McCraney repeated "Randy, [who] lives on Lilac." *Id.* at pp. 163-64. McCraney's mother also testified he informed her at the hospital "that punk ass bitch Randy shot me," and the shooting was gang-related. *Id.* at pp. 133-34. However, McCraney later provided sworn statements to the police wherein he stated he did not know who shot him and was unsure whether Dunaway or Cox was the shooter. *Id.* at pp. 96-97 & 102-10. In addition, while testifying before an Onondaga County grand jury, McCraney stated that Petitioner was not the shooter; rather, the masked individual accompanying petitioner shot him, and that individual was Raheem Dunaway. *Id.* at pp. 105-07. At trial, McCraney identified Petitioner as the shooter. *Id.* at pp. 92-96. During cross-examination, McCraney indicated that his prior inconsistent statements were made in an effort to obtain his boots, which were held by law enforcement as evidence, and to avoid going to court. *Id.* at pp. 97 & 105-10.

**\*3** On May 25, 2000, Petitioner was indicted by an Onondaga County grand jury. *See* Dkt. No. 61, Resp't Answer, Ex. 4, Resp't App., Indictment No. 0512-1-2 (5/25/00) ("Indictment"), at pp. A9-11. In that accusatory instrument, Petitioner was charged with attempted murder in the second degree, assault in the first degree, criminal possession of a weapon in the third degree, and criminal use of a firearm in the first degree. Indictment at pp. A9-11. [7]

> [7]  Raheem Dunaway also was indicted by the grand jury for criminal possession of a weapon in the third degree. Indictment at p. A9. In addition, Rausheen Cox was originally charged along with Petitioner and Dunaway, but was no-billed by the grand jury. Trial Tr. at pp. 328-29 & 339.

Beginning on October 23, 2000, Williams was tried before a jury as to the foregoing charges, with the Honorable Joseph E. Fahey, Onondaga County Court Judge, presiding. At the conclusion of that trial, Williams was found guilty of all charges brought against him. Trial Tr. at pp. 639-40. On January 25, 2001, Petitioner was sentenced to concurrent determinate terms of fifteen (15) years imprisonment for the attempted murder and assault offenses, a concurrent determinate term of four (4) years imprisonment for the weapon possession charge, and a consecutive determinate

term of five (5) years imprisonment for criminal use of a firearm. Dkt. No. 61, Resp't Answer, Ex. 3, Sentencing Tr. & Am. Tr. ("Sentencing Tr.") at pp. 11-12.

Through counsel, Williams appealed his convictions and sentences to the New York State Supreme Court, Appellate Division, Fourth Department. Dkt. No. 61, Resp't Answer, Ex. 5, Appellate Br. (9/27/01). [8] That court modified the judgment of conviction by directing that all sentences run concurrently, and otherwise affirmed the convictions. *People v. Williams,* 738 N.Y.S.2d 809 (N.Y.App. Div., 4th Dep't 2002). The New York State Court of Appeals denied Petitioner leave to appeal on July 3, 2002. *People v. Williams,* 776 N.E.2d 12 (N.Y.2002); *see also* Dkt. 61, Ex. 16. [9]

> [8]  Williams also filed a supplemental *pro se* appellate brief reiterating the arguments made by his counsel. Dkt. No. 61, Resp't Answer, Ex. 7, Supplemental *Pro Se* Appellate Br. (11/21/01). In addition, through counsel, Petitioner submitted a reply brief alleging that a *Batson* error deprived Petitioner of his constitutional rights under the Sixth and Fourteenth Amendments. Dkt. No. 61, Resp't Answer, Ex. 9, Reply Br. (1/2/02). The District Attorney filed a motion to strike the brief for improperly raising a new issue for the first time in a reply brief. Dkt. No. 61, Resp't Answer, Ex. 10, Motion to Strike Reply Br. (1/14/02). The Fourth Department granted the People's motion to strike Williams' reply brief. Dkt. No. 61, Resp't Answer, Ex. 11, Decision and Order (2/22/02).

> [9]  In addition, the Fourth Department denied Petitioner's motion for reargument and reconsideration on July 3, 2002. *People v. Williams,* 745 N.Y.S.2d 737 (N.Y.App. Div., 4th Dep't 2002).

On July 30, 2001, Williams filed a motion to vacate his judgment of conviction pursuant to New York's Criminal Procedure Law ("CPL"), Section 440.10 ("July 2001 CPL Motion"). Dkt. No. 61, Ex. 17. That application was opposed by the District Attorney. Dkt. No. 61, Ex. 18. In a Decision and Order, dated April 11, 2002, Judge Fahey denied Williams' July 2001 CPL Motion in all respects. Dkt. No. 61, Ex. 19 ("July 2001 DO"). The Appellate Division, Fourth Department denied Petitioner's application for leave to appeal the July 2001 Decision and Order on October 7, 2002. Dkt. No. 61, Ex. 21.

2007 WL 2177075

On July 28, 2004, Williams filed a second motion to vacate his judgment of conviction pursuant to N.Y. CPL § 440.10 ("July 2004 CPL Motion"). Dkt. No. 61, Ex. 22. That application also was opposed by the District Attorney. Dkt. No. 61, Ex. 23. In a Decision and Order, dated November 30, 2004, Judge Fahey denied Williams' second CPL Motion in all respects. Dkt. No. 61, Ex. 24 ("July 2004 DO"). On May 18, 2005, the Appellate Division, Fourth Department denied Petitioner's application for leave to appeal the July 2004 Decision and Order. Dkt. No. 61, Ex. 27.

## II. DISCUSSION

### A. Standard of Review

**\*4** Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant *habeas* relief to a state prisoner on a claim unless the state courts adjudicated the merits of the claim and such adjudication either

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Hawkins v. Costello,* 460 F.3d 238, 242 (2d Cir.2006); *DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005); *Miranda v. Bennett,* 322 F.3d 171, 177-78 (2d Cir.2003); *Boyette v. LeFevre,* 246 F.3d 76, 88 (2d Cir.2001).

The AEDPA also requires that in any such proceeding "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Boyette v. LeFevre,* 246 F.3d at 88 (quoting § 2254(e)(1)).
A state court determines a petitioner's federal claim "on the merits" and triggers the highly-deferential AEDPA standard of review when the state court (1) disposes of the claim on the merits and (2) reduces its disposition to judgment. *See Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001). In this regard, it is not necessary for the state court to explicitly refer to the particular federal claim or to any federal case law. *See id.*

However, if a state court does not adjudicate a petitioner's federal claim "on the merits," the state court's decision is not entitled to AEDPA deference and instead, the federal *habeas* court must apply the pre-AEDPA standard of *de novo* review to the state court's disposition of the federal claim. *See Cotto v. Herbert,* 331 F.3d 217, 230 (2d Cir.2003) (citing *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001)).

### B. Unexhausted Claims

In the first ground of his Amended Petition, Williams contends for the first time that his trial counsel was ineffective by: (1) failing to call Charmine Burns as a defense witness to testify regarding the victim's identification of the shooter and (2) failing to object to the admission at trial of a starter pistol found at Petitioner's home. Am. Pet., Ground One. Respondent argues that these factual claims of ineffective assistance of counsel are unexhausted and procedurally defaulted, thereby not subject to federal *habeas* review. Resp't Mem. at pp. 13-16.

Prior to seeking federal *habeas* relief, a petitioner must fully exhaust any claim presented to the *habeas* court. *Aparicio v. Artuz,* 269 F.3d at 89 (quoting 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis,* 42 F.3d 144, 147 (2d Cir.1994). This exhaustion requirement is satisfied if a federal claim has been "fairly presented" to the state courts. *See Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997) (quoting *Picard v. Connor,* 404 U.S. 270, 275 (1971)). Where a petitioner raises an ineffective assistance of trial counsel claim, each factual claim made in support must be fairly presented to a state court before a federal *habeas* court can consider it. *Panezo v. Portuondo,* 2003 WL 23198781, at * 10 (E.D.N.Y. Nov. 6, 2003) (citing *Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991)). Petitioner never raised these particular theories in support of his ineffective assistance claim either on direct appeal or in his two CPL Motions. [10]

---

[10]    The Court notes that on direct appeal, Petitioner alleged defense counsel failed to object to the admission of "boots, jeans, numerous bandanas and hooded sweatshirts taken from the residence," but he made no mention of the starter pistol. Appellate Br. at p. 16. Further, in his CPL Motions, Petitioner objected to counsel's alleged failure to call numerous defense witnesses, however,

Charmine Burns is not included amongst those proposed witnesses. July 2004 CPL Motion at pp. 18-21; July 2001 CPL Motion at p. 1.

**\*5** When a claim has not been fully exhausted in the state courts, a federal court may find that there is an absence of available state corrective process under 28 U.S.C. § 2254(b) "if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile." *Aparicio v. Artuz,* 269 F.3d at 90 (citing *Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997)); *Lurie v. Wittner,* 228 F.3d 113, 124 (2d Cir.2000) (stating that a federal court may address the merits of a *habeas* petition containing unexhausted claims where there is no further state proceeding for petitioner to pursue or where further pursuit would be futile). Under these circumstances, the claim would be "deemed exhausted." Further, if the federal court finds that the claim is procedurally barred in state court, it is similarly procedurally barred in federal court. *Aparicio v. Artuz,* 269 F.3d at 90 (citing *Coleman v. Thompson,* 501 U.S. 722 (1991)).

Petitioner's claims of ineffective assistance of counsel could have been raised in his direct appeal to the Appellate Division, Fourth Department, since these allegations are based upon matters which were in the trial court record. Petitioner cannot now file a second appeal with the Fourth Department as to these claims because a criminal defendant is "entitled to one (and only one) appeal" to the Appellate Division. N.Y. CRIM. PROC. LAW § 450.10(1); *see also Aparicio v. Artuz,* 269 F.3d at 91. Moreover, since "New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal," Petitioner cannot now properly raise these record-based claims in a third motion to vacate his judgment of conviction pursuant to CPL § 440.10. *Aparicio v. Artuz,* 269 F.3d at 91 (citing N.Y. CRIM. PROC. LAW § 440.10(2)(c)); *Bossett v. Walker,* 41 F.3d 825, 828-29 (2d Cir.1994). Accordingly, these claims, which Petitioner never asserted in the state courts, are deemed exhausted and procedurally defaulted.

Federal courts may only consider the substance of procedurally barred claims where the petitioner can establish both cause for the procedural bar and prejudice, or alternatively, that a fundamental miscarriage of justice would occur absent federal court review. *See DiGuglielmo v. Smith,* 366 F.3d 130, 135 (2d Cir.2004) (asserting that federal review of procedurally barred claims is unavailable unless petitioner "can show cause for the default and actual prejudice

resulting therefrom, or show that he is actually innocent'") (internal quotations and citations omitted); *Dixon v. Miller,* 293 F.3d 74, 80-81 (2d Cir.2002) (citations omitted); *Ramirez v. Attorney Gen. of the State of New York,* 280 F.3d 87, 94 (2d Cir.2001); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 809 (2d Cir.2000); *Ferguson v. Walker,* 2002 WL 31246533, at *2 (S.D.N.Y. Oct. 7, 2002) (citing *Fama* ) (other citation omitted); *see generally Murray v. Carrier,* 477 U.S. 478, 495-96 (1986).

**\*6** To establish "cause," a petitioner must show that some objective external factor impeded his ability to either comply with the relevant procedural rule or to fully exhaust his federal claims. *See Coleman v. Thompson,* 501 U.S. at 753; *Restrepo v. Kelly,* 178 F.3d 634, 638 (2d Cir.1999) (discussing cause in context of petitioner's procedural default); *Doleo v. Reynolds,* 2002 WL 922260, at *3 (S.D.N.Y. May 7, 2002) (finding that petitioner must demonstrate cause for failure to exhaust claims). Examples of external factors include "interference by officials," ineffective assistance of counsel, or that "the factual or legal basis for a claim was not reasonably available" at trial or on direct appeal. *Murray v. Carrier,* 477 U.S. at 488; *Bossett v. Walker,* 41 F.3d at 829 (citing *Murray* ); *United States v. Helmsley,* 985 F.2d 1202, 1206 (2d Cir.1993); *Lovacco v. Stinson,* 2004 WL 1373167, at *3 (E.D.N.Y. June 11, 2004) (citing *Murray* ). [11]

[11]    However, "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.' " *Coleman v. Thompson,* 501 U.S. at 752-53 (quoting *Murray v. Carrier,* 477 U.S. at 488).

Williams has not offered any cause for his failure to raise the procedurally defaulted claims referenced above in his direct appeal or his motions to vacate, and has never alleged, in either the state courts or this proceeding, that he received ineffective assistance of counsel because his appellate counsel failed to argue any of those claims on appeal.

Since Williams has not established cause for these unexhausted and procedurally defaulted claims, this Court need not decide whether he has suffered prejudice because federal *habeas* relief is unavailable as to procedurally barred claims unless *both* cause and prejudice are established absent proof that the failure to consider the merits of the procedurally barred claims would result in a fundamental

2007 WL 2177075

miscarriage of justice. *Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985); *see also McLeod v. Moscicki,* 2003 WL 22427757, at * 7 (S.D.N.Y. Oct. 22, 2003) (citing *Murray v. Carrier,* 477 U.S. at 494); *You v. Bennett,* 2003 WL 21847008, at *3 (E.D.N.Y. July 29, 2003) (citing *Coleman v. Thompson,* 501 U.S. at 750); *Ayuso v. Artuz,* 2001 WL 246437, at *9 (S.D.N.Y. Mar. 7, 2001); *Pou v. Keane,* 977 F.Supp. 577, 581 (N.D.N.Y.1997) (Kahn, D.J.). Additionally, after reviewing the state court records, this Court finds no basis to conclude that the denial of Petitioner's procedurally barred claims would result in a fundamental miscarriage of justice, which has been interpreted as amounting to "an unjust incarceration." *Spence v. Superintendent, Great Meadow Corr. Facility,* 219 F.3d 162, 170 (2d Cir.2000). Significant evidence exists pointing to Petitioner's guilt, including witness identifications, inculpatory evidence found at Petitioner's home, as well as Petitioner's desire to get "rejumped" into the Bloods gang. *See* Trial Tr. at pp. 92, 133-34, 163-64, 231-32, 316-19, 357, & 375-76. Therefore, the Court recommends that the above-referenced ineffective assistance of counsel claims be **denied** as unexhausted and procedurally barred.

### C. Procedurally Defaulted Claim

**\*7** Considering next Ground Five of Williams' Amended Petition, Williams contends that the trial court improperly allowed the prosecution to remove two black jurors from the prospective jury panel in violation of *Batson v. Kentucky,* 476 U.S. 79 (1986). Am. Pet., Ground Five. Williams raised this issue for the first time in his reply brief on direct appeal to the Appellate Division, Fourth Department. Dkt. No. 61, Ex. 9. That court granted Respondent's motion to strike the reply brief as improper. Dkt. No. 61, Exs. 10-11. In its decision rejecting Petitioner's direct appeal, the Fourth Department held that Petitioner's contention concerning a potential *Batson* violation "is raised for the first time in defendant's reply brief and therefore is not properly before us .... In any event, that contention is unpreserved for our review because defendant failed to articulate to the court any reason why he believed that the prosecutor's explanations [for challenging the prospective juror] were pretextual." *People v. Williams,* 738 N.Y.S.2d at 810 (citations and quotations omitted). Respondent argues that Petitioner's *Batson* allegation is unexhausted, procedurally defaulted, and lacks merit. Resp't Br. at pp. 24-28.

A federal court ordinarily will not review a federal claim presented in a *habeas* petition if it has been rejected by the state courts on a ground which is both "independent and adequate[.]" *Coleman v. Thompson,* 501 U.S. at 736; *Monroe v. Kuhlman,* 433 F.3d 236, 240-41 (2d Cir.2006); *Brown v. Greiner,* 409 F.3d 523, 532 (2d Cir.2005). For a federal court to deny *habeas* review based on the independent and adequate state ground doctrine, it must be clear that the state court actually relied upon a procedural bar as an independent basis for its disposition of the claim. *Fama v. Comm'r of Corr. Servs.,* 235 F .3d at 809.

The Second Circuit has determined that a petitioner's failure to challenge as pretextual a prosecutor's reasons for excusing potential jurors violates New York's contemporaneous objection rule articulated in CPL § 470.05(2),[12] and constitutes an independent and adequate state ground precluding federal *habeas* review. *See Rodriguez v. Schriver,* 392 F.3d 505, 509-10 (2d Cir.2004); *see also Galarza v. Keane,* 252 F.3d 630, 638 (2d Cir.2001) ("[A] party must raise his or her *Batson* challenges in a manner that would allow a trial court to remedy the problem at trial."); *Williams v. Donnelly,* 2005 WL 2290592, at *16 (E.D.N.Y. Apr. 12, 2005) (Mann, M.J.), *adopted,* No. 00-4445, Dkt. No. 26 (E.D.N.Y. Sept. 16, 2005) (Trager, D.J.). In *Rodriguez v. Schriver,* as in the present case, the petitioner timely raised a *Batson* objection, but failed to specifically challenge as pretextual the prosecutor's stated reasons for excusing three jurors. 392 F.3d at 509. The intermediate state appellate court in *Rodriguez* considered the petitioner's *Batson* claim "unpreserved for appellate review." *Id.* at 507 (quotations omitted). The Second Circuit determined that the state court's holding clearly and unambiguously rested on an independent and adequate state procedural bar embodied by CPL § 470.05(2). *Id.* at 511. Accordingly, this Court finds Williams' *Batson* claim procedurally barred, and therefore unavailable for *habeas* review.

12    CPL § 470.05(2) provides in relevant part:
      For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered ... at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.

**\*8** To overcome this procedural default, Williams must establish both cause and prejudice, or alternatively, that a

fundamental miscarriage of justice would occur absent federal court review. *See DiGuglielmo v. Smith,* 366 F.3d at 135. Petitioner has attempted to establish cause for this procedural default by alleging his counsel was ineffective in failing to demonstrate pretext during the *Batson* inquiry. *See* Am. Pet., Grounds One and Five. However, as discussed *infra,* this Court finds that Petitioner's allegations of ineffective assistance of counsel in this regard should fail. *See infra* Part II.E.1.b. Even assuming *arguendo* that Petitioner's counsel was ineffective and Petitioner therefore has established cause for the default, Petitioner is unable to demonstrate any prejudice because his *Batson* claim lacks merit. *Id.* [13]

[13]    Petitioner has not argued ineffective assistance of appellate counsel as cause for his failure to properly raise *Batson* on direct appeal. The Court therefore will not address this potential basis for cause. In any event, even if such a basis for cause was established, Williams cannot demonstrate the requisite prejudice.

In *Batson v. Kentucky,* the Supreme Court articulated a three-part test for trial courts to employ when evaluating whether a party exercised a peremptory challenge in violation of the Equal Protection Clause. 476 U.S. at 94-97; *see also Hernandez v. New York,* 500 U.S. 352, 358 (1991). First, the party objecting to the peremptory challenge must make a *prima facie* showing that the potential juror was struck because of his or her race. *Batson v. Kentucky,* 476 U.S. at 94-95; *see also Hernandez v. New York,* 500 U.S. at 358. A *prima facie* case may be established by showing a pattern of strikes exercised against minority prospective jurors. *Batson v. Kentucky,* 476 U.S. at 97. Second, once a *prima facie* case is established, the proponent of the peremptory challenge must offer a race-neutral explanation for striking the potential juror. *Id.* Finally, the trial court must consider whether the moving party carried his burden of proving that the challenge was motivated by purposeful discrimination. *Id.* at 96.

During *voir dire,* the prosecution exercised a peremptory challenge to remove an African-American juror, Hurburt Brown. Jury Selection Tr. at p. 167. Petitioner's counsel observed that this strike was the prosecution's second as to an African-American juror, and he therefore asserted a general *Batson* challenge. *Id.* Judge Fahey asked Assistant District Attorney Michael Price ("ADA Price") to provide a racially neutral reason for removal of the juror, and he responded:

Yes, Judge, the same answers he [Mr. Brown] gave as Mr. Scott as far as the people being let go based upon questions concerning D.N.A ., and the Illinois government, I think that got way out of bounds and he expressed very liberal concerns, he's been a journalism professor for three years. I don't think I've set any pattern as far as excluding African-Americans. Mrs. Shabazz [the first African American juror excused] was the mother of a convicted drug dealer.

*Id.*

Defense counsel failed to object to the prosecution's rationale as pretextual. *Id.* Thereafter, Judge Fahey apparently accepted the prosecution's explanation as race-neutral and excused Mr. Brown. *Id.* at p. 168.

**\*9** Upon raising the *Batson* objection, it was incumbent upon defense counsel to establish a *prima face Batson* violation. To make a *prima facie* showing, the moving party must demonstrate that: (1) "he is a member of a cognizable racial group," (2) "the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race," and (3) "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson v. Kentucky,* 476 U .S. at 96. All relevant circumstances should be considered, including whether the prosecutor engaged in a pattern of strikes, questions, or statements during *voir dire* evincing discriminatory motives. *Id.* at 96-98; *see also Edmonson v. Leesville Concrete Co, Inc.,* 500 U.S. 614, 631 (1991). In making the *Batson* challenge, defense counsel asserted that the prosecution exercised challenges against two African-American panelists. Based on this statement referencing a "pattern" of strikes against African-American panelists, this Court will assume Petitioner established a *prima facie* case under *Batson.*

The trial court then reached the second step of the *Batson* inquiry by asking the prosecution to articulate a race-neutral explanation for the peremptory challenges. This

explanation need not be "persuasive, or even plausible," and unless "discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem,* 514 U.S. 765, 767-68 (1995) (quotations omitted). First, ADA Price explained his reasons for striking Mr. Brown, and highlighted that he had stricken a non-African-American panelist, Jason Scott, for the same reason-their liberal views regarding violence in society. Jury Selection Tr. at pp. 143-44, 152, & 168.[14] When asked by defense counsel whether he believed disputes today are settled differently than in the past due to the prevalence of gangs, Mr. Scott, who was convicted of assault as a youthful offender, *see id.* at pp. 97-98, disagreed and stated in relevant part:

[14]    While Mr. Scott's race is not evident from the face of the record, it is clear to the Court that Mr. Scott was non-African American because defense counsel did not include Mr. Scott in his tally of *two* peremptory strikes exercised against black panelists Mr. Brown and Mrs. Shabazz. Jury Selection Tr. at p. 167.

No, I mean the way that you word it you make it sound like there's never been any violence over little disputes. There's always been violence. It just so happens that, I mean, some areas there is more violence over the same things and in other areas there wouldn't be. I don't think there is too much more, you have the same people living here.
*Id.* at p. 143.

Mr. Brown, a journalism professor at Syracuse University, nodded his head in agreement, and stated:

I tend to agree with what he is saying. I tend to think the amount of what there is violence right now, there are different means that people are using these days. Some of it is probably a little more violent than in the past, but there have always been groups that separate themselves, that had common symbols, had common rituals, those kind of things.... I think there has been somewhat more prevalent behavior, certain types in this area, but if you went back to generations you'd see

some awfully prevalent types of gang activity then, as well.

**\*10** *Id.* at pp. 143-44.

Based on this exchange, this Court finds that ADA Price provided a legitimate, race-neutral explanation for his decision to excuse Mr. Brown in that Mr. Brown's views on violence could tend to make him biased and sympathetic toward Petitioner. *See, e.g., People v. Dorsey,* 770 N.Y.S.2d 462, 463-64 (N.Y.App. Div., 3d Dep't 2004) (affirming trial court's rejection of *Batson* challenge where prosecution's explanation that the juror's answers reflected potential sympathy toward inmates was race-neutral and not pretextual).

In addition, the prosecutor provided a reasonable explanation for excusing Dorothy Shabazz, another African-American juror. That is, Mrs. Shabazz's son and grandson were prosecuted on drug charges by the Onondaga District Attorney's Office. Jury Selection Tr. at pp. 31-33; *see also Copeland v. Walker,* 258 F.Supp.2d 105, 126 (E.D.N.Y.2003) (stating that record demonstrated "plausible, race-neutral reasons for the exercise of peremptory challenges" where one excused black jury had a "close" cousin previously convicted of crimes); *People v. Barney,* 743 N.Y. S.2d 793, 794 (N.Y.App. Div., 4th Dep't 2002) (finding that trial court properly considered prosecutor's explanation for excusing black female juror as race-neutral where she stated her son had been convicted of a crime twelve years earlier). In fact, Mrs. Shabazz's son, Jeffrey Peterson, was serving his sentence in state prison at the time of *voir dire. See People v. Peterson,* 703 N.Y.S.2d 629 (N.Y.App. Div., 4th Dep't 2000).

The burden then shifted to Petitioner to rebut as pretextual the race-neutral reasons proffered by the prosecution. In the absence of any further objection by defense counsel, Judge Fahey denied Williams' *Batson* motion and excused Mr. Brown. Jury Selection Tr. at p. 168. Although Judge Fahey did not articulate his rationale, it is implicit in his rejection of Petitioner's motion that he had analyzed whether Petitioner shouldered his burden of proving purposeful discrimination under the third step of *Batson.* This analysis requires the court to evaluate the credibility and demeanor of the attorney offering the race-neutral explanation for the strike. *Hernandez v. New York,* 500 U.S. at 365. Generally, the critical issue is whether counsel's race-neutral explanation is believed. Given that "[t]he credibility of an attorney offering a race-neutral explanation is at the very heart of [the] analysis,"

*Barnes v. Anderson,* 202 F.3d 150, 157 (2d Cir.1999), the reviewing *habeas* court "ordinarily should give [the trial court's] findings great deference," *Batson v. Kentucky,* 476 U.S. at 98 n. 21. This Court agrees with the trial court's determination that the prosecution's race-neutral reasoning was credible, as Judge Fahey was in the ideal position to weigh the demeanor and believability of ADA Price. In the present action, Williams has failed to provide any evidence to rebut the trial court's finding that the prosecutor offered a non-pretextual, race-neutral explanation for exercising the peremptory challenges as to the potential jurors. Accordingly, this Court concludes that Petitioner's *Batson* challenge lacks merit. Given that Petitioner's *Batson* claim is meritless, he cannot establish any prejudice resulting from this procedural default.

**\*11** Furthermore, upon reviewing the state court record, there is no basis to conclude that the denial of Petitioner's procedurally barred *Batson* claim would result in a fundamental miscarriage of justice. Therefore, the Court recommends that Williams' *Batson* claim be denied as procedurally defaulted.

### D. Claims Afforded AEDPA Deference

#### 1. Ineffective Assistance of Counsel

In the first ground of his Amended Petition, Williams further contends, as he did on direct appeal, that his trial counsel was ineffective by: (1) failing to call Detective Robert Lenhart as a defense witness and (2) neglecting to object to the allegedly prejudicial testimony of Detective Eric Carr. Am. Pet., Ground One; Appellate Br. at pp. 16-19. Respondent argues that this aspect of Petitioner's ineffective assistance of counsel claim is meritless. Resp't Mem. at pp. 8-11. The Appellate Division, Fourth Department held that Petitioner was not denied effective assistance of counsel. *People v. Williams,* 738 N.Y.S.2d at 810. Petitioner's leave to appeal these claims was rejected by the New York Court of Appeals. *People v. Williams,* 776 N.E.2d at 12.

To establish ineffective assistance of counsel, a *habeas* petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness measured by the prevailing professional norms; and (2) prejudice, *i.e.,* there is a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. *Strickland v. Washington,* 466 U.S.

668, 688, 694 (1984) (cited in *Bell v. Cone,* 535 U.S. 685, 695 (2002)); *see also Aeid v. Bennett,* 296 F.3d 58, 62-63 (2d Cir.2002); *Brown v. Artuz,* 124 F.3d 73, 79-80 (2d Cir.1997); *White v. Herbert,* 2006 WL 3728878, at \*4 (N.D.N.Y. Dec. 15, 2006) (McCurn, S.J.). [15] There is a strong presumption that counsel rendered adequate assistance as courts give high deference to counsel, and Petitioner "must overcome the presumption that the challenged action 'might be considered sound trial strategy.' " *Gatto v. Hoke,* 809 F.Supp. 1030, 1038 (E.D.N.Y.1992) (quoting *Strickland v. Washington,* 466 U.S. at 689), *aff'd mem.,* 986 F.2d 500 (2d Cir.1992); *see also Jackson v. Conway,* 448 F.Supp.2d 484, 492 (W.D.N.Y.2006).

[15]    In *Williams v. Taylor,* the Supreme Court declared that "the rule set forth in *Strickland* qualifies as 'clearly established Federal law[.]' " *529 U.S. 362, 391 (2000); see also Sellan v. Kuhlman,* 261 F.3d 303, 309 (2d Cir.2001).

#### a. Failure to Call Detective Robert Lenhart

Petitioner claims his counsel was ineffective by failing to call Officer Robert Lenhart at trial to testify that Larry McCraney provided him with a statement identifying Rausheen Cox or Raheem Dunway, not Petitioner, as the shooter. Am. Pet., Ground One; *see also* Resp't App. at pp. A81-83. Petitioner has failed to demonstrate that counsel's decision not to call Detective Lenhart was objectively unreasonable. "[C]ounsel's decision as to 'whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation.' " *United States v. Best,* 219 F.3d 192, 201 (2d Cir.2000) (quoting *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.1997)). In fact, the record reveals that Petitioner's counsel rigorously explored Larry McCraney's prior inconsistent statements at trial, which obviated the need to call Officer Lenhart to the stand. Specifically, counsel decided to thoroughly cross-examine McCraney regarding the discrepancies in his statements to Detective Lenhart and his trial testimony identifying Petitioner as the shooter. Trial Tr. at pp. 101-04 & 115-17. In addition, counsel cross-examined McCraney with his grand jury testimony, which was consistent with his statements to Detective Lenhart but contradicted his trial testimony. *Id.* at pp. 104-10 & 125-29. McCraney plainly admitted he made inconsistent statements to Detective Lenhart. *Id.* at pp. 101-04. In light of the foregoing, calling Detective Lenhart at trial would have been unnecessary and duplicative. Therefore, Petitioner has failed to demonstrate

2007 WL 2177075

that defense counsel's decision not to call Detective Lenhart was objectively unreasonable, and that had counsel called the investigator as a defense witness, the outcome of his trial would have been different.

### b. Failure to Object to Detective Eric Carr's Testimony

**\*12** Williams further alleges that his defense counsel failed to object to Detective Eric Carr's testimony. Am. Pet., Ground One. Detective Carr testified he received a call at police headquarters indicating that the suspect in the shooting was "Randy who lived on Lilac Street," and he subsequently checked the police computer to research whether there was a "Randy who lived on Lilac Street, having dealt with the police in the past year." Trial Tr. at pp. 196-97. Williams claims his attorney should have objected to this statement as prejudicial because it suggested to the jury that he had "criminal propensities." Am. Pet., Ground One. The Court agrees with Respondent's argument that the statement "dealt with police" is open to several interpretations-to the jury's knowledge, Williams could have been listed in the police computer as a crime victim, a witness, or an individual who had filed a complaint with the police. *See* Resp't Mem. at p. 11. On the other hand, it is certainly possible that counsel made a reasonable strategic decision not to object to the statement to avoid highlighting it to the jury. *See, e.g., Quinones v. Miller,* 2003 WL 21276429, at *50 n. 78 (S.D.N.Y. June 3, 2003) (citing, *inter alia, Buehl v. Vaughn,* 166 F.3d 163, 176 (3d Cir.1999) for the proposition that "[b]ecause the [objectionable] statements were fleeting, ... trial counsel may have wished to avoid emphasizing what might have gone relatively unnoticed by the jury"); *United States v. Grunberger,* 431 F.2d 1062, 1069 (2d Cir.1970) for the proposition that "it is understandable that a defense counsel may wish to avoid underscoring a prejudicial remark in the minds of the jury by drawing attention to it [through an objection]"); *United States v. Corcoran,* 855 F.Supp. 1359, 1371 (E.D.N.Y.1994), *aff'd,* 100 F.3d 944 (2d Cir.), *cert. denied,* 517 U.S. 1228 (1996), for the proposition that trial counsel made a "reasonable tactical decision" not to object to damaging testimony, as it "would merely serve to highlight the testimony"); & *Gatto v. Hoke,* 809 F.Supp. at 1039 for the proposition that "counsel's failure to object to the prosecutor's summation represent[ed] his tactical decision to avoid underscoring the prosecutor's statements so as to draw the jury's attention to them")). As such, defense counsel's failure to object to Detective Carr's testimony was not objectively unreasonable.

Moreover, even assuming *arguendo* that defense counsel's representation was inadequate in this regard, the Court cannot find that the outcome of Petitioner's trial was prejudiced. In the context of the entire trial, the investigator's statement was not so prejudicial as to require the state court judge to declare a mistrial. *See Jackson v. Conway,* 448 F.Supp.2d at 492. In light of the substantial evidence against Williams, including witness identification of Williams as the shooter and evidence retrieved from his residence corroborating the identification, any objection by defense counsel would not have changed the outcome of the trial. *See id.*

**\*13** The Appellate Division's denial of these aspects of Petitioner's ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent articulated in *Strickland.* Accordingly, these allegations of ineffective assistance of counsel should be denied.

### 2. Police Officers Conspired to Convict Petitioner Through the Use of False Evidence

In Ground Two of his Amended Petition, Williams alleges that the police engaged in a conspiracy to convict him through the use of false evidence. Am. Pet, Ground Two. Petitioner offers three specific allegations of police conspiracy: (1) Officer Daniel Jones provided false evidence when he testified regarding victim Larry McCraney's statements about Petitioner; (2) Detective Gary Coe tampered with evidence; and (3) Officer Brown provided transportation to the victim and his mother to trial, and spoke with the victim regarding his testimony. Am. Pet., Ground Two. In his July 2004 CPL Motion, Petitioner claimed this police conduct violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution. Dkt. No. 61, Ex. 22, Mem. of Law at pp. 10-11. Judge Fahey determined that this aspect of Petitioner's motion to vacate was based upon the existence or occurrence of facts which the moving papers failed to substantiate with sworn allegations, and denied this basis for relief under CPL § 440.30(4)(b). [16] July 2004 DO at p. 4. Respondent maintains that the state court's reliance on CPL § 440.30 is an independent and adequate state procedural ground barring federal *habeas* review, and in any event, lacks merit. Resp't Mem. at pp. 17-19.

16    CPL § 440.30(1) provides, in relevant part, that
      if a CPL § 440.10 motion "is based upon the
      existence or occurrence of facts, the motion papers
      must contain sworn allegations thereof, whether by
      the defendant or by another person or persons."
      A county court may reject the motion without
      conducting a hearing if, "[u]pon considering the
      merits of the motion ... [t]he motion is based
      upon the existence or occurrence of facts and the
      moving papers do not contain sworn allegations
      substantiating or tending to substantiate all the
      essential facts." CPL § 440.30(4)(b).

A split of authority exists within the Second Circuit regarding
whether a denial of a motion pursuant to CPL § 440.30(4)
(b) is an "independent and adequate" state procedural rule
barring federal *habeas* review. *See Gonzalez-Pena v. Herbert,*
369 F.Supp.2d 376, 388-89 (W.D.N.Y.2005) (citing
cases on both sides of the issue); *Douglas v. Hollins,* 2004 WL
187130, at * 3 (S.D.N.Y. Jan. 29, 2004) (same); *Shaw v.
Artuz,* 2001 WL 1301735, at *3-4 (S.D.N.Y. Oct. 19, 2001)
(finding procedural default where petitioner failed to comply
with CPL § 440.30(4)(b)); *White v. Keane,* 2001 WL 699053,
at *2 (S.D.N.Y. June 21, 2001) ("a violation of [CPL §
440.30(4)(b) ] would create a procedural bar"); *Roberts v.
Scully,* 875 F.Supp. 182, 192-93 n. 7 (S.D.N.Y.1995) (holding
that state court denial under CPL § 440.30(4)(b) constitutes
independent and adequate state law ground).

Other courts find that a denial pursuant to CPL § 440.30(4)
(b) is a decision on the merits because it applies only when a
trial court denies a § 440.10 motion "[u]pon considering the
merits." N .Y. C.P.L. § 440.30(4)(b); *see also Lou v. Mantello,*
2001 WL 1152817, at *9 n. 9 (E.D.N.Y. Sept. 25, 2001)
(rejecting respondent's argument that denial under section
440.30(4)(b) was based on an adequate and independent state
law ground as "an erroneous interpretation" of the statute,
which allows the trial court to deny a motion to vacate a
judgment of conviction only 'upon considering the merits' ");
*Ortiz v. Keohane,* 1995 WL 669904, at *4 n. 5 (E.D.N.Y. Nov.
5, 1995) (same); *Muhammad v. Kirk,* 1993 WL 37502, at *4
(S.D.N.Y. Feb. 8, 1993) (same); *see also Smart v. Scully,* 787
F.2d 816, 820 (2d Cir.1986) (stating that state court's denial
of defendant's motion to vacate for failure to set forth sworn
allegations in violation of CPL § 440.30 was not "an adequate
and independent state ground warranting a federal *habeas*
court's refusal to consider the underlying federal issues")
(internal quotations omitted).

**\*14** Given that section 440.30(4) applies, by its own terms,
only when a trial court denies a motion to vacate "[u]pon
considering the merits," this Court agrees with those decisions
concluding that a denial based on section 440.30(4) is a
decision on the merits, and cannot be a procedural bar to a
federal *habeas* claim. Therefore, the Court will address the
merits of Williams' claims that law enforcement conspired to
convict him through the use of false evidence.

The use of "known false evidence is incompatible with
'rudimentary demands of justice.' " *Giglio v. United States,*
405 U.S. 150, 153 (1972) (citing *Mooney v. Holohan,* 294
U.S. 103, 112 (1935)). "[A] conviction obtained through use
of false evidence, known to be such by representatives of the
State, must fall under the Fourteenth Amendment." *Napue v.
Illinois,* 360 U.S. 264, 269 (1959); *see also Mills v. Scully,*
826 F.2d 1192, 1195 (2d Cir.1987). However, the use of false
evidence does not comprise a constitutional violation unless
there was a reasonable likelihood that the testimony affected
the judgment of the jury or that it likely had an effect on the
outcome of the trial. *See Giglio v. United States,* 405 U.S. at
154; *Napue v. Illinois,* 360 U.S. at 271. [17]

17    The use of false evidence by the police is equally
      harmful as the use of such evidence by the
      prosecution. *See Rivers v. Martin,* 484 F.Supp. 162,
      164 (W.D.Va.1980). "The police are also part of the
      prosecution, and the taint on the trial is no less ....
      [I]f the police allow the State's attorney to [utilize
      false evidence] ... [they] are practicing deception
      not only on the State's Attorney but on the court and
      the defendant." *Id.* (citations omitted).

Petitioner has failed to factually substantiate his claims that
law enforcement compiled false evidence to convict him, let
alone demonstrate that use of the alleged false evidence likely
would have affected the outcome of his trial.

First, Williams objects to Officer Daniel Jones' testimony
regarding the victim's statements to him about the shooter.
Am. Pet ., Ground Two. While in the ambulance en route
to the hospital, Officer Jones asked McCraney who shot
him, and McCraney yelled several times "Randy, Lilac, he
lives on Lilac, Randy." Trial Tr. at pp. 161-63. Petitioner
accuses Officer Jones of falsifying this testimony based
on the following alleged evidence: (1) paramedic Valerie
Harmatiuk, who also rode in the ambulance, never heard the
victim make this statement to Officer Jones; (2) Officer Jones
never filed a report documenting McCraney's statement; and

2007 WL 2177075

(3) Officer William Foster was the first police officer to speak with the victim, and he testified McCraney did not know who shot him. Am. Pet., Ground Two; Traverse at pp. 15-16. However, Petitioner's allegations are unsupported by the record. According to the testimony adduced at trial, Ms. Harmatiuk testified that when Officer Jones asked McCraney if he knew who shot him, she overheard him "say that it was gang related, and someone from the Bloods had done it.... that's all I remember." Trial Tr. at p. 158. Ms. Harmatiuk's testimony does not contradict Officer Jones' testimony, and in no way supports Petitioner's allegation that Officer Jones fabricated McCraney's identification of Petitioner as the shooter. Moreover, Officer Foster, who was the first officer to speak with the victim, actually testified that McCraney asserted "the person who shot him lived in the hundred block of Lilac Street." Trial Tr. at p. 54. Contrary to Petitioner's argument, Officer Foster's testimony actually *corroborates* Officer Jones' conversation with McCraney. Further, whether Officer Jones filed a report regarding McCraney's statements in the ambulance is certainly not evidence of a conspiracy to convict Petitioner.

 *15 Second, Petitioner claims Detective Gary Coe "openly admitted to tampering with evidence" when he moved a starter pistol found at Petitioner's residence in order to photograph it. Am. Pet., Ground Two. However, at trial, Detective Coe testified that while assisting in the search of Petitioner's apartment, he recovered several items as evidence, including a starter pistol he found under the mattress in Petitioner's bedroom. Trial Tr. at pp. 231-32 & 250-51. The investigator stated he moved the pistol onto the mattress in order to take a clear picture of it. *Id.* at p. 251. Detective Coe never admitted to evidence tampering. Petitioner's claim is based solely on conclusory allegations. In any event, the starter pistol had no significance in the case against Petitioner. Williams' reference to Officer Coe's testimony in no way supports his factually baseless contentions that the police conspired to convict him using false evidence.

Finally, Petitioner cites to the trial testimony of Doris Williams, in which she allegedly states Officer Brown provided transportation to the trial to her and her son, Larry McCraney, and spoke to McCraney about his testimony. Am. Pet., Ground Two. Petitioner appears to argue that McCraney corroborated his mother's admissions by testifying that "they" [*i.e.,* the police] told him he could not get his boots back from law enforcement until the case was over and thereby demonstrated that the police encouraged him

to implicate Williams. Am. Pet., Ground Two. However, Doris Williams specifically testified at trial that while ADA Price spoke to McCraney about his testimony prior to the commencement of trial, Officer Brown simply assured them "that everything would be all right." Trial Tr. at p. 136. On these facts, Petitioner has not demonstrated that Officer Brown was involved in a conspiracy to convict him.

Petitioner cannot substantiate his claims of false evidence and police conspiracy based on the foregoing mischaracterizations of the record. Williams therefore has failed to demonstrate that the use of alleged false evidence affected the outcome of his trial. The Court cannot grant *habeas* relief based upon unsubstantiated conclusions, opinions, or speculation. *Wood v. Bartholomew,* 516 U.S. 1, 8 (1995) (stating that federal courts should not grant "habeas relief on the basis of little more than speculation with slight support"); *Williams v. Burge,* 2005 WL 2179423, at *16 (N .D.N.Y. Aug. 15, 2005) (Peebles, M.J.), *adopted,* No. 02-0695, Dkt. No. 35 (N.D.N.Y. Dec. 7, 2005) (Hurd, D.J.). It cannot be said that the County Court's rejection of Petitioner's insufficiently-substantiated claims was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Accordingly, Petitioner's contentions that the police conspired to convict him through the use of false evidence should be **denied.**

### 3. Prosecutorial Misconduct

In the Third Ground of his Amended Petition, Petitioner sets forth several allegations of prosecutorial misconduct, including that the prosecution relied on the perjured testimony of Larry McCraney in securing a verdict in violation of Petitioner's due process rights. Am. Pet., Ground Three; Traverse at pp. 17-20. Williams first asserted this argument in his July 2004 CPL Motion. Dkt. No. 61, Ex. 22, Mem. of Law at pp. 1-9. The County Court denied Petitioner's motion to vacate because Petitioner failed to substantiate the facts alleged as required by CPL § 440.30. [18] July 2004 CPL DO at p. 2. Respondent argues that this aspect of Petitioner's prosecutorial misconduct claim is procedurally defaulted under CPL § 440.30. Resp't Br. at pp. 20-21.

[18]     The County Court specifically relied on CPL § 440.30 in rejecting Petitioner's federal constitutional claim that this prosecutorial misconduct violated his due process rights under

the United States and New York Constitutions. July 2004 DO at p. 2. Judge Fahey also asserted that the motion must be denied because Petitioner's prosecutorial misconduct claim previously was determined on the merits on direct appeal. July 2004 DO at p. 2 (citing CPL § 440.10(2)(a)). However, we note that while Petitioner set forth other factual claims of prosecutorial misconduct on direct appeal as articulated below, *see infra* Part II.E.2, he did not contend that the prosecution relied on false testimony to secure a conviction. *See* Appellate Br. at pp. 21-22. As such, we will examine the County Court's decision on this issue as based solely on CPL § 440.30.

**\*16** As previously discussed herein, this Court considers a denial based on CPL § 440.30(4) as a decision on the merits, rather than a procedural bar to a federal *habeas* claim. *See supra* Part II .D.2. The Court therefore will consider whether the state court's denial of this aspect of Williams' prosecutorial misconduct claim was an unreasonable application of clearly established Supreme Court precedent.

The Supreme Court examines claims for wrongful conviction based on perjured testimony under the Due Process Clause of the Fourteenth Amendment. *Napue v. Illinois,* 360 U.S. at 269. Under this standard, a conviction must be set aside if "the prosecution knew, or should have known, of the perjury" and "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103 (1976). The Second Circuit has declined "to draw the contours of the phrase 'should have known' " because the Supreme Court has not yet clearly established that *habeas* relief is available in the total absence of prosecutorial knowledge of perjury. *Drake v. Portuondo,* 321 F.3d 338, 345 n. 2 (2d Cir.2003).

Petitioner points to the troubling inconsistencies in McCraney's statements regarding the identity of his assailant as the perjured testimony relied on by the prosecution. Am. Pet., Ground Two. However, in light of the evidence set forth in state court, the County Court's decision on this issue was not an unreasonable determination of the facts.

Williams has offered no evidence whatsoever to indicate that McCraney's trial testimony was perjured, or that ADA Price knowingly permitted the testimony to be given. Although McCraney's trial testimony identifying Petitioner as the assailant was inconsistent with his grand jury testimony, ADA Price had no reason to doubt the truthfulness of McCraney's

testimony. The victim's statement was corroborated by the testimony of Wayne Williams and Rausheen Cox and by evidence obtained from Petitioner's residence, including a loaded Rohm brand .22 caliber revolver, a black hooded sweatshirt, black denim jeans, and boots tied with a blue bandana. Trial Tr. at pp. 232, 316-19, & 375-76. Indeed, McCraney's testimony at trial was consistent with his identification of Williams as the assailant immediately after the shooting. *Id.* at pp. 44-45, 54, 133-34, & 163-64. The issue of identification of the shooter was fully explored by defense counsel when he thoroughly cross-examined McCraney regarding his contradictory statements, and the jury was presented with both the prosecution and defense's stances and inferences on this issue. *Id.* at pp. 110 & 115-16. The jury was able to formulate its own conclusions regarding the victim's credibility. Therefore, it is highly unlikely that McCraney's testimony, even if false, affected the judgment of the jury or the outcome of the trial. As such, Petitioner's allegation that the prosecutor knowingly relied on perjured testimony of the victim should be **denied.**

### *4. Newly Discovered Evidence*

**\*17** In the Fourth Ground of his Amended Petition, Williams appears to contend that newly-discovered evidence has developed since his trial to exonerate him. Am. Pet., Ground Four. Petitioner asserts that:

> Witness Marcus Burns gave a statement after Petitioner's trial, that his cousin Larry McCraney told him that the police told him to inculpate Petitioner. Further, Mr. Burns stated to his attorney James F. Greenwald, in a statement, that he (Mr. McCraney) told him in the hospital that co-defendant Raheem had shot him. Not Petitioner.

*Id.*

He further alleges that the statement of Marcus Burns would result in an acquittal if he were granted a new trial. Traverse at p. 20. Petitioner first raised this claim in his July 2004 CPL Motion. July 2004 CPL Motion at pp. 28-30. That court rejected Petitioner's argument, stating that "evidence which

would merely tend to impeach or discredit prior testimony of a witness is not sufficient new evidence to set aside a judgment of conviction." July 2004 DO at p. 4. The County Court found that since the purported "new evidence" would serve only to impeach the credibility of Larry McCraney, it was insufficient to grant Petitioner's motion. *Id.*

Newly discovered evidence regarding the guilt or innocence of a petitioner is not a ground to grant *habeas corpus* relief. *Townsend v. Sain,* 372 U.S. 293, 317 (1963), *overruled on other grounds, Keeney v. Tamayo-Reyes,* 504 U.S. 1 (1992). Rather, for *habeas* relief to be available, the newly discovered evidence must relate to an independent constitutional violation in the underlying state court proceedings. *Herrera v. Collins,* 506 U.S. 390 (1993). In *Herrera,* the Supreme Court emphasized that the due process clause guarantees only that a trial is procedurally fair, and not that the verdict is factually correct. *Id.* at 401-02. Pointing to constitutional sufficiency-of-the-evidence review, *Herrera* highlights the requirement that the record contain sufficient evidence, viewed in the light most favorable to the prosecution, to justify a rational juror in finding a defendant guilty beyond a reasonable doubt. *Id.* (citing *Jackson v. Virginia,* 443 U.S. 307 (1979)); *see also Russell v. Ricks,* 2006 WL 1555468, at * 17 (quoting *Jackson,* 443 U.S. at 319 n. 13, and stating that a federal district court is precluded from " 'mak[ing] its own subjective determination of guilt or innocence' "). A state court's refusal to vacate a conviction based on newly discovered evidence violates due process when: "(1) the new evidence could not, with due diligence, have been discovered before or during trial; (2) evidence at trial was false and material; and (3) the jury probably would have acquitted the defendant." *Keller v. Herbert,* 1998 WL 34002606, at * 3 (N.D.N.Y. Sept. 9, 1998) (Sharpe, M.J.) (citing *Sanders v. Sullivan,* 863 F.2d 218, 224-26 (2d Cir.1988), *adopted,* No. 96-1158, Dkt. No. 19 (N.D.N.Y. Oct. 7, 1998) (Scullin, D.J.).

**\*18** "If newly discovered evidence indicates that testimony given at trial was perjured, the grant of a new trial depends on 'the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury.' " *United States v. Wong,* 78 F.3d 73, 81 (2d Cir.1996) (quoting *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991)). *Habeas* relief is not warranted unless the perjured testimony is "material in the sense that its suppression undermines confidence in the outcome of the trial," and is not cumulative. *Chamberlain v. Mantello,* 954 F.Supp. 499, 507 (N.D.N.Y.1997) (Kahn, D.J.) (quoting *United States v. Bagley,* 473 U.S. 667, 678 (1985)); *see also Clark v. Irvin,* 844 F.Supp. 899, 907 (N.D.N.Y.1994) (Hurd, M.J.). Therefore,

newly discovered evidence that would merely impeach a witness is insufficient to warrant *habeas* relief. *See Clark v. Irvin,* 844 F.Supp. at 907; *see also Mastin v. Senkowski,* 297 F.Supp.2d 558, 598 (W.D.N.Y.2003).

Examining Williams' claim according to the standard outlined in *Herrera,* it is evident the County Court's decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. In light of the compelling evidence against Williams adduced at trial, Marcus Burns' statement would have had little effect on the jury. Mr. Burns' statement simply would have impeached Larry McCraney's testimony and would have been cumulative of other testimony adduced at trial. The trial record establishes that the jury was well-aware McCraney made prior inconsistent statements regarding the identification of the shooter in order to obtain his boots back from law enforcement investigators. Trial Tr. at pp. 101-10. Mr. Burns' statement, a hearsay account of McCraney's alleged inconsistent identification, would not have substantially affected the jury's view of McCraney's credibility. McCraney's credibility was raised by defense counsel during a rigorous cross-examination and was weighed by the jury during its deliberations. *Id.* Even assuming Mr. Burns' statement was admitted as newly discovered evidence at trial, it is highly doubtful that the proffered evidence would lead to Petitioner's acquittal. This evidence is "nothing more than the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial, or in this instance, habeas relief." *Chamberlain v. Mantello,* 954 F.Supp. at 511 (citations omitted). The County Court's finding that Marcus Burns' statement simply tended to affect witness credibility was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d)(2). Williams cannot establish an independent constitutional violation as required by *Herrera,* and therefore the Court recommends that Williams' newly discovered evidence claim be **denied.**

### E. Claims Afforded *De Novo* Review

#### 1. Ineffective Assistance of Counsel

**\*19** In the First Ground of his Amended Petition, Williams alleges, as he did in his July 2004 CPL Motion, that his trial counsel, James Stern, was ineffective by: (1) failing to interview and call as defense witnesses Officer Lisa Negrisor

and Officer Richard Morris; and (2) failing to properly raise a *Batson* challenge. Am. Pet., Ground One; July 2004 CPL Motion at pp. 18-28. In the Sixth Ground of his Amended Petition, Williams raises, as he did in his July 2004 CPL Motion, that Stern failed to properly discuss plea offers with him. Am. Pet., Ground Six; July 2004 CPL Motion at pp. 17-18. The County Court denied these allegations pursuant to CPL § 440.10(2)(a) [19] because Petitioner raised the issue of ineffective assistance of counsel on direct appeal and the appellate court determined he was not deprived of effective assistance. *See* July 2004 DO at p. 4. [20] Respondent argues that these claims of ineffective assistance of counsel are procedurally barred by CPL § 440.10(2)(a), and, in any event, have no merit. Resp't Mem. at pp. 11-13 & 24-28.

[19]    CPL § 440.10(2)(a) provides in relevant part that a county court must deny a motion to vacate a judgment when "[t]he ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment, unless since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue."

[20]    Contrary to the County Court's observations, this Court notes that Petitioner's allegations of ineffective assistance raised on direct appeal do not include the aforementioned theories, which were raised for the first time in his July 2004 CPL Motion.

District Courts within the Second Circuit disagree as to whether a state court's reliance on CPL § 440.10(2)(a) in denying a constitutional claim results in the procedural default of that claim on federal habeas review. *See, e.g., Cruz v. Berbary,* 2006 WL 2946946, at *8 (W.D.N.Y. Oct. 16, 2006) (concluding that CPL § 440.10(2)(a) constitutes adequate and independent state ground resulting in procedural default of petitioner's federal *habeas* claims); *Hronopoulos v. Keane,* 1999 WL 529559, at *4 (E.D.N.Y. July 21, 1999) (finding that petitioner's claim was procedurally barred under CPL § 440.10(2)(a)); *Encarnacion v. Walker,* 1998 WL 34002608, at *4-5 (N.D.N.Y. Aug. 21, 1998) (Sharpe, M.J.) (identifying CPL §§ 440.10(2)(a) and (b) as adequate and independent state procedural rules), *adopted,* No. 96-329, Dkt. No. 17 (N.D.N.Y. Aug. 24, 1999) (Scullin, D.J.); *cf. Douglas v. Hollins,* 2004 WL 187130, at * 6 n. 5 (S.D.N.Y. Jan. 29, 2004) (finding that state court ruling under CPL § 440.10(2)(a) "does not constitute a finding of procedural default that

precludes federal habeas review of the merits"); *Guzman v. Couture,* 2003 WL 165746, at * 11 (S.D.N.Y. Jan. 22, 2003) ("A dismissal under § 440.10(2)(a) is not based on any procedural default. To the contrary, it is premised on a prior decision.") (quotations omitted); *Taylor v. Kuhlmann,* 36 F.Supp.2d 534, 546 (E.D.N.Y.1999) (same). [21] While this aspect of Williams' ineffective assistance claim is arguably procedurally defaulted, given the diverging views regarding which standard a federal *habeas* court should apply when a state court ruling relies on CPL § 440.10(2)(a), this Court will review *de novo* the County Court's decision denying these theories of ineffective assistance of counsel. *See, e.g., Lyons v. Conway,* 2006 WL 2847281, at *4 (N.D.N.Y. Sept. 30, 2006) (Mordue, C.J.) (citing *Marengo v. Conway,* 342 F.Supp.2d 222, 227 (S.D.N.Y.2004) ("If the state court's adjudication of a petitioner's federal claim is not based on the merits-for example, when the decision rests solely on procedural grounds ... the ... federal court must apply a pre-AEDPA *de novo* review to the state court's disposition of the federal claim") (citing *Cotto v. Herbert,* 331 F.3d at 230) (other citation omitted))).

[21]    The Second Circuit has not conclusively determined whether CPL § 440.10(2)(a) is an adequate and independent state ground precluding federal *habeas* review on the merits. *See Fernandez v. Artuz,* 402 F.3d 111, 115 n. 4 (2d Cir.2005) (identifying CPL §§ 440.10(2)(a) and 440.10(2)(c) as procedural bars under New York law) (citing *Artuz v. Bennett,* 531 U.S. 4, 8 (2000)); *but see Silverstein v. Henderson,* 706 F.2d 361, 368 (2d Cir.1983) (stating that a state court ruling under CPL § 440.10(2)(a) "does not constitute a finding of procedural default that would bar federal consideration of [petitioner's] claims").

### a. Failure to Call Officers Negrisor and Morris as Defense Witnesses

**\*20** Williams alleges that Officer Lisa Negrisor should have been called as a defense witness to testify regarding her interview of Larry McCraney's mother, Doris Williams. Am. Pet., Ground One. Detective Negrisor's report states that she interviewed Mrs. Williams immediately upon her arrival at the hospital to see her son, and Mrs. Williams indicated she had never heard McCraney mention anyone named "Randy." July 2004 CPL Motion at Ex. D. According to Petitioner, Mrs. Williams testified at trial that, in the presence of a female

2007 WL 2177075

police officer, McCraney told her "Randy" shot him. Am. Pet., Ground One.

Contrary to Petitioner's allegations, Stern's decision not to call Detective Negrisor was objectively reasonable. First, Doris Williams' trial testimony does not clearly contradict Detective Negrisor's report because it is indiscernible from the report whether Mrs. Williams spoke with the detective *before* or *after* she spoke with her son at the hospital. Even assuming Mrs. Williams made inconsistent statements regarding her conversations with her son, defense counsel made the strategic decision to cross-examine the victim as to his own inconsistent statements about the shooter. Stern reasonably decided that calling Detective Negrisor as a defense witness to testify regarding Doris Williams' conversations with her son simply was not as effective as questioning the victim regarding his statements to his mother and others. *See* Trial Tr. at pp. 101-10. Second, if Detective Negrisor was the female officer present when McCraney identified "Randy" as the shooter, her testimony regarding this issue would have supported the prosecution, rather than Petitioner's case.

Williams also contends that his counsel should have called Detective Richard Morris as a defense witness. Am. Pet., Ground One. Petitioner claims Detective Morris interviewed Charles Johnson and would have testified that Mr. Johnson identified someone other than Petitioner as the shooter. *Id.* However, more importantly, the victim provided inconsistent statements regarding the identity of the shooter. Trial Tr. at pp. 101-10. While Mr. Johnson did not testify at trial, Larry McCraney testified and was extensively questioned by defense counsel regarding his inconsistent identifications. *Id.* As such, any testimony by Detective Morris regarding Mr. Johnson's statements would have been irrelevant and extraneous.

Williams has failed to overcome the presumption that Stern did not stray from reasonable professional judgment in declining to call either Detective Negrisor or Detective Morris at trial. Even if counsel had erred in formulating this strategic decision, the testimony of these witnesses at trial would not have changed the outcome of the proceedings. Therefore, these allegations of ineffective assistance of counsel should be **denied.**

### b. Failure to Raise Batson Issue

Williams further contends that his counsel was ineffective by failing to properly raise a *Batson* challenge during jury selection. Am. Pet., Ground One. Specifically, Petitioner claims Stern failed to demonstrate pretext for the prosecution exercising peremptory challenges on two African-Americans in the jury pool. *Id.*

**\*21** Even assuming, *arguendo,* that defense counsel unreasonably failed to meet his burden of showing that the prosecution's reasons for exercising the challenges were pretextual, Petitioner did not suffer any prejudice because his *Batson* claim lacks merit. *See supra* Part II.C. As detailed above, upon reviewing the jury selection transcript, this Court agrees with the trial court's determination that the prosecution's race-neutral reasoning was credible, and Williams has failed to provide any evidence to the contrary. *Id.*

Significantly, it is entirely possible that Stern recognized the futility of the *Batson* challenge and strategically decided to abandon the motion. An attorney's purported failure to pursue a meritless *Batson* claim cannot be the basis of an ineffective assistance of counsel claim. *See, e.g., United States v. Franklin,* 157 F.3d 90, 97 (2d Cir.1998) (finding that petitioner, alleging ineffective assistance of counsel based on his attorney's waiver of *Batson* claim, was unable to meet the requirements of *Strickland* where the challenge was meritless); *Melenciano v. Walsh,* 2005 WL 768591, at \*7-8 (S.D.N.Y. Apr. 6, 2005) ("[T]rial counsel's failure to pursue a meritless *Batson* challenge cannot be the foundation for Petitioner's ineffective assistance counsel [sic].") (citation omitted). Accordingly, Williams' ineffective assistance *Batson* claim should be **denied.**

### c. Failure to Discuss Plea Offers with Petitioner

Petitioner further asserts that Stern was ineffective by failing "to properly discuss plea offer[s] with Petitioner and his family." Am. Pet., Ground Six. Specifically, Williams claims his attorney informed him that the District Attorney's plea offer was a determinate sentence of seven (7) years. Am. Pet., Ground Six; *see also* Traverse at p. 12. However, according to Petitioner, Stern informed his mother that the plea offer was a seven (7) to fifteen (15) year indeterminate sentence, and she was never aware of the seven (7) year determinate offer. Am. Pet., Ground Six; *see also* Traverse at p. 12. Williams also contends that he was misled when Stern advised him to

reject the plea offer because the case was "weak" and he could prevail at trial. Am. Pet., Ground Six.

Under the first prong of the *Strickland* test, the effective assistance of counsel requires a defense attorney to provide the client with his professional advice regarding the "crucial decision" of whether to accept a plea offer. *Boria v. Keane,* 99 F.3d 492, 496-97 (2d Cir.1996). A claim of ineffective assistance of counsel during plea negotiations will lie where an attorney fails to communicate a plea offer, or fails to exercise the proper skill and diligence in advising the client whether to accept or reject the offer. *Id.* Applying the second prong of *Strickland,* a petitioner must demonstrate a "reasonable probability" that absent counsel's errors in conveying or explaining a plea offer, the petitioner would have accepted the offer. *Id.* at 49; *see also Hill v. Lockhart,* 474 U.S. 52, 59 (1985) ("[I]n order to satisfy the ... 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.").

**\*22** As to the first *Strickland* prong, by Williams' own admission, Stern communicated the alleged plea offer of seven (7) years determinate sentence to him.[22] Traverse at p. 12. The fact that Petitioner's mother was allegedly unaware of this offer, but purportedly was informed of a less desirable plea offer of seven (7) to fifteen (15) years indeterminate, is irrelevant-counsel's duty was to advise *Petitioner* regarding the plea, not his mother. *See Booth v. Cont'l Ins. Co.,* 634 N.Y. S.2d 650, 655 (N.Y. Sup.Ct., Westchester County 1995) ("An attorney owes his client undivided loyalty and allegiance."). Petitioner appears to argue that if his mother had known about the seven year deal, she would have encouraged him to accept it. Am. Pet., Ground Six; Traverse at pp. 12-13. However, defense counsel's actions were not inadequate simply because Petitioner's mother allegedly would have convinced Petitioner to accept a deal had she been fully informed of the more favorable plea. *See, e.g., People v. Davis,* 534 N.Y.S.2d 429, 430 (N.Y.App. Div., 2d Dep't 1988) (finding that trial court's denial of defendant's request for an adjournment to discuss proposed plea agreement with his family was not improper). Furthermore, Williams' argument defies logic-if he were so reliant on his mother's advice, he would have informed her of the seven year deal communicated to him by Stern *prior* to rejecting the plea and proceeding to trial. Indeed, Williams admits to consulting with his mother upon learning of the plea deal, and she "request[ed]" he proceed to trial. *See* Am. Pet., Ground Six.

This Court finds it incredible that Williams and his mother failed to discuss the terms of any plea offers on the table at that critical time. Williams' allegation that Stern failed to adequately inform his mother of the deal is a contrived attempt to avoid the consequences of his convictions.]

[22]    The record before this Court does not indicate whether a plea offer was made, let alone improperly conveyed to Petitioner and/or his mother. However, based on Petitioner's claims and the evidence presently in the record, an evidentiary hearing is not required to explore the factual basis of Petitioner's allegations. Even accepting Petitioner's version of the facts as true, defense counsel's actions did not constitute ineffective assistance.

Even if, *arguendo,* Petitioner's argument is construed to allege that Stern was ineffective by failing to inform *him* of the seven to fifteen year indeterminate plea offer, this claim still lacks merit. The trial court informed Petitioner that if a disposition of the case was determined by October 5, 2000, any commitment would be capped at fifteen years. Traverse, App. I at pp. 4-5. If the case was not resolved by October 5, the trial court stated "that commitment isn't going to be binding and whatever disposition he enters into after that or if he gets convicted after trial[,] sentencing is wide open up to 25 years." *Id.* at p. 5. Based on this record, it is evident Petitioner was aware that the district attorney's office had the discretion to suggest a less favorable deal capped at fifteen years, rather than seven years determinate, and Petitioner further knew the consequences of rejecting such a deal. Moreover, whether Petitioner knew about a less desirable seven to fifteen year deal is not determinative, as Petitioner makes clear he would have rejected any other offer in favor of the seven year determinate deal. *See* Traverse at p. 13.

**\*23** After informing Williams of the plea offer, counsel's only further obligation was to provide adequate advice, based on his expertise and knowledge of the facts and the law, regarding whether Williams should accept the plea offer. *See Purdy v. United States,* 208 F.3d 41, 45 (2d Cir.2000); *Boria v. Keane,* 99 F.3d at 497 ("[P]rior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered.") (quoting *Von Moltke v. Gillies,* 332 U.S. 708, 721 (1948)). Williams faults his attorney for advising him not to take the plea offer because counsel felt the case against Williams was weak. Am. Pet., Ground Six. Adequate advice in this context requires counsel to "usually inform

2007 WL 2177075

the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Purdy v. United States,* 208 F .3d at 45. As the Second Circuit observed, counsel must provide the client with professional advice while allowing the defendant to make the ultimate decision whether to plead guilty. *Id.* (citing Model Rules of Professional Conduct Rule 1.2(a) (1995) ("In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered."). "Counsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness because '[r]epresentation is an art,' and '[t]here are countless ways to provide effective assistance in any given case.' " *Id.* (quoting *Strickland v. Washington,* 466 U.S. at 689 & 693). An attorney rendering advice in this area may consider, *inter alia,* "the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea ..., whether the defendant has maintained his innocence, and the defendant's comprehension of the various factors that will inform his plea decision." *Id.*

Clearly, Williams and Stern discussed the possibility of a plea because, according to Williams, Stern advised him that the case against him was weak and he should proceed to trial. Am. Pet., Ground Six. As such, it is more likely than not that they discussed the strengths and weaknesses of Petitioner's case, as well as the benefits of accepting the plea. In fact, Petitioner admits that he deemed the plea offer "inadequate" and he therefore "allowed counsel" to reject the offer and proceed to trial. *See* Traverse at p. 12. This statement supports the logical conclusion that Williams and Stern discussed the potential plea, which Williams ultimately decided to reject. *See* Model Rules of Professional Conduct Rule 1.2(a) (1995) (indicating the ultimate decision whether to accept or to reject a plea lies with client); *see also* New York Code of Prof'l Responsibility EC 7-7 (2003) (same). The Court cannot fault Stern for opining that the case against Williams was weak in light of the conflicting, ambiguous pre-trial evidence regarding the identity of the shooter. In addition, Petitioner necessarily was aware of the alternative sentences to which he would be exposed if he did not plea. Specifically, Petitioner knew that if a disposition was not reached by October 5, 2000, he could be sentenced up to twenty-five years. Traverse, App. I at pp. 4-5. In this regard, Judge Fahey and Stern engaged in the following discourse on the record in advance of trial:

> **\*24** THE COURT: If there is going to be a disposition of the case put it down for October 5th. If there is no disposition on October 5th then any commitments made

with respect to sentencing are not going to be binding, understand that.

> MR. STERN: I don't believe we made any commitments other than you wouldn't do less than fifteen years.

> THE COURT: I would indicate I would cap it at fifteen years.

> MR. STERN: That's right, you wouldn't do more than fifteen years.

> THE COURT: If you don't resolve it on the 5th of October you know that commitment isn't going to be binding and whatever disposition he enters into after that or if he gets convicted after trial sentencing is wide open up to 25 years.

> MR. STERN: I understand, your Honor. My client [sic] I would like to place on the record, my client is in court and I believe he heard, your Honor.

*Id.*

Williams surely comprehended that he would receive a shorter sentence if he pled guilty than if he were convicted after trial.

Accordingly, it appears that Williams was informed of the strengths and weaknesses of his case, was apprised of his chances of prevailing at trial in the face of ambiguous evidence regarding the identity of the shooter, and was aware of the disparity in sentencing after a full trial as compared to a guilty plea. *See Purdy v. United States,* 208 F.3d at 45. Williams therefore cannot overcome the strong presumption that his counsel's advice was reasonable under *Strickland.* This Court cannot measure the reasonableness of defense counsel's advice solely on the fact that Williams ultimately was convicted. *See Charris v. Artuz,* 32 F.Supp.2d 139, 141-42 (S.D.N.Y.1998) (discouraging *habeas* courts from measuring the quality of an attorney's advice regarding plea deal on the "ultimate event" that petitioner was convicted) (quoting *Costello v. Costello,* 103 N.E. 148, 152 (N.Y.1913) ("[A] wisdom developed after an event, and having it and its consequences as a source, is a standard no man should be judged by.")). On *habeas* review, Petitioner is attempting to impermissibly use hindsight, after being convicted, to receive the benefit of a previously rejected advantageous plea offer. However, Petitioner's allegations fail to establish that counsel's performance fell below an objective standard of reasonableness during plea negotiations.

Even if defense counsel's advice concerning the plea offer was unreasonable, the deficiency would not have prejudiced Williams. Under this second prong of the *Strickland* test, Williams must establish a reasonable probability that but for his counsel's inadequacies, he would have accepted the plea. *See Purdy v. United States,* 208 F.3d at 49. In his Traverse, Petitioner states he would have accepted the seven year determinate deal if it was "in fact the offer." Traverse at p. 13. However, a petitioner's "self-serving, post-conviction" statement is insufficient to meet his burden of proving that he would have accepted the plea if properly advised by his attorney. *See United States v. Gordon,* 156 F.3d 376, 380-81 (2d Cir.1998); *see also Purdy v. Zeldes,* 337 F.3d 253, 259 (2d Cir.2003) ("[I]n most circumstances a convicted felon's self-serving testimony is not likely to be credible."); *Smith v. McGinnis,* 2003 WL 21488090, at *4 (S.D.N.Y. June 25, 2003) (quotations omitted); *Gluzman v. United States,* 124 F.Supp.2d 171, 177 (S.D.N.Y.2000). The Court does not find credible Williams' claim that he would have accepted the plea. In the very Traverse where he alleges he would have accepted the plea, Williams also plainly states that when he was, in fact, offered the seven year deal, he determined the offer was "inadequate" and as such, he "allowed" counsel to reject the offer. *See* Traverse at p. 12. Indeed, Williams asserted he would have accepted the plea only *after* Respondent alerted him that he must make such a showing in order to prevail under the prejudice prong of *Strickland. See* Resp't Mem. at p. 12. Williams' contradictory statements serve only to discredit him before this Court. The Court therefore recommends that this claim of ineffective assistance of counsel should also be **denied.**

### *2. Prosecutorial Misconduct*

 **\*25**  In his Third Ground for *habeas* relief, Petitioner argues that the prosecution engaged in misconduct by: (1) eliciting prejudicial testimony from witness Wayne Williams regarding his fear of testifying due to threats against him and his family; (2) asking leading questions throughout trial and using the examination process to testify; and (3) attempting to shift the burden of proof to the defense during summation, thereby affecting the verdict. Am. Pet, Ground Three. On direct appeal, Williams claimed this alleged misconduct denied him a "fair trial." Appellate Br. at pp. 21-22. The Appellate Division, Fourth Department held that Williams' claim of prosecutorial misconduct "is in part unpreserved for our review, and in any event, is lacking in merit." *People v.*

*Williams,* 738 N.Y.S.2d at 810. Respondent addresses these allegations on the merits because the Fourth Department did not identify which aspect of Petitioner's prosecutorial misconduct claim was not preserved. Resp't Br. at p. 21.

The standard to be employed by this Court in analyzing these allegations is murky at best. Specifically, whether this claim is procedurally defaulted or "adjudicated on the merits" is unclear. "[A] procedural default does not bar consideration of a federal claim on ... habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed,* 489 U.S. 255, 263 (1989) (citations omitted). Where a state court has expressly found both a failure to preserve the argument for appellate review and states alternatively that the argument lacks merit, the procedural bar applies. *Fama v. Comm'r of Corr. Servs.,* 235 F.3d at 809 & 810 n. 4 (citing *Glenn v. Bartlett,* 98 F.3d 721, 724-25 (2d Cir.1996) & *Velasquez v. Leonardo,* 989 F.2d 7, 9 (2d Cir.1990)). If there is ambiguity, however, as in "when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Jimenez v. Walker,* 458 F.3d 130, 139 (2d Cir.2006) (citations omitted); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d at 810; *see also Coleman v. Thompson,* 508 U.S. at 735.[23]

23
>     Moreover, in a case where both procedural and substantive arguments have been advanced by the parties but no opinion is issued by the state court explaining its rejection of a claim, a federal court may properly assume that the state court based its decision on state procedural grounds absent "good reason" to believe the state courts' silence represents a decision to deny the claim on its merits. *Quirama v. Michele,* 983 F.2d 12, 14 (2d Cir.1993).

The Appellate Division, Fourth Department's finding that Petitioner's prosecutorial misconduct allegations were "in part unpreserved and in any event ... lacking in merit" is not necessarily a clear or express statement of reliance on a state procedural rule. *See, e.g., Suriel v. Burge,* 2006 WL 2583203, at *5 (E.D.N.Y. Sept. 6, 2006) (reviewing prosecutorial misconduct claim *de novo* where Appellate Division found contention "in part, unpreserved, and in any event does not warrant reversal"). In addition, the Fourth Department's holding is not clearly "on the merits" because the appellate court failed to specify which factual allegations were unpreserved and meritless. *See Jimenez v. Walker,* 458

F.3d at 144 n. 14 ("[I]t is self-evident, we believe, that a state court can fail to clearly express its reliance on a procedural basis while, at the same time, not adjudicating the claim on the merits [as required for AEDPA deference to apply].") (quoting *DeBerry v. Portuondo,* 403 F.3d at 67 n. 7). "If a federal claim has not been adjudicated on the merits, AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.*" *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir.2006). Given the lack of clarity inherent in the state court's disposition, this Court will review *de novo* the trial court's decision denying these theories alleging prosecutorial misconduct. *Cf. id.* at 204 ("It is unnecessary in this case to decide whether to afford AEDPA deference to the decision of the Appellate Division because, even applying a *de novo* review standard, we find that the petitioner has failed to establish any violation of federal law."); *see also Wiggins v. Smith,* 539 U.S. 510, 530-31 (2003) (applying *de novo* standard to federal claim not reached by state court); *Boyette v. LeFerve,* 246 F.3d at 89 (refusing to afford AEDPA deference to part of state court decision where it was "unclear which of the hearing court's findings the appellate court rejected"). [24]

[24] It also bears mentioning that whether Petitioner exhausted these claims in state court by merely arguing he was denied a "fair trial" remains unclear. Indeed, the exhaustion requirement "is not automatically satisfied every time an alleged trial error is claimed to deny a defendant a 'fair trial.' " *Kirksey v. Jones,* 673 F.2d 58, 60 (2d Cir.1982) ( "Alleging lack of a fair trial does not convert every complaint about evidence or a prosecutor's summation into a federal due process claim."); *see also Petrucelli v. Coombe,* 735 F.2d 684, 688 (2d Cir.1984); *Daye v. Attorney Gen. of the State of New York,* 696 F.2d 186, 193 (2d Cir.1982) ("The concept of fairness embraces many concrete notions .... Obviously not every event in a criminal proceeding that might be described as 'unfair' would be a violation of the defendant's rights under the Constitution."). A fair trial claim has constitutional implications if it is based on factual allegations that commonly call to mind due process constraints. *Daye v. Attorney Gen. of the State of New York,* 696 F.2d at 193. Some courts would consider Petitioner's claims of improper prosecutorial summation "well within the mainstream of constitutional litigation." *See, e.g., Walker v. Bennett,* 262 F.Supp.2d 25, 33

(W.D.N.Y.2003) (finding that, although petitioner couched his prosecutorial misconduct claim only in terms of state law on direct appeal, allegations that he was denied a fair trial due to prosecutor's prejudicial statements in summation called to mind constitutional issues of due process) (quoting *Daye v. Attorney Gen. of the State of New York,* 696 F.2d at 194); *D'Allesandro v. Fischer,* 2005 WL 3159674, at * 15 (S.D.N.Y. Nov. 28, 2005) (considering claim challenging propriety of prosecutor's summation exhausted for purposes of *habeas* review). However, a prosecutor's method of examining witnesses and eliciting allegedly prejudicial testimony from those witnesses may simply raise questions of state evidentiary law. *See, e.g., Petrucelli v. Coombe,* 735 F.2d at 688. Although this aspect of Williams' prosecutorial misconduct claim arguably is unexhausted, the Court will consider these allegations on *habeas* review in light of the ambiguity.

**\*26** A criminal defendant's right to a fair trial is mandated by the due process clause of the United States Constitution. *Albright v. Oliver,* 510 U.S. 266, 273 n. 6 (1994). [25] For *habeas* relief to be granted based on a claim of prosecutorial misconduct, however, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). In considering such a claim, courts are to focus on "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982). To prevail on a prosecutorial misconduct claim, a *habeas* petitioner must demonstrate that the prosecutor engaged in "egregious misconduct ... amount[ing] to a denial of constitutional due process." *Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990) (quoting *Donnelly v. DeChristoforo,* 416 U.S. at 647-48). To determine whether a prosecutor's conduct caused substantial prejudice, a *habeas* court should consider: (1) the severity of the misconduct; (2) the measures adopted by the trial court to cure the misconduct; and (3) the certainty of conviction absent the prosecutor's remarks. *See De Vivo v. Superintendent,* 2006 WL 581145, at *21 (N.D.N.Y. March 8, 2006) (Kahn, D.J. and Peebles, M.J.) (citing *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994) & *Floyd v. Meachum,* 907 F.2d at 353); *Moore v. Warden,* 380 F.Supp.2d 321, 330 (S.D.N.Y.2005).

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 163 of 267
Williams v. Duncan, Not Reported in F.Supp.2d (2007)

2007 WL 2177075

25  "A right to a fair trial is a right ... protected by the
due process clause of the Fourteenth Amendment."
*Adamson v. California,* 332 U.S. 46, 53 (1947)
(footnote omitted), *overruled on other grounds,*
*Malloy v. Hogan,* 378 U.S. 1 (1964).

### a. Prejudicial Testimony of Wayne Williams

Williams alleges that ADA Price improperly elicited
prejudicial testimony from witness Wayne Williams
regarding his fear of testifying due to threats to him and
his family. Am. Pet., Ground Three. ADA Price questioned
Wayne Williams as follows:

Q: Do you remember talking with your lawyer this morning
about your concerns about testifying in Court?

A: Yup.

Q: And what else are you concerned about with your
testimony, sir?

A: If I go home I know I'm gonna have to watch out.

Q: And did you also express concerns about your family?

DEFENSE COUNSEL: Objection, leading.

THE COURT: Yeah, I'll sustain that.

Q: Was there anything else, sir, in addition to your
testimony that you were worried about?

A: All I know is when I go home I'm gonna have to watch
my back, that's all ...

Q: And have you talked with other members of your family
before coming in here today?

A: Nope....

Q: And did you discuss with your attorney some of your
concerns about coming in to testify?

A: Yup.

Q: And what did you discuss with your attorney?

A: I told her what I just said, I'm gonna have to watch my
back 'cause I know there gonna be people looking out
there for me.

Q: And did you also discuss with your attorney your
concerns concerning your family and some of the things
that have happened to them?

**\*27**  A: Yup, 'cause some of them already came to my
house.

Q: And you weren't there when these people came to your
house, were you?

A: Nope.

Q: Other members of your family were?

A: Yup.

Q: And that's why you are fearful about testifying here
today?

A: Yup.

DEFENSE COUNSEL: Objection, leading.

THE COURT: I'll sustain it.

Trial Tr. at pp. 396-98.

Petitioner is unable to demonstrate he was denied due process
or a fundamentally fair trial based on ADA Price's questioning
of Wayne Williams. Even assuming, *arguendo,* that this line
of questioning was inappropriate, the misconduct was not so
severe or pervasive as to deprive Williams of his right to
a fair trial. Substantial evidence was adduced at trial which
implicated Petitioner in the shooting of Larry McCraney,
including the identification of Petitioner as the perpetrator
by McCraney, Wayne Williams, and Rausheen Cox, as well
as evidence found in Petitioner's residence. Trial Tr. at pp.
92, 133-34, 163-64, 231-32, 316-19, & 375-76. The fact that
testimony was adduced regarding Wayne Williams' fear of
testifying was not probative of Petitioner's guilt or innocence.
This Court cannot conclude that this testimony so infected
Petitioner's trial with unfairness as to make his conviction on
the charges in the Indictment a denial of due process.

### b. Prosecutor's Leading Questions

Williams also claims that ADA Price "constantly" led
witnesses throughout the trial, and used the questioning
process to testify. Am. Pet, Ground Three. Petitioner cites to
testimony from various witnesses presumably as the basis of

this claim. *Id.* (citing Trial Tr. at pp. 85-87, 96-97, 133-34, 314-21, & 375-79). The testimony referenced by Petitioner can be summarized as follows: (1) Larry McCraney testified he walked by Petitioner's house on Lilac Street on the day of the shooting and identified the individuals sitting on the porch of the house as Wayne, Rausheen, and Randy; the individuals asked McCraney and his friends whether they were members of the "Crips" gang, to which they responded "no," Trial Tr. at pp. 85-87; (2) McCraney testified that while in the hospital, he informed his mother and the police that Petitioner shot him, but later he told them he did not know who shot him because he did not want to come to court and wanted to get his personal effects back from the police, Trial Tr. at pp. 96-97; (3) McCraney's mother, Doris Williams, testified that when she arrived at the hospital after the shooting, McCraney informed her Petitioner shot him, Trial Tr. at pp. 133-34; (4) Rausheen Cox testified that a group of men, including McCraney, passed by Petitioner's residence, he and Petitioner followed the group, and Petitioner shot McCraney, Trial Tr. at pp. 314-21; and (5) Wayne Williams testified that Raheem Dunaway gave Petitioner a gun because Petitioner expressed a desire to shoot the individuals who had passed by his house on the afternoon of March 23, 2000, Trial Tr. at pp. 375-79.

**\*28** The Court initially notes that defense counsel did not make any objections to the prosecutor's interrogation in the foregoing portions of the record, let alone on the ground that the questioning was leading. The Court has examined this testimony and finds that ADA Price did not engage in any improper questioning tactics. While the testimony cited by Petitioner clearly is unfavorable to him, ADA Price did not utilize leading questions to procure it. This Court finds that the prosecutor's questions did not have the capacity on their own to so infect the trial with unfairness as to make the resulting conviction a denial of due process.

### c. Shifting Burden of Proof During Summation

Lastly, Petitioner charges that ADA Price attempted to shift the burden of proof during summation. Am. Pet., Ground Three (citing Trial Tr. at p. 589). This Court has reviewed the summations delivered by both counsel, and presumes Petitioner takes issue with the following statement made by ADA Price during summation: "Is there any proof at all that has been brought before you that anyone other than this defendant fired that gun at Larry McCraney?" *See* Trial Tr. at p. 589.

To prevail on a claim of prosecutorial misconduct based on an allegedly improper summation, a petitioner must demonstrate that "he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir.1998) (quoting *Bentley v. Scully,* 41 F.3d at 823); *see also Suriel v. Burge,* 2006 WL 2583203, at \*6; *Ramirez v. Poole,* 2005 WL 1123775, at \*9 (E.D.N.Y. May 9, 2005) (quoting *Bentley* ). Petitioner is correct in that a prosecutor is precluded from making comments which attempt to shift the state's burden of proof. *See Floyd v. Meachum,* 907 F.2d at 353. However, where the prosecution improperly suggests that a defendant has an obligation to present evidence in his favor at trial, such an error typically will be rendered harmless where the trial court's subsequent instructions to the jury make clear that the prosecution-and only the prosecution-bears the burden of proof in a criminal case. *See United States v. Rivera,* 971 F.2d 876, 884 (2d Cir.1992); *United States v. Walker,* 835 F.2d 983, 989 (2d Cir.1987); *United States v. Cruz,* 797 F.2d 90, 93 n. 1 (2d Cir.1986); *see also Gary v. Conway,* 2006 WL 3290149, at \*15-16 (N.D.N.Y. Nov. 13, 2006) (Kahn, D.J.) (asserting that a jury instruction regarding burden of proof cured any improper statements that petitioner was required to submit proof at his criminal trial); *Lugo v. Kuhlmann,* 68 F.Supp.2d 347, 369 (S.D.N.Y.1999).

In the underlying criminal trial, defense counsel did not object to this aspect of the prosecutor's summation, and thus the trial court did not take any corrective action at the time of the prosecutor's statement. [26] However, the County Court instructed the jury as follows concerning the burden of proof:

[26]    Defense counsel's failure to object to the allegedly improper remark of the prosecutor "undermines the seriousness of petitioner's claim of error." *Rojas v. Senkowski,* 1996 WL 449321, at \*4 (E.D.N.Y. July 29, 1996) (citation omitted).

**\*29** There is, of course, no duty upon the accused to call any witnesses since, as I have already explained to you, it's always incumbent upon the People to prove each and every essential element of the crime or crimes charged beyond a reasonable doubt, and this burden never shifts.
Trial Tr. at p. 599.

The County Court later emphasized the burden of proof as follows:

Without a doubt, one of the most important safeguards in our law is the presumption of innocence, and it simply says that all persons charged with a crime and brought to trial are presumed to be innocent unless proven guilty beyond a reasonable doubt. And the law therefore presumes the accused to be innocent unless proven guilty beyond a reasonable doubt. Put another way, the accused is never required to prove anything.

On the contrary, the People, having charged the accused of the crime or crimes charged, have the burden of proving the accused guilty beyond a reasonable doubt. The People have the burden of proving the accused guilty as to each and every essential element for conviction. The burden never shifts. It remains on the People, and the presumption of innocence with every accused from the beginning of the trial until such time when during final deliberations the jury may be convinced that the People have proved the accused guilty beyond a reasonable doubt.

And, therefore, if in your minds during your final deliberations the People have not borne their burden of proof, and the presumption of innocence has not been overcome by proof which convinces you beyond a reasonable doubt, then of course you must find the accused not guilty.

But if in your minds during your final deliberations you are satisfied from all of the evidence that the People have borne the burden of proof, and the presumption of innocence has been overcome by evidence which convinces you beyond a reasonable doubt, then you must, of course, find the accused guilty.

Trial Tr. at p. 621-23.

In addition, when instructing the jury on the law concerning each crime in the indictment, the County Court reiterated that "the People are required to prove from all of the evidence in this case beyond a reasonable doubt" each element of the crimes charged. *See id.* at pp. 611-21. Even assuming, *arguendo,* the prosecutor's statement regarding the burden of proof was improper, the above-described jury charges rendered these comments harmless and cured any possible prejudice to Petitioner.

The Court concludes, even upon *de novo* review, that the prosecutor did not engage in misconduct with respect to any of the instances cited in Williams' Amended Petition. Therefore, the Court recommends that Petitioner's third ground for relief be denied. *See, e.g., Miranda v. Bennett,* 322 F.3d 171, 180 (2d Cir.2003) (stating that claims alleging prosecutorial misconduct must be assessed "in the context of the entire trial") (quotations omitted); *Fletcher v. Mann,* 956 F.Supp. 168, 174 (N.D.N.Y.1997) (Scullin, D.J.), *aff'd,* 165 F.3d 13 (2d Cir.1998) (denying *habeas* claim alleging prosecutorial misconduct where any evidentiary error or misconduct allegation was "subsumed in what was overall a fair and well-run trial").

## III. CONCLUSION

**\*30 WHEREFORE,** it is hereby

**RECOMMENDED,** that Williams' Amended Petition for a Writ of *Habeas Corpus* (Dkt. No. 56) be **denied;** and it is further

**ORDERED,** that the Clerk serve a copy of this Report-Recommendation and Order on the parties.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a) & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2007 WL 2177075

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 23198781
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Luis PANEZO, Petitioner,

v.

Leonard A. PORTUONDO, Respondent.

No. 02–CV–1522(JBW), 03–MISC–0066.
|
Nov. 6, 2003.

**Synopsis**
**Background:** After petitioner's state court convictions for robbery, attempted robbery, assault, criminal possession of stolen property, reckless endangerment, criminal possession of a weapon, criminal trespass, and unlawful imprisonment were affirmed on direct appeal, 279 A.D.2d 482, 719 N.Y.S.2d 580, petitioner sought federal habeas relief.

**Holdings:** The District Court, Weinstein, Senior District Judge, held that:

[1] showup identification of petitioner by robbery victim near crime scene immediately after robbery was not unduly suggestive;

[2] claims that joint trial was improper and that petitioner was improperly denied right to participate in side-bar conferences were procedurally barred;

[3] habeas court could not consider *Brady* claim;

[4] claim that state trial court's failure to impose sanctions on the prosecutor for the delayed disclosure of police officers' written statements was in error was unexhausted; and

[5] defense counsel's failure to call witnesses did not constitute ineffective assistance of counsel.

Petition denied.

West Headnotes (6)

**[1]** **Criminal Law** Confrontations at the Scene or Shortly After Offense or Arrest

Showup identification of defendant by robbery victim near crime scene immediately after robbery was not unduly suggestive, in robbery prosecution; prompt showup was necessary to ascertain if defendant was one of the robbers, or whether the search of the building and surrounding area should continue for the escaped robbers, who were believed to be armed and violent.

**[2]** **Habeas Corpus** Criminal Prosecutions
**Habeas Corpus** Trial; Instructions

Habeas claims that joint trial with co-defendants was improper and that petitioner was improperly denied right to participate in side-bar conferences, in robbbery prosecution, were procedurally barred, where state court determined that petitioner failed to preserve those claims by objecting to trial court. 28 U.S.C.A. § 2254.

2 Cases that cite this headnote

**[3]** **Habeas Corpus** Particular Issues and Problems

State trial court's summary denial of petitioner's conclusory and unsubstantiated *Brady* claim, holding that defense counsel was provided with all appropriate discovery material prior to trial, in prosecution for robbery and other offenses, precluded habeas court from considering the claim. 28 U.S.C.A. § 2254.

1 Case that cites this headnote

**[4]** **Habeas Corpus** Criminal Prosecutions

Habeas petitioner's claim that state trial court's failure to impose sanctions on the prosecutor for the delayed disclosure of police officers' written statements was in error was unexhausted at

state level, barring habeas review, where defense counsel failed to make request for sanctions to trial court. 28 U.S.C.A. § 2254.

3 Cases that cite this headnote

**[5]    Criminal Law** 🔑 Experts; Opinion Testimony

Defense counsel's alleged failure to call expert witnesses to dispute the testimony of the police officers, who claimed that defendant fired at them as they followed him after the robbery, or to call civilian witnesses to contradict police witnesses did not constitute ineffective assistance of counsel, in prosecution for robbery and other offenses, where no such witnesses existed. U.S.C.A. Const.Amend. 6.

**[6]    Habeas Corpus** 🔑 Grounds in General

**Habeas Corpus** 🔑 Criminal Liability; Innocence

**Habeas Corpus** 🔑 Prosecutorial and Police Misconduct; Argument

Habeas petitioner's claims that he had maintained his innocence, that state's negation of individual rights was unconstitutional, and that prosecution assumed role of jurors were not cognizable in habeas review. 28 U.S.C.A. § 2254(b).

**Attorneys and Law Firms**

Luis Panezo, Shawangunk Correctional Facility, Wallkill, NY, Pro Se, for Petitioner.

Michael R. Gore, Kings County District Attorney, Brooklyn, NY, for Respondent.

MEMORANDUM, JUDGMENT & ORDER

WEINSTEIN, Senior J.

**\*1** The petition for a writ of habeas corpus is denied. No hearing on this matter is necessary. This memorandum briefly addresses petitioner's claims.

**I. Facts and Procedural History**

This petition was filed on March 19, 2002. Petitioner, sometimes referred to as defendant, claims:

Ground One: POINT I: Your Petitioner Has Always Maintained His Innocence: Actual Innocence.

Ground Two: POINT II: The Identification Of Petitioner Should Have Been Suppressed.

Ground Three: POINT III: The Joint Trial of Three Co–Accused Was Unconstitutional.

Ground Four: POINT IV: Your Petitioner Was Unconstitutionally Prevented From Participating In Crucial Side–Bar Conferences With Prospective Jurors.

Ground Five: POINT V: The Prosecution Knowingly Withheld Exculpatory Evidence And Thus Assumed The Role And Powers Of Your Petitioner's Jurors (p. 14, herewith).

Ground Six: POINT VI: The County Court's Denial Of Defense's Application For Sanctions Against The Respondents For *Brady* Violations Was Clearly Erroneous Pursuant To Said Lower Court's Own Words And Reasoning, And On Law.

Ground Seven: POINT VII: Ineffective Assistance Of Counsel.

Ground Eight: Point VIII: There Is Not A Single Provision, Phrase, Or Word In The People's Constitution That Provides For The State's Negation Of An Individual's Rights Outside A Constitutional Amendment: Thus, The State's Self–Proclaimed Power To Create Procedural Bars, Forfeiture Laws, Etc., That So–Negate An Individual's Rights At Any Time Are Unconstitutional And Of No Legal Weight Herein.

Ground Nine: POINT IX: The Prosecution's Failure To Deny That It's Unconstitutional Laws Allowed The Judiciary And Executive Officials To Assume The Role and Powers Of your Petitioner's Jurors, And That It's Criminal Procedure Laws, § 440, Allow Prosecution Officials To Sit In Judgment Of Their Own Causes In Post–Conviction Proceedings Are The State's Admissions–By–Silence That Said Laws Are In Fact Unconstitutional—That The Same Laws Violate Both Our Juror's Rights To Be The Sole Judges Of the Facts Of the Case, And The

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 168 of 267
Panezo v. Portuondo, Not Reported in F.Supp.2d (2003)
2003 WL 23198781

Accused's Right to A Trial By Jury And Not A Trial By Officials Of The Prosecution.

The evidence supports the following statements:

On September 21, 1996, at about 7:30 p.m., the petitioner, Luis Panezo, and two accomplices, Vernal Aldegon and Victor Tunnon, robbed a bodega located at 319 Rogers Avenue in Brooklyn. During the course of that robbery, petitioner brandished a gun, announced a stick-up, and ordered the proprietor, his employees, and numerous customers to turn over their valuables. A short distance away, co-defendant Aldegon, armed with a knife, beat several of the people, threatened the victims, and took various items from them. Cash and merchandise including phone cards, cigarette lighters, and other items were taken from the store.

The police arrived before the robbers could escape.

Police officers Jason Harris and Nickolas Budlimic saw a man leaving the bodega as they arrived at the scene, and followed him until he entered a nearby building. The man, who was identified as petitioner by each officer, fired a shot at the officers as he entered an apartment house at 377 Montgomery Street. Another police officer, Sergeant Robert Turrito, saw a man leaving the bodega carrying a Heineken box, followed him and saw him fire at the officers as they pursued him from the robbery scene. He later identified that man at a showup, as one of the co-defendants, Tunnon. Petitioner, along with Tunnon, forced his way into an apartment inside that residential building, and was apprehended in that apartment after the police had cordoned off the building. They then proceeded to conduct a search of the building, knocking at the door of each apartment until the occupants of one told them that the petitioner and his accomplice did not belong there. Inside that apartment, the officers recovered two loaded guns, one of which bore co-defendant Tunnon's fingerprint, and many of the items taken in the robbery and later identified by the store's owner. Some of the clothing worn and described by witnesses in the robbery was discarded there.

*2  The third co-defendant, Vernal Aldegon, was arrested several days later and was subsequently identified at a lineup as the knife-wielding robber by four of the victims of the bodega robbery.

Petitioner was indicted with his two co-defendants under Kings County Indictment Number 12374/96 for numerous

counts of robbery in the first degree, assault in the second degree, attempted robbery in the second degree and criminal possession of a weapon in the second degree and related counts for the bodega robbery. In addition, petitioner, who, along with Tunnon, was captured in the nearby apartment, was charged with attempted murder in the first degree (New York Penal Law §§ 110/125.27 [1][a][i] [police officer] ), attempted aggravated assault in the first degree, burglary in the first degree, criminal possession of a weapon in the second degree, and criminal possession of stolen property in the fifth degree.

Following a jury trial, petitioner, along with his two accomplices, was convicted of two counts of first-degree robbery, attempted robbery in the second degree, assault in the second degree, and two counts of criminal possession of a weapon in the second degree. Petitioner was also convicted of unlawful imprisonment in the first degree, criminal trespass in the first degree, and criminal possession of stolen property in the fifth degree, for breaking into the apartment in the attempt to escape.

On January 6, 1998, petitioner was sentenced as second violent offender (New York Penal Law § 70.04) to concurrent determinate terms of imprisonment of twenty-five years for the first-degree robbery count, fifteen years for attempted robbery in the second degree, ten years for criminal possession of a weapon in the second degree and numerous lesser-concurrent sentences.

Petitioner appealed his conviction, raising two issues in his brief:

  (a) the admission of petitioner's identification at a showup by a civilian was improper and prejudicial to him; and

  (b) The defendant's joint trial with his two co-defendants was improper and in violation of New York Criminal Procedure Law § 200.40(1).

In addition, petitioner filed a *pro se* Supplemental Brief, alleging that he was improperly excluded from several bench conferences, which implicated his right to be present at trial.

On January 8, 2002, the Appellate Division, Second Department, unanimously affirmed petitioner's judgment of conviction. The court found that the identification evidence, based on the prompt near-the-scene showup, was properly admitted at his trial. As to his two remaining claims, the court found they were each unpreserved for review, and declined

to address the merits. *People v. Panezo,* 279 A.D.2d 482, 719 N.Y.S.2d 580 (2d Dep't 2001).

On April 16, 2001, petitioner's application for leave to appeal was denied. *People v. Panezo,* 96 N.Y.2d 804, 726 N.Y.S.2d 382, 750 N.E.2d 84.

On or about July 20, 2001, petitioner moved to vacate his judgment pursuant to C.P.L. § 440.10. In his application, he claimed that the prosecutor withheld exculpatory evidence, and that his trial counsel had been ineffective in representing him at trial.

**\*3** On October 30, 2001, the trial court denied petitioner's motion. The court expressly found that the petitioner had been provided with discovery, including the witness' statements, that petitioner failed to identify any item which he claimed had been withheld from him, and that, as a result, his claim was "not supported by sworn allegations of fact and fails to state a basis for legal relief" (*see, e.g.,* N.Y.C.P.L. § 440.30(4) (a) and (b)). As to his claim of ineffective assistance of counsel at trial, the court rejected the claim on the merits. *See* Memorandum Opinion dated October 30, 2001.

On January 8, 2002, the Appellate Division, Second Department, denied petitioner's application for leave to appeal the denial of relief.

## II. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman,* 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle,* 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set

of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

**\*4** "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton,* 295 F.3d 270, 278 (2d Cir.2002); *see also Yung v. Walker,* No. 01–2299, 2002 U.S.App. LEXIS 28137 (2d Cir. Aug. 1, 2003) (amended opinion) (district court's habeas decision that relied on precedent from the court of appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Berbary v. Torres,* No. 02–2463, 2003 U.S.App. LEXIS 16167, at \*25 (2d Cir. Aug. 7, 2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III. Limitations Period

Congress has set a one-year period of limitations for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment. *See* 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). A conviction becomes final for habeas purposes when the

ninety-day period for filing a petition for a writ of certiorari to the United States Supreme Court has expired. *See McKinney v. Artuz,* No. 01–2739, 2003 U.S.App. LEXIS 6745, at \*22 (2d Cir.2003); *see also* Sup.Ct. R. 13.

Prisoners whose convictions became final before the effective date of AEDPA, April 24, 1996, had a grace period of one year, until April 24, 1997, to file their habeas application. *See Ross v. Artuz,* 150 F.3d 97, 103 (2d Cir.1998).

"[T]he district court has the authority to raise a petitioner's apparent failure to comply with the AEDPA statute of limitation on its own motion." *Acosta v. Artuz,* 221 F.3d 117, 121 (2d Cir.2000). "If the court chooses to raise sua sponte the affirmative defense of failure to comply with the AEDPA statute of limitation, however, the court must provide the petitioner with notice and an opportunity to be heard before dismissing on such ground." *Id.*

In calculating the one-year limitation period, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted...." 28 U.S.C. § 2244(d)(2). The "filing of creative, unrecognized motions for leave to appeal" does not toll the statute of limitations. *Adeline v. Stinson,* 206 F.3d 249, 253 (2d Cir.2000); *see also Artuz v. Bennett,* 531 U.S. 4, 8, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000) ("[A]n application is *'properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.... The question whether an application has been 'properly filed' is quite separate from the question whether the claims contained in the application are meritorious and free of procedural bar." (emphasis in original; footnote omitted)).

 \*5 The term "pending" in the statute has been construed broadly to encompass all the time during which a state prisoner attempts, through proper use of state procedures, to exhaust state court remedies with regard to a particular post-conviction application. *See Bennett v. Artuz,* 199 F.3d 116, 120 (2d Cir.1999), *aff'd,* 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000). "[A] state-court petition is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." *Bennett,* 199 F.3d at 120; *Carey v. Saffold,* 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260

(2002) (holding that the term "pending" includes the intervals between a lower court decision and a filing in a higher court for motions for collateral review). A motion for extension of time to file an appeal does not toll AEDPA's limitations period unless an extension is actually granted. *See Bertha v. Girdich,* 293 F.3d 577, 579 (2d Cir.2002).

The period of limitations set forth in AEDPA ordinarily does not violate the Suspension Clause. *See Muniz v. United States,* 236 F.3d 122, 128 (2d Cir.2001) ("[T]he Suspension Clause does not always require that a first federal petition be decided on the merits and not barred procedurally" (quotation omitted)); *Rodriguez v. Artuz,* 990 F.Supp. 275, 283 (S.D.N.Y.1998) (AEDPA statute of limitations is not, "at least in general," an unconstitutional suspension of the writ).

A pro se litigant is accorded "some degree of latitude" in meeting filing requirements. *Brown v. Superintendent,* 1998 U.S. Dist. LEXIS 1936, No. 97 Civ. 3303, 1998 WL 75686, at \*4 (S.D.N.Y. Feb.23, 1998). But "[it] has long been recognized that ignorance does not excuse lack of compliance with the law." *Velasquez v. United States,* 4 F.Supp.2d 331, 334–35 (S.D.N.Y.1998) (holding that Bureau of Prison's failure to notify prisoners regarding AEDPA's time limitation did not warrant acceptance of untimely petition); *see also Brown,* 1998 WL 75686 at \*4 ("self-serving statement that the litigant is ignorant of the law is not grounds for equitable tolling of a statute of limitations").

The Supreme Court held in *Duncan v. Walker* that "an application for federal habeas corpus review is not an 'application for State post-conviction or other collateral review' within the meaning of 28 U.S.C. § 2244(d)(2)," and that therefore the section does "not toll the limitation period during the pendency of [a petitioner's] first federal habeas petition." 533 U.S. 167, 181–82, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). *Duncan* reversed a case in this circuit which held to the contrary. *See Walker v. Artuz,* 208 F.3d 357, 361–62 (2000). Although the Supreme Court has now declared that AEDPA's one-year limitations period is not tolled during the pendency of a properly filed federal habeas petition, this statute of limitations is not jurisdictional and may be tolled equitably. *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000). "Equitable tolling ... is only appropriate in 'rare and exceptional circumstances.' To merit application of equitable tolling, the petitioner must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary

Panezo v. Portuondo, Not Reported in F.Supp.2d (2003)

2003 WL 23198781

circumstances 'beyond his control' prevented successful filing during that time." *Smaldone v. Senkowski,* 273 F.3d 133, 138 (2d Cir.2001).

**\*6** Although state prisoners are not entitled to counsel as of right in either New York state collateral or federal habeas corpus proceedings, the Court of Appeals for the Second Circuit has stated that "an attorney's conduct, if it is sufficiently egregious, may constitute the sort of 'extraordinary circumstances' that would justify the application of equitable tolling to the one-year limitations period of AEDPA." *Baldayaque v. United States,* No. 02–2611, 2003 U.S.App. LEXIS 15063, at *17 (2d Cir. July 30, 2003); *compare Smaldone,* 273 F.3d at 138–39 (attorney calculation error does not justify equitable tolling).

Prisoners cannot circumvent the strict AEDPA limitations period by invoking the "relation back" doctrine by arguing that a new petition should be treated as having been filed on the same day as a first petition. As the court of appeals has explained,

> If [the limitations period] were interpreted as Petitioner argues, the result would be impractical. A habeas petitioner could file a non-exhausted application in federal court within the limitations period and suffer a dismissal without prejudice. He could then wait decades to exhaust his state court remedies and could also wait decades after exhausting his state remedies before returning to federal court to "continue" his federal remedy, without running afoul of the statute of limitations.

*Warren v. Garvin,* 219 F.3d 111, 114 (2d Cir.2000) (quoting *Graham v. Johnson,* 158 F.3d 762, 780 (5th Cir.1999)).

IV. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1989). "This exhaustion requirement is ... grounded in principles

of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims-so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane,* No. 98 CIV. 1604, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y.2000) (state's failure to raise exhaustion requirement does not waive the issue).

V. Procedural Bar

**\*7** A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750. In determining whether a procedural bar is sufficient to preclude habeas review, a federal court must consider as "guideposts" the following:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule

given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir.2003) (quoting *Lee v. Kemna,* 534 U.S. 362, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)).

If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is not preserved. *See Glenn v. Bartlett,* 98 F.3d 721, 724–25 (2d Cir.1996). When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.,* 235 F.3d 804, 810 (2d Cir.2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." *Su v. Filion,* No. 02–2683, 2003 U.S.App. LEXIS 13949 at *15 n. 3 (2d Cir. July 11, 2003) (citing *Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir.2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required." *Id.*

## VI. Actual Innocence

"[A] habeas petitioner may also bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, *i .e.,* that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis,* 313 F.3d 724, 729 (2d Cir.2002).

**\*8** Because habeas corpus "is, at its core, an equitable remedy," *Schlup v. Delo,* 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Supreme Court has stated that "in appropriate cases, the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration," *id.* at 320–21 (quotations omitted). To ensure that this exception remains rare and will be applied only in the extraordinary case, the Court has "explicitly tied" the miscarriage of justice exception to the petitioner's innocence. *Id .* at 321. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence ... that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* at 324.

A showing of actual innocence serves merely as a gateway to the airing of the petitioner's defaulted claim and is not itself cognizable in habeas as a free-standing claim. *See Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). A habeas court is, in short, concerned " 'not [with] the petitioners' innocence or guilt but solely [with] the question whether their constitutional rights have been preserved." ' *Id.* (quoting *Moore v. Dempsey,* 261 U.S. 86, 87–88, 43 S.Ct. 265, 67 L.Ed. 543 (1923)); *cf. Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (habeas court may review an *independent constitutional claim* that the evidence adduced at trial was insufficient to convict a criminal defendant beyond a reasonable doubt; *Thompson v. Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (reversing conviction of "Shuffling Sam" *on direct review* from conviction in Louisville's police court where there was no evidence that defendant violated city ordinances).

## VII. Ineffective Assistance of Counsel

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added). The Supreme Court has explained that in giving meaning to this requirement we must be guided by its purpose–"to ensure a

fair trial"–and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. *See also Wiggins v. Smith,* 539 U.S. ——, No. 02–311, slip op. at 8–10 (June 26, 2003); *United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

 **\*9** The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane,* 239 F.3d 191, 202 (2d Cir.2001). The court must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland,* 466 U.S. at 696. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes,* No. 02–7468, 2003 U.S.App. LEXIS 2053, at \*18 (2d Cir. Feb. 6, 2003) (quoting *Strickland,* 466 U.S. at 694). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v.. Senkowski,* 321 F.3d 110, 112 (2d Cir.2003).

As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes

particular investigations unnecessary." *Id.* at 691. Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court must conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland'* s prejudice prong. *See Pavel v. Hollins,* 261 F.3d 210, 223 (2d Cir.2001) (counsel ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); *Lindstadt,* 239 F.3d at 201 (same). The court of appeals for the Second Circuit has recently gone so far as to imply that all of counsel's significant trial decisions must be justified by a sound strategy–a significant raising of the bar that would appear to require an unrealistic degree of perfection in counsel. *See Eze,* 2003 U.S.App. LEXIS 2511, at \*78–\*79 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for ... counsel's decisions").

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689.

 **\*10** Each factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. *See Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991) (dismissing petition as unexhausted where petitioner's claim of ineffective assistance of counsel alleged more deficiencies before the habeas court than were presented to the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (quotation omitted)). Where an additional factual claim in support of the ineffective-assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal is not required. *Caballero v.. Keane,* 42 F.3d 738, 741 (2d Cir.1994). Each significant factual claim in support of an ineffective-assistance allegation premised on appellate counsel's deficient performance must be exhausted. *See Word v. Lord,* No. 00 CIV. 5510, 2002 U.S. Dist. LEXIS 19923, at \*34–\*35 (S.D.N.Y. Mar. 18, 2002) (Magistrate's Report and Recommendation).

Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective appellate counsel. *See Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992). Appellate counsel does not have a duty to advance every

nonfrivolous argument that could be made, *see Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994). Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the state ... claim fell outside the wide range of professionally competent assistance." *Id.* (quotations omitted).

## VIII. Errors of State Law

Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Nonetheless, the Due Process Clause requires that state courts conducting criminal trials "proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.' " *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998) (quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)). Errors of state law that rise to the level of a constitutional violation may be corrected by a habeas court, but even an error of constitutional dimensions will merit habeas corpus relief only if it had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quotation omitted).

## IX. Evidentiary Error

**\*11** For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The standard is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, highly significant.' " *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985) (quoting *Nettles v. Wainwright,* 677 F.2d 410, 414–15 (5th Cir.1982). This test applies post-AEDPA. *See Wade v. Mantello,* No. 02–2359, slip op. at 13 (2d Cir. June 13, 2003).

## X. Verdict Against the Weight of the Evidence

To the degree petitioner claims that his guilt was not proven beyond a reasonable doubt, the relevant question for this court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler v. Supreme Court,* 109 F.3d 836, 840 (2d Cir.1997). To the degree petitioner claims the verdict was against the weight of the evidence, such a claim does not present a federal constitutional issue.

## XI. Legal Claims Frequently Raised in Habeas Corpus Applications

For an explication of the law concerning other claims that are frequently raised before this court in applications for a writ of habeas corpus, *see Waters v. McGuiness,* 99–CV–0615, 03–MISC–0066 (JBW), 2003 U.S. Dist. LEXIS 11077, at \*4–\*5 (E.D.N.Y. June 16, 2003) (grand jury claims); *Custodio v. Duncans,* Nos. 99–CV–2561, 03–MISC–0066 (JBW), 2003 U.S. Dist. LEXIS 11050, at \*4–\*7 (E.D.N.Y. June 11, 2003) (*Batson* challenges); *Reyes v. Irwin,* 99–CV–3758, 03–MISC–0066 (JBW), 2003 U.S. Dist. LEXIS 11045, at \*5–\*6 (E.D.N.Y. June 20, 2003) (*Wade* claims); *Brathwaite v. Duncan,* 00–CV–0860, 03–MISC–0066 (JBW), 2003 U.S. Dist. LEXIS 11056, at \*4–\*5 (E.D.N.Y. June 10, 2003) (*Sandoval* claims); *Thomas v. Kuhlman,* 255 F.Supp.2d 99, 108–09 (E.D.N.Y.2003) (perjured testimony); *Martinez v. Greiner,* 99–CV–4663, 03–MISC–0066 (JBW), 2003 U.S. Dist. LEXIS 11046, at \*7 (E.D.N.Y. June 20, 2003) (Fourth Amendment claims); *Plunkett v. Keane,* 97–CV–1992, 03–MISC–0066 (JBW), 2003 U.S. Dist. LEXIS 11048, at \*8–\*9 (E.D.N.Y. June 10, 2003) (*Rosario* claims); *Beniquez v. Bennett,* 00–CV–0985, 03–MISC–0066 (JBW), 2003 U.S. Dist. LEXIS 11032, at \*15–\*16 (E.D.N.Y. June 16, 2003) (prosecutorial misconduct); *Sevencan v. Herbert,* No. 01–2491, slip op. at 6–13 (2d Cir. Aug. 7, 2003) (public trial); *Cox v. Donnelly,* 99–CV–8216, 03–MISC–0066 (JBW), 2003 U.S. Dist. LEXIS 9886, at \*12–\*14 (E.D.N.Y. June 12 2003) (shifting burden of proof); *Jelinek v. Costello,* 247 F.Supp.2d 212, 266–67 (E.D.N.Y.2003) (right to self-representation); *Stewart v. Senkowski,* 00–CV–0806, 03–MISC–0066 (JBW), 2003 U.S. Dist. LEXIS 11028, at \*6 (E.D.N.Y. June 16, 2003) (erroneous jury instructions); *Jenkins v. Artuz,* 98–CV–7837, 00–MISC–0066 (JBW), 2003 U.S. Dist. LEXIS 11049, at \*7–\*8 (E.D.N.Y. June 13, 2003) (abuse of discretion in sentencing);

XII. Harmless Error

 **\*12** In order to be entitled to habeas relief, a petitioner must ordinarily demonstrate that any constitutional error "had substantial and injurious effect or influence in determining the jury's verdict," and that the error resulted in "actual prejudice." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quotation marks omitted).

When a claim was never adjudicated on the merits in the state courts and there is no ruling which commands AEDPA deference, it is unclear what the standard for review for harmlessness should be in a collateral attack when a federal court finds constitutional error. Should it proceed under the "beyond a reasonable doubt" standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (conviction infected by constitutional error must be overturned unless "harmless beyond a reasonable doubt") or under the "substantial and injurious effect or influence" standard of *Brecht* (for cases on collateral review, an error is generally considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict")? The correct standard of review is an open question in this circuit. *See Cotto v. Herbert,* No. 01–2694, 2003 U.S.App. LEXIS 8326, at \*92 (2d Cir. May 1, 2003).

XIII. Analysis of Claims

While some of petitioner's claims have not been exhausted, they are so lacking in substance that there is no reason to delay the proceeding permit a return to state court.

A.

 **[1]** Petitioner contends that the showup identification by robbery victim Barry Jones was improper and unduly suggestive. The showup was conducted near the scene of the crime, the bodega robbery, and was originally justified by the necessity to ascertain if petitioner was one of the robbers, or whether the search of the building and the surrounding area would continue for the escaped robbers, who were believed to be armed and violent. Such a prompt procedure was reasonably conducive to reliable identification.

The hearing court found that this showup was prompt and necessary and the Appellate Division, Second Department, expressly rejected petitioner's claim, finding the "showup

identification made of [petitioner was] near the crime scene." *People v. Panezo,* 279 A.D.2d 482, 719 N.Y.S.2d 580, 581 (2 nd Dep't 2001) (citing to several state Court of Appeals rulings upholding the propriety of prompt reviewings made at or near the crime scene).

That decision is in accord with the law as enunciated by the United States Supreme Court. It could not be held to be an unreasonable interpretation of federal law, as interpreted by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).

Courts have held that relatively prompt identifications at or near the scene of a crime may be required to determine if the right person has been arrested or if the police should continue their search for the criminal. *United States v. Bautista,* 23 F.3d 726, 730 (2 nd Cir.1994). Identifications occurring promptly afer the crime at a time when memory and perception may be greatest, help assure the reliability of the selection. *United States v. Bautista,* 23 F.3d at 730.

 **\*13** A full hearing on the issue in the state court requires deference to the New York decisions.

This claim lacks merit.

B.

The record demonstrates that the petitioner failed to bring the severance issue to the trial court's attention so as to permit the court to address it. He made no motion to sever prior to the joint trial, thus waiving any claim he might have had to a separate trial from his co-defendants.

He failed to assert any right to participate in the several side-bar discussions to which he now cites, nor did he suggest that he had any need to personally participate. As a result, there is no record of what these discussions concerned.

The Appellate Division, Second Department declined to adjudicate either of these claims on the merits. *People v. Panezo,* 279 A.D.2d at 482, 719 N.Y.S.2d at 581. In support of that holding, the court cited to the State Criminal Procedure Law § 470.05(2) (requiring a party asserting error to alert the trial court to such claim at an appropriate time), and to several cases dealing with findings of unpreserved claims.

 **[2]** Because the state court found that defendant failed to preserve the two claims that he raised on direct appeal, each

of these claims is procedurally barred from review here. *Epps v. Commissioner,* 13 F.3d 615 (2d Cir.), cert. denied, 511 U.S. 1023, 114 S.Ct. 1409, 128 L.Ed.2d 81 (1994).

The trial and hearings were not fundamentally unfair. There can be no claim of innocence. The decisions of the trial court on joint trials and in conducting arguments without the presence of defendant at the sidebar were sensible and provided no basis for a claim of prejudice. *See United States v. Gagan,* 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (right to be present at *in camera* interview). The evidence was overwhelming.

These claims lack merit.

C.

Petitioner claims that the prosecutor failed to disclose to him allegedly exculpatory evidence, and that the court failed to impose sanctions under *Brady* for this failure to disclose. Petitioner presents these as two separate grounds in his petitioner, Grounds 5 and 6. Because the state court expressly rejected this claim based on petitioner's failure to comply with the New York Criminal Procedure Law governing the raising of claims in a motion to vacate judgment pursuant to N.Y.C.P.L. § 440.10 and 440.30, the procedural vehicle by which petitioner was required to raise this matter, these claims are foreclosed from review in this *habeas corpus* application.

In his direct appeal, petitioner did not raise any claim invoking the duty to disclose under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and related cases. In his motion to vacate judgment, filed in July of 2001, petitioner first raised such a claim. *See* Exhibit D–1. Petitioner did not allege what items were not furnished to him, nor did he provide any affidavit of his trial counsel asserting that such items were not provided to him.

[3]    The trial court denied the motion. In regard to the *Brady* claim, it noted that the record showed that the defendant's attorney had been provided with appropriate discovery material prior to trial. It then disposed summarily of petitioner's motion, holding,

*14    [Petitioner] does not identify a single item to which [he] was entitled that was not provided to him.

Therefore, because [petitioner's] claim is not supported by sworn allegations of fact and fails to state a basis for legal relief, it must be denied.

Memorandum dated October 30, 2001, at 3 (Exhibit D–3). The Appellate Division, Second Department, subsequently denied petitioner's request for leave for further review, C.P.L. § 450.15(1). The trial court's summary denial of petitioner's conclusory and unsubstantiated *Brady* claim bars this Court from considering the claim.

In addition, petitioner raises an additional claim in relation to this *Brady* issue, that the trial court failed to impose "sanctions" on the prosecutor for the failure to disclose certain materials (Ground 6, petition). This claim does not appear to have been raised by petitioner at all in the state court, either on the direct appeal (including his *pro se* Supplemental Brief) or in his Motion to Vacate Judgment in 2001. As a result, this claim is unexhausted, having never been raised at the state court level, and would require dismissal of the petition. *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Daye v. Attorney General,* 696 F.2d 186, 190–91 (2nd Cir.1982).

It is not appropriate to dismiss this petition to permit the petitioner to return to state court to litigate this frivolous claim.

[4]    Nothing in the record establishes the existence of any wrongdoing or even what statements were withheld that would have helped petitioner's case. In addition, petitioner claims here that the trial court's failure to impose "sanctions" on the prosecutor for the delayed disclosure of the statements in question, was in error and merits relief. However, the record clearly shows that the only sanction requested was the complete preclusion of all of these witnesses, who were the police officers and the only witnesses testifying about the chase and the firing of shots (596 [transcript] ). That request was made solely by counsel for Mr. Tunnon (Mr. Zuss), and not by Mr. Friedman, trial counsel for petitioner. Under New York law, the objection or request of a co-defendant's counsel does not generally apply to another defendant at the trial. *See People v. Buckley,* 75 N.Y.2d 843, 846, 552 N.Y.S.2d 552 N.E.2d 160 (1990); *People v. Teeter,* 47 N.Y.2d 1002, 1003, 420 N.Y.S.2d 217, 394 N.E.2d 286 (1979); *People v. Buster,* 245 A.D.2d 460, 666 N.Y.S.2d 462 (2nd Dep't 1997). Even assuming that counsel for petitioner is deemed to have made

this argument, it is not conceivable that the court would have precluded the testimony in question.

The incident upon which petitioner relies, concerning the prior accounts of Officers Budlimic and Harris and Sergeant Turrito, about the pursuit of petitioner and co-defendant Tunnon, both of whom were apprehended in the apartment down the street from the bodega, which shooting had nothing to do with the petitioner's conviction for the robbery of the bodega, the principal crime for which petitioner has been convicted, or even the forcible entry into the apartment of Mr. And Mrs. Brito at 377 Montgomery Street. Although the testimony in question bore quite directly on the charge of attempted murder of the police officers, petitioner was acquitted of that charge and convicted solely of first-degree reckless endangerment (N.Y.P.L. § 120.25) in regard to that portion of the charges.

**\*15** Petitioner's convictions were not dependent in any significant way on the officers' testimony. He cannot establish any basis for relief in regard to these materials.

This claim has no merit.

D.

Petitioner claims that he was deprived of the effective assistance of counsel by reason of a number of claimed failures of his trial counsel, including the failure of counsel to consult with him prior to the trial. Petitioner raised this claim in his post-trial motion to vacate judgment in 2001. The trial court denied it on the merits in its Memorandum Opinion, dated October 30, 2001. Because this ruling by the trial court was based on its first-hand viewing of a trial vigorously contested by an experienced attorney (and two other experienced and active attorneys for the two co-defendants) as well as the very conclusory and unsubstantiated nature of the attacks of defendant, the court's decision was supported by the record and was correct. Under any objective standard, counsel's representation of petitioner was meaningful and adequate.

[5] Petitioner's attack on his trial counsel centers on his claim that counsel did not consult with him prior to trial and that trial counsel should have allowed other lines of defense, such as calling expert witnesses to dispute the testimony of the police officers, two of whom claimed he fired at them as they followed him after the robbery, or by calling civilian

witnesses who might have given testimony contradicting these police witnesses. *See* Petitioner's Motion to Vacate Judgment, pp. 23–24, 27–31 and 33, Exhibit D–1. Petitioner presents a host of speculations based solely on his apparent idealization of what such witnesses might have said. No such witnesses have ever come forward, and their existence virtually presupposes that they could have provided some exculpatory testimony. This, in turn, is based on petitioner's claimed innocence, which is refuted by all the evidence adduced at the trial. What is clear beyond any question is that the value of these imagined witnesses is hardly what petitioner hypothesizes. As a result, his claims are no more than a wish list of evidence that might have exonerated an innocent man. The fact is no such witnesses have been shown to exist and the instant claim based on such rank speculation is frivolous.

This claim has no merit.

E.

[6] Petitioner raises three claims as grounds for relief in his petition, which he designates as Point I, VIII and IX. None of these matters has been raised as a ground for relief either on his direct appeal or in his motion to vacate judgment. To the extent that such a claim would furnish grounds for relief from his judgment of conviction in the state court it has never been presented to the state court. As a result these claims may not be grounds for granting relief. *E.g., Rose v. Lundy,* 455 U.S. at 522, *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Grey v. Hoke,* 933 F.2d 117, 120 (2 nd Cir.1991); 28 U.S.C. § 2254(b). Moreover, none of these claims is even cognizable in *habeas* review.

**\*16** Petitioner includes as his first ground his claim of actual innocence. This is based, he asserts, on his seeking a jury trial. Although the presumption of innocence is a component of the due process of law guaranteed a criminal accused (*Kentucky v. Whorton,* 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979)), petitioner's conviction of serious crimes after a lengthy and fair trial, negates any reliance on a *pro forma* decision to go to trial as furnishing any factual basis for his assertion of innocence here. In support of his claim, he simply revisits the numerous issues that he has raised in the remainder of his petition as responsible for his conviction.

This contention has no merit.

F.

Petitioner's remaining two claims, posed in Points VIII and IX of his petition, are difficult to understand.

Turning to what must be assumed are the basis for petitioner's attack on the state's procedural rules for adjudicating substantive claims, it appears that of the five separate claims upon which he relies here, three were denied on what may be deemed procedural grounds. First, on his direct appeal, the Appellate Division, Second Department, declined to reach the merits on two of his three claims. *People v. Panezo,* 279 A.D.2d at 482, 719 N.Y.S.2d at 581. Petitioner raised two claims in addition to the identification claim, which the court expressly adjudicated against him, a severance claim and a claim that the court violated his right to be present during bench conferences with certain jurors (raised in his *pro se* Supplemental Brief). The Appellate Division rejected petitioner's severance claim, citing to C.P.L. § 470.05(2), in its disposition of the two remaining but unnamed matters. *See Id.* New York Criminal Procedure Law § 470.05(2) states in substance that no issue of law is presented unless the party claiming error protested a ruling or brought the point to the court's attention. *See e.g., People v. Gray,* 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 175, 652 N.E.2d 919 (1995); *People v. Robinson,* 36 N.Y.2d 224, 228, 367 N.Y.S.2d 208, 211, 326 N.E.2d 784 (1975). In this case, petitioner did not move for a severance (*see* C.P.L. § 200.20(3)). As a result of this failure to so move, his severance claim was not preserved. One of his co-defendants, Aldegon, moved twice for severance, albeit unsuccessfully, but petitioner never did so.

The other issue which the Second Department declined to review was petitioner's right to be present, which the court noted was also unpreserved. The Second Department cited to both New York Court of Appeals cases and its own rulings, in which the courts found that the appellant had failed to complain in any way or to make an adequate record upon which to adjudicate such a claim. *People v. Panezo, Id.* That decision is in accord with prior cases in the area in the New York courts. *See People v. Maher,* N.Y.2d 318, 325, 89 N.Y.2d 318, 653 N.Y.S.2d 79, 82, 675 N.E.2d 833 (1996); *People v. Vanegas,* 237 A.D.2d 469, 470, 655 N.Y.S.2d 965, 966 (2nd Dep't 1997) (declining to review defendant's presence claim due to inadequacy of the record to determine whether any right was implicated); *People v. McCargo,* 219 A.D.2d 683, 684, 631 N.Y.S.2d 407 (2nd Dep't 1995) (same).

*See generally, People v. Kinchen,* 60 N.Y.2d 772, 774, 457 N.Y.S.2d 680, 681 (1983) (insufficient record to determine claim of right to counsel violation, although such claim need not be preserved for review in New York).

*17 The New York Courts acted in accord with prior precedent, declining to consider two issues that were never brought to the lower court's attention and thus were never considered by the trial court. Such rulings are wholly consistent with both *habeas* principles and Federal Appellate Procedure. *E.g., Harris v. Reed,* 489 U.S. at 263 n.; *Grey v. Hoke,* 933 F.2d at 120 (federal *habeas* review precluded for claim that is barred under state procedural law).

The other claim that was denied primarily on procedural grounds was petitioner's *Brady* claim, which the trial court refused to adjudicate on the inadequacy of the allegations of petitioner's motion to vacate judgment. *See* Memorandum of October 30, 2001, at 2; N.Y.C.P.L. § 440.30(1) and (4)(b). The court identified the failure of petitioner to identify any item that was not disclosed to him. *Id.* Any suggestion that such application of a procedural bar to matters that are not even identified to the court as the subject of the claim, is frivolous. Petitioner's claim that his rights have somehow been violated in regard to undocumented issues is without support.

This series of claims has no merit.

G.

No other possible claim rises above the frivolous.

XIV. Conclusion
The petition for a writ of habeas corpus is denied.

No certificate of appealability is granted, petitioner having made no substantial showing of the possible denial of a constitutional right. He may, as already indicated, seek a certificate of appealability from the Court of Appeals for the Second Circuit.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 23198781

**Panezo v. Portuondo, Not Reported in F.Supp.2d (2003)**

2003 WL 23198781

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Mosley v. Rich, Not Reported in Fed. Supp. (2020)
2020 WL 3128530

Case 9:21-cv-00736-DNH-TWD  Document 35  Filed 05/29/24  Page 180 of 267

2020 WL 3128530
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael MOSLEY, Petitioner,
v.
John RICH, Superintendent, Elmira
Correctional Facility, [1] Respondent.

[1]  John Rich, Superintendent, Elmira Correctional Facility, is substituted for Harold Graham, Superintendent, Auburn Correctional Facility. FED. R. CIV. P. 25(c).

No. 9:18-cv-00428-JKS
|
Signed 06/12/2020

**Attorneys and Law Firms**

Michael Mosley, Elmira, NY, pro se.

Dennis A. Rambaud, New York State Attorney General, New York, NY, for Respondent.

MEMORANDUM DECISION

JAMES K. SINGLETON, JR., Senior United States District Judge

*1  Michael Mosley, a New York state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Mosley is in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and incarcerated at Elmira Correctional Facility. Respondent has answered the Petition, and Mosley has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

In 2010, Mosley was charged with first-degree murder, two counts of second-degree murder, and first-degree burglary in connection with the January 2002 deaths of Samuel Holley and Arica Schneider. On direct appeal of his conviction, the Appellate Division of the New York Supreme Court laid out the following facts underlying the charges against Mosley:

On January 25, 2002, Sam Holley and his girlfriend, Arica Schneider, were murdered in their apartment in the City of Troy, Rensselaer County. Each victim's body had at least 30 stab wounds as well as evidence of extensive blunt force trauma. Holley had been a member of a gang and a crack cocaine dealer. Although police were able to establish a DNA profile and usable palm print of a potential suspect from blood on a bed sheet and a palm print on the living room wall, they were unable to find a match in the state or federal databases. After an investigation that included numerous false leads over more than five years, two men— Terrence Battiste and Bryan Berry (reputedly members of a gang known to target and rob drug dealers)—were indicted for the murders. However, before the trial of Battiste and Berry commenced, a routine check of the DNA profile returned a match to [Mosley's] DNA, which had recently been added to the state database.

Upon investigating [Mosley], police soon learned, among other things, that he had once served as a crack cocaine runner for Holley. After interviewing [Mosley] several times and gathering further evidence purportedly linking him to the crimes, the indictment against Battiste and Berry was dismissed without prejudice and [Mosley] was charged with murder in the first degree, murder in the second degree (two counts) and burglary in the first degree.

*People v. Mosley*, 994 N.Y.S.2d 429, 431 (N.Y. App. Div. 2014).

Mosley proceeded to a jury trial on May 5, 2011. Mosley did not dispute the presence of his blood and palm print at the crime scene. Rather, he testified at trial that he had discovered the blood-covered victims and shook them to see if they were still alive. Mosley claimed that he did not alert authorities because he did not want to get himself or his family involved, especially in light of his knowledge of Holley's drug and gang activities.

After hearing evidence from, among others, the medical examiner, an expert serologist, crime scene analyst and meteorologist, the jury rejected Mosley's explanation that he discovered the victims' bodies the morning after they had been murdered, that he was bleeding from a hand injury he suffered while snowboarding the evening before at a gorge located in Troy, and that his blood transferred onto the victims' bedsheet as he attempted to move the mattress to retrieve a hidden cell phone. The jury found Mosley guilty of first-degree murder and first-degree burglary. The trial court

Mosley v. Rich, Not Reported in Fed. Supp. (2020)

2020 WL 3128530

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 181 of 267

sentenced Mosley to an aggregate term of life imprisonment without the possibility of parole ("LWOP").

**\*2** Mosley moved to vacate the judgment pursuant to New York Criminal Procedure Law ("CPL") § 440.10. In that *pro se* filing, Mosley argued that: 1) trial counsel was ineffective for failing to: a) consult with and call a blood expert and a forensic meteorologist, b) "investigate, interview, and subpoena witnesses in relation to third-party culpability," c) conduct an adequate pretrial investigation, d) "investigate [Mosley's] residence, job, and other facts relevant to the defense," e) preserve Mosley's right to a public trial; f) move to set aside the verdict pursuant to CPL § 330.30, and g) request a ruling in limine or object to the prosecutor's "improper questioning and comments about [Mosley's] tattoo;" and 2) Mosley is actually innocent of the crimes. The county court denied Mosley's motion without a hearing. Mosley sought leave to appeal the denial to the Appellate Division, which was granted and considered in conjunction with Mosley's counseled direct appeal.

On direct appeal, Mosley asserting that: 1) the verdict was against the weight of the evidence; 2) the court erred in admitting evidence that Mosley "did not com[e] forward with an exculpatory account before his arrest, and that he invoked his right to remain silent and right to counsel upon his arrest;" 3) the trial court erred in allowing the prosecution to question his mother about her knowledge of Mosley's March 2002 driving while intoxicated ("DWI") arrest; 4) the prosecution's summation remarks about Mosley's tattoos and DWI arrest were improper; and 5) trial counsel was ineffective for: a) failing to object to evidence of Mosley's pre-arrest silence, b) belatedly objecting to the references to Mosley's invocation of his rights upon arrest, c) failing to object to the prosecutor's references to Mosley's tattoo, and d) failing to object to certain summation comments by the prosecutor, which he alleged equated Mosley's pretrial silence with criminal propensity. Mosley also filed a *pro se* supplemental brief in which he contended that: 1) the prosecutor committed misconduct by comparing Mosley's mugshot to that of a man who an eyewitness said was not the person she saw outside of the crime scene, but looked "a lot" like that person, and by acting as an unsworn witness during the cross-examination of Mosley's mother; and 2) trial counsel was ineffective for failing to object to the prosecutor's misconduct.

On appeal from the order denying his CPL § 440.10 motion, Mosley submitted a counseled brief arguing that county court erred in denying the motion without a hearing. Mosley also

filed a supplemental *pro se* brief on that appeal, additionally arguing that: 1) his Sixth Amendment rights were violated when the prosecutor "implicitly alleged that a non-testifying witness saw [Mosley] at the scene of the crime" and his attorney failed to object; 2) his right to a public trial was violated when his attorney excluded Mosley's mother and aunt from voir dire; and 3) he is actually innocent. The Appellate Division granted Mosley's leave application for discretionary appeal of the denial of his CPL § 440.10 motion.

The Appellate Division unanimously affirmed the judgment of conviction but reversed the order denying Mosley's CPL § 440.10 motion in a reasoned opinion issued on October 16, 2014. *Mosley*, 994 N.Y.S.2d at 435. The Appellate Division remitted the CPL § 440.10 matter to the county court for a hearing. *Id.* Mosley sought leave to appeal from the portion of the Appellate Division's order affirming his judgment of conviction. The Court of Appeals denied leave without comment on December 13, 2014. *People v. Mosley*, 25 N.E.3d 350, 350 (N.Y. 2014).

On November 30, 2015, county court held a hearing on Mosley's CPL § 440.10 on Mosley's ineffective assistance and actual innocence claims. Mosley was represented by counsel at the hearing, in which Mosley and numerous witnesses, including trial counsel, testified over eight days. After the hearing, the county court denied Mosley's CPL § 440.10 in a reasoned, unpublished opinion on April 18, 2016. Mosley filed a counseled leave to appeal to the Appellate Division, which was granted. Mosley filed both counseled and *pro se* briefs in support of that appeal. On November 2, 2017, the Appellate Division affirmed the order denying Mosley's CPL § 440.10 motion. *People v. Mosley*, 64 N.Y.S.3d 707, 714 (N.Y. App. Div. 2017). Mosley filed a counseled application for leave to appeal to the Court of Appeals, raising his claim that trial counsel was ineffective for failing to present third-party culpability evidence. Mosley also filed a *pro se* leave application asking the Court of Appeals to review his various ineffective assistance claims. The Court of Appeals summarily denied leave on March 20, 2018. *People v. Mosley*, 102 N.E.3d 440, 440 (N.Y. 2018).

**\*3** Mosley then timely filed the instant *pro se* Petition for a Writ of Habeas Corpus to this Court on April 3, 2018. Docket Nos. 1, 4 ("Petition"); *see* 28 U.S.C. § 2244(d)(1) (A). Briefing is now complete, and the Petition is before the undersigned judge for adjudication.

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 182 of 267

Mosley v. Rich, Not Reported in Fed. Supp. (2020)

2020 WL 3128530

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Mosley raises the following twelve grounds for relief. First, he claims he is actually innocent of the crimes. In Grounds 2 through 12, Mosley contends that counsel was ineffective for failing to: 2) present third-party culpability evidence, 3) "suppress [Mosley's] statements on the correct legal grounds," 4) object or ask for curative instructions "when the prosecutor improperly used [Mosley's] pre-trial silence and invocation of rights," 5) consult with or call forensic experts, 6) present witnesses and evidence to refuse the People's "false consciousness-of-guilt evidence regarding [Mosley's] hand injury," 7) present evidence and witnesses to refute the People's "false motive and opportunity evidence regarding [Mosley's] lifestyle, residence and job," 8) object or ask for curative instructions when the prosecutor showed Mosley's "unredacted mugshot," 9) protect his right to a public trial, 10) object to the prosecutor's "improper claims that [Mosley's] tattoo and DWI demonstrated a propensity for violence and substance abuse, and were proof of guilt," 11) object to the prosecutor becoming an unsworn witness when cross-examining Mosley's mother, and 12) move to set aside the verdict based on counsel's ineffective assistance.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). The term unreasonable is a common term in the legal world. The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

**\*4** In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues de novo on the record before it. *See Dolphy v. Mantello*, 552 F.3d 236, 239-40 (2d Cir. 2009) (citing *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)); *cf. Wiggins v. Smith*, 539 U.S. 510, 530-31 (2003) (applying a de novo standard to a federal claim not reached by the state court). In so doing, the Court presumes that the state court decided the claim on the merits and the decision rested on federal grounds. *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989); *see also Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (explaining the *Harris-Coleman* interplay); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810-11 (2d Cir. 2000) (same). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference); *Jimenez*, 458 F.3d at 145-46. Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

2020 WL 3128530

IV. DISCUSSION

A. Actual Innocence (Ground 1)

Mosley first argues that he is "completely innocent of this crime." Mosley raised his actual innocence claim in his motion to vacate the judgment pursuant to CPL § 440.10, which the county court initially denied without a hearing, but the Appellate Division remanded with directions to hold a hearing. After an 8-day hearing, the county court again denied the motion, which was affirmed by the Appellate Division on appeal as follows:

> At the hearing, [Mosley] repeated his explanation with regard to the presence of his DNA and palm print at the crime scene. Further, [Mosley's] wife (then girlfriend), who did not testify at the trial, confirmed that she observed and treated defendant's injured hand when he returned home from snowboarding the evening before the murders. [Mosley] also offered testimony by Terry Labor, a forensic scientist, and Stephen Wistar, a forensic meteorologist. Labor testified that the blood stain on the bed sheet was transferred to the sheet through contact with an existing wound, a finding consistent with [Mosley's] explanation and contrary to the People's blood drop theory that [Mosley] was cut during the murders. Labor also opined that the palm print would not have been a discernibly different color if it had been made when the victims were murdered or when [Mosley] ostensibly entered the apartment the following morning—a point contrary to the People's argument that the color of the palm print showed that it was made at the time of the murders. Wistar testified that based on his review of the weather data and the topography and location of the area where [Mosley] claimed to be snowboarding, there was some snow present at the gorge during the time that [Mosley] claimed he was injured. [Mosley] also presented testimony by a witness who claimed that he had been incarcerated with Battiste in 2005 and that Battiste spoke to him about details of the victims' murders and admitted that he was the driver the night they were murdered.

> In our view, the evidence submitted at the hearing failed to establish by clear and convincing evidence that [Mosley] did not murder the victims. Much of the evidence presented at the hearing was also presented to the jury, which considered and rejected [Mosley's] explanation, and the jury's verdict was upheld on appeal. At best, the additional evidence submitted in support of the motion to vacate arguably raised "[m]ere doubt as to [Mosley's] guilt, or

a preponderance of conflicting evidence as to [Mosley's] guilt," neither of which is sufficient to support a motion to vacate a judgment based on actual innocence. Accordingly, we find that County Court properly declined to vacate [Mosley's] conviction pursuant to CPL 440.10(1)(h) based on actual innocence.

**\*5**  *Mosley*, 64 N.Y.S.3d at 710-11 (citations omitted).

As an initial matter, to the extent Mosley argues that the state court erred in determining that the state courts erred in finding that Mosley did not prove his innocence by clear and convincing evidence, again, such determination is based on state law and not cognizable in these federal habeas proceedings. *See Estelle*, 502 U.S. at 67-68.

While a federal habeas petitioner may assert a claim of actual innocence to overcome a procedural bar to review, *Schlup*, 513 U.S. at 326, or to overcome the AEDPA's one-year statute of limitations, *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013), the Supreme Court has not resolved whether a non-capital prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence, *McQuiggin*, 133 S.Ct. at 1931; *see House v. Bell*, 547 U.S. 518, 554-55 (2006); *Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 71-72 (2009). The Supreme Court has instead declined to answer the question, noting that where a "[p]etitioner has failed to make a persuasive showing of actual innocence[,] ... the Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of actual innocence." *Herrera v. Collins*, 506 U.S. 390, 427 (1993) (O'Connor, J., concurring). Although the Second Circuit has also not ruled on whether a claim of actual innocence is cognizable on habeas review, *see Friedman v. Rehal*, 618 F.3d 142, 159 (2d Cir. 2010) (citing *Osborne*, 557 U.S. at 71, and noting that whether an actual innocence claim is cognizable is an open question), it has "come close" to granting habeas relief on grounds of actual innocence, *see DiMattina v. United States*, 949 F. Supp. 2d 387, 417 (E.D.N.Y. 2013) (citing cases).

Assuming, but not deciding, that a freestanding actual innocence claim is cognizable in a § 2254 proceeding, the Supreme Court has described the threshold showing of evidence as "extraordinarily high." *Herrera*, 506 U.S. at 417. "The sequence of the Court's decisions in *Herrara* and *Schlup*—first leaving unresolved the status of freestanding claims and then establishing the gateway standard—implies at the least that *Herrara* requires more convincing proof of innocence than *Schlup*." *House*, 547 U.S. at 555.

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 184 of 267

Mosley v. Rich, Not Reported in Fed. Supp. (2020)

2020 WL 3128530

Measured against this standard, Mosley has fallen short of establishing his actual innocence. In support of this claim, Mosley avers:

> Ample evidence presented at my 440.10 hearing proves that two other men, Terry Battiste and Bryan Berry, committed this crime. Both men were previously indicted for the crime, based on the testimony of an eye witness and multiple fact witnesses, who all testified to inculpatory admissions by the two men. The prosecutor readily admitted that the two men were conducting surveillance on the victims just prior to the crime. At their pre-trial hearings, two police officers testified that they had a concrete case against the men and were convinced of their guilt. Their ADA testified that he reviewed the whole case file and did not indict until he was convinced of their guilt, and that none of the witnesses against them received any deals. Battiste's wife owned a car just like the one seen on the night of the crime at the scene. Battiste's wife also threatened and bribed a woman to make up a false alibi for her husband. Battiste left the state after the crime. Berry made incriminating admissions about the crime, threatened to kill a man if he talked to the police, and asked for money to leave the state after the crime.

**\*6** But as the Appellate Division decision makes clear, Mosley points to no evidence that conclusively exonerates him of the crime. Rather, he challenges the credibility and value of the evidence against him by pointing to inconsistencies in the evidence, and provided additional evidence in his § 440.10 hearing regarding corroboration of his story and other potential explanations for the evidence against him. As further discussed with respect to the corresponding ineffective assistance claims *infra*, nothing Mosley provided in the § 440.10 proceedings or in his Petition before this Court meet the "extraordinarily high" standard for demonstrating actual innocence in federal habeas proceedings.

The Court may discern that, construed liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), the Petition attacking the value of evidence against him raises not only an actual innocence claim, but an additional claim that the evidence against him is legally insufficient to sustain Mosley's conviction. As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the New York court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76; *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law...."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas*

*v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Here, Mosley attacks the value of the evidence against him and argues that the evidence presented in the § 440.10 hearing undermines the adverse evidence presented at trial. But this Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. *See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (dismissing habeas claim because 'assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal' and deferring to the jury's assessments of the particular weight to be accorded to the evidence and the credibility of witnesses). Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain the conviction. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995).

**\*7** Although it might have been possible to draw a different inference from the conflicts in the evidence offered by each side, this Court is required to resolve that conflict in favor of the prosecution, whose theory of the case prevailed with the jury. *See Jackson*, 443 U.S. at 326. In this case, the physical evidence presented at trial was sufficient to support Mosley's conviction, particularly given the deference required under *Jackson*. Accordingly, Mosley is not entitled to relief on this ground in any event.

B. Ineffective Assistance of Trial Counsel (Grounds 2-12)
Mosley additionally contends that trial counsel rendered ineffective assistance for a variety of reasons. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment.' *Id.* The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Thus, Mosley must show that his attorney did not represent him within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for this ineffectiveness, the result would have been different. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985). An ineffective assistance

of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

New York's test for ineffective assistance of counsel under the state constitution differs slightly from the federal *Strickland* standard. 'The first prong of the New York test is the same as the federal test; a defendant must show that his attorney's performance fell below an objective standard of reasonableness.' *Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010) (citing *People v. Turner*, 840 N.E.2d 123 (N.Y. 2005)). The difference is in the second prong. Under the New York test, the court need not find that counsel's inadequate efforts resulted in a reasonable probability that, but for counsel's error, the outcome would have been different. 'Instead, the 'question is whether the attorney's conduct constituted egregious and prejudicial error such that the defendant did not receive a fair trial.' ' *Id.* at 123 (quoting *People v. Benevento*, 697 N.E.2d 584, 588 (N.Y. 1998)). 'Thus, under New York law the focus of the inquiry is ultimately whether the error affected the 'fairness of the process as a whole.' ' *Id.* (quoting *Benevento*, 697 N.E.2d at 588). 'The efficacy of the attorney's efforts is assessed by looking at the totality of the circumstances and the law at the time of the case and asking whether there was 'meaningful representation.' ' *Id.* (quoting *People v. Baldi*, 429 N.E.2d 400, 405 (N.Y. 1981)).

The New York Court of Appeals views the New York constitutional standard as being somewhat more favorable to defendants than the federal *Strickland* standard. *Turner*, 840 N.E.2d at 126. 'To meet the New York standard, a defendant need not demonstrate that the outcome of the case would have been different but for counsel's errors; a defendant need only demonstrate that he was deprived of a fair trial overall.' *Rosario*, 601 F.3d at 124 (citing *People v. Caban*, 833 N.E.2d 213, 222 (N.Y. 2005)). The Second Circuit has recognized that the New York 'meaningful representation' standard is not contrary to the federal *Strickland* standard. *Id.* at 124, 126. The Second Circuit has likewise instructed that federal courts should, like the New York courts, view the New York standard as being more favorable or generous to defendants than the federal standard. *Id.* at 125.

1. Claims raised in appeal of CPL § 440.10 denial and rejected in reasoned analysis
**\*8** Mosley raised a number of ineffective assistance claims in his § 440.10 motion that were ultimately denied by the

2020 WL 3128530

Appellate Division in reasoned analysis. In Ground 2, Mosley faulted trial counsel for failing to call witnesses from the Battiste and Berry prosecution in order to pursue a defense of third-party culpability. At the § 440.10 hearing, counsel "confirmed that he believed that the 'most logical' theory of the defense was third-party culpability." *Mosley*, 64 N.Y.S.3d at 712. He nonetheless "explained that he did not subpoena the witnesses who provided testimony before the grand jury that indicted Battiste and Berry to testify at the trial because they were 'inherently unreliable,' for example, a known 'jailhouse snitch' and a purported drug addict who had changed her story multiple times." *Id.*

The record fully supports the Appellate Division's conclusion that counsel's decision was a tactical one that is unchallengeable on federal review. The record supports that counsel's handling of the third-party culpability evidence was part of a well-calculated trial strategy in which he weighed the strengths and witnesses of each of the prior prosecution's witnesses in light of their known credibility issues before determining that the best trial strategy would be to allude to the case against Battiste and Berry without calling any of the witnesses from that case. As the Court of Appeal explained:

> Indisputably, [Mosley's] blood DNA and palm print were discovered at the scene and there was no physical evidence indicating that either Battiste or Berry were in the apartment. Opting not to present potentially incredible witness testimony that would reflect poorly on [Mosley], trial counsel elicited testimony from the investigating officers that certain witnesses testified under oath that Battiste and Berry admitted that they were involved in the murders and that Battiste was seen outside of the victims' apartment the night of the murders. Trial counsel also elicited testimony with regard to the victims' lifestyle and exposure to disputes with, among others, gang members locally, in New York City and in Pennsylvania. In contrast, trial counsel highlighted that [Mosley] and Holley were friends

> and [Mosley] had no motive to murder the victims.

*Id.* at 712-13.

Counsel used that strategy to suggest to the jury that the police and the prosecution had pursued a wrongful prosecution and were doing so again. Although that strategy ultimately proved unsuccessful, counsel cannot be deemed ineffective for pursuing it, particularly when it has not been shown that an alternate strategy would have led to a better outcome. Counsel's proffered reasons for putting the case for third-party responsibility before the jury without endorsing it was reasonable in light of the available impeachment evidence against the witnesses in the Battiste and Berry prosecution.

Mosley next contends that counsel should have moved to suppress Mosley's statements to law enforcement (Ground 3). In support of his claim, however, Mosley cites only authority under New York state law where the New York courts have rejected federal authority that the right to counsel can attach only where the defendant is in police custody and concedes that he fails to "satisfy the federal standard" for his ineffective assistance claim. Docket No. 21 at 11. Again, his state-law claim does not provide an actionable basis for a federal ineffective assistance claim. *See Estelle,* 502 U.S. at 67-68. Moreover, as the Court of Appeal correctly determined, "[i]t is not disputed that [Mosley] voluntarily spoke with the police and never invoked his right to counsel, and we have determined that it was not error for County Court to allow testimony with regard to [Mosley's] statements to the police 'that revealed inconsistencies and omissions regarding important details.' " *Id.* at 713. As the record shows no basis for suppressing Mosley's statements, Mosley fails to show that counsel was deficient for failing to so move, or that Mosley was prejudiced by counsel's inaction even under state law. *See Aparicio v. Artuz,* 269 F.3d 78, 99 (2d Cir. 2001) (holding that it is not ineffective assistance where counsel fails to raise meritless claims).

**\*9** Mosley additionally claims in Ground 5 that counsel should have called as witnesses "forensic blood and meteorological expert" to "refute[ ] as false the principal contentions of the People's experts." The Court of Appeal rejected this claim on § 440.10 review as follows:

> As for the expert testimony, trial counsel claimed that there was inadequate time to find an expert after the

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 187 of 267

Mosley v. Rich, Not Reported in Fed. Supp. (2020)

2020 WL 3128530

People submitted a meteorologist's testimony on rebuttal and explained that he determined not to call a blood splatter expert because it was not possible to determine when [Mosley's] DNA was left at the scene, that is, during the murders or the next morning when [Mosley] admittedly went to the victims' apartment.

While trial counsel's personal assessment of the defense is informative, it is certainly not dispositive because our obligation is to determine whether, "[v]iewed objectively, the transcript and the submissions reveal the existence of a trial strategy that might well have been pursued by a reasonably competent attorney." Generally, a trial counsel's determination to not call a particular witness, including an expert witness, will not necessarily constitute ineffective assistance of counsel.

[W]e find that, under the circumstances, trial counsel's failure to retain certain experts did not constitute ineffective assistance of counsel. Trial counsel's cross-examinations of the People's experts were organized and effective and confirmed his knowledge of weather data and crime scene analysis. For example, trial counsel led the People's meteorologist to concede that it was not raining, and there was likely some ambient light when [Mosley] claimed that he was snowboarding. Further, after acknowledging that he had never actually been to the gorge, the meteorologist conceded that snow could be present on sheltered surfaces and that, based on the topography and the nature of drifting and blowing snow, he could not definitively state how much snow was on the ground in the gorge the evening before the victims were murdered. While [Mosley] takes issue with defense counsel's failure to call a bloodstain expert to address whether the blood on the bed sheet was a transfer pattern, i.e., consistent with [Mosley's] explanation, or a drop pattern, i.e., which would not be, the People's crime scene expert, Laura Pettler, had already testified that it was a transfer stain. Moreover, during his cross-examination, trial counsel elicited Pettler's opinion that the procedures that the police used when they processed the crime scene were not ideal, compromising her ability to develop her theory that the victims were murdered during the course of an argument and not during a planned robbery or gang-related murder. Consequently, she conceded that this theory was speculative. As for determining when the palm print was made based on the color of the blood, the medical examiner, Michael Sikirica, testified that "blood oxidizes and changes to a darker color —a process that can occur within a few minutes ... but it may take hours to finally develop." Given variables such as

temperature and humidity, Sikirica was unable to address how long it would take blood to dry. Notably, he did not opine as to the timing of the palm print and his explanation leaves that question unresolved.

**\*10** *Mosley*, 64 N.Y.S.3d at 713.

The Appellate Division's determination is both reasonable and fully supported by the record. Moreover, it does not contravene or unreasonably apply federal law, under which the ultimate decision of whether to call witnesses to testify is well within counsel's "full authority to manage the conduct of the [proceeding]." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision ... to decide not to put certain witnesses on the stand...."). "The decision of whether to call any witnesses on behalf of a defendant, and which witnesses to call or omit to call, is a tactical decision which ordinarily does not constitute incompetence as a basis for a claim of ineffective assistance of counsel." *Speringo v. McLaughlin*, 202 F. Supp. 2d 178, 192 (S.D.N.Y. 2002); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987). Mosley is therefore not entitled to relief on this ground either.

In support of Ground 7, Mosley similarly avers that counsel should have called his wife as a witness to "refute false motive and opportunity evidence." According to Mosley, the defense could have proffered evidence of his lifestyle, residence, and job to counter the prosecution's case against him. As the Appellate Division explained, however, "[t]rial counsel did not call [Mosley's] wife to testify because he believed that her testimony could have been overshadowed by evidence of a domestic violence incident perpetrated by [Mosley]." *Mosley*, 64 N.Y.S.3d at 712. The record supports that trial counsel had a reasonable explanation for his decision—he testified that Mosley had told him that his wife had a drinking problem and that Mosley could get her to change her testimony. In light of the potential witness's credibility and veracity issues, counsel's decision not to call her as a witness was reasonable and cannot form the basis of an ineffective assistance claim.

In Ground 8, Mosley complains that counsel should have objected when the prosecutor used a mugshot of Mosley from 2000. Mosley contends that counsel should have objected because Mosley's appearance in 2000, as shown in that mugshot, differed from his appearance in January 2002, when the murders were committed. But the record reflects that counsel introduced into evidence a photograph of Mosley taken in January 2002. As the Appellate Division noted, "the

Case 9:21-cv-00736-DNH-TWD Document 35 Filed 05/29/24 Page 188 of 267

Mosley v. Rich, Not Reported in Fed. Supp. (2020)

2020 WL 3128530

jury was aware that the photograph of [Mosley] displayed during the People's summation did not reflect [Mosley's] appearance in 2002, and County Court instructed the jury that commentary during opening and closing statements was not evidence." *Mosley*, 64 N.Y.S.3d at 714. Mosley thus fails to show that counsel was deficient in his handling of the 2000 photograph, or that Mosley was prejudiced as a result.

Mosley further contends that counsel should have objected to the prosecutor's question about Mosley's tattoo. According to Mosley, the question was intended to suggest to the jury that Mosley's tattoo evinced that he had the propensity to commit the murders. But as the Appellate Division noted, the challenged line of inquiry was a "single question about [Mosley's] tattoo." *Id.* at 713. It is not reasonably likely that the jury interpreted the question as Mosley now claims. Mosley fails to show that he was prejudiced by counsel's inaction, particularly when, as the Appellate Division reasoned, "review of the trial transcript indicates that trial counsel was reasonably concerned about the jury's perception of his frequent objections—which he claimed County Court overruled '95%' of the time." *Id.* at 713-14.

2. Claims raised in appeal of CPL § 440.10 denial and summarily rejected

**\*11** Mosley also raises in the instant Petition a number of claims that he raised to the Appellate Division on § 440.10 review that were summarily denied. In Ground 6, Mosley claims that counsel should have presented evidence that he injured his hand in a roofing injury to "refute false consciousness-of-guilt evidence" presented by the prosecution. The record reflects that Investigator Gary Gordon testified that, when he met with Mosley to bring him to the police station to take Mosley's palm prints, one of Mosley's hands was "all scraped up." Mosley claimed that he had injured it while working on a roof. Mosley now contends that counsel should have presented the testimony of his friend, Robbie Palmer, to corroborate his story and undermine any contention that Mosley intentionally injured his hand to avoid having palm prints taken. But Mosley cannot show that he was prejudiced by counsel's decision because the source of Mosley's hand injury was an ancillary matter of little importance given that there was ample testimony that Mosley was reluctant to provide his palm prints and had refused to do so multiple times.

For the same reasons, Mosley fails to show that counsel violated his right to a public trial by insisting that Mosley's mother and aunt leave the courtroom on the first day of trial

(Ground 9). Mosley provides no indication that the result of the proceeding would have been different if his family had been present for the voir dire. *See United States v. Gomez*, 705 F.3d 68, 80 (2d Cir. 2013) (finding that ineffectiveness claim based on attorney's failure to object to the family's exclusion from the courtroom during jury selection failed to meet the prejudice prong of *Strickland*); *see also Weaver v. Massachusetts*, 137 S. Ct. 1899, 1911 (2017) (holding that prejudice is not presumed when a defendant raises a violation of right to a public trial on a claim of ineffective assistance).

Mosley fares no better on his claim that counsel was ineffective for advising him not to file a *pro se* motion to set aside the verdict pursuant to CPL § 330.30 on grounds of ineffective assistance of counsel, prosecutorial misconduct, and insufficient evidence (Ground 12). As relevant here, § 330.30 allows a court to set aside or modify a verdict on "[a]ny ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court." N.Y. CRIM. PROC. LAW § 330.30(1). Here, Mosley has now raised to the Appellate Division all the underlying claims that he contends should have formed the basis for the § 330.30 motion, and all claims have been rejected on the merits. Mosley thus fails to show that counsel's advice was deficient or that he was prejudiced by it.

3. Claims not raised in appeal of CPL § 440.10 denial

Finally, Mosley raises two claims that do not appear to have been raised in his appeal of the denial of his CPL § 440.10 motion, namely, that counsel should have objected to the prosecutor's commenting on Mosley's pre-trial silence and invocation of his rights (Ground 4), and the prosecutor acting as an unsworn witness during the cross-examination of Mosley's mother (Ground 11).

This Court may not consider claims that have not been fairly presented to the state courts. 28 U.S.C. § 2254(b) (1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases). Exhaustion of state remedies requires the petition to fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995). A petitioner must alert the state courts to the fact that he is asserting a federal claim in order to fairly present the legal basis of the claim. *Id.* at 365-66. An issue is exhausted when the substance of the federal claim is clearly raised and decided in the state court proceedings, irrespective of the label used. *See Jackson v.*

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 189 of 267

Mosley v. Rich, Not Reported in Fed. Supp. (2020)

2020 WL 3128530

*Edwards*, 404 F.3d 612, 619 (2d Cir. 2005). To be deemed exhausted, a claim must also have been presented to the highest state court that may consider the issue presented. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In New York, to invoke one complete round of the State's established appellate process, a criminal defendant must first appeal his or her conviction to the Appellate Division and then seek further review by applying to the Court of Appeals for leave to appeal. *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). Further, "when a 'petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted." *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (citation omitted); *see also Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir. 2001).

**\*12** It appears that Mosley has not presented either of these claim to the state courts. Consequently, they are unexhausted. It is unclear from the record in these proceedings whether these unexhausted claims are based on the trial court record. If they are based on that record, the claims could have been raised on direct appeal but were not; consequently, Mosley cannot bring a motion to vacate as to such claims. N.Y. CRIM. PROC. LAW § 440.10(2)(c) ("[T]he court must deny a motion to vacate a judgment when[,][a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal...."). If they are based on evidence outside the record, however, they could still be brought in a motion to vacate judgment under CPL § 440.10 because there is no time limit or number cap on § 440.10 motions.

But even if Mosley could still exhaust these claims in state court, the Court will not stay the Petition and allow Mosley to return to state court to satisfy the exhaustion requirements. *See Zarvela v. Artuz*, 254 F.3d 374, 380-83 (2d Cir. 2001). Mosley has not requested that this Court stay and hold his Petition in abeyance. Moreover, the Supreme Court has held that it is an abuse of discretion to stay a mixed petition pending exhaustion where: 1) the petitioner has not shown good cause for failing to exhaust all available state court remedies; and 2) the unexhausted claim is "plainly meritless." *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

Here, both unexhausted claims are plainly meritless. With respect to his contention that counsel should have objected to the prosecutor's comment on Mosley's pre-trial silence and invocation of his rights, a suspect has a constitutional right not to speak to police after he is arrested and given his *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). As a consequence of that right, prosecutors are prohibited from commenting on a defendant's post-*Miranda* silence. *Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976); *see also United States v. Lopez*, 500 F.3d 840, 844 (9th Cir. 2007) (prosecutor's comment on defendant's post-*Miranda* silence violates *Doyle*). The rationale for this rule "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) (citation and internal quotation marks omitted) (holding that prosecution may not use defendant's silence during case-in-chief). After the Supreme Court's decision in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), "for a defendant to invoke either the right to remain silent or the right to counsel, he must do so unambiguously," *United States v. Plugh*, 648 F.3d 118, 128 (2d Cir. 2011).

The Supreme Court, however, has declined to extend *Doyle* to situations where the defendant did not invoke his *Miranda* rights but waived them and gave a post-arrest statement. *See Anderson v. Charles*, 447 U.S. 404, 408 (1980) (per curiam). The factual determination of the state courts that Mosley did not invoke his right to remain silent is entitled to deference pursuant to § 2254(d)(2). *See Parsad v. Greiner*, 337 F.3d 175, 180 (2d Cir. 2003). Counsel therefore had no basis to object on *Doyle* grounds. *See Aparicio*, 269 F.3d at 99 (holding that it is not ineffective assistance where counsel fails to raise meritless claims).

Mosley's contention that counsel should have objected to the prosecutor impermissibly acting as an unsworn witness is similarly without merit. Contrary to Mosley's contention, the record reflects that counsel did in fact object to the prosecutor's line of questioning when the prosecutor attempted to impeach Mosley's mother with prior inconsistent statements made to the prosecutor during a pretrial interview. Although the court overruled the objection and found the questioning to be "permissible cross-examination," counsel cannot now be faulted when the record shows that he did make the objection. In sum, Mosley is not entitled to relief on any argument advanced in support of his ineffective assistance claims.

2020 WL 3128530

### V. CONCLUSION

 **\*13**  Mosley is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e]

that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " (quoting *Miller-El,* 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R. APP. P. 22(b); 2D CIR. R. 22.1.

The Clerk of the Court is to enter judgment accordingly.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 3128530

---

**End of Document**                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 191 of 267

Gross v. Graham, Not Reported in Fed. Supp. (2016)

2016 WL 11621787

2016 WL 11621787
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Gordon B. GROSS, Petitioner,

v.

Harold GRAHAM, Superintendent, Auburn
Correctional Facility, [1] Respondent.

[1]   Harold Graham, Superintendent, Auburn
Correctional Facility, is substituted for Dale A.
Artus, Superintendent, Attica Correctional Facility.
FED. R. CIV. P. 25(c).

No. 9:14-cv-00768-JKS
|
Singed 08/26/2016

**Attorneys and Law Firms**

Brian Shiffrin, Easton, Thompson Law Firm, Rochester, NY,
Richard M. Langone, Pro Hac Vice, Langone & Associates,
PLLC, Mineola, NY, for Petitioner.

Michelle Elaine Maerov, Office of Attorney General—NY
Office, New York, NY, for Respondent.

MEMORANDUM DECISION

JAMES K. SINGLETON, JR., Senior United States District
Judge

**\*1** Gordon B. Gross, a New York state prisoner represented
by counsel, filed a Petition for a Writ of Habeas Corpus with
this Court pursuant to 28 U.S.C. § 2254. Gross is in the
custody of the New York State Department of Corrections
and Community Supervision and incarcerated at Auburn
Correctional Facility. Respondent has answered, and Gross
has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On November 19, 2008, Gross was charged with two counts
of first-degree rape; attempted sexual abuse in the first degree;
and two counts of endangering the welfare of a child in
connection with allegations that Gross had exposed himself

to his then nine-year-old daughter S.W. in 2003, raped his
daughter's friend J.S. in 2006, and endangered J.S.'s welfare
in 2008. [2]

[2]   A search of New York state case law indicates
that Gross was subsequently charged with other
crimes later committed against his daughter. *See
People v. Gross*, 917 N.Y.S.2d 783 (N.Y. App.
Div. 2010) (holding that statute providing that
person could not be subsequently prosecuted for
any sexual offense involving same victim did not
bar prosecution where the evidence underlying the
prior conviction was not offered in support of the
subsequent charges). While that case shares certain
similarities with the case at bar, as discussed in
footnote 5, *infra*, the subsequent case is not before
the Court, and this opinion is limited to Gross's
January 30, 2009, conviction.

At trial, S.W. testified that, between March and May 2003,
her father picked her up from her mother's home, drove to
the top of a field near his home, stopped his pickup truck,
pulled down his pants and asked S.W. to touch him. S.W. saw
his penis and then got out of the truck and ran down a hill.
She testified that no one else was present when this occurred.
Gross told her to get back into the truck, and she did. Gross
drove back to his house, and S.W. got out and went inside.

His daughter's best friend J.S. lived in the house next door
to Gross. Both S.W. and J.S. testified that Gross raped
J.S. sometime between July 1, 2006, and July 18, 2006,
right before she turned 13 years old. According to the
complainants, the attack occurred in Gross's living room
while his wife and two sons were upstairs.

J.S. also testified about an incident in 2008 in which Gross
drove her back home after a visit with S.W., stopped his truck
in the nearby field, and told J.S. to get in the back seat. J.S.
refused, and Gross drove her home.

J.S.'s guidance counselor testified regarding J.S.'s difficulties
at school and change in behavior by the fall of 2007. In June
2008, J.S. told a classmate K.C. [3] about "it" and swore her
to secrecy. K.C. eventually told the guidance counselor, who
spoke with J.S. and her father. Police Detective Robert Wafer
then interviewed both S.W. and J.S. and subsequently testified
at trial. The prosecution also presented the testimony of Ellen
Ford, a sexual abuse counselor, who testified about Child
Sexual Abuse Accommodation Syndrome.

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 192 of 267
Gross v. Graham, Not Reported in Fed. Supp. (2016)
2016 WL 11621787

3      K.C. and J.S.'s sister, A.S., who was told about the rape in around July 2007, testified at trial. Gross moved for a mistrial based, in part, on their testimony. The court denied the motion but struck their testimony.

**\*2** Gross testified on his own behalf and denied the charges. He stated that he believed S.W. fabricated the charges because she was jealous of her half-brothers, and J.S. went along because she was dependent on S.W.'s friendship. Gross's wife and one of his sons testified that the girls would sometime spend the night in the living room, but they never heard yelling or crying during those visits, despite the small size of the house and the fact that they kept their bedroom doors open.

A land surveyor also testified that he surveyed the land surrounding Gross's house in preparation for Gross's subsequent purchase of land and that, at the time, there was a stone wall that ran parallel to the back of Gross's property which blocked access to the nearby field. Gross also presented a psychologist who testified that Child Sexual Abuse Accommodation Syndrome is not generalizable to all children.

After the defense's case, J.S.'s grandmother, who was a former neighbor of Gross's, testified as a rebuttal witness for the prosecution. She testified that, in the spring or summer of 2000, with the family's permission, Gross knocked down part of the wall that backed both their and Gross's property so that Gross could drive from his property to the fields up the hill. The grandmother testified that the land survey was incorrect.

Defense counsel then sought to have Gross testify for a second time in surrebuttal. The court denied the request, pointing out that defense counsel had the opportunity to cross-examine the grandmother about her testimony and had already offered testimony from Gross and a surveyor regarding the wall.

In summation, the prosecutor asked the jury to "[p]ut yourself [in the complainants'] shoes. I'm going to ask you again, put yourself in their shoes." At the close of the summation, the trial court *sua sponte* struck the statement from the record and instructed the jury to "utterly disregard it as if it were never spoken." After the jury was excused for a brief recess, defense counsel moved for a mistrial based on the statement. The court denied the request and noted that an objection should have been made at the appropriate time.

On January 30, 2009, after deliberations, the jury found Gross guilty of predatory sexual assault of a child, first-degree rape, attempted sexual abuse in the first-degree, and two counts of endangering the welfare of a child. Gross then moved for the court to set aside the verdict. In support, Gross filed an affidavit detailing what he would have said had he been permitted to testify in surrebuttal. He later argued at sentencing that his conviction should be set aside because of the court's denials of his surrebuttal request and his mistrial motion based upon the stricken testimony of A.S. and K.C. The court denied the motion. The court then sentenced Gross to a term of 17 years to life imprisonment for predatory sexual assault upon a child, 20 years' imprisonment and 10 years of post-release supervision for the first-degree rape conviction, 1 to 3 years' imprisonment for attempted sexual abuse in the first degree, and time served on the two counts of endangering the welfare of a child. The court determined that all sentences were to run concurrently.

Gross then moved through counsel pursuant to New York Criminal Procedure Law ("CPL") § 440.10 to vacate the judgment on the grounds that: 1) the prosecutor elicited perjury from the complainants; and 2) he had identified new evidence in support of his innocence. The county court denied the motion with a citation to CPL § 440.10(2)(c), which requires a court to deny a motion to vacate a judgment when, "[a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him." The court additionally held that Gross "offered no competent evidence whatsoever forming a basis from which it can be concluded that the witnesses were in any way tampered with by the prosecutor." The court also concluded that the new evidence, J.S.'s home telephone records for July 2006, did not satisfy the due diligence requirement to constitute "newly discovered evidence." Gross sought leave to appeal, which was denied on March 31, 2010.

**\*3** Again proceeding through counsel, Gross also appealed his conviction, arguing that: 1) the court's denial of his request to testify in surrebuttal violated his constitutional right to testify; 2) the trial court erred in its handling of the hearsay testimony of A.S. and K.C.; 3) the prosecution committed misconduct in summation by shifting the burden of proof to

2016 WL 11621787

Gross; 4) the verdicts were against the weight of the evidence; 5) the dates in the indictment were too vague to allow Gross the opportunity to present a meaningful defense; and 6) the sentences was unduly harsh and severe. The Appellate Division unanimously affirmed the judgment against Gross in a reasoned decision issued on December 30, 2010. *People v. Gross*, 913 N.Y.S.2d 478, 480 (N.Y. App. Div. 2010). Gross sought leave to appeal to the New York Court of Appeals, which was denied without comment on May 27, 2011. *People v. Gross*, 949 N.E.2d 979, 979 (N.Y. 2011).

Gross then filed a counseled petition for a writ of error coram nobis, claiming that his appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to seek a remedy for: 1) the prosecutor's improper remarks about prior consistent statements; and 2) the introduction of the prior consistent statements. On September 28, 2012, the Appellate Division summarily denied the petition. *People v. Gross*, 951 N.Y.S.2d 420, 420 (N.Y. App. Div. 2012). The Court of Appeals likewise denied leave to appeal without comment. *People v. Gross*, 984 N.E.2d 329, 329 (N.Y. 2013).

On March 11, 2013, Gross filed a second counseled motion to vacate his conviction pursuant to CPL § 440.10. In that motion, Gross argued, as he had in his coram nobis motion, that trial counsel was ineffective for failing to: 1) object to the introduction of prior consistent statements; and 2) seek a remedy for the introduction of the testimony and for the prosecutor's related remarks. The court denied the motion on May 6, 2013 both on procedural grounds and on the merits. Gross again sought leave to appeal the denial, which was denied on August 20, 2013.

Proceeding *pro se*, Gross filed a third motion to vacate his conviction under CPL § 440.10 on the grounds that: 1) he was actually innocent; 2) the court precluded relevant evidence and allowed the prosecution to present improper evidence; 3) the court made improper remarks; 4) the prosecutor committed misconduct; 5) the conviction was not supported by legally sufficient evidence; and 6) trial counsel was ineffective. The county court also denied this motion on procedural grounds as well as on the merits. Gross sought leave to appeal to the Appellate Division, raising his claim that he was actually innocent. The Appellate Division denied leave without comment on June 9, 2014.

Gross has now timely filed a counseled Petition for a Writ of Habeas Corpus to this Court, which is pending before the undersigned judge and ripe for adjudication.

## II. GROUNDS RAISED

In his counseled Petition before this Court, Gross argues that: 1) trial and appellate counsel were ineffective for a variety of reasons; 2) the prosecutor committed misconduct in a number of ways; 3) the trial court improperly curtailed his defense by refusing to allow him to testify in surrebuttal; and 4) he is actually innocent of the crimes.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

**\*4**  To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 194 of 267

Gross v. Graham, Not Reported in Fed. Supp. (2016)

2016 WL 11621787

for not addressing those grounds, this Court must decide the issues de novo on the record before it. *See Dolphy v. Mantello*, 552 F.3d 236, 239-40 (2d Cir. 2009) (citing *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)); *cf. Wiggins v. Smith*, 539 U.S. 510, 530-31 (2003) (applying a de novo standard to a federal claim not reached by the state court). In so doing, the Court presumes that the state court decided the claim on the merits and the decision rested on federal grounds. *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989); *see also Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (explaining the *Harris-Coleman* interplay); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810-11 (2d Cir. 2000) (same). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference); *Jimenez*, 458 F.3d at 145-46. Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

### A. Ineffective Assistance of Counsel

Gross first argues that trial counsel was ineffective for a variety of reasons. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Thus, Gross must show that his counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts

may consider either prong of the test first and need not address both prongs if the defendant fails on one).

**\*5** New York's test for ineffective assistance of counsel under the state constitution differs slightly from the federal *Strickland* standard. "The first prong of the New York test is the same as the federal test; a defendant must show that his attorney's performance fell below an objective standard of reasonableness." *Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010) (citing *People v. Turner*, 840 N.E.2d 123 (N.Y. 2005)). The difference is in the second prong. Under the New York test, the court need not find that counsel's inadequate efforts resulted in a reasonable probability that, but for counsel's error, the outcome would have been different. "Instead, the 'question is whether the attorney's conduct constituted egregious and prejudicial error such that the defendant did not receive a fair trial.' " *Id.* at 123 (quoting *People v. Benevento*, 697 N.E.2d 584, 588 (N.Y. 1998)). "Thus, under New York law the focus of the inquiry is ultimately whether the error affected the 'fairness of the process as a whole.' " *Id.* (quoting *Benevento*, 697 N.E.2d at 588). "The efficacy of the attorney's efforts is assessed by looking at the totality of the circumstances and the law at the time of the case and asking whether there was 'meaningful representation.' " *Id.* (quoting *People v. Baldi*, 429 N.E.2d 400, 405 (N.Y. 1981)).

The New York Court of Appeals views the New York constitutional standard as being somewhat more favorable to defendants than the federal *Strickland* standard. *Turner*, 840 N.E.2d at 126. "To meet the New York standard, a defendant need not demonstrate that the outcome of the case would have been different but for counsel's errors; a defendant need only demonstrate that he was deprived of a fair trial overall." *Rosario*, 601 F.3d at 124 (citing *People v. Caban*, 833 N.E.2d 213, 222 (N.Y. 2005)). The Second Circuit has recognized that the New York "meaningful representation" standard is not contrary to the federal *Strickland* standard. *Id.* at 124, 126. The Second Circuit has likewise instructed that federal courts should, like the New York courts, view the New York standard as being more favorable or generous to defendants than the federal standard. *Id.* at 125.

#### 1. Counsel's Overall Performance

At trial, Gross was represented by two retained attorneys. These attorneys presented a robust defense based on the testimony of Gross, his wife, son, and a land surveyor, as well as that of an expert who spoke to the limitations of child abuse accommodation syndrome. The record further indicates that counsel effectively cross-examined the prosecution's

Gross v. Graham, Not Reported in Fed. Supp. (2016)

2016 WL 11621787

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 195 of 267

witnesses, specifically drawing attention to inconsistencies in the case against Gross. Importantly, as will be discussed further below, counsel succeeded in precluding evidence of the substance of J.S.'s conversations with K.C. and A.S. and successfully objected to those witnesses' testimony, which led to the testimony being stricken from the record. While counsel was not successful in all motions, including the denial of Gross's mistrial motion based on K.C. and A.S.'s testimony, an independent review of the record reflects that counsel provided meaningful representation, and thus Gross cannot prevail on his ineffective assistance claim.

2. *Claims relating to prior consistent statements*
Nor can Gross show that the specific claims of challenged conduct constituted deficient performance. He argues that counsel committed numerous errors with respect to inadmissible hearsay that he describes as prior consistent statements.

As an initial matter, Gross is not entitled to relief on these claims because he failed to properly exhaust them. Gross raised these ineffective assistance claims in his second and third CPL § 440 motions. But because they were "on the record" claims that could have been, but were not, raised on direct appeal, the § 440 court held, as to these claims, that Gross was procedurally barred from raising them in a § 440 motion. This statutory procedural bar is firmly established and regularly followed under New York law, and would, without more, result in a procedural bar in this Court. New York law is well settled that, where a claim of ineffective assistance of counsel is based on errors or omissions that appear on the record, such claims must be raised on direct appeal or they will be deemed procedurally barred when raised collaterally. *See, e.g.,* CPL § 440.10(2)(c) ("[T]he court must deny a motion to vacate a judgment when ... [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him"); *People v. Hickey,* 714 N.Y.S.2d 821, 822 (N.Y. App. Div. 2000); *see also People v. Cooks,* 500 N.Y.S.2d 503 (N.Y. 1986). Under federal law, this procedural bar is an adequate and independent state law ground that bars federal habeas corpus review. *See Sweet v. Bennett,* 353 F.3d 135, 140-41 (2d Cir. 2003); *Acevedo v. Capra,* No. 13-CV-5579, 2014 WL 1236763, at *10 (E.D.N.Y. Mar. 25, 2014) ("The Second Circuit has regularly held that a court's denial of a § 440.10

motion on the basis of the movant's failure to raise an issue on direct appeal is an independent and adequate state ground barring federal habeas review."), *aff'd,* 600 F. App'x 801 (2d Cir. 2015).

**\*6** Gross argues in his Traverse that his claims were properly brought in the § 440 motion because it was necessary for the court to determine whether counsel's actions were the product of strategy or mistake. The state courts apparently disagreed, and this Court is bound by that state law determination. In any event, even if Gross were correct and these ineffective assistance claims were not barred here, they nonetheless fail on the merits as well. [4] Prior to trial, the prosecution sought to introduce under the prompt outcry exception to the hearsay rule evidence that J.S. told A.S. and K.C. that Gross raped her. Gross opposed the application, and the trial court denied it. At trial, A.S. testified that J.S. was her sister and that the two had a conversation about Gross "[s]hortly after it happened." After the prosecution asked her how the conversation came about, defense counsel objected. The court overruled the objection and allowed A.S. to testify that nothing in particular prompted the disclosure and that she did not tell anyone what J.S. had told her. On cross-examination, defense counsel asked A.S. when J.S. made the disclosure, to which A.S. responded that she did not know. Counsel moved to strike A.S.'s testimony, which was denied.

[4]   Gross likewise argues that his appellate counsel's ineffectiveness cures the procedural bar. Because the claims fail on the merits, however, the Court does not need to address this argument.

K.C. then testified that she and J.S. were best friends and had talked about Gross at a party in the summer of 2007. Defense counsel again objected, which was overruled. K.C. testified that she disclosed the information to J.S.'s guidance counselor, but did not refer to J.S. by name. K.C. further testified that she saw J.S. crying in June 2008 and told the guidance counselor that she needed to speak with J.S.

After the jury was excused for the evening, the court acknowledged that defense counsel had objected during A.S.'s testimony on the grounds that it violated the pretrial ruling. The court stated that it should not have allowed the testimony and that it "complicated" matters by also allowing K.C.'s testimony. The court stated that it would research the issue, and they would discuss a remedy in the morning. The next day, the court stated that its research showed that:

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 196 of 267

**Gross v. Graham, Not Reported in Fed. Supp. (2016)**

2016 WL 11621787

no disclosure should have been allowed. Even though they didn't go into the conversation, it's clear that it involved Mr. Gross and that there was some emotion involved. We'd be selling the jury short if we thought that they didn't think that they were talking about the incident in question.

Defense counsel moved for a mistrial, which was denied. The court then instructed the jury:[5]

I'm going to strike the testimony of A.S. and K.C. The reason is that their testimony improperly bolstered the testimony of J.S. In other words, it tended to make J.S. more credible as a witness and that should not have been allowed. The testimony of A.S. and K.C. is now stricken in its entirety and you are to disregard it as if it were never given. It is entirely gone from this case.

[5] In the subsequent case mentioned in footnote 2, *supra*, the child victim testified that she disclosed the sexual abuse to a number of individuals, including her mother, sister and school principal, and two police officers assigned to investigate her allegations. *See People v. Gross,* 47 N.E.3d 738, 740 (N.Y. 2016). After that testimony, defense counsel did not request a limiting instruction that the child's statements of prior disclosures should not be considered in determining the truth of the child's allegations. *Id.* During the People's summation, the prosecutor argued that the jury could believe the child because of the prior consistent statements and referenced all of the prosecution witnesses who testified that the child had disclosed to them her allegations of sexual abuse. *Id.* at 741.

On direct appeal of the denial of a motion to vacate, a divided panel of the Appellate Division affirmed Gross's conviction, concluding that the testimony regarding the disclosures was not improper bolstering because it was not admitted for its truth but rather to demonstrate how the child disclosed the abuse and how the investigation began. *People v. Gross,* 988 N.Y.S.2d 733 (N.Y. App. Div. 2014). The dissenting justices contended that trial counsel's failure to object to the inadmissible testimony regarding the child's prior consistent statements deprived him of effective assistance. *Id.*

The Court of Appeals granted leave to appeal and also issued a divided opinion. *Gross,* 47 N.E.3d at 738. The dissent argued that the prosecutor exceeded the bounds of permissible summation by advocating that the victim's disclosure was proof of the abuse, and thus counsel was ineffective for failing to object to that impermissible argument. *Id.* at 744-45.

The case here, however, differs from Gross's subsequent case in material ways, as discussed above. Here, the court explicitly instructed the jury to disregard the testimony of the prior consistent statements, and the prosecutor did not argue that the prior consistent statements were proof of the abuse.

**\*7** The record therefore shows that, contrary to Gross's contentions in his Petition, defense counsel was successful in having the statements struck from the record.[6] Gross contends that counsel was nonetheless deficient because she failed to object to the prosecutor's opening statement where he identified people who J.S. told about the rape and to the prosecutor's summation statement that J.S. told the guidance counselor about the rape. But Gross fails to show that the challenged statements affected his trial, particularly given that the court instructed the jury that "what the lawyers say at any time is not evidence." Gross thus is not entitled to relief on any of his prior consistent statement claims.

[6] Gross does not re-assert his claim, raised to the state courts on direct appeal, that the trial court's handling of A.S. and K.C.'s testimony warranted reversal of his conviction. The Appellate Division concluded that, "[a]lthough the court erred in permitting [the] witnesses to refer to conversations that they each had with the victim about [Gross] because such testimony violated the court's pretrial

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 197 of 267

Gross v. Graham, Not Reported in Fed. Supp. (2016)

2016 WL 11621787

ruling excluding prompt outcry testimony, ... under the circumstances of this case ... the court's curative instruction with respect to that testimony was sufficient to alleviate any prejudice to" Gross. *Gross*, 913 N.Y.S.2d at 179 (citations and internal citations omitted). In any event, under federal law the jury is likewise presumed to obey the court's instructions. *See, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) ("juries are presumed to follow their instructions") (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Whitten*, 610 F.3d 168, 191 (2d Cir. 2010) ("We presume that juries follow instructions."); *United States v. Sabhnani*, 599 F.3d 215, 240 (2d Cir. 2010).

3. *Other claims*

Gross additionally argues, as he did in his third CPL § 440.10 motion, that counsel was ineffective for failing to: 1) argue that J.S.'s complaint was an "impossibility" because she was on a field trip to New York City on April 25, 2008; 2) "expound on the discrepanc[ies] between the various witnesses description of Gross' property and his ability to access the field in question; 3) object to the grandmother's testimony about the property; 4) "object to the bolstering of the alleged victims' credibility during the prosecutor's summation when the prosecutor put the burden of failed justice on the jury;" 5) object to "the pressure of the court to end the trial while he still had witnesses and evidence to produce;" and 6) move to set aside the verdict because J.S.'s home telephone records for July 2006 "showed no possibility of J.S. being able to call S.W. as they had no long distance carrier at that time." But Gross fails to provide any argument or additional facts to support these claims. It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief. *See, e.g.*, *Skeete v. New York*, No. 1:03-CV-2903, 2003 WL 22709079, at *2 (E.D.N.Y. Nov. 17, 2003) ("[V]ague, conclusory and unsupported claims do not advance a viable claim for habeas corpus relief."). As such, a claim of ineffective assistance must contain specific factual contentions regarding how counsel was ineffective. *See* *Hall v. Phillips*, No. 1:04-CV-1514, 2007 WL 2156656, at *13 (E.D.N.Y. July 25, 2007) (the absence of allegations that demonstrate how counsel was ineffective is "fatal to an ineffective assistance claim on habeas" review); Rules Governing Section 2254 Cases in the U.S. Dist. Courts Rule 2(c) (stating that habeas petitions must

specify all the grounds for relief available to the petitioner and the facts supporting each ground).

**\*8** Although Gross argues at length in his Traverse that his Petition included "fact specific descriptions of the failures," the Petition merely recites a short description of each claim which, in some cases, consist of a single sentence. The claims were initially raised to the state courts in Gross's third CPL § 440 motion, dated October 15, 2013, which recite the same cursory statements in support of the claims. Contrary to Gross's contention, the record is thus devoid of sufficient facts that would enable this Court to meaningfully consider these claims. In any event, the Court has reviewed the claims and found that the state courts' rejection of them was neither contrary to, or an unreasonable application, of federal law. Gross therefore is not entitled to relief on these ineffective assistance claims either.

B. Prosecutorial Misconduct

Gross next alleges that the prosecutor committed misconduct by eliciting perjury and distorting the evidence in summation. To successfully raise a claim cognizable on habeas review based on a prosecutor's comments at trial, a petitioner must demonstrate that the prosecutor's comments " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Under this standard, only "egregious" prosecutorial misconduct can give rise to a constitutional claim. *See* *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003) (quoting *Donnelly*, 416 U.S. at 647-48). A prosecutor's comments constitute "grounds for reversal only when the remarks caused 'actual prejudice.' " *Dunn v. Sears*, 561 F. Supp. 2d 444, 455 (S.D.N.Y. 2008) (citing *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998)). "In determining whether the prosecutor's comments cause[d] prejudice, [a] court considers three factors: '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the improper statements.' " *Id.* at 457 (quoting *United States v. Thomas*, 377 F.3d 232, 245 (2d Cir. 2004)).

1. *Eliciting perjury*

A prosecutor has a duty of candor in court and an enduring obligation to pursue the truth. *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 133 (2d Cir. 1998). "[T]he knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves 'a corruption of the truth-seeking

Gross v. Graham, Not Reported in Fed. Supp. (2016)

2016 WL 11621787

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 198 of 267

function of the trial process.' " *United States v. Bagley*, 473 U.S. 667, 680 (1985) (citing *United States v. Agurs*, 427 U.S. 97, 104 (1976)). It is well-established that a conviction must be side aside if "(1) 'the prosecution knew, or should have known, of the perjury,' and (2) 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (footnote omitted; quoting *Agurs*, 427 U.S. at 103).

But Gross cannot show that the prosecutor offered false testimony at trial. He argues that the witnesses purposefully lied about the property behind his home and disputes that there was a navigable path from there to the field. Gross has never articulated how the prosecution had either actual or constructive knowledge that the testimony of the four identified witnesses was false, and indeed, has failed to establish that the testimony was actually false. His claim is simply an attack on the witnesses' credibility. But this Court must defer to the jury's credibility findings concerning the challenged testimony. *See Bellezza v. Fischer*, Nos. 01-CV-1445, 03-MISC-0066, 2003 WL 21854749, at *15 (E.D.N.Y. Aug. 6, 2003) (holding that, on collateral review, a federal habeas court "must presume that the jury resolved any questions of credibility in favor of the prosecution") (internal quotation marks and citation omitted). Indeed, because that issue was not central to his case, it is not reasonably likely that Gross would have been acquitted had the witnesses not testified that the field was directly accessible from Gross's home. Gross is therefore not entitled to relief on this claim.

*2. Distorting evidence in summation*

**\*9** Gross also contends that the prosecutor misrepresented in his summation certain evidence presented at trial. But Gross's arguments either misinterpret the record or overstate the significance of minor inconsistencies. For example, he argues that the prosecutor erroneously argued that the access road from Gross's property to the field did not appear on the survey map because it was not a public road. At trial, the surveyor testified that "ingress or egress, easement or a trail ... typically are shown on survey maps." Gross thus claims that the surveyor testified that, if a path existed, it would have shown up on the survey maps. But the surveyor actually testified at trial that a path's appearance on a survey "[d]epends on the significance of the path." The surveyor did not elaborate on the factors used to determine whether a path should appear on a survey. As such, the record does not indicate that the prosecutor distorted the surveyor's testimony.

Likewise, although the prosecutor may have misspoken when he stated that the surveyor had only been to the property once, Gross cannot show that the misstatement was material, or that it infected his trial. The surveyor testified that it was his general practice to visit a property "two or three" times when preparing a survey. The prosecutor was simply arguing that the grandmother, who had lived in her home for 35 years, was more familiar with the property than the surveyor. None of Gross's arguments have merit, and he cannot prevail on his prosecutorial misconduct claims.

C. Curtailing of Defense

Gross next argues that the trial court violated his right to present a defense. Although unclear, it appears that Gross is re-asserting his direct appeal claim regarding the denial of his motion to testify in surrebuttal. The Appellate Division rejected that claim, concluding that the trial court did not abuse its discretion because "the proposed evidence would have been 'cumulative to, and duplicative of, evidence already presented on [Gross'] direct case.' " *Gross*, 913 N.Y.S.2d at 479 (citations omitted). Gross fares no better on federal habeas review. An independent review of the record supports the Appellate Division's determination, and federal habeas relief is not warranted on this claim.

D. Actual Innocence

Finally, Gross claims that he is actually innocent of the crimes. While a federal habeas petitioner may assert a claim of actual innocence to overcome a procedural bar to review, *Schlup*, 513 U.S. at 326, or to overcome the AEDPA's one-year statute of limitations, *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013), the Supreme Court has not resolved whether a non-capital prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence, *McQuiggin*, 133 S.Ct. at 1931; *see House v. Bell*, 547 U.S. 518, 554-55 (2006); *Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 71-72 (2009). [7] The Supreme Court has instead declined to answer the question, noting that where a "[p]etitioner has failed to make a persuasive showing of actual innocence[,] ... the Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of actual innocence." *Herrera v. Collins*, 506 U.S. 390, 427 (1993) (O'Connor, J., concurring). Although the Second Circuit has also not ruled on whether a claim of actual innocence is cognizable on habeas review, *see Friedman v. Rehal*, 618 F.3d 142, 159 (2d Cir. 2010) (citing *Osborne*, 557 U.S. at 71, and noting that whether an actual innocence claim is cognizable is an open question), it has "come close"

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 199 of 267

Gross v. Graham, Not Reported in Fed. Supp. (2016)

2016 WL 11621787

to granting habeas relief on grounds of actual innocence, *see DiMattina v. United States*, 949 F. Supp. 2d 387, 417 (E.D.N.Y. 2013) (citing cases).

7     In his Traverse, Gross clarifies that he is asserting both a freestanding claim of actual innocence as well as a gateway claim of actual innocence that excuses procedural barriers to federal habeas review. Because the Court has determined that Gross's claims fail on the merits and does not rely solely on the discussed procedural bars, the Court does not need to determine whether the evidence Gross presents supports a gateway claim of innocence.

**\*10** Assuming, but not deciding, that a freestanding actual innocence claim is cognizable in a § 2254 proceeding, the Supreme Court has described the threshold showing of evidence as "extraordinarily high." *Herrera*, 506 U.S. at 417. "The sequence of the Court's decisions in *Herrara* and *Schlup*—first leaving unresolved the status of freestanding claims and then establishing the gateway standard—implies at the least that *Herrara* requires more convincing proof of innocence than *Schlup*." *House*, 547 U.S. at 555.

Measured against this standard, Gross has fallen short of establishing his actual innocence. The purported impeachment value of the maps and survey and the telephone records fails to meet this demanding standard because Gross cannot show by clear and convincing evidence that no reasonable juror would have found him guilty had he been able to impeach S.W. at trial with this evidence. *See Schlup*, 513 U.S. at 327. Indeed, the Supreme Court has stated that

newly discovered impeachment evidence "is a step removed from evidence pertaining to the crime itself" and "tends only to impeach the credibility of" the witness. *Calderon v. Thompson*, 523 U.S. 538, 563 (1998). As such, newly discovered impeachment evidence "will seldom, if ever" establish actual innocence. *See Sawyer v. Whitley*, 505 U.S. 333, 349 (1992). Gross is thus not entitled to relief on this claim.

## V. CONCLUSION

Gross is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R. APP. P. 22(b); 2D CIR. R. 22.1.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11621787

---

**End of Document**        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 2053414
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Timothy LANKFORD, Petitioner,

v.

Timothy MCCARTHY, Respondent.

9:21-CV-22 (BKS/DJS)
|
Signed February 15, 2024

**Attorneys and Law Firms**

TIMOTHY LANKFORD, Petitioner Pro Se, 15-B-1162, Cayuga Correctional Facility, P.O. Box 1186, Moravia, New York 13118.

HON. LETITIA JAMES, Attorney General for the State of New York, PAUL B. LYONS, ESQ., Assistant Attorney General, Attorney for Respondent, 28 Liberty Street, New York, New York 10005.

### <u>REPORT-RECOMMENDATION and ORDER</u> [1]

[1]

> This matter was referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DANIEL J. STEWART, United States Magistrate Judge

**\*1** *Pro se* Petitioner Timothy Lankford was convicted of second-degree burglary and attempted petit larceny at the conclusion of a jury trial held in Onondaga County Court. He was sentenced to an aggregate determinate prison term of 15 years followed by 5 years of post-release supervision. Petitioner presently seeks a Writ of *Habeas Corpus* pursuant to 28 U.S.C. § 2254 on the grounds of ineffective trial counsel, denial of due process, insufficient evidence, and ineffective appellate counsel. Dkt. No. 1, Pet., pp. 6-27. [2] Respondent has filed a Memorandum of Law in Opposition to the Petition. Dkt. No. 13. Petitioner filed a Traverse. Dkt. No. 24. For the reasons that follow, this Court recommends that the Petition be **denied.**

[2]

> Citations to Petitioner's submissions are to page numbers assigned by the Court's CM/ECF system.

## I. BACKGROUND

On November 1, 2013, Petitioner was arrested, and the following day Petitioner was arraigned on charges of burglary in the second degree and attempted petit larceny. Petitioner was indicted on these charges on February 2, 2013 and chose to have a jury trial. He was convicted as charged at trial. The court then appointed new counsel for Petitioner who filed a CPL § 330.30 motion to set aside the verdict. Counsel did this on the basis of ineffective trial counsel and that the verdict was based on legally insufficient evidence. The Court denied the motion and subsequently sentenced Petitioner.

Next, Petitioner filed a *pro se* CPL § 440.10 motion to vacate his conviction on the grounds that trial counsel was ineffective. He gave several reasons for the ineffectiveness. This motion was denied as being procedurally barred because it could be raised on direct appeal. It was alternatively denied on the merits. The Appellate Division, Fourth Department, denied Petitioner's application for leave to appeal.

Petitioner filed his direct appeal with counsel. The counseled appeal asserted that the verdict was based on legally insufficient evidence and was against the weight of the evidence, and the sentence was excessive. Petitioner also filed a *pro se* brief in which he asserted additional appeal grounds: that trial counsel was ineffective; the court erroneously permitted the indictment to be amended; and the verdict was based on legally insufficient evidence and was against the weight of the evidence. The Appellate Division unanimously affirmed the conviction.

Petitioner then filed a *pro se* motion for re-argument which the court denied and filed counseled and *pro se* applications for leave to appeal to the Court of Appeals. The Court of Appeals denied leave.

Next, on January 19, 2019, Petitioner filed a *pro se* coram nobis motion with the Appellate Division. This motion claimed ineffective appellate counsel. The Appellate Division denied the motion. The Court of Appeals denied Petitioner's application for leave to appeal.

On July 16, 2019 Petitioner filed a *pro se* CPL § 440.10 motion to vacate his conviction in county court. The court denied the claims on both procedural grounds and on the merits. The Appellate Division denied Petitioner's application for leave.

## II. STANDARD OF REVIEW

**\*2** Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Petitioner bears the burden of proving by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir. 1997); *Rivera v. New York,* 2003 WL 22234697, at \*3 (S.D.N.Y. Aug. 28, 2003). A federal court may not grant *habeas* relief to a state prisoner on a claim unless the state court adjudicated the merits of the claim and such adjudication either:

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Hawkins v. Costello,* 460 F.3d 238, 242 (2d Cir. 2006).

The Second Circuit has summarized the application of the standard of review under AEDPA as follows:

> [u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: 1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz,* 237 F.3d 147, 152 (2d Cir. 2001) (citing *Williams v. Taylor,* 529 U.S. 362 (2000) and *Francis S. v. Stone,* 221 F.3d 100, 108-09 (2d Cir. 2000)). The standard of review under § 2254(d) is "highly deferential" and "demands

that state-court decisions be given the benefit of the doubt." *Renico v. Lett,* 559 U.S. 766, 773 (2010). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Harrington v. Richter,* 562 U.S. 86, 103 (2011).

The phrase "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412 (2000). A state court decision is "contrary to" established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Id.* at 413. A state court decision is an "unreasonable application" of established Supreme Court precedent "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* AEDPA also requires that "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir. 2005); *Boyette v. LeFevre,* 246 F.3d 76, 88 (2d Cir. 2001).

## III. DISCUSSION

### A. Sufficiency of the Evidence

#### 1. Procedural Bar

Federal habeas review of a state-court conviction is generally prohibited if a state court rested its judgment on a state procedural requirement that is "independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729 (1991); *see also Harris v. Reed,* 489 U.S. 255, 261-62 (1989) (explaining that under *Wainwright v. Sykes,* 433 U.S. 72 (1977), "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim"); *Garcia v. Lewis,* 188 F.3d 71, 76 (2d Cir. 1999); *Levine v. Comm'r of Corr. Servs.,* 44 F.3d 121, 126 (2d Cir. 1995). In the context of habeas

review, "the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism." *Coleman v. Thompson*, 501 U.S. at 730. "The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." *Id.* at 732.

**\*3** Here, Petitioner's trial counsel raised only a "general motion for a trial order of dismissal based on the failure of the People to prove a prima [facie] case." *People v. Langford*, 162 A.D.3d at 1584 (internal quotation omitted). The Appellate Division, therefore, found the claim unpreserved for review. *Id.* Under the New York contemporaneous objection rule, "an issue is preserved for appeal as a matter of law only when the appellant objected on that ground during the trial." *Fernandez v. Smith*, 558 F. Supp. 2d 480, 489 (S.D.N.Y. 2008) (citing N.Y. Crim Proc. Law § 470.05). In order to preserve a challenge to the sufficiency of the evidence a defendant must move for a trial order of dismissal making a specific objection. *See People v. Hawkins*, 11 N.Y.3d 484, 492 (2008). Furthermore, a defendant who moves to dismiss at the close of the People's case must renew that motion at the close of his case in order to preserve the objections raised therein. *People v. Kolupa*, 13 N.Y.3d 786, 787 (2009); *People v. Hines*, 97 N.Y.2d 56, 61 (2001). It is well established that New York's contemporaneous objection rule is an "adequate" state ground that may bar federal habeas review. *See, e.g.*, *Brown v. Ercole*, 353 F. App'x 518, 520 (2d Cir. 2009); *Richardson v. Greene*, 497 F.3d 212, 219 (2d Cir. 2007). Accordingly, the Appellate Division's finding that Petitioner's sufficiency of the evidence claim was not preserved is an "adequate" state ground barring habeas review. It is therefore procedurally barred from federal review.

### 2. Merits

Even if not procedurally barred, this claim is not a basis for relief on the merits.

In seeking habeas relief based on alleged insufficiency of the evidence, a petitioner "bears a 'very heavy burden.'" *Torres v. O'Meara*, 353 F.Supp.3d 180, 188 (N.D.N.Y. 2019) (quoting *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000)). The standard of review for a legal sufficiency claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Hogan v. West*, 448 F.Supp.2d 496, 512 (W.D.N.Y. 2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). Therefore, a habeas court may only overturn a conviction if, based upon the evidence presented at trial, "*no* rational trier of fact could have found that the prosecution established the defendant's guilt beyond a reasonable doubt." *Id.* (emphasis in original).

Here, the jury's findings do not fall below that "threshold of bare rationality" to render the verdict legally insufficient. *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). Petitioner was located at the scene of the crime-in-progress with his two co-defendants, one of whom pled guilty to the charges. SR. at pp. 202 & 346. The officers on the scene recovered latex gloves and black hats from the other two individuals, and found a third set of gloves and a hat discarded in an alleyway behind the home. SR. at p. 347. Petitioner denied knowing his co-defendant when questioned, but his co-defendant's mother later testified that the two are cousins who have known each other for their whole lives and who had lived together previously. SR. at p. 348.

The jury was convinced by these facts, and the state's case as a whole, of Petitioner's guilt. There is nothing to suggest that its findings have no basis in rationality. Petitioner's conviction was supported by legally sufficient evidence.

### B. Alleged Alteration of the Indictment

Petitioner asserts that his constitutional right to due process and fair trial was violated when the trial court allowed the prosecution to pursue and charge the jury with an acting in concert theory. Pet. at p. 22. The Fifth Amendment right to a grand jury indictment has not been incorporated against the states through the Fourteenth Amendment. *LanFranco v. Murray*, 313 F.3d 112, 118 (2d Cir. 2002). "The amendment of indictments is generally a matter of state law and is not ordinarily cognizable on habeas corpus review." *O'Halloran v. Gonyea*, 2015 WL 93716, at \*20 (N.D.N.Y. Jan. 7, 2015) (citing cases). "Accordingly, any alleged impropriety in the amendment of the indictment ... is therefore beyond this Court's review." *Staley v. Greiner*, 2003 WL 470568, at \*11 (S.D.N.Y. Feb. 6, 2003) (internal quotation omitted).

### C. Ineffective Assistance of Trial Counsel

*1. Procedural Issues*

**\*4**  For a petitioner to proceed on a federal habeas corpus claim, he must first exhaust available state remedies to ensure that the state is given the opportunity to consider and correct an alleged constitutional violation, *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014), or show that there is no available state corrective process, or that the remedy would not be effective. 28 U.S.C. § 2254(b)(1); *see also Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001). The exhaustion requirement is intended to maintain the "dual judicial system" and allow for both the federal and state judicial systems to function independently. *Daye v. Attorney Gen. of New York*, 696 F.2d 186, 191 (2d Cir. 1982). To uphold the independence of each judicial system, the state courts must be given the opportunity to consider and correct any violations of any laws. *Id.* In order to meet the requirements of exhaustion, a petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"; a petitioner can do this by presenting his claim to the highest court in the state. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000). A federal claim must also be "fairly presented" to the state courts to meet the exhaustion requirements. *See Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). This requires that a prisoner present the essential facts and legal premises of his federal constitutional claim to the highest state court capable of reviewing it. *Jackson v. Conway*, 763 F.3d at 133. Although a state prisoner is not expected to cite the Constitution perfectly in order to satisfy this presentment requirement, the prisoner must assert a claim that is likely to alert the state court about the federal nature of the claim. *Id.* (citing *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)).

Here, Petitioner presents ten specific claims of ineffectiveness on the part of his trial counsel. *See generally* Traverse. Of these ten claims, only one, related to the prosecutor's summation, appears to have been raised in Petitioner's leave applications to the Court of Appeals. SR at 387-405. Petitioner has not provided any reason that his procedural default may be excused.

*2. Merits of Ineffectiveness Claims*

Petitioner's claims, in any event, lack merit.

"To establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.' " *Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland v. Washington*, 466 U.S. at 689). A person challenging a conviction thus must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. at 687. Establishing prejudice requires Petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694.

The *Strickland* test imposes a "high bar." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Under the AEDPA, "it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 699 (2002) (citing *Williams v. Taylor*, 529 U.S. at 411). "Rather, [Petitioner] must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* On this record, Petitioner cannot make this showing. Nothing about the Appellate Division's rejection of Petitioner's ineffectiveness claim was unreasonable.

a. Counsel's communication with Petitioner

Petitioner generally asserts a lack of visits and strategic discussion on the part of his counsel, *see* Pet. at pp. 16-19, as a basis for his ineffective assistance of counsel claim. "There is no required minimum number of meetings between counsel and client." *Farr v. Greiner*, 2007 WL 1094160, at \*31 (E.D.N.Y. Apr. 10, 2007) (citing cases). In addition, "courts have consistently held 'that the brevity of consultation time between a defendant and his counsel alone cannot support a claim of ineffective assistance of counsel.' " *Collins v. Connolly*, 2013 WL 2443667, at \*9 (S.D.N.Y. May 17, 2013), *report and recommendation adopted*, 2013 WL 6085408 (S.D.N.Y. Nov. 19, 2013) (quoting *Raposo v. United States*, 2004 WL 1043075, at \*3 (S.D.N.Y. May 7, 2004)).

**\*5**  Moreover, Petitioner does not identify how, if at all, he was prejudiced by his attorney's alleged failure to communicate, nor how his position at trial would have been improved with additional opportunities for consultation with his attorney. Accordingly, trial counsel's alleged failure to communicate with Petitioner is inadequate to sustain Petitioner's claim of ineffective assistance of counsel.

*Raposo v. United States*, 2004 WL 1043075, at \*3.

### b. Failure to obtain key evidence and interview key witnesses

Petitioner claims that his trial counsel was ineffective because he did not examine the clothing that Petitioner was wearing on the night of the incident and he did not interview Petitioner's co-defendant, or his girlfriend, both of whom Petitioner believes would prove his innocence and corroborate his version of events. Pet. at p. 18.

The duty to investigate a case "requires counsel 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Greiner v. Wells*, 417 F.3d 305, 320-21 (2d Cir. 2005) (quoting *Strickland v. Washington*, 466 U.S. at 691). The Second Circuit has long held that "the decision to call or bypass particular witnesses is peculiarly a question of trial strategy." *U. S. ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir. 1974). Defense counsel's decisions in this area are "afford[ed] substantial deference." *United States v. Cureton*, 2022 WL 17726842, at \*3 (2d Cir. Dec. 16, 2022).

Regarding the alleged failure to properly investigate potential witnesses, the factual record clearly establishes a potential basis for counsel's actions. Counsel, in fact, made efforts to arrange for Petitioner's co-defendant to testify by sending a fax to the facility where the co-defendant was housed. SR. at p. 40. In response, counsel received a fax back which indicated that the co-defendant would not testify even if he was subpoenaed. *Id.* Counsel was not required to put

continuous efforts into producing a witness who was refusing to testify.

Testimony from Petitioner's girlfriend would have also likely been fruitless. As the state trial court found, her testimony was likely inadmissible hearsay. SR. at p. 90. Moreover, her testimony that Petitioner was with her and planning to go purchase marijuana could have been viewed by counsel as unhelpful and, in any event did not preclude his potential participation in the crime. SR. at pp. 25 & 90.

Petitioner also claims that counsel was ineffective for failing to obtain and examine the clothing he was wearing the night of his arrest. Pet. at p. 19. Other than Petitioner's statement that counsel did not take this action, there is no evidence in the record regarding whether counsel did or did not review Petitioner's clothing. That claim, therefore, is entirely conclusory and not a basis for habeas relief. *Miller v. New York*, 275 F. Supp. 2d 294, 299 (E.D.N.Y. 2003).

### c. Failure to Seek Suppression of Police Report

Petitioner next argues that counsel was ineffective in failing to seek the suppression of oral statements given by Petitioner to a police officer at the scene that were then included on a police report. Pet. at p. 17. Petitioner argues that the statements were factually inaccurate, but makes no claim that they were illegally obtained. *Id.*; *see also* Traverse at pp. 14-15. [3] Given that claim, it does not appear there was a basis for seeking, for example, a *Huntley* hearing which could have challenged the voluntariness of Petitioner's statements given to police. *See People v. Huntley*, 15 N.Y.2d 72 (1965). Because a *Huntley* motion would not be the appropriate means to resolve this dispute, it would be frivolous for counsel to move for such a hearing, and counsel is not constitutionally ineffective for not making that motion.

[3]  Petitioner does suggest that the failure to have his statement videotaped would have warranted suppression, Traverse at p. 15, but cites no New York or federal law to support that assertion.

### d. Suppression of Physical Evidence

**\*6**  Petitioner contends that counsel's "fail[ure]" to move to suppress physical evidence not attributed to petitioner" rendered his performance constitutionally ineffective. Pet. at

p. 18. Petitioner appears to be referring to clothing items found on the ground at the scene of the crime that did not, according to Petitioner contain his DNA and were therefore irrelevant. Traverse at p. 15. Three individuals were charged in this crime and "[g]loves and masks were found on the other two men, and a third set of gloves and a black ski mask were found discarded in the alleyway next to the home" that had been burglarized. *People v. Lankford*, 162 A.D.2d 1583 (4th Dep't 2018). All three individuals were apprehended at the scene. *Id.* In light of that, the discarded items were clearly relevant to the prosecution's theory that three individuals, including Petitioner, were involved in the crime and trial counsel's failure to seek suppression of them based on purported irrelevance most certainly was not ineffective assistance.

### e. Counsel's failure to properly oppose the indictment amendment

Petitioner states that counsel "failed to demad [sic] an adjournment for an evidentiary hearing for a [sic] in court examination of the grand jury minutes and/or admit proof supporting their amendment pursuant to C.P.L 200.70(1) and *People v. Rivera*, 84 N.Y.2d 766." Pet. at p. 19. The record reflects that Petitioner's trial attorney specifically objected to permitting amendment of the indictment. 10/22/2014 Tr. at 6. Even assuming that Petitioner was entitled to an adjournment of the proceedings under section 200.70, the decision whether to request an adjournment is typically a strategic choice which cannot establish deficient performance. *Lopez v. United States*, 2017 WL 1424328, at *6 (S.D.N.Y. Apr. 20, 2017). Moreover, Petitioner "has not demonstrated that it was unreasonable for trial counsel to decide not to request an adjournment." *Afrika v. Herbert*, 2007 WL 2323500, at *5 (W.D.N.Y. Aug. 10, 2007). Nor has he made a credible, specific claim of prejudice resulting from the failure to request an adjournment.

### f. Counsel's failure to demand a bill of particulars

Petitioner indicates that counsel's failure to request a bill of particulars "allowed the prosecution to deliberately keep the petitioner in ignorance of the matters vital to preparation of a defense and it postponed diligent investigation." Pet. at p. 17. "A defense attorney's failure to request a bill of particulars, in an[d] of itself, does not constitute ineffectiveness." *Slater v. Conway*, 2012 WL 777481, at *12 (W.D.N.Y. Mar. 7,

2012). Petitioner has failed to demonstrate that prior to trial he lacked any pertinent discovery that would have otherwise been available to him had a bill of particulars been requested. As such, he cannot show prejudice from the failure to request one. *Id.*; *see also Slater v. Conway*, 2012 WL 777481, at *12 (W.D.N.Y. Mar. 7, 2012). Petitioner's conclusory allegations regarding the alleged lack of preparation are insufficient. *Russell v. Rock*, 2008 WL 5333327, at *3 (E.D.N.Y. Dec. 19, 2008).

### g. Claims regarding El-Rahman's testimony

Petitioner raises multiple issues surrounding the testimony of his co-defendant's mother, Johnnie El-Rahman. He believes that the testimony was irrelevant and prejudicial, and that counsel should have moved to have her testimony stricken on those grounds. Pet. at p. 20. He also believes that the People did not provide prior notice of her being called as a witness. *Id.* at p. 18. Next, he maintains that there was a *Rosario* violation in which the People did not turn over El-Rahman's written statements to the defense. *Id.* at p. 20. Lastly, Petitioner contends that counsel failed to properly cross-examine El-Rahman and failed to request a limiting instruction. *Id.* The record establishes that none of these claims have merit.

The testimony of El-Rahman was clearly relevant. Petitioner denied knowing his co-defendants and the testimony at issue established that not only did he know his co-defendant, but was related to him. SR. at p. 92. That testimony was, therefore, relevant both to show that Petitioner had lied to the police at the scene and to the acting in concert theory on which the case was prosecuted. The state court findings in that record, *see* SR. at p. 91, were clearly not unreasonable.

*7 The record also refutes Petitioner's assertion that he was not provided notice of El-Rahman's testimony. The prosecution specifically advised Petitioner El-Rahman "would be testifying to the to the fact that [Petitioner] and his co-defendant, Willie Carter, were cousins to rebut [Petitioner's] contention that he did not know the individuals with whom he was arrested." SR. at p. 92. Petitioner's factual claim to the contrary is simply erroneous. Petitioner also offers no evidence of a failure on the part of the prosecutor to turn over prior statements of El-Rahman and his claim "is clearly contradicted by the record." *Id.*

Petitioner also has not pointed to any specific problems with his counsel's cross-examination. Instead, he only concludes that counsel "failed to adequately cross-examine ..." Pet. at p. 20. There is no indication of how a more in-depth cross examination could have helped Petitioner and changed the outcome of the case. Moreover, "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim." *Dunham v. Travis,* 313 F.3d 724, 732 (2d Cir. 2002) (quoting *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir. 1987)).

Finally, Petitioner asserts that counsel should have requested a jury instruction, related to El-Rahman's testimony, that advised the jury that it should not draw inferences about Petitioner's propensity to commit crimes. Pet. at p. 20. Nothing about El-Rahman's testimony implied a criminal propensity and so no such limiting jury instruction was needed. Counsel, therefore, was not ineffective when he did not request one.

#### h. Petitioner's Decision About Whether to Testify

Petitioner asserts that counsel would not allow him to testify. Pet. at pp. 20-21. The record, however, is clear that Petitioner discussed with his attorney the question of whether to testify. SR. at pp. 34 & 91. Petitioner wrote in a letter to his counsel "I truly believe that if I would not have listened to you and testified the verdict would of [sic] been different." SR. at p. 34. This admission by Petitioner indicates that there was a mutual decision made by the pair that he would not testify, and that Petitioner later came to regret that decision. "The question is not whether some other course would have been more successful. That can always be argued after a case has been lost. The question is whether counsel's conduct of the defense was a reasonable course at the time and came within the standards for acceptable representation." *United States v. Aguirre,* 912 F.2d 555, 563 (2d Cir. 1990). The concern about avoiding having Petitioner cross-examined about his prior criminal record, *see* SR. at p. 91, clearly "provid[ed] counsel with a valid reason for not calling his client." *Zeito v. Girdich,* 431 F. Supp. 2d 329, 334 (W.D.N.Y. 2006). "Calling a criminal defendant to testify in his behalf is one of those strategic decisions by defense counsel that a habeas court generally may not, with hindsight, second guess." *Id.* On this record, there is no basis for finding ineffectiveness.

#### i. Counsel's failure to preserve the legal sufficiency claim

Petitioner next objects to the failure of trial counsel to properly preserve a legal sufficiency defense for appeal. *See* Traverse at pp. 16-17. While the Appellate Division did find that claim unpreserved, "[t]rial counsel's failure to preserve the legal sufficiency issue for appellate review, standing alone, does not rise to the level of ineffective assistance." *Wade v. Melecio,* 2023 WL 2152489, at *13 (S.D.N.Y. Feb. 22, 2023), *report and recommendation adopted,* 2023 WL 2500676 (S.D.N.Y. Mar. 14, 2023).

**\*8** Nor could Petitioner show prejudice from the failure to preserve the issue because, as discussed above, there was legally sufficient evidence to support the verdict. *Augugliaro v. Bradt,* 2014 WL 5093849, at *11 (E.D.N.Y. Oct. 8, 2014).

#### j. Failure to Object to Summation

Petitioner's final claim under his ineffective assistance of counsel claim is that counsel was constitutionally ineffective for failing to object to the prosecution's summation remarks. Pet. at p. 21. While arguing generally that counsel was ineffective for failing to object to the prosecutor's appeal to sympathy and mischaracterization of the law, Petitioner has failed to identify any specific quotations or sections of the summation remarks that should have been objected to. This type of conclusory claim cannot serve as a basis for an ineffectiveness argument. "It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief." *Gross v. Graham,* 2016 WL 11621787, at *7 (N.D.N.Y. Aug. 26, 2016). "An important part of trial strategy is deciding when objections are likely to be productive and when they are not." *Glover v. Kirk,* 2020 WL 10316986, at *5 (E.D.N.Y. Apr. 20, 2020). In the context of a summation, defense counsel may make a strategic decision not to object to comments "so as not to draw the jury's attention to them." *Reid v. Giambruno,* 2007 WL 3232497, at *25 (W.D.N.Y. Oct. 31, 2007) (citing cases). Strategic choices "are virtually unchallengeable." *Strickland v. Washington,* 466 U.S. at 690. Having reviewed the record in detail the Court finds that the lack of objections may well have been such a strategic choice in light of the evidence against Petitioner and his defense at trial. Such choices should not be second-guessed many years after the fact.

### D. Ineffective Assistance of Appellate Counsel

Finally, Petitioner asserts that his appellate counsel was constitutionally ineffective. The *Strickland* standard discussed above "applies equally to claims of ineffective assistance by appellate counsel." *Aparicio v. Artuz*, 269 F.3d at 95. Petitioner's claim is based on counsel's failure to argue on direct appeal that the trial court erred when it permitted the amendment to the indictment, and that trial counsel was constitutionally ineffective because he failed to oppose the amendment. Pet. at pp. 25-26.

As set forth above, neither argument was meritorious and so appellate counsel cannot be said to have been ineffective in not raising trial counsel's purported ineffectiveness in not raising the issues. *Huzinec v. United States*, 2022 WL 44706, at *7 (W.D.N.Y. Jan. 5, 2022); *Alcindor v. Schneiderman*, 2017 WL 1383997, at *19 (S.D.N.Y. Apr. 14, 2017), *report and recommendation adopted*, 2018 WL 583117 (S.D.N.Y. Jan. 25, 2018)

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Petition (Dkt. No. 1) be **DENIED** and **DISMISSED**; and it is further

**RECOMMENDED**, that no Certificate of Appealability ("COA") be issued because Petitioner has failed to make "a substantial showing of the denial of a constitutional right" as required by 28 U.S.C. § 2253(c)(2); [4] and it is further

[4]    *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see also Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that, if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation").

 **\*9  ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2024 WL 2053414

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1694018
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Timothy LANKFORD, Petitioner,

v.

Timothy MCCARTHY, Respondent.

9:21-cv-22 (BKS/DJS)
|
Signed April 19, 2024

**Attorneys and Law Firms**

Petitioner pro se: Timothy Lankford, 15-B-1162, Cayuga
Correctional Facility, P.O. Box 1186, Moravia, NY 13118

For Defendant: Letitia James, Attorney General for the State
of New York, Paul B. Lyons, Assistant Attorney General, 28
Liberty Street, New York, NY 10005

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

 **\*1**  On January 8, 2021, Timothy Lankford filed a petition
seeking a writ of habeas corpus under 28 U.S.C. § 2254,
challenging a 2014 judgment of conviction, upon a jury
verdict, of burglary in the second degree and attempted petit
larceny. (Dkt. No. 1). On June 8, 2021, Respondent filed
an answer, accompanied by the state court records related
to the matter. (Dkt. Nos. 12–14). Petitioner filed a reply on
September 1, 2021. (Dkt. No. 24). This matter was assigned
to United States Magistrate Judge Daniel J. Stewart who,
on February 15, 2024, issued a Report-Recommendation and
Order recommending that Petitioner's petition be denied and
dismissed. (Dkt. No. 27). Magistrate Judge Stewart advised
the parties that under 28 U.S.C. § 636(b)(1), they had fourteen
days within which to file written objections to the Report-
Recommendation, and that the failure to object to the report
within fourteen days would preclude appellate review. (*Id.*
at 20–21). Petitioner has filed objections to the Report-
Recommendation. (Dkt. No. 30). For the reasons set forth
below, the Report-Recommendation is adopted in its entirety.

**II. STANDARD OF REVIEW**

The Court reviews de novo those portions of the Magistrate
Judge's findings and recommendations that have been
properly preserved with a specific objection. *Petersen v.
Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C.
§ 636(b)(1)(C). "A proper objection is one that identifies the
specific portions of the [Report and Recommendation] that
the objector asserts are erroneous and provides a basis for this
assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp.
2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly
raised objections must be "specific and clearly aimed at
particular findings" in the report. *Molefe v. KLM Royal Dutch
Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven
a pro se party's objections to a Report and Recommendation
must be specific and clearly aimed at particular findings in
the magistrate's proposal ...." *Machicote v. Ercole*, No. 06-
cv-13320, 2011 WL 3809920, at \*2, 2011 U.S. Dist. LEXIS
95351 (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings
and recommendations as to which there was no properly
preserved objection are reviewed for clear error. *Molefe*, 602
F. Supp. 2d at 487. To the extent a party makes "merely
perfunctory responses, argued in an attempt to engage the
district court in a rehashing of the same arguments" set forth
in the original submission, the Court will only review for clear
error. *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y.
2008) (citations and internal quotation marks omitted).

**III. DISCUSSION**

Following a jury trial in Onondaga County Court in Syracuse,
New York, Petitioner was convicted of burglary in the
second degree, N.Y. Penal Law § 140.25(2), and attempted
petit larceny, N.Y. Penal Law §§ 110.00, 155.25. State
Court Record ("SR") at 288. Petitioner was sentenced to a
prison term of 15 years followed by 5 years of post-release
supervision. (*Id.*).

 **\*2**  The Petition asserts five grounds for habeas corpus relief
under 28 U.S.C. § 2254. (Dkt. No. 1). Specifically, Petitioner:
(1) challenges the sufficiency of the evidence to support
his conviction of second-degree burglary and attempted
petit larceny following a jury trial; (2) asserts the alleged
amendment of the indictment violated his constitutional right
to due process and fair trial; (3) asserts a claim of ineffective
assistance of trial counsel on a number of grounds; and (4)
asserts a claim of ineffective assistance of appellate counsel.
(*See generally* Dkt. No. 1).

After carefully considering each of these claims, Magistrate
Judge Stewart recommended that the petition be denied.
(*See generally* Dkt. No. 27). The Court assumes familiarity

with the Report-Recommendation and the facts underlying the Petition, as summarized in the Report-Recommendation, and considers Petitioner's objections in the context of each asserted ground for relief in turn.

### A. Sufficiency of the Evidence

Magistrate Judge Stewart found Petitioner's sufficiency of the evidence claim was procedurally barred but that, even it had not been, it also failed on the merits. (Dkt. No. 27, at 5–8). To determine whether federal habeas review of Petitioner's sufficiency of the evidence claim was available, Magistrate Judge Stewart reviewed the procedural history of Petitioner's criminal case, which showed the Appellate Division had found this claim "unpreserved" because "Petitioner's trial counsel raised only a 'general motion for a trial order of dismissal based on the failure of the People to prove a prima [facie] case.' " (*Id.*) (quoting *People v. Lankford*, 162 A.D.3d 1583, 1584 (4th Dep't 2018)). Magistrate Judge Stewart explained that: (1) "to preserve a challenge to the sufficiency of the evidence a defendant must move for a trial order of dismissal making a *specific* objection," (*id.*) (emphasis added) (citing *People v. Hawkins*, 11 N.Y.3d 484, 492, 872 N.Y.S.2d 395, 900 N.E.2d 946 (2008)); and (2) that New York's contemporaneous objection rule is an 'adequate' state ground that may bar federal habeas review," (*id.*) (citing *Brown v. Ercole*, 353 F. App'x 518, 520 (2d Cir. 2009)). As the Appellate Division found that Petitioner's general motion failed to preserve his sufficiency of the evidence claim for review, and because such a finding was an " 'adequate' state ground," Magistrate Judge Stewart concluded that Petitioner's sufficiency of the evidence claim was "procedurally barred from federal review." (Dkt. No. 27, at 7).

Nonetheless, Magistrate Judge Stewart considered whether Petitioner's sufficiency of the evidence claim provided a "basis for relief on the merits." (Dkt. No. 27, at 7–8). Magistrate Judge Stewart concluded that Petitioner did not satisfy the "very heavy burden" of showing that "*no rational trier of fact could have found that the prosecution established the defendant's guilt beyond a reasonable doubt.*" (*Id.* at 7) (emphasis in original) (first quoting *Torres v. O'Meara*, 353 F. Supp. 3d 180, 188 (N.D.N.Y. 2019); and then quoting *Hogan v. West*, 448 F. Supp. 2d 496, 512 (W.D.N.Y. 2006)). In reaching this conclusion, Magistrate Judge Stewart recounted the following facts:

> Petitioner was located at the scene of the crime-in-progress with his two co-defendants, one of whom pled guilty to the charges. The officers on the scene recovered latex gloves and black hats from the other two individuals, and found a third set of gloves and a hat discarded in an alleyway behind the home. Petitioner denied knowing his co-defendant when questioned, but his co-defendant's mother later testified that the two are cousins who have known each other for their whole lives and who had lived together previously.

**\*3** (Dkt. No. 27, at 7–8) (internal citations omitted).

Petitioner argues that because he can "demonstrate cause for and prejudice from default," he is entitled to habeas review on his sufficiency of the evidence claim. (Dkt. No. 30, at 2). "Where a petitioner has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the petitioner can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.' " *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012) (quoting *DiSimone v. Phillips*, 461 F.3d 181, 190 (2d Cir. 2006)). Petitioner attributes "cause" for trial counsel's failure to articulate a specific basis for objection to the trial court to "the peoples [sic] request" to amend the indictment "to add an acting in concert theory and charge" five days before trial, and the trial court's "decision to permit amendment on the morning of trial," asserting that neither of which were "foreseen." (Dkt. No. 30, at 2–3). But Petitioner does not explain how the amendment of the indictment caused trial counsel's failure to raise a specific objection at trial. Nor has Petitioner articulated any prejudice, arguing only that "a fundamental miscarriage of justice resulted due to Appellate Division to consider petitioners [sic] claim on the merit." (Dkt. No. 30, at 3). In any event, Magistrate Judge Stewart considered Petitioner's sufficiency of the evidence claim on the merits and found no basis for habeas relief. (Dkt. No. 27, at 7–8).

Regarding the merits of Petitioner's claim that the evidence at trial was legally insufficient to support his burglary and attempted petit larceny convictions, Petitioner argues that the

prosecution failed to introduce "proof beyond a reasonable doubt of a critical element: intent—the mens rea necessary to support a burglary conviction." (Dkt. No. 30, at 3). Following a 911 call, police were dispatched to the victim's residence, where Petitioner and Willie Carter, Petitioner's cousin, were found, dressed in black clothing, on the porch of the victim's residence. S.R., at 352. After they were separated, a crowbar was found inside Carter's backpack and a pair of gloves, a pocket knife, and a black ski mask were recovered from Carter's pockets. *Id.* The victim's new front door was damaged and her residence was a mess. *Id.* "Burglary, in its simplest form, is a trespass into a building coupled with the intent to commit a crime therein." *People v. Cajigas*, 19 N.Y.3d 697, 701, 955 N.Y.S.2d 296, 979 N.E.2d 240 (2012) (citing N.Y. Penal Law § 140.20). There is nothing to suggest that the jury's finding of Petitioner's guilt had no basis in rationality or that his conviction was not supported by legally sufficient evidence. Accordingly, Petitioner's objection regarding legal sufficiency of the evidence is without merit.

### B. "Unlawful Amendment" of the Indictment

Magistrate Judge Stewart found that because, in general, the amendment of indictments was a matter of state law, Petitioner's assertion that "his constitutional right to due process and fair trial was violated when the trial court allowed the prosecution to pursue and charge the jury with an acting in concert theory" was beyond the Court's review. (Dkt. No. 27, at 8 (citing *O'Halloran v. Gonyea*, No. 11-cv-0346, 2015 WL 93716, at *20, 2014 U.S. Dist. LEXIS 179610 (N.D.N.Y. Sept. 23, 2014), *report-recommendation adopted by* 2015 WL 93716, at *1–4, 2015 U.S. Dist. LEXIS 1303 (N.D.N.Y. Jan. 7, 2015))). Petitioner's objection does not identify any error in Magistrate Judge Stewart's reasoning or recommended finding but is a rehashing of his original arguments. (*Compare* Dkt. No. 30, at 4–5; *with* Dkt. No. 24, at 20–21). Accordingly, the Court has reviewed for clear error, and having found none, adopts Magistrate Judge Stewart's recommendation that habeas relief be denied with respect to Petitioner's amendment of the indictment claim.

### C. Ineffective Assistance of Counsel

**\*4** Petitioner argues that the "cumulative effect of counsels [sic] errs and omissions violated petitioners [sic]

constitutional right to meaningful representation and fair trial." (Dkt. No. 30, at 5). In particular, Petitioner contends that "counsels [sic] errors and omissions denied petitioner his right to establish his innocence through testimony and evidence that was vital to him" and that the state court erred in "denying petitioners [sic] motion without at least holding an evidentiary hearing." (*Id.* at 5–6). Again, Petitioner's objection does not identify any specific error in Magistrate Judge Stewart's extended and thorough discussion of Petitioner ineffective assistance of trial and appellate counsel claims, (Dkt. No. 27, at 8–20), but rehashes the arguments he asserted in his reply, (*see* Dkt. No. 24, at 16–17, 20–21). Accordingly, having reviewed the Report-Recommendation's evaluation of Petitioner's ineffective assistance of counsel claims and having found none, the Court's adopts Magistrate Judge Stewart's recommendation that this claim does not provide a basis for habeas relief.

Having reviewed the remainder of the Report-Recommendation for clear error and having found none, the Court adopts it in its entirety.

### IV. CONCLUSION

**ORDERED** that the Report-Recommendation (Dkt. No. 27) is **ADOPTED** in its entirety; and it is further

**ORDERED** that the Petition is **DENIED** and **DISMISSED**; and it is further

**ORDERED** that no Certificate of Appealability ("COA") is issued because Petitioner has failed to make "a substantial showing of the denial of a constitutional right" as required by 28 U.S.C. § 2253(c)(2), and any further request for a COA must be addressed to the Court of Appeals, *see* Fed. R. App. P. 22(b); and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2024 WL 1694018

---

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)

2021 WL 3884217

2021 WL 3884217
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony GRIFFIN, Petitioner,

v.

Raymond COVENY, Superintendent,

Elmira Correctional Facility, [1] Respondent.

[1]    Raymond Coveny, Superintendent, Elmira Correctional Facility, is substituted for Joseph Noeth, Superintendent, Attica Correctional Facility. FED. R. CIV. P. 25(c).

No. 9:19-cv-01495-JKS
|
Signed 08/31/2021

**Attorneys and Law Firms**

Anthony Griffin, Attica, NY, Pro Se.

Margaret A. Cieprisz, New York State Attorney General, New York, NY, for Respondent.

MEMORANDUM DECISION

JAMES K. SINGLETON, JR., Senior United States District Judge

  **\*1** Anthony Griffin, a New York state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Griffin is in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and incarcerated at Attica Correctional Facility. Respondent has answered the Petition, and Griffin has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On October 28, 2009, Griffin, along with co-defendants Jason Kelley, Darron Phillips, and Justin White, was subsequently charged with two counts of first-degree burglary, first-degree robbery, second-degree robbery, second-degree assault, third-degree criminal possession of a weapon, two counts of second-degree intimidating a victim or witness, endangering

the welfare of a child, and fourth-degree conspiracy. The indictment also charged Griffin individually with second-degree criminal possession of a controlled substance, third-degree criminal possession of a controlled substance, two counts of second-degree criminal contempt, and making a punishable false written statement. The charges stemmed from several incidents in June and July 2009 where Griffin ordered several of his gang members to commit a home invasion at the home of his estranged wife.

Prior to trial, Griffin moved to sever the charges relating to the July 24 home invasion from the trial on the other counts because the menacing, contempt, and drugs charges would unduly prejudice Griffin's trial on the home invasion charges. The People opposed, arguing that the counts were joinable because they were all based upon the same criminal transaction. The court determined that the offenses were properly joined as they were "inexplicably woven," and each offense would be material and admissible to the others. The court concluded that severing the offenses would "sanitize any possible motive Griffin would have to conspire with anyone to have this home invasion," but stated that it would provide a limiting instruction to the jury concerning the separate consideration of each of the counts.

The court also held a pre-trial *Huntley* [2]/*Mapp* [3] hearing to determine the admissibility of Griffin's statements and evidence seized by police. At the hearing, Officer Sean Davis testified that he was dispatched on a domestic-related incident to the home of the parents of Griffin's estranged wife. The wife informed Davis that Griffin had physically assaulted her, and he could now be found sleeping at their home. Davis took the wife home, where he granted law enforcement access to arrest Griffin. According to Officer Davis, upon his arrest Griffin hit the wife with a pillow and threw his keys at her. Two days later, Officer Davis received a call to respond to the home because she found in Griffin's vehicle a substance she believed to be drugs. The wife signed a consent to search form, and Officer Davis found multiple clear plastic baggies with a whitish/yellowish substance inside, which, based on his experience, Davis believed to be crack cocaine. Officer Davis asked Griffin to come to the police station, and provided him with his *Miranda* rights when he arrived. According to Officer Davis, Griffin acknowledged that he understood and waived his rights, and Officer Davis took a statement from Griffin. Officer Davis believed that Griffin was being untruthful in his statement and consequently arrested him for criminal contempt. Griffin then admitted he had lied and said he wished to give another

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 212 of 267

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)

2021 WL 3884217

statement. Griffin was then released. At the conclusion of the hearing, the court denied Griffin's motions to suppress the crack cocaine recovered from his vehicle and his statements to law enforcement.

2    See *People v. Huntley*, 204 N.E.2d 179 (N.Y. 1965) (a shorthand reference to the hearing held in New York on a challenge to the admissibility of statements made to law enforcement personnel).

3    See *Mapp v. Ohio*, 367 U.S. 643 (1961) (a shorthand reference to excluding evidence obtained as a result of an unconstitutional search and seizure).

 **\*2**  After rejecting a plea offer, Griffin proceeded to trial. The jury found Griffin guilty as charged. At sentencing, Griffin pled guilty to a drug charge in an unrelated pending indictment. The court sentenced Griffin to an aggregate term of 50 years' imprisonment, to be followed by 5 years of post-release supervision.

Through counsel, Griffin appealed his conviction, arguing that: 1) the trial court abused its discretion in failing to sever the counts of the indictment; 2) he was denied a fair trial because the trial court did not *sua sponte* reopen the suppression hearing following Investigator Gallup's trial testimony admitting that he threatened to arrest Griffin's wife if Griffin did not cooperate; 3) the trial court improperly allowed evidence of sexual offenses against Griffin's wife that his co-conspirators committed even though Griffin had not been charged with those crimes; 4) the evidence was legally insufficient as to the burglary, robbery, assault, criminal possession of a weapon, criminal solicitation, endangering the welfare of a child, intimidating a witness, conspiracy and menacing counts; 5) his conviction was against the weight of the evidence for the same counts and two drug counts; 6) counsel was ineffective for a number of reasons; 7) the prosecutor engaged in misconduct that deprived Griffin of a fair trial; 8) the cumulative effect of the trial error denied Griffin of his right to a fair trial; and 9) his sentence was harsh and excessive. In a reasoned opinion, the Appellate Division of the New York Supreme Court modified the judgment of conviction by reversing as not supported by legally sufficient evidence Griffin's convictions for criminal possession of a weapon and intimidating a victim or witness. *People v. Griffin*, 975 N.Y.S.2d 306, 309 (N.Y. App. Div. 2013). The appellate court unanimously affirmed the judgment in all other respects. *Id.* Griffin filed a counseled application seeking leave to appeal to the New York Court of Appeals, raising only some of the grounds unsuccessfully presented

to the Appellate Division. The Court of Appeals summarily denied leave on July 28, 2014. *People v. Griffin*, 17 N.E.3d 505, 505 (N.Y. 2014).

Griffin then filed a *pro se* motion for a writ of error *coram nobis* raising two ineffective assistance of appellate claims, neither of which are raised in the instant petition ("2014 *Coram Nobis* Motion"). The Appellate Division denied the motion without comment on June 13, 2014, *People v. Griffin*, 987 N.Y.S.2d 590, 590 (N.Y. App. Div. 2014), and the Court of Appeals summarily denied leave to appeal, *People v. Griffin*, 21 N.E.3d 572, 572 (N.Y. 2014).

Again proceeding *pro se*, Griffin moved in County Court to vacate his conviction pursuant to New York Criminal Procedure Law ("CPL") § 440.10. In that motion, Griffin raised the following claims that appear in the instant Petition: 1) the prosecutor committed misconduct by presenting false evidence and perjured testimony; and 2) newly-discovered evidence in the form of a sworn statement from Justin White, one of the participants in the home invasion, disavowing Griffin's involvement established Griffin's actual innocence. In a reasoned unpublished opinion issued on July 25, 2019, County Court denied the motion in its entirety, concluding that the prosecution had not presented false evidence or testimony and that the affidavit was "untrustworthy and inherently unreliable." Griffin sought leave to appeal the decision in the Appellate Division, but his submission was rejected because certain papers were missing. Griffin twice moved for extensions to re-submit his application for appeal, which was ultimately denied on October 18, 2019.

 **\*3**  Griffin filed the instant *pro se* Petition for a Writ of Habeas Corpus on November 30, 2019. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A). Briefing is complete, and the Petition is now before the undersigned judge for adjudication.

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Griffin argues that: 1) the trial court erred in refusing to sever the charges involving the home invasion from the other counts; 2) his statement to law enforcement was involuntarily made due to "police deception;" 3) the court improperly allowed evidence that his co-defendants raped his estranged wife; 4) the evidence presented was insufficient to sustain his convictions, and the verdict was against the weight of the evidence; 5) trial counsel

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 213 of 267

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)
2021 WL 3884217

was ineffective for failing to properly advise him as to an offered plea bargain; 6) the prosecutor committed misconduct by "[i]mproper averment during voir dire of third panel of jurors" and procuring false evidence and testimony at trial; 7) newly-discovered evidence in the form of a recantation by a jailhouse informant demonstrates his actual innocence; 8) his sentence is harsh and excessive; and 9) his right to due process was violated by "egregious conduct committed during trial." Griffin also seeks an evidentiary hearing as to all claims.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). The term unreasonable is a common term in the legal world. The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. See *Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. See, e.g., *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (presuming that the state court knew

and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

**\*4** In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues de novo on the record before it. See *Dolphy v. Mantello*, 552 F.3d 236, 239-40 (2d Cir. 2009) (citing *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)); *cf. Wiggins v. Smith*, 539 U.S. 510, 530-31 (2003) (applying a de novo standard to a federal claim not reached by the state court). In so doing, the Court presumes that the state court decided the claim on the merits and the decision rested on federal grounds. See *Coleman v. Thompson*, 501 U.S. 722, 740 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989); *see also Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (explaining the *Harris-Coleman* interplay); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810-11 (2d Cir. 2000) (same). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference); *Jimenez*, 458 F.3d at 145-46. Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

### A. Timeliness
Respondent urges the Court to dismiss Griffin's Petition as untimely. The AEDPA provides:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 214 of 267

2021 WL 3884217

Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Here, the New York Court of Appeals denied Griffin's application for leave to appeal his conviction on July 28, 2014. His conviction became final 90 days later, on October 27, 2014, the conclusion of the period during which Griffin could have sought certiorari review in the United States Supreme Court. *See Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001). It appears that he filed his CPL § 440.10 motion to vacate on September 2, 2015, after 309 days had lapsed on the one-year limitations period. The limitations period was tolled from September 2, 2015, until at least July 25, 2019, when the county court denied his § 440.10 motion. 28 U.S.C. § 2244(d)(1)(D)(2). Respondent argues that further tolling is not available to Griffin because he never filed a leave application that the Appellate Division accepted for filing. Consequently, Respondent argues that, as of September 13, 2019, when the deadline for Griffin to file a leave application expired, only 56 days remained in the limitations period, which thus would expire on November 8, 2019. Because Griffin did not file the instant Petition until November 30, 2019, [4] Respondent argues that the Petition is at least 22 days late.

[4]  Griffin is entitled to the benefit of the prison mailbox rule, an equitable rule "justified by the litigant's dependence on the prison mail system and lack of counsel to assure timely filing with the court." *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001) (citing *Houston v. Lack*, 487 U.S. 266, 270-71 (1988)). Under that rule, the instant *pro se* Petition is deemed filed on the date that Griffin

gave it to the prison authorities for mailing, not on the date it was docketed in the Court. *See Houston*, 487 U.S. at 270-72.

**\*5**  In his Traverse, Griffin does not dispute the factual accuracy of Respondent's statements. Although the statutory limitations period under the AEDPA may be tolled for equitable reasons, *Holland v. Florida*, 560 U.S. 631, 645 (2010), Griffin does not state any facts in his Traverse that would render equitable tolling appropriate here. He does, however, assert in the Petition that he is actually innocent of the crimes, which, if true, may overcome the Petition's facial untimeliness. *McQuiggin v. Perkins*, 569 U.S. 383, (2012) (citing *Schlup v. Delo*, 513 U.S. 298 (1995). But as discussed with respect to Griffin's actual innocence claim, Ground 7, *infra*, the evidence he submits in support is insufficient to establish his factual innocence. Accordingly, while this Court is not unmindful of the plight of unrepresented state prisoners in federal habeas proceedings, the Court must conclude that Griffin's Petition is facially untimely, and Griffin fails to satisfy the very high threshold required to overcome that untimeliness.

**B. Merits**

Moreover, even if the instant Petition were not time-barred, Griffin is not entitled to relief on them. For the reasons discussed below, the Court alternatively concludes that Griffin's claims are without merit.

**Ground 1.** *Wrongful Joinder*

Griffin first argues that the trial court erred in refusing to sever the burglary-related counts from the other counts. According to Griffin, the counts relating to the order of protection and drug possession should have been severed from the robbery and burglary counts because the burglary occurred a month after the other crimes and the inclusion of those counts resulted in "spillover prejudice." In considering this claim on direct appeal, the Appellate Division concluded that "the counts were properly joined pursuant to CPL 200.20(2)(b), and thus the court 'lacked statutory authority to grant [his severance] motion.' " *Griffin*, 975 N.Y.S.2d at 308 (citation omitted).

Griffin fares no better on federal habeas review. CPL § 200.20(2)(b) provides that two offenses are "joinable" when, "[e]ven though based upon different criminal transactions, such offenses, or the criminal transactions underlying them, are of such nature that either proof of the first offense would

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 215 of 267

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)
2021 WL 3884217

be material and admissible as evidence in chief upon a trial of the second, or proof of the second would be material and admissible as evidence in chief upon a trial of the first." N.Y. CRIM. PROC. LAW § 200.20(2)(b). As an initial matter, to the extent Griffin alleges that the trial court erred under CPL § 200.20(2)(b) when it refused to sever the counts, such claim is not cognizable on federal habeas review because it implicates only the proper application of state law. *See Swarthout*, 131 S. Ct. at 863; *Estelle*, 502 U.S. at 67-68. In general, "[j]oinder and severance are questions left to the discretion of the trial judge; no constitutional question is involved." *Madden v. Fogg*, 501 F.Supp. 243, 246 (S.D.N.Y. 1980).

To elevate a joinder issue to one of constitutional magnitude, a petitioner must show that the denial of severance rendered his trial fundamentally unfair and hence violative of due process. *See, e.g., Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993). A habeas petitioner claiming a due process violation based upon joinder of offenses "must, to succeed, go beyond the potential for prejudice and prove that *actual* prejudice resulted from the events as they unfolded during ... trial." *Id.* at 377-78. "Substantial prejudice does not simply mean a better chance of acquittal." *United States v. Alvarado*, 882 F.2d 645, 655 (2d Cir. 1989), *overruled on other grounds by Bailey v. United States*, 516 U.S. 137 (1995). Indeed, the Second Circuit has commented that a lower court's determination that joinder does not present a risk of prejudice is "virtually unreviewable." *See United States v. Stewart*, 433 F.3d 273, 314-315 (2d Cir. 2006).

 **\*6** Here, Griffin cannot show the level of substantial prejudice required to warrant habeas relief. In his Petition and on direct appeal, Griffin summarily states that the joinder resulted in "spillover prejudice." According to Griffin, when the jury found him guilty of the home invasion, it likely "conclude[d] that if [he] committed one set of crimes, that he was deserving of punishment and probably committed the other set of crimes." But such conclusory and speculative contention falls far short of his "onerous burden," *Herring*, 11 F.3d at 378, of establishing that his trial was rendered fundamentally unfair by the joinder. Griffin does not contend that his defenses to the crime were antagonistic or that he wished to testify with respect to some counts but not others. Griffin is therefore not entitled to relief on this ground.

## Ground 2. *Involuntary Statement*

Griffin next contends that the trial court should have suppressed a statement he made to law enforcement admitting drug possession on the ground that the statement was involuntary due to the officer's deception and alleged threat to arrest CW and take Griffin's child if he refused to cooperate. As an initial matter, Respondent correctly points out that the claim is procedurally barred from federal habeas review. "[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim." *Harris*, 489 U.S. at 262. In rejecting Griffin's claim on direct appeal, the Appellate Division found that Gonzales failed to preserve his contention for appellate review. *Griffin*, 975 N.Y.S.2d at 308. The Appellate Division relied upon CPL §§ 330.30(1) and 470.05(2), New York's contemporaneous objection rule, which "provides that, with a few exceptions ... New York appellate courts will review only those errors of law that are presented at a time and in a manner that reasonably prompted a judge to correct them during criminal proceedings," *Downs v. Lape*, 657 F.3d 97, 103 (2d Cir. 2011). The record reflects that, as the Appellate Division noted, Griffin did not seek to reopen the *Huntley* hearing based on the trial testimony or move for a mistrial. *Griffin*, 975 N.Y.S.2d at 308.

New York's contemporaneous objection rule has long been considered an "adequate and independent ground" that bars federal habeas review. *See Whitley v. Ercole*, 642 F.3d 278, 292 (2d Cir. 2011); *see also Downs*, 657 F.3d at 102-04. As the record supports the Appellate Division's conclusion that Griffin failed to raise his challenge before the trial court, the Appellate Division properly applied CPL § 470.05(2), and Griffin's claim is subject to dismissal on that basis.

In any event, even if the claim were properly before this Court, Griffin would not be entitled to relief on the merits of it. The Supreme Court has held that an individual subjected to custodial interrogation by law enforcement personnel "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. The safeguards ensured by *Miranda* do not apply at all times, however. Spontaneous statements made by a defendant are not the product of an interrogation as defined by *Miranda*. *United States v. Vigo*, 487 F.2d 295, 300 (2d Cir. 1973); *see also United States v. Colon*, 835 F.2d 27, 28 (2d Cir. 1987) (*Miranda* inapplicable where the inculpatory statement is spontaneous and did not result from interrogation or its

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 216 of 267

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)

2021 WL 3884217

functional equivalent). Moreover, a person may validly waive his right to remain silent after receiving and understanding his *Miranda* rights. *Berghuis v. Thompkins*, 560 U.S. 370, 385-86 (2010).

**\*7** Griffin argues that law enforcement "exert[ed] improper influence" to induce the statement by "threatening [Griffin] with arresting his wife and taking his child." Although threats by law enforcement may render a confession inadmissible, *Lynnum v. Illinois*, 372 U.S. 528, 534 (1963), after conducting a *Huntley* hearing, the suppression court concluded, "[T]he record of this hearing does not disclose that [Griffin] was either physically or emotionally mistreated during this interview or that the police used threats, promises, physical force or any other form of coercion or trickery," ECF No. 17-3 at 185. The trial court's determination was based on the testimony of Investigator Gallup, which county court credited, and this Court may not second guess that assessment. *See Shabazz v. Artuz*, 336 U.S. 154, 161 (2d Cir. 2003) ("Th[e] presumption of correctness [afforded a state court's factual determinations] is particularly important when reviewing the trial court's assessment of witness credibility."). Because the state court's factual finding was not unreasonable in light of the evidence before it, that finding is entitled to deference. 28 U.S.C. § 2254(e)(1); *Miller-El*, 537 U.S. at 340. Griffin does not provide evidence sufficient to rebut the presumption of correctness this Court must afford the state court's decision.

Notably, county court recognized that Gallup candidly admitted during the hearing that he had made a false statement about the police having Griffin under surveillance. The county court concluded that Gallup's false statement "did not constitute a misrepresentation that could induce a false confession." [5] Docket No. 17-1 at 185.

[5]    Investigator Gallup subsequently testified at trial that he also told Griffin that his fingerprints were on the drugs, after which, Griffin admitted that he had received the drugs from an associate. Respondent concedes in its Answer to the Petition that Investigator Gallup's statement about the fingerprints was false. Ultimately, however, that false statement does not render unreasonable the state court's determination that Griffin's confession was voluntary for the same reasons discussed *infra* with respect to the false statement about surveillance. *See also Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding

that police misrepresentation that associate had already confessed to crime, "while relevant, [was] insufficient ... to make [petitioner's] otherwise voluntary confession inadmissible").

The Second Circuit has held that "a finding that police conduct is 'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render the confession involuntary." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)). The Second Circuit has instructed:

A court must still make "specific findings ... that under the totality of the circumstances ... the defendant's will was overborne by the [police] conduct." [*Anderson*, 929 F.2d at 99]; *see United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014) (identifying "key" question to voluntariness is "whether the subject's will was overborne" (internal quotation marks omitted)). Such circumstances generally fall into "three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988); *see United States v. Orlandez–Gamboa*, 320 F.3d 328, 332 (2d Cir. 2003) (observing that, whether voluntariness requirement derives from Due Process Clause or Fifth Amendment right against self-incrimination, "test for voluntariness is well established and multi-faceted").

*Id.*

Under those principals, the state court's voluntariness determination is reasonable in light of the totality of circumstances, which reflects that, even after Griffin admitted that an associate had given him the drugs, he continued to deny that he had hidden the drugs in his truck, instead accusing the police or his wife of planting the drugs. His continued denial as to that fact supports that the false statements were not unduly coercive. Moreover, Investigator Gallup's testimony at the *Huntley* hearing, which the suppression court credited as truthful, reflected that Griffin was questioned in a casual manner while he was un-handcuffed, and he made his statement after being given his *Miranda* warnings. Gallup testified that he was not trying to induce a confession from Griffin, but rather was encouraging his cooperation and hoping that Griffin would give the name of his supplier and possibly serve as a confidential informant. In light of the of the totality of circumstances, the Court cannot find unreasonable the state courts' determination that

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 217 of 267
Griffin v. Coveny, Not Reported in Fed. Supp. (2021)
2021 WL 3884217

Griffin's will was not overborne by Investigator Gallup's conduct.

**Ground 3.** *Evidentiary Error*

**\*8** Griffin additionally avers that the trial court erred by admitting evidence that his co-conspirators raped CW. The Appellate Division rejected this claim on direct appeal, concluding that CW's testimony concerning the uncharged crimes of rape and sexual assault were admissible " 'as background material that completed the narrative of the episode,' and the court properly instructed the jury that the testimony was admitted for that limited purpose." *Griffin*, 975 N.Y.S.2d at 308 (citation omitted).

Under New York law, evidence of prior crimes or bad acts may be admitted for the purpose of showing, *e.g.*, 1) motive, 2) intent, 3) absence of mistake or accident, 4) common scheme or plan, or (5) identity, as long as its probative value outweighs the prejudicial effect. *People v. Molineux*, 61 N.E. 286, 293 (N.Y. 1901) (setting out the rule that evidence of prior bad acts cannot be used to prove that the defendant has a propensity to commit such acts, but may be used for other purposes). [6] This evidence is also admissible to serve as background information or to complete the narrative of the events. *See People v. Dennis*, 937 N.Y.S.2d 496, 498 (N.Y. App. Div. 2012).

[6]     *Cf.* FED. R. EVID. 404(b) ((1) "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.... (2) This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

To the extent that Griffin contends that the trial court's ruling was contrary to *Molineux*, [7] such claim presents solely an issue of state law that is not cognizable on federal habeas review. *See, e.g., Mercedes v. McGuire*, No. 08-CV-299, 2010 WL 1936227, at \*8 (E.D.N.Y. May 12, 2010) (Appellate Division's rejection of petitioner's claim that the use of uncharged crimes violated his due process rights was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent because "the Supreme Court has never held that a criminal defendant's due process rights are violated by the introduction of prior bad acts or

uncharged crimes."); *Allouny v. McGinnis*, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004) (the Supreme Court has yet to clearly establish "when the admission of evidence of prior crimes under state evidentiary laws can constitute a federal due process violation").

[7]     *People v. Molineux*, 61 N.E. 286 (N.Y. 1901) (sets out the rule that evidence of prior bad acts cannot be used to prove that the defendant has a propensity to commit such acts, but may be used for certain other purposes); *cf.* FED. R. EVID. 404(b) ((1) "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character .... (2) This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

In any event, even if it were cognizable on federal habeas review, Griffin would not be entitled to relief on it. Again, with respect to the admission of prior bad acts to show a defendant's propensity to commit the charged crimes—which did not occur here—there is no clearly established federal law finding a due process violation. *See Estelle*, 502 U.S. at 75 n. 5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."). Nevertheless, the erroneous admission of evidence will rise to a deprivation of due process under the Fourteenth Amendment if the evidence in question, when evaluated in the context of the record as a whole, is "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would otherwise have existed on the record without it." *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 73 (2d Cir. 2011) (quoting *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985)). "In short it must have been crucial, critical, [or] highly significant." *Id.*

**\*9** Here, Griffin has not established that the challenged sexual offense evidence amounted to an evidentiary error so serious as to have denied him a fundamentally fair trial. *See Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012). The evidence of uncharged crimes was not "sufficiently material to provide the basis for [Griffin's] conviction," nor did this evidence "remove a reasonable doubt that would have existed ... without it." *McKinnon*, 422 F. App'x at 73. The trial court instructed the jury at the beginning of trial that Griffin was

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 218 of 267

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)

2021 WL 3884217

not charged with these sex offenses. Upon defense objection to the prosecutor's reference to the sex crimes during her opening statement, the court instructed the jury that "there is no charge in this indictment charging [Griffin] with having committed that—those particular crimes .... Mr. Griffin is not charged with a rape or a criminal sex act ...." Viewing the evidence of the uncharged crimes in light of the entirety of the record, the Appellate Division's denial of Griffin's due process claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

" ' *Ground 4. Insufficiency of the Evidence/Against the Weight of the Evidence*
Griffin claims in Ground 4 that the menacing and robbery-related convictions were against the weight of the evidence, and that the evidence presented was legally insufficient to sustain those convictions. [8] As an initial matter, claims that challenge verdicts as against the weight of the evidence are not cognizable on federal habeas review. *See McKinnon, 422 F. App'x at 75.* "Unlike a sufficiency of the evidence claim, which is based upon federal due process principles, a weight of the evidence claim is an error of state law, for which habeas review is not available." *Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006)* (citation and internal quotation marks omitted). "A weight of the evidence argument is a pure state law claim grounded in [CPL] § 470.15(5) which empowers New York state intermediate appellate court[s] to make weight of the evidence determinations." *Id.* (citation and internal quotation marks omitted). The Court therefore also denies Scott's weight of the evidence claim on that basis.

[8]    On direct appeal, the Appellate Division agreed that his convictions for third-degree criminal possession of a weapon and second-degree intimidating a victim or witness were not supported by legally sufficient evidence. *Griffin, 975 N.Y.S.2d at 308.* The Appellate Division recognized that Griffin failed to preserve that claim for appeal but nonetheless exercised its power to review it in the interest of justice, and modified the judgment accordingly. *Id.*

Griffin's insufficiency of the evidence claim, although cognizable on federal habeas review, is also without merit. As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Jackson v. Virginia, 443 U.S. 307, 319 (1979)* (emphasis in the original); *see McDaniel v. Brown, 558 U.S. 120, 132-33 (2010)* (reaffirming this standard). This Court must therefore determine whether the New York court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson, 443 U.S. at 318-19.* Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac, 456 U.S. 107, 128 (1982).* Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson, 443 U.S. at 324 n.16.* A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey, 546 U.S. 74, 76 (2005); see West v. AT&T, 311 U.S. 223, 236 (1940)* ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law ...."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon, 548 U.S. 331, 345 (2006)* (quoting *Smith v. Philips, 455 U.S. 209, 221 (1982)*) (internal quotation marks omitted).

 **\*10**  In support of his claim, Griffin attacks the value of the evidence against him, arguing that the prosecution presented insufficient evidence connecting him to the home invasion-related crimes and insufficient evidence that his actions satisfied the elements of the crime of menacing. This Court, however, is precluded from either re-weighing the evidence or assessing the credibility of witnesses. *See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996)* (dismissing habeas claim because "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal" and deferring to the jury's assessments of the particular weight to be accorded to the evidence and the

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)

2021 WL 3884217

credibility of witnesses). Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995).

With respect to the home invasion counts, the prosecution presented vast amounts of telephone records, which corroborated the accomplice testimony of Aimee Brown, who also implicated Griffin in the commissioning of the home invasion. CW's testimony that she was scared when Griffin threatened to kill her and pushed her face into a mattress amply supports Griffin's menacing conviction. Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. The record does not compel the conclusion that no rational trier of fact could have found proof that Griffin was guilty of the home invasion and menacing crimes, especially considering the double deference owed under *Jackson* and the AEDPA. Griffin therefore cannot prevail on his insufficiency of the evidence claim either.

**Ground 5.** *Ineffective Assistance of Counsel*
Griffin also argues that trial counsel was ineffective for failing to adequately advise him as to the "pros and cons of accepting a plea offer." To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Thus, Griffin must show that his counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

New York's test for ineffective assistance of counsel under the state constitution differs slightly from the federal *Strickland* standard. "The first prong of the New York test is the same as the federal test; a defendant must show that his attorney's performance fell below an objective standard of reasonableness." *Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010) (citing *People v. Turner*, 840 N.E.2d 123 (N.Y. 2005)). The difference is in the second prong. Under the New York test, the court need not find that counsel's inadequate efforts resulted in a reasonable probability that, but for counsel's error, the outcome would have been different. "Instead, the 'question is whether the attorney's conduct constituted egregious and prejudicial error such that the defendant did not receive a fair trial.' " *Id.* at 123 (quoting *People v. Benevento*, 697 N.E.2d 584, 588 (N.Y. 1998)). "Thus, under New York law the focus of the inquiry is ultimately whether the error affected the 'fairness of the process as a whole.' " *Id.* (quoting *Benevento*, 697 N.E.2d at 588). "The efficacy of the attorney's efforts is assessed by looking at the totality of the circumstances and the law at the time of the case and asking whether there was 'meaningful representation.' " *Id.* (quoting *People v. Baldi*, 429 N.E.2d 400, 405 (N.Y. 1981)).

**\*11** The New York Court of Appeals views the New York constitutional standard as being somewhat more favorable to defendants than the federal *Strickland* standard. *Turner*, 840 N.E.2d at 126. "To meet the New York standard, a defendant need not demonstrate that the outcome of the case would have been different but for counsel's errors; a defendant need only demonstrate that he was deprived of a fair trial overall." *Rosario*, 601 F.3d at 124 (citing *People v. Caban*, 833 N.E.2d 213, 222 (N.Y. 2005)). The Second Circuit has recognized that the New York "meaningful representation" standard is not contrary to the federal *Strickland* standard. *Id.* at 124, 126. The Second Circuit has likewise instructed that federal courts should, like the New York courts, view the New York standard as being more favorable or generous to defendants than the federal standard. *Id.* at 125.

Griffin's ineffective assistance claims must fail, however, even under the more favorable New York standard. Respondent first argues that Griffin has failed to exhaust this ineffective assistance claim. This Court may not consider claims that have not been fairly presented to the state courts. 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases). Exhaustion of state remedies requires the petition to fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)

2021 WL 3884217

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 220 of 267

*Duncan v. Henry*, 513 U.S. 364, 365 (1995). A petitioner must alert the state courts to the fact that he is asserting a federal claim in order to fairly present the legal basis of the claim. *Id.* at 365-66. An issue is exhausted when the substance of the federal claim is clearly raised and decided in the state court proceedings, irrespective of the label used. *Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir. 2005). To be deemed exhausted, a claim must also have been presented to the highest state court that may consider the issue presented. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In New York, to invoke one complete round of the State's established appellate process, a criminal defendant must first appeal his or her conviction to the Appellate Division and then seek further review by applying to the Court of Appeals for leave to appeal. *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). Further, "when a 'petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted." *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (citation omitted); *see also Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir. 2001).

Here, Griffin raised three ineffective assistance claims on direct appeal. [9] The only claim that, like the claim in this Petition, relates to plea negotiations is his direct appeal claim that counsel did not discuss with Griffin "the proper sentencing parameters" Griffin faced. But that claim is substantively different than the claim here that counsel "[f]ail[ed] to advise the pros and cons of accepting a plea offer." Consequently, the instant claim is wholly unexhausted and subject to dismissal on that ground.

[9]     Griffin argued that counsel was ineffective for failing to: 1) provide proper advice regarding his sentence exposure; 2) review Investigator Gallup's July 24, 2009, interview before trial; and 3) move to reopen the suppression hearing or move to suppress his June 19, 2009, statements to Investigator Gallup based on Gallup's trial testimony acknowledging that he falsely told Griffin that Griffin's fingerprints were on the drugs. Griffin does not re-assert any of these claims in the instant Petition.

**\*12** It appears, however, that the claim may be based on matters outside the record, and thus Griffin potentially could still file a *coram nobis* motion in the Appellate Division on that ground, rendering it not procedurally defaulted. But even

if Griffin could still exhaust this claim in state court, the Court declines to stay the Petition and allow him to return to state court to satisfy the exhaustion requirements. *See Zarvela v. Artuz*, 254 F.3d 374, 380-83 (2d Cir. 2001). Griffin has not requested that this Court stay and hold his Petition in abeyance. Moreover, the Supreme Court has held that it is an abuse of discretion to stay a mixed petition pending exhaustion where: 1) the petitioner has not shown good cause for failing to exhaust all available state court remedies; and 2) the unexhausted claim is "plainly meritless." *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

Despite Griffin's failure to exhaust his ineffective assistance claim, this Court nonetheless may deny his claims on the merits and with prejudice. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). This is particularly true where the ground raised is meritless. *See Rhines*, 544 U.S. at 277.

Although a defendant's Sixth Amendment right to counsel extends to plea negotiations, *see Padilla v. Kentucky*, 559 U.S. 356, 364 (2010) ("Before deciding whether to plead guilty, a defendant is entitled to 'the effective assistance of competent counsel.' " (citations omitted)), the record does not indicate that Griffin was deprived of competent counsel. Griffin provides nothing more than his unsupported and conclusory statement that counsel failed to adequately discuss the offered plea with him. [10] This lack of evidentiary support is fatal to his claim. *Woodford v. Visciotti*, 537 U.S. 19, 15 (2002) (*per curiam*) (holding that state habeas petitioner carries the burden of proof); *see, e.g., Powers v. Lord*, 462 F. Supp. 2d 371, 381-82 (W.D.N.Y. 2006) (laying out the general rule that "undetailed and unsubstantiated assertions [about counsel's alleged shortcomings] have consistently been held insufficient to satisfy either *Strickland* prong" (citation omitted)). "It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief." *See Kimbrough v. Bradt*, 949 F. Supp. 2d 341, 355 (N.D.N.Y. 2013). As such, a claim of ineffective assistance must contain specific factual contentions regarding how counsel was ineffective. *See Hall v. Phillips*, No. 1:04-CV-1514, 2007 WL 2156656, at *13 (E.D.N.Y. July 25, 2007) (the absence of allegations that demonstrate how counsel was ineffective is "fatal to an ineffective assistance claim on habeas" review). Consequently, Griffin is not entitled to relief on his ineffective assistance claim in any event.

Case 9:21-cv-00736-DNH-TWD Document 35 Filed 05/29/24 Page 221 of 267

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)

2021 WL 3884217

10    Indeed, the record reflects that the trial court recessed the proceedings to give defense counsel time to discuss the plea offer with Griffin. Although the substance of those discussion were not placed on the record, Griffin fails to establish any reasonable probability that defense counsel failed to discuss the "pros and cons" of the offer at that time.

**Ground 6.** *Prosecutorial Misconduct*

Griffin additionally contends that the prosecutor committed misconduct by: 1) improperly asking a potential juror regarding the prosecutor's decision not to call CW's child to testify; and 2) presenting "false evidence and testimony" at trial.

Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct violated due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 171 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 485 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667 (1985)). Under this standard, a petitioner must show there is a reasonable probability the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different.

 **\*13**  Griffin first contends that the prosecutor improperly asked a jury panel about the prosecutor's decision not to call CW's child as a trial witness. Griffin raised this claim on direct appeal, asserting that the prosecutor's inquiry improperly vouched for the veracity of the People's version of events. The Appellate Division summarily denied the claim. *See Griffin*, 975 N.Y.S.2d at 309 ("We have reviewed [Griffin's] remaining contentions and conclude that they are without merit.").

It is well-established that "[a]ttorney statements vouching for the credibility of witnesses are generally improper because they imply the existence of" evidence not before the jury. *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) (quoting *United States v. Rivera*, 22 F.3d 430, 438 (2d Cir. 1994)). Prosecutorial "vouching," in particular, is improper because it "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Newton*, 369 F.3d 659, 681 (2d Cir. 2004) (quoting *United States v. Young*, 470 U.S. 1, 18-19 (1985)).

But Griffin fails to show that improper vouching occurred here. The record reflects that the prosecutor informed the jury panel that CW's daughter could have been called as an eyewitness but that the People had decided not to call her due to the trauma she experienced. The People then asked if any potential jurors would hold it against the People if she were not called. Although the prosecutor stated that the daughter "would have some evidence for you," the prosecutor did not describe what that evidence would have been. To the extent the inquiry conveyed that the daughter was traumatized by that experience, that conclusion was supported by the trial proof. Moreover, the trial court prohibited any further inquiry and immediately instructed the jury that what the lawyers say during voir dire is not evidence. Under these circumstances, the Appellate Division's rejection of this claim was neither unreasonable nor contrary to federal law.

Griffin additionally argues that the prosecution committed misconduct by eliciting perjury and relying on false evidence. Again, to be deemed exhausted, a claim must have been presented to the highest state court that may consider the issue presented. *See O'Sullivan*, 526 U.S. at 845. Because Griffin did not properly appeal the denial of his § 440.10 motion, this prosecutorial misconduct claim is unexhausted. Further, "when a 'petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted." *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (citation omitted); *see also Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir. 2001). Because it appears that this unexhausted claim is based on the record, it could have been fully raised on direct appeal but was not; consequently, Griffin cannot bring a motion to vacate as to such claim. N.Y. CRIM. PROC. LAW § 440.10(2) (c) ("[T]he court must deny a motion to vacate a judgment when[,][a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal ...."). Accordingly, the

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)

2021 WL 3884217

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 222 of 267

claim may be deemed exhausted but procedurally defaulted. *Clark*, 510 F.3d at 390; *Grey*, 933 F.2d at 121.

**\*14** In any event, Griffin cannot prevail on the merits of the claim either. In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Supreme Court held "that 'a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.' " *Jenkins v. Artuz*, 294 F.3d 284, 292 (2d Cir. 2002) (alteration omitted) (quoting *Napue*, 360 U.S. at 269). "The threshold question is whether the evidence presented was false." *Black v. Rock*, 103 F. Supp. 3d 305, 317 (E.D.N.Y. 2015) (citing *McCants v. Hallenback*, No. 13-CV-5587, 2014 WL 4638836, at \*6 (E.D.N.Y. Sept. 16, 2014)). "With respect to perjured testimony, this requires a showing that the witness gave 'false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory.' " *Id.* (quoting *McCants*, 2014 WL 4638836, at \*6). "The petitioner has the burden of demonstrating, by a preponderance of the evidence, that the witness committed perjury." *Id.* (internal quotation marks and citation omitted). If the evidence is false or the witness committed perjury, "a conviction must be set aside if 'the prosecution knew, or should have known, of the perjury,' and 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Smith v. Herbert*, 275 F. Supp. 2d 361, 367 (E.D.N.Y. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

All of the instances cited by Griffin fail on the threshold question of veracity. Griffin first cites a letter purportedly written by Justin White that claims the author overheard a conversation between co-defendant Kelley and Aimee Burton said they were going to get rich and that they were no longer friends with Griffin. In considering this evidence on § 440.10 review, the county court found under "the totality of the circumstances" that the letter was "untrustworthy and inherently unreliable." Similarly, Griffin next refers to a 2012 affidavit by Robert Thomas in which he purports to recant his trial testimony regarding a conversation he overheard the night before the home invasion. The county court concluded that this affidavit was likely "inherently unreliable," particularly given that Thomas's trial testimony was corroborated by phone records. In short, Griffin provides no reliable evidence that would rebut the presumption of correctness this Court must afford the state court's factual determination. *See* 28 U.S.C. § 2254(e)(1); *Miller-El*, 537 U.S. at 340.

Finally, Griffin claims that Autumn Vanderzee wrote him a letter admitting that she lied at trial. Griffin does not submit that letter but rather submits an affidavit from his mother saying that she saw the letter but misplaced it. On CPL § 440.10 review, the county court found the mother's affidavit of insufficient evidentiary value to establish that the People deliberately elicited false testimony from Vanderzee, or that Vanderzee in fact lied at trial. Griffin provides no stronger evidentiary support here, and therefore the state courts' rejection of this claim is both reasonable and fully supported by the record. In sum, Griffin is not entitled to relief on any argument advanced in support of his prosecutorial misconduct claim.

**Ground 7.** *Newly-Discovered Evidence*

Griffin further asserts that newly-discovered evidence demonstrates his actual innocence. While a federal habeas petitioner may assert a claim of actual innocence to overcome a procedural bar to review, *Schlup*, 513 U.S. at 326, or to overcome the AEDPA's one-year statute of limitations, *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013), the Supreme Court has not resolved whether a non-capital prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence, *McQuiggin*, 133 S.Ct. at 1931; *see House v. Bell*, 547 U.S. 518, 554-55 (2006); *Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 71-72 (2009). The Supreme Court has instead declined to answer the question, noting that where a "[p]etitioner has failed to make a persuasive showing of actual innocence[,] ... the Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of actual innocence." *Herrera v. Collins*, 506 U.S. 390, 427 (1993) (O'Connor, J., concurring). Although the Second Circuit has also not ruled on whether a claim of actual innocence is cognizable on habeas review, *see Friedman v. Rehal*, 618 F.3d 142, 159 (2d Cir. 2010) (citing *Osborne*, 557 U.S. at 71, and noting that whether an actual innocence claim is cognizable is an open question), it has "come close" to granting habeas relief on grounds of actual innocence, *see DiMattina v. United States*, 949 F. Supp. 2d 387, 417 (E.D.N.Y. 2013) (citing cases).

**\*15** Assuming, but not deciding, that a freestanding actual innocence claim is cognizable in a § 2254 proceeding, the Supreme Court has described the threshold showing of evidence as "extraordinarily high." *Herrera*, 506 U.S. at 417. "The sequence of the Court's decisions in *Herrara* and *Schlup*—first leaving unresolved the status of freestanding

**Griffin v. Coveny, Not Reported in Fed. Supp. (2021)**

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 223 of 267

2021 WL 3884217

claims and then establishing the gateway standard—implies at the least that *Herrara* requires more convincing proof of innocence than *Schlup*." *House*, 547 U.S. at 555.

Measured against this standard, Griffin has fallen short of establishing his actual innocence. Griffin's claim is based on the purported recantations of White, Thomas, and Vanderzee, which he contends constitute newly discovered evidence. The Second Circuit has recognized that "due process is violated if a state leaves in place a criminal conviction after a credible recantation of material testimony and the recantation would 'most likely' have changed the outcome." *Quezada v. Smith*, 624 F.3d 514, 521 (2d Cir. 2010) (citing *Sanders v. Sullivan*, 863 F.2d 218, 222 (2d Cir. 1988)). However, "[i]t is axiomatic that witness recantations 'must be looked upon with utmost suspicion.' " *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007) (quoting *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003)). This rule exists because recantations upset society's interest in the finality of convictions and are very often unreliable and given for suspect reasons. *Id.* The presumption of correctness afforded to state-court findings on federal habeas review applies to "historical facts, that is, recitals of external events and the credibility of the witnesses narrating them." *Smith v. Mann*, 173 F.3d 73, 76 (2d Cir. 1999). Those findings will be overturned if the material facts were not adequately developed by the state court or if the factual determination is not adequately supported by the record. *Id.*

In this case, the state court fully developed the material facts on CPL § 440.10 review, and the record supports the county court's factual findings, as discussed in Ground 6, *supra*. Thus, no basis exists to overturn the state court's findings as to White, Thomas, or Vanderzee's testimony, and none of the alleged recantations support a claim of actual innocence here. Accordingly, Griffin is not entitled to relief on this ground.

**Ground 8.** *Harsh and Excessive Sentence*

Griffin also argues that his sentence is excessive, and the trial court failed to consider his particular needs when imposing that sentence. It is well-settled, however, that an excessive sentence claim may not be raised as grounds for federal habeas corpus relief if the sentence is within the range prescribed by state law. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *Bellavia v. Fogg*, 613 F.2d 369, 373 (2d Cir. 1979) (setting mandatory sentences is solely the province of state legislature); *Hernandez v. Conway*, 485 F. Supp. 2d 266, 284 (W.D.N.Y. 2007) (excessive sentence claim does not present a federal question cognizable on habeas review where

the sentence was within the range prescribed by state law). Griffin has never disputed, and does not dispute here, that he was sentenced within the applicable range for his offenses.

And to the extent that Griffin's claim could be construed to assert an Eighth Amendment claim of cruel and unusual punishment, he cannot prevail on that claim either. While the Supreme Court has stated that "[a] gross disproportionality principle is applicable to sentences for terms of years," it has further cautioned that it would be the "exceedingly rare" and "extreme" case which would involve a sentence which is "contrary to" or an "unreasonable application of" this principle. *Lockyer v. Andrade*, 538 U.S. 63, 72, 73 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in judgment)); 28 U.S.C. § 2254(d)(1). " '[A] reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate' because 'the decision of a sentencing [court] is entitled to substantial deference.' " *Edwards v. Marshall*, 589 F. Supp. 2d 276, 290 (S.D.N.Y. 2008) (quoting *United States v. Persico*, 853 F.2d 134, 138 (2d Cir. 1988)). Here, the 50-year aggregate sentence imposed by the trial court and subsequently affirmed by the Appellate Division "does not remotely approach the realm of grossly disproportionate punishments." *Edwards*, 589 F. Supp. 2d at 291 n.11; *see Lockyer*, 538 U.S. at 67-68, 77 (finding that, under California's Three Strikes law, a sentence of two consecutive terms of 25 years to life imprisonment for two counts of petty theft did not warrant relief under the AEDPA); *Rummel v. Estelle*, 445 U.S. 263, 285 (1980) (mandatory life sentence imposed under Texas statute upon defendant's third felony conviction, which was for obtaining $120.75 by false pretenses, did not constitute cruel and unusual punishment). Accordingly, this Court is without jurisdiction to reduce his lawful state sentence.

**Ground 9.** *Due Process Violation*

**\*16** Finally, Griffin claims that his trial was unfair due to "egregious conduct." But this bare and conclusory allegation is manifestly insufficient to warrant federal habeas relief. *See Kimbrough v. Bradt*, 949 F. Supp. 2d 341, 355 (N.D.N.Y. 2013) ("It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief."). Construing Griffin's *pro se* claim liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), Griffin may be arguing, as he did on direct appeal, that the cumulative effect of the errors alleged above warrants reversal of his conviction.

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 224 of 267

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)
2021 WL 3884217

"In limited circumstances, cumulative errors may "serve as the basis for habeas corpus relief." *Brumfield v. Stinson*, 297 F. Supp. 2d 607, 621 (W.D.N.Y. 2003) (citation omitted). In order for a federal habeas court to find that cumulative errors justify habeas relief, "the alleged individual errors a petitioner seeks to aggregate [must be actual] *errors*." *Id.* (citing *Joyner v. Miller*, No. 01–Civ.–2157, 2002 WL 1023141, at *13 (S.D.N.Y. Jan. 7, 2002) (collecting cases)). Further, the petitioner must show that the errors are " 'so prejudicial that they rendered petitioner's trial ... fundamentally unfair.' " *Id*. (citation omitted). For the same reasons that the individual errors fail to show fundamental unfairness, the errors viewed cumulatively fail to demonstrate fundamental unfairness, and Griffin cannot prevail on his cumulative error claim either.

**C. Request for Evidentiary Hearing**

Griffin further requests an evidentiary hearing as to all claims. The Supreme Court made clear in *Pinholster* that "review under [28 U.S.C.] § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *see Townsend v. Sain*, 372 U.S. 293, 312-13, 319 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superceded in part by statute*, 28 U.S.C. 2254(e)(2) (1996). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. 420, 437 (2000) (quoted with approval in *Pinholster*, 131 S. Ct. at 1401); *see Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (noting that the basic structure of federal habeas jurisdiction is designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions; *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing.") "If the state-court decision 'identifies the correct governing legal principle' in existence at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.' " *Pinholster*, 131 S. Ct. at 1399 (quoting *Williams*, 529 U.S. at 413). As the Supreme Court noted, "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id.* Although under *Pinholster* an evidentiary hearing in a federal habeas proceeding is not absolutely precluded, *Pinholster* also made clear that the discretion to grant a request for an evidentiary

hearing is cabined by § 2254(e)(2), *id.* at 1400-01, which provides:

**\*17** If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Griffin's request in this case does not meet that standard. Nor, based upon the record before this Court, can it be said that the state courts precluded him from developing the factual basis for his claim. *See Pinholster*, 131 S. Ct. at 1417 n.5 (Sotomayer, J., dissenting) (assuming that the majority did not intend to preclude an evidentiary hearing when the petitioner's ability to develop the facts was the fault of the state court itself). Accordingly, this Court also must deny his request for an evidentiary hearing.

**D. Certificate of Appealability**

Having determined that habeas relief is not warranted, the Court must now consider whether to grant a certificate of appealability, which is required for a party to appeal a district court's decision on a § 2254 petition. *See* Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts; FED. R. APP. P. 22(b)(1). A "certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy the showing required by Section 2253(c)(2), the petitioner must show that reasonable jurists could debate whether the petition should have been resolved differently or that the issues presented are "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). Where, as here, a court has dismissed a petition or claim on procedural grounds, in addition to showing that the petition "states a valid claim

Griffin v. Coveny, Not Reported in Fed. Supp. (2021)

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 225 of 267

2021 WL 3884217

of the denial of a constitutional right," as explained above, the petitioner must also show that reasonable jurists would find debatable whether the court was correct in its procedural ruling. *Id.* at 484. This standard "requires an overview of the claims in the habeas petition and a general assessment of their merits," but a court need not determine that the petitioner would prevail on appeal. *Miller–El,* 537 U.S. at 336.

This Court found here that Griffin's coerced confession claim was procedurally barred because the New York Supreme Court deemed the claim unpreserved for appellate review. The Second Circuit has explained, however, that:

> Federal courts may address the merits of a claim that was procedurally defaulted in state court ... upon a showing of cause for the default and prejudice to the petitioner. *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S. Ct. 2497, 2506-07, 53 L. Ed. 2d 594 (1977). Cause may be demonstrated with "a showing that the factual or legal basis for a claim was not reasonably available to counsel, ... or that 'some interference by state officials' made compliance impracticable, ... [or that] the procedural default is the result of ineffective assistance of counsel." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986) (citations omitted).

**\*18** *Bossett v. Walker,* 641 41 F.3d 825, 829 (2d Cir. 1994).

Having reviewed the record thoroughly, the Court concludes that even if a reasonable jurist could find debatable whether Griffin's procedural default should be excused due to appointed counsel's failure to properly raise the coerced confession claim before the trial court by moving to reopen the *Huntley* hearing or moving for a mistrial, [11] the Court also found the instant Petition untimely. With respect to the timeliness issue, the Court must conclude that no reasonable jurist would find debatable untimeliness of Griffin's Petition. Accordingly, the Court declines to issue a certificate of appealability as to Griffin's claim that his statements to Investigator Gallup were the product of undue coercion, as well as to all other claims.

[11]    On direct appeal, Griffin alleged that trial counsel was ineffective for failing to listen to the audio of Griffin's interview with investigators before trial and failing to reopen the *Huntley* hearing after Gallup's testimony. The Appellate Division summarily denied that claim. *See Griffin,* 975 N.Y.S.2d at 309 ("We have reviewed [Griffin's] remaining contentions and conclude that they are without merit."). As aforementioned, Griffin does not challenge that determination in the instant Petition.

### V. CONCLUSION

Griffin is not entitled to relief on any ground raised in his Petition, nor is he entitled to an evidentiary hearing.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED.**

**IT IS FURTHER ORDERED THAT** the Request for an Evidentiary Hearing is **DENIED.**

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " (quoting *Miller-El,* 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R. APP. P. 22(b); 2D CIR. R. 22.1.

The Clerk of the Court is to enter judgment accordingly.

### All Citations

Not Reported in Fed. Supp., 2021 WL 3884217

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 226 of 267
Swift v. Superintendent, Not Reported in Fed. Supp. (2022)

2022 WL 814033

2022 WL 814033
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lewis SWIFT, Petitioner,
v.
SUPERINTENDENT, Respondent.

9:18-CV-01204 (GTS/TWD)
|
Signed 02/17/2022

**Attorneys and Law Firms**

LEWIS SWIFT, Petitioner, pro se, 15-B-0607, Marcy Correctional Facility, P.O. Box 3600, Marcy, NY 13403.

HON. LETITIA JAMES, Attorney General of the State of New York, PAUL B. LYONS, ESQ., Assistant Attorney General, Counsel for Respondent, 28 Liberty Street, New York, NY 10005.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** This matter has been referred for a Report-Recommendation by the Hon. Glenn T. Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Lewis Swift ("Swift" or "Petitioner"), proceeding *pro se*, challenges his New York State convictions under 28 U.S.C. § 2254. (Dkt. No. 1, Petition ("Pet.").) Respondent opposed the petition. (Dkt. No. 13, Answer; Dkt. No. 14, Memorandum of Law ("R. Mem."); Dkt. No. 15, State Court Record. [1] ) Petitioner filed a reply. (Dkt. No. 18, Traverse.) For the following reasons, the Court recommends denying the petition, and declining to issue a Certificate of Appealability.

[1]  To maintain consistency, the Court adopts Respondent's convention for citing to the record. To that end, the prefix "SR" refers to the State Court Record, found at Dkt. No. 15-1, followed by the page numbering provided by Respondent. Citations to the trial testimony refer to the witness' surname name and the original page number of the

transcript found at Dkt. No. 15-2 though Dkt. No. 15-9, except that Diamante Swift, Petitioner's son, is referred to as "Diamante". Other citations to the trial simply employ the prefix "T.". The prefix "S." refers to the sentencing minutes, found at Dkt. No. 15-10. Citations to the Pet., R. Mem., and Traverse refer to the pagination generated by the CM/ECF, the Court's electronic filing system.

**II. BACKGROUND**

**A. Indictment**
On September 19, 2013, Swift, along with codefendant Gregory Ware ("Ware"), a/k/a "Country", was charged in a two count indictment with first degree manslaughter and third degree criminal possession of a weapon. (SR 11.) Count 1 alleged that Swift and Ware, while acting in concert with each other and an unidentified third person, caused the death of Carnell Marshall ("Marshall") by repeatedly striking Marshall, "causing him to suffer severe head trauma, multiple facial fractures, and a lacerated left eye, and left him, while in this vulnerable condition, outdoors, exposed to the elements, allowing him to suffer environmental hypothermia, thereby causing his death." *Id.* Count 2 alleged that Swift and Ware, while acting in concert with each other and an unidentified third person, "possessed a dangerous or deadly instrument with the intent to use the same unlawfully against another." *Id.*

**B. Ware's Conviction**
Prior to Swift's trial, Ware was convicted, upon his guilty plea, of manslaughter in the first degree. *People v. Ware*, 159 A.D.3d 1401 (4th Dep't), *lv. denied*, 31 N.Y.3d 1122 (2018). Ware was sentenced to twenty five years' imprisonment followed by five years of post-release supervision. (T. 40; *see* S. 7-11.)

**C. Trial**
Swift proceeded to a jury trial on January 12, 2015, in Onondaga County, during which nineteen witnesses testified for the prosecution. [2] Petitioner presented no evidence at trial. (T. 951-52.)

[2]  Ware did not testify at Swift's trial.

The evidence at trial established that on April 9, 2012, Swift and Marshall, a long-time acquaintance from the same Syracuse neighborhood, had a minor verbal altercation in the check-out line of a supermarket in Syracuse. [3] (Diamante:

391-92, 420-21; Hardnett: 471-72.) The People introduced security footage from the supermarket's cameras, which was played for the jury. (T. 445.) After the argument, Marshall and Swift had a friendly conversation in the parking lot and "exchanged phone numbers." (Diamante: 422-23.)

3      Swift was shopping at the supermarket with his girlfriend, sister, and teenage son, Diamante; Marshall was shopping with his niece, Stacey Hardnett ("Hardnett"), and her two cousins. (Diamante: 391-92, 420-21; Hardnett: 440, 471-72.)

 **\*2**  Three days later, on April 12, 2012, Marshall called Swift, asking, "Hey, are we okay?" (Diamante: 423-24.) Swift responded, "Yeah, right, no problems." (Diamante: 424-25.) Swift also asked Marshall to pick him up so that they could "chill" together. (SR 315-16.) Marshall asked Hardnett if she wanted to "hang out" with him and Swift but she declined. (Hardnett: 446-49.) Later, at around 9:30 p.m., while out with a friend, Hardnett saw Swift, Ware, and another man known as "Rat" together. (Hardnett: 449-50.)

Between 10:30 p.m. and 11:00 p.m., Marshall's girlfriend heard him talking on the phone and thereafter someone picked up Marshall from their house in Syracuse. (Scanes: 766-67, 769.) Marshall was wearing a red zip-up hooded sweatshirt, jeans, a white T-shirt, Timberland boots, and a square earring that consisted of nine diamonds. (Scanes: 767-69.) He had a red "doo-rag" in his pocket. (Scanes: 767.) The police recovered evidence of multiple telephone calls between Swift and Marshall that night, from 10:29 p.m. through 11:41 p.m. (T. 1018-19.)

On the evening of April 12, 2012, Marshall arrived at Swift's house. (Diamante: 396-98, 427-28.) Swift, Diamante, Ware, Rat, and Marshall were drinking and socializing at Swift's house together. (Diamante: 392, 394-97, 400-01, 425-26.)

At approximately 11:15 p.m., Marshall called Hardnett and told her that "if anything happened to him," he was with Swift. (Hardnett: 450-51, 454-55.) At 11:49 p.m., Hardnett received a text message from Marshall stating, "Yo I think those nigga set me up, but its Sammy brother lou." (SR 161; Hardnett: 451-55;[4] Glauberman: 756-58.) Hardnett replied, "So go home." (SR 161; Hardnett: 454.) Hardnett subsequently sent Marshall text messages and called him numerous times, but he did not respond. (Hardnett: 454-55.)

4      Hardnett testified that she understood that Marshall was again referring to Swift. (Hardnett: 454-55.) Sammy Swift is Petitioner's brother. (Diamante: 394, SR 160.)

At some point, Marshall "kind of left" Swift's house, but then returned. (Diamante: 397-98.) Diamante, who was in the kitchen, overheard Rat tell Swift, "He's back." (Diamante: 397-98, 425, 428.) Swift responded, "Hit him, that's orders." (Diamante: 402, 436.) "Right after" Diamante heard "mad tumbling" in the living room. (Diamante: 402-03, 427.) Diamante walked into the living room and saw Ware and Rat attacking and kicking Marshall, who was on the floor. (Diamante: 402-03, 427-29, SR 318.) Ware grabbed a board and hit Marshall with it. (Diamante: 403.) This assault continued for "a couple of minutes" until Swift ordered Ware and Rat, "get him out of the house." (Diamante: 404-05.) Diamante watched as Rat dragged Marshall out of the house by the hood of his red sweatshirt. (Diamante: 404-05.) Marshall and Rat continued to assault Marshall. (SR 318-19.) "The whole while," Swift and Diamante watched the assault from Swift's front porch. (SR 319.) "After about 6 or 7 minutes of watching this beating take place," Rat and Ware "dump[ed]" Marshall behind the Cole Muffler, across the street from Swift's house. (SR 319, Diamante: 407.) Diamante saw Rat and Ware come back into the house. (Diamante: 407-08, 433.) Swift walked away while Rat and Ware "cleaned up where the struggle was." (Diamante: 433-34.)

Diamante could hear Marshall screaming "over and over" from outside. (Diamante: 408-409.) A woman later came over to the house, and Diamante "guessed" that Swift had sex with her. (Diamante: 408.) Swift said, "good night" to Diamante and went to bed, as Swift had "had to[o] much to drink." (SR 319.) Swift woke up around 3 a.m. or 4 a.m., and heard Marshall "still screaming for help outside," but he went back to sleep. (SR 319-20.)

 **\*3**  The next day, Ware showed Swift and Diamante a video from his cellphone depicting Ware and Rat "beating and to[rtu]ring" Marshall, spitting and urinating on him, and burning him all over with a cigarette. (SR 320.) Marshall appeared to Swift to be asleep in the video. (SR 320.) A little later, Rat walked over from the vacant lot to Swift's house carrying "a bloody board." (SR 321.) Rat told Swift that he thought Marshall was dead, pointing to Marshall's body in the lot. Swift told Rat to "get the fuck away from my house." Swift then called Ware and told him that Marshall was dead. (SR 321.)

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 228 of 267
Swift v. Superintendent, Not Reported in Fed. Supp. (2022)
2022 WL 814033

That same day, on April 13, 2012, Diamante found Marshall's cellphone in Swift's house. (Diamante: 409-10, 434.) Diamante opened the cellphone and saw Marshall's text message to Hardnett stating that "he thought he had got set up." (Diamante: 410, 434.) When "[t]hey started cleaning up", Rat took Marshall's cellphone and a beer bottle and put it in the trash can behind Swift's house. (Diamante: 434-35.)

On April 14, 2012, at approximately 10:26 a.m., Syracuse police responded to a dead-on-arrival dispatch to the Cole Muffler located at 2527 South Salina Street on the corner of McAllister Avenue. (Greco: 361-63; Whitehead: 385-86; McGinn: 497.) A partially clothed black male, later identified as Marshall, was found in the vacant lot of 107 McAllister Avenue, located behind the Cole Muffler and across the street from Swift's house. (Greco: 364-67; McGinn: 498-500, 515.) Marshall was wearing only a blood-soaked and dirty T-shirt and one sock. (Greco: 367; McGinn: 516, 522, 560-62, 567, 574.) He had "severe trauma" to his face, with dried blood seeping from his nostrils, mouth, and swollen-shut eyes. (Greco: 368.) He was pronounced dead at 10:29 a.m. (Whitehead: 386-87; Knight: 910, 921.)

Based on Marshall's body temperature, rigor mortis, and lividity, as well as the outside temperatures, Dr. Knight determined that Marshall had been dead for at least 12 hours and up to 36 hours from the time he was pronounced dead. (Knight: 921-25.) Dr. Knight testified that, "[i]f Marshall was exposed to a windchill of 37 degrees Fahrenheit, he was certainly inappropriately dressed for that with only a T-shirt on and would have been subject to hypothermia." (Knight: 924.) Specifically, Dr. Knight opined, to a reasonable degree of medical certainty, that Marshall died as a result of "environmental hypothermia, or cold exposure," and that "the blunt force injuries of his head, his alcohol intoxication and asthma were contributory conditions to his death." (Knight: 935.)

When asked to estimate "the length of time of exposure to the cold that would have caused this environmental hypothermia," Dr. Knight opined that, although "[i]t's difficult to say in a given individual how long it would take to kill them from hypothermia given individual variations," her "best estimate would be that [Marshall] was likely exposed for a few hours." (Knight: 937.) Dr. Knight testified that Marshall "[c]ertainly ... could have survived" had Marshall received medical assistance. (Knight: 937-38.)

Diamante testified that on the morning of April 14, 2012, he saw the police across the street at Cole Muffler. (Diamante: 411.) When Diamante told his father, Swift replied, "There is no blood on me or anything" that the police can find. (Diamante: 411.) Swift told Diamante to tell the police that Marshall came to the house to apologize. (Diamante: 412.)

The police noticed Swift watching them from the doorway of his house. (Greco: 369-70.) Detective Rood spoke with Swift during a neighborhood canvas, but Swift stated that he had no information. (Rood: 779-81.)

**\*4** That same morning, Detective McGinn commenced a crime scene investigation. (McGinn: 493-511.) McGinn noticed bloodstains on the front porch of Swift's house and in the walkway and roadway in front of the house. These bloodstains consisted of "drag patterns, swipe patterns, drip patterns." (McGinn: 512, 516, 518-19, 523-24.) The drag or swipe patterns in the roadway and on the curb were consistent with a body being dragged from the house and across the street towards the vacant lot. McGinn also found drag patterns along with blood stains in the dirt of the vacant lot. (McGinn: 516-20.) Marshall's t-shirt was dirty and blood-soaked, and dirt and scratches were on his legs, all consistent with being beaten and dragged across the ground. (McGinn: 522-23.) A "red doo-rag" and red sweatshirt – both blood-soaked – were found near the body. (McGinn: 523, 560-61, 571, 575.)

McGinn also found partial footwear patterns in the dirt of the vacant lot. (McGinn: 520-21.) Blood splatter was found on the rear wall of Cole Muffler, relatively close to Marshall's body. (McGinn: 522.) Police also recovered a large rock covered with what was determined to be Marshall's blood. (McGinn: 520, 524, 570; Cowen: 700-02.)

Later that day, Detective Rood returned to Swift's house and was invited in to talk. (Rood: 781-82.) Both Petitioner and Diamante agreed to be interviewed at the police station. (Diamante: 412-15; Rood: 782-83.) At the Criminal Investigation Division, Detective MacBlane interviewed Diamante, while Detective Rood separately interviewed Petitioner. (Rood: 782-83; MacBlane: 828.) Petitioner ultimately provided a written statement, which was received into evidence and which Detective Rood read into the record. (Rood: 792-97; SR 159-60.)

Swift told the police that at around 11:30 p.m. on April 12, 2012, Marshall had called him, saying " 'I need to holla at u.' " (SR 160; Rood: 797.) A short while later, Marshall

Case 9:21-cv-00736-DNH-TWD   Document 35   Filed 05/29/24   Page 229 of 267
Swift v. Superintendent, Not Reported in Fed. Supp. (2022)
2022 WL 814033

showed up at Swift's door but only spoke to Diamante. (Rood: 797.) Diamante later told Swift that Marshall had said that "he wanted to apologize" about the supermarket incident, and that Marshall then left the house. (SR 160; Rood: 788-89.) Swift told the police that Marshall had never been in his house and that the police were welcome to search it, but that they "won't find anything." (Rood: 797.) Petitioner also stated that Marshall was better friends with his brother, Sammy Swift. (SR 160.)

Diamante also gave the police a written statement on April 14, 2012. (Diamante: 414-15.) At trial, Diamante admitted that he had not told the police the "whole truth" because he "didn't want anybody to get in trouble." (Diamante: 415.)

During their interviews, Petitioner and Diamante voluntarily surrendered the sneakers they were wearing. (Diamante: 412; Rood: 798-99, 811.) Diamante was wearing size 10-1/2 Adidas (Exhibit 10) and Swift was wearing size 10 Nikes (Exhibit 9). (Diamante: 412-13; McGinn: 613-15; Rood: 799.) The tread pattern on the bottom of Diamante's Adidas sneakers was consistent with partial patterns found in the vacant lot, though it was impossible to say whether there was an exact match. (McGinn: 612-14.) There was no match with Petitioner's Nikes sneakers. (McGinn: 615.)

Small bloodstains were found on the bottom of both Swift's and Diamante's sneakers. (McGinn: 616-22, 655.) A forensic scientist tested the bloodstains on Diamante's sneakers and determined that Marshall and Swift were the two highest DNA contributors. (Cowen: 674-77.) Swift's sneakers also tested positive for blood, but only Swift's DNA was found. (Cowen: 672-74.)

On April 20, 2012, eight days after the assault, the police executed a search warrant for Swift's apartment. (McGinn: 530, 598, 602; Rood: 810-11.) They recovered Marshall's broken cellphone (Exhibit 13) in a trash container behind the house. (Hardnett: 476-78; McGinn: 530-32, 536; Scanes: 771-72.) The police also recovered a beer can from Petitioner's trash (Exhibit 14), which had a mixture of DNA from both Marshall and Swift. (McGinn: 531, 576; Cowen: 677-82; Perlin: 746-48.)

 **\*5** On April 24, 2012, Swift was hiding from the police at a friend's house. He fled into the attic when police arrived to arrest him, asking his friend's girlfriend to tell the police that he was not there. (DeClerck: 901-04; Jasniewski: 905-06.) Swift was arrested without further incident.

In May of 2012, John Bondi and Swift were incarcerated in the same Mental Health Ward at the Onondaga County Justice Center. (Bondi: 863-65, 868, 875; Egan: 891-93, 897-99.) Bondi was being held on drug-related charges, among other things, and he was in the mental health "pod" because he suffered from posttraumatic stress disorder from his military service. (Bondi: 864-66, 875, 886.)

Swift and Bondi had been childhood friends growing up in the same Syracuse neighborhood. (Bondi: 863-64, 868.) Upon meeting up at the jail, the two men were reacquainted. Swift then described the events that led to his arrest and incarceration. (Bondi: 868-69, 880.) Swift told Bondi that a fight had started "downstairs" in his house. Swift and two other men assaulted the victim and then dragged the victim to a vacant lot across the street. Swift stated that he personally "caved [the victim's] face in with a rock," and that the group "beat him senseless" and "left him there." (Bondi: 868-69.)

Swift also sent three letters dated May 12, 15, and 24, 2012, addressed to "Detective," stating that he had information about the case and wished to meet with detectives. (SR 315-24; MacBlane: 829-31, 839-40; Mull: 857-59.) The three letters were received into evidence and read aloud to the jury. (MacBlane: 829-40.)

In his third letter, dated May 24, 2012, Swift described the April 12, 2012, assault in some detail, but claimed that he was merely present, and that Ware and Rat were solely to blame for Marshall's death. (MacBlane: 829-40.)

### D. Verdict and Sentencing
On January 21, 2012, the jury found Swift guilty on both counts–manslaughter in the first degree and criminal possession of a weapon in the third degree. (T. 1098, 1144-45.) On February 11, 2015, the trial court sentenced Swift, as a second felony offender, to a determinate term of 25 years in prison and 5 years of post-release supervision for manslaughter and a concurrent indeterminate term of 3½ to 7 years for criminal possession of a weapon. (See S.9-11; SR9-10, 335.)

### E. Direct Appeal
Through counsel, Swift appealed his conviction arguing: (1) the trial court erred by admitting evidence of the hearsay statements made by the victim; (2) the People failed to establish the victim's death from hypothermia was reasonably

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 230 of 267

Swift v. Superintendent, Not Reported in Fed. Supp. (2022)

2022 WL 814033

foreseeable; (3) the verdict was legally insufficient and against the weight of the evidence; and (4) the sentence was harsh and excessive. (SR 349-86.) The Appellate Division of the New York Supreme Court unanimously affirmed the judgment of conviction in a reasoned opinion issued on April 27, 2018. *People v. Swift*, 160 A.D.3d 1341 (4th Dep't 2018). Swift filed a counseled application for leave to appeal to the New York Court of Appeals, which was summarily denied on June 26, 2018. *People v. Swift*, 31 N.Y.3d 1122 (2018).

**F. Habeas Petition**

On October 10, 2018, Petitioner filed a petition for a writ of habeas corpus with this Court. Petitioner challenges his state court convictions raising the identical grounds he asserted in his state court appeal. (Pet. at ¶¶ 9, 22 (referring the Court to the attached appellate brief (Dkt. No. 1-1) to reiterate the arguments advanced during his state court appeal).)

**III. STANDARD OF REVIEW**

**\*6**  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)). The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.' " *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); see *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show

that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement' ") (quoting *Richter*, 562 U.S. at 103).

To the extent that the petition raises issues of the proper application of state law, they are beyond the purview of this Court. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "clear and convincing evidence." *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (quoting 28 U.S.C. § 2254(e)(1)). "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (internal quotation marks omitted). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

**IV. DISCUSSION**

**A. Weight of the Evidence and Legal Sufficiency**

Petitioner claims his conviction was: (1) against the weight of the evidence; and (2) based on legally insufficient evidence. (Pet. at ¶ 22, SR 372-83.) Respondent argues the weight of the evidence claim is not cognizable and the legal sufficiency claim is partially procedurally barred and entirely meritless. (R. Mem. at 27-63.) The Court agrees with Respondent.

**1. Petitioner's weight of the evidence claim is not cognizable.**

**\*7**  "It is well-settled that claims attacking a verdict as against the weight of the evidence are not cognizable in a federal

habeas proceeding." *Kimbrough v. Bradt*, 949 F. Supp. 2d 341, 360 (N.D.N.Y. 2013); *see McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) ("[T]he argument that the verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus.") (collecting cases). Thus, because Petitioner's weight of the evidence argument is not cognizable, the Court recommends denying the petition on this ground.

### 2. Petitioner's legal sufficiency claim is partially procedurally barred and entirely meritless.

Incorporating his direct appeal argument, Petitioner claims the evidence was legally insufficient to support his convictions because the People failed to establish: (1) that he acted with the requisite intent to cause serious physical injury to another person; (2) that the victim's death from hypothermia was reasonably foreseeable; and (3) that there was evidence he possessed a weapon. (Pet. at ¶ 22; SR 372-83.) In rejecting this claim, the Appellate Division recited the arguments advanced by Swift, i.e., intent, foreseeability, and possession, and concluded he

> failed to preserve the majority of those contentions for our review inasmuch as his general motion for a trial order of dismissal was not "specifically directed" at those alleged shortcomings in the evidence. In any event, viewing the evidence in the light most favorable to the People with respect to defendant's preserved and unpreserved contentions, we conclude that the evidence is legally sufficient to support the conviction.

*Swift*, 160 A.D.3d 1342 (internal citations omitted).

Although the Appellate Division did not expressly state which of the arguments were unpreserved, the Court agrees with Respondent that the Appellate Division deemed the foreseeability argument to be unpreserved, given that in his counseled brief Swift "conceded" that it was unpreserved and argued the Appellate Division should address the foreseeability portion of the insufficiency claim "in the

interest of justice" or with respect to the weight of the evidence. (SR 374-75; [5] *see* R. Rem. at 43-46.) Further, a searching review of the record reveals no other "unpreserved" arguments with respect to the sufficiency of the conviction, i.e., intent, foreseeability, or possession. *See Sanchez-Reyes v. Strack*, No. 94-CV-1317 (RSP/DNH), 1995 WL 759029, at *1 (N.D.N.Y. Dec. 15, 1995) ("Even in light of any ambiguity in the [Appellate Division's] written opinion, [the Court] can presume that the [decision] was based on independent and adequate state procedural grounds where the issue was not raised in the trial court and the procedural bar was argued by the state on appeal.") (citing *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)).

---

[5]     On direct appeal, the People agreed with Swift that the foreseeability claim was unpreserved. (SR 406.)

---

### a. Petitioner's foreseeability argument is procedurally barred.

Federal habeas review of a state court decision is prohibited if the state court rested its judgment on adequate and independent state grounds. *Harris v. Reed*, 489 U.S. 255, 261-62 (1989); *Cotto v. Herbert*, 331 F.3d 217, 239-40 (2d Cir. 2003). "[T]his rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). If the state court "explicitly invokes a state procedural bar rule as a separate basis for decision," a federal court is precluded from considering the merits of federal claims in a habeas petition. *Harris*, 489 U.S. at 264 n. 10; *see Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (In order for federal review to be barred, "[t]he state court must actually have relied on the procedural bar as an independent basis for its disposition of the case.") (quoting *Harris*, 489 U.S. at 261-62).

**\*8** "In New York State, a defendant may not raise, for the first time on appeal, arguments concerning the legal sufficiency of the prosecution's evidence that were not raised with specificity in the trial court." *King v. Artus*, 259 F. App'x 346, 347 (2d Cir. 2008) (citing CPL § 470.05(2)); *People v. Gray*, 86 N.Y.2d 10, 19 (1995) ("even where a motion to dismiss for insufficient evidence was made, the preservation requirement compels that the argument be 'specifically directed' at the alleged error"); *see also Garvey v. Duncan*, 485 F.3d 709, 714-15 (2d Cir. 2007); *see, e.g., People v. Pratcher*, 34 A.D.3d 1522, 1524 (4th Dep't 2015) ("Although defendant moved for a trial order of dismissal,

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 232 of 267

Swift v. Superintendent, Not Reported in Fed. Supp. (2022)

2022 WL 814033

he did not contend in that motion that the victim's death was not the foreseeable result of the injuries the victim sustained during the commission of the crimes, and thus failed to preserve his legal sufficiency contention for our review.").

The Second Circuit has held that CPL § 470.05(2) is "firmly established and regularly followed," and "New York courts consistently interpret [CPL] § 470.05(2) to require that a defendant specify the grounds of alleged error in sufficient detail so that the trial court may have a fair opportunity to rectify any error." *Garvey*, 485 F.3d at 715-16; *see Meja v. Artus*, No. 12 Civ. 2241, 2016 WL 1305162, at *10-11 (E.D.N.Y. Mar. 31, 2016).

At trial, Swift's counsel moved for a trial order of dismissal upon completion of the People's proof on the ground that the People had not made out a prima facie case with respect to the counts in the indictment. (T. 948-49, 954-55.) However, with respect to Count 1, first degree manslaughter, trial counsel only argued the People failed to prove Swift's intent to cause any serious physical injury. (T. 948-49, 954-55.) The record is void of any discussion that the victim's death from hypothermia was not the foreseeable result of the injuries the victim sustained during the assault. (T. 948; *see also* T. 954-55.) Thus, the Court agrees with Respondent that the objection was "too general" to preserve Petitioner's foreseeability argument for appellate review and, therefore, is procedurally barred.[6]

[6]    Where, as in this case, the state court denies the claim on the merits using the phrase "in any event" its "primary reliance on this state procedural law constitutes an independent ground for its decision." *See Serrano v. Kirkpatrick*, No. 11 Civ. 2825, 2013 WL 3226849, at *11 (S.D.N.Y. June 25, 2013); *Fama*, 235 F.3d at 810 & n.4 (noting that when a state court opines that a claim is "not preserved for appellate review" and then rules "in any event" that the claim also fails on the merits, the claim rests on independent state law rule which precludes federal habeas review); *Harris*, 489 U.S. at 264 n.10 (finding that a state court decision relying on a procedural rule to dismiss a claim, but that, in the alternative, also proceeds to dismiss the claim on the merits, relies on the independent state law ground for dismissal); *Fore v. Ercole*, 594 F. Supp. 2d 281, 289 (E.D.N.Y. 2009) (citations omitted).

A procedural default will "bar federal habeas review of the federal claim, unless the ... petitioner can show 'cause' for the default and 'prejudice attributable thereto,' " or demonstrate that "failure to consider the federal claim will result in a 'fundamental miscarriage of justice.' " *Coleman*, 501 U.S. at 749-50 (citations omitted). Because Petitioner has not alleged, much less established, "cause" for his default, this Court need not address the issue of prejudice. *See Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 127 (2d Cir. 1995); *Burkett v. Artus*, No. 9:14-CV-0110 (BKS), 2016 WL 6659492, at *6 (N.D.N.Y. Nov. 10, 2016) ("If a petitioner fails to establish cause, a court need not decide whether he suffered actual prejudice, because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated.").[7] Nor has Petitioner alleged a fundamental miscarriage of justice, such as evidence that he was actually innocent of the crime. *See Schlup v. Delo*, 513 U.S. 298, 325 (1995).

[7]    Nevertheless, there is also no evidence of prejudice, because, as discussed herein, Petitioner's substantive foreseeability claim is meritless.

**\*9** Therefore, Petitioner's foreseeability claim is procedurally barred from federal habeas review. As such, the Court recommends the petition be denied on this ground. In any event, assuming *arguendo* that this claim is reviewable, it is substantively without merit, as set forth below.

### b. Petitioner's legal sufficiency claim is entirely meritless.

The law governing habeas relief from a state conviction based on insufficiency of evidence is well established. A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler v. Supreme Court of the State of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "[T]he findings of the state court are presumptively correct and entitled to a high degree of deference as that court was in the best position to view the credibility of the witnesses and all of the facts as they were adduced at trial." *Santos v. Zon*, 206 F. Supp. 2d 585, 589 (S.D.N.Y. 2002) (citations and alterations omitted).

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 233 of 267
Swift v. Superintendent, Not Reported in Fed. Supp. (2022)
2022 WL 814033

Even when "faced with a record of historical facts that supports conflicting inferences [the court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326) (internal quotation marks omitted).

A petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that, viewing the evidence in the light most favorable to the prosecution, " 'no rational trier of fact could have found proof of guilt beyond a reasonable doubt.' " *Flowers v. Fisher*, 296 F. App'x 208, 210 (2d Cir. 2008) (quoting *Jackson*, 433 U.S. at 324); *accord Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). Thus, a conviction stands if "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.' " *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)); *Loving v. People of State of New York*, No. 04-CV-1284, 2007 WL 1825401, at *7 (E.D.N.Y. June 21, 2007) ("Ultimately, so long as the evidence at trial establishes 'any valid line of reasoning and permissible inferences [that] could lead a rational person' to convict, then the conviction will survive sufficiency review.").

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999). Here, the Court agrees with Respondent that the jury had more than sufficient evidence to convict Petitioner of both manslaughter and possession of a weapon, and it is at least "possible" that a fairminded jurist could agree with the Appellate Division's decision denying Petitioner's legal sufficiency claim. (*See* R. Mem. at 30-43, 46-63.)

### i. Manslaughter

**\*10**  In New York, a person commits first degree manslaughter when "[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.20(1).

New York law provides that " '[s]erious physical injury' means physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10). "A person need not directly cause the death of another to be criminally liable for first-degree manslaughter." *Martinez v. Breslin*, No. 07 CIV. 8671, 2009 WL 2244633, at *5 (S.D.N.Y. July 28, 2009). Under New York law, a person may be criminally liable for the conduct of another:

> When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

N.Y. Penal Law § 20.00. A person whose criminal liability is premised upon the conduct of another person may be held liable even though the other person is not criminally liable for the offense, or is not prosecuted for or convicted of the offense. N.Y. Penal Law § 20.05(1) & (2); *see, e.g.*, *People ex rel. Guido v. Calkins*, 9 N.Y.2d 77 (1961) (holding that one who "aids and abets" in committing a crime can be prosecuted even if principal has been acquitted).

Here, Petitioner claims that his conviction is not supported by legally sufficient evidence because he lacked the requisite intent to be convicted of first degree manslaughter. (Pet at ¶ 22, SR 372-82.) However, viewing the evidence in the light most favorable to the prosecution and drawing all permissible inferences in its favor, a rational fact finder could have found—and did find—that Petitioner acted with an intention to cause serious physical injury upon Marshall. [8]

[8]
> To the extent Petitioner attacks the value of the evidence against him, this Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. *See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (dismissing habeas claim because "assessments of the weight of the

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 234 of 267

Swift v. Superintendent, Not Reported in Fed. Supp. (2022)

2022 WL 814033

evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal" and deferring to the jury's assessments of the particular weight to be accorded to the evidence and the credibility of witnesses).

"[A] person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct." N.Y. Penal Law § 15.05(1). There is a presumptive inference that a person intends that which is the natural and probable consequences of his acts. People v. Getch, 50 N.Y.2d 456, 465 (1980); People v. Meacham, 84 A.D.3d 1713, 1714 (4th Dep't 2011). The requisite intent may be inferred from the circumstances, including the actions of the accused, and may be proven by direct or circumstantial evidence. Stone v. Stinson, 121 F. Supp. 2d 226, 247 (W.D.N.Y. 2000); People v. Price, 35 A.D.3d 1230, 1231 (4th Dep't 2006), lv. denied 834 N.Y.S.2d 516 (2007). The issue of intent is "one of fact for the jury." People v. Cabey, 85 N.Y.2d 417, 421-22 (1995).

In this case, the evidence at trial demonstrated Swift intended to cause serious physical injury to Marshall when he (1) personally assaulted Marshall and/or (2) ordered Ware and Rat to assault Marshall.

First, the People offered testimony that Swift admitted that he personally "caved [the victim's] face in with a rock," and that Swift and two other men, "beat him senseless" and "left him there." (Bondi: 868-69.) Courts have consistently held that " 'the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.' " United States v. Frampton, 382 F.3d 213, 222 (2d Cir. 2004) (quoting United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979)). Here, the record established that Bondi received no benefit from the prosecution for testifying. (Bondi: 870-72, 881, 883, 887-89.) Moreover, Bondi's testimony was corroborated by the medical examiner's testimony that some of Marshall's injuries were consistent with being struck by a rock (Knight: 929); the discovery of the large rock with Marshall's blood on it (McGinn: 520, 524; Cowen: 700-02); and the discovery of Petitioner's and Marshall's blood on Diamante's sneaker (Cowen: 674-77).

**\*11** The medical examiner testified that Marshall sustained "a severe beating," consisting of multiple blunt force trauma strikes, particularly to the head. (Knight: 918-19.) The medical examiner testified Marshall's jaw was fractured in two places – the result of very substantial force. (Knight: 914, 918-19, 930, 934-35.) His face and scalp sustained multiple

cuts, scrapes, and bruises that were caused by blunt force trauma, either by fists or other objects. (Knight: 913-14, 916, 926-30.) Marshall's right eye was swollen virtually shut and lacerated. (Knight: 913, 926-27.) His left eyeball suffered blunt force trauma so severe that it was "ruptured," or "caved in." (Knight: 926-27, 929.) Marshall's brain was "mildly swollen overall," with hemorrhages and bruising. (Knight: 916.) He had "a small area of a remote stroke or remote injury on the right frontal lobe" of the brain. (Knight: 917.)

Marshall also sustained numerous internal injuries, such as bruising, hemorrhaging and a broken rib. (Knight: 916-17, 919.) His left testicle suffered blunt force trauma. (Knight: 919-20.) He had cuts, scrapes, burn marks, bruises, and swelling all over his body, including his back, arms, hands, and legs. (Knight: 914-15.) The scrapes on his arms and legs were consistent with being dragged along the ground without wearing pants. (Knight: 915, 919, 931-33.)

Second, the jury could have reasonably concluded that, by personally assaulting Marshall, i.e., "caving in" Marshall's face with a rock,[9] and "beating him senseless" and by "le[aving] him there", Swift intended to cause a serious physical injury. A jury may infer that a defendant intended the natural and probable consequences of his actions. See Getch, 50 N.Y.2d at 465. "A person's intent may be inferred from his acts and conduct." Id.; see, e.g., People v. Aveille, 148 A.D.2d 461, 461-62 (2d Dep't 1989) (evidence showing that during an argument, the defendant threw a stone, approximately eight inches in length, at victim, was sufficient to show that he had the intent to cause serious physical injury).

[9]    A rock has been held to be a "dangerous instrument," which is statutorily defined as "readily capable of causing death or other serious physical injury." Gonzales-Martinez v. Kirkpatrick, 16-CV-5119, 2017 WL 3891649, at *13 (E.D.N.Y. Sept. 6, 2017) (quoting N.Y. Penal Law § 10.00(13)).

Further, that the attack was on Marshall's "head, a vital part of the body, provided further support for the conclusion that [Swift] intended to injure [Marshall] seriously." People v. Steinberg, 170 A.D.2d 50, 69 (1st Dep't 1991), aff'd, 79 N.Y.2d 673 (1992); accord People v. Aveille, 148 A.D.2d at 461-62.

Additionally, there was more than sufficient evidence that Petitioner commanded Ware and Rat to assault Marshall, thus

Swift v. Superintendent, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 235 of 267

2022 WL 814033

establishing Petitioner's intent to seriously injure Marshall. *See* N.Y. Penal Law § 20.00. Petitioner was convicted of being an accessory to manslaughter. (SR 11; T. 1075-76, 1081.) Under the accessory statute "there is no distinction between liability as a principal and criminal culpability as an accessory." *People v. Rivera*, 84 N.Y.2d 766, 770 (1995) (citations and internal quotation marks omitted). "[D]irect proof of an express agreement or statement" between principal and accessory is not required. Rather "[t]he intent to commit a crime may be implied by the act itself, or it may be established by the defendant's conduct and the surrounding circumstances." *Martinez*, 2009 WL 2244633, at *6 (citations and internal quotation marks omitted) (finding that although the evidence at trial showed that a codefendant administered the blows that directly caused victim's death, a reasonable jury could have reasonably concluded that defendant was an active and willing participant from start to finish).

As discussed above, Diamante testified that he overheard Swift tell Rat, "Hit him, that's orders." (Diamante: 436-37.) "Right after" Petitioner's order, Ware and Rat assaulted Marshall in the living room, kicking Marshall and beating him with a board. (Diamante: 402-03, 428-29; *see also* SR 318.) This assault continued for "a couple of minutes" until Swift ordered Ware and Rat, "get him out of the house." (Diamante: 404-05.) Additionally, the medical examiner testified that some of Marshall's injuries, "particularly the puncture-like lacerations on the face that had a square shape, would have been created by a square-pattern object." (Knight: 914, 918, 929.) Based on the bloodstain evidence, the detective concluded that there were four distinct areas where a beating occurred. (McGinn: 523-25, 652-54.) The assault began on the front porch of Swift's house, as evidenced by blood droplets on the floor of the porch, the stairs, and the sidewalk in front. The assault then continued into the roadway in front of the house, where Marshall had to have been in a "downward position," based on the "low angle of impact" of the blood on the roadway. His body was then dragged across the street into the vacant lot where another beating occurred (and where the large rock was found). Finally, Marshall was dragged to the rear of the vacant lot, against the wall of the Cole Muffler, where his body was found and where bloodstains indicated another beating took place. (McGinn: 523-25, 652-54.)

**\*12** The detective also observed, inside Swift's house, a broken wallboard, and Swift's bloodstains. Further, there was evidence that the scene had been cleaned up. Accordingly, the

detective could not rule out that the assault began inside the house. (McGinn: 602-05, 636-38, 651-55, 657-58.)

Here, drawing all inferences in the People's favor, the jury could have reasonably concluded that Petitioner, acting in concert with Ware and Rat, was at all times in charge – "that's orders" – and that Ware and Rat did precisely as Swift directed. [10] Specifically, when Swift commanded that Marshall be "hit," they responded by assaulting him with kicks and a board, and when Swift directed that they take Marshall "out of the house," they continued the assault outside and dragged him to the vacant lot as Petitioner watched. (Diamante: 402-05, 428-29, 436-37; *see also* SR 318.) Given that Swift ordered the assault and then watched, and did not stop the beating, the jury could have reasonably concluded that Ware and Rat followed Swift's orders. *See, e.g.*, *People v. Vaughn*, 36 A.D.3d 434, 435 (1st Dep't 2007) (finding a defendant liable for his subordinates' assault of a victim where, as here, the defendant "gave his subordinates an instruction that was open-ended with respect to how the victim was to be assaulted, and remained throughout the assault"); *see In re Tatiana N.*, 73 A.D.3d 186, 190-91 (1st Dep't 2010) ("[T]he necessary knowledge and intent [to prove accessorial liability] need not be admitted directly or verbally acknowledged. They may be established through the actions of the accused, based on the entire series of events.").

[10]    The trial court denied the People's motion to be permitted to elicit evidence regarding Swift's affiliation with the Crips gang to explain why Ware and Rat followed Swift's orders. (SR 135-37; T.5-21.)

In sum, drawing all inferences in the People's favor, the jury could have reasonably concluded that Swift personally assaulted Marshall and/or ordered Ware and Rat to assault Marshall, intending to cause him serious physical injury. The jury's decision should not be second-guessed, given the doubly deferential standard of review under *Jackson* and the AEDPA. *See Johnson*, 566 U.S. at 651.

Turning to Petitioner's foreseeability argument, to convict Petitioner of first degree manslaughter, the People were required to prove that Swift's conduct was "a sufficiently direct cause" of Marshall's death. *People v. DaCosta*, 6 N.Y.3d 181, 184 (2006). "Sufficiently direct causation is established by proof of the following: (1) that defendant's actions were an actual contributory cause of [the] death, in the sense that they forged a link in the chain of causes which

Swift v. Superintendent, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 236 of 267

2022 WL 814033

actually brought about the death;[11] and (2) that the fatal result was reasonably foreseeable." *People v. Davis*, 28 N.Y.3d 294, 300 (2016) (citations and internal quotation marks omitted); *accord Matter of Anthony M.*, 63 N.Y.2d 270, 280 (1984).

[11]    In his counseled brief on direct appeal, Swift did not contest this prong of causation. Nevertheless, drawing every inference in the People's favor, a rational jury could have concluded that Petitioner's conduct was an actual contributory cause of Marshall's death. Here, the jury could have reasonably determined that Petitioner oversaw the assault, given that he: initially ordered and personally took part in the assault; later ordered that the assault be moved out of the house; and admitted watching the assault for several minutes without attempting to stop it. *See People v. Vaughn*, 36 A.D.3d at 435 (finding defendant liable where he "gave his subordinates an instruction that was open-ended with respect to how the victim was to be assaulted, and remained throughout the assault" without attempting to stop it). Moreover, given that Petitioner stood by and watched, without interfering, as Ware and Rat subsequently "dumped" and abandoned Marshall in the vacant lot (*see* SR 319; Diamante: 407), the jury could have reasonably concluded that Petitioner directed that action as well. *See Vaughn*, 36 A.D.3d at 435. Further, Petitioner did nothing thereafter to come to Marshall's aid as he lay screaming for help. (SR 319-20.) Lastly, Dr. Knight opined to a reasonable degree of medical certainty that Marshall died as a result of "environmental hypothermia, or cold exposure," and that "the blunt force injuries of his head, his alcohol intoxication and asthma were contributory conditions to his death." (Knight: 935.) Dr. Knight also testified that Marshall "[c]ertainly ... could have survived" had he received medical assistance. (Knight: 937-38.) Accordingly, the evidence established that Petitioner "set[ ] in motion the events which ultimately result[ed] in the victim's death." *People v. Matos*, 83 N.Y.2d 509, 512 (1994). In sum, there was more than sufficient evidence to conclude that Petitioner's conduct – in beating Marshall, abandoning him in the vacant lot in a helpless condition and in the cold, and doing nothing thereafter to assist him as he lay there for hours

– was an actual contributory cause of Marshall's death.

**\*13**  With respect to foreseeability of the death, the People must prove "that the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the accused." *Davis* 28 N.Y.3d at 301 (citing *People v. Kibbe*, 35 N.Y.2d 407, 412 (1974)). A victim's death is reasonably foreseeable if it " 'should have been foreseen as being reasonably related to the acts of the accused.' " *Id.* (quoting *People v. Kibbe*, 35 N.Y.2d at 412). However, "[f]oreseeability does not mean that the result must be the most likely event." *People v. Hernandez*, 82 N.Y.2d 309, 319 (1993); *accord Matos*, 83 N.Y.2d at 512.

For example, in *People v. Davis*, the Court of Appeals found "there was legally sufficient evidence to support the jury's findings that defendant's assault of the victim during a home invasion was an actual contributory cause of the victim's death and that the victim's death, induced by the stress of the violent event, was a reasonably foreseeable result of defendant's conduct." 28 N.Y.3d at 296-97. There, the defendant violently attacked the victim, in his home, breaking his jaw and leaving him on the floor in a blood-spattered room where he was found dead. From all of the evidence and the circumstances surrounding this violent encounter, the proof was sufficient to permit the jury to conclude that the victim's heart failure, induced by the extreme stress and trauma of such a violent assault, was a directly foreseeable consequence of defendant's conduct." *Id.* at 298-99 (citing *Matos*, 83 N.Y.2d at 511-512).

Moreover, in its analysis of the weight of the evidence, the Appellate Division rejected Swift's claim that Marshall's "death from hypothermia was not a reasonably foreseeable result of the beating that he received." *Swift*, 160 A.D.3d 1342. As summarized by the Appellate Division:

> With respect to an allegedly intervening cause of death, it is only where the death is solely attributable to the secondary agency, and not at all induced by the primary one, that its intervention constitutes a defense. Here, the victim's injuries left him unable to see because both of his eyes were swollen shut and one was ruptured, he was confused and likely concussed due to head trauma, and he sustained several

Swift v. Superintendent, Not Reported in Fed. Supp. (2022)

2022 WL 814033

broken facial and skull bones. The jury could have concluded that defendant ordered the codefendants to attack the victim, that he took part in the ensuing assault, and that he and the codefendants removed most of the victim's clothing and left him outside while the wind chill was below 40 degrees. Thus, defendant may not avoid responsibility by arguing that other causes contributed since his acts [and those of the codefendants that he requested] were also factors in the victim's demise.

*Id.* (internal quotation marks and citations omitted, brackets in original). That decision was neither contrary to, nor an unreasonable application of, *Jackson*.

Here, Dr. Knight testified that hypothermia was the cause of death, and that, given Marshall's debilitated condition, he likely died within "a few hours." (Knight: 935-37.) Drawing all inferences in the People's favor, the jury could have reasonably concluded that, by severely beating Marshall and abandoning him outside, nearly naked, in a helpless condition and in near-freezing temperatures, Swift placed Marshall at risk of death. *See, e.g.*, *People v. Kibbe*, 35 N.Y.2d at 410-13 (holding defendants were liable for "directly foreseeable consequences of their own actions" where they robbed the victim and threw him out of a car onto the shoulder of a rural highway, leaving him alone at night in near-zero degree weather with limited visibility conditions, without his glasses, and with his pants down, shoeless and his shirt rolled up around his chest, where the victim was struck and killed by a truck).

**\*14** In sum, the record does not compel the conclusion that no rational trier of fact could have found proof that Swift was guilty of first degree manslaughter especially considering the double deference owed under *Jackson* and the AEDPA. Swift therefore cannot prevail on his insufficiency of the evidence claim either. As such, the Court recommends denying the petition on this ground.

*ii. Criminal Possession of a Weapon*

In New York, a person commits third degree criminal possession of a weapon when he "commits the crime of criminal possession of a weapon in the fourth degree as defined in subdivision one, two, three or five of section 265.01, and has been previously convicted of any crime." N.Y. Penal Law § 265.02(1). In turn, a person commits criminal possession of a weapon in the fourth degree when he possesses "any ... dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." N.Y. Penal Law § 265.01(2). Because Swift admitted that he had been previously convicted of a crime (T. 30-34, 336-38), the trial court charged that Swift could be found guilty of criminal possession of a weapon if, personally or acting in concert with others, he knowingly possessed a dangerous instrument and did so with the intent to use it unlawfully against another. (T. 1089-90; SC 11.). A "dangerous instrument" means "any instrument ... which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(13).

The Appellate Division rejected Swift's claim that, "because there [was] no evidence that he possessed a weapon," the evidence was legally insufficient to support the conviction on the weapon charge. *Swift*, 160 A.D.3d at 1342. That decision was neither contrary to, nor an unreasonable application of, *Jackson*.

In this case, the People presented more than sufficient evidence to establish the elements of possession of a weapon. As discussed above, Bondi testified that Swift personally "caved [the victim's] face in with a rock" (Bondi: 868-69), and Bondi's testimony was corroborated both by the medical examiner's testimony that some of Marshall's injuries were consistent with being struck by a rock (Knight: 929), and by the recovery of a rock that was covered with Marshall's blood (Cowen: 700-02). *See* *Gonzales-Martinez*, 2017 WL 3891649, at *13 (finding a rock considered a dangerous instrument under N.Y. Penal Law § 265.01(2).) Although Diamante testified only Ware and Rat beat Marshall with a board, any discrepancies between Bondi's and Diamante's testimonies are presumed to be decided by the jury in favor of the prosecution, to which this Court gives great deference.

Additionally, the jury could have reasonably found Petitioner liable for possession of the weapon under a theory of constructive possession, *see* N.Y. Penal Law § 10.00(8), as Petitioner "exercised dominion and control over the persons who possessed" the board and the rock. *Vaughn*, 36 A.D.3d

at 435 (citing *People v. Carvajal*, 6 N.Y.3d 305, 314 (2005); *People v. Manini*, 79 N.Y.2d 561, 572-75 (1992)). Moreover, the jury could have rationally concluded that Petitioner possessed a weapon – including a rock and a board – through his control over his accomplices, on an acting-in-concert theory. *See, e.g.*, *People v. Johnson*, 94 A.D.3d 1408, 1409 (4th Dep't 2012).

**\*15** Thus, the Court finds that, viewing the evidence presented at trial most favorably to the prosecution, there was sufficient evidence for a rational trier of fact to convict Petitioner of third degree possession of a weapon. Accordingly, the Court also recommends denying habeas relief on this ground.

### B. Admission of Hearsay Statements

Petitioner claims, as he did on direct appeal, the trial court erred in admitting hearsay evidence consisting of certain text messages and a phone conversation between Marshall and Hardnett. (Pet. at ¶ 22; SR 362-72.) Generally, Respondent argues that the decision to admit the statements concerned a state evidentiary issue and is not subject to federal habeas review. (R. Mem. at 63-64.) Respondent further contends that even if the Court liberally construed the petition to assert a federal constitutional claim – such as for a violation of the Fourteenth Amendment Due Process Clause – that claim should be denied as unexhausted and procedurally defaulted because it was raised in state court in solely state law terms. *Id.* at 64-67. Finally, Respondent maintains that even if the Court were to very liberally construe Petitioner's claim to assert a violation of federal due process, and even if the Court were to find that the claim was properly exhausted, the claim should be denied as meritless because, as the Appellate Division held, any error in admitting the evidence was "harmless." *Id.* at 67-71. In his reply, Petitioner asserts this claim invokes violations of his constitutional rights under the Sixth and Fourteenth Amendments and, therefore, is cognizable. (Traverse at 2-8.) He further contends he exhausted this claim and habeas relief is warranted on the merits. *Id.*

Before trial, the People moved for permission to offer evidence of the telephone conversation and text messages between Marshall and Hardnett on the evening of April 12, 2012, asserting various hearsay exceptions. (SR 137-41; T. 21-24.) Swift's trial counsel opposed, arguing that the evidence was "clearly hearsay." (T. 24-26.) The trial court admitted the evidence, adopting the various hearsay exceptions asserted by the prosecution "in toto". (T. 25-28.)

The Appellate Division considered and rejected this claim on direct appeal as follows:

> The witness testified that the victim had called and texted her, indicating in each communication that he thought defendant had set him up, and to look to defendant if anything happened to the victim. Contrary to the People's contention, we conclude that defendant preserved his contention for our review, and we agree with defendant that the text messages and testimony in question constituted hearsay. Nevertheless, even assuming, *arguendo*, that the court erred in admitting the communications in evidence under the present sense impression and excited utterance exceptions to the hearsay rule, we conclude that any such error is harmless.

*Swift*, 160 A.D.3d 1342 (internal citations omitted).

"Evidentiary questions are generally matters of state law and raise no federal constitutional issue for habeas review." *Sudler v. Griffin*, No. 9:12-CV-0367 (NAM/ATB), 2013 WL 4519768, at \*3 (N.D.N.Y. Aug. 26, 2013); *accord Estelle v. McGuire*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

**\*16** Here, even assuming, without deciding, that Petitioner's hearsay claim is cognizable and exhausted, the Court agrees with Respondent that it fails on the merits.

### 1. Petitioner's hearsay claim is meritless.

"Federal courts may issue a writ of habeas corpus based upon a state evidentiary error only if the petitioner demonstrates that the alleged error violated an identifiable constitutional right, and that the error was so extremely unfair that

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 239 of 267

Swift v. Superintendent, Not Reported in Fed. Supp. (2022)

2022 WL 814033

its admission violates fundamental conceptions of justice." *Buchanan v. Chappius*, No. 9:15-CV-0407 (LEK), 2016 WL 1049006, at *4 (N.D.N.Y. Mar. 11, 2016) (citations and internal quotation marks omitted); *accord Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) ("The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.' "). That is a "heavy burden, for 'generally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation.' " *Bonet v. McGinnis*, 98 Civ. 6529, 2001 WL 849454, at *2 (S.D.N.Y. July 27, 2001).

"For the erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Id.* (citations and internal quotation marks omitted); *accord Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985); *Smith v. Grenier*, 117 F. App'x 779, 781 (2d Cir. 2004).

Accordingly, for Petitioner to succeed with his federal habeas corpus petition asserting state evidentiary errors, he must establish that (1) the trial court's evidentiary rulings were erroneous as a matter of state law, (2) the admitted evidence deprived him of a fundamentally fair trial, and (3) under the AEDPA, the state court's ruling was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See, e.g., Sorrentino v. LaValley*, No. 12-CV-7668, 2016 WL 11482062, at *16 (S.D.N.Y. Feb. 3, 2016) ("erroneously admitted hearsay statements cannot provide a basis for federal habeas relief unless the evidentiary error so undermined the fairness of the trial as to violate the petitioner's constitutional right to due process.").

On the record presented, Petitioner cannot meet that standard because even if the trial court's admission of the challenged statements constituted evidentiary error, the court's ruling cannot be said to have deprived Petitioner of a fundamentally fair trial. *See Vega v. Portuondo*, 120 F. App'x 380, 382 (2d Cir. 2005) ("Even assuming, for the sake of argument, that petitioner is correct to assert that admission of [the evidence] was erroneous as a matter of [state] law, this alone would not suffice to merit federal habeas relief.... 'The introduction of

unfairly prejudicial evidence against a defendant in a criminal trial ... does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice.' ") (citations omitted).

**\*17** Here, although the Appellate Division "agreed" the statements at issue were hearsay and assumed, *arguendo*, the trial court erred in admitting the communications in evidence under the present sense impression and excited utterance exceptions to the hearsay rule, the state court determined "any such error is harmless." *Swift*, 160 A.D.3d 1342. Petitioner fares no better on habeas review.

Where, as in this case, "a state court makes a harmless error determination on direct appeal," the Court "owe[s] the harmlessness determination itself deference under the [AEDPA]." *Orlando v. Nassau Cty. Dist. Attorney's Off.*, 915 F.3d 113, 127 (2d Cir. 2019). A hearsay "[e]rror is harmless if it is highly probable that it did not contribute to the verdict." *United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010) (quoting *United States v. Kaiser*, 609 F.3d 556, 573 (2d Cir. 2010)); *see* 3A Charles A. Wright, Federal Practice & Procedure § 854, at 311 (2d ed. 1982) ("Error in the admission of evidence is harmless if the facts shown by that evidence are already before the jury through other properly-admitted evidence."). In determining whether an alleged error is harmless, a court considers, among other factors, "the importance of the wrongly admitted testimony" and "whether such evidence was cumulative of other properly admitted evidence." *United States v. Kaplan*, 490 F.3d 110, 123 (2d Cir. 2007); *see, e.g., Morman v. Superintendent, Mid-State Corr. Facility*, No. 9:18-CV-01338 (MAD/DJS), 2021 WL 5139718, at *7 (N.D.N.Y. Nov. 4, 2021) (concluding the testimony offered, while improper, was harmless because of the overwhelming evidence presented at trial); *Anderson v. Martuscello*, No. 17-CV-9638, 2021 WL 4429333, at *10 (S.D.N.Y. Sept. 27, 2021) (finding the petitioner not entitled to habeas relief on his hearsay claim where petitioner failed to demonstrate that the county court's alleged error in admitting the police dispatcher's statement deprived him of a fundamentally fair trial).

In this instance, Hardnett testified, in sum and substance, that Marshall told her in a phone call placed at 11:15 p.m. on April 12, 2012, that "if anything happened to him," he was with Swift. (Hardnett: 450-51, 454-55.) While this statement may have reflected Marshall "sens[ed] something was about to happen to him," (*see* T. 27) and that he was with Swift and Swift was to be blamed, the Court agrees with Respondent

2022 WL 814033

that the statement was not so material as to provide the basis for conviction or remove a reasonable doubt that would otherwise have existed. *Arena v. Kaplan*, 952 F. Supp. 2d 468, 492-93 (E.D.N.Y. 2013). As Respondent points out, this evidence established that Swift and Marshall were together on the night of April 12, 2012, which was also established by other credible evidence, including Diamante's testimony, Petitioner's admissions to Bondi, and Petitioner's own letters and statements to the police. (*See* R. Mem. at 67-73.) Further, as to any "blame" to be placed on Swift if "anything happened" to Marshall, such evidence was established by Diamante's testimony and Petitioner's admission to Bondi. [12]

[12]    Again, to the extent Petitioner attacks the value of the evidence against him, this Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. *See Maldonado v. Scully*, 86 F.3d at 35.

As to Marshall's text message to Hardnett, "Yo, I think those nigga set me up, but it's Sammy brother, Lou", the Court agrees with Respondent that the somewhat cryptic text message was, at best, cumulative of other evidence including Sammy Swift is Petitioner's brother, Swift ordered Ware and Rat to assault Marshall ("Hit him, that's orders."), Bondi's testimony that Swift admitted taking part in the assault (including hitting the victim with a rock); and Petitioner's letter to the police admitting that he watched the entire assault. Thus, even if the statements at issue were admitted in error, the statements neither provided the basis for Petitioner's conviction, nor did it remove reasonable doubt that would have existed in the absence of the statement. *See Johnson*, 955 F.2d at 181.

**\*18**  In sum, the Court agrees with Respondent that, even assuming *arguendo* that the state court erred in admitting the evidence regarding Marshall's phone call with and text message to Hardnett, such evidence added little to the People's case. *See Brown v. Walker*, 275 F. Supp. 2d 343, 351 (E.D.N.Y. 2003) ("There is no reasonable probability that the result of petitioner's trial would have been different even if all of the contested hearsay testimony had been deemed inadmissible by the trial court upon an objection from defense counsel."). [13]

[13]    While Petitioner may disagree with the way in which the jury weighed the evidence or with the credibility assessments that the jury made, "assessments of the weight of the evidence or the

credibility of witnesses are for the jury and not grounds for reversal on habeas appeal." *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (alterations and citation omitted).

Accordingly, Petitioner has failed to establish that admission of this evidence was so "egregious" or fundamentally unfair as to violate due process. *See Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013). Moreover, given the extremely broad deference due to state court decisions under the AEDPA, Petitioner has not established that there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents" on due process. *Richter*, 562 U.S. at 102. Accordingly, the Court recommends denying the petition on this ground.

### 2. Petitioner's confrontation claim is meritless.

To the extent Petitioner contends that his right to confront the victim under the Sixth Amendment was violated by the introduction of the victim's statements through the trial testimony of Hardnett, the Court agrees with Respondent that the claim lacks merit. (Traverse at 2-8; R. Mem. at 65 n.17.)

As Respondent correctly observes, the record does not support the conclusion that the victim's statements to Hardnett regarding Petitioner (as testified to by Hardnett, who was subject to cross-examination) were testimonial in nature. (*See* R. Mem. at 65 n.17.) "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006). Here, there is no indication that the declarant (i.e., the victim) had any reasonable expectation that his statements, made to Hardnett outside the context of any proceeding, investigation, or formal complaint, would be used in future judicial proceedings. *See United States v. Saget*, 377 F.3d 223, 228-230 (2d Cir. 2004); *see generally Giles v. California*, 554 U.S. 353, 376 (2008) (noting that "only testimonial statements are excluded by the Confrontation Clause[, and s]tatements to friends and neighbors about abuse and intimidation ... would be excluded, if at all, by hearsay rules"). Thus, Petitioner is not entitled to habeas relief on this basis. Therefore, the Court also recommends denying the petition on this ground.

### C. Harsh and Excessive Sentence

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 241 of 267

Swift v. Superintendent, Not Reported in Fed. Supp. (2022)

2022 WL 814033

Finally, Petitioner challenges his sentence as overly harsh and excessive. (Pet. at 22; SC 383-85, 442.) Respondent argues Petitioner's sentencing claim is not cognizable. (R. Mem. at 71.) The Court agrees with Respondent.

On direct appeal, Swift argued his sentence was "harsh and excessive," and asked the Appellate Division to exercise its discretionary powers under CPL § 470.15 to reduce the sentence "in the interest of justice" because, *inter alia*, he received the exact same sentence as codefendant Ware, who "actually" "brutalized" the victim. (SR 383-85 ("To impose the exact same sentence on [Swift] who did little more than stand idly by (even if one credits the testimony that he told Ware and Rat to 'hit him') is excessive[.]").) The Appellate Division denied the claim, finding the sentence was "not unduly harsh or severe." *Swift*, 160 A.D.3d at 1343.

 **\*19**  The issue of whether a sentence is overly harsh or excessive is not a proper issue for review in the federal habeas context unless the sentence was outside of the permissible range provided for by state law. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."); *accord Maldonado v. Lee*, No. 09-CV-5270, 2012 WL 3240710, at *3 (E.D.N.Y. July 31, 2012.) Here, Petitioner has never claimed that his sentence was outside the statutory range. [14] Accordingly, his state-law sentencing claim is not cognizable in this Court. *White*, 969 F.2d at 1383; *see also Alfini v. Lord*, 245 F. Supp. 2d 493, 502 (E.D.N.Y. 2003) ("It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law."); *McCalvin v. Senkowski*, 160 F. Supp. 2d 586, 589 (S.D.N.Y. 2001) ("Sentencing decisions are not cognizable on habeas corpus review unless the sentence imposed falls outside the range prescribed by state law.").

[14]     As the People argued on direct appeal, "the sentencing court did not abuse its discretion when it imposed the legally permissible maximum sentence of 25 years in prison for manslaughter in the first degree[.]" (SR 413.) *See, e.g., People v. Sullivan*, 37 A.D.3d 974, 975 (3d Dep't 2007) (sentence of 25 years for first degree manslaughter found not harsh or excessive "in light of the brutal nature of the attack" and the defendant's failure to take responsibility or show remorse for his actions following his guilty plea), *abrogated on*

*other grounds by People v. Lewis*, 48 A.D.3d 880, 851 N.Y.S.2d 295 (2008).

Therefore, the Court recommends denying the petition on this ground.

## V. CERTIFICATE OF APPEALABILITY

"Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from ... the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." 28 U.S.C. § 2253(c)(1); *see also* Fed. R. App. P. 22(b)(1). "A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Hohn v. United States*, 524 U.S. 236, 240 (1998). Because Petitioner has not satisfied this standard, the Court recommends declining to issue a Certificate of Appealability in this matter.

## VI. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein the Court hereby

**RECOMMENDS** that the petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED and DISMISSED**; and the Court

**RECOMMENDS** that no Certificate of Appealability shall be issued with respect to any of Petitioner's claims; and the Court

**ORDERS** that the Clerk provide Petitioner with a copy of this Order and Report-Recommendation along with a copy of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [15] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

15    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**\*20  IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 814033

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 813923
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lewis SWIFT, Petitioner,
v.
SUPERINTENDENT, Respondent.

9:18-CV-1204 (GTS/TWD)
|
Signed 03/17/2022

**Attorneys and Law Firms**

LEWIS SWIFT, 15-B-0607, Petitioner, Pro Se, Marcy Correctional Facility, P.O. Box 3600, Marcy, New York 13403.

HON. LETITIA A. JAMES, Attorney General for the State of New York, PAUL B. LYONS, ESQ., Assistant Attorney General, Counsel for Respondent, 28 Liberty Street, New York, New York 10005.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Lewis Swift ("Petitioner") filed his petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on October 9, 2018. (Dkt. No. 1.) By Report-Recommendation dated February 17, 2022, the Honorable Thérèse Wiley Dancks, United States Magistrate Judge, recommended that the Petition be denied and dismissed, and that no certificate of appealability be issued. (Dkt. No. 25.) Petitioner has not filed an objection to the Report-Recommendation, and the time in which to do so has expired. (*See generally* Docket Sheet.)

After carefully reviewing the relevant papers herein, including Magistrate Judge Dancks' thorough Report-Recommendation, the Court can find no clear-error in the Report-Recommendation. [1] Magistrate Judge Dancks employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons set forth therein, Petitioner's Petition is denied and dismissed, and no certificate of appealability shall be issued.

[1]     When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Dancks' Report-Recommendation (Dkt. No. 25) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Petitioner's Petition for a Writ of *Habeas Corpus* (Dkt. No. 1) is **DENIED** and **DISMISSED**.

**The Court declines to issue a certificate of appealability.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 813923

---

2010 WL 7417094
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Harold John HUMPHREY, Jr., Petitioner,

v.

Brian FISHER, Respondent.

No. 9:07–CV–1200 (TJM/DRH).
|
July 23, 2010.

**Attorneys and Law Firms**

Harold John Humphrey, Jr., Coxsackie, NY, pro se.

Hon. Andrew M. Cuomo Attorney General for the State of New York, Leilani J. Rodriguez, Esq., Assistant Attorney General, of Counsel, New York, NY, for Respondent.

**REPORT–RECOMMENDATION AND ORDER**[1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.4.

DAVID R. HOMER, United States Magistrate Judge.

**\*1**  Petitioner pro se Harold J. Humphrey, Jr. ("Humphrey") is currently an inmate in the custody of the New York State Department of Correctional Services ("DOCS") at Greene Correctional Facility in Coxsackie, New York. Humphrey was found guilty after a jury trial in Rensselaer County[2] of rape, sexual abuse, and endangering the welfare of a child. Humphrey is presently serving an aggregated indeterminate term of imprisonment of seven to twenty-one years. Humphrey now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that (1) he received ineffective assistance of counsel; (2) he was denied equal protection under the law; (3) the trial court erred in not admitting the victim's school records; (4) the trial court erred in not admitting the victim's letter to Humphrey; (5) the trial court erred in denying Humphrey's motion to suppress; (6) his right to a fair trial was prejudiced by the improper examination of the prosecution's witnesses; (7) the trial court improperly limited cross-examination; (8) his right to present

witnesses on his own behalf was violated; (9) he was deprived of a fair trial since the trial judge showed bias against him; (10) his sentence was excessive; (11) his constitutional right to confront his accusers was violated; and (12) the indictment should have been dismissed. For the reasons which follow, it is recommended that the petition be denied.

[2]    The trial transcript is divided into four volumes and one sentencing transcript. Volumes one and two are filed at Docket No. 12. Volumes three, four and the sentencing transcript are filed at Docket No. 11. Additionally, Docket No. 11 contains two attachments titled "Transcript," but these are identical copies of transcript volumes three, four and the sentencing transcript. Each volume and the sentencing transcript are separately paginated. References herein are to the pages of each volume.

**I. Background**

On July 8, 2003, a Troy Police Detective investigated a report by a fourteen-year old girl in which she alleged that Humphrey subjected her to rape and sexual abuse over a seven-month period. RA. 142, 148.[3] The victim reported that Humphrey, the ex-brother-in-law of her mother's boyfriend, stayed over night at the house where she lived with her mother, her mother's boyfriend, and her brother, and sexually abused and raped her on three occasions. T. 181–205[4]; RA. 148. On June 18, 2003, the victim's stepmother took her to the hospital where the victim was examined by Nurse Nancy Harris, who found that the results of the exam were consistent with the victim's allegations. RA. 169; T. 244, 252–56. At trial, the victim testified about the details of the sexual abuse. T. 178–242.

[3]    "RA" followed by a number refers to the page(s) of the record on appeal included with respondent's answer. To protect the victim, all trial transcripts were filed under seal.

[4]    "T" followed by a number refers to the page(s) of the trial transcript included with respondent's answer. Due to the sensitive nature of the underlying state court convictions, all trial transcripts were filed under seal. Aside from the actual trial transcript, the "trial transcript" packet also consists of: the arraignment held on October 14, 2003, the pre-trial conference held on May 20,

2004, the order to show cause proceeding held on June 15, 2004, the suppression hearing held on June 17, 2004, and the sentencing held on August 6, 2004, all of which are separately paginated. Thus, any reference to "T" refers to the actual trial transcript.

Based on the child's allegations, Sgt. John Cooney located Humphrey at his place of employment on July 8, 2003. T. 269–70. Sgt. Cooney told Humphrey that he was investigating allegations of rape by a victim who had passed a polygraph test. T. 273–76. In fact, the victim was never given a polygraph test. T. 275–77. Rather, Humphrey was shown a fabricated polygraph test prepared by the New York State Police for use when questioning suspects. T. 274–76. Humphrey voluntarily agreed to make a written statement. T. 277, 280. Humphrey waived his constitutional rights. T. 277–79. Sgt. Cooney wrote the statement himself, allowing Humphrey to make changes. T. 280–81, 283–84. In the four-page signed statement, Humphrey stated that he would get extremely intoxicated at the victim's house and remembered waking up once on the victim's floor. RA 15–16. While Humphrey could not recall having sex with the victim, he stated that if he did, "it must have been because [he] was so drunk [he] didn't know what [he] was doing." *Id.* Humphrey also stated that he had been "so drunk at times that [he] wasn't responsible for [his] actions," and tended to engage in very stupid activities while he was intoxicated. *Id.* The entire meeting between Sergeant Cooney and Humphrey lasted about an hour and Humphrey was not placed under arrest at any time during the meeting. T. 274, 289.

**\*2** Humphrey was indicted, found guilty, and sentenced as indicated above. On June 15, 2006, the Third Department unanimously affirmed Humphrey's conviction. *People v. Humphrey,* 30 A.D.3d 766, 816 N.Y.S.2d 393 (3d Dep't 2006). Application for leave to appeal to the New York Court of Appeals was denied on August 15, 2006. *People v. Humphrey,* 7 N.Y.3d 813, 822 N.Y.S.2d 488, 855 N.E.2d 804 (N.Y.2006). On September 27, 2007, Humphrey filed a motion to vacate his judgment pursuant to § 440.10 of New York's Criminal Procedure Law. Docket No. 19–7, Ex. F. The motion was denied on December 26, 2007. Docket No. 19–9, Ex. H. Humphrey sought leave to appeal on January 7, 2008. Docket No. 19–10, Ex. I. Leave was denied on March 12, 2008. Docket No. 19–11, Ex. J. This action followed.

## II. Discussion

## A. Exhaustion

In order for a federal court to grant habeas relief, a petitioner must have exhausted all state judicial remedies. *See* 28 U.S.C. § 2254(b) & (c). To satisfy this requirement, the petitioner must have exhausted all claims both procedurally and substantively. *Horton v. Ercole,* 557 F.Supp.2d 308, 322 (N.D.N.Y.2007). Procedurally, the federal claim must be presented to the highest state court capable of rendering a decision at least once, on direct or collateral review. *Klein v. Harris,* 667 F.2d 274, 284 (2d Cir.1981) (*citing Fielding v. Le Fevre,* 548 F.2d 1102, 1106 (2d Cir.1977)). Substantively, the constitutional claim must be "fairly presented" to the state courts by "inform [ing] the state court of both the factual and the legal premises of the claim assert[ed] in federal court." *Daye v. Att'y Gen. of N.Y.,* 696 F.2d 186, 191 (2d Cir.1982) (en banc), *on remand,* 712 F.2d 1566 (2d Cir.1983) (citations omitted). The petitioner must fairly appraise the court of the constitutional nature of the claim in order to exhaust state remedies. *Id.* at 192. This does not necessarily require "citing chapter and verse of the Constitution." *Smith v. Duncan,* 411 F.3d 340, 348 (2d Cir.2005) (*quoting Daye,* 696 F.2d at 194). Rather, it can be accomplished by

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional ligation.

*Id.* (*quoting Daye.* 696 F.2d at 194).

On Humphrey's direct appeal, he properly raised the following claims in his Appellate Division brief: (1) ineffective assistance of counsel; (2) denial of equal protection under the law; (3) trial court error in not admitting the victim's school records; (4) trial court error in not admitting the victim's letter to Humphrey; (5) trial court error in denying Humphrey's motion to suppress; (6) improper examination of the state's witnesses; (7) improper limitation on cross-examination; (8) violation of his right to present

witnesses on his own behalf; (9) deprivation of a fair trial due to trial judge bias; and (10) an excessive sentence. In his application for leave to appeal to the Court of Appeals, Humphrey attached the state court briefs. The Second Circuit has recognized

> **\*3** that where a habeas petitioner (1) submits to the New York Court of Appeals his or her Appellate Division briefs and a letter application seeking leave to appeal that did not identify particular issues for that court's review, and (2) leave to appeal was denied by the New York Court of Appeals without stating that the denial was due to petitioner's failure to identify particular issues for review, then a habeas petitioner has properly exhausted his or her federal claims pursuant to § 2254.

*Galdamez v. Keane,* 394 F.3d 68, 70 (2d Cir.2005). Therefore, these claims are exhausted.

The remaining two claims raised by Humphrey in his Appellate Brief, that the indictment should have been dismissed and that the trial court erred in denying Humphrey's motion for a trial order of dismissal, are not exhausted since he failed to apprise the court of the constitutional nature of the claims. However, these claims should be deemed exhausted since there is no further state remedy available. *See Aparicio v. Artuz,* 269 F.3d 78, 90 (2d Cir.2001). Therefore, these two claims are procedurally barred and can only be reviewed if Humphrey shows cause for the default and actual prejudice; or a fundamental miscarriage of justice, such as actual innocence. *See DiGuglielmo v. Smith,* 366 F.3d 130, 135 (2d Cir.2004); *Dunham v. Travis,* 313 F.3d 724, 730 (2d Cir.2002).

To show cause for the default, it must be established that "some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986): *see also Restrepo v. Kelly,* 178 F.3d 634, 638 (2d Cir.1999). Actual prejudice can be shown by "a reasonable possibility" that the results at trial would have been different. *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Since

cause for the procedural default has not been demonstrated or even alleged, it need not be determined if Humphrey suffered actual prejudice. *See Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985).

As for the fundamental miscarriage of justice, a showing of actual innocence is required. *Aparicio,* 269 F.3d at 90 (*citing Coleman v. Thompson,* 501 U.S. 722, 748–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). Humphrey has made no claim that he is actually innocent, nor would the record support such a position. Therefore, Humphrey's claims that the indictment should have been dismissed and that the trial court erred in denying Humphrey's motion for a trial order of dismissal cannot be reviewed by this court.

In addition, in his motion to vacate the conviction pursuant to § 440.10 of the New York Criminal Procedure Law (hereinafter "CPL"), Humphrey raised the following claims: (1) denial of equal protection; (2) deprivation of a fair trial since the prosecutor asked the victim leading questions; (3) violation of his right to confront his accusers; (4) deprivation of his right to a fair trial since the trial judge was impartial against him; and (5) ineffective assistance of counsel. It has been held that if a habeas petitioner makes a § 440.10 motion and it is denied, the exhaustion requirement is met. *Klein,* 667 F.2d at 282–83. In this case, the motion to vacate was denied, and the Appellate Division denied Humphrey's application for leave to appeal. Thus, Humphrey has exhausted these claims.

### C. Merits

#### 1. Standard of Review

**\*4** The Antiterrorism and Effective Death Penalty Act (AEDPA) restricted on the power of federal courts to grant habeas relief to state prisoners. *Williams v. Taylor,* 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The AEDPA has been codified in 28 U.S.C. § 2254(d)(1). It states that a federal court may grant habeas relief only if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*

"A state court's decision is 'contrary to' clearly established federal law, as expressed by the Supreme Court, if 'the state

court arrives at a conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts.' " *Davis v. Grant,* 532 F.3d 132, 140 (2d Cir.2008) (*quoting Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). A decision will be based on an unreasonable application of clearly established federal law if a state court " 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case,' or refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." *Hoi Man Yung v. Walker,* 468 F.3d 169, 176 (2d Cir.2006) (*quoting Williams v. Taylor,* 529 U.S. 362, 407–08, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

For the deferential AEDPA standard to apply, the state court must have decided the claims on the merits. *See* 28 U.S.C. 2254(d). On the other hand, claims that were not adjudicated on the merits by state courts are to be reviewed de novo. *Aparicio,* 269 F.3d at 93 (*citing Washington v. Schriver,* 255 F.3d 45, 55 (2d Cir.2001)). The Second Circuit has found that a state court adjudicates a claim on the merits when it disposes of the claim on substantive rather than procedural grounds and reduces its disposition to judgment. *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001). For a claim to be deemed adjudicated on the merits, the state court "need not mention the argument raised or cite relevant case law" or even "explain[ ] its reasoning process." *Eze v. Senkowski,* 321 F.3d 110, 121 (2d Cir.2003) (*citing Brown v. Artuz,* 283 F.3d 492, 498 (2d Cir.2002); *Sellan,* 261 F.3d at 311). For the deferential AEDPA standard to apply, it is not necessary that the state court refer to the federal claim or to federal case law. *See Davis v. Kelly,* 316 F.3d 125, 127 (2d Cir.2003) (*citing Sellan,* 261 F.3d at 312).

If the last-reasoned state court opinion decided the claim on an independent and adequate state law ground, the claim would be procedurally barred, and the petitioner can only overcome the procedural bar by showing cause and prejudice, or a fundamental miscarriage of justice. However, if the state court decided the claim on the merits of the federal claim, the AEDPA standard of review and merits analysis applies.

**\*5** Here, the Appellate Division explicitly rejected Humphrey's contentions that the indictment should have been dismissed, and that he was denied equal protection. *Humphrey,* 816 N.Y.S.2d at 393. As for the remaining claims, the court stated "[w]e have considered defendant's remaining arguments and find them equally unavailing." *Id.* Thus, the state court adjudicated Humphrey's claims on the merits and so the AEDPA standard of review applies.

It is also important to note that on habeas review by a federal court, the evidence must be viewed in the light most favorable to the prosecution. *Washington,* 255 F.3d at 58. At the same time, *"pro se* pleadings are held to a less stringent standard than briefs by counsel, and are read generously, 'however artfully pleaded.' " *Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997) (*quoting Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam)). Also significant is that a petitioner is only entitled to habeas relief if the constitutional error at trial was not harmless. *Brown v. Keane,* 355 F.3d 82, 91 (2d Cir.2004). When determining whether an error is harmless or not, "the court looks to the record as a whole, considering the overall strength of the prosecution's case, the importance of the improperly admitted evidence, and whether the evidence was emphasized at trial." *Id.; see also Raheem v. Kelly,* 257 F.3d 122, 142 (2d Cir.2001).

### 2. Ineffective Assistance of Counsel

Humphrey claims that he received ineffective assistance of counsel. He contends that his counsel failed to (1) timely file the notice of alibi witnesses, (2) retain an expert witness, and (3) subpoena certain witnesses. Respondent argues that the Appellate Division's holding was neither contrary to nor involved an unreasonable application of clearly established federal law, and that nevertheless, the claim is without merit. Since this claim was adjudicated on the merits in state court, it must be reviewed under the deferential AEDPA standard.

To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See also Purdy v. United States,* 208 F.3d 41, 44 (2d Cir.2000). To be deficient, the attorney must have "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687. In other words, counsel's performance had to have fallen below an objective standard of reasonableness. *Id.* at 688. As for the prejudice prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 698. It is well-settled that a court can address the prongs in either order and that both need not be

2010 WL 7417094

addressed if the petitioner fails to make a sufficient showing on one. *Id.* at 697.

 **\*6** Humphrey's contention that his counsel's failure to retain an expert witness resulted in ineffective assistance of counsel is without merit. It is well-settled that when reviewing a habeas claim based on ineffective assistance of counsel, there is a strong presumption that the attorney's performance was reasonable and that the attorney's actions may constitute trial strategy. *Strickland,* 466 U.S. at 689; *Bell v. Miller,* 500 F.3d 149, 156 (2d Cir.2007). In fact, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Williams v. Herbert,* 435 F.Supp.2d 199, 205 (W.D.N.Y.2006) (*citing Strickland,* 466 U.S. at 690).

An attorney's decision on whether or not to call a particular witness is part of trial strategy, and therefore courts will generally not question the attorney's decision. *Id.* (*citing United States ex rel. Walker v. Henderson,* 492 F.2d 1314 (2d Cir.1974)). With respect to expert witnesses, "[w]here an expert would only marginally assist the jury in its role as fact finder, an attorney's decision not to call an expert is more likely to fall within the bounds of reasonable performance and less likely to prejudice the defendant." *Id.* at 206 (citations omitted).

Humphrey claims that an expert witness would have testified that the portion of the victim's hymen which was displaced could have been due to a reason other than intercourse. Pet. (Docket No. 1) at 12. However, Humphrey's attorney was effective in cross-examining the prosecution's expert witness. Therefore, it was reasonable for defense counsel to choose not to call an expert witness since it would only marginally assist the jury, given that defense counsel effectively and vigorously cross-examined the prosecution's witness. Through his questioning on cross-examination, defense counsel was able to elicit from the prosecution's medical expert witness, Nurse Harris, an explicit admission that the physical examination was not conclusive as to whether the victim was subjected to forcible intercourse or whether the sex was consensual. T. 260. Defense counsel also elicited from the nurse an admission that the physical examination did not reveal who the victim had sexual intercourse with. T. 261. Therefore, defense counsel could have concluded that calling an expert witness would have been unnecessary and duplicative. Since it has already been established that the attorney's performance was not deficient

in this respect, there is no need to assess the prejudice prong. *See Strickland,* 466 U.S. at 697.

Humphrey also argues that his attorney failed to timely file a notice of alibi. Humphrey has failed to show that his attorney's representation was deficient in this respect. The record indicates that the notice of alibi was untimely because Humphrey's attorney was assigned the case late. OSC. 5.[5] Since the alibi notice was filed late, it was within the judge's discretion to accept testimony from an alibi witness. *See Millio v. Barkley,* 48 F.Supp.2d 259, 263 (W.D.N.Y.1999) (*citing* N.Y.Crim. Proc. Law § 250.20(3)). The judge found that the alibi notice had limited probative value since it only covered the time period of March 15, 2004 at 6:00 p.m. through March 16, 2004 at 10:00 a.m., while the indictment alleged that one of the rape incidents occurred "on a date in March." RA. 6–9, 194; T. 326–27. Thus, there was no indication that the alibi witness' testimony coincided with the date of one of the alleged rapes. Moreover, Humphrey's attorney stated he understood the limited probative value of the alibi, and filed the notice as a precautionary measure. OSC. 5. This conduct of protectively filing an alibi of notice simply does not fall below an objective standard of reasonableness and thus, was not deficient.

5       "OSC" followed by a number refers to the page(s) of the order to show cause proceeding held on June 15, 2004, which is contained in the "trial transcript" packet.

 **\*7** Even if Humphrey is able to establish that the attorney's representation was deficient in this respect, he has failed to show that the deficient representation resulted in prejudice. *See Strickland,* 466 U.S. at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). As stated above, the alibi notice only covered one day during the month of March while the indictment was not specific as to on what day in March the incident occurred. Thus, even if timely filed, the alibi notice had limited probative value and therefore the outcome of the trial would not have differed had the attorney timely filed the notice.

Lastly, Humphrey contends that he was denied effective assistance of counsel because of his attorney's failure to subpoena witnesses, specifically the victim's sisters, mother, and the mother's boyfriend. This claim is without merit.

As previously stated, a court will generally not question an attorney's decision not to call a particular witness since it constitutes a matter of trial strategy. *See United States ex rel. Walker v. Henderson,* 492 F.2d 1314 (2d Cir.1974); *Gaskin v. United States,* 591 F.Supp.2d 247, 256 (W.D.N.Y.2008). The Second Circuit has recognized that "the tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse of professional representation." *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.1997) (citations omitted). Furthermore, when reviewing a habeas claim, courts "must make every effort ... to eliminate the distorting effects of hindsight." *Bell v. Miller,* 500 F.3d 149, 156 (2d Cir.2007) (quoting *Strickland,* 466 U.S. at 689).

Humphrey has failed to rebut the presumption that his attorney's performance was reasonable and that his actions constituted trial strategy. Humphrey's attorney may reasonably have concluded that calling the witnesses would harm Humphrey's defense. All of the potential witnesses Humphrey sought to testify are family members of the victim. Humphrey's attorney may have found that, rather than benefitting Humphrey's case, those witnesses only had inculpatory evidence to offer, harming Humphrey's defense.

As for the prejudice prong, even though it need not be addressed since there was no showing of deficient performance by defense counsel, Humphrey has failed to demonstrate that but for his trial counsel's errors, the result of the trial would have been different. The jury heard testimony from, among others, the victim of the sex crimes for which Humphrey was convicted, which was corroborated by the nurse's testimony and Humphrey's own statement. Based on all of the evidence the jury was asked to consider, a reasonable probability does not exist that but for defense counsel's alleged error in not calling additional witnesses, the result of the trial would have differed. Thus, Humphrey has failed to demonstrate that trial counsel's alleged errors either fell below an objectively reasonable standard of representation or resulted in prejudice.

### 3. Equal Protection Claim

**\*8** Humphrey claims that he was denied equal protection since he was deprived of the ability to plea bargain. This claim is without merit. First, there is no constitutional right to plea bargain. *See Weatherford v. Bursey,* 429 U.S. 545, 561, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Habeas relief is

only available to correct errors of constitutional dimensions or violations of federal law. 28 U.S.C. § 2254(a). Since on habeas review, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States," this claim provides no basis for habeas relief. *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (*citing* 28 U.S.C. § 2241). Second, Humphrey was informed that the trial j's policy was not to accept plea bargains, Humphrey understood the policy, he discussed it with his counsel, and he still chose to pursue a trial. PTC. 2–3. [6] Therefore, Humphrey's claim that he was denied equal protection based on his inability to plea bargain is without merit.

[6] "PTC" followed by a number refers to the page(s) of the pre-trial conference held on May 20, 2004, which is contained in the "trial transcript" packet.

### 4. Evidentiary Rulings

It is well-settled that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle,* 502 U.S. at 67–68. Federal habeas courts review state court evidentiary decisions only for consistency with notions of fundamental fairness derived from due process and compulsory process. *See Rosario v. Kuhlman,* 839 F.2d 918, 924 (2d Cir.1988); *Rosario v. Ercole,* 582 F.Supp.2d 541, 596 (S.D.N.Y.2008). Thus, "evidentiary rulings, even erroneous ones, rarely rise to the level of a constitutional violation." *Ercole,* 582 F.Supp.2d at 558 (citations omitted). For a state court evidentiary ruling to rise to the level of constitutional error, "the error [must be] so pervasive as to have denied [the petitioner] a fundamentally fair trial." *Collins v. Scully,* 755 F.2d 16, 18 (2d Cir.1985) (*citing United States v. Agurs,* 427 U.S. 97,108 (1976)).

When a habeas petitioner makes a claim that defense evidence was wrongfully excluded, the reviewing court must first assess whether the trial court ruling was proper. *Hawkins v. Costello,* 460 F.3d 238, 244 (2d Cir.2006) (citations omitted). If proper under a state evidentiary rule, the review is limited to whether the rule is " 'arbitrary' or 'disproportionate to the purposes [it is] designed to serve.' " *Id.* (quoting *United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)). However, if the court finds that the ruling was improper, the materiality of the evidence is analyzed to determine whether the excluded evidence "creates a reasonable doubt that did not otherwise exist." *Id.* (quoting

*Justice v. Hoke,* 90 F.3d 43, 47 (2d Cir.1996)). In addition, for a writ of habeas corpus to be granted following a state court conviction, a petitioner must demonstrate that the alleged trial error "had substantial and injurious effect or influence in determining the jury's verdict." *Henry v. Speckard,* 22 F.3d 1209, 1215 (*quoting Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

### a. Victim's School Records

**\*9** Humphrey contends that the trial court erred when it denied his request for access to the victim's school records. Also, Humphrey asserts that his rights under the Confrontation Clause were violated since he was unable to properly cross-examine the victim without the records. Respondent argues that state evidentiary rulings are not cognizable on federal habeas review and that nevertheless, the records were not relevant to the victim's credibility.

In the present case, the judge denied Humphrey's motion for access to the victim's school records. SH. 2. [7] The trial judge stated that if the victim was so impaired that she could not testify, she could not be sworn as a witness, and, therefore, the records were not relevant. OSC. 11. As stated above, the habeas court must determine if the trial court ruling was proper under a state evidentiary rule, and if so, whether the rule the court relied on is arbitrary or disproportionate to the purposes it is designed to serve.

[7]    "SH" refers to the suppression hearing held on June 17, 2004, that is contained in the "trial transcript" packet.

The trial court's ruling was proper as a matter of state evidentiary law. According to New York case law, school records are not discoverable unless their relevancy and materiality are established. *See People v. Brown,* 24 A.D.3d 884, 806 N.Y.S.2d 262, 265 (3d Dep't 2005); *Monica W. v. Milevoi,* 685 N.Y.S.2d 231,233 (1st Dep't 1999); *Moores v. City of Newburgh School Dist.,* 213 A.D.2d 527, 623 N.Y.S.2d 911, 912 (2d Dep't 1995); *McGuane by McGuane v. M.C.A., Inc.,* 182 A.D.2d 1081, 583 N.Y.S.2d 73, 74 (4th Dep't 1992). Thus, since the relevancy and materiality of the records were not established, the ruling was proper. This rule is neither arbitrary nor disproportionate to the purposes it is designed to serve, namely to protect the infant student, preserve the confidentiality of the records, and prevent fishing expeditions that search for a way of attacking the victim's credibility. *See*

*Growick v. Bd. of Educ.,* 39 A.D.2d 785, 331 N.Y.S.2d 906, 908 (3d Dep't 1972); *Brown,* 806 N.Y.S.2d at 265. Therefore, this claim is without merit.

The Confrontation Clause claim is similarly without merit. It has been held that "[a]ll erroneous rulings that improperly restrict cross-examination under state or federal rules of evidence do not necessarily implicate the Confrontation Clause." *Harper v. Kelly,* 916 F.2d 54, 57 (2d Cir.1990). Furthermore, "trial judges retain wide latitude, insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination." *Id.* (*quoting Van Arsdall,* 475 U.S. at 679). "Restrictions on a defendant's presentation of evidence are constitutional if they serve 'legitimate interests in the criminal trial process' " and are not " 'arbitrary or disproportionate to the purposes they are designed to serve.' " *United States v. Almonte,* 956 F.2d 27, 30 (2d Cir.1992) (*quoting Rock v. Arkansas,* 483 U.S. 44, 55–56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)). For example, defendants cannot circumvent the rules of evidence. *Id.* As stated above, the court properly denied Humphrey's motion for access to the school records based on state rules, which was neither arbitrary or disproportionate to the purpose the rules were designed to serve.

**\*10** For argument's sake, even if the court did err, Humphrey must establish that the error was harmful. When determining the effect of a Confrontation Clause error, the court can consider various factors, including,

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Harper,* 916 F.2d at 57 (*citing Van Arsdall,* 475 U.S. at 684). Applying these factors to the present case, it is evident that on the whole, even if there was an error, it was harmless. Although the victim was the prosecution's key witness and her testimony was significant in proving the prosecution's case, a great deal of corroborating evidence was introduced. Both the

medical exam results provided through the nurse's testimony, as well as Humphrey's own statement, corroborated the victim's testimony on material points. Thus, even if the victim's school records were introduced and resulted in the exclusion of her testimony, there was sufficient corroborating evidence for the jury to consider.

Alternatively, if the victim's school records were introduced for the purpose of attacking her cognitive abilities and ability to recollect, the jury had ample opportunity to assess the victim's abilities through her lengthy testimony on direct and cross-examination. In addition, the fact that the defense counsel was afforded wide latitude in otherwise cross-examining the victim, demonstrates that the denial of the school records did not have a substantial effect on the jury's verdict. Thus, this claim should be rejected.

### b. Victim's Letter

Humphrey also argues that the court erred in refusing to admit a letter the victim wrote to Humphrey. Respondent contends that as a state evidentiary ruling, it is not cognizable on federal habeas review, and that nevertheless, the letter was properly excluded since it constituted hearsay. In the letter, the victim wrote that she loved Humphrey and that she was "sorry for all the trouble that [she] got [Humphrey] into." RA. 212. The court ruled that the letter was not admissible since it was an out-of-court statement that was not inconsistent with any testimony given by the victim at trial. T. 217.

Under New York's rules of evidence, a prior inconsistent statement can be introduced to impeach testimony a witness gave on direct examination. N.Y.Crim. Proc. Law § 60.35. However, the letter did not contradict any of the victim's testimony. In fact, when Humphrey's attorney asked her whether she wrote to Humphrey that she was sorry, she answered yes. T. 225. When Humphrey's attorney asked her if she remembered writing that she loved Humphrey, the victim indicated that she did not recall. T. 227. At that point, defense counsel was permitted to refresh her recollection with the letter. T. 228. New York case law has held that when a witness admits making a prior statement, it is unnecessary to prove the inconsistency by admitting the statement into evidence. *See People v. Person,* 26 A.D.3d 292, 810 N.Y.S.2d 68, 70 (1st Dep't 2006); *People v. Benson,* 233 A.D.2d 749, 650 N.Y.S.2d 448, 449–50 (3d Dep't 1996) ("When the inconsistency was admitted by [the witness], it did not have to be belabored. The inquiry is ended by the admission.") (citations omitted).

*11 Since the ruling was proper under a state evidentiary rule and that rule is not arbitrary or disproportionate to the purposes it is intended to serve, Humphrey's right to a fair trial and his rights under the Confrontation Clause were not violated. Even if the evidentiary ruling was improper, the letter would not have created a reasonable doubt that did not otherwise exist. *See Hawkins v. Costello,* 460 F.3d 238, 244 (2d Cir.2006). In addition, even if it was error for the court to have excluded the letter, it did not have a substantial effect on the verdict as the jury heard the victim admit to what she wrote in the letter and Humphrey was still convicted.

### 5. Motion to Suppress

In his petition, Humphrey argues that the lower court erred in denying his motion to suppress his statement given to a detective. In June of 2004, before trial, Humphrey was afforded a suppression hearing in which the judge found that he was not in custody at the time he made statements to the detective and that nevertheless, Miranda warnings were administered before Humphrey gave his written statement. SH. 27–28.

If the state court "has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992) (*quoting Stone v. Powell,* 428 U.S. 465, 482, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)). Thus, a Fourth Amendment claim can be considered on habeas review only "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan,* 975 F.2d at 70 (*citing Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir.1977)). This rule applies regardless of the nature of the evidence the petitioner seeks to suppress, and includes confessions. *See Dawson v. Donnelly,* 111 F.Supp.2d 239, 247 (W.D.N.Y.2000) (*citing Cardwell v. Taylor,* 461 U.S. 571, 572–73, 103 S.Ct. 2015, 76 L.Ed.2d 333 (1983)).

Section 710 of New York's Criminal Procedure Law provides for New York's statutory procedure for obtaining suppression of illegally obtained evidence. In this case, Humphrey made

2010 WL 7417094

an omnibus motion, in part pursuant to that section, asserting that his written statement to the detective was illegally obtained. RA. 121–122. After an evidentiary hearing, the motion to suppress was denied. SH. 28. Humphrey then obtained further review of the suppression issue in the state judicial system by raising it in his direct appeal to the Appellate Division. Docket No. 19–2, Exhibit A. The Appellate Division found the claim to be without merit. *People v. Humphrey,* 30 A.D.3d 766, 816 N.Y.S.2d 393 (3d Dep't 2006). Since the state provided a corrective mechanism and Humphrey used that mechanism and had a full and fair opportunity to litigate his Fourth Amendment claims prior to trial, his claim concerning the statement that he gave to the detective cannot be reviewed. The Second Circuit has recognized that "the issue whether New York State provides adequate procedures for litigating Fourth Amendment claims 'cannot be open to serious challenge.' " *Corchado v. Rabideau,* 576 F.Supp.2d 433, 455 (W.D.N.Y.2008) (*quoting Gates,* 568 F.2d at 837). Furthermore, there is no evidence of an unconscionable breakdown in the underlying process.

**\*12** Although this claim is thus barred on procedural grounds, Humphrey's claim also fails on the merits. Since advice of rights is only required when a person being interrogated by law enforcement officials is in custody, the need to give advice of rights was never triggered in this case. *See Isasi v. Herbert,* 176 Fed.Appx. 143, 144 (2d Cir.2006). The Second Circuit has held that in determining whether a person is "in custody" for purposes of [advice of rights], two questions must be analyzed: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Tankleff v. Senkowski,* 135 F.3d 235, 243 (2d Cir.1998) (*quoting Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). The first determination is a factual one, while the second inquiry involves both questions of law and fact. *Id.*

Analyzing the first determination, the record is clear as to the circumstances surrounding the interrogation. On July 8, 2003, Sgt. Cooney went to Humphrey's work place to speak to him about the rape allegations. SH. 3–4. Once he arrived, Sgt. Cooney asked the woman at the reception area if he could speak to the manager, without indicating his reason for being there. SH. 4. Sgt. Cooney then spoke to the manager and asked if he could speak to Humphrey, once again, not indicating his reasons for wanting to speak to Humphrey. SH. 5. The manager then escorted Sgt. Cooney to a private, training type

room. *Id.* He returned with Humphrey, and excused himself. SH. 7. Sgt. Cooney was in plain clothes at the time of the meeting but indicated to Humphrey that he was a detective and was conducting a criminal investigation into allegations where Humphrey's name had been mentioned. *Id.*

Humphrey willingly spoke to Sgt. Cooney and never asked to leave. SH. 8. At one point during the conversation, the detective told Humphrey that the victim had passed a lie detector test relating to her allegations. SH. 22–23. After a few minutes of casual conversation, Humphrey agreed to reduce the conversation to writing. SH. 9. As Sgt. Cooney began to prepare the written statement, he advised Humphrey of his rights, which Humphrey voluntarily waived. SH. 9–11. Sgt. Cooney wrote the statement himself. SH. 11. Once Humphrey indicated that he had nothing else he wished to include in the statement, Humphrey reviewed the statement and was allowed to make changes, which he did by initialing the portions he wished to change. SH. 12. He also initialed the line immediately after the last word, as well as signed the bottom of each page of the four-page statement. SH. 12, 13. Humphrey was free to leave at any time during the conversation and was not placed under arrest at any time during the meeting. SH. 14. The entire conversation lasted about one hour. SH. 19.

Factors a court will consider when determining whether a petitioner was in custody thereby requiring Miranda warnings include "whether a suspect is or is not told that she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the police, whether the suspect is searched, frisked, or patted down, and the length of the interrogation." *Tankleff,* 135 F.3d at 244 (citations omitted). Humphrey was not in custody because he was free to leave, was never placed in handcuffs, and was never placed under arrest at the time of questioning-in fact, he was not arrested until one or two weeks later. SH. 14, 22. In addition, Humphrey was questioned in a neutral, unimposing location, a conference-type room at his place of employment. SH. 4. Sgt. Cooney was not hostile and in fact, Humphrey and the detective engaged in casual conversation. SH. 8. There is also no evidence that Humphrey was searched, frisked, or patted down at any point during the interrogation. SH. 1–34. Lastly, the interrogation lasted only about one hour. SH. 19.

**\*13** Even if in custody, Humphrey was nevertheless given the Miranda warnings before he gave his written statement. SH.9. Even if Humphrey did make statements before the giving of the warnings, the Second Circuit has held that

the admission of a defendant's statements that were made before the advice of rights, even if error, was harmless error "in light of the overwhelming evidence of guilt and the fact that [the defendant] made a complete, detailed written confession after the [advice of rights]." *Isasi,* 176 Fed.Appx. at 145 (citations omitted). This is precisely the case here. The victim's testimony coupled with Humphrey's detailed, four-page written statement made after the advice of rights demonstrates that the admission of any statements made before the advice of rights, even if in error, was harmless.

Lastly, Humphrey's claim that his statement should have been suppressed because Sgt. Cooney falsely told him that the victim had passed a polygraph test, is also without merit. The detective testified that using the "prop" was an appropriate and even recommended practice among law enforcement officials when conducting a criminal investigation. T. 275. Courts have held that since a "totality of circumstances" test is used to assess whether a confession was voluntary, "[a] falsehood by a police officer, although deplorable, does not necessarily induce an involuntary confession." *Walker v. Goord,* 427 F.Supp.2d 272, 277 (W.D.N.Y.2006) (citations omitted). The use of the "prop" in this case did not make Humphrey's statement an involuntary one.


### 6. Examination of Prosecution's Witnesses

The next claim is that Humphrey was denied a fair trial because of the improper examination of the prosecution's witnesses. The Respondent argues that it was proper for the prosecution to ask leading questions due to the young age of the victim, as well as the need to expedite the victim's testimony. Merely alleging a violation of the right to a fair trial does not automatically satisfy the exhaustion requirement. *Kirksey v. Jones,* 673 F.2d 58, 60 (2d Cir.1982). In addition, while some courts have considered a prosecutor's conduct during trial to be a constitutional issue, *see, e.g., Walker v. Bennett,* 262 F.Supp.2d 25, 33 (W.D.N.Y.2003), others construe the claim as a question of state evidentiary law. *See, e.g., Petrucelli v. Coombe,* 735 F.2d 684, 688 (2d Cir.1984). Since case law is ambiguous and it cannot be said that the claim is unexhausted, the claim will be considered.

Humphrey's claim can be construed as one for prosecutorial misconduct. In analyzing a prosecutorial misconduct claim, the prosecutor must have engaged in "egregious misconduct ... amount[ing] to a denial of constitutional due process." *Blissett v. Lefevre,* 924 F.2d 434, 440 (2d Cir.1991) (*quoting Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990)). Prosecutorial misconduct violates a defendant's due process right when the misconduct is "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Blissett,* 924 F.2d at 440 (quoting *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 1102, 97 L.Ed.2d 618 (1987)). The court must consider the severity of the alleged misconduct, the curative measures taken, and the likelihood of conviction absent any misconduct, when determining whether the conduct resulted in substantial prejudice. *Id.* (citations omitted). In determining whether the misconduct deprived the defendant of a fair trial, a court must considered whether the misconduct was " 'pervasive' or part of a 'persistent' trial strategy." *Id.* at 441 (*quoting United States v. Weiss,* 914 F.2d 1514, 1524 (2d Cir.1990)).

**\*14** A review of the prosecution's questioning of the victim demonstrates that there was no conduct that was so severe as to deprive Humphrey of a fair trial. As a fifteen-year-old girl testifying about a sensitive and embarrassing subject, the victim was clearly having difficulty formulating verbal responses. Courts have recognized that while leading questions are generally not permissible on direct examination, there are some circumstances in which leading questions should be allowed "as may be necessary to develop the witness' testimony." *United States v. Salameh,* 152 F.3d 88 (2d Cir.1998) (*quoting* Fed.R.Evid. 611(c)). Such a circumstance is when a young victim testifies. *See Paramore v. Filion,* 293 F.Supp.2d 285, 293 (S.D.N.Y.2003). In such a case, "leading questions may be permitted of a child victim in a sexual abuse case so that the child's testimony can be clarified or expedited if the child is apparently unwilling to testify freely." *Id.* (*quoting People v. Cuttler,* 270 A.D.2d 654, 705 N.Y.S.2d 416, 417 (3d Dep't 2000)). Therefore, the leading questioning did not amount to egregious misconduct since it was necessary to elicit testimony from the young victim.

Even if it could be characterized as misconduct, the conduct did not result in substantial prejudice since, even absent the alleged misconduct, it is likely that Humphrey would have been convicted based on the evidence presented at trial. Also, there is no evidence that the misconduct was pervasive or part of a pattern during the trial. Therefore, this claim is without merit.


### 7. Cross–Examination

Humphrey claims that the trial court improperly restricted the cross-examination of the state's witnesses, including the victim and Sgt. Cooney. This claim arises from the Sixth Amendment right to confront witnesses. *See* U.S. Const. amend. VI, *Crawford v. Washington,* 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). As previously noted, while this right affords a defendant an opportunity to cross-examine witnesses, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Also, while a defendant is afforded the opportunity to cross-examine witnesses, he is not guaranteed "cross-examination that is effective in whatever way, and to whatever extent the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (citations omitted). Furthermore, the Confrontation Clause is not necessarily implicated when a ruling restricting cross-examination of a witness is erroneous. *See Harper v. Kelly,* 916 F.2d 54, 57(2d Cir.1990).

Based on a review of the record, it is clear that Humphrey was afforded wide latitude in cross-examining the prosecution's witnesses and that his Sixth Amendment right was not violated. The limits on cross-examination that Humphrey cites were reasonable and based on various concerns. Many limits were likely due to the court's desire to prevent questioning that would elicit testimony that could confuse the jury. This is a valid limit on the scope of the cross-examination. *See Van Arsdall,* 475 U.S. at 679. Specifically, Humphrey argues that defense counsel should have been permitted to inquire about the victim's relationship with her mother's boyfriend. However, the judge reasonably sustained the prosecution's objection in order to avoid irrelevant testimony. Also, Humphrey argues that the court improperly limited his cross-examination of Sgt. Cooney regarding the surrounding circumstances of Humphrey's statement and his investigation of the case. The limits the court placed on the cross-examination were likely due to concerns about confusion of the issues and relevance.

**\*15** Even if a Confrontation Clause error was made, the court must consider whether it was harmful. In conducting this analysis, the court must consider "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that

the error was harmless beyond a reasonable doubt." *Van Arsdall,* 475 U.S. at 684. The main factors to be considered in determining the effect of the error are

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case.

*Id.* (citations omitted); *see also Brinson v. Walker,* 407 F.Supp.2d 456, 481 (W.D.N.Y.2006). In the present case, while the victim and Detective Cooney were clearly key witnesses in the prosecution's case, even if there was an error, it was clearly harmless in light of the wide latitude of cross-examination otherwise afforded to the defense, the corroborating evidence through the nurses' testimony and Humphrey's statement, and the overall strength of the prosecution's case. Therefore, this claim should be denied.

### 8. Right to Present Witnesses

Humphrey contends that his right to present witnesses was violated when the court precluded alibi testimony. Respondent argues that under New York's discovery rules, the notice of alibi was untimely and was therefore properly precluded.

It is well-settled that "[t]rial courts are allowed to impose rules on the identification and presentation of evidence, including notice of alibi requirements, in order to further '[t]he State's interest in the orderly conduct of a criminal trial.'" *Zimmerman v. Burge,* 492 F.Supp.2d 170, 192 (E.D.N.Y.2007) (*quoting Taylor v. Illinois,* 484 U.S. 400, 411, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)). In addition, "[a] defendant's constitutional right to present evidence is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Pulinario v. Goord,* 291 F.Supp.2d 154, 174 (E.D.N.Y.2003) (*citing Taylor,* 484 U.S. at 411). Aside

from the defendant's right to present evidence, the court must also weigh "[t]he integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process ...." *Taylor,* 484 U.S. at 414–15. The Supreme Court has held that in determining whether preclusion of alibi testimony is an appropriate sanction for non-compliance with notice requirements, a court should consider various factors, including the extent of prosecutorial surprise or prejudice, the effectiveness of a less severe sanction, whether the defendant's non-compliance was willful, the criminal justice system's interest in rejecting unreliable evidence, and the impact of the preclusion of the alibi testimony on the verdict. *See Taylor,* 484 U.S. at 414–15 & n. 19.

**\*16** It has been held that "[i]t is acceptable to preclude testimony that violates a state's discovery rules." *Millio v. Barkley,* 48 F.Supp.2d 259, 264 (W.D.N.Y.1999) (citation omitted). However, the Supreme Court has held that in deciding whether a court should exclude alibi testimony when notice has not been timely filed, the court should determine if the non-compliance with the notice requirement was willful. *See Taylor,* 484 U.S. at 415. If the non-compliance was willful, then a sanction precluding such alibi testimony is justified. *Id.* However, if the non-compliance was not willful and lesser sanctions are available, preclusion is not appropriate. *See Noble v. Kelly,* 246 F.3d 93, 100–101 (2d Cir.2001).

In considering the factors in *Taylor,* it was proper for the trial court to preclude the alibi testimony. The notice of alibi was served on June 4, 2004, which was approximately eight months late and only a few weeks before the trial was to start. RA. 199. Therefore, the prejudice to the prosecution was great since there was not sufficient time to investigate the alibi. As for the effectiveness of a less severe sanction, the trial was set to begin two weeks after the notice of alibi was served, and therefore an adjournment would not have been effective, and the prosecution would still have suffered prejudice. RA. 199. The non-compliance does not appear willful as defense counsel stated that he was assigned the case late and promptly filed the notice of alibi. OSC. 5. In addition, the criminal justice system's interest in rejecting unreliable evidence is great in this case when the notice was served only weeks before trial. Lastly, the impact of the preclusion of the alibi testimony on the verdict is minimal if not non-existent. The notice of alibi merely covered one day in March, while the

indictment alleged that one of the rape incidents occurred "on a date in March." RA. 194. There is no evidence to suggest the date the alibi witness planned to testify to was the same date as the rape. Therefore, the notice of alibi was not probative and cannot be said to have had an affect on the verdict.

Even if the noncompliance was not willful and that lesser sanctions were available such that the alibi testimony should not have been precluded, it was certainly a harmless error. In light of the other significant evidence against Humphrey, the exclusion of the alibi witnesses' testimony did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

### 9. Judicial Bias

Humphrey also claims that he was deprived of a fair trial because the judge was biased. Humphrey argues that the trial judge improperly permitted the prosecution to ask the victim leading questions on direct examination, questioned the victim himself, was abrasive with Humphrey during his testimony, and allowed the prosecution to engage in improper questioning during the cross-examination of Humphrey, and that the trial judge should have recused himself from the case.

**\*17** It has been held that

> [a] trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits.

*Daye,* 712 F.2d at 1572. The test for determining whether a judge's conduct deprived a defendant of a fair trial "is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, or whether it appeared clear to the jury that the court believed the accused is guilty." *United States v. Amiel,* 95 F.3d 135, 146 (2d Cir.1996) (*citing United States v. Pisani,* 773 F.2d 397, 402 (2d Cir.1985); *United States v.*

*Nazzaro,* 472 F.2d 302, 303 (2d Cir.1973)) (internal quotation marks omitted). In addition, this determination is made by a review of "the record as a whole." *United States v. Tocco,* 135 F.3d 116, 129 (2d Cir.1998)). Furthermore, "only infrequently does intervention by a trial judge rise to the level of a due process violation." *Gayle v. Scully,* 779 F.2d 802, 806 (2d Cir.1985) (citations omitted).

After a review of the trial transcript, it is clear that this claim is without merit. The judge's comments and questioning of the witnesses were done simply for clarification purposes. "[A] judge does not deny a defendant due process of law by merely intervening in a trial to question witnesses." *Gayle,* 779 F.2d at 806. The judge's other rulings were based on New York rules of evidence. Based on the record as a whole, the judge was clearly impartial and any potential partiality never became a factor in determining the defendant's guilt or affected the jury's verdict in any way.

As to recusal, recusal is only required when the judge's "impartiality might reasonably be questioned." *United States v. Giordano,* 442 F.3d 30, 48 (2d Cir.2006) (*citing* 28 U.S.C. § 455(a); *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999)). Since there is no evidence that the judge acted partially, recusal was not necessary. Thus, the trial judge's actions in this case did not exceed constitutional limits and did not violate Humphrey's right to a fair trial.

### 10. Right to Confront Accusers

Humphrey claims that he was denied the right to confront his accusers, specifically the victim's sisters, grandmother, mother, and mother's boyfriend, as well as two of the victim's friends who were present for one of the incidents, and the victim's stepmother, who signed the incident report. Respondent argues that the prosecution does not have a duty to call every witness to a crime during the trial. Respondent also asserts that, aside from the victim's two friends, none of the witnesses Humphrey cites were witnesses to the crime, and that Humphrey could have called the witnesses as part of his case.

*18 One of the rights guaranteed by the Sixth Amendment is the right to confront one's accusers. *See* U.S. Const. Amend. VI. The Second Circuit has held that when a person was never called as a witness, the confrontation clause is not implicated. *United States v. Coven,* 662 F.2d 162, 170 (2d Cir.1981); *see also United States ex rel. Meadows v. State*

*of New York,* 426 F.2d 1176, 1184 (2d Cir.1970) (noting that "the sixth amendment applies to evidence actually disclosed at a trial" and "a defendant has no right to confront a witness who provides no evidence at trial.") (internal citations and quotation marks omitted). Humphrey contends that he had a right to confront the victim's mother and her boyfriend since they were interviewed by Sgt. Cooney. Petition, 6 (Docket No. 1). However, this does not implicate the Sixth Amendment right to confront one's accusers since neither was called as a witness at trial. In addition, Humphrey's claim that he was entitled to question Mary Ainsworth because she signed the incident report, rather than the victim herself, is also without merit. *See* RA. 148. Once again, the Sixth Amendment right to confront one's accusers was not implicated in this situation since Ms. Ainsworth was never called as a witness at trial and there is no indication that the report was ever introduced into evidence. Also, it is irrelevant that the victim did not sign the incident report since the victim was actually the accuser and therefore, the confrontation clause was not violated since the defendant did in fact cross-examine her.

Even if it is shown that this right was violated, it was clearly a harmless error. The harmless error test requires an evaluation of whether the error "had substantial and injurious effect or influence in determining the jury's verdict" and a showing of actual prejudice. *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353, 623 (1993). None of the alleged errors rose to this level and there is certainly no showing of actual prejudice. Thus, this claim is without merit.

### 11. Excessive Sentence

Humphrey argues that his sentence was excessive. It is well established that "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992) (citations omitted). In this case, since Humphrey's sentence was within the range prescribed by state law, his claim is without merit.

In New York, the sentencing range for rape in the second degree, a class D felony, is one to seven years. N.Y. Penal Law § 70.00; *see also* N.Y. Penal Law § 130.30. Since Humphrey was sentenced to an indeterminate period of incarceration of two and one-third to seven years for this count, his sentence was within the prescribed range. *See* S.[8] Thus his claim is without merit. Furthermore, the one-year sentences

Humphrey received for sexual abuse in the second degree and endangering the welfare of a child, class A misdemeanors, were also within the prescribed statutory range. *See* N.Y. Penal Law § 70.15(1) (sentence of imprisonment for a class A misdemeanor shall not exceed one year); N.Y. Penal Law §§ 130.60, 260.10. Additionally, New York law provides that, " 'even if the material elements overlap, consecutive sentences are permissible where the People demonstrate that the offenses are based on separate and distinct acts.' " *Palacios v. Burge,* 470 F.Supp.2d 215, 224 (E.D.N.Y.2007) (internal quotations and citations omitted). This is clearly the case as the indictment alleged that, while the charges were the same, the chargeable acts were committed on three separate occasions. RA. 3–9. Accordingly, this claim should be denied.

8      "S" followed by a number refers to the page(s) of the sentencing held on August 6, 2004, which is contained in the "trial transcript" packet.

### 12. Defects in the Indictment

**\*19**  Humphrey argues various claims regarding defects with the indictment. Specifically, he argues that (1) the prosecution failed to present all exculpatory evidence to the grand jury, (2) the prosecution failed to properly instruct the grand jury on the law, (3) the prosecution infringed Humphrey's right to fully testify before the grand jury, (4) the indictment is the result of a defective grand jury proceeding, (5) the indictment should have been dismissed for legal insufficiency before the grand jury, (6) the indictment should have been dismissed based on duplicity, and (7) the indictment should have been dismissed based on lack of specificity as to the dates of the alleged offenses. Respondent contends that the claim should be deemed exhausted but procedurally defaulted, and that notwithstanding, the claims are not cognizable on federal habeas corpus review. As noted above, the indictment claims are deemed exhausted and procedurally barred since Humphrey failed to raise the claims in a way that appraised the courts of the federal and constitutional question, but there is no further state remedy available. *See Alston v. Donnelly,* 461 F.Supp.2d 112, 122 (W.D.N.Y.2006) (citations omitted). Since no cause and prejudice or a fundamental miscarriage of justice was demonstrated, the claim cannot be reviewed. *See id.* (citations omitted).

Nonetheless, with respect to Humphrey's claims regarding the grand jury proceeding, deficiencies in grand jury proceedings are not cognizable in federal habeas corpus proceedings. *See*

*Lopez v. Riley,* 865 F.2d 30, 32 (2d Cir.1989); *Green v. Artuz,* 990 F.Supp. 267, 273 n. 8 (S.D.N.Y.1998). Claims concerning state grand jury proceedings are rendered harmless beyond a reasonable doubt once a defendant has been convicted by a jury. *United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986); *Lopez,* 865 F.2d at 32 (2d Cir.1989). Furthermore, the Fifth Amendment right to a grand jury indictment is not incorporated by the Due Process Clause of the Fourteenth Amendment and thus does not apply to the states. *See Branzburg v. Hayes,* 408 U.S. 665, 688 n. 25, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Fields v. Soloff,* 920 F.2d 1114, 1118 (2d Cir.1990) (citation omitted). Thus, none of Humphrey's claim involving the grand jury proceedings are cognizable on habeas review and in any event, are deemed harmless beyond a reasonable doubt as he was convicted by a jury.

As for Humphrey's claims that the grand jury indictment should have been dismissed for legal insufficiency based on lack of specificity as to the dates of the alleged offenses, it is well-settled that challenges to the sufficiency of an indictment are generally not cognizable on habeas review. *See Cortez v. Scully,* 717 F.Supp. 224, 227 (S.D.N.Y.1989) (citing *United States ex rel. Mintzer v. Dros,* 403 F.2d 42, 43 (2d Cir.1967)). However, a claim that there is a defect in a state indictment can be cognizable on habeas review if "the indictment falls below basic constitutional standards." *Carroll v. Hoke,* 695 F.Supp. 1435, 1438 (E.D.N.Y.1988). An indictment is deemed constitutionally sufficient if "it charges a crime [1] with sufficient precision to inform the defendant of the charges he must meet and [2] with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *De Vonish v. Keane,* 19 F.3d 107, 108 (2d Cir.1994) (quotations and citations omitted). Thus, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Stavroulakis,* 952 F.2d at 693 (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.1975)). Furthermore, when time is not an essential element of a crime, stating time in approximate language is sufficient. *United States v. Nersesian,* 824 F.2d 1294, 1323 (2d Cir.1987) (citing *United States v. Weiss,* 752 F.2d 777, 787 (2d Cir.1985)). When determining whether a time span is reasonable in a case involving a young victim, consideration must be given to "the fact that young complainants often do not remember the exact date of when an alleged offense occurred." *Campbell v. Poole,* 555 F.Supp.2d 345, 379 (W.D.N.Y.2008) (citations omitted). The indictment here states that the acts relating to the rape and sexual abuse counts were performed "on a date

in September 2002," "on a date in November 2002," and "on a date in March 2003." RA. 3–8. As for the endangering the welfare of a child count, the indictment alleges "on or between September of 2002 to March 2003." RA. 8. The time period of the charges is therefore approximate enough to meet the requirements of an indictment.

**\*20** As for Humphrey's claim that the indictment should have been dismissed based on duplicity, it is also without merit. Under Rule 8 of the Federal Rules of Criminal Procedure, an "indictment ... may charge a defendant in separate counts with 2 or more offenses if the offenses charged ... are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed.R.Crim.P. 8. Thus, duplicity exists when an indictment "joins two or more distinct crimes in a single count." *United States v. Walsh,* 194 F.3d 37, 46 (2d Cir.1999) (*quoting United States v. Aracri,* 968 F.2d 1512, 1518 (2d Cir.1992)). Here, each count of the indictment alleges only one offense and is therefore not duplicitous. *See* RA. 3–9.

### 13. Trial Order of Dismissal

Humphrey claims that the trial court erred in not granting a trial order of dismissal. Respondent argues that the claim is unexhausted but that in any event, there was sufficient evidence to prove the charges. As noted above, since this is a state law claim and Humphrey failed to appraise the court of the constitutional nature of the claim, the claim is not exhausted. However, it will be deemed exhausted and thus procedurally barred since there is no further available state remedy. *See Alston v. Donnelly,* 461 F.Supp.2d 112, 122 (W.D.N.Y.2006). As no cause for default and actual prejudice or a fundamental miscarriage of justice has been shown, the claim cannot be reviewed. *Id.* Nevertheless, on its merits this claim goes to the sufficiency of the evidence. It is well-settled that "the question of the sufficiency of the evidence is a question of state law and does not rise to constitutional dimensions." *United States ex rel. Griffin v. Martin,* 409 F.2d 1300, 1302 (2d Cir.1969) (citations omitted). Furthermore, "[a]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on

[habeas] appeal." *Garett v. Perlman,* 438 F.Supp.2d 467, 470 (S.D.N.Y.2006) (*quoting Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996)). Thus, Humphrey's claim as to the weight of the evidence is not reviewable in habeas proceedings.

Furthermore, "[i]t is only when the record is devoid of any evidence to support the findings or the conviction that it is subject to constitutional attack for alleged violation of a defendant's right to due process of law." *United States ex rel. Thomas v. Deegan,* 282 F.Supp. 344, 347 (S.D.N.Y.1968) (citations omitted). Based on the victim's testimony alone, it is evident that the record was replete with evidence to support the charges. Humphrey's claim is therefore without merit.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the petition for a writ of habeas corpus be **DENIED.**

Furthermore, the Court finds that Johnson has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) (a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."); *see Slack v. McDaniel,* 592 U.S. 473, 474 (2000). Therefore, the Court recommends that no certificate of appealability should issue with respect to any of petitioner's claims.

**\*21** Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 7417094

---

2011 WL 4055407
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Harold John HUMPHREY, Jr., Petitioner,

v.

Brian FISHER, Defendants.

No. 07–CV–1200.
|
Sept. 12, 2011.

**Attorneys and Law Firms**

Harold John Humphrey, Jr., Hudson, NY, pro se.

Leilani J. Rodriguez, Office of Attorney General-Poughkeepsie Office, Poughkeepsie, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

 **\*1** This *pro se* petition for a *writ of habeas corpus* pursuant to 28 U.S.C. § 2254 was referred to the Hon. David R. Homer, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.4. Magistrate Judge Homer's Report–Recommendation and Order recommends that the petition be denied and dismissed, and that no certificate of appealability be issued. *See* Rep. Rec. [dkt. # 23]. Petitioner has filed objections and supplemental objections to the Report–Recommendation and Order. *See* Obj. [dkt. # 24]; Suppl. Obj. [dkt. # 26].

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C); *see also United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). "[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings

in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." *Machicote v. Ercole,* 2011 WL 3809920, at * 2 (S.D.N.Y., Aug.25, 2011) (citations and interior quotation marks omitted); *DiPilato v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (same). By the same reasoning, a party may not advance new theories that were not presented to the magistrate judge in an attempt to obtain this second bite at the apple. *See Calderon v. Wheeler,* 2009 WL 2252241, at *1, n. 1 (N.D.N.Y. July 28, 2009); [1] *Green v. City of New York,* 2010 WL 148128, at * 4 (E.D.N.Y. Jan.14, 2010) ("[N]ew claims ... presented in the form of, or along with, 'objections ...' should be d ism issed.") (citations omitted).

[1]   As Judge Suddaby noted in *Calderon:*

   On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.,* 2009 WL 465645 at *2 (S.D.N.Y. Feb.25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

2011 WL 4055407

## III. DISCUSSION

With this standard in mind, and after having reviewed Petitioner's objections and supplemental objections, the Court determines to adopt the recommendations for the reasons stated in Magistrate Judge Homer's thorough report. Petitioner has not pointed any error in Magistrate Judge Homer's analysis, and the Court finds that those portions of the Report–Recommendation and Order that Petitioner has chosen to reargue are not clearly erroneous. To the extent Petitioner's objections raise new arguments or theories not presented in the Petition or in the traverse in opposition to the respondent's motion, the arguments or theories are rejected because Petitioner has not provided a valid justification for failing to raise these issues previously.

## IV. CONCLUSION

**\*2** Therefore, the Court **ADOPTS** the recommendations made by Magistrate Judge Homer. For the reasons set forth above and as set forth in Magistrate Judge Homer's Report–Recommendation and Order, the petition is **DENIED and DISMISSED.** The Court determines that the petition presents no question of substance for appellate review and that Petitioner has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see Fed. R.App. P. 22(b). Accordingly, a **certificate of appealability will not issue.** Petitioner's letter motion for an evidentiary hearing [dkt. # 27] is **DENIED as moot.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4055407

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1936227
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.

Ramon E. MERCEDES, Petitioner,
v.
Leo P. McGUIRE, Bergen County Sheriff, Respondent.

No. 08–CV–299 (JFB).
|
May 12, 2010.

**Attorneys and Law Firms**

Mitchell Dranow, Mineola, NY, for petitioner.

Kathleen M. Rice, District Attorney, by Tammy J. Smiley and
Andrea DiGregorio, Mineola, NY, for respondent.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

**\*1** Ramon E. Mercedes (hereinafter "petitioner" or
"Mercedes") petitions this Court for a writ of habeas corpus,
pursuant to 28 U.S .C. § 2254, challenging his conviction in
state court. Petitioner was convicted in a judgment rendered
on July 21, 2005, following a jury trial in County Court,
Nassau County. Petitioner was convicted of sexual abuse in
the first degree [N.Y. Penal Law § 130.65(1) ] and assault
in the third degree [N.Y. Penal Law § 120.00(1) ] and was
sentenced to ten years of probation for the sexual abuse
conviction and to "time served" and three years of probation
for the assault conviction, to be served concurrently.

Petitioner challenges his conviction on the following ground:
the state violated petitioner's rights under the Due Process
Clause of the Fourteenth Amendment when the trial court
admitted evidence regarding threatening communications and
gestures that the defendant made towards the victim in the
weeks and months before the assault.

For the reasons stated below, petitioner's request for a writ of
habeas corpus is denied in its entirety on the merits.

## I. BACKGROUND

The Court has adduced the facts below from the instant
petition and the state court record in this case.

### A. Facts

In approximately February 2004, Mercedes and his victim
(hereinafter "KJ") [1] began dating. (Tr. at 131–32.) [2]
Mercedes was then 41 years old, and KJ was 22 years old. (*Id.*
at 135.) Although they lived in the same apartment building,
they would go to motel rooms to "sit and talk" because
Mercedes lived with his mother and KJ lived with her family
and friends. (*Id.* at 134–35, 192–93, 332, 375–76.) While their
relationship was intimate in that they kissed and hugged, they
never engaged in sexual intercourse, as per KJ's request. (*Id.*
at 134, 136.)

[1] To protect the victim's privacy, the Court refers to
her only as "KJ."

[2] "Tr." refers to the transcript of the trial proceedings
in the underlying state criminal action.

In June 2004, KJ told Mercedes that she wanted to end their
relationship because he was married and had children, he was
too old for her, her mother disapproved of their relationship,
and she neither wanted to be with or have sex with him. (*Id.*
at 135–36.) In response, Mercedes became angry. (*Id.* at 136–
37.) Subsequently, Mercedes (1) left messages on KJ's phone
in which he threatened to kill her if she did not resume their
relationship; (2) made a throat-slashing gesture by looking at
KJ and slicing his hand across his throat; and (3) grabbed KJ's
face and told her that she would "be his." (*Id.* at 137–42.)
These acts occurred at different times between June and July
of 2004. (*Id.*)

In response to petitioner's threatening phone calls, KJ called
back to tell him that his behavior frightened her and to stop
leaving such messages. (*Id.* at 138–39, 142.) Occasionally,
KJ had to call Mercedes many times before she could reach
him. (*Id.* at 138, 246–47.) Around July 10, 2004, KJ reported
petitioner's threatening phone calls to the police. (*Id.* at 139,
201, 247.)

On July 31, 2004, KJ spoke to Mercedes on the telephone. (*Id.* at 144–45.) He was behaving "good," so she agreed to meet with him the next day in order to discuss their relationship problems. (*Id.* at 144–45, 216.) When they met on August 1, 2004, Mercedes suggested that they go to a motel room, to which KJ agreed. (*Id.* at 145, 219.)

**\*2** Inside the motel room, KJ told Mercedes that she wanted to end their relationship. (*Id.* at 146, 226, 253.) In response, Mercedes asked if he could kiss her. (*Id.* at 146, 226, 253.) When KJ said "no," Mercedes "went after her." (*Id.* at 146.) He threw her on the bed, shook her, choked her, and demanded sex from her. (*Id.* at 146–47.)

When KJ refused to have sex with him, Mercedes removed his clothes and ripped off her shorts with such force that he tore off the buttons fastening the shorts together, along with her underpants. (*See id.* at 149.) He also removed her sanitary napkin, even though she was menstruating. (*Id.* at 147.) Mercedes grasped KJ's neck with one hand, while fondling her private parts with his other hand. (*Id.* at 149, 175.) He put his penis "on top" of her vagina, but there was no penetration. (*Id.* at 149–50.) KJ repeatedly told Mercedes to stop, but he ignored her pleas. (*Id.* at 150.)

Only when KJ could not breathe and became nauseated did Mercedes stop his sexual attack, after which KJ vomited. (*Id.* at 150–51.) KJ asked Mercedes to take her to the hospital. (*Id.* at 151.) He agreed that he would, but only if she did not tell hospital personnel about what had happened at the motel. (*Id.* at 151.) Petitioner also told KJ that they needed to go to a store to buy KJ new clothes before they went to the hospital. (*Id.* at 152.)

When KJ and Mercedes arrived at a nearby clothing store, Mercedes got out of his car and walked towards the store. (*Id.* at 153–54.) During his absence, KJ called 911 on her cellular phone, told the operator that someone had tried to rape her, and pleaded for help. (*Id.*) Her call was cut short, however, because the clothing store was closed, and Mercedes quickly returned to the car. (*Id.* at 154, 236.) Mercedes then drove to another nearby clothing store and walked out of his car. (*Id.* at 154.) During his absence, KJ ran out of the car and fled through the parking lot and across a street, setting off the car alarm in the process. (*Id.* at 155–56.) She called 911 again, told the operator that someone had tried to rape her, and begged for help and medical assistance. (*Id.* at 156.) She informed the operator of her whereabouts while remaining in hiding. (*Id.* at 157–58.)

When two police officers arrived at the scene, they saw that KJ was crying, was "quite hysterical," and appeared fearful and disheveled. (*Id.* at 259, 285.) They observed that she was holding up her unzipped, button-less shorts (which were bloody). (*Id.* at 259–64, 285–87.) Also, her arms and shoulders appeared red. (*Id.* at 287.) KJ was taken to a hospital by ambulance. (*Id.* at 261–62.) The hospital report indicated that KJ had contusions on her neck and chest, her chest was "tender," her neck and part of her chest were swollen, and she was suffering from neck pain. (*Id.* at 163–64, 400, 470.) KJ was in pain for approximately two weeks because she could not lift her arm above her, and she was unable to work. (*Id.* at 160–61, 242–43.)

## B. Procedural History

**\*3** Petitioner was charged with sexual abuse in the first degree in violation of N.Y. Penal Law § 130.65(1), assault in the third degree in violation of N.Y. Penal Law § 120.00(1), and attempted rape in the first degree in violation of N.Y. Penal Law §§ 110.00/130.35(1).

After a trial, a jury convicted petitioner on the sexual abuse and assault charges, but acquitted him on the attempted rape charge. During the course of the trial, the court allowed the prosecution to introduce evidence that, in the weeks and months before the assault, petitioner (1) threatened to kill KJ if she did not resume their relationship; (2) had made a slashing movement with his hand across his throat while KJ watched; and (3) had grabbed KJ's face and told her that she would "be his" (hereinafter "the prior bad acts"). On July 21, 2005, petitioner was sentenced to a determinate term of ten years of probation for the sexual abuse conviction and to "time served" and three years of probation for the assault conviction.

Petitioner appealed his conviction to the Appellate Division, Second Department, claiming that: (1) the verdict was against the weight of the evidence; (2) the admission of evidence of the prior bad acts violated his due process rights and his right to a fair trial; (3) the evidence was insufficient to sustain his assault conviction; (4) tapes of the victim's calls to 911 should not have been admitted into evidence; and (5) the trial court improperly directed the jury to speculate on the meaning of "contusion." The Appellate Division affirmed the judgment of conviction in a decision and order dated June 26, 2007. The court held that: (1) the verdict of guilt on the charges of sexual

abuse in the first degree and assault in the third degree was not against the weight of the evidence; (2) petitioner's contention that the prior bad acts were improperly admitted was without merit; (3) the evidence was legally sufficient to establish the petitioner's guilt of assault in the third degree; (4) the trial court correctly admitted the 911 calls into evidence under the excited utterance exception to the hearsay rule; and (5) petitioner's contention that the trial court improperly directed the jury to speculate on the meaning of "contusion" was unpreserved for appellate review. *See People v. Mercedes,* 837 N.Y.S.2d 580 (App.Div.2007).

Mercedes then filed an application with the New York Court of Appeals for leave to appeal the Appellate Division's order on the claim regarding the admission of the prior bad acts. On September 26, 2007, the New York Court of Appeals denied petitioner's application for leave to appeal the decision. *People v. Mercedes,* 875 N.E.2d 898 (N.Y.2007).

On January 22, 2008, Mercedes petitioned this Court for a writ of habeas corpus. Petitioner asserts that the introduction of the prior bad acts evidence violated his rights to due process and to a fair trial. As set forth below, the Court finds petitioner's claim to be without merit. In particular, the Court concludes that the evidence was properly admitted under state law and, even if its admission was erroneous under state law, its admission was not egregious enough to reach the level of constitutional error necessary for habeas relief.

## II. STANDARD OF REVIEW

**\*4** To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Section 2254 requires that federal courts apply a deferential standard of review to claims that were adjudicated "on the merits" in state court. Specifically, under § 2254(d):

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554.

"Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412 (2000)). A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

However, "if the federal claim was not adjudicated on the merits [in state court], 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.*' " *Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir.2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir.2006)).

In this case, the deferential AEDPA standard of review applies. In its opinion affirming the trial court's judgment, the Second Department stated that "[t]he defendant's contention raised in Point Two of his brief"—i.e., his claim that the introduction of prior bad acts violated his due process and fair trial rights—"is without merit." *People v. Mercedes,* 837 N.Y.S.2d 580, 581 (App.Div.2007). The state court therefore decided this claim on the merits, and the deferential AEDPA standard of review applies. *Cf. Brown v. Greiner,* 409 F.3d 523, 532–33 (2d Cir.2005) ("In [petitioner's] case, the Appellate Division ruled that his ... claim was 'without merit,' which was clearly a decision on the merits.... Accordingly, our review ... falls under the deferential standard of § 2254(d).").

## III. DISCUSSION

Mercedes v. McGuire, Not Reported in F.Supp.2d (2010)

2010 WL 1936227

A. Procedural Issues

**\*5** As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the state." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida,* 549 U.S. 327, 333 (2007), petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Daye v. Attorney Gen. of N.Y.,* 696 F.2d 186, 191 (2d Cir.1982) (en banc). Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry,* 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor,* 404 U.S. 270, 275 (1971) (quotation marks omitted) (alteration in original)). Here, as respondent acknowledges,[3] petitioner raised his claim regarding the admission of the prior bad acts in his appeal to the Second Department and in his petition for review by the New York Court of Appeals. Moreover, he presented the claim in constitutional terms, asserting that the admission of the evidence violated his "rights to a fair trial and due process." (*See* Resp. Ex. A). Accordingly, petitioner has properly exhausted his claim.[4]

[3]    (Resp. Mem. of Law at 7.)

[4]    Another prerequisite to relief under § 2254 is that the petitioner be "in custody pursuant to the judgment of a state court ." Here, although petitioner is in custody in New Jersey pursuant to unrelated proceedings (*see* Resp. Aff. ¶ 13), he did not receive a prison sentence as a result of the Nassau County judgment at issue in the instant habeas petition. Instead, the court sentenced him to probation and time served. Nevertheless, petitioner's sentence of probation suffices to meet § 2254's "in custody" requirement. *See, e.g., Corines v. Warden,* No. 05–CV–2056 (NGG), 2008 WL 4862732, at \*3 (E.D.N.Y. June 10, 2008); *see also U.S. ex rel. B. v. Shelly,* 430 F.2d 215, 217 n. 3 (2d Cir.1970). Given that petitioner is on probation, the proper respondent is "the particular probation or parole officer responsible for supervising the applicant, and the official in charge of the parole or probation agency, or the

state correctional agency, as appropriate." Rules Governing § 2254 Cases, Rule 2, 28 U.S.C.A. foll. § 2254 advisory committee's note (1976 adopt.); *see also Ortiz–Sandoval v. Gomez,* 81 F.3d 891, 894 (9th Cir.1996). The current-named respondent, Leo P. McGuire, is the Sheriff of Bergen County, New Jersey and has no apparent connection to the conviction at issue here. *See* Bergen County Sheriff's Office—Sheriff Leo P. McGuire, http:// www.bcsd.us/sheriff.shtml (last visited Apr. 27, 2010). Instead, the Court will construe the petition as asserting a claim against the Director of the Nassau County Department of Probation. *See generally* Nassau County Probation Department, http:/ / www.nassaucountyny.gov/ agencies/Probation/index.html (last visited May 10, 2010) (explaining that department has responsibility for supervising criminal defendants sentenced to probation).

B. Merits

Petitioner contends that the trial court erred in admitting the prior bad acts evidence. As set forth below, this claim is without merit and does not warrant habeas relief.

A federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 68 (1991). It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.1983); *see generally Estelle,* 502 U.S. 62, 67 (1991) ("[H]abeas corpus relief does not lie for errors of state law." (citations omitted)). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must demonstrate that the error deprived him of his right to "a fundamentally fair trial." *Taylor,* 708 F.2d at 891; *see also Zarvela v. Artuz,* 364 F.3d 415, 418 (2d Cir.2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.' " (quoting *Rosario v. Kuhlman,* 839 F.2d 918, 925 (2d Cir.1988) (internal quotation marks omitted))).

In determining whether a state court's alleged evidentiary error deprived petitioner of a fair trial, federal habeas courts engage in a two-part analysis, examining (1) whether the

2010 WL 1936227

trial court's evidentiary ruling was erroneous under state law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *See Wade v. Mantello,* 333 F.3d 51, 59–60 & n. 7 (2d Cir.2003); *Ramos v. Phillips,* No. 104–CV–1472–ENV, 2006 WL 3681150, at *6 (E.D.N.Y. Dec 12, 2006). The Court will now apply this test to the prior bad acts evidence introduced at petitioner's trial.

### 1. The Evidence of Uncharged Crimes and Prior Bad Acts Was Admissible Under New York State Law

**\*6** Under New York law, "[a] trial court may admit into evidence uncharged crimes when the evidence is relevant to a pertinent issue in the case other than a defendant's criminal propensity to commit the crime charged." *People v. Till,* 661 N.E.2d 153, 154 (N.Y.1995). However, "[e]ven then, such evidence is admissible only upon a trial court finding that its probative value for the jury outweighs the risk of undue prejudice to the defendant." *Id.* (citations omitted). In *People v. Molineux,* 61 N.E. 286 (N.Y.1901), the New York Court of Appeals stated that "[g]enerally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial. 61 N.E. at 294. However, this list is "illustrative and not exhaustive," *People v. Rojas,* 760 N.E.2d 1265, 1268 (N.Y.2001), and evidence of uncharged crimes that is necessary to provide "background material" or to "complete the narrative of the episode" may also be admissible. *Till,* 661 N.E.2d at 154 (internal citations omitted).

In the instant case, the evidence was properly admitted under New York law to provide background to the jury to understand the nature of the relationship between KJ and Mercedes. Specifically, the evidence of petitioner's threatening behavior helped explain why KJ met with plaintiff on August 1, 2004 and went to a motel room with him. *Cf. People v. Dorm,* 903 N.E.2d 263, 265 (N.Y.2009) (finding no error in trial court's admission of evidence of previous arguments and conflicts between victim and defendant because evidence, *inter alia,* "provided necessary background information on the nature of the relationship and placed the charged conduct in context"); *People v. Westerling,* 852 N.Y.S.2d 429, 431 (App.Div.2008) ("Evidence that defendant grabbed the victim during an argument the night before the incident at issue,

leaving a bruise, was relevant to the background of this incident and was probative of her state of mind as well as his intent."); *People v.. James,* 797 N.Y.S.2d 129, 130 (App.Div.2005) (finding, in homicide case, that evidence of defendant's prior assaults on victim was properly admitted as, *inter alia,* "relevant background material to enable the jury to understand the nature of the defendant's relationship with the decedent"). Moreover, the evidence of the prior bad acts was relevant to refute the defense's theory [5] that KJ went to a motel room with petitioner so that she could engage in sexual relations with him. *Cf. People v. Galloway,* 876 N.Y.S.2d 406, 407 (App.Div.2009) (finding, in sexual assault case, evidence of defendant's prior assault on victim admissible because evidence "placed the victim's testimony in a believable context and tended to refute defendant's defense"); *People v. Steinberg,* 573 N.Y.S.2d 965, 979 (App.Div.1991) (finding evidence of defendant's prior assaults on witness admissible "to explain to the jury the background of [witness's] testimony, to make it comprehensible and to enhance its credibility" and noting that "[t]here is ample case law to support the proposition that uncharged crime evidence may be used to support testimony that otherwise might be unbelievable or suspect"). Furthermore, any potential unfair prejudice from the admission of the prior bad acts evidence did not outweigh its probative value. In its final charge to the jury the state trial court explained that the alleged prior bad acts were

[5]     (*See, e.g.,* Tr. at 117.)

**\*7** no proof whatsoever that [petitioner] possessed a propensity or disposition to commit the crimes charged in this indictment or another crime.... [I]t is not offered for such a purpose, nor may you consider that for that purpose. Instead, [the evidence is offered] solely for the purpose of describing the nature of the relationship between the defendant and the complaining witness and the complaining witness's state of mind. I charge you that such evidence may be considered by you only for such limited purpose and for none other.

(Tr. 511.) A limiting instruction like this one lessens the potential prejudice of uncharged act evidence. *See, e.g., People v. Asai,* 888 N.Y.S.2d 617, 621 (App.Div.2009); *People v. Doyle,* 852 N.Y.S.2d 433, 437 (App.Div.2008) ("Additionally, [the] County Court gave proper and appropriate limiting instructions to the jury concerning the permissible uses of this evidence thus limiting its prejudicial effect."); *James,* 797 N.Y.S 2d at 130 (finding the prejudicial effect of the admission of prior bad acts did

not outweigh their probative value, "especially in light of the fact that the trial court properly charged the jury on how to use the prior act evidence in their deliberations"); *see also Wells v. Brown,* No. 06–CV–857 (CBA), 2008 WL 2097612, at \*7 (E.D.N.Y. May 15, 2008) (explaining, in context of a habeas petition involving a *Molineux* issue, that the state trial court's limiting instruction lessened the evidence's prejudicial effect). Finally, the trial court did not err under state law by allowing the prosecution to admit the prior bad acts evidence even though the prosecution did not move for the evidence's admission until shortly before jury selection began. *See People v. Ventimiglia,* 420 N.E .2d 59, 63 (1981) (indicating that it is permissible for the prosecutor to move to introduce *Molineux* evidence, *inter alia,* "just before the trial begins or just before the witness testifies"). Thus, the state court was well within its discretion under New York law to admit evidence of the tumultuous relationship between the victim and petitioner.

### 2. Admission of the Evidence Did Not Deprive Petitioner of His Fair Trial or Due Process Rights

Moreover, even assuming the state trial court erred in admitting the evidence, any error did not deprive petitioner of his right to a fair trial. "Due process requires the state courts in conducting criminal trials to proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.' " *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998) (quoting *Lisenba v. California,* 314 U.S. 219, 236 (1941)). "The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.' " *Id.* (quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990)). Where, as here, the evidence does not relate to an essential element of the charged crimes, its admission will violate due process only when it is " 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.' " *Id.* (quoting *Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir.1992)); *see also Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985) (explaining that the evidence must be "crucial, critical, highly significant" (internal quotation marks omitted)). Moreover, even if a constitutional error occurred, it "will merit habeas corpus relief only if it had a 'substantial and injurious effect or influence in determining the jury's verdict.' " *Sierra v. Burge,* No. 06 Civ. 14432(DC), 2007 WL 4218926, at \*6 (S.D.N.Y. Nov. 30, 2007) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993)). Further, in assessing materiality, the Court must view the evidence "objectively in

light of the entire record before the jury ." *Collins,* 755 F.2d at 19.

**\*8** This standard is not met here. The prior bad acts evidence was not "sufficiently material to provide the basis for [petitioner's] conviction" nor did the prior bad acts evidence "remove a reasonable doubt that would have existed ... without it." *Dunnigan,* 137 F.3d at 125 (quotations and citations omitted). Instead, the jury had overwhelming evidence—beyond the prior bad acts evidence—to conclude that petitioner assaulted and sexually abused the victim on August 1, 2004. KJ's testimony about petitioner's sexual attack in the motel room was supported by physical evidence, medical evidence, and the testimony of two police officers who observed KJ shortly after the incident. The jury also observed KJ's testimony first hand and found her testimony to be credible. *Cf. Tingling v. Donelli,* No. 07 Civ. 1833(RMB)(DF), 2008 WL 4724567, at \*9 (S.D.N.Y. Oct. 24, 2008) ("Moreover, in light of the other strong evidence of Petitioner's guilt ... Petitioner has not shown that the admitted evidence removed a reasonable doubt that otherwise would have existed."); *Clanton v. Rivera,* No. 06 Civ. 4756(DAB) (AJP), 2008 WL 2839712, at \*21 (S.D .N.Y. July 22, 2008) (stating that, even if state court erred in admitting evidence of uncharged robbery, "any such error did not deprive [petitioner] of a fundamentally fair trial, given the strong evidence against him" (collecting cases)). Additionally, the trial court's limiting instruction is further evidence that the state court did not deny petitioner a fundamentally fair trial. *See, e.g., Clanton,* 2008 WL 2839712, at \*22 (stating that "[l]imiting instructions have been found to militate against a finding of constitutional error" and collecting cases); *Lockhart v. Brown,* No. 9:05–CV–1166 (GLS), 2008 WL 2977609, at \*9 (N.D.N.Y. June 10, 2008) (denying habeas claim regarding introduction of uncharged acts because, *inter alia,* trial court limited testimony prosecutor could elicit regarding the uncharged acts and gave limiting instructions).

In any event, under the deferential AEDPA standard of review, petitioner must show that the state courts' resolution of this issue was contrary to or an unreasonable application of clearly established federal law. Also, as noted above, "clearly established federal law" consists of the holdings—not merely the dicta—of the Supreme Court of the United States. And the Supreme Court has never held that a criminal defendant's due process rights are violated by the introduction of prior bad acts or uncharged crimes. *Parker v. Woughter,* No. 09 Civ. 3843(GEL), 2009 WL 1616000, at \*2 (S.D.N.Y. June 9, 2009) ("Here, petitioner cites no Supreme Court case,

Case 9:21-cv-00736-DNH-TWD    Document 35    Filed 05/29/24    Page 267 of 267
**Mercedes v. McGuire, Not Reported in F.Supp.2d (2010)**

2010 WL 1936227

and the Court is aware of none, holding that the admission of evidence of uncharged crimes violates the Due Process Clause of the Fourteenth Amendment."); *Jones v. Conway,* 442 F.Supp.2d 113, 131 (S.D.N.Y.2006) ("Given that the Supreme Court has not held that the use of uncharged crimes would violate the Due Process Clause, the Appellate Division's rejection of this claim is hardly either contrary to or an unreasonable application of clearly established Supreme Court law."); *Tingling,* 2008 WL 4724567, at *9 ("Not only would Petitioner's claim fail if analyzed under the Second Circuit precedent cited above, but, under AEDPA, it would also fail ... as the Supreme Court has not directly held that due process is violated by the introduction at trial of evidence of a defendant's uncharged crimes.").[6]

[6]    Similarly, to the extent petitioner challenges the introduction of the prior bad acts evidence because he did not learn that it would be introduced until shortly before jury selection, that argument is without merit. Petitioner has not identified any Supreme Court precedent holding that due process requires a criminal defendant to be made aware of the evidence against him by a certain date. In fact, if anything, Supreme Court case law points in the opposite direction. *See Gray v. Netherland,* 518 U.S. 152, 167 (1996) ("A defendant's right to notice of the charges against which he must defend is well established. But a defendant's claim that he has a right to notice of the *evidence* that the state plans to use to prove the charges stands on quite a different footing. We have said that 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be

afforded.' " (quoting *Wardius v. Oregon,* 412 U.S. 470, 474 (1973) (emphasis in original) (additional citations omitted))); *Weatherford v. Bursey,* 429 U.S. 545, 560 (1977) (stating, in action under 42 U.S.C. § 1983, that plaintiff's fair trial rights were not violated during his criminal trial when prosecutor decided, on the day trial began, to call a witness who plaintiff previously believed was not going to testify against him).

**\*9** In sum, having carefully analyzed petitioner's claim, the Court concludes that the state court decisions on the issue raised by petitioner were not contrary to, nor an unreasonable application of, clearly established federal law, and petitioner's claim lacks merit and does not provide any ground for habeas relief. Accordingly, the habeas petition must be denied.

### IV. CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Accordingly, the instant habeas petition is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1936227

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.